**Vol. 2 of 5 (Appx7136-22746)**
**No. 24-1098**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

BRITA LP,

*Appellant*,

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

ZERO TECHNOLOGIES, LLC, CULLIGAN INTERNATIONAL CO., VESTERGAARD FRANDSEN INC., d/b/a LIFESTRAW, KAZ USA, INC., HELEN OF TROY LIMITED,

*Intervenors*.

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1294

## NON-CONFIDENTIAL JOINT APPENDIX

PANYIN A. HUGHES
DOMINIC L. BIANCHI
HOUDA MORAD
OFFICE OF THE GENERAL COUNSEL
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
*Counsel for ITC*

JEFFREY R. GARGANO
DEVON C. BEANE
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602
Tel: (312) 372-1121
*Counsel for Vestergaard Frandsen Inc.,
d/b/a LifeStraw*

DEANNE E. MAYNARD
SETH W. LLOYD
NOAH PRILUCK*
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

PAUL A. AINSWORTH
STERNE KESSLER GOLDSTEIN
& FOX PLLC
1101 K Street NW, 10th Floor
Washington, DC 20005

*Counsel for Brita LP*

*Additional Counsel Listed on Inside Cover*

AUGUST 2, 2024

ADAM D. SWAIN
THOMAS W. DAVISON
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004

KIRK T. BRADLEY
KARLEE WROBLEWSKI
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203

KATHERINE RUBSCHLAGER
ALSTON & BIRD LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105

*Counsel for Helen of Troy Limited and
Kaz USA, Inc.*

JOHN LETCHINGER
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 3700
Chicago, IL 60606

JARED BRANDYBERRY
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202

ALAINA LAKAWICZ
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103

*Counsel for Zero Technologies, LLC
and Culligan International Co.*

*Admitted only in Iowa and Nebraska.
Practice supervised by principals of the
firm admitted to the DC bar.

# TABLE OF CONTENTS

| **Date** | **Document** | **Appx** |
|---|---|---|
| | **Volume I** | |
| 09/19/2023 | Commission Opinion | Appx1 |
| 02/28/2023 | Final Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond | Appx62 |
| | U.S. Patent No. 8,167,141 | Appx378 |
| 12/12/2023 | Certified List | Appx427 |
| 12/23/2021 | Brita's Complaint | Appx476 |
| 01/31/2022 | Federal Register Notice of Institution of Investigation | Appx648 |
| 07/18/2022 | Brita's Pre-Hearing Brief | Appx3703 |
| 07/20/2022 | Order No. 30 – Markman Order | Appx4514 |
| 08/02/2022 | Order No. 33 – Denying-In-Part and Granting-In-Part Respondents' Motion to Strike Undisclosed Conception and Reduction to Practice Theories in Dr. Benny Freeman's Expert Report | Appx5382 |
| 03/13/2023 | Excerpts of Respondents' Petition for Review of the Final Initial Determination | Appx6718 |
| 06/28/2023 | Notice to Review in Part Final ID | Appx7033 |
| 07/14/2023 | Complainant Brita LP's Response to Notice to Review | Appx7046 |
| | **Volume II** | |
| 07/14/2023 | Respondents' Response to Notice to Review | Appx7136 |
| | Evidentiary Hearing Transcript – Aug. 17, 2022 (Day 1) | Appx22000 |
| | Evidentiary Hearing Transcript – Aug. 18, 2022 (Day 2) | Appx22273 |
| | Evidentiary Hearing Transcript – Aug. 19, 2022 (Day 3) | Appx22533 |

| Date | Document | Appx |
|------|----------|------|
| | **Volume III** | |
| | Evidentiary Hearing Transcript – Aug. 19, 2022 (Day 3) cont. | Appx22747 |
| | Evidentiary Hearing Transcript – Aug. 22, 2022 (Day 4) | Appx22822 |
| | Evidentiary Hearing Transcript – Aug. 23, 2022 (Day 5) | Appx23123 |
| | **Volume IV** | |
| | Evidentiary Hearing Transcript – Oct. 13, 2022 (Day 6) | Appx23382 |
| | CDX-001C:  Brita Opening Demonstratives | Appx30000 |
| | CX-0010:  Drinking water treatment units (NSF/ANSI 53 International Standard) | Appx30560 |
| | CX-0836:  Fabrication of blend biodegradable nanofibrous nonwoven mats | Appx30684 |
| | CX-0842:  Handbook of Filter Media | Appx30693 |
| | CX-0843:  Handbook of Non-Woven Filter Media | Appx30754 |
| | CXM-0005:  Why Brands Should Verify Their Marketing Claims | Appx31247 |
| | JX-0023:  '141 Patent Prosecution History Excerpts | Appx31253 |
| | JXM-0003:  Drinking water treatment units (NSF/ANSI 53 International Standard) | Appx32039 |
| | RX-0631:  U.S. Patent Application Pub. No. 2006/0000763 to Rinker | Appx32163 |
| | RX-2601C:  Reid Deposition Excerpts | Appx32186 |
| | RX-2602C:  Saaski Deposition Excerpts | Appx32382 |
| | **Volume V** | |
| | RX-2607C:  Knipmeyer Deposition Excerpts | Appx32657 |
| | RXM-0020C:  Dr. Harrison Claim Construction Declaration | Appx34993 |

| **Date** | **Document** | **Appx** |
|---|---|---|
| | CX-0042:  U.S. Application No. 11/927,372 Prosecution History Excerpts | Appx40213 |
| | CX-0917:  U.S. Application No. 11/927,372 Prosecution History Excerpts | Appx40288 |
| | (Unadmitted) U.S. Application No. 11/858,765 Prosecution History Excerpts | Appx41067 |
| | RX-0425C:  Brita Monthly Update | Appx41133 |
| | RX-0437C:  Brita Project Update | Appx41154 |
| | CX-0108C:  Knipmeyer Lab Notebook | Appx41160 |

NOTE:  Confidential information is indicated by green highlighting.  The green shading in the table on Appx259 is not highlighting and does not indicate confidentiality.  Markings of any other color are part of the document as filed at the Commission and do not indicate confidentiality.

The non-confidential version of this appendix redacts material filed under seal pursuant to the Commission's protective order. As required by Federal Circuit Rule 25.1(e)(1)(B), the table below notes the specific pages with redacted material in the non-confidential appendix and the general nature of that material.

**Description of Redacted Material in Non-Confidential Appendix**

| Document | Pages | Description |
|---|---|---|
| Final Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond | Appx92, Appx107, Appx114-16, Appx121, Appx144, Appx148, Appx175-76, Appx178, Appx182, Appx185-86, Appx202, Appx204, Appx232-35, Appx351-62, Appx366-68, Appx370 | Confidential product, technical, and financial information |
| Brita's Pre-Hearing Brief | Appx3703-867 | Confidential product, technical, and financial information |

| | | |
|---|---|---|
| Respondents' Petition for Review of the Final Initial Determination | Appx6820 | Confidential technical information |
| Complainant Brita LP's Response to Notice to Review | Appx7087 | Confidential product and technical information |
| Respondents' Response to Notice to Review | Appx7162, Appx7164-65, Appx7172-73 | Confidential business and product information |
| Evidentiary Hearing Transcripts – August 17-19, 22-23 and Oct. 13, 2022 (Days 1-6) | Appx22040-51, Appx22238-61, Appx22289-90, Appx22331-86, Appx22392-413, Appx22431-56, Appx22469-516, Appx22522-25, Appx22560-61, Appx22622-60, Appx22672-746, Appx22797-807, Appx22891-97, Appx22911-15, Appx22921-23, Appx22947-68, Appx23031-33, Appx23039-54, Appx23068-69, Appx23086-114, Appx23144-54, Appx23193-99, Appx23227-31, Appx23236-37, Appx23244-315, Appx23407-09, Appx23561-68 | Confidential product, product, technical, and financial information |
| RX-2607C: Knipmeyer Deposition Excerpts | Appx32657-3021 | Confidential product development and technical information |

| | | |
|---|---|---|
| RX-0425C: Brita Monthly Update | Appx41133-53 | Competitively sensitive business and technical information |
| RX-0437C: Brita Project Update | Appx41154-59 | Confidential product development and technical information |
| CX-0108C: Knipmeyer Lab Notebook | Appx41160-69, Appx41268 | Confidential product development and technical information |

**CONFIDENTIAL MATERIAL OMITTED**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN HIGH-PERFORMANCE GRAVITY-FED WATER FILTERS AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1294** |

**RESPONDENTS' RESPONSE TO THE COMMISSION NOTICE OF REVIEW**

PUBLIC

**CONFIDENTIAL MATERIAL OMITTED**

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................... 1

II.   ISSUES UNDER REVIEW ........................................................................................ 2

    A.   Discuss whether the construction of the claim term "filter usage lifetime claimed by a manufacturer or seller of the filter" to mean "[t]he total number of gallons of water that a manufacturer or seller has validated can be filtered before the filter is replaced," (Order No. 30 at 14), impermissibly deviates from the plain language of the claims. Further, discuss whether the foregoing construction requires the reading of one or more limitations from the specification into the claim in order to find the limitation not invalid for indefiniteness. *See, e.g.*, '141 patent at col. 26:14–15. .............................................................................................................. 2

        1.   The *Markman* Order's Construction of the Lifetime Term is Legally Incorrect .......................................................................................... 2

        2.   Under the Plain Construction the Lifetime (L) Term is Indefinite ...................... 5

    B.   Discuss the effect of the recent Supreme Court decision, *Amgen Inc. v. Sanofi*, No. 21-757 (May 18, 2023), on the ID's enablement and written description findings .................................................................................................. 7

        1.   The *Amgen* Decision ............................................................................................ 8

        2.   Brita's Asserted Claims are Even Broader, but Supported by Even Less Disclosure Than in *Amgen* ..................................................... 9

        3.   Brita Impermissibly Relies on "Trial and Error" to Fill the Massive Gulf Between Its Claims and Its Disclosure ......................................... 12

        4.   Neither the '141 Patent nor any Evidence in this Investigation Demonstrates a "General Quality" Encompassing the Entire Class of Claimed Filters ..................................................................................... 15

    C.   Discuss whether a person of ordinary skill in the art would understand how to use filter types other than carbon block (e.g., mixed media, hollow fibers, membranes, nonwovens, depth media, nanoparticles and nanofibers, and ligands (JX-0022 at 25:9-12, 26:30-37)) to achieve a FRAP factor below 350 as of the priority date of the '141 patent. ................................... 17

    D.   Discuss the predictability of the technology at issue and, in particular, how predictably these other filter types were expected to perform in terms of the FRAP factor as compared to the carbon block arrangement described in the specification as of the priority date of the '141 patent. .......................... 20

    E.   Discuss whether a person of ordinary skill in the art as of the priority date of the '141 patent could have readily manipulated the FRAP factor variables of volume V, average filtration unit time f, effluent $c_e$, and lifetime L for any of the other filter materials named in the specification to achieve FRAP factor below 350. For example, if the manufacturer were to reduce only the volume V of a given filter, or if the manufacturer or seller were to claim a longer lifetime L for a given filter, would that correspondingly reduce the FRAP factor without affecting (or at least unpredictably affecting) the other variables? *See* JX-0022 at 26:41-49, Figs. 21-23. ....................................................................................................... 25

Appx7137

CONFIDENTIAL MATERIAL OMITTED

F.      If it was possible to predictably determine the FRAP factor for non-carbon block filter types as of the priority date of the '141 patent, explain why it took Brita ten years and 7,326 hours of research and development to design a nonwoven filter that practices the '141 patent. See ID at 213 n. 77; Tr. (Freeman) at 1562:18-1563:6. Is Brita's research and development effort with respect to its non-woven filter DI products indicative of the experimental time and effort needed to develop filters other than the carbon block arrangement described in the specification? ........................ 31

III.    PUBLIC INTEREST ............................................................................. 32

A.      Please identify whether any reasonable substitutes for the Accused Products are available to consumers and whether they are capable of meeting any public health and welfare concerns raised by any remedial relief in this investigation. Is or would there be sufficient supply of any such reasonable substitutes for the Accused Products. ....................................................... 34

B.      Are the identified reasonable substitutes capable of filtering per- and polyfluoroalkyl substances (PFAS) chemicals in drinking water and how effective are they in doing so in relation to the accused products' capability of filtering PFAS in drinking water? ................................................................. 37

C.      Do the identified reasonable substitutes meet or exceed the following standards: NSF P231/US EPA (bacteria and parasites); NSF 53 (pesticides, herbicides, lead and other heavy metals); NSF 42 (chlorine); NSF 473 (PFAS); and NSF 401 (emerging chemical contaminants)? How does this compare to the accused products' performance with respect to these standards? Please discuss the impact, if any, on the public health and welfare of water filters not meeting these standards and please submit and discuss any studies, data, or other evidence that shows an impact on the public health and welfare. ....................................................... 40

        1.      The LifeStraw Accused Products .......................................... 44

        2.      The ZeroWater Accused Products ......................................... 46

        3.      The PUR Accused Products ................................................... 47

D.      Is there any production of like or directly competitive products in the United States and how would such production be impacted by any remedial relief? .......................................................................................... 48

E.      Response to ITC's Request regarding Third Party Public Interest Statements (Notice p.4) ................................................................................. 48

IV.     FORM OF REMEDY ............................................................................. 49

A.      No Remedial Order Should Issue ................................................................... 49

B.      A Carveout for Replacement Filters May Reduce Some Public Health Harm .................................................................................................................. 50

C.      No Bond is Appropriate for any Respondent ................................................. 51

        1.      No Bond is Appropriate for any Accused Replacement Filter ........................... 51

        2.      No Bond is Appropriate for any PUR or ZeroWater Product ............................. 51

PUBLIC

CONFIDENTIAL MATERIAL OMITTED

## I.    INTRODUCTION

The United States patent system is built on a quid-pro-quo.  In return for clearly disclosing to the public how to make new inventions, a patent owner receives a limited monopoly to exclude others from making the invention it disclosed.  But that monopoly extends only to what was invented and distinctly claimed, disclosed, and enabled.  In this case, Brita claims to have invented a specific carbon block filter that had improved performance over existing mixed media filters.  No Respondent uses that invention.  Instead, Respondents make advanced filters of the type that the Brita's inventor specifically disparaged and claimed would not work.  Brita now ignores what it told the patent office and seeks to extend the scope of its invention to cover any filter that meets certain performance criteria regardless of design, and notwithstanding the fact that Brita never discloses how to make any filter that is not carbon block.  This violates the quid-pro-quo on which our patent system is built.  The requirements of definiteness, enablement, written description, and patentable subject matter are designed to prevent the exact conduct Brita has engaged in, and render Brita's claims invalid.

Brita's campaign is particularly egregious because by monopolizing the entire gravity-fed water filter market, Brita would deprive U.S. consumers of water filters that are critical to the public health.  The filters Brita seeks to exclude help remove lead and other major contaminants from drinking water and allow consumers to filter their water in their homes.  Brita's improper monopoly would leave millions of U.S. consumers without access to contaminant reducing filter systems and would target the most vulnerable members of our Nation.  There are very good reasons the Commission has received almost two dozen submissions expressing the public health concerns of what Brita/Clorox ask the Commission to do.  And precisely zero supporting Brita/Clorox's harmful and profit-over-people driven campaign.

The answers to the Commission's questions set forth herein conclusively demonstrate that the Initial Determination erred in finding a violation, and the undersigned parties respectfully submit that it should be reversed.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
CONFIDENTIAL MATERIAL OMITTED

## II.   ISSUES UNDER REVIEW

**A.    Discuss whether the construction of the claim term "filter usage lifetime claimed by a manufacturer or seller of the filter" to mean "[t]he total number of gallons of water that a manufacturer or seller has validated can be filtered before the filter is replaced," (Order No. 30 at 14), impermissibly deviates from the plain language of the claims.   Further, discuss whether the foregoing construction requires the reading of one or more limitations from the specification into the claim in order to find the limitation not invalid for indefiniteness.  *See, e.g.*, '141 patent at col. 26:14–15.**

The *Markman* Order's construction for the Lifetime (L) term impermissibly deviates from the plain language of the claims.  Against all well-established principles of claim construction, the *Markman* Order inserted the term "validated"—which is not found anywhere in the specification—into the claim meaning, while removing the plain language of "claimed by."   The plain meaning of "validated" is unquestionably different from the plain meaning of "claimed by," so there can be no legitimate debate that the *Markman* Order deviated from the plain meaning of the claim language.   And under that plain meaning, there can be no legitimate dispute that the plain meaning of "claimed by" renders the claim indefinite because it provides no objective boundaries for the claimed scope.  The law is clear that the proper construction of the term—i.e., the plain language, "claimed by"—must be applied "even if it renders the claims inoperable or invalid" because "it is what the patentee claimed and what the public is entitled to rely on." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781–83 (Fed. Cir. 2010); *see also White v. Dunbar*, 119 U.S. 47, 52 (1886) ("[t]he claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."); *see also Chef Am., Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 13734 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity.").  As properly construed, the "filter usage lifetime" term is indefinite, and the Asserted Claims are invalid under Section 112.

### 1.    The *Markman* Order's Construction of the Lifetime Term is Legally Incorrect

The *Markman* Order improperly reads "claimed by a manufacturer or seller" out of the claim and

CONFIDENTIAL MATERIAL OMITTED

reads "that a manufacturer or seller has validated" into the claim. These phrases mean very different things. One requires validation testing to determine the claim scope, and the other requires only that a seller "claim" a particular lifetime. The *Markman* Order thus construed the claimed phrase contrary to its plain meaning—a result that is contrary to controlling law. To be clear, the word "validated" does not appear in the specification or the prosecution history.

Under well-established claim construction principles, the plain meaning of the claims controls unless the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The *Markman* Order, however, identified no such exception, and instead rewrote the claims to require that the filter lifetime be "validated" by the seller or manufacturer. This unquestionably differs from the plain meaning of the claim language, and there is no lexicography or disclaimer to support such a departure. These facts alone demonstrate that the *Markman* Order's construction cannot be correct.

As suggested by the Commission's question, claims must be construed "with an eye toward giving effect to all of their terms." *Haemonetics*, 607 F.3d at 781 (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)). The "claimed by" phrase is the language the inventors chose to define the scope of the claims and the phrase must be given effect. *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("Thus, 'a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point[] out and distinctly claim the subject matter which the patentee regards as his invention.'" (citation omitted)). If the inventors wanted the claims to require a lifetime based on **validation** rather than simply the **claim** made by the manufacturer or seller, then the inventors could have done so. By selecting the "claimed by" language, the inventors chose that language in an attempt to define the scope of their invention, and the *Markman* Order was wrong to salvage the claim by interjecting a term that alters the scope of the claim. As discussed below, the plain "claimed by" language is tied to an unbound subjective decision by the manufacturer or seller (e.g., what to elect to claim on

CONFIDENTIAL MATERIAL OMITTED

product packaging), while the improper "validated" language is tied to an undefined type of contaminant testing.

The *Markman* Order's redrafting of the claim language to require validation and eliminate the requirement that the lifetime be affirmatively "claimed by the manufacturer or seller" also contradicts the patent specification.  The specification never mentions "validation"; instead, the specification focused on what the manufacturer or seller "claims": "[t]he filter usage lifetime L is defined as the total number of gallons that can be effectively filtered according to claims presented by the manufacturer or seller of the filter."  (JX-0022.43 at 26:6–8.).  The inventors further cement this requirement in the patent specification by providing examples of how such a claim could be made, including on the packaging and or in advertising, making abundantly clear what the "claimed by" language means.  (JX-0022.43 at 26:8–17.).

Although the specification mentions that "such claims typically bear some relationship to some performance attribute of the filter" and "[t]ypically, filter usage lifetime claims require a substantiation process" (*id.*), this language does not ***require*** validation of any sort, nor does it disclaim methods of "claiming" lifetime ***without any sort of validation***.  Moreover, the references to "claims" or "lifetime claims" in these sentences appear to refer to the preceding sentences discussing "claims presented by the manufacturer or seller of the filter," which, again, the specification states may be found on product packaging or advertising.  (*Id.* at 26:8–13.).  The *Markman* Order suggests that its validation requirement is necessary because the specification allegedly incorporates the NSF 53 (2007) Standard (*Markman* Order at 19), which sets forth requirements for "product literature and labeling information" related to certified contaminant reduction claims made by a manufacturer or seller.  (*Id.*).  But this standard does not support redrafting the claims.  To the contrary, it merely provides an example of how lifetimes "claimed by" a manufacturer or seller could be validated.  Such examples, however, cannot be read into the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (en banc) ("[O]ne of the cardinal sins of patent law" is "reading a limitation from the written description into the claims." (citation omitted)).

Moreover, as the *Markman* Order and ID readily admit, the '141 Patent's specification does not even require that the NSF 53 (2007) standard be used to determine the filter's lifetime in gallons.

**CONFIDENTIAL MATERIAL OMITTED**

(*Markman* Order at 16 ("Importantly, the standard is not required as the method of 'validation' because of the permissive language used in the specification of the '141 patent." (citing JXM-0001 at 26:22 (stating that the standard "may" be used for FRAP testing)) & *Markman* Order at 18–19 ("other methods of lifetime could be used other than that tied to the standard"); ID at 164-165 ("nothing in this claim limitation or in the specification of the '141 Patent requires lifetime to be certified under the NSF 53 (2007) standard.").). Left unanswered by the *Markman* Order and the ID is how the specification's citation of the NSF 53 (2007) standard justifies redrafting the claim language to include "validated," yet the standard (or even other methods) are not required to determine a filter's lifetime. This continues to leave the public at a loss as to how to determine the scope of the claim and renders the *Markman* Order's construction is improper.

The plain language controls, and it is clear that the *Markman* Order's construction, which imports "validated" into the claim, is clear error and should be reversed by the Commission.

**2.      Under the Plain Construction the Lifetime (L) Term is Indefinite**

When the plain language of the lifetime limitation is applied, the claims are indefinite. Because the plain language allows for the manufacturer or seller (or perhaps both at the same time) to subjectively "claim" different lifetimes (L), without any limit on how such a lifetime is selected by the manufacturer or seller, the claim is indefinite. The Federal Circuit has repeatedly found that "purely subjective" claims devoid of guidance as to a certain method to be used are indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1353 (Fed. Cir. 2005); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 634 (Fed. Cir. 2015) ("[T]he existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite.").

Under the plain claim language, a manufacturer or seller can "claim" multiple lifetimes depending on the contaminant reduction claims the manufacturer or seller elects to present.[1] The record

---

[1] The *Markman* Order's adopted construction for the lifetime term does not cure this issue. Just as a manufacturer or seller can "claim" multiple lifetimes in gallons under the patent, a manufacturer or seller

CONFIDENTIAL MATERIAL OMITTED

and ID (*see* RPet. At 90-93) demonstrate that this ambiguity—the ability for a manufacturer or seller to arbitrarily select multiple lifetimes for the same exact filter—is far from trivial, as it allows the same exact filter to be infringing at one "claimed" lifetime but non-infringing at another "claimed" lifetime. The patent's reference to the NSF/ANSI 53 (2007) standard does nothing to cure this problem. While that standard sets forth methods for determining a lifetime of a filter if the manufacturer or seller elects to present on its packaging a certification seal for reduction of a contaminant, the patent's claims do not require any type of validation or certification, much less specify which method is used to identify a filter's lifetime. Moreover, even the standard itself allows for different lifetimes depending on what contaminant the lifetime is measured against. For example, the lifetime of a filter relative to its effectiveness for filtering chlorine may be different from its lifetime relative to filtering lead or other substances. Neither the claims, the specification, or the standard provide objective boundaries from which the scope of the claim can be determined. Thus, the manufacturer or seller can make a contaminant reduction claim without undergoing the certification process and can claim a lifetime under a less stringent methodology. There is nothing that prohibits the manufacturer or seller from subjectively claiming one or more lifetimes—or none.[2] Accordingly, the *Markman* Order's reliance on NSF 53 (2007) as a "default" method for determining a filter's lifetime (*see Markman* Order at 17) is misplaced and results in legal error as to the claims' indefiniteness.

Finally, the *Markman* Order fails to resolve the issue of revisions to the NSF Standards. The NSF Standards undergo revisions on a periodic basis. A revision to the NSF 53 Standard for lead reduction (included in the NSF 53 (2007) version) is what prompted Brita to lose its lead certification and pursue the alleged invention in the '141 Patent. (ID at 17–18, 28–29 (citing Tr. (Herman) at 1016:8–1017:18).). As the NSF Standards are revised, typically with more stringent requirements for being certified for

---

can "validate" multiple lifetimes, some that cause a filter to have an infringing FRAP value and some that cause a filter to have a non-infringing FRAP value. Thus, the lifetime term and the Asserted Claims remain indefinite and invalid even under the *Markman* Order construction.

[2] ZeroWater Redesign Filters (RPX-0121-124) remove the lifetime in gallons claim and rely solely on a TDS meter to inform the user when the filter should be replaced. (Tr. (Kellam) 851:22-854:7, 891:10-893:25.).

**CONFIDENTIAL MATERIAL OMITTED**

reduction of the difference harmful contaminants, a filter's potential lifetime under the NSF Standards may change. Accordingly, a filter could move from an infringing to non-infringing, or vice versa, based on an NSF Standards revision made more than a decade after the '141 Patent issued. *See Jetaire Aerospace, LLC v. AerSale Inc*., No. 1:20-cv-25144-DPG, 2022 U.S. Dist. LEXIS 174482, at *43 (S.D. Fla. Mar. 9, 2022) (Report & Recommendation), *adopted by* 2022 U.S. Dist. LEXIS 174064 (S.D. Fla. Sept. 26, 2022) ("The problem here is that the inventor has introduced into each of the '998 claims wording that effectively allows the FAA to control the scope of claims 1-3 of the '998 patent from time to time, by changing its regulations on fuel-gauge calibrating procedures. I do not believe this was or is within the contemplation of the patent statute."). Thus, once again, the public is left guessing as to the scope of the claim because of the indefinite lifetime limitation.

When the plain language of lifetime is applied, the resulting claims are indefinite as they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002) ("A patent holder should know what he owns, and the public should know what he does not."). Because the subjective lifetime limitation cannot survive under 35 U.S.C. § 112, the Commission should reverse the *Markman* Order's legal error and find the Asserted Claims invalid as indefinite.

> **B.    Discuss the effect of the recent Supreme Court decision, *Amgen Inc. v. Sanofi*, No. 21-757 (May 18, 2023), on the ID's enablement and written description findings.**

The Supreme Court's unanimous decision in *Amgen Inc. v. Sanofi* decision unequivocally confirms two core principles that the Initial Determination ignored: (1) "the more a party claims, the broader the monopoly it demands, the more it must enable"; and (2) leaving enablement to trial and error experimentation is impermissible. 143 S. Ct. 1243, 1256 (2023).[3] With these principles in hand, the Initial Determination's finding that Brita's Asserted Claims were sufficiently enabled is clearly erroneous as a matter of law.

---

[3] *Amgen* also left undisturbed that enablement is a matter of law, not fact. *Id*. at 1250-51.

CONFIDENTIAL MATERIAL OMITTED

The Asserted Claims of the '141 Patent cover tens of thousands of possible filter combinations of filter types (at least 8 different types of filter media, 100s of different sources of activated carbon and lead scavengers, more than 50 different binders to enhance cohesion of the filter materials, and countless other performance-impacting variables), yet the specification only details one filter media type with one type of activated carbon and two types of lead sorbents. The '141 Patent also claims an exceedingly large "FRAP" performance range down to zero, yet only discloses working examples that achieve a miniscule portion of those performance ranges. With this limited disclosure, Brita sought for itself an entire infinite kingdom of gravity water filtration types, attempting to claim every possible gravity-fed water filter that achieves a "FRAP" factor less than 350 no matter the media type, lead sorbent, activated carbon, size, composition, and any other of the dozens of variables that impact filter performance. Not only that, Brita claimed every filter type having limitless size and performance that thousands of times beyond what Brita could invent. In doing so, Brita deprived the public of the full benefits of its "invention" and undermines the very "quid-pro-quo premise of patent law." *Id.* at 1258. The *Amgen* decision thus endorses the sole reasonable conclusion in this Investigation that Brita's Asserted Claims are not enabled as a matter of law.[4] *See In re Ziegler*, 992 F.2d 1197, 1200 (Fed. Cir. 1993) (Whether a disclosure is enabling is a question of law).

### 1.    The *Amgen* Decision

The *Amgen* patent relates to PCSK9, a naturally-occurring protein that binds to and degrades LDL receptors that extract bad cholesterol from blood. *Amgen*, 143 S. Ct. at 1249. Amgen, and others, discovered that **certain** antibodies could bind to the "sweet spot" of the PCSK9 protein and prevent it from binding to and degrading LDL receptors. *Id.* This would in turn allow the LDL receptors to more effectively reduce a person's bad cholesterol levels. With this research in hand, Amgen developed and patented an antibody with a unique amino acid sequence that achieved this desired functionality. *Id.* at

---

[4] While *Amgen*'s holding is specific to enablement, the Supreme Court's guidance regarding the disclosure necessary to support claims to an entire class of things defined by their function has implications regarding whether the specification demonstrates possession of the full scope of the claimed invention, as discussed further below, and whether the claims are directed to an abstract idea under Section 101.

CONFIDENTIAL MATERIAL OMITTED

1250.

That patent, however, was not at issue. Rather, it was Amgen's later acquired patent that was challenged, where Amgen sought infinitely broader patent coverage, "purport[ing] to claim for itself 'the entire genus' of antibodies that (1) 'bind to specific amino acid residues on PCSK9,' and (2) 'block PCSK9 from binding to [LDL receptors].'" *Id.* (quoting *Amgen*, 872 F.3d at 1372). Like many who came before, "Amgen [sought] to claim 'sovereignty over [an] entire kingdom of antibodies," which "pose[d] Amgen with a challenge." *Id.* at 1256 (quoting *The Incandescent Lamp Patent*, 159 U.S. 465, 476 (1895)). The Supreme Court was unequivocal—"the more a party claims, the broader the monopoly it demands, the more it must enable." *Id.*

Amgen's patent disclosure, however, fell well-short of the mark. The patent "identified the amino acid sequences of 26 antibodies that perform these two functions, and it depicted the three-dimensional structures of two of these 26 antibodies." *Id.* at 1250. Beyond that, the inventors left it to the industry to figure out for itself what other antibodies may be encompassed by its broad genus claim. *Id.* As the Supreme Court explained, Amgen offered two methods for how to do make such a determination: (1) follow a "roadmap" for generating potential antibodies and then testing them one-by-one for the claimed functionality; or (2) engage in "conservative substitution" whereby you would take a known antibody that achieves the desired functionality and swap out certain amino acids with others "known to have similar properties," and then "test the resulting antibody to see if it also performs the described functions." *Id.* The Supreme Court unanimously rejected both approaches, finding they "amount to little more than two research assignments." *Id.* at 1256. Leaving scientists to engage in "painstaking experimentation" or "trial-and-error discovery" "is not enablement." *Id.* at 1256–57.

### 2. Brita's Asserted Claims are Even Broader, but Supported by Even Less Disclosure Than in *Amgen*

Like *Amgen*, Brita's Asserted Claims in the '141 Patent broadly seek coverage over the "entire kingdom" of gravity-fed water filters, electing to define their alleged novel carbon block filters in generic structure and purely functional terms. This is an astounding departure from what Brita actually invented.

CONFIDENTIAL MATERIAL OMITTED

Brita's purported invention was a specific carbon block filter with a specific activated carbon, a specific lead sorbent, and a specific size that was, according to Brita, **unique** in its lead removal performance. During prosecution of the '372 Application (the parent to the asserted '141 Patent), Brita initially sought patent protection for that unique invention and expressly distinguished its carbon block filter from other filter types, such as mixed media, that did not have the lead reduction capabilities of the allegedly inventive carbon blocks. (CX-0042.0030.). That the inventors sought to separate their carbon block filter from other filter types comes as no surprise given that Dr. Knipmeyer testified it was necessary to "change[] technology from a granular media to a carbon block" in order to address the problem the inventors sought to solve:

> Q. What – what's the delta? What's the magic formula?
> A. *So in this particular execution I'll say –*
> Q. Uh-huh.
> A. *-- we changed technology from a granular media to a carbon block.*
> Q. Did the current granular media solutions at the time, were they able to solve this problem?
> A. *Not that I'm aware of.*

(RX-2607C Brita (Knipmeyer) Dep. at 52:7-15.).

Brita's initial claims for its carbon block filter invention were continually rejected under §§ 102, 103, and 112, and Brita ultimately abandoned these claims.[5] (CX-0042.0.228, 0237–39.). Rather than continuing to seek claim coverage for the filter design of its invention, Brita filed a new application that removed all limitations regarding filter type, activated carbon size, lead scavenger size, and the size of filter media. (JX-0022 at cl. 1; *see also* RPet. at 32.). In place of these limitations, Brita added a purely functional requirement that the filter satisfy a made-up performance metric that purports to indicate how well a filter reduces particulate lead, without providing sufficient design guidance or optimization to achieve "the full scope of the invention as defined by the claims." *Amgen*, 143 S. Ct. at 1254.

---

[5] The '141 Patent also claims priority to a number of other U.S. patent applications: 10/881,517; 11/858,765; and 60/846,162. Like the '372 Application, these earlier applications **only** disclosed and **only** claimed **carbon block** gravity fed water filters of specific formulations, size, structure and performance, while disparaging and distinguishing prior mixed media filters. The claims in the non-provisional applications were repeatedly rejected under §§ 102, 103, and 112 before Brita abandoned these applications.

CONFIDENTIAL MATERIAL OMITTED

Brita's new claims attempt to "monopolize an entire class of things defined by their function"—i.e., any and all gravity-fed water filters with any amount and any type of activated carbon and any amount and any type of lead scavenger as long as the filter achieved a Filter Rate and Performance ("FRAP") factor of 350 or less. (JX-0022 at cl. 1.). The immense size of this broad genus is not even known because these claims cover any and all types of carbon filters with a lead scavenger that can reduce particulate lead in any shape, speed, and form, even in ways yet to be invented using materials that have yet to be developed. At the bare minimum, there are at least 8 filter media types mentioned in passing in the '141 Patent, hundreds of sources of activated carbon and lead scavengers that existed as of the priority date of the '141 Patent, and more than 50 different binders identified in the '141 Patent, leaving a POSA with thousands, if not tens of thousands, of permutations. (JX-0022.0035 at 9:44–10:40; Tr. (Freeman) at 1573:23-1574:8, 1573:5-10.). This does not even account for the numerous other factors that impact filter performance as described by Brita during prosecution. (RX-0375 at BRITALP-0005205–06 ("The art of making an effective gravity flow, porous filter block, with excellent flow rates and excellent contaminant and lead removal under gravity flow is a very difficult task that is sensitive to **shape** and **composition**." (emphasis added)); RX-0375 at BRITALP-0005170 ("small difference in **many variables** can make large differences in . . . **performance**" (emphasis added)).). These additional factors take the permutations readily into millions of potential filters, all of which must then be tested to determine whether they achieve a FRAP of less than 350. (Tr. (Freeman) at 1586:7–1589:10.). The '141 Patent's guidance on how to identify, make, and test such a broad swath of filters is scant with just two such working examples, both carbon block. What's worse, the '141 Patent unequivocally tells a POSA what would not work—mixed media filters. As for any other potential type of filter media, the '141 Patent is simply silent.

Compounding the breadth of Brita's Asserted Claims with respect to the nearly unlimited combination of filter media, activated carbon, lead scavengers, and additional features that impact filter performance is the fact that Brita's Asserted Claims are also entirely unbounded in terms of flow-rates, volumes, and effluent lead concentrations so long as the claimed FRAP value is achieved:

RESPONDENTS' RESPONSE TO NOTICE OF REVIEW                                    Page 11

CONFIDENTIAL MATERIAL OMITTED

- The breadth of the Asserted Claims covers any non-zero FRAP value under 350, but the best the inventors could achieve was 6.7. To put this number into perspective, the Accused and DI Products have FRAP values as low as 0.02, a 335-fold increase in performance than the inventors were able to achieve on their best day.

- The breadth of the Asserted Claims covers any non-zero flow rate, but the best the inventors could achieve was 4.2 min/liter.

- The breadth of the Asserted Claims covers any volume, but the best the inventors could achieve was 89 cm$^3$.

- The breadth of the Asserted Claims covers any effluent lead concentration approaching zero, but the best the inventors could achieve was 1.3 ppb.

(RPet. at 32–34.). The ID neither disputes these facts nor addresses how this nearly unlimited breadth impacts the question of enablement. (*Id.*). But these types of claims are exactly what the Supreme Court unanimously found in *Amgen* to be so broad that a limited disclosure of just a few working examples was woefully insufficient. *Amgen*, 143 S. Ct. at 1250 ("Amgen's claims cover potentially millions more undisclosed antibodies that perform these same functions.").

Brita's claims also fall squarely within the type of claim rejected in *O'Reilly v. Morse*, 15 How. 62 (1854). In *Morse,* as the *Amgen* court discusses, the inventor included a claim covering "'the essence' of the invention, which Morse described as 'the use of motive power of the electric or galvanic current . . . however developed for marking or printing intelligible characters, signs, or letters, at any distances." *Amgen*, 143 S. Ct. at 1252 (quoting *Morse*, 15 How. at 112). The *Morse* court explained that the claim was invalid because it covered all means of achieving telegraphic communication absent disclosure of how to make and use all such means. *Morse*, 15 How. at 113–17. If such a claim were to be upheld, the Court concluded, "there was no necessity for any specification." *Id.* at 119. It was Brita's choice to broadly shoot for the moon and obtain patent coverage directed to any and all gravity-fed water filters achieving FRAP below 350. "But just as Morse . . . claim[ed] all means of telegraphic communication," so too has Brita extended its claims well beyond their enabled scope. *Amgen*, 143 S. Ct. at 1254.

    **3.**    **Brita Impermissibly Relies on "Trial and Error" to Fill the Massive Gulf Between Its Claims and Its Disclosure**

The '141 Patent never describes how one could get non-carbon block filters to sufficiently

CONFIDENTIAL MATERIAL OMITTED

remove particulate lead to achieve a FRAP factor below 350. The ID instead allowed Brita to fill the gaps with trial and error from one skilled in the art—the exact approach the Supreme Court unanimously rejected in *Amgen*. According to Brita's expert Dr. Freeman (who has no experience with lead filtration and was not admitted as an expert in lead removal from water) (Tr. (Freeman) at 1487:1–11), "a person of skill in the art could take the teachings about activated carbon and lead sorbent components that are useful in the '141 patent for carbon blocks and could use those same components in other filter media, and then ***without too much trouble experimentally could make filters and test them***." (Tr. (Freeman) at 1514:3–8) (emphasis added).). In his own words, this would require "extend[ing] and expand[ing] on the working examples to other media and to other examples with different characteristics and different materials." (Tr. (Freeman) at 1520:19–1521:4.). To create such a filter, Dr. Freeman concedes that a POSA would have to choose from a "haystack" of "an enormous amount of background information and performance about prior mixed-media." (Tr. (Freeman) at 1646:2–8.). A POSA would then need to choose "the pieces that they need to make the inventive filters . . ." (*Id.*).

Even after this trial-and-error piecing together of a gravity-fed water filter, a POSA would then have to test the filter to determine whether it actually practiced the Asserted Claims. (Tr. (Freeman) at 1586:7–1589:10.). If that daunting process were not enough to undertake even once, Dr. Freeman nowhere addresses how many times a POSA would have to engage in this experimental building and testing to make and use ***the full breadth*** of Brita's claims detailed above ***that cover potentially millions or more of unique filters of unprecedented performance***. Instead, he was unable to describe the physical or performance bounds of any filter other than to repeat the uncontroversial opinion that any embodying filter must achieve the claimed FRAP. (Tr. (Freeman) 1577:15–21 (regarding volume), 1627:20–1628:6 (regarding lead scavenger), 1593:6–20 (regarding lifetime).).

This approach is even worse than what Amgen argued and lost—that "its broad claims are enabled because scientists can make and use every undisclosed but functional antibody if they simply follow the company's 'roadmap' or its proposal for 'conservative substitution.'" *Amgen*, 143 S. Ct. at 1256. Here, even the roadmap is missing. To build the filters covered by the scope of Brita's claims, one

CONFIDENTIAL MATERIAL OMITTED

would basically have to start from scratch and invent it on their own. "That is not enablement. More nearly, it is 'a hunting license.'" *Id.* at 1257 (quoting *Brenner v. Manson*, 383 U.S. 519, 536 (1966)).

The Court explained:

> Think about it this way. "Imagine a combination lock with 100 tumblers, each of which can be set to 20 different positions." "Through trial and error, imagine that an inventor finds and discloses 26 different successful lock combinations." But imagine, too, "that the inventor tries to claim much more, namely all successful combinations," while instructing others "to randomly try a large set of combinations and then record the successful ones." Sure enough, that kind of "roadmap" would produce functional combinations. But it would not enable others to make and use functional combinations; it would instead leave them to "random trial-and-error discovery."

*Amgen*, 143 S. Ct. at 1257 (internal citations omitted). Brita foists upon the water filtration industry the herculean effort of inventing new filters to embody the scope of its claims by spinning the lock at random thousands (or millions) of times even though Brita was incapable of developing any non-carbon block embodiments itself. (RX-2607C Brita (Knipmeyer) Dep. at 52:7–15 (testifying that the "magic of the invention" was to move away from mixed media filters to carbon block).).

To make matters worse, the specification actually teaches away from mixed media filter designs by making it crystal clear that they are incapable of achieving the claimed performance. It is undisputed:

- **Each and every practicing example that achieves a FRAP factor of less than 350 is a carbon-block filter.** The '141 Patent only provides practicing, working examples of carbon block filters. (JX-0022 at Tables 1 and 5; Tr. (Hatch) at 1425:17–23; Tr. (Freeman) at 1561:13–23, 1567:8–11, 1571:7–12).

- **The '141 Patent disparages non-carbon block filters.** As it declared carbon block filters unique in their ability to achieve a FRAP below 350, the specification states "*[n]o mixed media filters* tested met the claimed FRAP factor range due to their inability to remove particulate lead.*" (JX-0022 at 26:61–65 (emphasis added); Tr. (Hatch) at 1427:21–1428:10 (discussing same).).

(*See also, e.g.*, RPet. at 34–39.). The '141 Patent consistently and repeatedly explains that mixed media filters are incapable of achieving lead filtration sufficiently to FRAP below 350. (JX-0022 at 26:55–27:2, 31:54–55, 33:23–24, 33:60–63.). The '141 Patent consistently and repeatedly describes the significant problems with existing mixed media filters in their ability to achieving lead filtration sufficiently to FRAP below 350. (JX-0022 at 3:51–62, 3:64–67, 4:20–24, 4:56–61, 4:61–67.). What the '141 Patent does not do is explain how—at all—a POSA could overcome these challenges with respect to mixed media filters

**CONFIDENTIAL MATERIAL OMITTED**

and somehow pull a needle out of the haystack. (Tr. (Freeman) at 1646:2–8; Tr. (Hatch) at 1426:19–1427:4; RDX-8.25).)

Thus, "[w]orse than being silent as to that aspect of the invention" (as was the case in *Amgen*), the '141 Patent "clearly and strongly warns" that mixed media filters would not work. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). Rather than enabling other filter designs, the '141 Patent directs POSAs *away* from mixed media filters due to their "inability to remove particulate lead." This is far worse disclosure than the "roadmap" that was rejected in *Amgen*, which at least did not disparage certain types or structures of antibodies.

In combination with the excessive breadth of the '141 Patent's claims, the trial-and-error required to identify and test new species of embodying filters, and the '141 Patent's teaching that mixed media filters (which fall within the scope of the claims) are incapable of achieving the claimed functionality, there can be no doubt of the significant experimentation required, or of the claims' lack of enablement. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007) (quoting *AK Steel*, 344 F.3d at 1244) ("[W]here the specification teaches against a purported aspect of an invention, such a teaching 'is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention.'").

> **4.    Neither the '141 Patent nor any Evidence in this Investigation Demonstrates a "General Quality" Encompassing the Entire Class of Claimed Filters**

The Supreme Court's *Amgen* decision acknowledges that it may not be necessary to "describe with particularity how to make and use every single embodiment within a claimed class. For instance, it may suffice to give an example (or a few examples) *if* the specification also discloses 'some general quality. . . running through' the class that gives it 'a peculiar fitness for the particular purpose.'" *Amgen*, 143 S. Ct. at 1254 (quoting *Incandescent Lamp*, 159 U.S. at 475). But Brita's '141 Patent comes nowhere close to satisfying such disclosure.

The ID appears to credit Dr. Freeman's testimony that the claims' inclusion of "activated carbon" and a "lead scavenger" sufficiently provides commonality among all filter media types because "activated

**CONFIDENTIAL MATERIAL OMITTED**

carbon and lead scavengers don't know or care what filter format they're in.  They perform their function independent of how they're organized and what their geometry is."  (Tr. (Freeman) at 1513:24–1514:2.).  But Dr. Freeman's testimony simply supports the unremarkable fact that a lead scavenger (which by its very definition is simply "a component that removes or reduces lead from water") will function to reduce lead from water.  (*Markman* Order at 20.).  Nothing suggests that the mere inclusion of activated carbon and a lead scavenger will, on its own, sufficiently reduce lead to levels such that the filter will necessarily achieve FRAP below 350.

Just the opposite, in fact.  The '141 Patent explains that "[a]ll mixed media filters containing granular carbon [i.e., activated carbon] and ion exchange resin [i.e., a lead scavenger] were tested."  (JX-0022 at 31:9–10.).  The results of those tests, reported plainly in the '141 Patent, put this issue to rest— "All mixed media filters tested *fail* to adequately reduce total lead concentrations by 50% (75 liters) of filter life." (JX-0022 at 31:54–55.).  "The mixed media filters fall above the preferred FRAP range (0-350)." (JX-0022 at 33:23–24; *see also* Tr. (Freeman) at 1566:14–18.).  In this way, the '141 Patent disclosure is just like that in *Incandescent Lamp*.  There, "the record showed that most fibrous and textile materials *failed to work*," yet the patentee attempted to include a broad claim for every fibrous and textile material.  *Amgen*, 143 S. Ct. at 1254.  The *Incandescent Lamp* Court found such a broad claim lacked enablement in light of the disparagement of materials falling within the scope of the broad genus: "It held that [the] patent claimed much but enabled a little. . . . '[T]he fact that paper happens to belong to the fibrous kingdom did not invest [Sawyer and Man] with sovereignty over this entire kingdom.'" *Id.* at 1253–54 (quoting *Incandescent Lamp*, 159 U.S. at 476).

The only general quality common to every filter disclosed in the '141 Patent capable of achieving FRAP of less than 350 is carbon block, which is a completely different type of filter than any other type referenced in passing in the '141 Patent.  Carbon block filters are made from powdered activated carbon that must be bonded with a binder (50 or more of which are identified in the '141 Patent at 9:44–10:40) and then formed into "an integrated, porous, composite, carbon block."  (JX-0022.0037 at 13:22–24.).  This is in stark contrast to something like a mixed media filter that uses granular activated carbon (i.e.,

**CONFIDENTIAL MATERIAL OMITTED**

loose granules held in a compartment with no binder) with an ion exchange resin. (JX-0022.0032 at 3:25–4:24.). As the '141 Patent explains, "no binder is present and, hence, no binder fills the spaces between the carbon granules to interfere with the flow." (*Id.* at 3:36–38.). But the '141 Patent's claims are not limited to the only common quality—"carbon block filters." If they were, none of the accused products would infringe (as none use a carbon block), and Brita could not meet their DI technical requirement (as it uses pleated paper for filtration).

Brita claimed and asserted functional claims that cover *any* gravity-fed water filter with generic activated carbon and a lead scavenger—ubiquitous to the prior art—that achieves the claimed FRAP performance factor. Brita and its expert suggest that, with the mountain of information available, a skilled artisan could engage in trial-and error to make and use the embodiments not disclosed by the specification. This was not sufficient in *Amgen*, and it is not sufficient here.

  **C.** **Discuss whether a person of ordinary skill in the art would understand how to use filter types other than carbon block (e.g., mixed media, hollow fibers, membranes, nonwovens, depth media, nanoparticles and nanofibers, and ligands (JX-0022 at 25:9-12, 26:30-37)) to achieve a FRAP factor below 350 as of the priority date of the '141 patent.**

As of the priority date of the '141 Patent, a POSA would not understand how to use filters other than carbon block to achieve a FRAP factor below 350. To the contrary, a person of ordinary skill would understand from the specification that filter types other than carbon block *cannot* achieve a FRAP factor below 350 as of the priority date.

Most tellingly, the '141 Patent explains:

Several gravity fed carbon blocks and mixed media filters have been tested for flow rate and lead reduction capability against the defined lead challenge water. Filters tested include several formulations of carbon blocks along with commercially available mixed media filters produced by BRITA® and PUR®. Based on the results from testing, the FRAP factors were calculated for each filter and reported below. ***No mixed media filters tested met the claimed FRAP factor range due to their inability to remove particulate lead.*** The formulations of gravity fed carbon blocks disclosed are unique in [their] ability to meet the required FRAP factor. The "Examples" below include many examples of gravity flow carbon blocks that have a FRAP factor of less than 350. ***It is not believed that any currently-marketed gravity-flow filters have a FRAP factor of less than 350.***

CONFIDENTIAL MATERIAL OMITTED

(JX-0022 at 26:55–27:2 (emphasis added); Tr. (Hatch) at 1427:21–1428:10 (discussing same).). The

specification repeats this mantra throughout the disclosure:

- "All mixed media filters tested fail to adequately reduce total lead concentrations by 50% (75 liters) of filter life." (JX-0022 at 31:54–55.).

- "The mixed media filters fall above the preferred FRAP range (0-350)." (JX-0022 at 33:23–24.).

- "As shown, the multiple-core filters all had FRAP factors below 350, while the mixed media and cylindrical filters had FRAP factors above 350." (JX-0022 at 33:60–63; *see also id.* at Table 5.).

In addition to explicitly describing that mixed media filters were incapable of achieving a FRAP

factor of below 350, the '141 Patent identifies a number of specific problems preventing these other filter

types from achieving the claimed goals:

- "Weak acid cation exchange resins can reduce the hardness of the water slightly, and some disadvantages are also associated with their use: first, they require a long contact time to work properly, which limits the flow rate . . ." (JX-0022 at 3:51–62.).

- "A further problem associated with blended media of granular carbon and ion exchange resin is that they have limited contaminant removal capability due to particle size and packing geometry of the granules." (JX-0022 at 3:64–67.).

- "But there are some drawbacks to using filter media with small granules. Water flow can be slow because the packing of the granules can be very dense, resulting in long filtration times. Also, small granules can be more difficult to retain within the filter cartridge housing." (JX-0022 at 4:20–24.).

- "The goal of low pressure drop for high flowrates would drive the design toward short granular filter beds, but the goal of effective contaminant removal and long life without breakthrough would drive the design to in the opposite direction, toward long filter beds." (JX-0022 at 4:56–61.).

- "Further, achieving adequate flowrate is also problematic because the carbon-based granular media that are used in the filters in question tend to be slightly hydrophobic. Therefore, while excellent water-media contact is needed for good flow distribution and good flow rates, the media actually tends to resist wetting by the water it is intended to filter." (JX-0022 at 4:61–67.).

(Tr. (Hatch) at 1426:20–1427:1, 1427:23–1428:5, 1444:10–1445:3.).

Despite the recitation of these well-known and widely recognized problems associated with non-

carbon block filters, neither the '141 Patent nor its expansive prosecution history provides a solution to

overcome the downfalls of non-carbon block filters. Quite the contrary, the '141 Patent touts the

CONFIDENTIAL MATERIAL OMITTED

"unique" ability of the disclosed carbon block embodiments to achieve FRAP below 350: "The formulations of gravity fed carbon blocks disclosed are **unique** in [their] ability to meet the required FRAP factor." (JX-0022 at 26:63–65 (emphasis added); *see also, e.g.*, CX-932C ("Additionally, we have examples of gravity flow carbon blocks that do not meet this specification and currently marketed mixed media filters that do not meet this specification. **We have not found a currently marketed filter that meets these specifications**." (emphasis added).). Dr. Knipmeyer, lead inventor on the '141 Patent and architect of "FRAP," testified that the magic formula to solving the problem of existing mixed media filters was to "change[] technology from a granular media to a carbon block." (RX-2607C Brita (Knipmeyer) Dep. at 52:7–15.).

The lack of disclosure in the '141 Patent with respect to non-carbon block filters is particularly alarming in light of the applicants' statements to the USPTO. For example, the inventors explained that there are "**many variables and difficulty** involved in designing a gravity-flow filter." (RX-0375 at BRITALP-0005204 (emphasis added).). The applicants continued, "[t]he art of making an effective gravity flow, porous filter block, with excellent flowrates and excellent contaminant and lead removal under gravity flow **is a very difficult task that is sensitive to shape and composition**." (RX-0375 at BRITALP-0005205–06 (emphasis added).). In another submission to the USPTO, the applicants also explained that "small differences in many variables can make large differences in molding, durability **and performance**." (RX-0375 at BRITALP-0005170 (emphasis added).). In this way, the claimed water filters are similar to the antibodies claimed in *Amgen*—both have complex structure and compositions that impact their ability to achieve the claimed functionality. *Amgen*, 143 S. Ct. at 1248–49.

The inventors' testimony confirms that nothing in the '141 Patent teaches a POSA how to use non-carbon block filters to achieve a FRAP below 350. As the inventors readily admit, they did not invent any nonwoven filters, ion exchange filters, membrane filters, or microfiber filters and no such filters are described in the '141 Patent. (*See* Tr. (Knipmeyer) at 202:9–17 (invention utilized only carbon block); 203:5–9 (did not invent membrane filter); 203:10–14 (did not invent nonwoven filter); 203:15–19 (did not invent depth media filters); 203:20–24 (did not invent nanoparticle filter); 203:25–204:2 (did not

CONFIDENTIAL MATERIAL OMITTED

invent nanofiber filter); 204:3–8 (did not invent granular media filter); 204:9–12 (did not invent or disclose granular activated carbon and ion exchange resin combination meeting FRAP limitation); 204:13–17 (no disclosure in the '141 Patent of any filters other than carbon block); *see also* RX-2602C Omnipure (Saaski) Dep. at 114:17–115:4; RX-2601C (Reid) Dep. at 27:24–28:4 (admitting that Omnipure had no knowledge of ever making a gravity fed-water filter using non-carbon block technology in the form of granular carbon), 42:4–10 (did not design any granular carbon (mixed media) filters for the '141 Patent), 91:17–20 (same).).

The only evidence cited in the ID that a POSA would know how to use other filter types to achieve the required performance is the cursory testimony of Brita's expert who, again has absolutely no experience with lead removal from water: he never designed a lead reducing filter or even conducted a lead reducing test on a filter (Tr. (Freeman) at 1563:13–18, 1563:25–1564:7, 1564:13–19.).). Dr. Freeman's testimony however, demonstrates that a POSA would ***not*** know how to use other alternative filters. At most, his testimony shows that a POSA could engage in random experimentation that could potentially create a filter with the claimed performance metrics. (Tr. (Freeman) at 1513:7–1515:14.).

To create such a filter, Dr. Freeman concedes that a POSA would have to choose from a "haystack" of "an enormous amount of background information and performance about prior mixed-media." (Tr. (Freeman) at 1646:2–8.). A POSA would then choose "the pieces that they need to make the inventive filters . . ." (*Id.*). Even after this trial-and-error piecing together of a gravity-fed water filter, ***a POSA would then have to test the filter to determine whether it actually practiced the '141 Patent***. (Tr. (Freeman) at 1586:7–1589:10.).

Dr. Freeman's testimony attempts to substitute experimentation for enabling disclosure, and that is simply not sufficient. *See, e.g.*, *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018) ("gap-filling" "cannot substitute for basic enabling disclosure"); *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010) (It is not enough to "simply rely on the knowledge of a [POSA] to serve as a substitute for the missing information in the specification.").

    **D.**    **Discuss the predictability of the technology at issue and, in particular, how**

CONFIDENTIAL MATERIAL OMITTED

**predictably these other filter types were expected to perform in terms of the FRAP factor as compared to the carbon block arrangement described in the specification as of the priority date of the '141 patent.**

The technology at issue is the reduction of particulate lead in drinking water to a new standard without sacrificing other performance factors. The *only* filter type that the inventors discovered that could rise to meet this challenge was carbon block filter media. Having no success in using mixed media formulations to achieve the goals stated in the '141 Patent, Dr. Knipmeyer testified that the solution or magic was to "change[] technology from a granular media to a *carbon block*." (RX-2607C Brita (Knipmeyer) Dep. at 52:7–15 (emphasis added).). From that decision forward, the inventors did nothing at all to invent filters of differing media to achieve the same goal. Instead, each one testified in turn that the scope of their discovery was limited to *carbon block*. (*See* Tr. (Knipmeyer) at 202:9–17 (invention utilized only carbon block); RX-2602C Omnipure (Saaski) Dep. at 114:17–115:4; RX-2601C (Reid) Dep. at 27:24–28:4 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

The '141 Patent specification follows suit, unequivocally expressing that carbon blocks were in and mixed media filters were out:

> factors were calculated for each filter and reported below. No mixed media filters tested met the claimed FRAP factor range due to their inability to remove particulate lead. The formulations of gravity fed carbon blocks disclosed are unique in there ability to meet the required FRAP factor. The "Examples" below include many examples of gravity flow carbon blocks that have a FRAP factor of less than 350. It is not believed that any currently-marketed gravity-flow filters have a FRAP factor of less than 350.

(JX-0022 at 26:61–27:2 (emphasis added).).

The *un*predictability of the technology at issue is apparent from Brita's own efforts to design a carbon block filter to achieve optimal particulate lead reduction in water. The results, even for similar carbon block filter designs, varied widely. For example, Dr. Knipmeyer's lab notebook details test results

CONFIDENTIAL MATERIAL OMITTED

for identical filters that have disparate effluent lead concentrations at end of life, and thus wildly varying

FRAP values as Dr. Freeman calculated. This variation was not unique, but rather repeatedly found

throughout the inventors' testing of carbon block filters as shown below (FA1 filters in blue; FA2 filters

in green; FT2 filters in orange).

| Filter | Formulation | Flow-Rate | Effluent Lead Concentration | Calculated FRAP[6] |
|--------|-------------|-----------|-----------------------------|--------------------|
| FA1-1 | 50% ACF/10% Alusil/40% GUR22122 | 3:44 min/L | 6.86 ppb | 30.6 |
| FA1-3 | 50% ACF/10% Alusil/40% GUR22122 | 3:36 min/L | 17.31 ppb | 81.8 |
| FA2-3 | 45% ACF/15% Alusil/40% GUR2122 | 3:41 min/L | 17.36 ppb | 30.9 |
| FA2-4 | 45% ACF/15% Alusil/40% GUR2122 | 2:32 min/L | 20.29 ppb | 69.2 |
| FT2-1 | 50% ACF/10% Alusil/40% GUR2122 | 3:11min/L | 7.76 ppb | 28.5 |
| FT2-3 | 50% ACF/10% Alusil/40% GUR2122 | 2:42 min/L | 6.92 ppb | 68.4 |

(CX-108C.0109.).

The "FRAP" results of additional carbon block filters are reported in the '141 Patent at Table 5,

which confirms the lack of predictability in this art. Table 5 shows that even where a filter has the same

Lifetime, the same average flow rate, and the same volume, the resulting effluent lead concentration and

FRAP factors diverged (drastically in some cases). (JX-0022.0047 at Table 5 (*compare* PA3-5, PT3-6,

PT3-4 alternate housing with corrected FRAP values from 6.7 to 68.1)). The specification does nothing

to explain why these filters experienced such drastically different effluent lead concentrations at end of

life ($c_e$) and does nothing to demonstrate that such variation is predictable. For PT3-6 and PT3-4 alternate

housing, they incredibly used the same lead sorbent, the same activated carbon, and the same percentage

---

[6] These values were calculated by Dr. Freeman, but are not present in the lab notebook as the made-up FRAP formula did not yet exist. (CX-0139C; Tr. (Knipmeyer) at 192:16-18, 193:4-10.).

**CONFIDENTIAL MATERIAL OMITTED**

ratio of lead sorbent to activated carbon to binder. (JX-0022.0044 at Table 1.). Another data point in Table 5 bears out the unpredictable nature of gravity-fed water filtration technology. The inventors tested the exact same "Pur 2-stage w/ timer" filter *three times* and achieved *three different FRAP results*: 670.9, 748.4, and 851.6. (JX-0022.0047 at Table 5.).

While one would expect filters with the exact same starting materials and compositions would achieve similar FRAP factors, nothing could be farther from the truth. The data shows, in black and white in the '141 Patent, that one such filter achieved a FRAP of 6.7, whereas another such filter achieved a FRAP of 68.7—over a ten-fold increase. (*Id.*). Notably, this unpredictability just relates to whether *carbon block* filter embodiments could achieve FRAP factors of less than 350. The '141 Patent has zero disclosure regarding the expectations surrounding non-carbon block filters apart from the fact that they would not be able to achieve the required performance.

This erratic data is consistent with what the applicants told the USPTO during prosecution of the '141 Patent family. As detailed above, Brita repeatedly told the USPTO that there are "many variables and difficulty involved in designing a gravity-flow filter." (RX-0963 at BRITALP-0005294.). Making an effective filter (particularly one that achieved the industry's need for particulate lead reduction) is "sensitive to shape and composition" and "small differences in many variables can make large differences in molding, durability and performance." (RX-0963 at BRITALP-0005205–06, 5170.).

Moreover, the inventors made clear that other filter types were *not capable* of achieving the required performance. (*See infra*, Section II.C; JX-0022 at 26:61–27:2.). Their understanding demonstrates that to the extent performance of other filter types was predictable, the prediction would be that other filter types would ***not*** perform as required.

Three different real-world examples from Brita, PUR, and ZeroWater filter also illustrate this unpredictability. For example, when it hired Dr. Knipmeyer, Brita began trying to develop a new NSF 53 (2007) Standard compliant gravity-fed filter. (Tr. (Knipmeyer) 163:9–165:16). But Brita was not able to release a non-carbon block lead reducing filter until 2017. (Tr. (Kahn) 246:4–5 (Brita DI Product launch); Tr. (Barrillon) 447:1–10 ███████████████████████████████. ████

██████████████████████████████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

██████████████████████████████████████████████████████████████

██████  (*See* RX-2604C at 68:18–69:4, 70:7–20 (Deposition of ████████████

██████████████████████████████████████████████████████████████

██████  Even more telling, Brita still has not to this day created a granular filter that would meet the

claims of the '141 Patent.  And the only way Brita was able to produce a practicing non-block filter was

to rely on ████████████████████████████████████████████████████  (Tr.

(Barrillon) 447:11–451:24 ████████████████████████████████████

██████████████████████████████████████  Brita's inability to use its own '141 Patent to

develop a new non-block filter with a FRAP of less than 350 only bolsters the unpredictability of the art

and the already clear and convincing evidence of and the lack of enablement.

Respondent PUR was able to create an allegedly practicing mixed media filter only after

thousands of hours of lab work and on-the-ground experience.  The unfortunate events of Flint and

Newark required PUR to roll its sleeves up and spend years creating never-before-used combinations of

ion exchange resins and nonwovens for its Mario 3 product to reduce effluent lead ($c_e$) below 1 ppb,

resulting in a FRAP below 1.  (Tr. (Mitchell) at 764:24–765:12; *see also* 783:9–784:11.).   This

performance is light years beyond what the inventors were ever able to create, which is remarkable

considering Mario 3 used technology (mixed media and weak acid ion exchange) that the '141 Patent

expressly disparaged.  (Tr. (Mitchell) at 761:13–25, 763:24–765:12.).  Yet, because of Brita's impossibly

broad claims, it now claims PUR's invention as its own.  This is quintessential lack of enablement.

Turning finally to ZeroWater, Mr. Kellam's testimony regarding the development of the

██████████████  filter also demonstrates unpredictability in the art.  (Tr. (Kellam) at 858:8–861:21.).  █

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████  ██████████████████████  This

**CONFIDENTIAL MATERIAL OMITTED**

development demonstrates the unpredictability in the art and further confirms that more is required from the '141 Patent to enable the claims.

> **E.**   **Discuss whether a person of ordinary skill in the art as of the priority date of the '141 patent could have readily manipulated the FRAP factor variables of volume V, average filtration unit time f, effluent $c_e$, and lifetime L for any of the other filter materials named in the specification to achieve FRAP factor below 350.   For example,  if the manufacturer were to reduce only the volume V of a given filter, or if the manufacturer or seller were to claim a longer lifetime L for a given filter, would that correspondingly reduce the FRAP factor without affecting (or at least unpredictably affecting) the other variables?** *See* **JX-0022 at 26:41-49, Figs. 21-23.**

As of the earliest priority date of the '141 Patent (July 25, 2006), a person of ordinary skill in the art could not have readily manipulated the FRAP factor variables of volume (V), average filtration unit time (f), effluent ($c_e$), and/or lifetime (L) to predictably achieve a FRAP factor below 350.

While a POSA would know how to calculate the inputs to the FRAP equation (V, f, $c_e$, and/or L), it is undisputed that the inputs to the FRAP equation (V, f, $c_e$, and/or L) are all interrelated. (Tr. (Hatch) at 1433:16-1435:20, 1435:21-1438:8, 1439:23-1440:21; Tr. (Knipmeyer) 218:20-219:311; RDX-0008.13.). For example, as shown below, lead inventor Dr. Knipmeyer was clear that a POSA could not change an individual input to the FRAP equation and expect a corresponding FRAP factor change because all the inputs are interrelated.

> Q.   Keeping all other variables in the FRAP equation other than flow rate, let's say equal, in order to go from a FRAP of 6 to 3, I would have to essentially double my flow rate; is that right?
>
> A.   Yes, but ***you can't change an individual characteristic.  They're all interrelated***.
>
> Q.   You have to create the filter and consider the performance holistically, correct?
>
> A.   That is correct.
>
> Q.   In other words, ***you can't just snap your fingers, change one variable, and know that you would achieve a FRAP half as much; is that right***?
>
> A. ***That's correct, because they are not mathematical variables, they are characteristics of the filter.***

(Tr. (Knipmeyer) 218:20–219:311 (emphasis added).).  The ID agrees:

> The individual components, such as volume V, are well-known, but as a whole, the FRAP factor does not embody a well-known law of physics because ***the variables are***

**CONFIDENTIAL MATERIAL OMITTED**

> *interrelated so that varying one variable leads to variations in others*. (Tr. (Hatch) at
> 1437:12-18.). For example, in practice, doubling one variable does not double the FRAP
> factor because other variables also change depending on the interrelationship of the water
> filter, activated carbon and lead scavenger. (Tr. (Knipmeyer) at 219:7-11.).

(ID at 263, n.88 (emphasis added).).

The interrelationship of the inputs to the FRAP equation makes the output of the FRAP equation unpredictable and therefore invalid for lack of written description and enablement. (Tr. (Hatch) at 1435:21–1438:8, 1439:23–1440:21; Tr. (Knipmeyer) 218:23–219:3; RDX-0008.13.). Dr. Hatch put it succinctly at the hearing, "when you change one of these factors, you do not know what is going to be the final result of your FRAP value, and this is -- this is a conundrum with the FRAP equation, which creates unpredictability in knowing what changing one variable is going to do to the others and [the resulting FRAP value]." (Tr. (Hatch) at 1437:12–18.).

Dr. Hatch testified about one of the exact questions asked by the Commission, i.e., what happens if a manufacturer were to reduce only the volume V of a given filter. (Tr. (Hatch) at 1435:21–1437:18.). As shown below, Dr. Hatch explained that if a manufacturer were to lower the volume of a given filter he would expect: (i) a lower value in the numerator for V, (ii) a lower f value (because flow rate increases and the f value is the inverse of the flow rate), (iii) a higher $c_e$, and (iv) a higher lifetime. (*Id*).

$$FRAP \;?? = \frac{[V\downarrow * f\downarrow * c_e\uparrow]}{[L\uparrow * 2]}$$

The resulting FRAP value is entirely unpredictable because in this hypothetical scenario, two values in the numerator have decreased, which would tend to decrease the FRAP value, but the effluent lead ($c_e$) value increased, which would tend to increase the FRAP value. Additionally, if lifetime (L) increases in

**CONFIDENTIAL MATERIAL OMITTED**

the denominator, that would also tend to increase the FRAP value. The amount of the relative increase/decrease of each variable is inter-related and makes the net outcome of changing one variable entirely unpredictable.

As discussed above in section II.D, Table 5 of the '141 Patent confirms the unpredictable nature of gravity fed water filters and the FRAP equation. Let's first consider PA3-5, PA3-6, and PT3-4 alternate housing (highlighted in green below) which have the same f (4.6 min/liter), the same L (40 gallons) and the same V (89 cm$^3$), but different $C_e$ values and therefore different FRAPs (48.6 vs 68.1 vs 6.7). Next, let's consider PA3-8 and PT3-11 (highlighted in purple below) which have the same f (4.4 min/liter), the same L (40 gallons) and the same V (89 cm$^3$), but different $C_e$ values and therefore different FRAPs (36.7 vs 41.6). Finally, PT3-4 and PT3-13 (highlighted in yellow below) which have the same f (4.2 min/liter), the same L (40 gallons) and the same V (89 cm$^3$), but different $C_e$ values and therefore different FRAPs (29.4 vs 43).

Table 5

| | L (gallons) | f (min/liter) | V (cm$^3$) | $C_e$ (mg/liter) | FRAP Factor |
|---|---|---|---|---|---|
| **Filter Multiple-Core:** | | | | | |
| PA3-5 | 40 | 4.6 | 89 | 9.5 | [[58.6]]48.6 |
| PA3-8 | 40 | 4.4 | 89 | 7.5 | [[45.7]]36.7 |
| PT3-4 | 40 | 4.2 | 89 | 6.3 | [[38.7]]29.4 |
| PT3-6 | 40 | 4.6 | 89 | 13.3 | [[78.5]]68.1 |
| PT3-4 alternate housing | 40 | 4.6 | 89 | 1.3 | [[16.6]]6.7 |
| PT3-11 | 40 | 4.4 | 89 | 8.5 | [[51.2]]41.6 |
| PT3-13 | 40 | 4.2 | 89 | 9.2 | [[52.7]]43.0 |
| PT3-51 | 40 | 5.7 | 89 | 3.8 | [[36.2]]24.1 |
| PT3-53 | 40 | 5.1 | 89 | 2.3 | [[24.2]]13.0 |
| P2-8 lead sorbent free | 40 | 3.4 | 89 | 52.8 | [[208.4]]199.7 |
| P2-6 lead sorbent free | 40 | 2.3 | 89 | 87.1 | [[223.1]]222.9 |

(JX-0022 at Table 5 (as corrected and exceprted and annotated.).)

In other words, even with constant variables of L, f, and V, *the $C_e$ value is completely unpredictable*. This confirms that the unpredictable nature of the variables and provides objective evidence supporting Dr. Hatch's testimony discussed above.

PUBLIC

**CONFIDENTIAL MATERIAL OMITTED**

Given the unpredictable results and interrelationship of the inputs to the FRAP equation, testing is required to determine if a filter meets the functional performance of the Asserted Claims. Even Brita's expert Dr. Freeman agrees as he is unable to determine without testing whether a disclosed embodiment would still practice the '141 Patent when a single variable was changed. (Tr. (Freeman) at 1586:7-1589:10.). For example, Dr. Freeman was asked what would happen if one was to cut the volume of a filter in half. (Tr. (Freeman) 1586:7–26.). In short, he did not know:

> Q. Let's look at embodiment PT 3-13. I take my filter media. I cut it in half. I'm from 89 down to 44. What is the impact on the lifetime flow rate of effluent lead on that filter?
>
> A. And you've made no other changes to it?
>
> Q. No, sir.
>
> A. So if you reduce the volume by half and haven't changed anything about the format or the layout, what that will do is increase the flow through the filter. In the simplest case it would double it. *It might not necessarily double it depending on the particular geometry.* And then as the water flowed faster through the thinner -- through the thinner filter, it would have less contact time of that water with the -- with the filter media, which would, for example, if the lead scavenger --*potentially* give the lead scavenger less time to remove the soluble lead, which *could* drive Ce up. *It could also* – it would also reduce the capacity of the lead scavenger by half, which would *potentially* change the lifetime L.

(*Id*.). While Dr. Freeman could generally speculate as to what may happen, it is not possible for a POSA to know what the FRAP value would be without testing. Dr. Knipmeyer agrees as well, testifying that one must test the filter to know if one has a certain FRAP value. (RX-2607C at 71:14–20.).

The ID concurs "in practice, *doubling one variable does not double the FRAP factor because other variables also change depending on the interrelationshi*p of the water filter, activated carbon and lead scavenger." (ID at 263, n.88 (emphasis added).). The admissions of Dr. Freeman and Dr. Knipmeyer and the conclusion of the ID underscore that the '141 Patent does not "enable others to make and use functional combinations; it would instead leave them to 'random trial-and-error discovery.'" *Amgen*, 143 S. Ct. at 1256-57.

As discussed above in Section II.C, the FRAP equation is even more unpredictable when a POSA

CONFIDENTIAL MATERIAL OMITTED

considers changing one of the four interrelated input variables in view that the '141 Patent describes only a single species of filter, carbon block, that meets the asserted claims.).  The '141 Patent fails to describe: (i) how to overcome these known problems to mixed media filters; (ii) how mixed media filters, or any filters other than carbon block filters, can reduce lead to achieve the claimed FRAP factor less than 350 or (iii) how the interrelated variables would change if a POSA started to manipulate the inputs to the FRAP equation in a non-carbon block filter.

Brita and Dr. Freeman rely on Figures 21-23 of the '141 Patent to show understanding of the FRAP factor, but Figures 21-23 do not provide any information to a POSA that would make the output of FRAP equation predicable.  The graphs shown in Figures 21-23 are merely graphical projections of the basic ***algebraic*** relationships of the variables of the FRAP equation itself when some variables of the FRAP equation are held constant.  (Tr. (Freeman) at 1578:25–1579:6.).  Unremarkably, these figures illustrate that if a POSA were to double the volume of a filter, the manufacturer would have to cut the flow rate in half to maintain the same FRAP value.  (Tr. (Freeman) at 1586:7–1587:18.).  Of course, in the real world, all parties agree that a POSA cannot just hold one (let alone multiple) variables constant: a change in one FRAP variable (like volume) impacts all of the other variables.  (Tr. (Freeman) at 1579:17–21; Tr. (Hatch) at 1435:21–1437:25.).  Moreover, there are no *actual* embodiments of the invention shown in Figures 21-23 nor was the data shown in Figures 21-23 derived from any actual embodiments. (Tr. (Freeman) at 1581:16–1582:2.).

Perhaps more importantly, any relationship between FRAP factor inputs in Figures 21-23 does not hold true across different filter media.  For example, data for prior art mixed media filters is also disclosed in Table 5.  The German Maxtra prior art mixed media filter was tested and had a lifetime of 40 gallons, a flowrate (f) of 4.9 min/liter and a FRAP factor of 389.  Turning to Figure 23, when a flowrate of 4.9 min/liter is applied to the 40 gallon lifetime curve, the expected FRAP factor is approximately 100, not the actual calculated FRAP factor of 389 listed in Table 5. (*See* annotated Figure 23 below). Likewise, one of the PUR 2 stage prior art mixed media filters in Table 5 was tested and had a lifetime of 40 gallons, a flowrate of 11.0 min/liter, and a FRAP factor of 784.4.  Again looking to Figure 23, a filter

**CONFIDENTIAL MATERIAL OMITTED**

with a lifetime of 40 gallons and a flowrate of 11.0 min/liter would have a FRAP factor of approximately

250. (*See* annotated Figure 23 below).  Instead, the actual calculated FRAP factor in Table 5 for this PUR

2 stage filter is 784.4.



FIG. 23

Because the graphs in Figures 21-23 are not based on actual filter embodiments and test data,

conclusions as to any relationship between the FRAP variables is questionable at best, or flat out wrong.

Certainly, the graphs in Figures 21-23 do not accurately represent other filter media types.

Additionally, the discussion above regarding the *actual* embodiments shown in Table 5 confirms

that these figures ***show only the basic algebraic relationships of the variables*** of the FRAP equation ***not***

***the actual relationship of the FRAP inputs***—let alone how one would actually construct a filter.  For

example, Figure 22 shows the relationship of the FRAP equation as a function of flowrate (f) and effluent

lead concentration ($C_e$).  What Figure 22 does not show is how $C_e$ or the FRAP value actually changes

based on f for any filter.  Table 5 confirms that different filters with the same f, L, and V (e.g., PA3-5,

PT3-6 and PT3-4 alternate housing) can have different FRAP values.

CONFIDENTIAL MATERIAL OMITTED



FIG. 22

With respect to unpredictable technologies, such as those here and that the inventors did not possess, the Commission should find the '141 Patent invalid for lacking written description and enablement.

>    **F.**    **If it was possible to predictably determine the FRAP factor for non-carbon block filter types as of the priority date of the '141 patent, explain why it took Brita ten years and 7,326 hours of research and development to design a nonwoven filter that practices the '141 patent.  See ID at 213 n. 77; Tr. (Freeman) at 1562:18-1563:6.  Is Brita's research and development effort with respect to its non-woven filter DI products indicative of the experimental time and effort needed to develop filters other than the carbon block arrangement described in the specification?**

Brita, in unequivocal language, represented to the ALJ that Brita R&D employees in the U.S. spent "7,326 hours researching and developing the LongLast filter ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" (CPBr. at 138.).  Brita's expert, Dr. Green, further confirmed at the hearing that every hour of the 7,326 hours was necessary to development of a filter that would practice the '141 Patent.  (Tr. (Green) at 730:13–18.).  Brita's expert Dr. Freeman, of course, had no idea how it took this long because he did not bother to even speak with Brita or any of the inventors who have actually designed gravity-fed water filters for lead removal.  (Tr. (Freeman) at 1562:4–21.)  Yet, Dr. Freeman agreed "it wouldn't be surprising" if it took one at least 7,326 hours of research to design a nonwoven filter that practices the '141 Patent.  (Tr. (Freeman) at 1562:22–1563:12.).

The 7,326 hours Brita spent in developing its non-carbon block filter is just the beginning.  It

**CONFIDENTIAL MATERIAL OMITTED**

does not count the years of effort that ████ put into developing non-woven filtration media that could filter particulate lead sufficiently to be used in the LongLast filter. Indeed, Brita, despite its 7,326 hours of development, ████████████████████████████████████████████ (Tr. (Barillon) at 447:21–448:15.). Nor does it count ████████████████████████ ████████████████████████████████████ (Tr. (Ramirez) 625:21–626:7.). Thus, 7,326 hours is only a part of the real-world effort it took to develop just one non-carbon block filter that practices the '141 Patent.

This is consistent with the testimony of Mr. Mitchell from PUR, who testified that the lead performance and thus the FRAP value of the PUR granular mixed media Accused Product would not have been possible at the time of the invention. (Tr. (Mitchell) at 783:6–784:16.). Indeed, the PUR line of lead reducing filters were not released until 2019, over 10 years after the alleged invention of the '141 Patent and only after technologies were refined from PUR's weeks and months on the ground in Newark and in the laboratory. (Tr. (Mitchell) at 783:5–784:11.).

Most importantly, it is consistent with Brita's own admissions and the '141 Patent itself. It cannot be understated that at the time of the invention, according to the '141 Patent, the only means available to meet the FRAP limitation according to Brita was carbon block technology. (JX-0022 at 26:61–63, 26:67–27:2.). Brita was years and thousands of hours of experimentation away from developing any non-carbon block filter capable of the claimed performance, and still has not developed the array of filter designs that would be needed to enable the full scope of the claims.

## III.    PUBLIC INTEREST

This investigation presents the rare but dire circumstance where the Commission must seriously consider denying the sweeping remedial orders sought by Clorox/Brita. Lead in drinking water is a crisis for millions of Americans as it causes irreversible, debilitating harm in humans and, in some cases, death. Expectedly, federal, state, and local government agencies, as well as congress, have vigorously fought lead in drinking water and have issued many laws and regulations to remediate it entirely from drinking water.

RESPONDENTS' RESPONSE TO NOTICE OF REVIEW                                        Page 32

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
In the Matter of                  Investigation No.

CERTAIN HIGH-PERFORMANCE          337-TA-1294

GRAVITY-FED WATER FILTERS AND

PRODUCTS CONTAINING THE SAME

-------------------------------x
```

**OPEN/CLOSED SESSIONS**

```
Pages:    1 through 272

Place:    Washington, D.C.

Date:     August 17, 2022
```

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

```
 1              UNITED STATES INTERNATIONAL TRADE COMMISSION

 2                          Washington, D.C.

 3                 Before the Honorable MaryJoan McNamara

 4                       Administrative Law Judge

 5

 6    -------------------------------x

 7    In the Matter of                    Investigation No.

 8

 9    CERTAIN HIGH-PERFORMANCE            337-TA-1294

10    GRAVITY-FED WATER FILTERS AND

11    PRODUCTS CONTAINING THE SAME

12    -------------------------------x

13

14

15                       EVIDENTIARY HEARING

16                   Wednesday, August 17, 2022

17                           Volume I

18

19

20         The parties met via remote videoconferencing

21    pursuant to notice of the Administrative Law Judge at 9:30

22    a.m. Eastern.

23

24

25    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR
```

```
 1   A P P E A R A N C E S:

 2   (all parties appeared remotely)

 3

 4   For Complainant Brita LP:

 5          STERNE, KESSLER, GOLDSTEIN & FOX, PLLC

 6          1100 New York Avenue, NW

 7          Washington, DC 20005

 8          (202) 371-2600

 9          painsworth@sternekessler.com

10               Paul A. Ainsworth, Esq.

11               Josephine Kim, Esq.

12               Uma Everett, Esq.

13               Robert E. Niemeier, Esq.

14               Lauren Watt, Esq.

15

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           950 F Street, NW

 7           Washington, DC 20004

 8           (202) 239-3025

 9           Pur-ITC@alston.com

10               Adam D. Swain, Esq.

11               Thomas W. Davison, Esq.

12

13

14

15           ALSTON & BIRD LLP

16           101 S. Tryon Street

17           Charlotte, North Carolina 28280

18           (704) 444-1000

19           Pur-ITC@alston.com

20               Karlee N. Wroblewski, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           1950 University Avenue

 7           East Palo Alto, California 94303

 8           (650) 838-2000

 9           Pur-ITC@alston.com

10                   Katherine G. Rubschlager, Esq.

11

12

13   For Respondents EcoLife Technologies, Inc., and Qingdao

14   Ecopure Filter Co., Ltd.:

15           CALFEE, HALTER & GRISWOLD LLP

16           1405 East Sixth Street

17           Cleveland, Ohio 44114

18           (216) 622-8200

19           ecopure_brita@calfee.com

20                   Todd R. Tucker, Esq.

21                   Jack R. Smith, Esq.

22                   Brad Liu, Esq.

23                   Ashley J. Earle, Esq.

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5          BAKER & HOSTETLER LLP

 6          1801 California Street

 7          Denver, Colorado 80202

 8          (303) 764-4072

 9          zerowater-itc@bakerlaw.com

10               Jared A. Brandyberry, Esq.

11

12          BAKER & HOSTETLER LLP

13          1050 Connecticut Avenue, NW

14          Washington, DC 20036

15          (202) 861-1633

16          zerowater-itc@bakerlaw.com

17               Cassandra J. Simmons, Esq.

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5           BAKER & HOSTETLER LLP

 6           One North Wacker Drive

 7           Chicago, Illinois 60606

 8           (312) 416-6200

 9           zerowater-itc@bakerlaw.com

10                John S. Letchinger, Esq.

11

12           BAKER & HOSTETLER LLP

13           1735 Market Street

14           Philadelphia, Pennsylvania 19103

15           (215) 568-3100

16           zerowater-itc@bakerlaw.com

17                Jeffrey J. Lyons, Esq.

18                Phillip D. Wolfe, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5        BAKER & HOSTETLER LLP

 6        312 Walnut Street

 7        Cincinnati, Ohio 45202

 8        (513) 929-3400

 9        zerowater-itc@bakerlaw.com

10             Derek M. Freitas, Esq.

11

12

13   For Respondent Vestergaard Frandsen Inc. d/b/a LifeStraw:

14        K&L GATES

15        70 W. Madison Street

16        Chicago, Illinois 60602

17        Vestergaard1294@klgates.com

18             Jeffrey R. Gargano, Esq.

19             Nelson Hua, Esq.

20             Devon C. Beane, Esq.

21             Ewa Wojciechowska, Esq.

22

23

24

25             ** Index appears at end of transcript **
```

```
 1                    P R O C E E D I N G S
 2              (In session at 9:30 a.m. Eastern)
 3         JUDGE MCNAMARA:  We're here this morning for the
 4   evidentiary hearing in Certain High-Performance Gravity-Fed
 5   Water Filters and Products Containing the Same.  That is
 6   337-TA-1294.
 7              So before we get started, I would very much
 8   appreciate it if -- I gather that, Mr. Ainsworth, you're
 9   lead counsel for the Complainant Brita LP; is that correct?
10         MR. AINSWORTH:  That's correct, Your Honor.
11         JUDGE MCNAMARA:  All right.  Would you like to
12   start by introducing your trial team and the attendees who
13   are appearing on behalf of Brita?
14         MR. AINSWORTH:  Absolutely, Your Honor.  And we
15   have -- we're all here in one room.  They are not going to
16   be on camera, if that's okay.
17         JUDGE MCNAMARA:  That's fine.  Thank you.
18         MR. AINSWORTH:  Our trial team, Your Honor, is
19   going to be composed of Uma Everett, Josephine Kim, Rob
20   Niemeier, and Lauren Watt, all the attorneys you will see on
21   camera.  Lots of other attorneys behind the scenes, as I'm
22   sure you appreciate.
23         JUDGE MCNAMARA:  Oh, yes.
24         MR. AINSWORTH:  From our in-house team, we have
25   Mark Danis, who is associate counsel with Clorox, Nicholas
```

1    Napolitan, Aaron Collins, joining us later today, and we'll
2    have a client representative here for the opening statement,
3    Lauren Kahn.  And then, of course, you'll meet several Brita
4    witnesses over the course of the next day and a half.
5              JUDGE MCNAMARA:  Of course.  Thank you so much.
6              Before I move on to Mr. Swain and the
7    Respondents' lead counsel and the other counsel, I would
8    appreciate it, Mr. Ainsworth, if you would identify a
9    timekeeper for the proceedings.
10             MR. AINSWORTH:  Absolutely, Your Honor.  For
11   today it will be Lauren Watt.
12             JUDGE MCNAMARA:  And I would appreciate it if you
13   would also identify someone from your trial team who will be
14   responsible for ensuring that anyone who has not signed onto
15   a protective order jumps off before any confidential
16   business information is discussed.
17             MR. AINSWORTH:  Absolutely, Your Honor.  That
18   again will be Lauren -- correction -- Devon Floyd, one of
19   our paralegals, will be the timekeeper for us.
20             JUDGE MCNAMARA:  Welcome everybody.  So we
21   also -- I would appreciate it now, we have a number of
22   Respondents, and so, Mr. Swain, I'm going to start with the
23   PUR Respondents.
24             Good morning.  Would you kindly identify your
25   trial team?

```
 1            MR. SWAIN:  It would be my honor to, Your Honor.
 2            JUDGE MCNAMARA:  Thank you.
 3            MR. SWAIN:  And they will be introducing
 4     themselves as well.
 5            Good morning to you too, Your Honor, and, as you
 6     know, I'm Adam Swain from Alston & Bird.  I'm proud to
 7     represent the PUR Respondents here.  I'm going to introduce
 8     my trial team, who are either in this room or in rooms down
 9     the hall.
10            There are two familiar names you'll know, Mr. Tom
11     Davison and Ms. Katherine Rubschlager.  We also have
12     Ms. Emily Healy, our all-star paralegal.  We also have some
13     in-house client representatives on the Webex today.  We have
14     the general counsel of Helen of Troy, which owns PUR,
15     Ms. Tessa Judge.  We have the head of intellectual property,
16     Ms. Melissa Silverstein.  We have our client representative,
17     Mr. Mike Mitchell, who you will be hearing from later in the
18     hearing.  We also have the VP of engineering, Mr. John
19     Franks, and also the VP of engineering, Mr. Kevin Johnson,
20     on the line as well.  They are very happy to be here as
21     well.
22            JUDGE MCNAMARA:  Good.  Thank you.  Thank you
23     very much.
24            So, Mr. Letchinger, I gather that you will be
25     representing ZeroWater, or will Mr. Brandyberry be up?
```

1          MR. SWAIN:  Mr. Brandyberry is on his way up to
2    the podium.
3          I do want to say we have a timekeeper, Ms. Ewa
4    Wojciechowska from the LifeStraw team, and Ms. Katherine
5    Rubschlager will be in charge of making sure all the people
6    that can see the confidential information are here and all
7    the ones that don't aren't.
8          JUDGE MCNAMARA:  Very good.
9          MR. SWAIN:  Thank you, Your Honor.
10          JUDGE MCNAMARA:  Just make sure that you give a
11    heads-up before you move into CBI territory or confidential
12    business information.
13          MR. SWAIN:  Certainly, Your Honor.
14          JUDGE MCNAMARA:  Thank you very much.
15          Good morning, Mr. Brandyberry.
16          MR. BRANDYBERRY:  Good morning, Your Honor.
17    Jared Brandyberry for the ZeroWater Respondents.
18          So I'm proud to introduce our trial team as well.
19    We have John Letchinger from BakerHostetler, Cassandra
20    Simmons from BakerHostetler, Jeffrey Lyons from
21    BakerHostetler, Phil Wolfe from BakerHostetler, and Derek
22    Freitas, BakerHostetler.
23          We also have a client representative from
24    ZeroWater, Doug Kellam, and a client representative from
25    Culligan International, John Griffith.

1        And for our team Derek Freitas will be monitoring

2    the CBI record.

3        JUDGE MCNAMARA:  Very good.  Thank you for

4    letting me know that.

5        And for the Respondents LifeStraw or Respondent

6    LifeStraw, Mr. Gargano, are you there?  Are you going to be

7    up on this one?

8        MR. BRANDYBERRY:  Mr. Gargano is on his way up.

9        JUDGE MCNAMARA:  Very good.  Good morning.

10       MR. GARGANO:  Good morning, Your Honor.  Jeff

11   Gargano of K&L Gates on behalf of Respondent Vestergaard

12   Frandsen, who is known as LifeStraw.  It does business under

13   the name LifeStraw.

14       And I'll introduce our trial team.  It's myself,

15   my partner, Devon Beane from K&L Gates, attorney, associate

16   attorney Nelson Hua, and associate Ewa Wojciechowska.  She

17   is going to be monitoring CBI on our behalf, Your Honor.

18   And as Mr. Swain indicated, she is also going to be keeping

19   time for the Respondents.

20       JUDGE MCNAMARA:  Very good.  Thank you.

21       MR. GARGANO:  I also would like to introduce the

22   in-house team.  Alison Hill, the chief executive officer of

23   LifeStraw will be attending, as will the general counsel,

24   Brianna Schreiner.

25       JUDGE MCNAMARA:  Okay.  Very good.  Thank you for

1   those introductions.

2           MR. GARGANO:  Thank you.

3           JUDGE MCNAMARA:  And then on behalf of Respondent

4   Ecopure, Mr. Tucker, are you there?

5           MR. GARGANO:  Mr. Tucker is on his way up,

6   Your Honor.

7           JUDGE MCNAMARA:  Thank you, Mr. Gargano.

8           Good morning, Mr. Tucker.

9           MR. TUCKER:  Good morning, Your Honor.  This is

10  Todd Tucker from Calfee, Halter & Griswold in Cleveland,

11  Ohio, and I represent Ecopure.  We'll often be referred to

12  as the Aqua Crest Respondents, because that's the brand name

13  they sell under.  Hopefully I don't confuse you moving

14  between Ecopure and Aqua Crest.  I'll try to stick with Aqua

15  Crest because that seems to be used in the pleadings more.

16          My trial team are my colleagues Brad Liu and Jack

17  Smith.  Mr. Liu is going to monitor CBI for us.  And the

18  president of Ecopure, Adam Zhang, who is right now in

19  Qingdao, China, so it is getting on 10:00 at night.  He is

20  going to join for just a little while, hopefully, today.  I

21  don't think he is going to stay up until 5:30 a.m. to see

22  all the proceedings.

23          Thank you.  We're excited to be in front of you,

24  Your Honor.

25          JUDGE MCNAMARA:  Thank you.  Everybody is

1    welcome.  This should be a very interesting hearing.

2         So that you know who is with me this morning, my

3    two lawyers are here with us this morning, and you all know

4    Jae Lee, who has been with me for quite a long time, and

5    Ms. Anita Alonko, who joined our team this spring, and I

6    also have with us my program support specialist, who is a

7    critical part of our team, as you all know, Ms. Nicole

8    Muhammad, who is joining us also.

9         Okay.  So there are a few things that I would

10   like to mention, and we have a couple of pretrial matters to

11   discuss, but just a couple of reminders about procedure.

12        We will take, most likely, a one-hour lunch

13   break, and we will take probably two 15-minute breaks at an

14   organic stopping time, one in the morning and one in the

15   afternoon.

16        If you are not speaking, please mute your

17   computer.  We all know this.  We've been doing this long

18   enough, but I think people still slip.  It's just easy

19   enough to do.

20        And when you stand up to speak, would you please

21   identify yourself so that we have a clear record.  In that

22   same vein, when you're working through your slide decks,

23   would you be sure to correlate the number of the slide deck

24   with the testimony that's being given so that we have a very

25   clear record there as well.  I may jump in and remind you if

1    I see that you're in your flow and you're not quite

2    remembering to do that.

3        Okay.  So I think Mr. Swain knows this quite well

4    and his team from previous hearings.

5        All right.  So there are two motions that I would

6    like to discuss quickly.  And I will ask each party to

7    identify someone after I describe the motion and the motion

8    docket number.

9        The first of which I'm going to deal with is

10   motion docket 024, which was filed on July 21, 2022, and

11   it's Brita's motion to file a corrected brief.

12       The argument that Brita has made concisely or the

13   argument that I'll give concisely is that Brita included in

14   their pretrial brief Bates numbers, Bates document numbers,

15   rather than exhibits.  Brita has argued that these Bates

16   numbers in lieu of exhibits were clerical errors.

17       On July 22nd the Respondents filed an opposition

18   and said that the substitution or the failure to include

19   exhibit numbers as opposed to the Bates numbers of documents

20   violates ground rule 8.7.4.

21       So, concisely, briefly, is there anything that

22   you would like to add on that score, Mr. Ainsworth, before I

23   tell you what my thinking is?

24       MR. AINSWORTH:  Your Honor, other than that I

25   take responsibility for the fact that our team did not meet

1   the expectations of the ground rules, it was not deliberate.

2   I don't believe there is prejudice to Respondents.  In

3   particular, we didn't exchange exhibits until last week.  So

4   Bates numbers was the easiest way for the parties to

5   identify where in the record the evidence was.

6          But, Your Honor, I take responsibility for us not

7   meeting the ground rule there.  And we respectfully request

8   that you grant the motion.

9          JUDGE MCNAMARA:  Thank you.  Mr. Swain, are you

10  speaking on behalf of all of the Respondents or is someone

11  else addressing this?

12         MR. SWAIN:  Mr. Brandyberry from the ZeroWater

13  team will be addressing this motion, Your Honor.

14         JUDGE MCNAMARA:  Thank you.

15         MR. BRANDYBERRY:  Thank you, Your Honor.  I

16  apologize.  We'll get a little quicker on the exchange here.

17         I think it's laid out in our two oppositions and

18  the response to their letter.  Just the fact that we took

19  the time to comply with the ground rules.  We tried to work

20  something out.  We were not able to work something out.  We

21  think there has been prejudice.

22         It took a lot of time.  There's a lot of

23  citations on 150 pre-hearing brief -- page brief -- to go

24  through and cite everything correctly.  So a lot of

25  resources expended on our side to comply with that rule.

1          JUDGE MCNAMARA:  So what exactly -- I read the

2     opposition.  I saw two remedies that Respondents were

3     requesting or in the alternative.

4          One was to strike the brief, which you know would

5     be pretty draconian, and the second would be some sort of

6     recompense for the time spent.

7          So what exactly is it that Respondents want?  Why

8     don't you tell me.  There was only one remedy that actually

9     dealt with time in your brief.  So would you explain what

10    that is, and if there are other alternatives here?

11         MR. BRANDYBERRY:  Sure.  As far as remedies, we

12    were thinking about how to be fair with the time we

13    expended, and so it's either a reduction of allotted time at

14    the hearing or a reduction of allotted pages in the

15    post-hearing brief were kind of the two ideas we came up

16    with -- to be honest, it's not an issue I've dealt with

17    before -- but just to try to level the playing field those

18    are two that we came up with -- a very modest reduction in

19    the allotted of time at the hearing or modest reduction of

20    pages in the post-hearing brief.

21         JUDGE MCNAMARA:  Did your team calculate the

22    amount of time that it took your paralegals and/or attorneys

23    to actually go into the brief and modify from Bates stamped

24    numbered documents to exhibits?

25         MR. BRANDYBERRY:  We did.  So we looked at that.

1    I mean, it's a little hard to come up with the estimate, but
2    the best estimate we could come up with is that it was
3    somewhere between 10 to 12, 15 hours, you know, paralegal
4    time and younger associate time to, basically, cite check
5    everything and get everything in compliance with the rules.
6         JUDGE MCNAMARA:  So I'm curious.  Since you've
7    asked for a reduction in time or reduction in number of
8    pages, how does that equate to the number of hours that were
9    put in, and did you think of any other remedies since you
10   know that I'm not going to reduce the trial time by 10 or 12
11   hours, and you know that I'm not likely to reduce the number
12   of days that they have to file a brief by 10 to 12 days,
13   that would be a little bit difficult, but could do it.
14        But did you think in terms of a monetary
15   compensation?
16        MR. BRANDYBERRY:  We had not.  I have to admit,
17   it was not something that we considered, but if we're
18   looking at compensation for the 10 to 12 hours, that could
19   be a remedy.
20        Again, I apologize, it's not a situation that
21   anyone on our team had dealt with before, trying to come up
22   with kind of a creative remedy that wasn't as draconian as,
23   you know, striking the entire brief.
24        JUDGE MCNAMARA:  I'm certainly -- I think that
25   the case law is pretty clear, and we're going to issue a

1  written order on this, but case law is quite clear that

2  these were not clerical errors per se.  And so that argument

3  does not get much support, if any.

4          And I think that this was, I know, Mr. Ainsworth,

5  this was -- I'm glad you stepped up to the plate on owning

6  responsibility for this -- but it's still something that was

7  problematic and problematic for the other side.  So I'm sure

8  you agree that some kind of recompense is necessary.

9          Wouldn't you agree?  It was either your trial

10  team or their trial team.

11          MR. AINSWORTH:  Your Honor, we'll, of course,

12  accept any remedy Your Honor wishes to grant.

13          I would say there's been a number of times in

14  this case where the other side has been late on things as

15  well.  And so I realize this is an important filing, but

16  there were other filings in this case and other ground rules

17  violated by Respondents where Your Honor has recognized that

18  the prejudice was not that significant to the other side.

19          But like I said, I accept responsibility,

20  Your Honor, for what we believe was an inadvertent error on

21  our part during the preparation of the brief.  We tried to

22  correct it, we couldn't, but we'll accept your -- whatever

23  remedy you would like to order.

24          JUDGE MCNAMARA:  I don't want to belabor this,

25  but I think I can infer what may have happened here.  I

1    don't want to go into speculation and so forth.  But if

2    there had been and there were other motions and I dealt with

3    other ground rule issues in other orders, and so I agree

4    with you that the Respondents were not substantially

5    prejudiced.  That's why I'm not going to limit time.  I'm

6    not going to do that.  I think that would be too draconian.

7           But what I would like is for the Respondents to

8    file an affidavit with the names of the individuals and the

9    amount of time that was spent correcting the brief.  I would

10   like that.  I've got some time to take care of this.  So I

11   would like that within ten days after the end of the trial.

12          And you-all know how to prepare an affidavit,

13   name of timekeeper, the amount of time spent, the date as it

14   would come from your timekeeping system, and I will take it

15   from there.  Whether it will be a one-to-one recompense is

16   not clear to me yet.  I want to see the affidavit.

17          So I would appreciate that, Mr. Ainsworth, if you

18   would file that, again, within ten days or by the tenth day,

19   at least, at the end of the close of the hearing.  Okay?

20          MR. AINSWORTH:  You want us to file an affidavit

21   for the amount of time we spent?

22          JUDGE MCNAMARA:  I'm so sorry.  I got that

23   backwards.  Sorry there, Mr. Brandyberry, I meant that

24   Respondents should file that.

25          MR. BRANDYBERRY:  Understood, Your Honor.  Thank

1    you.

2              JUDGE MCNAMARA:  All right.  Sorry about that.

3              The next motion with which I am going to deal

4    quickly is motion to quash a subpoena that was issued to

5    Dr. Freeman to be called as an adverse witness in the case.

6              Mr. Ainsworth, would you like to address that

7    motion concisely?  It's motion docket 028.  I think it just

8    got a docket number yesterday.

9              Would you address that, please?

10             MR. AINSWORTH:  My partner is going to address

11   that.

12             MR. BRANDYBERRY:  Mr. Swain will be addressing

13   for the Respondents.

14             JUDGE MCNAMARA:  Very good.  Thank you,

15   Mr. Brandyberry.

16             MS. EVERETT:  Good morning, Your Honor.  Uma

17   Everett.

18             As you know, last week Respondents applied for

19   and issued a subpoena to Brita's expert, Dr. Benny Freeman.

20   Benny Freeman has been retained by Brita, and it appears

21   that the Respondents attempt to use him affirmatively in

22   their own case.  So we filed a motion to quash that subpoena

23   under two basic grounds.

24             One, Dr. Freeman is our expert, and at no point

25   in time has Respondents identified Dr. Freeman as their

1    expert.  Similar reasoning to the multistage case where

2    Judge Elliot looked at what Respondents had -- who they had

3    identified as their expert and said they could only use who

4    they had identified.  At no time at that part in the

5    analysis did Judge Elliot look at whether somebody was a

6    testifying expert in the case or not.  He simply looked at

7    identification and said you did not identify the expert.

8    You can't use him.

9         Respondents' subpoena also says that they wish to

10   get facts and opinions from Dr. Freeman.  Dr. Freeman is not

11   an expert here with any facts.  He is not a percipient

12   expert.  He is here for their opinion.

13        And Respondents in their pleading haven't

14   identified either in their opposition or in their bare bones

15   application the facts they seek from Dr. Freeman.

16        And, finally, if we look to the standards of just

17   the traditional motion to quash a trial subpoena, there are

18   three factors: relevance, need, and hardship.  Respondents

19   haven't shown any of these.  In fact, they don't even

20   address them in their opposition.

21        First to relevance, they can't -- they have not

22   even come forward to cleanly and clearly state how they wish

23   to use Dr. Freeman.  What we can glean from the opposition

24   is -- and how they want to -- just stepping back.

25        Dr. Freeman has provided reports and opinions on

1    this case about the priority of the invention.  So he is

2    going to talk about whether Brita is entitled to claim an

3    earlier invention date.  He will look through the analysis

4    and the testing of the inventors in 2006.  He will look

5    through the applications.  And he will give an opinion to

6    Your Honor about why Brita is entitled to claim their date.

7    He also has opinions on written description, lack of

8    enablement, and eligible patent subject matter.

9          It appears -- so as we move to trial, we will be

10    focusing on the priority case, and there was a great volume

11    of work that was done in 2006.  Time will not permit us to

12    go through all of those reductions and all of that work.  So

13    we do intend to provide a narrow presentation this week or

14    next week.

15          And it appears that Respondents want to take some

16    priority work from 2006, which may or may not come into the

17    case through trial testimony.  So it appears they seek to

18    elicit Dr. Freeman's testimony and opinion about work in

19    2006 and potentially use it for their case-in-chief on

20    anticipation.  And that is implied in page 5 of their

21    opposition.

22          The issue is Dr. Freeman didn't give an opinion

23    on anticipation.  So it is improper for Respondents to come

24    and say they are going to use his opinion in one context and

25    apply it in a context he has not even been involved in in

1  their case-in-chief.

2         Respondents haven't met prong two.  They haven't

3  shown any need.  They have two experts.  They conducted

4  prior art testing.  They have failed to explain in their

5  application or in their opposition any need for

6  Dr. Freeman's testimony.

7         And then the third prong is hardship.  It should

8  go without saying that Dr. Freeman is Brita's witness.  He

9  should not be called in the case-in-chief to support

10  anticipation.  That is a burden.  To look at simply his

11  trial testimony and say he will appear on video this week

12  really undermines and undercuts what is a burden on

13  testifying for trial, testifying for someone you've been

14  retained to provide an opinion when you're on the other

15  side.  And this has not been addressed at all in

16  Respondents' briefs.

17         They do cite some deposition testimony from

18  Dr. Freeman where he said he would accept a trial subpoena.

19  But if you look at the language of that questioning, there

20  wasn't any time that Mr. Swain was clear about the trial

21  subpoena where he said, Dr. Freeman, will you accept a trial

22  subpoena from Respondents to testify in their case.  If he

23  had said that, perhaps Dr. Freeman would have had a

24  different answer.

25         It's also worth noting that Dr. Freeman is a lay

1    person.  He is not a lawyer.  He is an expert, but he is not

2    a lawyer.  When he replied that he would, of course, respond

3    to any order that Your Honor issues, I mean, he is

4    responding as a lay person.  He is not responding on whether

5    he is willingly going to give trial testimony that supports

6    the Respondents.

7          JUDGE MCNAMARA:  Okay.  Thank you.  A couple of

8    questions for you.

9          I understand from Respondents' opposition, which

10    came in, I think, yesterday, that there was some discussion

11    about Respondents calling Dr. Freeman as an adverse witness

12    as early as July 18th.  I think that's the date of his --

13    July 13th, the date of his deposition.

14          MS. EVERETT:  That was about the time we were in

15    pre-hearing statements on who would come when.  We have

16    opposed that plan since Respondents mentioned to us and we

17    included that reservation of rights in the pre-hearing

18    statement.

19          JUDGE MCNAMARA:  So when Dr. Freeman was asked

20    during his deposition whether or not he would accept the

21    subpoena, as vague as that may have been, and although he is

22    a lay person, did counsel jump in and say, whoa, define what

23    you mean here?  Was there any objection to this and asked

24    for a definition of what you mean?

25          MS. EVERETT:  No, I don't believe there was any

1    just explanation or definition.  And as far as accepting a

2    subpoena, to be clear, we have accepted the subpoena on

3    Dr. Freeman's behalf.  That strikes me as a little bit

4    different question than whether he will come and offer

5    adverse testimony.

6        JUDGE MCNAMARA:  It is, and that's why I'm asking

7    if counsel asked for any clarification during the

8    deposition.  And from what you said, I gather they did not.

9        MS. EVERETT:  No, I don't believe that occurred.

10        JUDGE MCNAMARA:  Okay.  So the next question that

11    I have for you, other than anticipation, which I think I

12    heard you say Dr. Freeman did not offer -- on which

13    Dr. Freeman did not offer an opinion -- were there other

14    opinions that were offered during his deposition testimony

15    that were adverse to Brita's position about which he was

16    examined?

17        MS. EVERETT:  I don't believe there's any -- he

18    provided any testimony that was adverse to Brita's position.

19        I've noticed in the pre-hearing brief there are

20    partial extracts of Dr. Freeman's testimony that, if you

21    take in full context, actually supports Brita's position.

22        So I don't believe he has provided anything that

23    was adverse.  I do note that there were some questions that

24    went beyond his opinion.  He was asked some questions about

25    the prior art products and some testing that was not part of

1  his opinion.  But, again, depositions are very broad, and
2  we're not able to stop those questions.
3          JUDGE MCNAMARA:  Absolutely they are very broad.
4  And you know that deposition testimony can be used on
5  cross-examination, even if -- so, in any event, just to be
6  clear, you understand that for sure.  I don't mean -- I'm
7  not -- I don't mean to be condescending here.  I'm just
8  trying to get an affirmation on the record.
9          MS. EVERETT:  Absolutely, Your Honor.  If the
10  this was a proper cross-examination, I don't think any of us
11  would be here.  I think we're here because Respondents have
12  indicated they intend to go beyond proper cross-examination.
13          JUDGE MCNAMARA:  We don't know that yet, do we?
14  We don't know until the questions are asked.
15          MS. EVERETT:  You're correct, Your Honor.  We
16  don't officially know until the questions are asked.  But
17  this issue came up because the Respondents have said they
18  intending to beyond direct, and they wanted to confirm we
19  were okay with that -- and we're not -- and they wanted to
20  confirm we were okay with calling Dr. Freeman adversely in
21  their case, which we were not.
22          So you're absolutely correct, we don't know the
23  questions until we hear it, but this issue came up because
24  they actually indicated they intend to go to for cross.
25          JUDGE MCNAMARA:  When did you have attorneys meet

1    and confer specifically on the issue of adverse cross or the

2    potential adverse -- on the subpoena and the potential that

3    Respondents would call Dr. Freeman, did you have a specific

4    attorney meet-and-confer on that?

5           MS. EVERETT:  I don't believe we had a phone call

6    where we discussed the positions of why that was possible.

7    We have asked numerous times for Respondents' case law

8    support or support that allows them to go beyond that, and I

9    don't think we've actually ever received anything until

10   yesterday.

11          JUDGE MCNAMARA:  Okay.  Thank you very much.

12          Mr. Swain, do you have a response?  I'm sorry.

13   One moment, Mr. Swain.

14          MS. EVERETT:  Just a couple points on the

15   meet-and-confer issue, Your Honor.

16          We did offer, before the trial subpoena was

17   issued, we did offer to bring this issue before Your Honor

18   in a non-motion format, and the Respondents told us there

19   was no time.  So they went and got the trial subpoena at the

20   11th hour.  They have not responded on our positions.

21          Your Honor, if you feel it is appropriate that we

22   get on the phone, I would just say we're still in the

23   ten-day window.  We can meet and confer or withdraw the

24   motion and re-file by Monday at 5:15.  But the timing -- the

25   compressed timing is timing Respondents have made.  As soon

1    as they raised the issue we have always been very clear we

2    oppose.

3            JUDGE MCNAMARA:  What I don't understand fully is

4    why you didn't file a motion.  Because I've made it clear to

5    everyone that these types of issues should be brought up in

6    motions and that we'll try and deal with them pretty

7    quickly.

8            So I'm not sure the timing cuts in anybody's

9    favor on this one, whether for or against, since you-all

10   knew about this a month ago.  So that's my thinking about

11   it, but I don't -- I would like to hear -- thank you so

12   much.  It was a good argument.

13           Mr. Swain, I would like to turn to you and hear

14   your arguments now on behalf of Respondents.

15           MR. SWAIN:  Thank you, Your Honor.  And I'm

16   hoping I can streamline this and make this much clearer.

17           We do not intend to call Dr. Freeman on

18   anticipation or any subject matter outside the scope of the

19   two signed and sworn reports that he submitted to you and

20   the scope of his deposition that he gave under oath in this

21   case.

22           He intends to be submitted as an expert witness

23   by Brita on the same issues that Ms. Everett just

24   discussed -- written description, priority, enablement, and

25   101 -- that's all we're going to ask him about.

1          Now the issue is that Brita, when they filed this
2   report, when Dr. Freeman signed this report, he went on 35
3   different reductions to practice, and this was the subject
4   of a motion to strike, and Brita insisted that these all
5   come in and these were all validly disclosed and Your Honor
6   agreed with Brita.
7          And now, Your Honor, Brita seeks to withdraw some
8   of these 35 reductions to practice because they cut against
9   their late-changing theories on infringement and invalidity.
10  And this began in Dr. Freeman's deposition.  He started
11  withdrawing certain embodiments of the invention that he no
12  longer says practice the patent.
13         And we're concerned that Brita is going to not
14  talk about these reductions to practice in their direct
15  examination preventing us from eliciting those admissions,
16  those opinions during his cross-examination.
17         And so when that came to a head and they refused
18  to say we could go outside the scope at all, which we
19  actually don't believe it's outside the scope, if he is
20  coming to opine on any of these issues, it's well within the
21  scope of us to ask his previous opinions on the subject.  It
22  also goes to his credibility and his switching of his
23  opinions.
24         We're not here to ambush or drag Dr. Freeman
25  through a subpoena at the ITC, but Brita is making us do it.

1    So what we want for clarity from Your Honor is we

2    just want to ask about the opinions and statements that he

3    made in his expert reports and within the scope of his

4    deposition, that's it.

5    And we are also willing to call him once.  So if

6    he appears in Brita's rebuttal case, we're happy to call him

7    as part of our case to make it streamlined.

8    JUDGE MCNAMARA:  Well, I guess the question that

9    I have for you, Mr. Swain, is why you simply can't do this

10   through cross-examination.

11   MR. SWAIN:  I had the same question too,

12   Your Honor, but when we met and conferred and discussed this

13   with Brita, they said you may not go outside the scope, you

14   may not bring this up.  And we're concerned that they may

15   continue to withdraw subject matter that is harmful to their

16   case and we won't be able to examine Dr. Freeman about it.

17   That's our concern.

18   JUDGE MCNAMARA:  Okay.  But if they have

19   withdrawn and narrowed down the dates for conception and

20   reduction to practice and so forth, why isn't that

21   sufficient?  What does going to other dates get you?

22   MR. SWAIN:  Certainly, Your Honor.

23   JUDGE MCNAMARA:  If they have already conceded

24   them, what's the point?

25   MR. SWAIN:  That's a very good question,

1    Your Honor, and, hopefully, I can explain that.

2           In doing so, Your Honor, they have made two late

3    arguments on what the definition of average flow rate and

4    what lifetime means.  As you remember, you issued your

5    Markman order two weeks ago.  The issue of lifetime was put

6    to bed.  But now Brita is arguing that lifetime means you

7    can never go under a certain effluent level at any point in

8    testing.  They made this argument for the first time in

9    their rebuttal briefs and in rebuttal expert reports.

10          Before that Dr. Freeman, at least ten times in

11   his reduction to practice report, gave an opinion that each

12   of those embodiments of the invention practice the patent,

13   once they go over 10, once they go over 20.  They directly

14   contradict Brita's late-shifting opinions in this case, and

15   so we want to examine Dr. Freeman on that.

16          JUDGE MCNAMARA:  Again, my question to you is why

17   can't this simply be done through cross-examination?

18          MR. SWAIN:  I agree.

19          JUDGE MCNAMARA:  You have cases to which you

20   cited.  All right.  I guess I have the answer I'm going to

21   get on that one.

22          The other question that I have for you, why

23   wasn't the request for the trial subpoena made sooner?  Let

24   me give you some dates.

25          Dr. Freeman, I gather, was deposed on -- I can't

1   read my own handwriting -- either July 13 or July 18.

2            MR. SWAIN:  It was July 13th, Your Honor.

3            JUDGE MCNAMARA:  Thank you.  Thank you for that.

4            The expert discovery cutoff was July 15th, 2022,

5   and the pre-hearing statements were due July 18.

6            So why did you wait until -- within the past week

7   or so?  I guess it was, what, August 11th.  Why did you wait

8   until just before trial to request a subpoena and to bring

9   up this issue?  You had time.

10           MR. SWAIN:  Sure.  That's absolutely true,

11  Your Honor.  There's an agreement in this case that the fact

12  witnesses in the pre-hearing statement, there was an

13  agreement between the parties that fact witnesses are called

14  adversely.  There is an agreement they can go outside the

15  scope.

16           What became apparent to us in early August was

17  that Brita began to take the position that you can't go

18  outside scope at all with Dr. Freeman, not just you can't

19  call him adversely, but if he doesn't mention specific

20  reductions to practice, you can't ask him about that on

21  cross at all.  And that's our concern.

22           And so we realized that Brita is making the very

23  narrow approach and argument that, if Dr. Freeman doesn't

24  mention a specific reduction to practice in his testimony,

25  that he can't be asked about that and confronted with his

1    prior opinions on cross-examination, which we think is

2    wrong.

3        And so as a backstop we had to go get a trial

4    subpoena because it seemed to us they were either going to

5    withdraw his entire opinion or not let us cross-examine him

6    at all.  And that was our concern, Your Honor.  We don't

7    believe a trial subpoena is necessary.

8        JUDGE MCNAMARA:  I still don't understand why the

9    trial subpoena came so late.  You started discussing this,

10   according to Brita's counsel, as early, again, as the

11   deposition, or you were formulating something as early as

12   Dr. Freeman's deposition on the 13th.  I still don't have a

13   clear answer about what happened that you waited so long and

14   why there wasn't a meet-and-confer on this.

15       The other issue that I have is, again, the answer

16   to my very direct question, what does it get you to talk

17   about earlier conception and reduction to practice dates

18   that have been conceded?

19       MR. SWAIN:  Sure, Your Honor.  They are not

20   conceding any earlier reductions to practice dates.  They

21   are remaining the same ones.

22       The difference is, Your Honor, Dr. Freeman made

23   opinions that 35 prior filters, right, to establish the

24   reduction to practice, he said 35 different filters practice

25   the claims of the '141 patent.  But in doing so, at least

1    10, possibly 15 of these embodiments he directly

2    contradicted the new opinions of their other expert,

3    Dr. Rockstraw, on what average flow rate means and what

4    lifetime means.

5          They withdrew any reduction to practice

6    embodiment that average flow rates, using a couple samples

7    or a few samples, as the patent dictates, or any embodiments

8    that go over 10 ppb lifetime.  And we think that that calls

9    into question the credibility of Dr. Freeman, and also

10   demonstrates that, before Brita made this an issue,

11   Dr. Freeman had no problem saying that certain embodiments

12   of the invention practice the patent based on average flow

13   rate and lifetime, as properly defined by the patent, and we

14   just want to explore that on cross-examination.

15         JUDGE MCNAMARA:  So the bottom line, what you're

16   trying to get at, is change in opinion and credibility.

17         MR. SWAIN:  Absolutely, Your Honor.

18         JUDGE MCNAMARA:  All right.  What I'm going to do

19   on this, to not prolong this, I need to read the brief that

20   just came in and check some of the cases.  I will give you

21   an answer within the next two days so that you can prepare

22   in the event I do not quash the motion.  I'll give it to you

23   fairly quickly.

24         MR. SWAIN:  Thank you, Your Honor.  I do have a

25   question that may streamline things if you could give

1    guidance.

2         JUDGE MCNAMARA:  Go ahead.  Sure.

3         MR. SWAIN:  If Dr. Freeman appears before this

4    court, may we ask him questions about his two expert reports

5    and events that occurred in his deposition?  We believe that

6    that is fair game to ask Dr. Freeman.

7         JUDGE MCNAMARA:  It is, generally speaking, under

8    the Federal Rules of Evidence and under the APA, sure, that

9    is fair game.  As you well know, the depositions can be used

10   for any purpose that deals with, again, testimony -- well,

11   testimony can come in on cross-examination with respect to

12   any part of that record.  But whether or not the entire

13   scope comes in, I don't know yet until I hear the questions

14   in part.

15        So let me also, as I said to you, I'm going to

16   take a look at your brief, and I am going to look at the

17   cases, and I will give you, first of all, an oral order.  We

18   will then issue a written order.  And I will let you know

19   what's possible, given the rules of evidence, and what the

20   scope may or may not be.  And that's how I'm going to deal

21   with this.

22        MR. SWAIN:  Thank you, Your Honor.  That's

23   helpful.

24        JUDGE MCNAMARA:  Okay.  Thank you.  There are a

25   couple of other issues that I wanted to raise before I ask

1    the parties -- this, again, Mr. Swain, goes to the

2    Respondents.

3           When I read through the briefs, I saw the number

4    of affirmative defenses that the Respondents raised, and I

5    also took a look at some of the proposed testimony that was

6    provided, at least with respect to the pre-hearing brief.

7           I'm not convinced that there's clear and

8    convincing evidence for some of these -- some of the

9    affirmative defenses, specifically inequitable conduct,

10    there's an estoppel, there's a couple different estoppel

11    arguments.

12           Are you prepared to just let some of these go

13    without spending trial time on potential defenses that

14    simply do not have factual or legal support?

15           MR. SWAIN:  Absolutely, Your Honor, and I'm glad

16    you asked.  At least on behalf of the PUR Respondents, we

17    are no longer making an equitable estoppel defense and

18    that's basically because of the protective order issue.  We

19    cannot prove the facts and evidence there.

20           There are others -- I believe ZeroWater is going

21    to clarify, and I'll have Mr. Brandyberry come up.  We

22    certainly will not present any defense that we do not have

23    sufficient evidence for, let alone clear and convincing

24    evidence, and Mr. Brandyberry can confirm more.

25           JUDGE MCNAMARA:  Just to be clear, at least the

1    PUR Respondents are conceding they don't have the necessary

2    factual or legal support for inequitable estoppel.

3         MR. SWAIN:  We are not going to be arguing

4    equitable estoppel in this investigation, Your Honor.

5         JUDGE MCNAMARA:  Do any of the other Respondents

6    join you, if you know, on conceding that?

7         MR. SWAIN:  That was a defense that was specific

8    to the PUR Respondents.  There are many other affirmative

9    defenses that Mr. Brandyberry can talk about.

10        JUDGE MCNAMARA:  And I just wanted to get you on

11   the record on that.  I know what the complaint and responses

12   say.

13        Go ahead, Mr. Brandyberry.  What are you

14   conceding and not bringing up during trial?

15        MR. BRANDYBERRY:  As far as inequitable conduct,

16   that defense is no longer being pursued at trial, which we

17   confirmed with Brita's counsel, and the Joint Statement of

18   Issues, I believe, lays out that that's not in there.

19        We do have an unenforceability defense that we

20   are pursuing at trial.  And underneath that there's an

21   inequitable estoppel theory and an implied waiver theory

22   related to conduct at the standard-setting organization.

23        JUDGE MCNAMARA:  Okay.  So the case law on that

24   is pretty clear, on what constitutes any of those defenses

25   and the kind of evidence that you have.

 1          What do you have on that other than the fact that

 2     Brita had representatives attending some of those meetings,

 3     what do you have?

 4          MR. BRANDYBERRY:  So to answer that, I think we

 5     may need to go on the confidential record.

 6          JUDGE MCNAMARA:  Okay.  So at this point would

 7     each side confirm, first of all, Mr. Ainsworth, would you

 8     double-check and make sure that anybody who is not on the

 9     protective order jumps off?

10          (Whereupon, the hearing proceeded in confidential

11     session.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22040-22051 redacted in their entirety

```
 1                O P E N   S E S S I O N

 2

 3         JUDGE MCNAMARA:  Yes, Mr. Ainsworth, if you would

 4    check, and anybody who needs to come back in can at this

 5    point.

 6         MR. AINSWORTH:  We're doing that, Your Honor.

 7              And so that Your Honor knows, the parties have

 8    agreed that, for purposes of the opening statements, our

 9    in-house counsel and client representatives may stay in even

10    though there will be some party CBI shared, it's only

11    third-party CBI that the we're going to excuse the people

12    not under the protective order.

13         JUDGE MCNAMARA:  Thank you for letting us know

14    that, Mr. Ainsworth.

15         MR. AINSWORTH:  I'll be ready to proceed when the

16    Respondents are ready, Your Honor.

17         JUDGE MCNAMARA:  Okay.  Mr. Swain, are you ready?

18                   OPENING STATEMENT

19         MR. AINSWORTH:  This investigation, Your Honor,

20    concerns technology that Brita developed to solve a

21    real-world issue -- particulate lead in drinking water.

22              Brita solved this problem with an innovative

23    product, a Brita filter, activated carbon, lead scavenger,

24    and a novel combination of physical and performance

25    properties that achieved the result of removing both soluble
```

1    and insoluble lead through a gravity-fed filter.  The

2    invention disclosed and enabled by the '141 patent is novel

3    and it's definitely not obvious.  And it's also eligible

4    subject matter.  It describes an article of manufacture that

5    falls squarely within the scope of section 101.

6            In this investigation, Your Honor, infringement

7    is not substantially contested.  You're not going to hear

8    testimony from Respondents' experts on issues of how their

9    filters perform.  Dr. Rockstraw's opinions are largely

10   unrebutted on the issues of infringement.

11           You're also not going to hear much on domestic

12   industry.  There's not a real challenge to the fact that we

13   have a product that practices our patent.

14           And in terms of our economic prong, you're also

15   not going to hear much of a challenge other than some

16   nibbling around the edges.

17           And this is because Brita's product was developed

18   and is predominantly made in the United States, as to

19   Respondents' invalidity theories, I will go through those in

20   some detail.

21           As Your Honor knows, the '141 patent was already

22   tested once at the PTAB, through their best prior art,

23   published prior art, patent prior art that they could as a

24   patent, and couldn't even get institution under the lower

25   standard of burden required at the PTAB.

1          So what we have for this investigation is a prior

2    that they cannot use at the Patent Office, of course their

3    physical prior art, a series of statutory defenses, every

4    one they could muster, in order to try and throw as much as

5    they could at the '141 patent.

6          At the end of the day, we believe Respondents

7    cannot and will not show by clear and convincing evidence

8    that the '141 patent is invalid.

9          But I want to start, Your Honor, if we can, with

10   what led to where we are in terms of the invention of the

11   '141 patent.

12         In the early 2000s, as we discussed in the

13   Markman hearing, there was some wide-scale reports in

14   different municipalities of particulate lead in drinking

15   water.  D.C., for example, in 2004 had a high-profile report

16   of lead in drinking water.

17         As a result of that, the industry group NSF and

18   ANSI, which is responsible for the standards related to

19   water filtration, began looking at the standard.  There's

20   two requirements for lead reduction on a water filter.  One

21   is at a pH 6.5, the other is a pH 8.5, and the pH 8.5

22   standard was intended to cover particulate lead or insoluble

23   lead, but the task force realized it wasn't doing the job.

24   It wasn't -- the filters that met that standard weren't

25   sufficient to remove both soluble and insoluble lead.

1   That's what lead to the change in the industry standard.

2           That work began around 2004, resulted in draft

3   guidance in November 2005, and ultimately a standard was

4   adopted in early 2007.

5           Respondents have suggested that the only reason

6   the standard changed had to do with just -- there were

7   issues with reliability of the testing.  But as the task

8   force held or described in their joint presentation on May

9   11th, 2006 particulate lead is a real-world issue that can

10  occur cross many water chemistries and distribution systems.

11  And, Your Honor, that was the problem that the '141 patent

12  inventors set out to solve.

13          So just to look at what the prior art was like.

14  This is from the patent, Table 3, Brita granular, that was

15  the then existing legacy filter that Brita had.  If you've

16  had a Brita filter over the years, it's a white one.  The

17  domestic industry product is a blue filter.  We still have

18  our old white flagship filter.

19          What you're seeing here, Your Honor, the top row

20  of Table 3, that's showing the levels of lead in effluent

21  after the NSF 53 pH 8.5 challenge water was passed through

22  the Brita filter.

23          Now a passing result would be under 10 parts per

24  billion.  And as you can see, at every time point, the Brita

25  filter, our old filter, was three times the level required

1  for a passing result under the new standard that was coming

2  out.  This was what the inventors saw and said this is what

3  we need to solve.

4         And that's what they set out to do.  And as they

5  noted in the patent, all the mixed-media filters that they

6  tested failed, failed to reduce -- I apologize, Your Honor,

7  I lost my clicker -- failed to reduce lead to below 10 parts

8  per billion over the life of a filter -- in fact, by 50

9  percent, half the filter life of all the existing filters

10  they tested failed to remove soluble and insoluble lead.

11         Now I just want to say, this is going to be a big

12  point of dispute in this case.  We believe the prior art was

13  incapable of removing soluble and insoluble lead under that

14  new 8.5 standard.  You're going to see evidence from

15  Respondents that they are going to bring in testing to say,

16  hey, we've tested some old filters, and, lo and behold, they

17  are removing lead down to 10 parts per billion.

18         The question for Your Honor is, are you going to

19  believe the evidence that they generated for litigation or

20  the testing done by the inventors, the testing done by third

21  parties back in 2006, the testing done by Respondents in

22  2006, that show the very filters they now say invalidate our

23  patent were incapable of reducing soluble and insoluble lead

24  to anywhere near what you needed to have a filter capacity

25  of 40 gallons.

1          That is going to be the crux of the issue,
2     Your Honor.  Do you believe the testing today from
3     Respondents' expert or the historical testing that wasn't
4     done to invalidate a patent but was done to understand the
5     science and to determine what was the right step forward.
6     And the whole industry was focused on this.  It wasn't just
7     Brita.
8          All the Respondents or at least the PUR
9     Respondents, because they have been our competitor for many,
10    many years, they too were focused on trying to solve this
11    problem.  You will see the evidence.  Their filters in 2006,
12    they didn't do the job.
13         So you're going to hear from Dr. Knipmeyer today.
14    She is going to be our first witness.  Dr. Knipmeyer had
15    just finished her Ph.D., had joined the Clorox Company, and
16    had been assigned to the Brita team.  And one of her first
17    tasks was help us figure out a solution to soluble/insoluble
18    for our gravity-fed water filter business.
19         We're going to go through her notebook.  First of
20    all, she has lovely handwriting.  You can see clearly and
21    easily what she was describing.  You'll see her prototypes.
22    You'll see the results.  They are in black and white.  In
23    the summer of 2006 she had reduced to practice along with
24    the other inventors working prototypes that reduced soluble
25    and insoluble lead to the desired levels.

1      Now one thing you're going -- you've heard from
2  Respondents that I really do take issue with, because they
3  have a cynical view of Dr. Knipmeyer and Brita.  They have
4  suggested that our patent, the '141 patent, is a result of
5  clever patent lawyer drafting, that it was done in response
6  to multiple Office Actions in other applications.  You saw
7  at the Markman hearing, you saw it in their pre-hearing
8  brief, they made this assertion.
9      Your Honor, in Dr. Knipmeyer, you're going to see
10  the memo she wrote September 19th, 2006.  Dr. Knipmeyer, in
11  her own hand, drafted out her concept of using the FRAP
12  factor to define what they had invented.
13      Respondents can throw lots of accusations against
14  the '141 patent and Dr. Knipmeyer, if they want to.  One
15  thing they can't take away from her -- this was her idea.
16  It was in her hand.  She thought of it.  She wasn't a patent
17  lawyer.
18      So, you know, she was just -- she was a young
19  scientist who had come up with an idea that she thought was
20  novel and innovative.  And that is one thing that she is
21  entitled to.  This is definitely her concept and her idea,
22  and with the cynical view it was drafted by patent lawyers
23  to avoid prior art.
24      So just to show you what Dr. Knipmeyer and the
25  other inventors achieved, this is a representation, and what

1   you're seeing here is four filters and is charted out across

2   this graph.  You see that dotted line?  That represents the

3   new NSF standard, the level of lead you have to be above --

4   yeah -- you have to reduce -- so 100 percent reduction of

5   lead, that line shows the minimum you need in order to stay

6   within the NSF standard.

7           And that red line is the prototype, one of the

8   prototypes that Dr. Knipmeyer invented along with the other

9   inventors.  You can see right there, maintaining constant

10  levels of lead reduction across -- this would be 80 gallons,

11  200 percent of her target filter life.

12          JUDGE MCNAMARA:  Pardon me.  Mr. Ainsworth, would

13  you remind us all what slide you're on?

14          MR. AINSWORTH:  Thank you, Your Honor.  I'm on

15  slide 6 of CDX-1.

16          JUDGE MCNAMARA:  Go ahead.

17          MR. AINSWORTH:  So the red line, again, is one of

18  the prototypes demonstrating soluble and insoluble lead

19  reduction levels required to meet the new standard.

20          Then we look at -- there's three other lines in

21  there.  There's a green line that goes from 90 percent down

22  towards the bottom.  You see that one.  That was PUR's

23  two-stage filter.  That's the filter they are saying is

24  prior art and anticipates our patent.  Had horrible lead

25  reduction.  You can just see how the line goes straight

1    down.  That's our data showing that.  We'll show you their
2    own data that shows the same thing.

3         And then you see down that blue line, it goes
4    straight across or drops off, that's the Brita white filter
5    we talked about.  And so just looking at the data you can
6    tell what the inventors did is they solved the problem that
7    the prior art did not.  And, like I said, we're going to
8    have evidence besides Brita's own testing.

9         So in September of 2006, September 2006, so this
10   was after Dr. Knipmeyer and her team had already come up
11   with prototypes, had already tested and solved the problem,
12   Culligan, one of the Respondents in this group -- it's the
13   parent company of the ZeroWater Respondents -- Culligan
14   commissioned a third-party lab, Pace Analytical, to do a
15   study.

16        And the conclusion of this third-party lab, they
17   tested eight gravity filters.  They don't tell you which
18   one.  It says eight gravity filters from various
19   manufacturers -- we can all assume that probably Brita and
20   PUR are at least some of the ones tested there -- were
21   tested against the high pH and alkalinity lead reduction
22   testing -- that's that NSF 53 draft standard we've been
23   talking about -- and the conclusion was every single one of
24   them failed, and six of them failed at the very first time
25   point.

1          So the data from third parties, third-party labs,

2    independent labs in 2006, is completely consistent with what

3    the inventors of the '141 patent had discovered or had

4    realized and identified in prior art.  And, frankly,

5    Your Honor, it was consistent with what the industry knew.

6    Because after the new standard came out, everyone that had a

7    lead reduction claim on their existing filter lost it --

8    every single one.

9          So the idea that these filters that Respondents

10   say were great in reducing lead in 2006, according to their

11   new testing, doesn't hold water.  And please pardon the pun.

12   But no one would spend the money that Brita spent on

13   developing a new filter, and the other Respondents spent on

14   trying to find better technology, if existing technology was

15   just fine at reducing soluble and insoluble lead.

16         I'm going to jump forward here.  We have already

17   talked --

18         JUDGE MCNAMARA:  To which slide?

19         MR. AINSWORTH:  I'm sorry.  CDX-1, slide 9.

20         And this, Your Honor, is claim 1 of the '141

21   patent.  We talked about it at the Markman hearing.  I think

22   you're now at this point familiar with the general structure

23   of the '141 patent.  It's directed towards a gravity-fed

24   water filter, has filter media with activated carbon and a

25   lead scavenger, and that's that FRAP factor we've been

1    talking about.  You're going to hear more about that FRAP

2    factor today from Dr. Knipmeyer.

3         We have a dependent claim that limits the FRAP

4    factor from 350 down to 200.  We have a couple claims drawn

5    to further limitations on the volume of filter media, so the

6    size of filter media housing.  We have a couple claims --

7    now on slide 11 -- claims 5 and 6, drawn to further

8    restrictions on the average filtration unit over time.

9         And then the last claim we're going to talk about

10   in this investigation is claim 23, and if I just put it

11   simply, it's a combination of the filter of claim 1 with a

12   container that has an upper reservoir and a lower reservoir.

13   So think of it like a pitcher you would have in your

14   refrigerator or dispenser.

15        Those are the claims we have.  So really one

16   independent claim and several dependent claims.  Claim 23, I

17   guess, is technically an independent claim, but it has

18   that -- it's one of those weird ones that refers back to an

19   earlier dependent claim.

20        I want to talk just briefly about a couple of

21   things.  One thing you've heard in Respondents' brief is

22   they try to say -- this was at the Markman hearing too --

23   that all the Brita inventors came up with was carbon block

24   technology and they didn't invent anything else.

25        You'll hear testimony from the witnesses and from

1  our experts that the difference is the similarities between

2  carbon block, mixed-media, and nonwoven are more similar

3  than they are different.

4        First of all, they all involve the exact same

5  principles, mechanical filtration and chemical filtration.

6  They involve activated carbon and lead scavengers.  And the

7  principles of how you adjust flow rates and volumes to

8  achieve the goals you want are similar across all these

9  technologies -- across all these formats of filter media.

10  And you'll hear testimony to that from the witnesses in this

11  investigation.

12        At the Markman hearing we talked through, I

13  think, every single one of these properties of the FRAP

14  factor, Your Honor --  volume, average filtration unit time

15  over lifetime, lifetime, lead reduction.  The evidence will

16  show these are not abstract concepts.  These are tied

17  directly to physical properties of the filter in terms of

18  how they are structured.  Every single one of these relates

19  directly to the physical properties of a filter and how

20  those properties impact performance.

21        In terms of our domestic industry case, I want to

22  touch on it briefly.  I do think this is one that shouldn't

23  largely be in dispute.

24        I am on slide 16.  These are the accused

25  products.  There's the PUR products, which include

1    containers and dispensers, and one filter, the PUR Plus

2    filter.

3            We then have the ZeroWater products, which,

4    again, includes containers or pitchers and their filter.

5    There's the Aqua Crest product, which is a replacement for

6    the ZeroWater filter, so we have it sort of grouped together

7    with ZeroWater.

8            And on the right-hand side we have the LifeStraw

9    pitcher and filters.  And it's just the filters here that

10   are accused when they are sold -- with the pitcher that

11   should say.  But the filters, it has two components that

12   work together to provide filtration for that particular

13   system.

14           Our domestic industry products are the Brita

15   LongLast and Longlast+.  The Longlast+ has just been

16   rebranded to the Elite product.  It's the exact same

17   product.  It has a new name attached to it.  You're going to

18   hear testimony about that product this week.

19           And then on infringement, the evidence is going

20   to show, we're going to meet our burden -- I'm sorry, slide

21   18.  Your Honor, I'll get this right, I promise.

22           On slide 18, we show -- there shouldn't be a

23   dispute, hopefully, that these are all gravity-fed water

24   filters.  There shouldn't be any dispute that there's

25   activated carbon and a lead scavenger.  Although we may hear

1    a challenge on that from one party.

2         And the testing that was done, there's no testing

3    that is contradicted.  No one is going to say they don't

4    really meet these requirements.  And we're going to show

5    that every one of the accused products as well as, of

6    course, our DI product meet the FRAP requirement of 350 or

7    less.

8         Down the line, on slide 19, there's some

9    variations in which dependent claims are asserted against

10   the various Respondents.  We'll meet our burden on every

11   single one of these.  Dr. Rockstraw, who will be our expert

12   testifying on those issue, will explain in detail,

13   Your Honor, our evidence there, but we think a lot of this

14   is not going to be in dispute.

15        And it's because, you know, they have admitted in

16   their responses, there's activated carbon, they admitted

17   they have an ion exchange resin, which the testimony will

18   show is, in fact, a lead scavenger.  Really shouldn't be in

19   dispute.

20        And then the testing is going to show what the

21   volume is, what the average filtration over time is, what

22   the lead reduction was, and the lifetime is pretty

23   straightforward we think, Your Honor, for these products,

24   and the FRAP values are all well within less than 350 or

25   less than 200, depending upon which claim we're talking

1    about.

2          So we think infringement, domestic industry,

3    technical, Your Honor, are going to be relatively

4    straightforward.

5          Turning to domestic industry -- I'm now on slide

6    22, but I'll just jump to slide 23 -- first of all, the R&D

7    for the Longlast product happened in Pleasanton, California.

8    Investments were made for the R&D work in Pleasanton.  We're

9    going -- the Longlast product is made in West Haven,

10   Connecticut.  You're going to see the evidence from that.

11   You're going to hear from Mr. Barillion, who is the CEO of

12   KX, the supplier of the naked filter media.  They assemble

13   it into the housing and then ship it off for packaging

14   elsewhere.

15         You're going to hear testimony about the labor

16   and investment that goes into the domestic industry product.

17   And we think it's very strong, really an indisputable case

18   of domestic industry.

19         On slide 25, $6.2 million in domestic

20   investments, with, as I said, almost all made entirely

21   within the United States.  And in terms of the relative

22   value of that, 54 percent of the costs of the Longlast

23   filter is domestic, either U.S. parts or U.S. labor.

24         In response to the pre-hearing brief, they made

25   an argument that we hadn't quite seen before, and it's

1  quoted at the bottom.  They say that our value add is only 4

2  percent.  On page 1 of their brief, they said it was fatal

3  to our case.  I just want to address that real quickly to

4  show you what they did.

5          So the top number there they say was 4 percent.

6  They discounted a lot of our investments and said we have

7  double-counted, Brita double-counted its investments.  That

8  doesn't come from any factual testimony.  Their expert just

9  said, I can't tell whether it's double-counted or not, so

10 I'm just going to subtract it out of the column.

11         That's why we had to bring in Mr. Ramirez to

12 testify.  He's in the finance department at Brita.  He will

13 explain the math.  And Mr. Barillion will come in and

14 explain the accounting from KX.  There's no double-counting.

15 Our $6.2 million is a solid number.

16         But the other thing they do is then divide the

17 investment over total sales.  So under Respondents' theory,

18 a really successful product would have a really low value

19 add under this sort of contextual analysis.  We think,

20 Your Honor, this is not appropriate for a DI case because

21 that just means the more successful you are the less

22 investment you would have in industry.  And that doesn't

23 make a lot of sense from the Commission's standpoint.

24         So we believe, Your Honor, the evidence will show

25 there's a strong domestic industry here in the

1    United States.

2          So turning to validity, which is really, I think,

3    Your Honor, where you want me to spend my time but I had to

4    do the first part first.

5          This case has been a series of -- I've raised

6    this at DCM calls.  We had concerns over the number of

7    defenses that were raised.  Your Honor, I understood you

8    wanted to give them a chance in discovery and to make their

9    case, and they are entitled to that, but there have been a

10   lot of defenses raised.  We have whittled that down to at

11   least a more manageable number.

12         I want to start with, first of all, the issue of

13   priority and our dates.  I think we're explicit in our

14   pre-hearing brief on this, but we said, for purposes of

15   102(a), our invention date, May 2006, with reduction to

16   practice, that summer, you saw that -- you understand where

17   we are on that -- the evidence will show our conception to

18   reduction to practice date for purposes of 102(a).

19         For purposes of 102(b), we're relying only on our

20   '372 application that was filed in October of 2007, which

21   means the critical date for prior art is one year before

22   that, so October 29, 2006.

23         So those are our 102(a) and 102(b) dates.  We're

24   going to establish the first one.  We'll establish the

25   second one.

```
1        In terms of our claim to priority to the '372 --
2   I'm now on slide 28, Your Honor -- I would be remiss if I
3   didn't mention, The Patent Trial and Appeal Board already
4   found that we were entitled to priority to the '372
5   application.  They found disclosure there based upon
6   testimony from PUR's own witness that we had priority to the
7   '372 application when they denied institution of the PUR
8   IPR.
9        So, Your Honor, you, of course, will take a look
10  at the evidence yourself and decide for yourself whether we
11  have priority, but we think the right conclusion, the one
12  the PTAB found, that the '141 patent claims are entitled to
13  priority to the '372 application.
14       Let's talk about their prior art.  The first set
15  of prior we're going to hear about -- if I heard Mr. Swain
16  correctly, they are no longer alleging obviousness.  I can
17  shortchange a couple things here in my presentation.
18       It sounds like they are relying on just prior art
19  they tested.  There's an old Brita filter they tested.
20  There were two PUR filters they tested.  There was a couple
21  of DuPont filters they tested.
22       Now, as we understand it, Respondents -- one of
23  the Respondents have, basically, a storage room with old
24  products.  Not terribly surprising that R&D groups have old
25  products sitting in a storage room somewhere.  They pulled
```

1   them out.  They tested them.  They also got some of these

2   off of eBay, Your Honor.  Those I have a little more doubt

3   about those.  I'm not sure how you find a 20-year-old filter

4   on eBay, but the internet is an amazing thing.

5           They got these products and they tested them.  I

6   want to be clear here about one of the issues is going to

7   be.

8           So as Your Honor knows, black letter law, I hate

9   to put black letter law on this slide, this is slide 30, but

10  requiring anticipation, every element is found within a

11  single prior art reference.  That's black letter.  We all

12  know that.  You're not going to see that entirely in their

13  case.  You're going to see a lot of combinations of trying

14  to combine information from different sources to prove the

15  prior art.  We'll show you that.  We'll get to that when it

16  comes.

17          The second thing, though, is this case involves a

18  question of inherency.  And when you're trying to prove

19  invalidity, anticipation, under the principle of inherency,

20  the law is super clear.  It can't be established through

21  probabilities or possibilities.  It's not enough that it

22  just may result.  They have to prove it's necessarily

23  present in the prior art.  That's a very high burden.

24          And, Your Honor, the evidence is going to show

25  Respondents cannot meet that burden in this case,

1  particularly not with their litigation-driven testing
2  conducted, and I'll explain why.
3        There are three fundamental flaws in Respondents'
4  anticipation case.  First, as I'll explain in a minute,
5  their testing was deliberately flawed, deliberately flawed,
6  and it cannot demonstrate what the value of the effluent
7  lead concentration at end of lifetime was for any of the
8  filters they tested.
9        Second, their testing of the average filtration
10  unit time over lifetime was deliberately flawed.  They
11  measured only 3 percent, 3 percent, of the total filtered
12  liters to try and show what the average was over the
13  lifetime of the filter.
14        Now Respondents are going to say -- well, I'll
15  get to what Respondents are going to say about that in a
16  minute, but that's the second flaw.
17        And the third flaw, the evidence will show, a
18  skilled artisan would not understand the filters they tested
19  could have a lifetime of 40 gallons under the NSF 53
20  standard or under the challenge water recited in the claims,
21  because it did not perform in a manner that would show you
22  can reduce lead for 40 gallons or any longer.
23        I'm now over on slide 33.  So, Your Honor, let me
24  tell you -- I want to highlight what went wrong with their
25  testing.

1          So the test protocol they used was developed by

2    the in-house people, the team at PUR, Helen of Troy, I

3    assume with their counsel.  And the challenge of their

4    design, their specification was total lead, 120 to 140 parts

5    per billion, soluble lead, 90 to 120, colloidal lead, 30 to

6    60.  It's that top number I want Your Honor to remember, 120

7    to 140.

8          What does that mean?  They were aiming for the

9    low end.  So our claims, claim 1 of the '141 patent, says

10   soluble lead from 90 to 120, colloidal lead from 30 to 60.

11   Those parts are okay.  But that means your total lead can be

12   between 120 and 180.

13         What Respondents tried to do is get it as low as

14   possible at the lower end of the range, with probably the

15   hope that you put less lead in, you get less lead out.

16         But what happened was it caused real issues with

17   their testing.  So I'm showing you now, this is the -- what

18   you're looking at, Your Honor, on slide 34, this is their

19   tank water.  So this shows that they measure the lead

20   influent in the tank at the beginning of the day and at the

21   end of the day.

22         And if you look on the table, from -- on April

23   20th, April 21st, April 22nd, April 24th, and April 25th,

24   they were out of specification every single day.  That was

25   the first 20 gallons, the first 20 gallons that they

1    challenged these filters with, they didn't even use lead --

2    challenge water that was in the specification.

3           Now they realized this, because they were

4    checking in the morning, and some days the lead was not

5    correct in the morning, and they then checked in the

6    evening, and some days it wasn't right in the evening.  We

7    don't know when over the course of the day the challenge

8    water fell out of specification, but their challenge water

9    had issues.

10          So you would think that test isn't going right,

11   what should we do, perhaps restart the test, figure out why

12   our challenge water isn't working correctly.  That's not

13   what they did, Your Honor.

14          They did a revised protocol in the middle of the

15   test.  An in-house scientist, Mr. Mitchell, at PUR,

16   Mr. Herman, the expert they hired, along with counsel for

17   Respondents, for PUR, issued a revised memo.  And this is

18   the real kicker.

19          If we look at what they try to do here, they try

20   to narrow the range even more.  So they try -- instead of

21   going for 30-60 parts per billion of colloidal lead or

22   particulate lead, they aim for 30-40.  Instead of aiming for

23   90-120 parts per billion soluble lead, they aim for 90-100.

24          So their goal, Your Honor, was not to approach

25   testing like a person of skill in the art would, where you

1  approach the nominal value to make sure you stay within a

2  range -- they aimed for the bottom.  By aiming for the

3  bottom, that meant their tank kept having issues and not

4  being the right challenge water to administer.

5       The other thing they did -- I was on slide 35

6  there.  Let me go back to slide 34.

7       So I mentioned earlier that they were testing the

8  tank water at the beginning of the day and at the end of the

9  day.  The other change in their protocol, Your Honor, when

10  they realized their tank water was not working, they stopped

11  checking.  They stopped checking the tank water at the end

12  of the day.  So we have no idea whether they actually fixed

13  the problem.  They instead just stopped testing to

14  determine, at the end of the day, whether challenge water

15  was a problem.

16       And now you'll hear testimony that you don't

17  necessarily have to check at the beginning of the day and

18  the end of the day if you have good challenge water.  But

19  it's pretty clear the Respondents had an issue with their

20  tank.  They made no adjustments whatsoever to how they

21  prepared the challenge water -- no adjustments.  They just

22  stopped testing to confirm that it was within specification

23  at the end of the day.

24       Now the technician and scientist that actually

25  made this challenge water and did this testing, they are not

1   going to call him, Your Honor.  He is not on their witness

2   list.  Instead of hearing from Dr. Herman, who is going to

3   say, well, I reviewed the results, these results look good

4   to me, but we're not going to have the person who actually

5   made this challenge water and tested the filters here to

6   explain his results, Your Honor.

7           Jumping forward to -- this just highlights,

8   Your Honor, I've talked through how their specification was

9   different from what the '141 patent required.  You can see

10  here, the middle set of bars, the green is what the claims

11  require, 60 to 30, that's where they started in their

12  initial specification.  And then when they changed halfway

13  through, they dropped it down to 40-30.  On the right-hand

14  side of slide 36, same thing, you see they started

15  supposedly at the same requirement for soluble lead and then

16  dropped it down 100 to 90.

17          This just goes to why their challenge water --

18  why they had so many issues with their challenge water.

19  They weren't aiming for the right objective, the right

20  specifications in their challenge water.

21          And this isn't just some -- the issue is with

22  their testing, isn't just about the challenge water.  This

23  has real effects on the results.  And what they have done,

24  Your Honor, in their pre-hearing brief, they selectively

25  gave you the results.  I just want to show you what they

1    did.

2          So the PUR 2-stage filter -- this is in their

3    pre-hearing brief at page 76 -- they show you the QFT 6A,

4    first 40, that's one of the filters they tested, and they

5    show you, look, Your Honor, this PUR 2-stage filter has a

6    FRAP value of 133.  They show you at the bottom there, HOT,

7    IT 1373, another sample -- I'll talk about the middle one in

8    a minute -- they provided the testing, but they didn't

9    present this in the brief -- they had other test results

10   with the PUR 2-stage filter, and those test results show

11   FRAP values of 1300, 2100, and 560.

12         It's hard to say that the prior art necessarily

13   inherently has the properties required to demonstrate the

14   FRAP value when you have these kinds of dramatically

15   different results.

16         And, by the way, their results for the ones they

17   didn't present are just consistent with what the prior art

18   said about the PUR 2-stage filter.  I do want to point out,

19   above is a PUR 2-stage with no timer and the PUR 2-stage

20   below is one with a timer.  The testimony will be that it's

21   the same filter media, the same housing.  One has a device

22   to tell you how many gallons you've used.  But their

23   witnesses say it's the same filter.

24         So what we don't know, Your Honor, is -- what we

25   do know, what the experts will explain, is that PUR's and

1   the Respondents' testing was flawed, it resulted in

2   inconsistent and wildly inconsistent results in their

3   testing, and should not be credited for purposes of

4   demonstrating invalidity of the '141 patent.

5          I can point to more -- I'm now on slide 38,

6   Your Honor.

7          On slide 38, this is just showing a little more

8   detail on the problems in their testing.  So the top table,

9   just to orient Your Honor, is a testing of one of the older

10  Brita filters they tested.  And the middle column, effluent

11  lead concentration, that's showing measuring the lead as

12  it's filtered out of the water.

13         You see the first time point is as 5 parts per

14  billion, then 1 part, then it jumps up to 17 parts per

15  billion, and then it goes up to 62, and then it goes down to

16  17.5, 6.5, 4.9.

17         Respondents' expert doesn't explain why their

18  testing resulted in such wildly different lead results

19  across the testing of these filters.  We see it on another

20  PUR product.  This is the PUR 1 stage, the 1450Z down below.

21         You see the first time point, 1.6 parts per

22  billion; the second time point, 1 part per billion.  Jumps

23  to 19.  And then 83 parts per billion, seven times over what

24  would be a passing result under the standard, and then drops

25  down to 11.3.

1          The data doesn't make any sense except for the

2   fact they were not using the right challenge water.

3          The second big issue with their testing,

4   Your Honor, they didn't properly measure the average

5   filtration over time lifetime.  They are going to say we

6   have changed our position on this.

7          Your Honor, Brita's position on how you determine

8   the average filtration over lifetime has been consistent

9   throughout this investigation.  In early March we produced

10  our testing to Respondents.  We gave them the raw data.  We

11  gave them the worksheets that show that we measured

12  essentially every liter.

13         I say "essentially" because, when you measure 151

14  liters you might miss three or four because of operator

15  error.  96 percent of the liters were measured when Brita

16  did its infringement testing and provided it to Respondents.

17  They knew how Brita viewed this back in March.  They chose

18  to do it differently.  Instead of measuring multiple

19  datapoints across all of the testing, they measured five

20  times -- 3 percent, 3 percent.

21         And, Your Honor, I do want to point out, this was

22  an issue we had at the Markman hearing when Your Honor

23  resolved the issue of claim construction.  Respondents'

24  counsel told you multiple, multiple times -- I'm quoting

25  here on slide 39 -- they say they did every single liter,

1  that's us.  They measured flow rate at every single liter

2  and averaged over all of the filtered liters.  They say it

3  over and over in the Markman presentation.  They knew what

4  our position was on this.  They knew how we said was the

5  right way to do this.  They chose to cut corners and only

6  measure flow rate a few times.

7          And the evidence will show, Your Honor, that

8  Dr. Herman's opinion on average filtration time over

9  lifetime should not be credited because he didn't properly

10 test it.  We don't think he properly tested it under a plain

11 and ordinary meaning.  We don't think he properly tested it

12 under the construction adopted by Your Honor.  And for that

13 reason as well their calculations of FRAP, the FRAP factor

14 for the prior products, can't be credited.

15         I'm running a little low here on time,

16 Your Honor.  I want to kind of jump to the last couple

17 issues.

18         It is unclear to me whether this is still in the

19 case, because both Dr. Hatch and Dr. Herman talk about it,

20 but one of the references in the pre-hearing brief was a

21 ZeroWater reference.  And what's really interesting about

22 this, they say it anticipates, but they can't tell us what

23 the volume is, the flow rate is, or the lifetime is.

24         So what Dr. Hatch did is he said we're going --

25 here is a range of values for volume, a range of flow rates,

1    a range of lifetimes, or at least two different lifetimes, a

2    matrix, and said, well, some here is anticipation.

3        Your Honor, this is not anticipation.  If they

4    are going to claim a prior product practices the claims,

5    tell us what the volume was, tell us what the flow rate was,

6    tell us what the lifetime was.  They can't even tell us what

7    the composition of the filter was.  They don't have any

8    documents showing specifically what the filter was in 2006.

9    And they don't have a witness who was there in 2006 who can

10   explain what the filter was.

11       So we think, Your Honor, we don't know whether

12   they are going to pursue this ground, but the ZeroWater

13   reference, we think, Your Honor, is an easy one to discount

14   on anticipation, obviousness, that as well, Your Honor.

15       The last reference, again, it sounds like

16   obviousness may not be in now because Dr. Hatch they said

17   was not going to testify on 103, but just real quickly --

18   this is in the pre-hearing brief and I want to address it.

19       The Rawson reference, which is three published

20   applications, to cut to the chase, the data they rely upon

21   in Rawson concerns a pressurized water filter.  They are

22   taking a pressurized water filter that is flowing through a

23   filter at approximately a half a minute per liter compared

24   to a FRAP table of closer to five minutes per liter.  It's

25   apples and oranges for purposes of invalidity.

1      Your Honor, we're going to also -- we're the

2  Patent Owner.  We're going to talk about objective indicia

3  as well.  I want to talk about one quickly, and that's

4  commercial success.

5      On slide 43, Your Honor, this just shows how the

6  Longlast filters and systems have, over the last four years,

7  the market share has grown, their sales have grown.  This is

8  the type of financial commercial success that demonstrates

9  objective indicia.

10      You'll hear testimony that our domestic industry

11  product is coextensive with the claims, and for that reason

12  commercial success also weighs in our favor.

13      Respondents have alleged that the '141 patent

14  lacks written description support, that the claims lack

15  written description support in the specification.

16      I think Your Honor is well familiar with the law

17  and written description.  It's the four corners is what we

18  look to, including the original claims.

19      The evidence will show their expert ignored much

20  of the relevant evidence, ignored the original claims,

21  ignored the figures that demonstrate multiple embodiments.

22      I'm on slide 44, Your Honor.

23      He ignored figures 21 and 23, which also disclose

24  additional teachings regarding the embodiments of the '141

25  patent.  And he also ignores multiple disclosures relating

1  to alternatives that carbon block formats that are closed in

2  the '141 patent.

3         Our expert will explain, Your Honor, and we think

4  there's sufficient evidence of written description support,

5  they cannot meet their burden by clear and convincing

6  evidence that we don't have 112 support.

7         They also raise enablement, Your Honor.  On

8  enablement, Dr. Hatch, he really focused on two parts of the

9  factors -- guidance in specification and working examples.

10  He really credited working examples like it was the end all

11  to be all for enablement ignoring the other factors

12  predominantly.  He gives them a little bit of lip service,

13  maybe a conclusory statement, but he doesn't really explain

14  or address the predictability of the art, the relevant skill

15  of the artisan, all that are important in evaluating whether

16  the '141 patent enables the claims.

17         We think the evidence will show that Respondents

18  cannot meet their burden on lack of enablement as well.

19         Respondents have also, as Your Honor knows, from

20  the MST they filed or raised in 101, patent subject matter

21  is one of their grounds.  As we explain in our opposition

22  brief and pre-hearing brief, the claims are directed to

23  eligible subject matter, and article manufacturers,

24  explicitly one category, and the claims here are not

25  abstract.  They are drawn to concrete physical and

1    performance properties of the filter that we believe qualify

2    under section 101.

3           Your Honor touched and I want to touch on a few

4    of the remaining defenses in the case that we hope --

5    hopefully, maybe we won't see again after today.  The first

6    one is you may remember Respondents argue we don't have

7    standing, and this argument I found particularly

8    interesting.

9           They tell you on page 134, on slide 49,

10   Your Honor, they tell you on 134 of their pre-hearing brief

11   that we granted Omnipure, our joint development partner, an

12   exclusive license without restriction as to field.  That's

13   what they told you.  And they cite the license, section 4.2

14   of the license.

15          Let's go to the license.  Let's put this issue to

16   bed right now.  So here's the license.  I apologize.  We're

17   on slide 50.  The quality of the print is not wonderful.

18          We granted Omnipure a license, as I said,

19   exclusive one, under the CIP application, that ultimately

20   became the '141 patent.  But here's the part they completely

21   ignore in the sentence, Your Honor.

22          For Omnipure to import, develop, make, to have

23   made, use, sell, offer for sale and sell for use products or

24   components for use in Omnipure products in the territory

25   outside of the field.  There are actually two field

1    restrictions there, Your Honor.  So field is defined, 1.2,

2    as gravity flow drinking water purification or filtration

3    devices.

4              And the second field restriction, Omnipure

5    products, is non-gravity flow, water purification or

6    filtration products sold outside of the field.

7              Omnipure and Brita could not have been more clear

8    about what they were doing here.  They were saying,

9    Omnipure, we'll give you a license to anything that comes

10   out of our patent that relates outside of the field of

11   gravity-fed water filters.  They said it multiple times in

12   that one sentence.

13             As Your Honor has already held, the '141 patent,

14   as the parties actually agreed, the claims are limited to

15   gravity-fed water filters.  There's nothing in the '141

16   patent that Omnipure has, in fact, a license to, as those

17   claims were allowed.  So this issue of standing, we think,

18   can be put to bed right away.

19             You asked Mr. Brandyberry about their equitable

20   estoppel and implied waiver defenses.  We understand,

21   Your Honor, you're going to take the evidence, you're going

22   to hear it, you're going to decide it.  There are a couple

23   of massive flaws in their evidence, and, hopefully, we don't

24   have to address this too much in post-hearing briefing.

25             One, we don't think they can show there was a

1    duty breached by Brita, and we'll get to that, but we don't

2    think they can show there was a duty breached.

3            The second thing, and their pre-hearing brief

4    doesn't even mention this, Your Honor, they just -- and that

5    is, under the law, it's not enough that you have a breach of

6    a duty to disclose patents to a standards-setting

7    organization.

8            The equitable estoppel or implied waiver both

9    require a showing of prejudice or egregious misconduct

10   sufficient to justify the sanction of an unenforceability.

11   In Core Wireless Licensing, which Respondents cite at page

12   139 in their brief, Your Honor -- I'm on slide 51 -- they

13   cite this case.  This case tells you, it's just like

14   inequitable conduct.  It's more than just breach of a duty.

15   You have to show prejudice.  You have to show egregious

16   misconduct.

17           They also have to show that there was -- that we

18   somehow benefitted from the alleged wrongdoing we did.

19   Nowhere in their pre-hearing brief, Your Honor, nowhere do

20   you see any record evidence cited of wrongdoing by Brita, no

21   alleged -- no allegation of egregious misconduct, and no

22   evidence, in fact, of prejudice, Your Honor.

23           It can't be the case that a mere duty to breach

24   under the law -- the law says duty to breach isn't

25   sufficient.  You have to show more than that.  They haven't

1   even alleged that or provided a citation to that in their
2   pre-hearing brief, Your Honor, and, for that reason, we
3   think they will fail to prove this at the evidentiary
4   hearing.
5           Just to put a couple fine points on this, one of
6   their experts, Mr. Herman, or Dr. Herman, is chairman of the
7   task force that oversaw this standard setting.  We asked him
8   at his deposition, are you familiar with a patent policies
9   from NSF?  He said yes.
10          Do you know whether or when you first became
11  familiar with that patent policy?  First familiar, probably
12  three months ago.
13          So if the chairman of the task force hadn't heard
14  of patent policy, Your Honor, it's hard to see how they have
15  established that Brita was aware of some patent policy that
16  they somehow breached.
17          On the second point of alleged misconduct, we
18  also asked Mr. Herman, the chairman of this task force, are
19  you aware of any evidence that anyone from Brita used any
20  improper efforts to try and manipulate the process for
21  adopting the NSF 53 standard for lead reduction?
22          His answer, if you're referring to unethical
23  behaviors, I'm not aware of any such behaviors.
24          Your Honor, their own expert who was a percipient
25  witness at the time has said he wasn't aware of the policy

1    and he is not aware of any misconduct.  We don't think

2    Respondents can meet their burden on their equitable

3    estoppel or their implied waiver, both of which require both

4    showings.

5         One other defense we have seen in their

6    pre-hearing brief -- we're not sure they're going to raise

7    it, Your Honor -- they're going to challenge whether --

8    improper inventorship.  They have alleged that one of our

9    inventors, Ms. Lynch, is an improper inventor.  And,

10   Your Honor, they have accused her of just being a technician

11   and not contributing to the conception of the invention.

12        You'll hear the testimony of Dr. Knipmeyer.

13   You'll see the deposition testimony of Ms. Lynch.  Ms. Lynch

14   was directly involved with the conception of the invention

15   as claimed, the various claims of the '141 patent.  And

16   Respondents certainly cannot meet their burden by proving by

17   clear and convincing evidence that she was improperly named

18   as an inventor, but we'll get to that with the testimony

19   today, Your Honor.

20        So let me briefly tell you who you will be

21   hearing from in our case-in-chief.  First up will be

22   Dr. Knipmeyer, who is currently the R&D department

23   manager -- her title is wrong here now -- she is actually

24   back in the Brita business as of a couple months ago.

25   You'll hear from Dr. Knipmeyer.  You'll hear from Ms. Lauren

1    Kahn, who is senior director and commercial leader for the

2    Brita business.  You'll hear from Mr. Rick Nishijima, who is

3    a scientist and associate research fellow at Brita.  He is

4    the gentleman who did the testing that you're going to hear

5    about.  And you'll hear from Mr. Joel Ramirez, who works in

6    the finance department and will talk about domestic

7    industry.  And, lastly, Mr. Barillion, a third party, who

8    will be testifying in connection with domestic industry.

9            In terms of our experts, we will have three you

10   will hear from, Your Honor.  Dr. Rockstraw, you will hear

11   from him on infringement probably tomorrow.  You'll hear

12   from Mr. Green, who is our economic expert testifying on

13   domestic industry as well as commercial success.  And then

14   one of our rebuttal experts, Dr. Freeman, will be addressing

15   any 101, 112 priority-related issues that come up in

16   rebuttal.  I should also mention Dr. Rockstraw will be back

17   a second time to talk on rebuttal on prior art as well.

18           Those are our witnesses, Your Honor.  We're

19   looking forward to you meeting them.  I've already

20   introduced my team who you will be seeing this week.

21           I've taken Your Honor's advice.  We have some

22   attorneys here who, I'm not going to take away their credit,

23   but they may not have had as much time at the podium as I

24   have.  So, hopefully, you'll be understanding as they plow

25   through.  We look forward to you seeing them as well this

1    week.

2         Unless Your Honor has any questions, I will

3    conclude my remarks.

4         JUDGE MCNAMARA:  Thank you, Mr. Ainsworth.  A

5    couple of things.

6         First of all, I am really pleased that you are

7    taking the next generation of practitioners seriously and

8    are supporting them.  That's great.  And I don't need to

9    know their names.  We're just trying to keep track of which

10   firms are participating in this.  It's, again, as you know

11   my thinking on this, it's great for our industry.  It's

12   great for our profession.

13        So the second thing is, I appreciate the

14   pictures, because I was going to ask going forward that all

15   parties supply pictures of witnesses.  I went through the

16   pretrial statements, but it's helpful when we're writing to

17   put names and faces together.  So thank you for that.  And

18   thank you for your opening.

19        At this point we're going to take a 15-minute

20   break.

21        Mr. Swain, you can get to your opening in about

22   15 minutes.

23        So I'll see you back here -- it's 11:21 -- I'll

24   see you back here in 15 minutes.  Thank you.

25        MR. SWAIN:  Thank you, Your Honor.

1          (Whereupon, the proceedings recessed at 11:21

2    a.m.)

3          (In session at 11:47 a.m.)

4          JUDGE MCNAMARA:  Okay, Mr. Swain.

5          MR. SWAIN:  I'm ready to proceed, Your Honor.

6          JUDGE MCNAMARA:  Very good.  Thank you.

7                    OPENING STATEMENT

8          MR. SWAIN:  I do want to start off by saying I'm

9    up here on behalf of the PUR Respondents giving an opening.

10   The other three Respondent groups will be giving short

11   openings as well.  But I will be covering what we believe to

12   be the jugular vein issues in this case that cover all

13   Respondents' products and issues.

14         So if I may, I'd like to proceed.

15         JUDGE MCNAMARA:  Go ahead, Mr. Swain.  Thank you.

16         MR. SWAIN:  Thank you, Your Honor.  I want to

17   start by identifying the parties in this case.

18         Could I have slide 2, please.

19         Your Honor, here we have the Complainant Brita,

20   but in the documents that you're going to see in this case

21   and the testimony you're going to see and the emails, you're

22   going to see Clorox, and that's because Clorox is the owner

23   of Brita.  And Clorox is a multi-conglomerate company that

24   owns such illustrious brands as Liquid-Plumr and Pine-Sol

25   alongside Brita.  So you'll see Clorox a lot in the

1    documents.

2           As I mentioned before, I represent the PUR

3    Respondents on the right, and you will be hearing from

4    LifeStraw, ZeroWater, and Ecopure here at the conclusion of

5    live testimony.

6           So slide 3.  A little bit about PUR, Your Honor.

7    PUR water filtration began in the late '90s, started in

8    Minneapolis, Minnesota, as a company called Recovery

9    Engineering, and it quickly grew into Brita's biggest

10   competitor.  They sell faucet-mount filters, gravity-mount

11   water filters.

12          But, regardless, and what makes us distinctive

13   from Brita is that we make water filtration products that

14   generally go to help the American public.  And you'll see

15   here, Your Honor, on slide 72 -- I jumped ahead a little

16   bit -- is Mr. Mike Mitchell from PUR, and you will be

17   hearing about him later in this investigation who is the

18   designer of the accused products in this case, and he will

19   be speaking about how a lot of his design of later accused

20   products involved his work in Flint, Michigan and in Newark,

21   New Jersey in the affected communities.  And PUR is very

22   proud of our work to develop specific filters that can

23   handle specific lead challenges.

24          Now Mr. Ainsworth had it right, the lead crisis

25   actually began in our city, Your Honor, when we had spikes

1    in what are called particulate lead.  And this is very

2    important -- and I will be a broken record on this --

3    certain types of particulate lead of certain sizes, from 0.1

4    microns to 1.2 microns.  Those were the problem

5    particulates.

6          The '141 patent is not bound as such.  Any

7    particulate 0.1 and above the '141 patent captures.  I will

8    repeat this several times in my presentation just as a

9    heads-up.

10          JUDGE MCNAMARA:  That's fine.  That's the whole

11    idea of driving home your point.

12          MR. SWAIN:  Thank you, Your Honor.

13          It started in our town, which I didn't quite

14    realize.  At the same time Martha Stewart was being indicted

15    for insider trading, unfortunately, the lead pipes in our

16    city were flaking off particulate lead that had built up

17    over years and years and years, and our affected residents,

18    especially our low-income ones, were being impacted.

19          And so you heard a lot about Mr. Herman, slide 5.

20    Mr. Herman, along with the rest of the National Sanitation

21    Foundation, came up with a new standard, to make sure, if

22    you have a lead filtering product and it's certified, it can

23    address those narrow particulates that became the problem in

24    Washington, D.C. -- not just any particulate -- that

25    particulate range, and it led to the NSF 53 standard.

1          Slide 6.  And so what Brita did, and I say Brita
2     in a very loose term, what Brita supervised was the
3     provision of carbon block filters, on the left of slide 6,
4     examining them, testing them to see if they can meet that
5     NSF 53 very stringent standard for lead reduction, and some
6     of them did.

7          But, Your Honor, the intellectual property at
8     issue in this case is so much broader than what Brita
9     actually invented, and that is no better seen than in the
10    particulate sizes at issue.  And that explains why there's
11    differences of testing in the '141 patent, what Brita had,
12    and what is actually covered by the '141 patent.

13         As you can see here, and I hope is a clear
14    demonstrative, it's not drawn to size, but the NSF 53 2007
15    standard at the center, the particulate range is bound very
16    tightly in the center.  The '141 patent covers those
17    particulate ranges as well as pretty much any particulate
18    size above a certain amount, .1 micron, and that makes a
19    load of difference when it comes to lead filtration.

20         So I'm going to speak about the two implications
21    of Brita's broad patent.  It is infinitely broad as far as
22    structure.  It is infinitely broad as far as its components.
23    And it is infinitely broad as far as its performance.

24         And that has consequences, Your Honor.  And I
25    will be speaking about their lack of written description and

1    enablement on at least seven different bases as well as the

2    anticipation later in my presentation.

3           Every patent has a story, Your Honor, slide 9,

4    and, as I mentioned in the Markman, Brita invented or

5    co-invented some carbon block filters, very specific type of

6    filter to address a very specific problem.  And they did

7    what an inventor should do, which is they took their

8    invention and tried to patent it.

9           So as you see in the '372 parent to the '141

10   patent here on slide 9, they patented -- they went to try

11   and patent a carbon block water filter.  We'll address these

12   claims in one moment.  But every time they tried to patent

13   what they actually invented with the actual performance they

14   were receiving, the Patent Office rejected it, first under

15   102, then under 103, and twice under 112, until eventually

16   it was abandoned.

17          So to the extent Brita had a new filter that they

18   actually invented, Your Honor, that was already rejected by

19   the Patent Office, but enter the '141 patent.

20          Before we do, Your Honor, I want to talk about

21   slide 11.  I want to talk about exactly how this was

22   rejected.  In the '372 parent, Your Honor, they not only

23   gave a specific types of activated carbon on the left --

24          JUDGE MCNAMARA:  You've gone mute.  I think you

25   just went mute unless you weren't talking.

1          MR. SWAIN:  I wasn't talking.  I was waiting for
2    my trial tech.
3          JUDGE MCNAMARA:  Good to know.
4          MR. SWAIN:  His name is Mr. Kotarski, by the way.
5    He is wonderful.
6          JUDGE MCNAMARA:  The trial techs are wonderful.
7          MR. SWAIN:  Absolutely, Your Honor.
8          And so I wanted to show Your Honor, in their
9    parent application what exactly they were trying to claim.
10   They gave specific ranges of the type of activated carbon
11   particles; they gave specific ranges of the specific type of
12   lead scavenger -- one lower -- they gave a specific range of
13   the final effluent, the 10 micrograms per liter; they gave a
14   specific lifetime of 40 gallons; and, Your Honor, they gave
15   a specific flow rate of at least 0.1 liter per minute.
16         And with all that specificity on the type of
17   filter and the performance and the constituents of the
18   filter, including many of the embodiments on the right,
19   Your Honor, PA 1-1, PA 1-2, that you'll be hearing about
20   later, all of them were rejected for lack of enablement.
21   That's on slide 12 and 13.
22         Both times when they tried to add more
23   specificity, what if we narrowed the activated carbon
24   particles or the lead scavenger in question and add binders
25   or a particle size and put more specificity on the

1   constituents of the filter and the performance of the

2   filter, the Patent Office still said it was not enabled.

3          So, with that heritage, enter the '141 patent,

4   which was allowed with no meaningful examination whatsoever.

5   It applies to any gravity-fed water filter, as Mr. Ainsworth

6   pointed out in his presentation.  The claims cover any lead

7   scavenger regardless of type, any activated carbon.  And

8   that's just the constituents.

9          It covers any filter with a flow rate that would

10   meet the FRAP limitation unbound.  It covers any filter,

11   large or small.  Any filter, with any sort of good lead

12   effluent performance, as low as you can possibly get, and

13   any filter of any lifetime.  Slide 15.

14          The comparison between the embodiments of what

15   Brita actually invented and what is covered by the claims is

16   astounding, Your Honor.  In at least seven different

17   respects they are unbound, both from the kind of filter, the

18   type of lead scavenger you need to use to get that lead

19   performance.  The flow rate is completely unbounded.  The

20   volume is unbounded.  The lead effluent unbounded.

21   Lifetime, as long as and as sure as you want.  And the

22   result is a FRAP that can be anything just under 350.

23          Your Honor, I'd like to pause here.  What I like

24   about our patent system and what the world likes about our

25   patent system is that it is the model for the rest of the

1  world, and that is because it's a compact with society an

2  inventor makes.  When an inventor comes up with an

3  invention, it is a great day, and they have an important

4  choice to make with that invention.  Do you keep it a

5  secret?  You're welcome to do that.  That's what Coca-Cola

6  does with its cola, and they have been able to keep it

7  secret for a hundred years now.  That's one way to protect

8  your invention.

9        The other is to make a deal with society, not

10  just the government, but every single person on this Webex,

11  every single person in this country, to say, I have an

12  invention, I'm going to share it with the world, and you

13  will all benefit from it, in exchange I want a 20-year

14  monopoly.

15        In order to do that, Your Honor, the inventor has

16  to disclose what the invention is and what the scope is.

17  That is the quid pro quo of the period of exclusivity.  They

18  need to tell the public what the invention is in addition on

19  how to make and use it.  One should not be able to obtain a

20  patent on what one has not disclosed to the public.

21        And that's on slide 16, the LizardTech,

22  Your Honor, but there are dozens of cases just like this.

23  That's the point of the enablement and written description

24  requirements.  It's part of the deal that an inventor makes

25  with society.  And, Your Honor, Brita broke that deal in at

1    least seven ways.

2        Starting with layer 1.  Claim 1 of the '141

3    patent claims any gravity-fed water filter that has carbon

4    or lead scavenger -- and a lead scavenger.  And, Your Honor,

5    as you well know, Brita asked for and obtained a very broad

6    definition of lead scavenger -- any component that can

7    reduce lead in drinking water, which is an infinite number

8    of chemical species.

9        But I want to start first by talking about the

10   types of filters.  Slide 18.

11       As I mentioned before, three of the more popular

12   gravity-fed water filter types are shown on the screen.

13   There's carbon block, which are all the embodiments of the

14   '141 patent.  There's a mixed media, which most of the

15   accused products are, and the prior art that Brita said

16   could not meet the claims of the '141 patent, and then there

17   are nonwoven filters, which the DI products are.

18       Now I want to show you just exactly how different

19   these filters are, Your Honor.  I have in my hand what I

20   believe to be -- well, I know to be -- a carbon block

21   filter.  And if you open a carbon block filter, you push

22   out, it is solid.  It is comprised of carbon and potentially

23   some sort of lead sorbent.

24       But, importantly, unlike mixed media, unlike

25   mixed-media filters, it contains a binder.  It binds it

1    together.  You can see it's a ring you can see through.

2    It's hollow, and, more importantly, Your Honor, completely

3    solid.  The phenomenon by which a carbon block filter

4    filters water is very different than mixed media.  And we

5    know that, not only from one skilled in the art, but from

6    the '141 patent itself.

7         In contrast, Your Honor, this is a mixed-media

8    filter that Brita said was different than their patent --

9    than what they invented, the carbon blocks they invented.

10        I haven't tried this yet live, Your Honor, so

11   we'll give it a shot.  As you might imagine, loose media,

12   mixed media, granular, that filters in a very different way

13   than a carbon block filter.

14        So, Your Honor, despite only inventing carbon

15   block filters, slide 19, the '141 patent claims every type

16   of carbon-base filter, the mixed media that I just displayed

17   to you, and, unfortunately, dumped all over my podium, which

18   I'll clean up later -- the dangers of demonstratives.

19        JUDGE MCNAMARA:  No kidding.

20        MR. SWAIN:  Nonwovens, membranes, depth media,

21   nanoparticles, nanofibers, ligands, if you have a piece of

22   carbon and something that reduces lead in your filter, that

23   falls under the claim of the patent.  And that has real

24   implications in this case, Your Honor, because, as slide 20

25   shows, the '141 patent embodiments say only carbon blocks

1    can meet the FRAP limitations.  That's all the inventors

2    could test and show met the patent.  That's all they

3    disclosed to the public.  And so when this patent expires,

4    we are left with the idea that one uses carbon blocks and

5    that's it.

6          And this is particularly problematic, Your Honor,

7    because you will not see an accused carbon block product in

8    this case whatsoever.  Instead, you are going to see mostly

9    mixed-media products with some nonwovens.  You will see some

10   nano membranes that weren't even invented at the time of the

11   '141 patent.  You will see mixed media combinations that

12   were not around at the time of the '141 patent.  And you

13   will even see some unique nanofibers from LifeStraw that

14   were not around at the invention time of the '141 patent --

15   yet Brita says it invented that too.

16         Don't take my word for it, Your Honor.  The '141

17   patent tells us expressly, in their contract with society,

18   they tell us, on slide 22, but more specifically, column 26,

19   60 to 65, two very important sentences.  They tell us that

20   no mixed-media filters, just like the one that I hold in my

21   hand that Brita said could not practice the patent, no

22   mixed-media filters tested met the claimed FRAP factor range

23   due to their inability to remove particulate lead.

24         Equally important, Your Honor, they tell us the

25   formulations of gravity-fed carbon blocks disclosed are

1  unique -- unique -- in their ability to meet the required

2  FRAP factor.

3          And lest there be any dispute, Brita's expert,

4  Dr. Freeman, who we have discussed a lot already, when

5  asked, do you agree with me that there is not a single

6  mixed-media filter disclosed in the '141 patent that

7  achieves a FRAP factor of about 350 or less, correct?  He

8  confirms, yes, there are no examples that teach mixed-media

9  filters that have a FRAP factor of less than 350.

10         We're going to hear from Dr. Knipmeyer soon too

11  on 24, and we should not hear about any inventions from her

12  on mixed media, wen she was asked, did you invent anything

13  outside carbon block technology, is there anything new or

14  unique that you developed as far as maybe granular filter or

15  paper media for this patented technology?  Not that I'm

16  aware of.

17         Dr. Knipmeyer's testimony at 58, 22 to 59, 1 on

18  slide 24.

19         Slide 25.  Your Honor, this type of overreach is

20  rejected repeatedly by the Federal Circuit.  The written

21  description requirement prohibits exactly what Brita is

22  trying to do -- a patentee from leaving the industry to

23  complete an unfinished invention.  They couldn't create

24  anything other than the carbon block to meet the claims of

25  the patent, so they waited for others to do it and they

1    accuse them here.

2           The point of written description is to ensure
3    that the scope of the right to exclude as set forth in the
4    claims does not overreach the scope of the inventors'
5    contribution to the field of the art.  Yet, Your Honor, as
6    shown in 26, that's exactly what Brita has done.

7           They tell us in their patent, they tell us in
8    their invention history, and they tell us now, the only
9    invention they had was carbon block, and every other type of
10   filter, especially mixed media, was insufficient to get the
11   performance that was necessary.  And even if mixed media was
12   able to do it, they certainly don't tell us how to do that
13   in the patent.  But that's just written description.

14          Enablement, Your Honor, we also have to teach
15   someone how to make the patent.  You can't just say, I have
16   the invention and run away from it and leave for other
17   people to figure it out.

18          You have to tell them how to do it.  And the '141
19   patent, to its credit, is replete with repeated examples
20   that even I think I could build a carbon block filter at
21   this point, Your Honor.  But it certainly doesn't tell you
22   anything about how to make any other filter type to meet the
23   FRAP limitation.

24          The reason we have -- and so, Your Honor, when
25   asked about this, Dr. Freeman, their expert on enablement,

1  was asked, how would a person of ordinary skill in the art

2  do that, as in create a mixed-media filter with a FRAP under

3  350, when there is not a single mixed-media filter example

4  disclosed in the '141 patent that achieves a FRAP below 350.

5  Dr. Freeman tells us a person of ordinary skill in the art

6  could use the information in the '141 patent to then pick,

7  if you will, the needles out of the haystack of mixed media

8  and other formats to practice the invention.

9        Your Honor, I find Dr. Freeman's comments and

10  opinions quite honest and illustrative of the issues in this

11  case.  Hoisting enablement entirely on one skilled in the

12  art is exactly what the Federal Circuit says we cannot do

13  and should not do.

14        And even the analogy he makes, the needles in the

15  haystack, is quite apt because it may sound familiar to

16  Your Honor, because on slide 30, it's exactly the analogy

17  the Federal Circuit says you can't do.

18        The '597 patent from the Idenix Pharmaceuticals

19  vs. Gilead Sciences says the '597 patent leaves the person

20  of skill in the art, just like Dr. Freeman says, searching

21  for a needle in a haystack.  This is not enablement,

22  Your Honor.  It is exactly the opposite.

23        Your Honor, on these two bases, the case is

24  easily disposed of.  The broad scope of the species of

25  filter, the lack of enablement and written description alone

1    this case founders, but there is so much more.

2            Let's talk about lead scavengers, the second

3    layer.  The '141 patent says a lead scavenger, it does all

4    that is required for claim 1, and in the claims of the

5    patent it could be all sorts of lead scavengers per the

6    construction asked for by Brita.  A component that removes

7    or reduces lead in water, that's a lot of different

8    categories of chemicals, Your Honor, ATS, all sorts of ion

9    exchange resins, which you'll hear a lot about in this case,

10   oxides, dioxides, hydroxides, activated alumina.  I asked my

11   client to provide me with a list of all potential lead

12   scavengers, and it would have taken 42 slides to get there.

13           But what's important here, Your Honor, is on the

14   right you'll see the only two types of lead scavengers are

15   very specific chemicals -- ATS and Alusil.  There is no

16   disclosure of having to use a weak acid ion exchange resin

17   or cation exchange resins or anything else.

18           And that has particular impact in this case

19   because, slide 3, you won't see anyone using ATS, you won't

20   see anyone else using Alusil.  You will actually be seeing

21   lots of accused products that use the weak acid ion exchange

22   resin or cation exchange resins for their lead reduction

23   capability, the very same type of lead scavengers that the

24   '141 patent, Your Honor, in 34, tells us can't be used.

25           I'm going to pick on this Brita filter one more

1    time that is quickly running out of filter media as I

2    continue to dump it on my podium, but I can represent to

3    Your Honor this has granular carbon and weak acid ion

4    exchange resin, and the patent tells us a further problem

5    associated with blended media of granular carbon and ion

6    exchange resin is that they have limited contaminant removal

7    capability due to particle size and packing geometry of the

8    granules.  It disparages this exact type of lead scavenger.

9    Instead it tells us two kinds that we can use.  Slide 35.

10          Dr. Knipmeyer, to confirm, again, Your Honor,

11   written description and enablement, we know is on the four

12   corners of the specification, but lest there be any doubt,

13   inventor, Dr. Knipmeyer was asked:

14          Do you recall inventing any sort of innovative --

15   ion exchange resin and granular activated carbon as part of

16   her invention.

17          Do you recall inventing or coming up with any

18   sort of specific combination of those two in a gravity

19   filter to specifically solve the problem of contaminants in

20   drinking water?

21          Answer.  I do not remember inventing anything in

22   that space.

23          So to the extent there was any mixed media or any

24   sort of invention of ion exchange resin to meet the claims

25   of the '141 patent, that certainly wasn't in the patent and

1    it certainly wasn't told at the deposition.

2          And, again, Your Honor, you got it right in the

3    1031 case, when you identified that the '508 patent when it

4    only identified two working examples, in this case two

5    different lead scavengers of the invention, that is a

6    classic lack of written description enablement, and, as

7    typical practice, the Commission affirmed you on that point.

8          We're only on 2 of 7, Your Honor.  I'm moving as

9    quickly as I can given the lunch hour.  We're on layer 3.

10          We have just only scratched the surface,

11    Your Honor.  We're just talking about the structure behind

12    the filters here.  We haven't gotten to the point of the

13    boundless performance that the '141 patent claims.  We're

14    going to start with the first variable, the FRAP equation.

15          The only thing novel you're going to hear in this

16    case about the claims in the '141 patent is the FRAP

17    equation.  And what the FRAP equation is, is a purely

18    boundless aspirational coagulation of well-known performance

19    factors.  If you want it low, it goes on the numerator.  If

20    you want it high, like lifetime, it goes on the denominator.

21    Ergo, the FRAP factor, as it approaches zero, it approaches

22    infinite perfect performance.

23          Flow rate, Your Honor, I want to just make clear,

24    because it was confusing to myself and others in this case

25    in the beginning, the lower you go with flow rate, the

1    better, and that's because it's measured in terms of minutes

2    per liter.  So the less minutes or time it takes to get

3    through a liter of water, that's as fast as a filter goes.

4         So if we're talking four minutes per liter here

5    on slide 38, that's .06 gallons per minute.  That's about as

6    good as the inventors got.  But this claim carries so much

7    more.

8         It claims so much more.  When you get down 0.5

9    minutes per liter, that's half a gallon a minute.  When you

10   get to 0.25 minutes per liter, now you're dumping an entire

11   carton of milk through a filter in a minute.

12        These are exceptional flow rates for gravity-fed

13   water filters, yet the patent covers anything, any flow

14   rate, and that is confirmed by claims 5 and 6, which say the

15   flow rate can be 12 or under or 6 and under.

16        And, again, Your Honor, in the 1031 case where we

17   have unbound ranges such as this, the specific examples of

18   the best flow rate they could possibly obtain with 4.2 in

19   the '141 patent, they don't get to claim that they invented

20   anything better than that.

21        And shown on slide 40, Your Honor, there's an

22   entire unbounded range that Brita has never disclaimed

23   either through amendment or corrections to the spec.  As

24   long as it has a flow rate that meets the FRAP, it's part of

25   Brita's invention, even though they came nowhere close to

1    enabling let alone disclosing the ranges of those flow

2    rates.

3           There is no recitation of a lower bound for flow

4    rate or a faster flow rate.  They can go as fast as it wants

5    to and still meet the claims of the patent.  And the 1213

6    Commission investigation with ALJ Cheney and his ID, which

7    was fully affirmed on this point, confirms this.  If you

8    have an unbound range and you don't come close to specifying

9    it and supporting it in this spec, it is invalid per

10   enablement, written description, as my colleague will tell

11   you shortly, 101.

12          Again, that relies on the AK Steel, Federal

13   Circuit case, when a range is claimed, there must be

14   reasonable enablement of the scope of the range.

15          So you might be asking yourself, well, surely

16   Brita's experts will tell us that there is enablement.  We

17   asked Dr. Freeman, once again, on slide 41, could I have a

18   filter that has a one-minute liter flow rate and meet claim

19   1 of the '141 patent?  He answers -- I don't know -- I don't

20   know if a person of skill in the art could achieve that or

21   not.

22          Again, Your Honor, that is a remarkable

23   admission.  I don't know if a person of skill in the art

24   could achieve this flow rate or not.  Yet the claims of the

25   '141 patent cover this.

1          So maybe someone can't achieve this, and, if they
2     could, Brita's patent will cover it in the event that they
3     do in the future with new materials or new processes that
4     Brita can only dream of.
5          Slide 42.  We also asked Dr. Rockstraw, is it
6     possible to have a .45 minutes per liter flow rate.  He says
7     that could only be achieved by a pressurized system, not a
8     gravity-fed system that we have in claim 1 of the patent.
9     It's not possible, yet Brita continues with its claims to
10    cover the impossible, and that is impermissible.
11         Layer 4, Your Honor, unlimited volume.  The
12    claims of the '141 patent are unbound as far as volume goes,
13    and that is confirmed by dependent claims 3 and 4 that tell
14    you, you can have a volume of 300 and less or 150 or less.
15    What the lower bounds is Brita won't tell us.
16         And, again, Your Honor, there's only two working
17    specifications or embodiments in the specification, a volume
18    of 89 centimeter -- cubic centimeters, which is also
19    milliliters, or 151, two embodiments.  That's it.  They tell
20    us how to make this invention using two volumes.
21         Again, it's two working examples, just like the
22    1031 investigation, and this alone lacks enablement and
23    written description in the patent.  They claim all volumes,
24    as long as it meets the FRAP, it could be as small as a
25    handful of pebbles and it could be as big as a grain silo,

1    Your Honor.  As long as you come up with good lead reduction

2    and flow rate with it, Brita says it invented that.

3        We asked, so you see the dramatic, dramatic lack

4    of disclosure in the patent of the different volumes, you

5    can meet the FRAP limitation with in slide 45.

6        We asked their expert, well, surely Dr. Freeman

7    will have an opinion that you can reach all volumes claimed

8    by the '141 patent, and he was asked, what's the lowest

9    filter media volume one can have and still bee a gravity-fed

10   water filter within claim 1 of the '141 patent?

11       I don't know exactly what the lower bound on

12   volume could be.  I think a person of ordinary skill in the

13   art would have to use the teachings in the '141 patent and

14   then do experiments with different combinations of materials

15   and shape and so forth to see where they could come.  That

16   is per se undue experimentation, Your Honor, especially to

17   get below 89 cubic centimeters, which is disclosed in the

18   patent.

19       And, of course, Dr. Rockstraw, when asked the

20   same question as Brita's expert, we asked him, are you

21   telling me it's not possible to make a filter that meets

22   claim 1 with a volume of 2 cubic centimeters, something that

23   is squarely within their claims?

24       Dr. Rockstraw admits, yeah, I don't know how that

25   could possibly be done, because the '141 patent certainly

1    doesn't tell us how to do it.

2          Layer 5, Your Honor, lead reduction.  This is the

3    important one.  We have to keep lead out of our drinking

4    water.  We have to get lead low.  That's the point of the

5    NSF 53 standards that we have now in place.

6          Lead is particularly damaging, unfortunately, to

7    our most vulnerable populations: children, the elderly and

8    the lower income.  They are lead poisons.  And the idea is

9    you want lead effluent low.  And that's why it's on the

10   numerator of the FRAP.

11         But the best lead effluent that Brita could come

12   up with is 1.3 ppb, which is pretty good, except many of the

13   accused products in this case, Your Honor, have lead

14   effluent of 100 times less than that, including the DI

15   products, including LifeStraw's product, including

16   ZeroWater's product, and including one embodiment of PUR's

17   product.

18         This all too important variable of lead effluent,

19   the best they could do is 1.3, yet they are accusing

20   inventions that have 100 times better lead performance.

21   There is no bound to the lead reduction component of FRAP.

22         Layer 6, lifetime, Your Honor.  Lifetime is on

23   the denominator.  That means we want it long.  No one in

24   this investigation will disagree that you want your lifetime

25   to be long.

1          Brita will tell you, no, with no question, that

2     their Longlast filter is great because it has a 120-liter

3     lifetime.

4          I want to pause here because Brita doesn't

5     actually design or make filters.  They have them made for

6     them and put their name on them.  They help integrate them,

7     but the media comes from a company called KX, which we'll

8     talk about.  But the point is, Your Honor, long-lasting

9     filters are important, so to get a long lifetime is quite an

10    achievement.  It is something that parties sell their

11    products on.

12         Yet lifetime in the patent, there's only one, 40,

13    40 gallons, that's the only, Table 5, the only embodiment of

14    the patent says 40 gallons, does not teach us how to make

15    one with 120, 200.  So if someone comes in the future and

16    invents a longer lasting filter with their own inventions,

17    Brita will cover that.  They have shown that by including

18    the Longlast filter in their own allegations for DI.

19         Your Honor, I've showed you why all four

20    variables of the FRAP equation are unbound, and, thus, the

21    FRAP is unbound.  There is no tethering.  And Brita's

22    experts do not claim a tethering to any lower limit or upper

23    limit of any of these variables, and, thus, the FRAP

24    limitation is unbounded.

25         And the whole benefit of their patent is that

1    they came up with a FRAP limitation of 350 or 200 or less.

2    That's what separates their invention from the prior art.

3            It's great if it's under 350; it's not great if

4    it's over 350.  And they claim all FRAP ranges, Your Honor,

5    not just 350 to 2 or 350 to 30 -- all of them.

6            And that has consequences, Your Honor.  The best

7    they could achieve was 6.7.  And because the lower you go

8    with FRAP, the closer you get to infinite performance of a

9    filter.  And so something with a FRAP of 1 versus a FRAP of

10   6 has six times better performance.  And something with a

11   FRAP of .1 versus a FRAP of 1 has ten times better

12   performance.  And so not every FRAP integer is made equally.

13   The best they could do is 6.7.

14           And, Your Honor, that's problematic.  As I show

15   you in slide 54, there's an entire range of 6.7 FRAP and

16   below that many of the accused products and the DI products

17   fall into involving innovations, structures, and abilities

18   that Brita could only dream of inventing.  Even if they had

19   invented it, it is nowhere in their patent, breaking the

20   contract with society once again.

21           We asked Dr. Freeman, at the time of the

22   invention, Dr. Freeman, September 2006, or May 2006,

23   depending on who you believe, what's the lowest FRAP a

24   gravity-fed water filter having a lead scavenger and

25   activated carbon could achieve?  He tells us, I don't know,

1    I don't know an absolute lower bound.

2         When your novelty point is pure performance, like

3    Brita's is, when you have an unbound range such as this, it

4    is unenabled and it is lacking written description.

5         Your Honor, Dr. Gary Hatch is, hopefully, quickly

6    recovering, but we in this case, what you'll see,

7    Your Honor, is we brought professionals as experts.  None of

8    these -- neither of these experts have testified in trials

9    before.  We went out and found the people with the most

10   experience with filter design and filter development and

11   filter testing that we could find to come to you and explain

12   why it would be extremely hard to do what Brita is saying

13   that its invention claims.  And this is Dr. Gary hatch.  He

14   has designed and developed countless filters, both on this

15   earth and for the astronauts in orbit.  So if you have

16   questions on what is enabled or disclosed in the '141

17   patent, we invite you, please, when we're able to resume

18   with Dr. Hatch, please ask him.  He has had leadership roles

19   in NSF International and Water Quality Association.

20        Your Honor, that's just one category of our

21   defenses.  The second is anticipation.  I revisit on slide

22   57, Your Honor, the fact that the '141 patent, claim 1, has

23   an infinitely bound particulate range as far as the sizes of

24   your particles of lead they go through.  They can be .1

25   microns, they can be 1 micron, they can go all the way up as

1    large as they can get.  And the consequence of that is it

2    doesn't require that you have the really hard to filter ones

3    right in the center there, Your Honor, the ones between 0.1

4    microns and 1.2 microns.  And those are the ones that were

5    plaguing Washington, D.C., and those are the ones that NSF

6    53 was designed to protect.  But the '141 patent is not an

7    NSF 53 2007 challenge water.  It's not even close.

8           And that explains why, Your Honor, when Brita was

9    testing its alleged prior art patents, it wasn't getting the

10    same results as what's in the '141 patent.

11           We have gone out and obtained both from PUR's own

12    storage and, admittedly, yes, one purchased on eBay -- I

13    could over the lunch hour, Your Honor, find 200 filters

14    alone for sale on eBay right now; people are cleaning out

15    their closets -- but the important thing is, Your Honor, all

16    of these prior arts were sealed, in packages, and, most

17    importantly, confirmed genuine by people who were involved

18    in their development.

19           I want to quickly hit ZeroWater on the right

20    before I move to the three other filters.  On 59, all of

21    these, when tested, under the claims of the '141 patent, all

22    of them, and we tested multiple samples, all of the ones

23    that were sealed had a FRAP under 200.

24           And you will ask yourself, how is it possible

25    that Brita, when it tested prior art filters, it was getting

1    FRAPs of 370 or 900.  And the answer is twofold, Your Honor.

2         Number one, they didn't test any of these

3    properly, and, number two, they were aware of all four of

4    these filters and they didn't test them at the time of the

5    invention.  They knew about the DuPont filter.  They didn't

6    bother testing it.  They knew about their own Brita filter.

7    They didn't test it properly.  They knew about the PUR 1

8    stage.  They didn't test it properly.  And ZeroWater they

9    were well aware of, and ZeroWater had already, as you will

10   hear from my colleagues, the ZeroWater product was one of

11   the first commercial products to meet NSF 53 2007 standard.

12   It has a FRAP of under 141, because it readily met the

13   claims of the patent and had a flow rate that was readily

14   calculatable to other NSF tests that were going on at the

15   same time.  And you will hear more of that from ZeroWater's

16   witness soon.

17        But the other three, because Brita didn't test it

18   correctly, we had to go get prior art and test that.  And

19   who did we get to test it? Mr. Rob Herman.  Mr. Rob Herman,

20   as shown in 60, we tested it at two different laboratories.

21   We tested it at our own labs in Marlborough, Massachusetts,

22   Helen of Troy on the left, and you will see Mr. Mitchell

23   there testing and analyzing the contents of the prior art

24   filter, as well as an independent laboratory, QFT, Quality

25   Filter Testing Laboratory, were all of the samples that we

1    used.

2            Unlike Brita, we used independent laboratories to

3    verify our results.  Unlike Brita, we tested multiple

4    samples of each prior art product.  They only tested one of

5    our products.  And unlike Brita, we were able to use the

6    challenge water of the '141 patent to show that it is met by

7    these prior filters.

8            Now, like I said, we went and got professionals

9    for our experts.  Mr. Herman or Dr. Herman, I think we have

10   explained, he has a doctorate from Summit Bible College, but

11   I think he prefers to be called Mr. Herman, but what's most

12   important, Your Honor, is he was involved in the NSF 53

13   protocol, not just in 2007, but all the way back from 1987

14   through his retirement last year in 2021.

15           He has worked endlessly with testing water

16   filters for the reduction of lead.  And so we wanted to make

17   sure our testing was compliant and consistent and made sure

18   it met the testing specifications of the '141 patent.

19           And as an officer of this court, Your Honor, I

20   don't mind telling you it is my personal belief that there

21   is no one on this planet who has tested more gravity-fed

22   water filters for lead reduction than Mr. Rob Herman.  Not

23   only that, he designed NSF protocol, NSF laboratories, and

24   he visited each of the laboratories that were tested here to

25   ensure items were being tested correctly.

1           Your Honor, in contrast, you just heard a lot

2   from Mr. Ainsworth about a lot of suspicions, allegations,

3   and lost ballots or whatever he has to say about our

4   testing.  But you'll notice in the pre-hearing brief that

5   it's mostly attorney argument.  And to the extent it relies

6   on Dr. Rockstraw, you can be assured, Your Honor, it's

7   coming from someone with no lead testing experience.

8   Dr. Rockstraw is a professional expert.  He was asked, have

9   you ever run or taken any part of NSF tests?  I have not.

10          Again, you don't have any experience designing

11  gravity-fed water filters that fit in consumer containers,

12  like the ones in this case?  That's correct, slide 62.  And

13  there's more, Your Honor.

14          Slide 63.  Dr. Rockstraw admits that he has never

15  analyzed whether a particular combination of components

16  removed lead from water in a way that met any specification

17  -- it's true that I have not worked with lead in my

18  laboratory.

19          And he was asked, have you ever worked in lead,

20  how about in your professional engagements that were

21  corporate?  I did not work with lead, no.

22          When you hear about the testing later this week

23  from Mr. Herman and you hear what Dr. Rockstraw has to say,

24  you have to weigh the backgrounds of these experts, and they

25  will explain all of the little alleged inconsistencies that

1    were brought up by Mr. Ainsworth are of no impact to the

2    invalidity of this patent.

3         Let's take a look at some of their rebuttal

4    contentions.  On slide 64, they tell us, all tested

5    products, the problems with them is that they are 15 years

6    old.  Well, Your Honor, prior art tends to be old.  That's

7    the problem with prior art.

8         And for anyone to allege that for some reason an

9    old piece of prior art gets better over time, I can tell you

10   firsthand that filters are not fine wine.  They do not age

11   like fine wine.  The only thing, as long as they are sealed,

12   they operate just the same as they did when they were

13   firstborn as long as they are sealed.

14        You don't have to take my word for it.  Take

15   Dr. Rockstraw.  Do you have any scientific opinion on the

16   filters in this case having their lead-reduction

17   capabilities enhanced over the last 15 years?  No, no, I

18   don't have any data to support a conclusion like that.

19        And you won't hear that in this case, Your Honor.

20        Let's take a look at another argument.  And this

21   is the one that Brita made -- this is one of the two that

22   we'll discuss -- that Brita made for the first time in

23   rebuttal expert reports.  They are arguing now a different

24   definition of lifetime that Respondents failed to show that

25   the prior art had a lifetime that was validated for removing

1    lead because at one point, when tested, they exceeded 10

2    parts per billion lead.

3          Again, Your Honor, the lifetime in this case, as

4    correctly confirmed by Your Honor, does not have to be a

5    lead-certified lifetime; it just has to be the amount of

6    gallons run through the filter that is validated by the

7    manufacturer or seller.

8          And this is new, Your Honor, because in the

9    opening report of Dr. Freeman, he had no issue -- and this

10   is why we have a motion to quash, and this is why Brita is

11   objecting to us asking Dr. Freeman about anything in his

12   report because he over and over again, when he tells us

13   there are 35 reductions to practice, he tells us you can

14   have a lifetime with a lead CE of 22 parts per billion.  No

15   problem calculating a lifetime, no problem explaining that

16   this embodiment practices the patent.  Brita doesn't want

17   you to hear this testimony.

18         Let's look at another missive from Brita.

19   Respondents' testing does not show average filtration unit

20   time over lifetime because Respondents failed to test every

21   liter.  Nowhere was that in Brita's construction.  Nowhere

22   is that in the '141 patent.

23         And, Your Honor, to the extent Brita believes

24   that testing at an even sample rate to get the average flow

25   rate is somehow shortchanging or misrepresenting the prior

1   art, then Brita did the same thing in their patent,

2   repeatedly, including for the PUR 2-stage.  They averaged

3   the flow rate at 3 points and represented that flow rate to

4   the public and then used it to calculate FRAP.

5         You can calculate an average flow rate using even

6   sampled points.  That is taught by the '141 patent, and that

7   will be confirmed by every expert in this investigation.

8         Slide 70.  And, more importantly, it's confirmed

9   by Brita's expert, one of the other admissions that Brita

10  does not want to come in.  He admits that you -- here,

11  again, with this same embodiment -- you can calculate

12  average flow rate at the bottom 5.4 minutes per liter, the

13  average of 3 sample points, 547, 524, and 453.

14        So before Brita decided to generate this dispute

15  in its rebuttal expert reports to avoid prior art, their

16  expert, one skilled in the art, had no issue averaging flow

17  rates.  It's a manufactured dispute.

18        And, Your Honor, I do want to say, in closing, if

19  you have any concerns, if you have any questions about

20  testing, we have brought Mr. Herman here to explain why for

21  each filter exactly a lifetime and possibly more of

22  challenge water was run through each filter and why beyond a

23  reasonable doubt, not just clear and convincing evidence,

24  that each of these filters meet the claims of the '102

25  patent.

1          Mr. Ainsworth brought up the issue of inherency.
2    We have never said the word inherency.  We don't rely on an
3    inherency theory.  These filters absolutely meet the
4    performance claims of the patent.  You will have people
5    talking about and authenticating these filters that were
6    around at the time and tell you they were all the same at
7    the time of manufacture.  You don't -- we don't need an
8    inherency because we have proved it explicitly.
9          If you have any concerns about the testing or the
10   dramatic testing documents that Mr. Ainsworth put up,
11   Mr. Herman is here to answer any and all questions for you,
12   Your Honor.
13         And those are just two of the major defenses we
14   have in this case, but I think the case easily founders on
15   both, but I do want to address something, Your Honor.
16         When you have the patent that Brita does, when
17   it's infinite in structure and infinite in constituents and
18   infinite in performance, it presents a dire public interest
19   problem, because they are accusing filters, such as PUR's
20   filters, such as LifeStraw's filter, that were made using
21   materials that the patent disparaged and using innovations
22   that came along a decade later.
23         For example, in slide 71, one of the Pur Plus
24   filter, the Mario 3 edition that you'll hear about, was
25   developed through Mike Mitchell's experience -- that's the

1   wrong slide but not a problem -- slide 4, please.  There he

2   is.  Mike Mitchell helped develop this new type of filter,

3   this new ion exchange combination, through his work dealing

4   with affected communities in Flint and in Newark,

5   New Jersey, things that Brita did not invent, things that

6   Brita only hoped to invent.

7           And this presents a tremendous public interest

8   problem, because now Brita is claiming, basically, any lead

9   certified filter is something they invented, regardless if

10  it's carbon block or, as most of the products, just mixed

11  media that they said could never meet the claims of the

12  patent that they couldn't meet the claims of the patent.

13          Your Honor, we look forward to presenting these

14  issues to you throughout the next five days.  Thank you.

15          JUDGE MCNAMARA:  Thank you, Mr. Swain.  It's now

16  12:34.  I think it might make sense that we take a break.  I

17  know that the other Respondents wish to present an opening.

18  However, let's take our break now and then come back and

19  finish with the openings.  That will give everybody a chance

20  to --

21          MR. SWAIN:  To be clear -- I'm sorry, Your Honor,

22  I think I spoke over you because of the delay.

23          I just want to make sure that this is the lunch

24  break?

25          JUDGE MCNAMARA:  Yes.

```
 1            MR. SWAIN:  Okay.  Good.  You have a lot of

 2    hungry faces in the room, so thank you.

 3            JUDGE MCNAMARA:  That's what I thought.  And I'm

 4    sure Ms. Kinkade needs a break.

 5            MR. SWAIN:  Absolutely.

 6            JUDGE MCNAMARA:  I'll see you back here in an

 7    hour.

 8            MR. SWAIN:  Yes, Your Honor.

 9            JUDGE MCNAMARA:  Thank you.

10            (Whereupon, the proceedings recessed at 12:35

11    p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        AFTERNOON SESSION

 2                  (In session at 1:35 p.m.)

 3           JUDGE MCNAMARA:  We're back.  I think we're

 4   ready, then, to start the next opening.

 5           MR. SWAIN:  That is quite correct, Your Honor.

 6   There's two things I would like to update you on.

 7           The first, I'm ashamed and sad to have forgotten

 8   because Mr. Ainsworth did such a good job on this.  We have

 9   two attorneys making an appearance under the NEXT Program as

10   well.

11           Are Katherine Rubschlager from our firm and

12   Nelson Hua from K&L Gates will be making their appearances

13   here.  And I think once Ms. Rubschlager makes her appearance

14   she will no longer be eligible for the NEXT Program.

15           So this is a wonderful program.  It allows

16   clients to feel comfortable bringing in new attorneys, and

17   that's how they get to be great attorneys.

18           JUDGE MCNAMARA:  I think so too.  I think this is

19   just great.  We all got our start somewhere, and you have to

20   learn by doing.

21           MR. SWAIN:  That's right, Your Honor.

22           And the second is, I believe -- and I understand,

23   Mr. Ainsworth can correct me -- they have reached out to

24   discuss what to do with Dr. Hatch.  If they are amenable,

25   we're going to meet and confer either -- we should have an
```

1    update for you tomorrow morning.  I'm confident we can work

2    something out.

3            JUDGE MCNAMARA:  That's great.  Again, no

4    pressure on Dr. Hatch, none whatever.

5            MR. SWAIN:  Thank you, Your Honor.  I am going to

6    now -- I'm looking to see who is next -- we do have an

7    update on the privilege issue.  I'm going to present

8    Ms. Cassandra Simmons from ZeroWater to come discuss it.

9            JUDGE MCNAMARA:  Okay.  Very good.

10           Hello, Ms. Simmons.

11           MS. SIMMONS:  Good afternoon, Your Honor.  So I

12   think earlier this morning we had a little confusion.  We

13   did receive an order about the eight documents that were

14   from Omnipure.  And in our June 2nd -- or our May 16th

15   letter and June 2nd DCM there were also some Brita documents

16   from Ms. Lauren Kahn's deposition that were clawed back, and

17   we had challenged the privilege assertion on those

18   documents.

19           JUDGE MCNAMARA:  Okay.  Was that in a motion to

20   be sure -- was it specifically challenged in the motion, or

21   did a motion -- or did it just come up in the DCM?

22           MS. SIMMONS:  It came up in the DCM, and then in

23   your June 9th order, on page 9 through 10, the documents

24   were ordered for in-camera inspection, I think on June 17th,

25   and we -- we obviously don't have visibility into -- if

1    those were submitted, but we just assumed they were.

2         JUDGE MCNAMARA:  Okay.  We'll double-check.  I'm

3    sorry about that.  I'm usually pretty good about

4    double-checking those things.  I'm glad you brought it to my

5    attention.

6         So do you know how many documents there were that

7    were clawed back that you're looking for?

8         MS. SIMMONS:  I believe there was one at the

9    deposition and then eight additional Bates-stamped documents

10   that were clawed back right after the deposition as well.

11        JUDGE MCNAMARA:  Okay.  We'll double-check.

12        Anita, would you double-check that for me,

13   please.  Just spend some time this afternoon looking at that

14   and get back to me.  You had worked on the earlier clawback

15   issue.  So let me know.  And double-check to make sure that

16   those documents that were clawed back came in to McNamara337

17   and we'll take care of that pretty promptly.

18        Will there be an issue today or is it later on?

19        MS. SIMMONS:  With receiving those documents into

20   evidence?

21        JUDGE MCNAMARA:  Well, will there be a problem in

22   terms of witness testimony today?

23        MS. SIMMONS:  Well, the documents -- we haven't

24   seen the documents in a few months.

25        JUDGE MCNAMARA:  Of course you haven't.

1          MS. SIMMONS:  They did come in through Lauren
2     Kahn's deposition.  She is going today.  But they are
3     related to marketing.  So if we need those documents, we can
4     discuss with counsel regarding probably Mr. Green.  We may
5     be able to work something out with them.
6          JUDGE MCNAMARA:  Okay.
7          MS. SIMMONS:  If we receive those documents.
8          JUDGE MCNAMARA:  Yep.  Got it.  Let me just pull
9     up and see --
10          MR. AINSWORTH:  Your Honor, if I may, we did
11     submit those in camera.
12          JUDGE MCNAMARA:  Who's speaking?
13          MR. AINSWORTH:  Sorry, Your Honor, this is Paul
14     Ainsworth for Brita.  We did submit those in camera.  I can
15     get you the date we submitted those, but we complied with
16     your order.  I believe we sent an affidavit as well, at your
17     request, explaining the attorneys involved with the
18     privilege information.  If you want, I can get you on the
19     next break with dates that we submitted that, but I know we
20     did.
21          JUDGE MCNAMARA:  I'm not sure how that got
22     missed.  I apologize for that.
23          Let's see how it goes.  Let's get going and we'll
24     see where that is and we'll work something out with respect
25     to where it comes in with Lauren Kahn or Mr. Green,

1    depending on what the outcome is.

2              MS. SIMMONS:  Thank you, Your Honor.

3              JUDGE MCNAMARA:  Thank you, Ms. Simmons.

4              Thank you, Mr. Ainsworth.

5              MS. SIMMONS:  With that, I believe Mr. Letchinger

6    will continue with the Respondents' opening.

7              JUDGE MCNAMARA:  Okay.  Thank you very much.

8              MR. LETCHINGER:  Good afternoon, Your Honor.

9              JUDGE MCNAMARA:  Good afternoon, Mr. Letchinger.

10             MR. LETCHINGER:  I appreciate the lunch break,

11   because there's nothing worse than going right before lunch.

12   There's nothing even worse than being about a foot shorter

13   than the person who preceded me who had a full head of hair.

14   I appreciate whatever I could get.

15             May it please the Court, Your Honor, my name is

16   John Letchinger, and Mr. Brandyberry identified our team.

17   We are honored to be here representing Zero defendants.

18             I also want to comment about the program.

19   Ms. Simmons obviously just appeared for us.  She is not

20   technically eligible because she has actually been able to

21   do a few examinations, but we purposely put our team

22   together, not just to satisfy the requirements, but it does

23   give our younger people an opportunity to get up on their

24   feet and for what us is basically about the company case,

25   and with the trust of our client, in addition to having two

 1    younger associates who are going to be putting on witnesses

 2    here.  Mr. Brandyberry is a first-year partner, and he has

 3    been our lead counsel.

 4            JUDGE MCNAMARA:  That's wonderful.  I just think

 5    it's so important.  It's just so important.  It's so

 6    important for your clients, absolutely it is.  They have

 7    succession planning, everybody should have succession

 8    planning.  It's great.

 9            MR. LETCHINGER:  I agree.  So, with that, I'll

10    proceed.

11            I've tried to really minimize my remarks.

12    Mr. Swain took up almost all of our time, but he did a great

13    job, all kidding aside.  I'm going to really try to focus on

14    our 101 argument, not that we're giving up on any of the

15    defenses, but I think it's time to try to get to the

16    evidence, and there's two more people to go.

17            So the investigation against Zero is directed to

18    Zero's primary and essentially only product.  We make one

19    filter.  And we've made that same filter essentially since

20    2005.

21            As Zero's long-time president and CEO, Mr. Doug

22    Kellam, who will testify today -- not today but this week --

23    his first reaction reading the patent when it was accused

24    was how can a patent that was applied for in 2008 cover our

25    products that have been on the market since 2004 and 2005.

1          And we, to that point, Your Honor, will present
2    overwhelming evidence that as of, the latest, September
3    2006, we had our filter in over 250 Home Depot stores.  Our
4    filter then proceeded to be rolled out to, I believe, the
5    balance of Home Depot stores, in 2007.

6          Also, notably, I think Mr. Swain noted this, our
7    filter, the Zero filter, was the first filter commercially
8    available that passed the 2007 NSF/ANSI 53 standard, and we
9    passed in 2007.

10          I think it does beg the question of, with all of
11    that, how is the Zero product not even mentioned in the '141
12    patent?  We heard a lot from Mr. Ainsworth about testing
13    that's reported of competitors, but how was this key product
14    missed?

15          Mr. Kellam's second question was, after reviewing
16    the patent, what is covered with an end result?  And that's
17    my brilliant segue into our 101 argument.

18          And this is collective for all the Respondents.

19          You're going to hear a lot of testimony, you've
20    already heard a lot of argument, about what's covered in the
21    patent, and I think Mr. Swain has done a pretty adequate job
22    explaining the difference between a block filter and the
23    filters that are actually accused.  In fact, we just cleaned
24    up his mess a few minutes ago of all the particulates that
25    were on the podium.  So I'm not going to cover that again.

1  I think that part is clear.

2         I'm looking at it a little differently.  And I'm

3  going to give credit to what's in the specification and all

4  the exhibits you're going to see and all the testing that's

5  going to be talked about on these block filters.

6         Even with the incorporation by reference of the

7  NSF/ANSI 53 2007 standard, upon which claimant has

8  repeatedly relied to overcome myriad other challenges to the

9  patent, even with that, and the fulsome specification of all

10  the examples of different constructions of filters, block

11  filters, that the claimant claims meet the standard, simply

12  stated, none of that structure is recited in the asserted

13  claims.  And as Mr. Swain noted, it won't begin to cover

14  much of the 30 to 350 range.

15         Looking at a few portions of the specification in

16  claim 1, hopefully I can highlight the 101 problem a little

17  bit better.

18         The abstract is directed to a gravity-fed carbon

19  block water filter.  And in the specification, as

20  Mr. Ainsworth addressed, there are several examples of block

21  filters that claimant claimed to have invented describing in

22  detail configurations of particle sizes, wall thickness,

23  surface area, compression, diameters for the blocks, shapes

24  of the blocks, other surface area measurements for different

25  components, different patterns and waveforms, and

1    measurements of the components, as well as specified

2    materials for making the various filter components, and then

3    how all of these can be mixed and combined to make different

4    types of filters to achieve the FRAP result.

5         And I think it's worth a pause, Mr. Swain touched

6    on it, but even the FRAP formula is made of nothing old,

7    generic qualities of water filters -- volume and the media,

8    well-known in the art -- how fast the water flows, how long

9    it lasts, and measuring lead -- nothing new there.

10        I give more credit to the specification.  It goes

11   on, as Mr. Ainsworth talked about, describes blocks with

12   even more certainty, talks about cavity types, if there's

13   more than one cavity type, sometimes there are, and then

14   they address in the specification whether or not they are

15   glued together, how they lay flat, if they are supposed to

16   lay flat, the nature of the plane that separates multiple

17   blocks and ways for making these various filters.

18        He also, as I expected he would, directed your

19   attention to the descriptions in Figs. 1 through 20, and 20

20   through -- 24 through 25 -- to the extent they are not

21   describing prior art, those that didn't work, they are all

22   about block filters with a lot of detail.

23        The remaining figures, primarily charts, two of

24   which, I believe, 26 and 27, are simply reporting values

25   measured of prior art that they claim didn't satisfy the

1    FRAP.  Of course mixed media, granular filters, and three
2    charts that report FRAP measurements for the filters they
3    claim -- the block filters they claim they invented.
4            But, again, that all being said, none of that
5    detail for the invented block filter, that's a quote, is
6    included in the asserted claims -- none of it.
7            Take a brief look at claim 1.  A gravity-fed
8    filter comprising filter media including at least activated
9    carbon and a lead scavenger.
10           I want to pause.  Not only have multiple
11   witnesses for the claimant conceded, as we expect the
12   evidence to show, that, number one, gravity-fed water
13   filters are long known in the art.  Gravity-fed water
14   filters with activated carbon and lead scavenger are also
15   generic, well-known components in the industry.  But we
16   don't need to take their word for it.  It's actually
17   articulated in the patent.  I think Mr. Swain identified it.
18           I'll reference Your Honor to column 1, starting
19   at line 53, through column 66, I'm sorry, column 2, through
20   line 2.  I probably butchered that.
21           I'll read it.  Filter blocks for water filtration
22   comprising granular activated carbon and binder with or
23   without various additives, such as lead sorbent, have been
24   commercially available for many years, ours being one of
25   them.

1          The balance of the claim simply then recites what

2     the filter will achieve by way of testing.  That's FRAP.

3          In our opinion, this is the perfect embodiment of

4     an impermissible aspirational claim with no attendant

5     structure to explain how to achieve the results.  And while

6     Brita, even I think as recently today, continues to argue

7     that the information is in the specification, and putting

8     aside the fine job Mr. Swain did making it really clear that

9     all of that was directed solely to block filters, putting

10    that aside, I knew they would argue it's in the

11    specification.

12         But it doesn't make their way -- none of those

13    details make their way into the claims.  And the question, I

14    think, is why, why not.  And I do believe the evidence will

15    show that the prior applications that Mr. Swain talked about

16    that did go into detail about all the different ways you

17    should try to make a filter, those were rejected over and

18    over again as anticipated and ultimately abandoned by Brita.

19         The omission of detail in the claims describing

20    how to create the filters that might achieve the

21    aspirational FRAP is fatal to the validity of the claims.

22         I like to use analogies to help me understand and

23    explain things in my cases and just in life.  With six

24    daughters and lots of eye rolling, I'm well aware that not

25    every analogy works for everybody.

1          I used the car analogy in front of Judge Williams

2     in superior court about a year and a half ago.  I went on

3     and on and on.  And after I was done, she very gently smiled

4     and said, I take public transportation, but she did at least

5     credit me with at least making my point.  So I'm going to

6     give it a go.

7          And my hypothetical patent is going to be another

8     automobile one.  I don't know if you drive or not, but my

9     claim covers a nonelectric automobile comprising an engine,

10    including at least gears and fuel lines where, when

11    calculating the weight of the engine, the flow of the

12    gasoline, and the horsepower claimed by the manufacturer,

13    the automobile can achieve 0 to 60 miles an hour in under

14    180 seconds.

15         I know somebody is going to poke holes in the

16    analogy.  I'm not a scientist.  I'm not even a patent

17    lawyer.  But I hope the analogy illustrates the point we're

18    making.  While allowing us to get outside this vacuum of

19    talking about filters and pouring granular stuff all over

20    the place, the question that I'm trying to raise for

21    Your Honor is, did I invent an automobile or did I just

22    describe what I hope the automobile with two well-known

23    components can achieve.  We think that's a fatal flaw in

24    their patent.

25         Simply stated, it's not the entire patent, at

1    least the asserted claims, respectfully, are hopelessly

2    invalid under 101, and I don't have lots of fancy diagrams

3    and pictures, but I do want to cite for Your Honor, American

4    Axle & Manufacturing vs. Neapco, a Federal Circuit case, 967

5    F.3d, 1285-2020, and I don't believe we cited this case

6    earlier on because I think there was a petition for cert.

7    pending.  The petition was denied.  And it's really not new

8    law, it's recent, and we wanted to bring it to your

9    attention.

10            I'm just going to read from page 1293 of the

11   holding.  It says -- I'm not going to read the entire

12   section; just the good stuff for us -- the Supreme Court's

13   cases focus on the claims, not the specification, to

14   determine section 101 eligibility.

15            Similarly, we have held repeatedly that features

16   that are not claimed are irrelevant to step 1 or step 2 of

17   the Alice analysis.  The specification cannot be used to

18   import details from the specification if those details are

19   not claimed.  And as I mentioned, this is not new law, but

20   it's stated really nicely.

21            I'm going to skip our arguments for now on

22   unenforceability and domestic industry, other than to say I

23   think Mr. Ainsworth is trying to gloss over the domestic

24   industry economic prong a bit.  And Mr. Mitchell will be

25   handling that part of it for the group.

1          I want to conclude by echoing Mr. Swain's

2     comments about us looking forward presenting evidence to

3     you, and I want to acknowledge and thank you for the obvious

4     attention that you've already paid to this case and are

5     paying to this case.  I've actually been in a situation

6     reading from a podium like this with a judge who was typing

7     on their computer.  So -- and not about our case.  So we do

8     appreciate that.

9          As I mentioned, for my client, Zero, this is

10    about the company case.  We have one filter.  It's the same

11    filter we've had since 2004-2005 essentially, and, for us, a

12    loss means we have to terminate a lot of people and close

13    our doors.

14          So I appreciate your time, your attention, and

15    I'm going to turn this over to the next Respondent.  Thank

16    you very much.

17          JUDGE MCNAMARA:  Thank you, Mr. Letchinger.  That

18    was really helpful.

19          MR. LETCHINGER:  Thank you.

20          MR. TUCKER:  Good afternoon, Your Honor.

21          JUDGE MCNAMARA:  Good afternoon, Mr. Tucker.

22          MR. TUCKER:  May it please the Court, I'm Todd

23    Tucker, and I represent Ecopure Respondents in this

24    investigation.

25          Ecopure sells its products that are in this

1  investigation under the Aqua Crest brand, so I'll refer to

2  us as Aqua Crest.

3         And while we join in all the other defenses that

4  are at issue in this case, the Aqua Crest filters have some

5  defenses very unique to them, and those defenses are related

6  to noninfringement, and no other party, no other Respondent

7  in this case, has those defenses.  So let me give you a

8  little bit of information about that, Your Honor.

9         I am on RDX 1902, Mr. Kotarski.

10        So our slides are RDX-19.1 through 10,

11 Your Honor, so I'm just going to refer to slide 2, slide 3,

12 if that works.  Thank you.

13        So Aqua Crest has an extensive product portfolio

14 that includes more than a dozen gravity-fed water filters.

15 These filters serve as affordable replacements for many of

16 the other parties in this case as products, PUR, Brita, and

17 ZeroWater.

18        When the complaint was filed, the only product

19 that was alleged to infringe the '141 was the 7006A filter,

20 which was a replacement filter for Brita.  That product has

21 been dropped.  Interestingly, the only product that's left

22 in this case of Aqua Crest is the 7023B.  That's a

23 replacement filter for ZeroWater.

24        And I want the Commission to understand very

25 clearly that, when we say that they're a replacement

1    product, they are a replacement in the sense that they

2    physically fit into that pitcher manufacturer's slot.  They

3    do not necessarily have the same inner components or guts,

4    which is very important here.

5              Because, again, the Aqua Crest filter does not

6    infringe for two very particular reasons, because it has --

7    while it is a replacement filter that fits those pitchers,

8    it is a little bit different.

9              In the first area where we submit that the

10   there's no infringement is related to the FRAP equation.

11   When Aqua Crest filters are properly analyzed using a proper

12   lifetime, under the claim construction, the FRAP of these

13   filters is 470 or higher.

14             Now this morning I think you heard my client

15   mention about for 15 seconds or so, so we're very excited to

16   get this out, because I think what has happened in this case

17   is Brita has just kind of waved their hand and assumed there

18   is infringement, and then when they got into exactly what my

19   client actually makes, there was an uh-oh moment, our

20   initial numbers are wrong, let's try to backfill.  But for

21   them the issue is, by that point, they had already submitted

22   a claim construction and were using a lifetime under their

23   very own claim construction that does not meet FRAP.

24             Also, I think, as we get through this

25   investigation, we're going to see that there's a failure of

1    proof as to the lead scavenger required by claim 1.

2           So let me give you a brief chronology of how the

3    7023B and its analysis came to light in this case.  In the

4    initial contentions Brita initially said that the proper

5    lifetime was 25 gallons.  And you can see that's in their --

6    the initial contentions RX-2620C from April.  In their

7    pre-hearing brief, which was served on July 13th, so about a

8    month ago, and in their expert Dr. Rockstraw's report, again

9    indicate that the 7023 B product is advertised as a

10   replacement for the ZeroWater five stage pitcher, which has

11   a 20-gallon-rated capacity.  20-gallon-rated capacity, let's

12   remember that.

13          Now when Dr. Rockstraw -- he quotes that in his

14   report, but, for some reason, he uses 15 instead of 20, or

15   instead of the initial 25.  And I know that's a little bit

16   confusing to hear 25 and then 20 and 15.  They are bouncing

17   all over the place.  Because what has happened here is I

18   think they assumed infringement, said 25, then they did the

19   calculation and realized 25 gets you a FRAP of over 470, 20

20   gets you a FRAP of over 470, we have a problem.

21          But what's the bigger problem?  The claim

22   construction that was -- and this is Brita's claim

23   construction that you adopted -- for the lifetime component

24   of FRAP is the, I quote, the total number of gallons of

25   water that a manufacturer or seller has validated can be

1    filtered before the filter is replaced.

2          Now you saw this morning in Brita's presentation,

3    did Aqua Crest get its own box for its products?  No, it did

4    not.  Lumped right in with ZeroWater.  So they have assumed

5    ZeroWater is what the lifetime is.  And that fits under

6    their claim construction.  Their claim construction is the

7    manufacturer's lifetime.  And their own documents say, and

8    they have quoted this as recently as a month ago, it's

9    ZeroWater replacement, use what ZeroWater does -- 20.

10         And when you do that, and this is pointed out

11   again, when you do that, when you use 25 gallons or when you

12   use 20 gallons -- so they started with 25, they have also

13   used 15 and 20 -- when you use 25, you're over 470, and when

14   you use 20, you're over 470.  And those are -- that's the

15   information that we have that meets that claim construction.

16         But in their final infringement contentions, when

17   they finally looked at this, when they finally maybe started

18   to look at this and take Aqua Crest seriously, they realized

19   that the 25 number, which is -- that's their claim

20   construction, that didn't work, so they had to go

21   cherry-pick another number, and they picked 15.

22         And where they -- where they picked 15 from is

23   from a product sheet that Aqua Crest uses, but this is a

24   product sheet that's telling you when to change potentially

25   times you may need to change the filter, not based on lead

1    removal.  And this case is about lead removal.  This is --
2    they are cherry-picking two numbers under what's called TDS.
3    TDS is essentially how hard your water is, does it have
4    minerals like calcium in it.  It has nothing to do with
5    lead.
6         So what they do, because they know they have a
7    problem with the manufacturer's lifetime, under their very
8    own claim construction, they picked a range of 15 to 25,
9    they used the low number of that range, that range is based
10   on a high TDS, and they ignore that, when you do use TDS,
11   the typical range would be 25 to 40.
12        Now make matters worse, it took us a while to
13   unravel this in Dr. Rockstraw's report, and our expert,
14   Dr. John Crittenden, is going to explain this in a lot of
15   detail for you.  Now unlike Dr. Rockstraw, who you've heard,
16   he has no experience in lead removal, Dr. Crittenden has
17   been decades, civil engineering, teaching lead removal at
18   Georgia Tech University.  He is a guru on lead removal.  And
19   he is going to explain to you that, not only did they
20   cherry-pick numbers based on TDS and used maybe the wrong
21   numbers, they mismatched their numbers to put into FRAP.
22        What they did was ultimately, when they are using
23   TDS for FRAP, instead of using the claim construction, when
24   they used TDS for FRAP, they are taking a lifetime -- they
25   are taking a content for the cleanest water with the

1    shortest lifetime.  That's a huge mismatch.

2            The cleanest water, the filter will last the

3    longest.  So, okay, it's the absolute cleanest water,

4    probably going to fail FRAP there, so what do we do, we're

5    going to cherry-pick these numbers and use the wrong

6    lifetime.  And, oh, by the way, we're going to wholly ignore

7    our claim construction.

8            When you do FRAP correctly and when you look at

9    that lifetime variable, and, again, the claim construction

10   of that, the total number of gallons of water that a

11   manufacturer or seller has validated can be filtered before

12   the filter is replaced.

13           Aqua Crest only says that it's a replacement for

14   ZeroWater.  You then look at ZeroWater, and ZeroWater says

15   time and time again it's 20.  The only other proper number

16   that's possibly out there is above 20 -- it's that 25 to 40.

17   They have cherry-picked this 15.  It doesn't work.  It

18   doesn't work under their very own claim construction.

19           You didn't hear about any of this this morning,

20   because, again, I think that to date the Aqua Crest clients,

21   the Aqua Crest Respondents, Ecopure, has been given very

22   short shrift.  So myself and my team and my client, frankly,

23   are very excited to get to square the record on that.

24           Using the claim construction, it's at least 20

25   gallons, possibly 25, and when you do that number,

1    Dr. Crittenden is going to show you that the FRAP is 470 or

2    greater, and that certainly exceeds the limitation of 350.

3          Now my guess is they're going to try to backfill

4    again and try to dance around their claim construction and

5    go after our present with exactly what is the lifetime, but

6    let's look at what they have said.  They have said at the

7    start of this case, and they said it as recently as July

8    13th, when you're doing FRAP, for the Aqua Crest filter, you

9    use 20 gallons, and 20 gallons gets you 470 -- 20 gallons

10   gets you noninfringement.

11         Now, Your Honor, we also -- I'll touch on this

12   very briefly -- we think there's going to be a failure of

13   proof based on the record so far of lead scavenger.  Brita's

14   chemical test, when they finally got around to looking at

15   the 7023B, it includes polystyrene.  Brita fails to show how

16   this material is a lead scavenger.

17         In order to scavenger lead, polystyrene would

18   have to have chemical modifications to pull lead out of the

19   water.  There's no evidence of that.  They never tested or

20   estimated the ability of polystyrene or any other component

21   to the scavenger the lead.

22         Again, I point you back to that opening where

23   we're lumped into that ZeroWater box, and maybe, maybe,

24   maybe, in hindsight, Aqua Crest should have had their own

25   box, because they do do things a little bit differently.

1          So, Your Honor, and this is where I'm going to

2    conclude, at the end of the day, my job here is to tell you

3    Aqua Crest's side of the story.  It's not going to be waving

4    the hand and it's not going to be lumping in with other

5    people.  It is what the hard math with the proper lifetime

6    under your claim construction gets for FRAP.  And when you

7    do it the right way, and they have admitted the right way to

8    do it, they just had a whoopsie, and didn't realize it

9    didn't hit 350, when you do it the right way, you're at 470

10   or higher, and that is very easily noninfringement, no

11   issues.

12          Thank you, Your Honor.

13          JUDGE MCNAMARA:  Thank you very much, Mr. Tucker.

14   Much appreciated.

15          MR. TUCKER:  Thank you.

16          JUDGE MCNAMARA:  Okay.  So at this point,

17   Mr. Ainsworth, I think you should be ready to call your

18   first witness, Dr. Knipmeyer.  I'm sorry.  Did I miss

19   someone?  I think I did.

20          MR. GARGANO:  You did, Your Honor.

21          JUDGE MCNAMARA:  Oh, I am so sorry.

22          MR. GARGANO:  That's quite all right.

23          JUDGE MCNAMARA:  Go ahead, please.

24          MR. GARGANO:  I will be brief.

25          Good afternoon, Your Honor, and may it please the

1    Court.

2              JUDGE MCNAMARA:  Good afternoon.

3              MR. GARGANO:  Jeff Gargano of K&L Gates on behalf

4    of Respondent Vestergaard Frandsen, which does business

5    under the name, Your Honor, as you know, LifeStraw.

6              So I just want to spend a couple of minutes

7    introducing my client and describing the technology utilized

8    in its home line of filtration products, which are the

9    accused products in this investigation.

10              My colleagues have done a wonderful job pointing

11    out the significant problems with the '141 patent, so I will

12    not replow that ground.

13              Ken, can we have the first slide, RDX-18.1.

14              So unlike Brita and the other Respondents,

15    Your Honor, LifeStraw is not a consumer goods company.  You

16    will hear from Alison Hill, the chief executive officer of

17    LifeStraw, and Ms. Hill will tell you that LifeStraw is a

18    humanitarian company that gives back.

19              LifeStraw was founded on the principle of

20    humanitarian entrepreneurship with the belief that business

21    can and should play a role in creating positive social

22    impact globally.

23              LifeStraw believes that everyone, everyone

24    deserves equal access to clean drinking water.  Accordingly,

25    LifeStraw strives to serve underrepresented communities

1    through its actions, its products, and its initiatives, and

2    it uses sales of its products to fund humanitarian

3    initiatives across the globe.

4         LifeStraw began in 2005 when it introduced its

5    award-winning LifeStraw personal filter, which utilizes a

6    membrane microfilter to transform dirty drinking water into

7    safe drinking water by removing bacteria and parasites.

8         This product evolved from a collaboration between

9    Vestergaard and the Carter Center to strain out guinea larva

10   from drinking water and eradicate guinea worm disease in

11   developing countries around the world.

12        Since then, Your Honor, LifeStraw has developed a

13   portfolio of water filtration products for humanitarian

14   efforts and for use outdoors.

15        Now Ms. Hill will also tell you that in 2016

16   LifeStraw began to develop a product line of water

17   filtration products for the home market.  And this was --

18   the reason for this was to improve protection against

19   emerging contaminants that were not addressed by the market

20   at the time and also to more fully support the humanitarian

21   efforts and LifeStraw's global safe water programs.

22        In 2019 LifeStraw commercially launched its home

23   product line, which builds upon LifeStraw's membrane

24   microfilter technology by adding a second stage filtration

25   component.  And that second stage filtration component,

1    Your Honor, utilizes well-known filtration media activated

2    carbon and ion exchange resin.

3            I want to pause here for a minute and I just want

4    to talk briefly, because I know we've talked about this

5    already, but I want to talk briefly about activated carbon

6    and ion exchange resin.  The '141 patent refers to this type

7    of filtration media as mixed media.

8            Ken, can we pull up JX-22, the '141 patent, and

9    blow up column 3, lines 50-67.

10           So this is 141 patent, Your Honor, column 3,

11   lines 50 to 67.

12           It is undisputed that activated carbon and ion

13   exchange resin was used in water filtration products long

14   before the priority date of the '141 patent.  The '141

15   patent acknowledges this, and every technical witness that's

16   going to testify in this hearing will admit the same fact.

17           The Background of the Invention section of the

18   '141 patent identifies a number of problems and drawbacks

19   associated with the use of activated carbon and ion exchange

20   resin.  It's right here on the screen before you in column

21   3.

22           First, the '141 patent teaches that ion exchange

23   resins require a long contact time to work properly.  That's

24   the first drawback.

25           The second drawback is that ion exchange resins

1    take up a large amount of space in the filter, leaving

2    little space for the activated carbon.

3           And, finally, the '141 patent teaches that

4    blended granular carbon and ion exchange resin have limited

5    contaminant removable -- removal capability due to particle

6    size and packing geometry of the granules.

7           You already heard that the inventors tested mixed

8    media filters in the '141 patent, and not a single one, not

9    a single one, Your Honor, achieved a FRAP factor below 200

10   or even below 350.

11          Not surprisingly, the '141 patent does not

12   provide a solution to the problems identified here.

13          It doesn't provide problems to the use of

14   activated carbon and ion exchange resins because the '141

15   patent only focuses on carbon blocks.  You've heard that.

16   That's a common theme between all of the Respondents'

17   presentations today.  Because it's true.

18          The inventors will even tell you that they did

19   not invent mixed media filters or filters employing

20   activated carbon and ion exchange resins.

21          LifeStraw did solve these problems in their

22   filter.

23          Ken, can we now switch back to RDX-18.2.

24          I want to just briefly talk about the LifeStraw

25   technology, Your Honor.  As I mentioned, LifeStraw employs a

1    two-stage filtration process.  The first filtration stage,
2    it slows down the flow of water, because it must first pass
3    through submicron-size pores in what's known as a membrane
4    microfilter.
5            Think of a bunch of straws with very, very small
6    holes in it that the water must pass through to then get to
7    the second stage.  And it's this -- these holes in the
8    membranes that actually physically filter out bacteria,
9    microplastics, and parasites to a level that no other
10   product on the market can achieve.
11           To give you some perspective how small the pores
12   and the microfilter membrane are, the average diameter of a
13   human hair is roughly 70 microns.  The size of the pores in
14   the membrane microfilter are sub-1 micron, below 1 micron.
15           Now in the second stage the activated carbon and
16   ion exchange resin is in the form of woven fibers, which
17   greatly increase the surface area of the filter media,
18   thereby increasing the contact time between the water and
19   the filtration media.  This solves one of the problems, the
20   very problem that the '141 patent described with respect to
21   the use of activated carbon and ion exchange resins.
22           The use of woven fibers also solves the problems
23   associated with granular particle sizes and packing
24   geometries, because these fibers are woven together, there's
25   very little space between the fibers.  Again, solving a

1    problem identified in the '141 patent.

2         To wrap up, Your Honor, LifeStraw really uses
3    old, well-known filtration media that benefits from improved
4    manufacturing technologies to achieve a highly effective and
5    efficient water filter.  And that, Your Honor, highlights
6    the problem with the '141 patent.

7         The asserted claims of the '141 patent have
8    almost no structural limitations whatsoever.  The claims are
9    almost entirely defined by a purely functional FRAP formula.
10   Yet the '141 patent only describes and enables carbon block
11   filters that achieve this functional FRAP limitation.

12        Brita should not now be allowed to overreach the
13   scope of its contribution to the field of water filtration
14   technology through the '141 patent and preclude innovation
15   that provides access to safe, clean drinking water no matter
16   how that is achieved.

17        Thank you, Your Honor.

18        JUDGE MCNAMARA:  Thank you, Mr. Gargano.

19        All right.  At this point it is now time for
20   Brita to put on its first witness.  Now it's time.
21   Dr. Knipmeyer.

22        MR. AINSWORTH:  Thank you, Your Honor.  Paul
23   Ainsworth for Brita.  And we are prepared to call
24   Dr. Knipmeyer.  So Your Honor knows, I expect our direct
25   presentation, our direct examination will be about an hour

1    to an hour and 15 minutes.  If you need to take a break,

2    just interrupt me.  I have a habit of talking --

3            JUDGE MCNAMARA:  Okay.  Thank you.

4            MR. AINSWORTH:  And she is sharing a mic to avoid

5    feedback.

6            JUDGE MCNAMARA:  Good afternoon, Dr. Knipmeyer.

7    Would you kindly raise your right hand.

8                    ELIZABETH KNIPMEYER,

9              having been first duly sworn and/or affirmed

10   on their oath, was thereafter examined and testified as

11   follows:

12           JUDGE MCNAMARA:  Please state your full name.

13           THE WITNESS:  Elizabeth Louise Knipmeyer.

14           JUDGE MCNAMARA:  Thank you very much.

15                    DIRECT EXAMINATION

16   BY MR. AINSWORTH:

17       Q.   Dr. Knipmeyer, would you please summarize your

18   educational background?

19       A.   Yes.  I have a bachelor's of chemical engineering

20   in biomedical engineering from the Johns Hopkins University,

21   and I have a Ph.D. in chemical engineering from the

22   University of California, Santa Barbara.

23       Q.   Dr. Knipmeyer, where are you currently employed?

24       A.   I'm employed with the Clorox Company,

25   specifically in the Brita division.

1        Q.    What is your title with the Brita division?

2        A.    I'm an associate director of R&D.

3        Q.    How long have you been with the Clorox Company?

4        A.    Since May of 2006.

5        Q.    And when you started in May of 2006, what was

6    your position?

7        A.    I was a scientist for product and process

8    development in the Brita division.

9        Q.    How long were you in that role with Brita?

10       A.    Approximately four years.

11       Q.    And where did you go next?

12       A.    To the cleaning division as a product developer.

13       Q.    How long have you been in the cleaning division?

14       A.    About two, three years.

15       Q.    Dr. Knipmeyer, do you have any patents related to

16   your work at Brita?

17       A.    I do.

18       Q.    Mr. Rennick, if we could please bring up JX-22.

19             Dr. Knipmeyer, do you recognize JX-22?

20       A.    I do.

21       Q.    What is it?

22       A.    It is the patent we refer to as the '141 patent

23   from my work in Brita.

24       Q.    Are you a named inventor on the '141 patent?

25       A.    I am.

1  Q.   Let's cut to the chase, Dr. Knipmeyer.  What do

2  you think you invented that's claimed in the '141 patent?

3  A.   A gravity-flow filter that was able to meet this

4  new and emerging lead challenge that existed when I joined

5  the company without really trading off on any of the

6  performance characteristics we deemed were important.

7  Q.   And what about lead was challenging for

8  gravity-fed filters at that time?

9  A.   When I joined the company, there was this growing

10  knowledge of lead in drinking water, not just lead, but the

11  type of lead that was in drinking water, number of high

12  profile cases kind of -- out in the world, and it was the

13  acknowledgment of particulate lead that was growing, the

14  growing knowledge of it.

15     And the industry standards were adjusting to

16  relate to this growing challenge, and it was a technical

17  challenge for us in the Brita division.

18  Q.   Dr. Knipmeyer, what do you think was new about

19  what you invented?

20  A.   The ability to really remove this particulate

21  lead in a gravity-fed system and do so without trading off

22  on the performance characteristics and physical

23  characteristics of the filter that we deemed important.

24  Q.   Mr. Rennick, if we could bring back up JX-22 and

25  go to claim 1, please.

1          Starting with the start of claim 1, why are your

2    claims directed to a gravity-fed filter?

3          A.   This is really where the challenge was, the

4    technical challenge was, with dealing with this particulate

5    lead.  There's a variety of technologies or forms of water

6    filtration out in the world, gravity-fed commonly seen in

7    pitchers, pressurized systems like a faucet mount or

8    whole-house filter, the pressurized systems were really able

9    to meet this challenge.  It was in the gravity-fed pitcher

10   system where it was new.  That was where the newness was.

11         Q.   And then the next limitation in the filter media

12   limitation, why did you include activated carbon as part of

13   your claim?

14         A.   Yes.  The activated carbon provided a number of

15   benefits for us.  First and foremost, it provided a physical

16   structure to help with the mechanical filtration, and it's

17   noose to use a physical attribute that also had other

18   contaminant removal capabilities.

19         So we knew that carbon for sort of the physical

20   structure of the filter, but it also provided taste and odor

21   benefits, general absorption, so that's why we included it.

22         JUDGE MCNAMARA:  Pardon me.  Mr. Ainsworth, I'm

23   sorry for interrupting, but I can't see Dr. Knipmeyer.  She

24   is not on my screen.  I see a dark screen.

25         MR. AINSWORTH:  Your Honor, do you see

1    P-Brita-witness?

2         JUDGE MCNAMARA:  No, that's what's really

3    interesting.  I don't.

4         MR. AINSWORTH:  Was she there and disappeared?

5         JUDGE MCNAMARA:  She is back.  I changed the

6    screen again.  Sometimes it defaults on me.  Sorry about

7    that.

8         MR. AINSWORTH:  No problem.  Thank you,

9    Your Honor.

10    Q.   Dr. Knipmeyer, why did you include a lead

11    scavenger in your claim?

12    A.   That really went, you know, to the crux of the

13    problem we were trying to solve, which is the removal of

14    lead, especially the soluble portion of lead, a lead

15    scavenger made the most sense to us to accomplish that goal.

16    Q.   So let's turn to what I think I'm sure Her Honor

17    is interested in hearing more about, which is the limitation

18    that's directed to what's called the FRAP factor.

19         What is the FRAP factor?

20    A.   The FRAP factor refers to the Filter Rate and

21    Performance factor.  It's a technical way to look at the

22    filter's performance and the tradeoff of characteristics of

23    that filter in relation to its performance specifically

24    against lead as well as a variety of other physical and also

25    consumer experience characteristics.

1      Q.    Why did you select the properties of the FRAP
2  factor to help define your invention?
3      A.    Yeah.  The properties that we selected or
4  characteristics really went to the physical embodiment of
5  the filter, the actual makeup, as well as the performance of
6  the filter, and the consumer experience.  So it was a way to
7  look at all of these characteristics simultaneously, to
8  really figure out how to balance that performance, and get
9  to the problem we were trying to solve.
10      Q.    So let's start with the first characteristic
11  there of the FRAP factor, volume of the filter media.
12            In particular, why did you select that
13  characteristic for the FRAP factor?
14      A.    So the volume goes to, the actual physical nature
15  of the filter, the media, the part that's actively filtering
16  and how much of it you have, and that impacts a lot of
17  things about the performance and experience with the filter.
18            So as I think about the consumer experience, the
19  more volume you have, the larger the filter is, the more
20  space it takes up in your system, space that could be used
21  for filtered water.  It can go to the cost of the filter.
22  You need more media.
23            On the other side, volume traditionally goes to
24  how much filtering capability you have and the lifetime, so
25  the more media you have, typically the more filtration you

1    have.  So it's this interesting balance and way to capture

2    that in a physical characteristic.

3         Q.   Let's drop to the last property or characteristic

4    of the FRAP factor, lifetime.

5              Why did you select lifetime as a property for the

6    FRAP factor?

7         A.   Lifetime really goes to the performance of the

8    filter.  Its ability to remove a contaminant.  And also that

9    consumer experience with it as well.  So it's another one of

10   those that's kind of capturing two aspects of the filter.

11             So from a performance standpoint, it's how long

12   are you able to remove a contaminant, which really goes to

13   the technical challenge, right.  Like removing a contaminant

14   for a short time versus a very long time, and then from a

15   consumer experience, well, how often do I have to go through

16   the challenge of replacing it and repurchasing it.  So it's

17   interrelated with the physical characteristics, the

18   performance, so that's why it was included.

19        Q.   And how was lifetime of a filter pertinent to the

20   challenge that you were trying to solve with your invention?

21        A.   So as we were exploring and learning our way on

22   how to deal with this lead challenge water, one of the

23   things we're seeing is sometimes it's easy -- easier, I

24   should say -- to get that lead particulate for a very short

25   period of time.  So, you know, removing it for a couple of

1    liters.  But that's not as desirable from a consumer

2    experience standpoint.  So it was important to me to include

3    this, because it went to balancing the performance of a

4    filter, and so that's where it related.

5        Q.    Turning to the F value or the average filtration

6    unit time over lifetime L, why did you select that property

7    for your -- for the FRAP factor?

8        A.    So this is another characteristic of the filter

9    that goes to both the performance tied to the physical

10    nature of the filter as well as that consumer experience.

11            So the filtration unit time is really how long

12    you're waiting for your filtered water.  From a consumer

13    standpoint, the longer that is or the slower the filter

14    filters, the longer you're waiting.  But the counter to that

15    is the longer it takes for the filter to filter water, the

16    more contact time you get between that water and the filter

17    media.

18            So your desires kind of go in opposite

19    directions.  So that's where it's a really great physical

20    characteristic of the filter to balance with everything else

21    in the product.

22        Q.    How does filtration rate change over lifetime in

23    your experience?

24        A.    Wholly depends on the filter.  What we see is

25    many filters actually change as you filter more liters.  So

1  depending on the technologies, some will start fast and then

2  get slower.  Some will start fast and then kind of even out.

3  Others will actually start slow and speed up.  And it

4  really, you know, depends on the nature.  So our granular

5  media would get -- would get slower as the filter media

6  wetted out.  Carbon blocks tended to get faster as more

7  pores got opened up with the water moving into it.  And

8  that's really why I used the average filtration unit time

9  over lifetime instead of a single datapoint.

10      Because you have different filters moving at

11  these different curves of filtration unit time over

12  lifetime, the average was a way to compare between different

13  technologies on sort of an even footing, and also capture

14  that consumer experience over time.  You're going to use it

15  for the whole lifetime, so you'll experience it slow and

16  fast, if it's changing.

17      Q.   Lastly, I think we have -- the last one is CE

18  value or effluent lead concentration at end of lifetime

19  using the source water there cited in the claim.

20      Why did you select that property value for

21  your -- for the FRAP factor?

22      A.   That really went to the crux of the problem we

23  were trying to solve, the new problem of this particulate

24  lead in the challenge water.  So measuring that really was,

25  you know, that important variable that we were trying to go

1    after.

2           I used the end concentration really because the

3    way contaminants come through a filter, typically experience

4    a breakthrough curve.  So it will start better and then

5    overtime, if you exhaust the filter or something happens, it

6    will peak.  So capturing at the end of lifetime seemed like

7    a simple way to sort of think about the performance over the

8    entire lifetime.

9           Q.   So in claim 1 that you have limited the filter to

10   kind of FRAP factor of about 350 or less, why?

11          A.   That was the bounds on the technology we had

12   created.  So kind of the part that was different or new was

13   this FRAP factor of 350 or less.  It really captured that

14   right balancing of these different performance

15   characteristics of the filter and really what we had

16   explored.

17          Q.   How would you describe how to view that 350 in

18   the context of your invention?

19          A.   It's really how to budget the performance of your

20   filter.  I don't mean budget like monetary value, but where

21   to spend the performance of the -- the performance

22   characteristics, right, so how to get to the right overall

23   performance and technical characteristics.

24          Q.   Thank you.  We can take that down.

25          I jumped right to the meat, but let's step back

1    for a moment.  First of all, I don't think I asked you, what

2    led you to start to work for Brita and the Clorox Company?

3         A.    Yeah, I joined Clorox right out of graduate

4    school.  Clorox recruits from UC Santa Barbara.  And I

5    followed my then fiancⒺ, now husband, to Clorox.  He was

6    already working here, loved it, talked about the great

7    technical work and the challenges at the company.  So it

8    made sense.

9         Q.    So when you joined Brita in 2006, what did you

10   learn about what was happening in the water filter industry

11   at that time?

12        A.    Yes.  So I learned about this change in protocol

13   really related to the understanding of particulate lead in

14   municipal water and the challenge that it faced for the

15   water filtration industry, yeah, I mean, that's really --

16        Q.    And how did that challenge confront the water

17   filtering industry?

18        A.    So in the water filtration industry we certify

19   our products to industry standards, industry standard test

20   methods, so those test methods were changing in response to

21   this new understanding of particulate lead.  The industry

22   standard test methods are meant to evolve to keep up as you

23   learn new things, new contaminants, new forms of

24   contaminants, and we knew the industry standard was going to

25   change, and we knew that our pitcher filters or gravity-fed

1   filters were not going to be able to meet this and provide

2   the benefit consumers needed.

3        Q.   What did Brita do in response to this change or

4   expected change in industry standards?

5        A.   We created a technical discovery project to go

6   and explore how to actually address it to evolve our

7   technology, our portfolio, to be able to remove particulate

8   lead.

9        Q.   And you mentioned industry standard.  What was

10  the name of that industry standard?

11       A.   Sorry.  The NSF/ANSI 53 standard.

12       Q.   And what specifically do you understand NSF/ANSI

13  53 to cover?

14       A.   NSF/ANSI 53 covers a variety of health-related

15  contaminants for water filtration.  So specifically

16  certifying water filters to remove -- I couldn't tell you

17  off the top of my head all of the health contaminants, but

18  you can select individuals, copper, cadmium, lead is in

19  there, a variety of them.

20       Q.   And how was the standard changing with respect to

21  performance claims for lead?

22       A.   Yes.  So the NSF/ANSI 53 standard for lead

23  required testing to two pHs of water, pH 6.5 and 8.5.  The

24  8.5 was the part that was changing.  And there was the

25  introduction of the need for particulate lead to be in that

1    test water.

2          So instead of it being undefined, which could or

3    couldn't have particulate, it laid out a specific amount of

4    the water to have particulate lead in it.

5    Q.   Do you recall when you first learned about the

6    NSF/ANSI 53 standard?

7    A.   It would have been shortly after I joined the

8    company, maybe day one, maybe day two.

9    Q.   Did you have any involvement whatsoever in the

10   drafting of the draft NSF/ANSI 53 standard?

11   A.   No.  That was known when I joined the company.

12   Q.   And what was perceived to be the implication of

13   this new industry standard for lead for the Brita business?

14   A.   If we didn't change our product to be able to

15   meet the standard, then we would have to remove our lead

16   claim from our product.

17   Q.   You referred to a product that Brita had.  What

18   was that product when you joined the company in 2006?

19   A.   Yeah, for our pitcher system we had just one

20   filter at the time.  It would be the white Brita pitcher

21   filter.  We call it today the legacy filter.

22   Q.   Is that the same white legacy filter that we see

23   today on the store shelves?

24   A.   From a consumer standpoint, Brita still has a

25   white pitcher filter for systems.  I think the design may

1    have changed a little bit.  As to the, you know, innards,

2    what's the exact makeup, I don't know if it has changed or

3    evolved over time, with suppliers, the ratio.  That filter

4    has mixed media in it, so it's granular carbon and ion

5    exchange resin.

6        Q.   What was your understanding of the impact that

7    the ANSI/NSF 53 standard would have on the water filter

8    industry generally?

9        A.   So referring to gravity-fed?

10       Q.   Referring to gravity-fed.

11       A.   Sorry.  I just want to make sure.

12            So, yes, in terms of for pitcher filters or

13   gravity-fed filters at the time, we really expected it to

14   have a similar impact on everybody as it did for us.  Most

15   gravity -- all gravity filters that I knew of at the time

16   were using mixed media, similar technology to what Brita was

17   using, so we would expect the performance to be the same.  I

18   think they also did some screening tests when I joined the

19   company, so we really expected this to be a challenge

20   industrywide, not specifically to us.

21       Q.   You mentioned some screening tests.  What did you

22   mean by that?

23       A.   Where we would test the filters, our own and

24   competitive products, in-house to the draft NSF/ANSI 53

25   standard water.

1      Q.   Mr. Rennick, if we could pull up CX-143.

2           If we could go to -- Dr. Knipmeyer, do you

3    recognize CX-143?

4      A.   Yes.  This looks like the first page of a Clorox

5    laboratory notebook issued to my colleague Toni Lynch.

6      Q.   And if we go to -- before we turn the page, one

7    second.

8           Would you just briefly describe the practice at

9    Brita for the use of laboratory notebooks in this time

10   frame?

11     A.   Yes.  So laboratory notebooks were issued to all

12   scientists, all personnel working in labs, and as a means to

13   capture the work that we did in the laboratory.  So writing

14   down experiments results, that kind of thing.  The

15   expectation was, our best practice I really should say, was

16   filling out those pages, copying down everything that you're

17   observing, signing at the bottom of every page, dating it,

18   and then having it witnessed by another scientist and them

19   signing and dating.

20     Q.   If we could go to page 72, Mr. Rennick.

21          And before we blow it up, just hold on.

22          Dr. Knipmeyer, what generally is reported on page

23   72 of Exhibit 1 -- CX-143?

24     A.   Yes.  This is the test results, and by test

25   results I mean results of testing filters against the

1   NSF/ANSI 53 draft challenge water for a variety of existing

2   filters.

3       Q.   Mr. Rennick, if we could go to the top table on

4   the top of that page there.  Perfect.

5           Focusing on just the top set of data here, could

6   you explain at a high level what we're seeing on CX-143 at

7   page 72?

8       A.   Yes.  This table is a summary of the results of

9   testing the current or legacy Brita filter, that mixed media

10  filter, against lead challenge water, particulate lead

11  challenge water, over the lifetime of the filter all the way

12  out to 200 percent of lifetime.  And it's sampled at the

13  same frequency that would be required under the NSF/ANSI

14  standard.

15          So that's the initial pull at 3 liters.  50

16  percent life at 76 liters, 100 percent life at 151 liters,

17  all the way up to 200 percent life of 303 liters.  It

18  captures the total effluent, some breakdown of that

19  effluent, the filter flow rate as well as the actual

20  challenge water that went through the filter below that with

21  the influent properties.

22      Q.   Thank you, Doctor.  Let me break down a few

23  things to be sure the record is clear.

24          Under the first column, which says sample, the

25  next word down is current.  What does current refer to?

1        A.    Current is referring to the Brita pitcher filter

2   that was -- that we made at the time.  So that legacy mixed

3   media filter.

4        Q.    And that row of data that extends across from

5   current, what are the values in each of those columns --

6   what do those values relate to?

7        A.    Those values that go across are the effluent lead

8   values, effluent being the water that's come through the

9   filter, so for lead.  So that water that has been filtered,

10  we would sample it, and determine the lead concentration in

11  it.  So that's the parts per billion of lead in the water

12  that had been filtered.

13       Q.    And if we go down a few rows to the row labeled

14  influent, do you see that?

15       A.    Yes.

16       Q.    What data is reported in that row?

17       A.    The influent is the total amount of lead parts

18  per billion of lead in the water that we were adding to the

19  top of the pitcher that would then be filtered through the

20  filter.

21       Q.    Just to sort of maybe put a little more character

22  on this, for that first column, at the 3 liter mark, what

23  was the influent -- what was the effluent, and what did that

24  mean?

25       A.    So the influent was 170.1.  So that means there

1    was 170 parts per billion of lead in the challenge water,

2    the water we were going to put through the filter.

3          After the water passed through the filter, there

4    was 39.3 parts per billion of lead remaining.  So it's

5    telling me that my filter, you know, removed 130-ish parts

6    per billion but left behind close to 40 parts per billion of

7    lead.  And at the time that was telling me that it was not

8    able to adequately remove lead to this test method, this

9    challenge water.  At the time the acceptable level of lead

10   in the effluent would have been 10 parts per billion.

11        Q.   If we go up to the current row, the datapoints

12   for effluent, across all 303 liters, what does the whole

13   data picture there tell you about this filter?

14        A.   That it does a fairly terrible job of removing

15   particulate lead for the duration of its lifetime out to the

16   200 percent.

17        Q.   Now, doctor, for this particular experiment, was

18   the challenge water that was used in specification for the

19   whole test?

20        A.   I don't believe so.

21        Q.   What portion of this test was out of

22   specification?

23        A.   The 151 liter challenge water was high in total

24   lead.

25        Q.   How does that impact -- how did that impact your

1    conclusions regarding this particular or the Brita legacy

2    filter?

3        A.   It does not.  You know, while we're high at the

4    151 liter, it doesn't change the fact that the effluent

5    values were well above 10 parts per billion at the 3 liter

6    and at the 76, and that trend continued out to 200 percent.

7        Q.   If we -- let's scroll down the page a little bit,

8    Mr. Rennick, to the next set of data.  Right there.

9             Do you see in the lower table there it says PUR?

10   Do you see that table?

11       A.   I do.

12       Q.   What data is reported here?

13       A.   Similar to the table above, this is showing the

14   results of testing, in this case, the PUR filter against the

15   NSF/ANSI 53 challenge water we had made up in our lab out to

16   the lifetime of the filter, 151 liters.

17       Q.   And what did these results tell you about the

18   existing PUR filter?

19       A.   That it was also incapable of meeting the new

20   NSF/ANSI 53 particulate lead challenge, by 76 liters or 50

21   percent of lifetime.  It was significantly over the effluent

22   value of 10 parts per billion.

23       Q.   Thank you.  You can take that exhibit down.

24             So with that backdrop on the analysis at Brita of

25   the existing filters, what did you -- let me start --

1       Was there a project name associated with the work

2  you did on these gravity filters?

3     A.  Yes.  The evolution of the product, there would

4  be two project names.  It started as a discovery project in

5  R&D under the name of Carbonado and then later moved into

6  product G-Force as we chartered or created a

7  commercialization product to bring it to market.

8     Q.  How would you describe the objective of project

9  Carbonado?

10     A.  So Carbonado was really aimed as being able to

11  meet this new lead challenge, the particulate lead

12  challenge, for our pitcher filters, and do so without making

13  significant tradeoffs on the important characteristics of

14  that filter.

15     Q.  Who was involved at Brita with project Carbonado?

16     A.  It was primarily myself and Toni Lynch.

17     Q.  Who is Toni Lynch?

18     A.  Toni Lynch was a technician in the Brita

19  department when I joined the company.  She was my onboarding

20  buddy in fact.

21     Q.  And do you know how long Ms. Lynch had been with

22  Brita?

23     A.  I don't.  I know she had extensive experience.

24  She did a lot of my training, my understanding, she had a

25  lot of experience in the product development on the Brita

1    business.

2         Q.   How would you describe her role in Project

3    Carbonado?

4         A.   She was my partner.  We were both assigned to the

5    project working side by side.  We worked together to design

6    our experiments, next steps, discussed results, came up with

7    ideas together, worked in the lab together.

8         Q.   If someone were to describe Ms. Lynch's role on

9    project Carbonado as just a mere technician, would you agree

10   with that?

11        A.   No.  I don't think she just performed

12   experiments.  She was my partner.

13        Q.   Who else was involved -- strike that.

14             Was there anyone outside of Brita involved with

15   project Carbonado?

16        A.   Yes.

17        Q.   Who was that?

18        A.   Omnipure, a company called Omnipure.

19        Q.   Who is Omnipure?

20        A.   It was a company that specialized in making

21   carbon blocks for water filtration.  We had worked with them

22   prior to my joining, things like our faucet mount and on

23   looking at carbon block technology for gravity-fed

24   applications.

25        Q.   And who, in particular, at Omnipure was involved

1    with your work on project Carbonado?

2        A.    Primarily that would have been Roger Reid and

3    Bruce Saaski.

4        Q.    And you mentioned a carbon block.  In general,

5    what is a carbon block?

6        A.    A carbon block is a filter for water that is

7    solid, three-dimensional.  You can pick it up and hold it on

8    its own.  And it's comprised of carbon, activated carbon,

9    that's held together usually with a binder.  That makes a

10   porous structure to do mechanical and chemical filtration.

11   Oftentimes you include additional sorbent materials to go

12   after specific contaminants, like a lead sorbent, for

13   example.

14       Q.    Were carbon blocks known in the water filtration

15   industry?

16       A.    Absolutely.  In fact, our faucet mount was -- all

17   faucet mounts really are carbon blocks.

18       Q.    How were the carbon blocks you worked with on

19   project can be different from, say, a conventional carbon

20   block used in a pressure-mount or faucet-mount system?

21       A.    They are different in the sense of how open they

22   are, how porous they are.  In a pressurized application,

23   like faucet mount, you have that benefit of 60 PSI or

24   thereabouts of water pressure pushing the water through the

25   carbon block so they can be a lot tighter in their pore

1  structure.  You can have a lot thicker wall to be able to,

2  you know, come in contact with your water.

3          On the gravity side, if you were to try to run

4  water through a faucet mount or a pressurized system, you

5  would be waiting a long time for the water to make its way

6  through.  So pitcher carbon blocks that we were exploring

7  were much more open, much more porous, much thinner walls.

8      Q.  Earlier you had mentioned a term "mixed media,"

9  and I don't think I had a chance to ask you what you meant

10  by that.

11          Would you explain what mixed media is?

12      A.  Mixed media, I'm referring to, you know,

13  conventional pitcher filters, and it's granular activated

14  carbon, so bigger granules of activated carbon, mixed with

15  ion exchange resin.

16      Q.  And how would you compare the mixed media format

17  to the carbon block format from your work at Brita?

18      A.  In a lot of ways they are very similar.  They

19  both operate with the same fundamental filtration --

20  filtration goals, so they have chemical filtration where

21  they can absorb ion exchange and mechanical filtration or

22  physical filtration.  Really the difference is in the size

23  particle that is used.  So granular media tends to be larger

24  sizes.  Carbon block tends to be smaller sized particles.

25      Q.  So when you were tasked with project Carbonado,

1    what did you do first?

2        A.    First define the problem that we were going to

3    solve, kind of get the team together on the same page, and

4    then identify our idea on how we were going to solve the

5    important characteristics that we wanted to include, and

6    that would be our jumping-off point to start making

7    prototypes.

8        Q.    Mr. Rennick, if you could please pull up CPX-12.

9              Dr. Knipmeyer, do you recognize CPX-12?

10       A.    Yes.

11       Q.    And what is CPX-12?

12       A.    This is a document I created back in May of 2006

13   to do just what we talked about, which was getting the team

14   on the same page of the problem we were trying to solve, and

15   then also identifying the idea of which characteristics were

16   important for us to pay attention to to be able to actually

17   go create physical prototypes for.

18       Q.    What is the date on the face of this document?

19       A.    May 16th, 2006.

20       Q.    And, Mr. Rennick, I'm going to ask you to turn to

21   the metadata for CPX-12, if you would.

22             Dr. Knipmeyer, what was the date that CPX-12 was

23   created?

24       A.    May 16th, 2006.

25       Q.    And what date was it last modified?

```
 1        A.   May 16th, 2006.

 2        Q.   Mr. Rennick, if you could actually pull up

 3   CPX-932.

 4             Doctor, do you recognize CPX-932?

 5        A.   It's the same document we were just looking at.

 6        Q.   This is the PDF format.

 7        A.   Thank you.

 8        Q.   Just to be clear, who prepared CX-932?

 9        A.   I did.

10        Q.   And what were you trying to describe in CPX-932?

11        A.   Really the important characteristics of the

12   filter we were trying to create and the tradeoff in

13   relationship between those characteristics.

14        Q.   How does that relate to what you ultimately

15   described in the 141 patent?

16        A.   I think this is the start of the idea of what

17   we -- what we ultimately ended up with in the '141 patent.

18        Q.   In this document do you mention FRAP?

19        A.   No.

20        Q.   Had you articulated FRAP as of May 16th, 2006?

21        A.   No.

22        Q.   We can take that down.  Thank you.

23             So after you had sort of prepared that CX-932,

24   what did you and the other inventors on project Carbonado

25   do?
```

1    A.   We got to work trying to bring that to life,

2    creating physical prototypes that we could test, and

3    understand if they were meeting what we wanted them to do.

4    Q.   Mr. Rennick, if you could please bring up CX-186.

5         Dr. Knipmeyer, do you recognize CX-186?

6    A.   I do.

7    Q.   And what is CX-186?

8    A.   This is a document that Omnipure sent to us with

9    a proposed shape of carbon block for our work on Carbonado.

10   Q.   And what date did you receive this document?

11   A.   June 7th, 2006.

12   Q.   Was there a name for this -- or a nickname for

13   this particular block?

14   A.   Yes, we referred to this block as the pantaloons

15   block because it looked like a little pair of pants.  It

16   later became known as the G-Force block as well.

17   Q.   If we could turn to page 4 so we could see those

18   pair of pants.

19        What do we see here on page 4?

20   A.   This is a cross-section of that carbon block.  So

21   if you were to cut it in half, it shows the surface area

22   that would be available for filtration, and also the fact

23   that it looks like a little pair of pants.

24   Q.   What was the volume for the pantaloon-shaped

25   block?

1       A.   The volume was 5.41 cubic inches or 89 cube

2   centimeters.

3       Q.   Do you know who came up with this particular

4   shaped design for the carbon block?

5       A.   That would have been Roger Reid at Omnipure.

6       Q.   Do you know when you first saw -- I may have

7   already asked you this but I'll ask it again.

8            Do you know when you first saw this design for

9   the carbon block?

10      A.   Yeah, June 7th, 2006.

11      Q.   How do you know that?

12      A.   Not only is it on this document, but I also made

13  a note of it in my lab notebook.

14      Q.   Mr. Rennick, if we could turn to CX-108.

15           What is CX-108?

16      A.   It's a lab notebook from the Clorox Company.

17      Q.   If we could turn to page 3 of CX-108.

18           Who was this notebook issued to?

19      A.   It was issued to me.

20      Q.   Your name isn't Elizabeth Chambers.

21      A.   It was on May 4th.  I was Elizabeth Chambers.

22  That's my maiden name.

23      Q.   All right.  And, Dr. Knipmeyer, if we could have

24  Mr. Rennick turn us to page 78 of CX-108.

25           Dr. Knipmeyer, do you recognize what is shown

1    here on page 78 of your lab notebook?

2        A.    Yes.  This is my documentation of receiving

3    physical prototypes of the pantaloon-shaped carbon block.  I

4    have my poor drawing of that shape and then the inspection

5    thereof.

6        Q.    And if we could go to the bottom of the page, to

7    the signature line, who signed your lab notebook?

8        A.    I signed it on the "Recorded by" section, so

9    that's, again, my maiden name as Elizabeth Chambers.

10       Q.    What date was that?

11       A.    June 7th, 2006.

12       Q.    And who else signed your notebook?

13       A.    That would be John Curtin.

14       Q.    Who is John Curtin?

15       A.    He was a scientist in the Brita group at the

16   time.

17       Q.    Besides the pantaloon shapes, did you look at

18   other potential filter shapes for your work on Project

19   Carbonado?

20       A.    Yes, we explored a variety of different

21   prototypes.

22       Q.    If we could turn to page 96 of your lab notebook,

23   CX-108.

24            Dr. Knipmeyer, what are we seeing on the top of

25   the page of page 96?

1      A.   This is a drawing of one of the other prototype
2    shapes that we created that we referred to as the Maxtra
3    shape.
4      Q.   Why was it called the Maxtra shape?
5      A.   Because it would fit within what was known as the
6    Maxtra filter.  That was a filter available by Brita GmbH at
7    the time.
8      Q.   Who is -- do you know who Brita GmbH is?
9      A.   They were a company that sold filters outside the
10   U.S. that shared the same name and history with our Brita in
11   the U.S.
12     Q.   And if we go down, scroll down a little bit,
13   Mr. Rennick, there we go.
14          What is on the right-hand side of your lab
15   notebook?
16     A.   This would be the volume calculations for the
17   Maxtra-shaped carbon block.
18     Q.   And what was the volume?
19     A.   105 cubic centimeters.
20     Q.   And if we go all the way down to the bottom of
21   the page, who signed the lab notebook?
22     A.   I signed the lab notebook as "Recorded by" and
23   Ben Ma signed it as a witness.
24     Q.   What date did you sign it?
25     A.   June 27th.

1      Q.   Who is Ben Ma?

2      A.   He was a scientist in the Brita department at the

3   time.

4      Q.   Let's next turn to page 102 of your lab notebook.

5           Dr. Knipmeyer, what do we see on page 102 of your

6   lab notebook?

7      A.   These are a variety of proposed alternative

8   shapes for Carbonado, for Project Carbonado.

9      Q.   Could you just briefly describe what we're seeing

10  in terms of those shapes?

11     A.   Yes.  Starting with -- the first one would be a

12  simple puck-shape cylinder, a short cylinder.  The next one

13  would be something like an igloo, where the media was domed.

14  The next one would be a flat sheet, so where the media is

15  very thin.  And the last one, I was apparently feeling very

16  creative and had a mushroom shape where, similar to the

17  dome, but solid with media in the middle.

18     Q.   Do you recall if you ever actually constructed

19  prototypes along these lines?

20     A.   No, I don't believe we tested all of the shapes.

21     Q.   If we could turn to page 98 of your lab notebook.

22          What does this entry on page 98 relate to?

23     A.   This entry relates to receiving of prototypes of

24  the Maxtra-shaped carbon blocks and then the subsequent

25  testing of them.

1      Q.   If we scroll down, what are we seeing here on the

2   left side of the page?

3      A.   This is formulation information for a variety of

4   prototypes of carbon blocks in that Maxtra shape.

5      Q.   And those codes, FA 1-1, FA 2-3, et cetera, what

6   do those correspond to?

7      A.   The formulation of the prototype.

8      Q.   If we look at, for example, FA 3-2, what does

9   that tell us about that prototype?

10      A.   That prototype had a formula with 40 percent

11   binder, in this case the GUR 2122, 40 percent ACF, or

12   activated carbon fiber, and 20 percent Alusil, which was the

13   lead sorbent.

14      Q.   Do you know what the volume was of FA 3-2?

15      A.   It would have been the same as all the

16   Maxtra-shaped blocks that we were testing on the 105

17   centimeter cubed.

18      Q.   Why do you know that?

19      A.   We always use the same size molds for these

20   products so the volume would be the same.

21      Q.   Do you know if you ultimately tested FA 3-2?

22      A.   Yes.  We tested and I believe the results are on

23   the subsequent pages of my lab notebook.

24      Q.   If we could turn to page 100 of CX-108.

25           Doctor, what are the tables at the bottom of page

1   100 of CX-108?

2       A.   This would be a summary of the results of testing

3   these prototypes against the particulate lead challenge

4   water for the targeted lifetime to 200 percent of that

5   lifetime.

6       Q.   And on the third table there it's labeled FA 3-2,

7   what does that correspond to?

8       A.   That was the prototype we just discussed

9   formulation for.

10      Q.   And what does -- I'm sorry, Doctor, if I -- what

11  type of test was used here on page 100?

12      A.   Yes, this was against the particulate lead

13  challenge water, the NSF/ANSI 53 draft challenge water.

14      Q.   Thank you, doctor.  And can you describe what

15  results we're seeing here for FA 3-2?

16      A.   Yes, absolutely.  Similar to the other tables,

17  that first line is the effluent value or the amount of lead

18  remaining in the water after it has passed through the

19  filter.  For the targeted life out to 200 percent.

20          We also capture the influent water

21  characteristics at each of those datapoints, as well as a

22  summary of the rig.

23      Q.   What did these results indicate to you about your

24  prototype?

25      A.   That we were starting to get some good

1   performance against the particulate lead.  This particular

2   prototype had passing effluent values or values less than

3   the 10 parts per billion for the lifetime of the filter.

4       Q.   If we could now turn to 120 of your lab notebook.

5          If we just expand the lower portion there,

6   Mr. Rennick.

7          What are we seeing here on page 120?

8       A.   This is the start of an experiment into a section

9   looking at the pantaloon-shaped prototype, and so this table

10   here is the formulation of a variety of prototypes, two

11   formulations in fact, for a variety of prototypes in that

12   pantaloon shape.

13       Q.   What date were these prototypes manufactured?

14       A.   They were manufactured July 25th, 2006, according

15   to the Omnipure file that's pasted here.

16       Q.   And if we focus on PA 3-8, do you see where that

17   is on the table?  There we go.

18          What is PA 3-8?

19       A.   That is a prototype in the pantaloon shape, a

20   carbon block with the formulation that's indicated above,

21   which is 40 percent carbon, 20 percent of the Alusil

22   absorbent, and 40 percent of the GUR 122 binder.

23       Q.   Do you know if you ultimately tested PA-8 against

24   the draft NSF/ANSI 53 standard?

25       A.   Yes.

1    Q.    Let's turn to page 122.  Just blow up the top of
2    the page there, Mr. Rennick, if you would.
3           What are we seeing at the top of the page here on
4    page 122 of your lab notebook?
5    A.    This would be the results of testing those
6    prototypes against the lead particulate challenge water.
7    Q.    And if we look over on the top right hand square
8    there labeled PA 3-8, what does that correspond to?
9    A.    That corresponds to the prototype PA 3-8 that we
10   just talked about the pantaloons with the formula we just
11   talked about.
12   Q.    And what did -- looking at the data here in that
13   table, what does that indicate about PA 3-8?
14   A.    If we look at that effluent lead concentration
15   for PA 3-8 you can see that the effluent concentration is
16   less than 10 parts per billion for the desired filter
17   lifetime of 40 gallons all the way out to 200 percent of
18   that life.
19   Q.    And if we go down to the middle of the page
20   there, Mr. Rennick, please.
21          What did you conclude at the time about the
22   results of your experiment?
23   A.    That all blocks exhibited fast and consistent
24   flow rates, lead removal was consistent across the test with
25   passing results for PA 3-8, PT 3-4, PA 3-5 was close to

1    passing.

2        Q.    And when you say passing results, what did you

3    mean?

4        A.    Really what I had in mind here was the NSF/ANSI

5    53 draft standard and the requirement for the effluent lead

6    to be less than 10 parts per billion for 200 percent of the

7    life.

8        Q.    And what did that mean to you at the time?

9        A.    That we were starting to find or we found a way

10   to meet this emerging lead challenge, this particulate lead

11   challenge.

12       Q.    Mr. Rennick, we can take that down.

13             Dr. Knipmeyer, besides lead reduction properties

14   of your prototypes, what other properties did you test?

15       A.    We looked at a variety of properties ultimately.

16   One of the ones that was important in this phase of the

17   project was really the flow rate of the filter.

18       Q.    And why was flow rate important to your

19   development work?

20       A.    Because it was one of the important tradeoffs or

21   consideration with the performance of the filter as well as

22   the consumer experience with that filter and not wanting to

23   slow down the filters so much that it was cumbersome or

24   difficult.

25       Q.    What was your standard practice for evaluating

1    the flow rate of your prototype blocks?

2        A.   So, luckily enough, when I was on the business we

3    had an automated rig to test our filters.  So we actually

4    took the flow rate for essentially every liter that we

5    tested and so we were able to monitor that flow rate over

6    time.  There were other ways we evaluated flow rate for

7    different purposes, you know, Omnipure would measure the

8    first one, ultimately we looked at it for quality control

9    purposes.

10       Q.   You referred to an automated rig.  Can you just

11   briefly explain what you meant by that?

12       A.   Yes.  We had a machine, I guess, would be a good

13   description, that enabled us to run the challenge water

14   through the filters.  So it held a variety of different

15   pitchers, so you could use the pitcher the filter was

16   designed to be used in, and it would add the challenge water

17   from the tank we made up to the top, it would monitor the

18   flow of the water through the filter, it would be able to

19   pour that pitcher and collect the samples that we needed

20   from the effluent, and it had an electronic eye, I guess is

21   the right description, to monitor that flow rate and record

22   the time it took for water to go through the filter.

23       Q.   For the tests that you conducted on flow rate and

24   lead reduction, what did you use for lifetime?

25       A.   For lifetime we generally used 40 gallons, right,

1    in this exploratory phase of the work, because that's what

2    the Brita legacy pitcher had.  It's really what all pitcher

3    filters had at the time.  It was kind of the industry

4    standard, so to speak, for lifetime.

5         Q.   In the summer of 2006 how many filter prototypes

6    do you think you had made and tested?

7         A.   I've never actually counted, but it feels like a

8    lot.  Maybe on the order of a hundred or so.

9         Q.   If we can turn, Mr. Rennick, please, to CX-119C.

10             And Dr. Knipmeyer, do you recognize this document

11   generally?

12        A.   Yes.

13        Q.   What is this document?

14        A.   This is a copy of an Excel file that I used to

15   compile or capture a bunch of testing results for prototype

16   filters.

17        Q.   And if we go to page 24 of CX-119C.

18             What information is shown on CX-119 at page 24?

19        A.   This is the flow rate data taken from the

20   automated rig for a variety of prototypes.

21        Q.   And what prototype is listed in column C?

22        A.   Column C is the PA 3-8.

23        Q.   And that was -- was that the pantaloon-shaped

24   block we just looked at?

25        A.   Yes, it is.

1      Q.   Generally, what data -- can you describe what
2 data we're seeing here on page 24?
3      A.   Yes.  In the columns, column A, is the liter that
4 has been put through the filter.  And then the subsequent
5 columns are indicating the flow rate for a variety of
6 different prototype filters.
7           So row 1 indicates the prototype that we're
8 looking at, and so below that name would be the flow rate
9 for the first liter, the second liter, the third liter, all
10 the way -- all the way down.
11     Q.   And if we turn to CX-114C now, please.
12          Dr. Knipmeyer, do you recognize CX-114C?
13     A.   Yes.
14     Q.   What is this?
15     A.   This is another Excel spreadsheet that I used to
16 capture results for this one it's the Maxtra-shaped filter.
17     Q.   If we turn to page 115 of CX-114C.
18          This is the right page.  Thank you.
19          What information is shown on this page,
20 Dr. Knipmeyer?
21     A.   This is similar to that last Excel spreadsheet
22 where it is showing the flow rate data from the automated
23 rig for a variety of prototypes.
24     Q.   In column F, what prototype is shown there?
25     A.   FA 3-2.

1        Q.   Is that the same Maxtra prototype we were

2    discussing earlier?

3        A.   Yes.

4        Q.   Mr. Rennick, we can take that exhibit down.

5    Thank you.

6             Lastly, not lastly, if we could next turn to

7    CX-118, please.

8             What is CX-118?

9        A.   This is a document that I created summarizing the

10   results of our work on Project Carbonado as of August 11th,

11   2006.

12       Q.   And for what purpose was this memo prepared?

13       A.   It was pulling together all of our learnings,

14   observations at the time, it was a way to keep everybody on

15   the team informed and on the same page, as well as update my

16   leadership as to the progress we were making and what we

17   were length at the time and next steps Carbonado.

18       Q.   If we could turn to page 4, second full paragraph

19   the what information are you describing in this paragraph of

20   your memorandum?

21       A.   This is talking about a way to use the housing

22   and modification to the housing design to increase the

23   contact time or performance of the filter.

24       Q.   Mr. Rennick, we lost our -- thank you.

25             In the second sentence there's a reference to

1    Tony lunch.  What is that reference to?

2        A.    That this used was from Toni Lynch on how to use

3    this alternative housing to improve the performance of the

4    filter.

5        Q.    Thank you.  We can take Exhibit 118 down.

6              Doctor, we have been through your lab notebook.

7    Did we see any reference yet to the FRAP factor?

8        A.    No.

9        Q.    When do you recall first using the description of

10   the FRAP factor to describe what you believe you had

11   created?

12       A.    Sometime in the August-September of 2006 range.

13       Q.    And if we could pull up CPX-11, please.

14             Do you recognize CPX-11?

15       A.    I do.

16       Q.    What is CPX-11?

17       A.    This is a document I created outlining or laying

18   out the FRAP factor, Filter Rate and Performance factor.

19       Q.    Is this document dated on its face?

20       A.    No, it is not.

21       Q.    Mr. Rennick, could we turn to the metadata for

22   this document?

23             And what date was this document created?

24       A.    On September 19th, 2006.

25       Q.    And when was the last modified date?

1        A.    September 19th, 2006.

2        Q.    Now, Mr. Rennick, if we could go to the PDF

3   version, which is CX-139.

4              Do you recognize CX-139?

5        A.    Yes, this is the PDF version of the same

6   document.

7        Q.    Why did you prepare this document?

8        A.    It was really capturing the technology that we

9   were working on.  It was an articulation of how I was

10  thinking about the filter we were creating.

11       Q.    We seem to have lost CX-139.

12             In CX-139, at the top of the page, what do we see

13  there?

14       A.    The header, the Filter Rate and Performance

15  (FRAP) factor.

16       Q.    And then is that FRAP factor there in the larger

17  print?

18       A.    Yes.  Yes, it is.

19       Q.    Let's clear something up.  Did any lawyers help

20  you prepare this memo?

21       A.    No.

22       Q.    Was this all your own words?

23       A.    Yes.

24       Q.    If we go down to the lower portion of this first

25  page, to the second-to-last paragraph, what are you

1  describing here?

2      A.   Really the kind of scope of what this captures as

3  well as our observations of the prototypes we've created and

4  what's the state of the existing technology that's out

5  there.

6      Q.   And then if we go down, Mr. Rennick, to the next

7  paragraph, what's indicated here?

8      A.   It's referring to the graphs that are below it,

9  which is graphical representations of this FRAP factor and

10  how it's impacted by the specific characteristics of the

11  filter that go into that FRAP factor.

12      Q.   If we can turn to the next page just so we can...

13          So if we look at the top figure, what do we see

14  here?

15      A.   Yes, so this is the FRAP factor as a function of

16  the filtration unit time and then the different lines are

17  really the volume of different filters.

18          So it's a way to kind of conceptualize the impact

19  these characteristics and the tradeoffs have and sort of --

20  it's how I was thinking about filter design, and it was a

21  great tool to instruct on how to develop.

22      Q.   If we just scroll down to the next figure, what

23  is shown in this figure compared to the previous figure we

24  looked at?

25      A.   It's similar except for it's showing the impact

1    of changing or the impact of the changing and the other

2    filter characteristics.  The last one showed volume.  This

3    one is showing the effluent lead or the efficacy of that

4    filter.

5        Q.   And if we go to the next page, the top figure,

6    what is shown there?

7        A.   This one is similar; however, it's showing the

8    FRAP factor and then on the x-axis is the volume of the

9    filter, and we bring in the lifetime in the different

10   curves.  Unfortunately, with multiple characteristics,

11   there's no one graph to really, you know, bring the space to

12   life, which is why I used three graphs here.

13       Q.   And these graphs that you prepared in CX-139, did

14   they -- were they included in the '141 patent?

15       A.   Yes.

16       Q.   We can take that down, Mr. Rennick.

17            Let's talk briefly about the data you had on

18   your -- the work you did on Project Carbonado.

19            And Mr. Rennick, if you could bring up Exhibit

20   922, please.

21            Do you recognize Exhibit 922?

22       A.   Yes.

23       Q.   What is it?

24       A.   This is a draft of a presentation that was

25   created to share out the learnings on the project with the

1   R&D community.

2       Q.   And if we turn to page 8, what do we see here on

3   page 8?

4       A.   This is the results of testing of a variety of

5   different pitcher filters, as it relates to the particulate

6   lead challenge water.

7       Q.   And so if we look at -- can you explain what the

8   x-axis is and the y-axis and just -- yeah, what's going on

9   with this graph?

10      A.   Absolutely.  So the x-axis is the percent filter

11  lifetime.  So shown here as a percentage.  All of these

12  filters had, you know, the same lifetime, but shown as a

13  percentage of lifetime.  So 100 percent would be 151 liters

14  or 40 gallons out to 200 percent.

15           The y-axis is the percent lead reduction, for the

16  amount of lead that's being pulled out of the challenge

17  water, shown here in percentages instead of how some of the

18  other graphs were shown in absolutes, because this was more

19  consistent with how R&D across Clorox looked at data.

20           So the higher you are in percent lead reduction,

21  the more lead you're pulling out.  So 100 percent reduction

22  would mean you removed all of the lead.  0 percent reduction

23  would mean you removed none of it.  So it's that curve of

24  how the filter performs over time against the challenge

25  water.

1       There's a dashed line here, the NSF required lead

2   reduction, that's a hypothetical line or a limit.  It's

3   representing what percentage you would need to reach to hit

4   10 parts per billion of lead in the effluent water.

5       Q.   What does the red curve represent?

6       A.   That is the G-Force filter or the pantaloon

7   shaped carbon block.  Its one of those prototypes.

8       Q.   What does this show with respect to the

9   performance of that pantaloon or G-Force shaped block?

10      A.   That it has a high percent lead reduction.  All

11  of the datapoints for the lifetime all the way out to 200

12  percent are all above that NSF requirement.  It's very

13  consistent, high performance.

14      Q.   How did that performance compare to the other

15  filters depicted on page 8 of Exhibit 922?

16      A.   It's significantly different.  So as we kind of

17  walk through the other prototypes, starting with the current

18  Brita filter, the legacy mixed media filter, you see that

19  none of those datapoints for the current Brita filter are

20  above that dashed line.  They are all significantly lower,

21  75 percent or lower.  We look at that PUR filter, the PUR

22  ultimate filter, you can see it starts with higher

23  performance but then quickly drops off over the lifetime of

24  the filter.  And the same with the prototype here, the Brita

25  filter with 90 percent ion exchange resin, that one actually

1    starts out all right but very quickly drops down and

2    continues to perform poorly against the particulate lead

3    challenge water.

4         Q.   Thank you, Mr. Rennick.

5              Dr. Knipmeyer, for how many years did you work on

6    the G-Force project?

7         A.   Approximately four, I believe.

8         Q.   What happened with the G-Force project?

9         A.   Ultimately it did not move forward.

10        Q.   And do you know why that is?

11        A.   I don't believe it was financially attractive.

12        Q.   Financially attractive for?

13        A.   For Brita.  Sorry.

14        Q.   So even though the Project G-Force did not

15   commercialize, do you feel you accomplished something with

16   your work on that project?

17        A.   I do.

18        Q.   What is that?

19        A.   I think we created something that nobody else had

20   done.  We were able to create a pitcher filter, a gravity

21   filter, that was able to meet this particulate lead

22   challenge without sacrificing the performance of that

23   filter, the other characteristics of that filter.

24        Q.   Thank you, Dr. Knipmeyer.

25             MR. AINSWORTH:  Your Honor, we pass the witness.

1          JUDGE MCNAMARA:  Okay.  Thank you very much,

2     Mr. Ainsworth.

3          Who is going to do the cross for Respondents?  I

4     know it's in one of the lists here.

5          MS. BEANE:  Your Honor, I'm doing the cross

6     today, Devon Beane.

7          JUDGE MCNAMARA:  Very good, Ms. Beane.

8          (Clarification by reporter.)

9          JUDGE MCNAMARA:  This would be a good time to

10    take a break.  I'll see you in 15 minutes.

11          (Whereupon, the proceedings recessed at 3:33

12    p.m.)

13          (In session at 3:48 p.m.)

14                    CROSS-EXAMINATION

15    BY MS. BEANE:

16    Q.   Good afternoon, Dr. Knipmeyer.  My name is Devon

17    Beane.  I'm counsel for the Respondent LifeStraw in this

18    investigation, and I'll be asking you some questions today

19    about the testimony that you provided.

20    A.   Good afternoon.

21    Q.   So before joining Clorox in 2006, you did not

22    have any experience in the water filtration industry; is

23    that right?

24    A.   That is correct.

25    Q.   And so the first time you learned about or

1   starting working with water filters was as part of your

2   first job with Brita, correct?

3       A.   That is correct.

4       Q.   And at the time when you started with Brita you

5   learned that there were already granular activated carbon

6   and ion exchange resin filters in the market, right?

7       A.   That is correct.

8       Q.   And, in fact, when you joined Brita, the filter

9   that Brita already sold included a filter with granular

10  activated carbon and ion exchange resin, correct?

11      A.   That was our filter on the market, yes.

12      Q.   And in January of 2006, when you joined Brita,

13  you were aware that granular activated carbon could reduce

14  contaminants such as lead from water; is that right?

15      A.   Are you asking if the Brita pitcher filter had a

16  lead claim at the time when I joined the company?

17      Q.   Not quite.  I'm asking whether you are aware,

18  when you first joined -- as you joined the company in 2006,

19  that activated carbon could reduce lead from water.

20      A.   I'm not sure that I knew that, no.

21      Q.   Were you aware in January of 2006 that activated

22  carbon could act to reduce contaminants generally in

23  drinking water?

24      A.   Was I aware in January of 2006 that carbon could

25  reduce contaminants in drinking water?

```
 1        Q.   Correct.
 2        A.   I'm not sure in January of 2006 I thought about
 3   it.
 4        Q.   Okay.  Do you recall providing a deposition in
 5   this matter on May 3rd, 2022?
 6        A.   I do.
 7        Q.   And you were under oath and provided testimony in
 8   response to questions asked by counsel?
 9        A.   I do.
10        Q.   And do you recall being asked this question and
11   providing this answer:
12             In January 2006 were you aware that activated
13   carbon could act to reduce contaminants generally in
14   drinking water.
15             Answer.  Yes.
16        A.   I do.
17        Q.   Okay.  And so in January of 2006 you were aware
18   that activated carbon could reduce contaminants generally in
19   drinking water, correct?
20        A.   Yes.
21        Q.   And you were also aware at that time that ion
22   exchange resin could remove heavy metals such as lead from
23   drinking water, correct?
24        A.   Yes.
25        Q.   But in Brita's view at the time the filters
```

1   already on the market did not adequately reduce particulate

2   lead from drinking water; is that your testimony today?

3        A.   Yes.

4        Q.   And Brita was in its view successful in reducing

5   particulate lead without sacrificing flow rate by changing

6   from its previous granular activated carbon ion exchange

7   resin media to a carbon block; isn't that right?

8        A.   Sorry.  Can you repeat that question?

9        Q.   Yes.  Brita was successful in reducing

10  particulate lead from drinking water without sacrificing

11  flow rate by changing from its old media, granular activated

12  carbon ion exchange resin, to the new media that you were

13  testing, carbon block; isn't that right?

14       A.   We were successful in our technical discovery

15  efforts to do that, yes.

16       Q.   And that related to carbon block, right?

17       A.   That was the prototypes we created, yes.

18       Q.   Okay.  So we talked about using carbon block to

19  solve the problem you were trying to address with the '141

20  patent, and I want to turn briefly to the '141 patent, which

21  is Exhibit JX-0022 in your binder, at column 26, lines

22  34-37.  And I think we'll pull it up on the screen for you

23  as well.

24            In this part of your patent reads, quote, other

25  embodiments of the present invention include alternate

1    filtration techniques such as membranes, nonwovens, depth

2    media, nanoparticles, and nano fiber, ligands, et cetera.

3         Did I read that correctly?

4    A.   Yes, you did.

5    Q.   So let's take those one at a time.  You'll agree

6    with me that, as part of your work at Brita in inventing the

7    invention of the '141 patent, that you did not develop any

8    filtration tech nook using a membrane; is that correct?

9    A.   That is correct.

10   Q.   And you'll also agree with me that you did not

11   invent any nonwoven filters in relation to the invention of

12   the '141 patent, correct?

13   A.   That is correct.  We didn't develop any

14   prototypes.

15   Q.   And you also did not invent any depth media

16   filters that met the FRAP limitation of the '141 patent;

17   isn't that correct?

18   A.   Yes, we did not develop any examples or

19   prototypes of that.

20   Q.   And you also did not invent any filtration

21   technique that met the FRAP limitation of the '141 patent

22   using a nanoparticle filter, correct?

23   A.   That is correct, we did not develop any

24   prototypes of that.

25   Q.   And the same is true, you did not develop any

1    filtration technique using a nanofiber filter, correct?

2        A.   That is correct.

3        Q.   And it is true that, with respect to the work

4    with relation to the '141 patent, that Brita did not invent

5    anything new or unique as far as granular or paper media,

6    correct?

7        A.   We did not develop any prototypes with the

8    granular media, correct.

9        Q.   Specifically Brita did not invent any granular

10   activated carbon and ion exchange resin combination that met

11   the '141 patent's claimed FRAP limitation; isn't that right?

12       A.   Yes, we didn't develop prototypes.

13       Q.   In all of those examples you just said, you

14   didn't develop any prototypes, you'll agree with me that

15   there is no disclosure of any such filter in the '141 patent

16   as well, correct?

17       A.   That is correct.

18       Q.   Now turning to the FRAP specific limitation, I

19   believe that you testified on your direct exam with

20   Mr. Ainsworth that you came up with the FRAP equation; is

21   that right?

22       A.   That is correct.

23       Q.   And if we could go to CX-139C.  We'll pull it up

24   on the screen as well, but it should be in your binder.

25       A.   Sorry.  Can you repeat that one more time?

 1          Q.   Yes.  It's CX-0139.  I just call it the FRAP
 2    document.
 3          A.   I'm in the wrong binder.  I apologize.  Okay.
 4          Q.   No problem.  You just let me know when you have
 5    it.
 6          A.   Yeah, I do.
 7          Q.   Okay.  Great.  Now this is one of the documents
 8    that you testified about during your direct examination with
 9    Mr. Ainsworth.  Do you recall that?
10          A.   I do.
11          Q.   And that you drafted this document in September
12    of 2006, correct?
13          A.   Yes.
14          Q.   And this document in September of 2006 includes
15    the same FRAP relationship that is described in the '141
16    patent, correct?
17          A.   Yes.
18          Q.   And the document CX-0139C was used to crystallize
19    the FRAP equation for the first time, correct?
20          A.    I can't remember if it was the first time, but it
21    was a document that I had written it down.
22          Q.   Well, you went through a number of documents with
23    your counsel today.  This is the first one I recall that had
24    FRAP in it; is that fair?
25          A.    Yes, absolutely that's fair.

 1         Q.    Now turning to the -- can I see the whole
 2    document page?  Thank you.
 3              Turning to the second-to-last paragraph of the
 4    document that we can blow up here, you state that we have
 5    many -- sorry, I'll start from the beginning.
 6              We are claiming all gravity fed filters with a
 7    FRAP factor between 0 and 350.  We have many examples are
 8    gravity flow carbon blocks that meet this specification.
 9    Additionally, we have examples of gravity flow carbon blocks
10    that do not meet this specification and currently marketed
11    mixed media filters that do not meet this specification.
12              Do you see that?
13         A.    I do.
14         Q.    So you have carbon block filters that are meeting
15    your FRAP equation, correct?
16         A.    That is correct.
17         Q.    You have some carbon block filters that are not
18    meeting your FRAP equation, correct?
19         A.    That is correct.
20         Q.    And I guess I should say, when not meeting your
21    FRAP equation, I mean they are over 350 when you calculate
22    FRAP.  Does that make sense?
23         A.    Yes.
24         Q.    Okay.  And then you also have mixed media filters
25    that did not meet a FRAP of below 350, right?

1        A.    That is correct.

2        Q.    Okay.  Now you also testified about some of the

3    charts towards the end of the document.

4              If we could go to the next page of CX-139C.

5              You testified that these graphs started to

6    articulate the filter characteristics that you were

7    creating.  Do you recall that?

8        A.    Articulated the interrelationship between the

9    characteristics and the FRAP factor.

10       Q.    Sure.  That's a great clarification.  Thank you.

11             And this articulation of the relationship between

12   the FRAP factor variables relates to carbon block filters,

13   correct?

14       A.    No, these graphs are not specific to carbon block

15   filters.

16       Q.    The data that's represented in these graphs

17   relate to carbon block filters, do they not?

18       A.    No, they do not.

19       Q.    Okay.  So if we could go to the second graph here

20   and just blow it up.

21             Are you aware at the time in 2006 when you were

22   developing this technology of any mixed media filter that

23   had an effluent lead concentration of 15 parts per billion

24   or less?

25       A.    Am I aware of mixed media filters that would have

1  an effluent value less than 15 parts per billion?  At some

2  point in their time?

3      Q.   Yes.

4      A.   Yes.

5      Q.   Okay.  And so it's your testimony that those

6  filters are reflected in these graphs?

7      A.   No, that is not my testimony, that these graphs

8  reflect the testing data of a mixed media filter with a lead

9  effluent less than 15 parts per billion.

10     Q.   Okay.  So do they reflect something different?

11     A.   Yes, they do.  Would you like me to walk you

12 through what this graph is articulating?  Would that be

13 helpful?

14     Q.   That would be great.  Thank you.

15     A.   Absolutely.  So this is a graph helping bring to

16 life really the FRAP factor and what it teaches about filter

17 development.

18          So on the y-axis is the FRAP factor.  On the

19 x-axis is one of the characteristics of -- that a filter

20 could have in relationship to the FRAP factor.

21          In this case it's the filtration unit time, and

22 it shows how the filtration unit time, the average, I should

23 say, filtration unit time of that filter, would impact the

24 FRAP factor.  And then as you can see the other curves bring

25 to life one of the other variables in the FRAP factor, which

1   would be the effluent lead concentration.

2          There are obviously two other characteristics

3   captured within the FRAP that aren't shown here.

4   Unfortunately, you have these multitude of interaction of

5   characteristics, and I didn't know how to show all of them

6   in a single graph.  It would have had to have been four

7   dimensions.  So I don't know how to do that.

8          So that's what this is really bringing to life,

9   is how those interactions occur and how this technology

10  really teaches on balancing those interactions in filter

11  development.

12      Q.  So if we take just one datapoint, for example,

13  and it's hard to tell without the color, I think, which is

14  which, but one of the lines is 5 parts per billion effluent

15  lead as being held constant, is that fair?

16      A.  That is correct.

17      Q.  And I guess what I'm wondering is what data are

18  you using to create a chart that has 5 parts per billion

19  effluent lead held constant if not carbon block filter data?

20      A.  I think you're misunderstanding what this graph

21  is for.  This graph is really showing the benefit of the

22  FRAP in filter development.

23      Q.  I see.  Okay.  Now you also testified during your

24  direct examination about Toni Lynch's lab notebook.  So if

25  we could pull up CX-143 at page 72.  It's a little hard to

1    read.  If we could just blow up the first one would be

2    great.  Thank you.

3           So this is from Toni Lynch's notebook, and I

4    believe that you testified that it was sample data from some

5    of the prior filters that Brita was aware of; is that

6    correct?

7       A.   Yes.

8       Q.   Okay.  And I actually don't think that's

9    accurate.  This is actually the data from -- oh, yeah, no,

10   okay.  Sorry.

11          So this is actually the data from the Brita

12   granular current product that was on the market, right?

13      A.   Yes.

14      Q.   Okay.  And in this dataset we see samples pulled

15   at 3 liters, 76 liters, 151 liters, and so on, correct?

16      A.   That is correct.

17      Q.   And for flow rate we only see those three or six,

18   I guess, datapoints, three during the life of the filter,

19   correct?

20      A.   That is correct.

21      Q.   Okay.  And now you walked through with your

22   counsel all of your flow rate data testing for the carbon

23   block filters, but there's no such similar extensive flow

24   rate data testing for these prior art filters, correct?

25      A.   I don't know in totality what we do ant don't

1    have from that time period.  I know what our best practice

2    was, which was to capture the flow rate at every datapoint.

3    Unfortunately, there's not a real great way to put all of

4    that data into a lab notebook, so our best practice was to

5    capture the individual datapoints where we sampled.  I would

6    assume at the time we actually had all that data for these.

7    That was our best practice, but I don't remember

8    specifically for these.

9        Q.   Okay.  And you don't remember specifically doing

10   that for these either?

11       A.   So Toni ran these samples, so I don't know if she

12   had that data.  Our best practice at the time was to capture

13   it all, the rig captured all the data, but I honestly don't

14   remember what data we pulled or captured, how we used it for

15   every prototype, every product we tested.  So I can tell you

16   what our best practice was.

17       Q.   Okay.  Thank you.  Next I want to turn to

18   CX-108C.  Sorry.  I'm jumping around for your binder a

19   little bit, which I believe you testified was your lab

20   notebook, and specifically I want to go to page 109.  And

21   just let me know when you're there.

22       A.   Yes, I am.  Thank you.

23       Q.   Okay.  So you testified with Mr. Ainsworth about

24   the top part of this document that lists out the data for

25   the carbon block embodiments that you tested.

1        Now right underneath the data in your

2  handwriting, and I think I'm reading this accurately, it

3  says, the calculation for percent particulate removed made

4  assuming 30 percent particulate in the influent.

5        Do you see that?

6     A.   I do.

7     Q.   Okay.  So is it fair to say that the influent

8  particulate lead concentration as part of these tests was an

9  assumed figure and not a calculated figure?

10    A.   No.  The particulate was actually shown up in the

11  data table.

12    Q.   Okay.

13    A.   I think what I'm referring to here, at the time

14  we were trying to understand if there was a correlation on

15  how much particulate was left in the effluent and to make

16  the calculations easier I used an assumption about the

17  influent challenge water for that part of my work, but the

18  actual influent water was monitored.

19    Q.   Okay.  And if we could just actually go to one of

20  the samples, then.  Perhaps just FA 1-1, which is the top

21  left sample.

22        So I see effluent and then I see filtered and

23  then I see influent.

24    A.   Mm-hmm.

25    Q.   So I'm just wondering, influent, is that influent

1    particulate lead concentration or is that something else?

2        A.   No, that's the total influent for that -- for the

3    water, total lead.

4        Q.   Okay.  And then where do I see the total

5    particulate lead in the influent?

6        A.   We would have to go back in the lab notebook to

7    find the challenge water and where it was made up, which, if

8    I look on this top of the page, it says from page 99 in my

9    lab notebook.  So we can flip back there and let me see...

10            And here it would show the amount of particulate

11   lead.  Oh, I'm sorry, I should use the -- I can't

12   remember -- the number 104 at the bottom of the page, page

13   99 in the actual lab notebook or 104 in the exhibit number.

14   Sorry.

15       Q.   Yes, I see.

16       A.   That's the number I'm looking for.  So this, this

17   graph, would show the challenge water that was made up and

18   the particulate of that challenge water would have been 27

19   percent.

20       Q.   Okay.  So I see that down at the bottom right of

21   your chart here, right?

22       A.   Yes.

23       Q.   Okay.  And so that was only measured at the start

24   of the test; is that right?

25       A.   I would have to make sure that that's the case,

1    but probably.

2        Q.  Okay.  And then I see -- let's just stick with

3    the page that we're on now.  I see you have a signature

4    here, kind of covering part of the page that is pasted in.

5    Is that your signature on the lab notebook?

6        A.  Yes.  Yes, it is.

7        Q.  Okay.  And your signature there means that you've

8    reviewed the data on this page and that you believe it's

9    accurate; is that correct?

10       A.  Yes.

11       Q.  Okay.  And fair to say that that's true of all of

12   your signatures within your lab notebook?

13       A.  Yes.

14       Q.  I think you can put aside the binder for now.

15           So I want to turn back to the '141 patent, JX-22,

16   but I'll have it up on the screen as well.  I've actually

17   created a demonstrative for today, RDX-0015, page 2, please.

18           So, Dr. Knipmeyer, turning to Table 5 of the '141

19   patent, it's at page 47 of the patent, if you would like to

20   pull it up, but I've also excerpted the filter multiple core

21   data here on slide 2.

22           And I've corrected on the right side the

23   calculated FRAP factors.  Do you see that?

24       A.  I do.

25       Q.  Okay.  And at some point last year -- I guess you

1  could tell me the timing -- but you corrected the calculated

2  FRAP factors and submitted what's called a Certificate of

3  Correction.  Do you recall that?

4       A.   Yes, Brita corrected or Clorox corrected the FRAP

5  factors.

6       Q.   Okay.  And so you tested each of these carbon

7  block filters to determine the FRAP factors, corrects?

8       A.   That is correct.

9       Q.   And the lowest FRAP factor reported in your table

10  for the carbon block filters is 6.7.  Do you see that?

11       A.   I do.

12       Q.   And that was corrected from 16.6 originally,

13  right?

14       A.   Yes.

15       Q.   And so the lowest FRAP factor that you're telling

16  the world that you've obtained by your carbon block

17  invention is a 6.7 FRAP, correct?

18       A.   That is the lowest example in the patent, so,

19  yes, the lowest example in the patent.

20       Q.   And it's for the PT 3-4 alternate housing, right?

21       A.   Yes.

22       Q.   Some of the underlying data for this Table 5 is

23  also presented in the patent as table 2.  So if we could go

24  to slide 3, lots of numbers here, but slide 3 shows table 2

25  of the patent specific to the PT 3-4 alternate housing data,

1    and this actually shows then the influent lead concentration

2    at different points during the testing of the PT 3-4

3    alternate housing carbon block embodiment, correct?

4        A.   Yes.

5        Q.   Okay.  Now on the right side I have claim 1 of

6    your patent, and it requires source water throughout the

7    testing to include between 30 and 60 parts per billion

8    colloidal lead greater than .1 micrometers in diameter.  Do

9    you see that?

10       A.   I do.

11       Q.   And so that's saying that the source water you're

12   using to test the filters should have in its concentration

13   between 30 and 60 parts per billion of this kind of

14   particulate lead as opposed to something else, correct?

15       A.   Yes.

16       Q.   Now that 30 to 60 parts per billion concentration

17   range, it's your testimony that that should be present in

18   the source water throughout the entirety of the lifetime of

19   the filter testing, correct?

20       A.   That is correct.

21       Q.   So turning back to the Table 2 data, we see PT

22   3-4, alternate housing, and the first influent lead

23   datapoint shows that the source water at three liters had a

24   total lead concentration of 127.5 parts per billion.  Do you

25   see that?

1      A.   I do.

2      Q.   And then the influent soluble lead concentration

3  is listed at 106.7, correct?

4      A.   Yes, that's correct.

5      Q.   Okay.  And so just so we all understand, because

6  it took me some time to realize this, you would take the

7  total lead concentration, you subtract out the soluble lead

8  concentration, and you arrive at a particulate lead

9  concentration, correct?

10     A.   That is correct.

11     Q.   Because, ultimately, particulate lead plus

12  soluble lead equals total lead, right?

13     A.   That is correct.

14     Q.   Okay.  And so here at the first sample point for

15  the PT 3 alternate housing, the particulate lead

16  concentration is actually 20.8.  Do you see that?

17     A.   I do.

18     Q.   Okay.  And by my calculation, that's about 30

19  percent less than the minimum required concentration of 30

20  parts per billion under claim 1 of the '141 patent, agree?

21     A.   Agreed.

22     Q.   In other words, the water that was being filtered

23  through at this test point actually had less concentration

24  of particulate lead than was required, correct?

25     A.   That is correct.

1      Q.   And despite this, you still believe that the PT

2   3-4 alternate housing filter achieved a FRAP of 6.7; is that

3   right?

4      A.   I believe it achieved a FRAP less than 350.

5      Q.   Okay.  But maybe not 6.7?

6      A.   If you're asking how do I think the first tank

7   being low would affect it, I cannot say.

8      Q.   In your view, being under the particulate lead

9   requirement by over 30 percent for one tank with not produce

10   a dramatically different FRAP result; is that right?

11      A.   I agree with that, yes.

12      Q.   Now there are no examples that I can see in the

13   '141 patent or your lab notebooks that achieved a FRAP

14   factor of under 6.  Do you agree with that?

15      A.   Yes.

16      Q.   And causing a halfway drop from 6 to 3 would be a

17   pretty big step.  Do you agree with that?

18      A.   I'm not sure what you mean by "a pretty big

19   step."

20      Q.   It would take a lot of effort to go from a 6 FRAP

21   to a 3 FRAP, would you agree with that?

22      A.   Not necessarily.

23      Q.   Keeping all other variables in the FRAP equation

24   other than flow rate, let's say equal, in order to go from a

25   FRAP of 6 to 3, I would have to essentially double my flow

1    rate; is that right?

2        A.    Yes, but you can't change an individual

3    characteristic.  They're all interrelated.

4        Q.    You have to create the filter and consider the

5    performance holistically, correct?

6        A.    That is correct.

7        Q.    In other words, you can't just snap your fingers,

8    change one variable, and know that you would achieve a FRAP

9    half as much; is that right?

10       A.    That's correct, because they are not mathematical

11   variables, they are characteristics of the filter.

12       Q.    And I assume this is true since there's no

13   disclosure of a filter of less than 6, but you agree that

14   there's also no disclosure of a filter with a FRAP of less

15   than 3, correct?

16       A.    That is correct.

17       Q.    And you aren't aware of a single test that you

18   did in the lab notebooks or in the '141 patent that led to a

19   FRAP factor of 3 or less; isn't that accurate?

20       A.    I believe that's the case.

21       Q.    Okay.  So we've talked through some of the

22   filters that met the requirements of FRAP under 350 in the

23   '141 patent.  I want to talk about a few that the '141

24   patent says do not.

25             So back to the '141 patent at Table 5.  And we

1    can pull up RDX-15, slide 4.

2         I now have the bottom part of the table that

3    relates to the mixed media filters.  Do you see that?

4         A.  I do.

5         Q.  And, again, I've added a column for the corrected

6    FRAP factor.  Do you see that?

7         A.  I do.  Thank you.

8         Q.  And in the '141 patent, you explain, the

9    inventors explain, that all of the mixed media filters

10   tested were above the FRAP cutoff of 350, right?

11        A.  Yes.

12        Q.  And that's based not only on the original FRAP

13   data but the corrected FRAP factor data as well, right?

14        A.  That is correct.

15        Q.  So looking at -- and I've highlighted it here so

16   you already knew where I was going to go -- the best filter,

17   the closest to 350 is the Brita granular filter, which has a

18   FRAP of 371.4.  Do you see that?

19        A.  I do.

20        Q.  Okay.  So I want to, again, dive a little bit

21   deeper into that filter.  And so we have to, again, go to

22   Table 3 of the patent, which I have on RDX-15.5.

23        It shows again the lead concentration at various

24   points throughout the testing, correct?

25        A.  Yes.

1      Q.    And I actually think you testified about this

2  during your direct exam as well, so it should be no

3  surprise, but the influent lead total concentration at 151

4  liters for the Brita granular prior art filter was 182.7,

5  right?

6      A.    Yes.

7      Q.    And the soluble concentration of lead at that

8  same test point was 107.6.  Do you see that?

9      A.    I do.

10     Q.    And, again, doing the math, taking one from the

11  other, you arrive at the particulate lead concentration in

12  the charge water of 75.1, correct?

13     A.    That is correct.

14     Q.    And, again, that is actually over the limit of 30

15  to 60 parts per billion that is permissible, not only under

16  the claim, but I think also under NSF, correct?

17     A.    That is correct.

18     Q.    So, in other words, at this point in time the end

19  of life of the filter, the water that is being pushed

20  through actually had more particulate to start than was

21  permissible, correct?

22     A.    That is correct.

23     Q.    And that is at the exact liter, 151, where it's

24  important to know what the effluent lead concentration is,

25  correct?

1      A.   That is correct.

2      Q.   So at the moment that you're using in the FRAP

3   equation effluent lead concentration, 151 liters, the source

4   water at that point in time actually had almost 25 percent

5   more particulate lead than is permissible; isn't that right?

6      A.   That is correct.

7      Q.   I think this was your testimony, despite using

8   source water that was 25 percent greater particulate lead

9   for the end of life of the Brita granular filter, it is your

10  testimony that the filter would still have a FRAP over 350;

11  is that accurate?

12     A.   Yes, I believe so.

13     Q.   In your testimony the difference in the source

14  water being 25 percent over at this point would not make up

15  the 20 point delta between the 371 FRAP calculated for the

16  Brita granular filter and the 350 FRAP limitation of claim

17  1; is that your testimony?

18     A.   Yes.  Yes, it is.

19     Q.   But you don't actually have any data that shows

20  what the FRAP factor would be for this filter if you had

21  used the appropriate charge water at 151 liters; isn't that

22  right?

23     A.   That is correct.

24     Q.   And, Dr. Knipmeyer, you didn't go back and retest

25  the granular, Brita granular filter, using the source water

1    of 30 to 60 parts per billion at 151 liters, did you?

2        A.    I did not.

3        Q.    Even though that's a Brita product, right?

4        A.    That is correct.

5        Q.    And you had any number of these filters at your

6    disposal to retest the product, correct?

7        A.    That is correct.

8            MS. BEANE:  Your Honor, I'm done with my

9    question.  I believe I need to pass off to one more counsel

10   for some briefly questioning, if we could just have a couple

11   of minutes.

12           JUDGE MCNAMARA:  Of course.

13           MS. BEANE:  Thank you.

14           JUDGE MCNAMARA:  Thank you, Ms. Beane.

15           MR. LETCHINGER:  Thank you for the couple of

16   minutes, Your Honor.

17           JUDGE MCNAMARA:  Sure, Mr. Letchinger.  Are you

18   ready to go?

19           MR. LETCHINGER:  I am.  Thank you.

20                   CROSS-EXAMINATION

21   BY MR. LETCHINGER:

22       Q.    Good afternoon, Dr. Knipmeyer.

23       A.    Good afternoon.

24       Q.    Could we put up CX-139 again, please?

25           JUDGE MCNAMARA:  Just for the record,

1  Mr. Letchinger, I know who you represent, but would you let

2  Dr. Knipmeyer know.

3           MR. LETCHINGER:  Oh, that's -- yes.

4     Q.   Dr. Knipmeyer, I represent Zero and Culligan.

5     A.   Thank you.

6     Q.   Dr. Knipmeyer, we've looked at several parts of

7  this document.  I'd like to direct your attention to about

8  three quarters of the way down where it defines the filter

9  usage lifetime.  Do you see that?

10    A.   I do.

11    Q.   And for the record it states, the filter usage

12 lifetime is defined as the total number of gallons that can

13 be filtered before the filter requires replacement, correct?

14    A.   Yes.

15    Q.   And you drafted that, right?

16    A.   I did.

17    Q.   That's not what ended up in the claim, correct?

18    A.   The exact language is different, that is correct.

19    Q.   The language in the claim actually references the

20 claim that the manufacturer or seller makes, correct?

21    A.   That is correct.

22    Q.   And that's not what you originally came up with,

23 right?

24    A.   The claims language -- yes, the language is

25 different.  The words on the page are different.

1    Q.   In order to measure flow rate, Dr. Knipmeyer, you
2  don't need to measure every liter, correct?
3    A.   I'm sorry.  Are you asking -- in what context are
4  you asking, in order to measure the flow rate of a filter --
5  you could measure 1 liter and that would be the flow of that
6  1 liter.  Are you in reference to the patent, the
7  lifetime -- sorry.
8    Q.   Yes, for the lifetime claim in the patent.
9    A.   In the patent you need to have the average
10  filtration unit time over the lifetime of the filter.
11    Q.   And you can use just a statistically significant
12  number of measurement, correct?
13    A.   Yes, as long as it accurately captures the
14  performance of that filter over the lifetime.
15    Q.   Okay.  In the patent, if we look at -- we can
16  pull the patent --
17    A.   Are we going to a different document?
18    Q.   We're going to go to the '141 patent.  If we can
19  look at example 3 A, which is at column 28.
20    JUDGE MCNAMARA:  Could you repeat that again,
21  Mr. Letchinger?
22    MR. AINSWORTH:  Sure.  We're at the bottom of the
23  '141 patent where it starts I believe at line 61,
24  Your Honor.
25    JUDGE MCNAMARA:  Thank you.

1      Q.    I'm not going to ask you to read it out to

2   yourself, but if we continue on to the top of column 29.

3   The patent reports that the filtrate effluents were

4   collected at 3, 76, 151, 227, 273, and 303 liters of

5   challenge water, correct?

6      A.    Give me one second to catch up with you.

7      Q.    Sure.

8      A.    That is correct.

9      Q.    It proceeds to say this corresponds to 2, 50,

10  100, 150, 180, and 200 percent of the filter life, correct?

11     A.    That is correct.

12     Q.    And that's what's reported in table 2; is that

13  right?

14     A.    Yes.

15     Q.    And that's where in the patent it teaches one

16  ordinary skill in the art how to measure the lifetime by

17  liters over the lifetime of the filter, correct?

18     A.    That is where it's indicating how to measure the

19  effluent lead over the lifetime of the filter as it

20  corresponds with the industry standards and the NSF/ANSI 53

21  standard.

22     Q.    You testified earlier, Dr. Knipmeyer, that within

23  a day or two of returning to Brita in 2006 -- was it Brita

24  or Clorox?

25     A.    I'm sorry.  Are you referencing to when I joined

1    the company in May of 2006?

2        Q.   Yes.

3        A.   Yes, I joined the Brita group out of graduate

4    school.

5        Q.   Okay.  And you said you were immediately

6    introduced to the draft NSF standard that was in play for

7    lead reduction; is that right?

8        A.   I think I was introduced to the challenge we were

9    trying to solve.  I don't know the exact date that I saw the

10   draft NSF challenge water.  I'm sorry if I implied that was

11   the first or second day.  But, yes, in May of 2006 I became

12   familiar with the problem.  I don't remember the exact days

13   or times that I saw the draft challenge water.  It was a

14   long time ago.  I'm sorry.  If you're looking for a specific

15   date.

16       Q.   Nope, I don't need a specific date, just sometime

17   in spring or summer of 2006?

18       A.   Yes.

19       Q.   You were advised that there was going to be a

20   change in the NSF 53 standard for lead, correct?

21       A.   Yes, I believe so.

22       Q.   Who told you that, if you remember?

23       A.   I'm going to guess it was my, you know, first

24   heard about it from my direct manager, which would have been

25   Sylvia Shavonne at the time.

1      Q.    Do you remember what that person told you?

2      A.    Word for word, I do not, I'm sorry.

3      Q.    Just generally.

4      A.    I think explaining the challenge facing the

5  industry, our existing technology, and that the NSF/ANSI

6  standards were changing in response.  The general crux of

7  the problem is what I would say.

8      Q.    Okay.  And were you advised by somebody who was

9  actually participating on the committee, the NSF committee?

10      A.    I do not know.  I don't remember.

11      Q.    Do you remember who from Clorox or Brita was on

12  that committee?

13      A.    It probably would have been like a Rick

14  Nishijima, but, honestly, I don't remember.

15      Q.    Did you ever speak with him about the draft NSF

16  53 policy for lead?

17      A.    I may have.  I mean, he was an expert in our

18  group.  I'm sure we talked a lot about the Brita business

19  and how I could leverage his knowledge maybe on filters.

20      Q.    Did you ever test a Zero filter?

21      A.    I did not, no.

22      Q.    Have you ever heard of Zero?

23      A.    I have.

24      Q.    When did you first hear of ZeroWater?

25      A.    I don't remember the exact date.

1     Q.    How did you determine what filters that were on
2  the market to test and report in the '141 patent and which
3  ones not to?
4     A.    I honestly cannot remember how we selected the
5  competitive products for the '141 patent.
6     Q.    Was it your goal to try to test as many
7  competitive products as you could find?
8     A.    I think it was to understand kind of what was out
9  there.
10    Q.    Okay.  Have you ever tested the Zero product?
11    A.    I personally, no.
12    Q.    Do you know if anybody from Brita has or Clorox
13  other than in this litigation?
14    A.    No, not that I'm aware of.  I transitioned off
15  the business in 2010, I believe.
16    Q.    Do you know if the NSF/ANSI 53 2007 standard
17  teaches how to measure flow rate as used in your patent?
18    A.    No, I do not believe so.
19    Q.    And you'd agree with me, would you not, that FRAP
20  is a performance measurement, correct?
21    A.    It's a way to measure performance.  I wouldn't
22  just say it's a performance measurement.
23    Q.    I'm sorry.  I missed it.  You said it's a way to
24  measure, is that what you said?
25    A.    It can be used to measure performance, yes.

```
 1        Q.   Can we, please, pull up CX-108?  I believe it
 2   will be at 122.
 3             Can we blow up just the part in the middle,
 4   please.
 5             I'm looking at -- thank you -- I'm looking
 6   towards the bottom, Dr. Knipmeyer, and it states, the -- can
 7   you read what that says?  Your handwriting is a lot better
 8   than mine, but I can't read it.
 9        A.   No problem.  "The holes in the barrel
10   dramatically affected flow rate and performance.
11   Additionally, the mesh was removed from the barrel feet to
12   prevent air locking at the feet."
13        Q.   Okay.  So you're commenting on one particular
14   filter embodiment, correct, or prototype?
15        A.   It was a long time ago.  I'll have to go back and
16   make sure what that references, if you'll give me a minute
17   to just look back through my notebook pages in reference to
18   this.
19             So for this instance, I don't believe the hole in
20   the barrel is referencing a specific -- I think it was all
21   of these prototypes were utilized in a housing with a hole
22   drilled in the side.
23        Q.   Okay.  And what about the mesh?
24        A.   I believe the same would be true for all four of
25   these prototypes.
```

1    Q.   Okay.  And things like adding holes or removing

2    holes or adding mesh and removing mesh, those are all

3    physical characteristics of the filter that affect the

4    performance, correct?

5    A.   I'm sorry.  Can you repeat that question one more

6    time?

7    Q.   Sure.  You're reporting here that by adding holes

8    in the barrel that it dramatically affected the flow rate

9    and performance, correct?

10   A.   That is correct.

11   Q.   Okay.  And the next line talks about the removal

12   of mesh, also helping to prevent locking, correct?

13   A.   Yes.

14   Q.   And there are a myriad of other physical

15   characteristics that impact the efficacy of the filters,

16   correct?

17   A.   That is correct.

18   Q.   You don't report in your claims any physical

19   structures like that to educate people who are skilled in

20   the art as to actually how to build the filter, correct?

21   A.   That is correct.

22        MR. LETCHINGER:  I have nothing further, Your

23   Honor.  Thank you.

24        Thank you, Dr. Knipmeyer.

25        JUDGE MCNAMARA:  Thank you, Mr. Letchinger.

1          Are there any more Respondents who would like to

2   perform any additional cross before we go back to

3   Mr. Ainsley?

4          MR. LETCHINGER:  No, Your Honor.  Thank you.

5          JUDGE MCNAMARA:  Thank you very much,

6   Mr. Letchinger.

7          Okay.  Mr. Ainsley, do you have any redirect?

8          MR. AINSWORTH:  Yes, Your Honor.  I really do not

9   like to correct the Court.  It's Ainsworth, my last name.

10          JUDGE MCNAMARA:  Ainsworth.  I'm sorry.  I don't

11   know why I said that.  I think I may have done that a couple

12   of times.  So sorry about that.

13          MR. AINSWORTH:  It's okay.

14          JUDGE MCNAMARA:  No, my error.  I apologize.

15          MR. AINSWORTH:  You had the first few letters

16   right.

17          JUDGE MCNAMARA:  Hey, that's not enough, as we

18   both know.  Come on.  We've got to be precise here, right?

19          MR. AINSWORTH:  We're trying.  Absolutely,

20   Your Honor.  I apologize for the correction.  I just want to

21   let you know.

22          JUDGE MCNAMARA:  No, you didn't.  That's a good

23   rhetorical technique.  You meant to correct me and you did.

24   So no apologizing for it.

25          MR. AINSWORTH:  All right.

```
 1                     REDIRECT EXAMINATION

 2   BY MR. AINSWORTH:

 3       Q.   Dr. Knipmeyer, you were asked in the last set of

 4   questions about holes on the barrel.  Do you recall that?

 5       A.   I do.

 6       Q.   If you turn to claim 24 of your patent, JX-22,

 7   Mr. Rennick.

 8            What's described in claim 24, doctor?

 9       A.   A gravity-flow system as recited in claim 23,

10   wherein the cartridge has an aperture through a sidewall

11   thereof for allowing at least an egress of air into the

12   filtered water reservoir.

13       Q.   So would that be an example in your claims of

14   another physical feature of a water filter?

15       A.   Yes.

16       Q.   Dr. Knipmeyer, you were asked a couple of

17   questions about one of your examples, PT 3-4.

18       A.   Yes.

19       Q.   Do you recall those questions?

20       A.   I do.

21       Q.   The 3 liter mark of effluent was outside

22   specification.

23       A.   Yes.

24       Q.   Why does that not impact your view as to the

25   performance of that particular filter?
```

1      A.   Because over the lifetime of the filter it was

2  really able to remove particulate lead and do so

3  effectively.

4      Q.   Are you familiar with whether under the NSF/ANSI

5  standard you're allowed to discount one value over the

6  course of the sampling?

7      A.   Yes.

8      Q.   And what is does the NSF standard say about that?

9      A.   You're allowed to discount one sample point as

10 long as it's not the last one in the testing criteria

11 essentially.

12     Q.   Dr. Knipmeyer, we have no further questions.

13          JUDGE MCNAMARA:  Okay.  Thank you, Mr. Ainsworth.

14 This time I got it right, so there you go.

15          All right.  Do any of the Respondents have any

16 redirect -- recross based upon Mr. Ainsworth's redirect?

17          MS. BEANE:  No, Your Honor, we're all set.  Thank

18 you very much.

19          JUDGE MCNAMARA:  And you're speaking on behalf of

20 Mr. Letchinger as well?

21          MS. BEANE:  I am, yes.

22          JUDGE MCNAMARA:  And all the other Respondents,

23 just to be clear on the record.

24          MS. BEANE:  Yes, all the Respondents have rested

25 with Dr. Knipmeyer.  Thank you very much.

```
 1              JUDGE MCNAMARA:  Okay.  Thank you, Ms. Beane.
 2              Okay.  Are you ready to call your next witness
 3    then, Mr. Ainsworth?
 4              MR. AINSWORTH:  We are, Your Honor.  Our next
 5    witness will be Ms. Lauren Kahn with the Brita Company, and
 6    Ms. Everett will handle that examination.
 7              JUDGE MCNAMARA:  Yes.  And just so that you know,
 8    my team is looking at the clawback documents.  And so it may
 9    very well be that we won't have a decision this afternoon on
10    that because they are double-checking to make sure whether
11    or not any of those documents should be produced.
12              So in case that decision is not forthcoming this
13    afternoon, do you have a fallback position in order to get
14    some of those documents in in the event that I rule that
15    some of them should come in?
16              MR. AINSWORTH:  Your Honor, we have no interest
17    in those documents coming in.
18              JUDGE MCNAMARA:  I know you don't.
19              MR. AINSWORTH:  Respondents haven't asked us
20    about that.  We're happy to confer with them, but we haven't
21    had a chance to confer on that issue yet.  I think they
22    propose using our financial expert, our economic expert, and
23    that probably would be fine.
24              JUDGE MCNAMARA:  Okay.  So we'll get back to you
25    on that when I see where things stand.
```

1          Good afternoon, Ms. Kahn.

2          THE WITNESS:  Good afternoon.

3                    LAUREN KAHN,

4      having been first duly sworn and/or affirmed

5  on their oath, was thereafter examined and testified as

6  follows:

7          JUDGE MCNAMARA:  Please state your full name.

8          THE WITNESS:  Lauren Kahn.

9          JUDGE MCNAMARA:  Thank you very much.  Okay.  Go

10  ahead, please, Ms. Everett.

11                  DIRECT EXAMINATION

12  BY MS. EVERETT:

13      Q.  Can you please state your full name for the

14  record?

15      A.  Sure.  It's Lauren Kahn.

16      Q.  Did you prepare any demonstratives to assist with

17  your testimony today?

18      A.  I did, yes.

19      Q.  Would you please summarize your educational

20  background?

21      A.  Absolutely.  I have a bachelor's in science from

22  the University of Pennsylvania and a master's in business

23  administration from the Kellogg School at Northwestern.

24      Q.  Who is your current employer?

25      A.  The Clorox Company.

```
 1          Q.    What is your position?
 2          A.    I'm senior director of marketing, and commercial
 3     leader for the Brita business.
 4          Q.    How long have you been employed at Clorox and
 5     Brita?
 6          A.    I've been with Clorox for just about 15 years,
 7     and I started with Brita a little over two years ago.
 8          MS. EVERETT:  Your Honor, some of the next set of
 9     questions will begin to elicit material that it's
10     confidential, so if we could move to confidential record, we
11     would appreciate that.
12          JUDGE MCNAMARA:  Thank you.  I appreciate that.
13          (Whereupon, the hearing proceeded in confidential
14     session.)
15
16
17
18
19
20
21
22
23
24
25
```

Appx22238-22261 redacted in their entirety

```
 1                  O P E N   S E S S I O N

 2

 3              JUDGE MCNAMARA:  So at this point if any of the

 4       Respondents attendees would like to come back in they may.

 5       BY MS. EVERETT:

 6          Q.    Ms. Kahn, as part of your job you oversee

 7       marketing for Longlast and Longlast+ products?

 8          A.    That's right.

 9          Q.    Do you have any responsibility of tracking or

10       following any type of consumer feedback?

11          A.    Yes, absolutely.

12          Q.    And do you follow any industry feedback?

13          A.    Yeah.  We track industry feedback as well as kind

14       of direct consumer feedback.

15          Q.    What would you consider industry here?

16          A.    So for us industry would be anybody who looks at

17       consumer products.  So there are lots of publications that

18       will focus on kind of what's the best water filter or, you

19       know, making recommendations that pertain to our category.

20          Q.    Can you describe the types of feedback that

21       you've received on Longlast and Longlast+?

22          A.    Yeah.  We've received very positive feedback from

23       the press as they have gotten to know the product.

24          Q.    Can you -- what type -- what aspects of the

25       product are being praised?
```

1    A.   They are typically talking about contaminant

2    removal, like specifically they will call out the lead

3    removal, they talk about the fact that you don't have to

4    change it as often and what a huge benefit it is to have a

5    six-month filter.  They talk about kind of the compact size

6    of the filter, the fact that it fits in our previous system

7    so that you can buy the filter without having to buy a whole

8    new system, the value, the sustainability benefit.  So I

9    would think a lot of the things that we've talked about are

10    often reflected in those reviews.

11    Q.   Mr. Rennick, if you could bring up CX-0168, I

12    appreciate it.

13         Going to have to blow this one up.

14         Ms. Kahn and Your Honor, are you able to --

15         JUDGE MCNAMARA:  Yes.  It's still small, but I

16    can see it.  Can you see it, Ms. Kahn?

17    A.   I can.  My glasses are helping.

18         JUDGE MCNAMARA:  Well, if you can blow it up some

19    more maybe, Ms. Everett, and focus on the text that you

20    would like.  There you go.

21    Q.   So, Ms. Kahn, what is this article?

22    A.   So this is an article from the strategist, which

23    is part of The New Yorker, and they are doing a review on

24    the best water filter pitchers, and they said, according to

25    experts, I think, in this particular instance they are

1  talking to health and medical experts.

2      Q.   Great.  And if we could go toward the bottom half

3  of the first page.  If we could blow up the part on Brita

4  Longlast.

5          Ms. Kahn, what do the experts say about the Brita

6  Longlast?

7      A.   So they are talking about how the Brita Longlast

8  is good at removing contaminants in the water, and they are

9  recommending it for people who either have contaminant or

10  lead in their water and specifically for people who have any

11  health issues or, you know, weakened immune system.  And

12  they're talking about kind of NSF standards and the 99

13  percent of lead.  So they are going pretty deep on

14  contaminants.

15     Q.   Thank you.  If you could bring this down and

16  bring up CX-0170.

17         Ms. Kahn, are you familiar with CX-0170?

18     A.   Yes.

19     Q.   What is it?

20     A.   This is an article from a blog called house

21  grail, and this is kind of a great example of something we

22  would consider a micro-influencer blog.  So this blog is,

23  you know, has about two hundred thousand readers a month,

24  and they are mostly DIY-ers and handymen.  So this was kind

25  of one exactly of, like, we would go out and create a

1    micro-influencer strategy where we would reach lots of sites

2    like this.

3        Q.    And is this kind of magazine Brita would look to

4    for praise or see how their products are being reviewed?

5        A.    Yeah, absolutely.  So for us DIY-ers and handymen

6    are kind of a great influencer for water filtration, like if

7    you have a friend who, like, does all of their own home

8    building and they make a recommendation about a water

9    filter, you're very likely going to take it.

10       Q.    If we could go to the bottom of page 2, top of

11   page 3.  Ms. Kahn, what does house grail say about the Brita

12   Longlast filter?

13       A.    Yeah, so they are calling out several benefits of

14   the filter.  They talk about the lifespan of six months.

15   They talk about the contaminant removal.  And they mention

16   chlorine, lead, and mercury.  The replacement filters are

17   easy to find, that's a reference to just the broad

18   distribution of the product and the fact that once you get

19   the pitcher it's easy to find replacement filters.  And the

20   fact that the product is just really easy to use.

21       Q.    Thank you.  We can take this down and bring up

22   CX-0171.

23            Ms. Kahn, are you familiar with this article?

24       A.    Yes.  This is a review from the magazine Real

25   Simple.

1      Q.    And if we go to page 2, what does Real Simple

2   have to say about the Brita filter?

3      A.    So they are calling out that it lasts three times

4   longer than other filters.  So there's kind of that value of

5   you get six months of water purification instead of two.

6   And then they are highlighting the sustainability benefit

7   that's associated with that lifetime.  So because it lasts

8   for six months, it actually replaces 900 16-ounce plastic

9   water bottles.

10      Q.    Does it say anything about lead removal?

11      A.    Yeah, in the second paragraph here it's talking

12   about the contaminants that it reduces, and they say

13   including 99 percent of lead.

14      Q.    Now I see that Amazon Shopper is referenced.  Do

15   you see that?

16      A.    Yes.

17      Q.    Amazon shoppers to determine whether its product

18   is praised?

19      A.    Absolutely.  Amazon reviews are amazingly

20   influential or all products, especially this category where

21   people do a research before they choose a system.  We find

22   that almost everybody who buys a water filtration system

23   actually starts their search on Amazon, whether or not they

24   are buying their product ultimately on Amazon.  So we

25   definitely look at our Amazon rating and we pay attention

1  whether it's high, if it starts to drop, we look very

2  carefully at what people might be complaining about and make

3  efforts to correct that.

4       Q.   We can bring this down and then go to CX-0173.

5  Ms. Kahn, are you familiar with this article?

6       A.   Yes.  This is an article that is reviewing water

7  pitchers from Epicurious.

8       Q.   Page 4, please.  What does Epicurious say about

9  the Brita Longlast+ filter?

10      A.   So they are talking about NSF certified filters

11  specifically and they are talking about the contaminants we

12  remove and the different NSF standards that we meet, and

13  then they further go into detail again around the 120 gallon

14  capacity, which is essentially the six-month lifespan.  And

15  then here they actually talk about the value of the product

16  as well.

17            MS. EVERETT:  No further questions, Your Honor.

18            JUDGE MCNAMARA:  Okay.  Thank you, Ms. Everett.

19  It is just about 5:30.  We're going to have to bring

20  Ms. Kahn back in the morning.  We really need to stop.

21            Had you planned for that, Ms. Everett, the

22  possibility that we might run out of time, by any chance?

23            MS. EVERETT:  I believe we may have Ms. Kahn in

24  the morning as well.

25            JUDGE MCNAMARA:  Okay.  Good.  Very good.  Thank

1    you so much, Ms. Everett, and for the day, you may step

2    down, Ms. Kahn, and I guess we'll see you back tomorrow

3    morning.

4            THE WITNESS:  Okay.  Thank you so much.

5            JUDGE MCNAMARA:  Okay.  Thank you.  There are

6    just a couple of housekeeping matters that I would like to

7    take care of.

8            First of all, with respect to admission of

9    exhibits from Dr. Knipmeyer's testimony today, have you been

10   able to talk with Respondents yet, Mr. Ainsworth, about

11   which exhibits they will agree with and which they don't?

12           MR. AINSWORTH:  We haven't Your Honor.  The

13   parties have a estimation on this and how to handle

14   admitting the exhibits.  I don't have it in front of me so I

15   don't know the exact procedure.  We have an agreement that

16   everything discussed with the witness by either side will be

17   admitted so we'll get together a list if that is acceptable

18   to Your Honor.

19           JUDGE MCNAMARA:  You can do it tomorrow morning

20   or sometime tomorrow would be fine.  Maybe we can take a few

21   minutes at a break or just before lunch, something like

22   that, just to make sure you've conferred, even though you

23   have a estimation, things bubble up.

24           MR. AINSWORTH:  We'll take care of it first thing

25   in the morning.

```
 1          JUDGE MCNAMARA:  Okay.  What I'm going to do also
 2   is, rather than prolong today, since it's been -- it's a
 3   long day for everyone -- in the morning I'll also take care
 4   of the clawed back documents and we'll talk about those and
 5   give you an answer in the morning on that.  In all
 6   likelihood we'll also give you an answer tomorrow about the
 7   motion to quash.  We're still working on that.  We'll
 8   certainly give you an answer on the clawed-back documents.
 9          MR. AINSWORTH:  Thank you, Your Honor.
10          JUDGE MCNAMARA:  Okay.  Is there anything,
11   Mr. Ainsworth, that you'd like to mention before we close
12   today or any housekeeping matter?
13          MR. AINSWORTH:  I don't believe so, Your Honor.
14   Thank you.
15          JUDGE MCNAMARA:  Okay.  Is there anything,
16   Mr. Swain, on behalf of the Respondents that you would like
17   to mention, or Ms. Rubschlager, are you taking care of this?
18          MS. RUBSCHLAGER:  I can take care of this
19   Your Honor.  Mr. Swain is right here.  But I understand that
20   we do not have any issues that Respondents need taken care
21   of at this time.
22          JUDGE MCNAMARA:  Okay.  So please make sure that
23   you send me an email tonight to McNamara337@usitc.gov with
24   respect to the time that was sent today by each side and
25   make sure you come to an agreement on that so that there is
```

```
1    just one email -- or that all parties are signing off on.
2            MS. RUBSCHLAGER:  We will do that.
3            MR. AINSWORTH:  Yes, Your Honor.
4            JUDGE MCNAMARA:  All right.  Thank you very much
5    everybody, and a special thanks to Ms. Kinkade, and I will
6    see you all tomorrow morning at 9:30.  Thank you.
7            MS. RUBSCHLAGER:  Thank you.  And thank you,
8    Ms. Kinkade.
9            JUDGE MCNAMARA:  Have a good evening, everyone.
10           MS. RUBSCHLAGER:  You too.
11   //
12
13           (Whereupon, at 5:30 p.m., the proceedings
14   adjourned, to reconvene the following day, August 18, 2022,
15   at 9:30 a.m. Eastern)
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C O N T E N T S

 2                  INDEX OF WITNESSES

 3
                                       RE-    RE-
 4  WITNESS              DIRECT CROSS DIRECTCROSS

 5  ELIZABETH KNIPMEYER.........153    199,  233

 6                                223

 7  LAUREN KAHN.................236

 8

 9

10

11  AFTERNOON SESSION                      125

12

13

14  CONFIDENTIAL SESSIONS                  40-51

15                                         238-261

16

17

18

19

20

21

22

23

24

25
```

1                       C E R T I F I C A T E

2    TITLE: In the Matter of Certain High-Performance Gravity-Fed

3    Water Filters and Products Containing the Same

4    INVESTIGATION NO.:  337-TA-1294

5    HEARING DATE:  August 17, 2022

6    LOCATION:  Washington, D.C. - Remote

7    NATURE OF HEARING:  Evidentiary Hearing

8            I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9    above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:  August 17, 2022
     Signed:
11   ss//     _____

12   Signature of the Contractor or the Authorized Contractor's
     Representative

13

14           I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//     Raymond G. Brynteson

20

21           I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//     Linda Kinkade

25


                      Heritage Reporting Corporation
                             (202) 628-4888

                             Appx22272

```
 1              UNITED STATES INTERNATIONAL TRADE COMMISSION

 2                          Washington, D.C.

 3                 Before the Honorable MaryJoan McNamara

 4                        Administrative Law Judge

 5

 6    -------------------------------x

 7    In the Matter of                    Investigation No.

 8

 9    CERTAIN HIGH-PERFORMANCE            337-TA-1294

10    GRAVITY-FED WATER FILTERS AND

11    PRODUCTS CONTAINING THE SAME

12    -------------------------------x

13

14

15                       EVIDENTIARY HEARING

16                   Thursday, August 18, 2022

17

18

19         The parties met via remote videoconferencing

20    pursuant to notice of the Administrative Law Judge at 9:30

21    a.m. Eastern.

22

23

24

25    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR
```

```
1   A P P E A R A N C E S:

2   (all parties appeared remotely)

3

4   For Complainant Brita LP:

5           STERNE, KESSLER, GOLDSTEIN & FOX, PLLC

6           1100 New York Avenue, NW

7           Washington, DC 20005

8           (202) 371-2600

9           painsworth@sternekessler.com

10              Paul A. Ainsworth, Esq.

11              Josephine Kim, Esq.

12              Uma Everett, Esq.

13              Lauren Watt, Esq.

14              Robert E. Niemeier, Esq.

15

16

17

18

19

20

21

22

23

24

25  CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           950 F Street, NW

 7           Washington, DC 20004

 8           (202) 239-3025

 9           Pur-ITC@alston.com

10               Adam D. Swain, Esq.

11               Thomas W. Davison, Esq.

12

13

14

15           ALSTON & BIRD LLP

16           101 S. Tryon Street

17           Charlotte, North Carolina 28280

18           (704) 444-1000

19           Pur-ITC@alston.com

20               Karlee N. Wroblewski, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           1950 University Avenue

 7           East Palo Alto, California 94303

 8           (650) 838-2000

 9           Pur-ITC@alston.com

10                   Katherine G. Rubschlager, Esq.

11

12

13   For Respondents EcoLife Technologies, Inc., and Qingdao

14   Ecopure Filter Co., Ltd.:

15           CALFEE, HALTER & GRISWOLD LLP

16           1405 East Sixth Street

17           Cleveland, Ohio 44114

18           (216) 622-8200

19           ecopure_brita@calfee.com

20                   Todd R. Tucker, Esq.

21                   Jack R. Smith, Esq.

22                   Brad Liu, Esq.

23                   Ashley J. Earle, Esq.

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5         BAKER & HOSTETLER LLP

 6         1801 California Street

 7         Denver, Colorado 80202

 8         (303) 764-4072

 9         zerowater-itc@bakerlaw.com

10             Jared A. Brandyberry, Esq.

11

12         BAKER & HOSTETLER LLP

13         1050 Connecticut Avenue, NW

14         Washington, DC 20036

15         (202) 861-1633

16         zerowater-itc@bakerlaw.com

17             Cassandra J. Simmons, Esq.

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5           BAKER & HOSTETLER LLP

 6           One North Wacker Drive

 7           Chicago, Illinois 60606

 8           (312) 416-6200

 9           zerowater-itc@bakerlaw.com

10               John S. Letchinger, Esq.

11

12           BAKER & HOSTETLER LLP

13           1735 Market Street

14           Philadelphia, Pennsylvania 19103

15           (215) 568-3100

16           zerowater-itc@bakerlaw.com

17               Jeffrey J. Lyons, Esq.

18               Phillip D. Wolfe, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
1    A P P E A R A N C E S (continued):

2

3    For Respondents Zero Technologies, LLC and Culligan

4    International Co.:

5            BAKER & HOSTETLER LLP

6            312 Walnut Street

7            Cincinnati, Ohio 45202

8            (513) 929-3400

9            zerowater-itc@bakerlaw.com

10                Derek M. Freitas, Esq.

11

12

13   For Respondent Vestergaard Frandsen Inc. d/b/a LifeStraw:

14           K&L GATES

15           70 W. Madison Street

16           Chicago, Illinois 60602

17           Vestergaard1294@klgates.com

18                Jeffrey R. Gargano, Esq.

19                Nelson M. Hua, Esq.

20                Devon C. Beane, Esq.

21                Ewa Wojciechowska, Esq.

22

23

24

25                ** Index appears at end of transcript **
```

```
 1                    P R O C E E D I N G S

 2              (In session at 9:30 a.m.)

 3              JUDGE MCNAMARA:  Good morning again, Ms. Kinkade.

 4    Good morning everyone.

 5              Let me take care this morning of the issue of the

 6    clawback of certain Brita documents.  So this came up

 7    yesterday, and I apologize that we didn't have this ready at

 8    the start, but the documents that were clawed back reference

 9    BRITALP, these are the Bates numbers, 0007318, BRITALP

10    007319, BRITALP 0033247, BRITALP 0015872, 73, 74, 75, 76,

11    and 77.

12              These documents were accompanied by a declaration

13    by Mr. Ainsworth, Mr. Paul Ainsworth, stating that the

14    BRITALP 007318 contained information prepared at the request

15    of Clorox in-house counsel in order to provide legal advice

16    regarding this investigation, and that the other documents

17    are substantially similar.

18              This declaration was prepared by Mr. Ainsworth at

19    my request pursuant to Order No. 22, and I just gave you

20    paragraphs -- or I'm referencing paragraphs 2 and 7.

21              So these documents are privileged, but -- well,

22    they're not privileged by the attorney-client privilege.

23    They are work product.  They are protected by the work

24    product doctrine under Federal Rules of Civil Procedure

25    26(b)(3).
```

1       We're not entirely sure why these were required

2  or requested by Respondents, but they are protected, and

3  they do not need to be disclosed.  And we also have

4  substantiating case law to support that.

5       MS. SIMMONS:  Thank you, Your Honor.  I don't

6  believe we've received that declaration.  Is this --

7       JUDGE MCNAMARA:  You did not.  This was part of

8  an in-camera inspection.

9       So, Mr. Ainsworth, do you mind if the declaration

10  is disclosed?

11       MR. AINSWORTH:  I don't believe I have an

12  objection to that, Your Honor.  Let me just double-check

13  what I put in my declaration.  I don't think I revealed

14  anything beyond what you had said, Your Honor.

15       Yes, we don't have an objection.  I can produce

16  that declaration to Respondents.

17       JUDGE MCNAMARA:  Okay.  What I would like to do

18  actually, I'll submit a written order on this with precedent

19  substantiation.  And, by the way, these documents were

20  identified on the privilege log as protected by

21  attorney-client privilege, but we don't think that's

22  accurate.  It's more accurate to have described them as work

23  product, attorney work product.

24       MR. AINSWORTH:  Okay.

25       MS. SIMMONS:  Sorry.  Since the only privilege

1   that we've seen is attorney-client privilege --

2              JUDGE MCNAMARA:  It doesn't matter.

3              MS. SIMMONS:  Okay.

4              JUDGE MCNAMARA:  It does not matter.  I'm taking

5   judicial notice of the fact that these are properly

6   protected documents under the work product doctrine.

7              MS. SIMMONS:  Okay.  Thank you, Your Honor.

8              JUDGE MCNAMARA:  Okay.  And then we will get to

9   you -- we will talk to you this morning probably before or

10  after the break, more likely after the break, about the

11  motion to quash, and what the ruling on that is going to be

12  as well.

13             Okay.  So is Ms. Kahn available?

14             Before we get started, are there any other issues

15  that anyone would like to address?

16             Mr. Ainsworth, I can see you were getting ready

17  to speak.

18             MR. AINSWORTH:  I am, thank you, Your Honor.

19  Paul Ainsworth for Brita.

20             One housekeeping matter.  The parties have agreed

21  upon some deposition designations and documents to go in

22  with those designations.  Can we just submit a list of

23  those?  How would you like those submitted to Your Honor?

24             JUDGE MCNAMARA:  Well, I think, why don't you

25  just submit a joint list, make sure you file them on EDIS,

1  submit a copy to McNamara337, and we will -- one of the

2  parties can move to have those admitted into evidence as

3  part of anything we're doing this morning with respect to

4  yesterday's exhibits.  How would that work?

5        MR. AINSWORTH:  That works just fine.  Thank you,

6  Your Honor.

7        JUDGE MCNAMARA:  All right.  Is there anything

8  else, Mr. Ainsworth?  And notice I got your name correct

9  today.

10        MR. AINSWORTH:  Thank you, Your Honor.  Nothing

11  else from us today.

12        JUDGE MCNAMARA:  Great.  Mr. Swain, I can see you

13  were getting ready to speak as well.

14        MR. SWAIN:  I was.  Good morning, Your Honor.

15  How are you?

16        JUDGE MCNAMARA:  Very well.  Thank you.  How are

17  you?

18        MR. SWAIN:  Dr. Hatch is feeling slightly better,

19  but it's been touch and go.  And I spoke with -- well, over

20  email -- with Mr. Ainsworth last night, and I think we are

21  close to presenting a structure whereby Drs. Hatch and

22  Freeman can testify in a continued hearing sometime, we're

23  looking maybe in September, but I need to finalize, the most

24  important dates are your dates Your Honor where you might be

25  able to hold a day hearing for that.  But I do want to talk

1    to Mr. Ainsworth on the next break just about the parameters

2    of that, but I think the general structure of Dr. Hatch and

3    Dr. Freeman testifying at a later date, I think that's been

4    agreed upon.

5              JUDGE MCNAMARA:  I think that's great, and I

6    think that's the right way to go.  Nobody who is ill or

7    feeling ill should ever testify.  When I was at Social

8    Security there would be people coming in who I was pretty

9    sure lacked the mental focus and capacity to testify, and I

10   would not let them testify.

11             So what we'll do, we'll send you an email letting

12   you know my dates of availability.  I'll be out of pocket

13   for at least the first ten days of September.  And then

14   there are other dates when I will be out of state as well.

15   So we'll send you a list of dates when I'm available and

16   we'll set that up.  That won't be a problem.

17             MR. SWAIN:  That is very much appreciated,

18   Your Honor.  Thank you.

19             MR. AINSWORTH:  Thank you, Your Honor.

20             JUDGE MCNAMARA:  You're welcome.  Give Mr. Hatch

21   our best, or Dr. Hatch our best.  I hope he gets well soon.

22             MR. SWAIN:  Certainly, Your Honor.

23             And I believe where we left off, Your Honor, was

24   Ms. Lauren Kahn, we were about to begin her

25   cross-examination, and it is my pleasure to present

1    Ms. Katherine Rubschlager from Alston & Bird to conduct that

2    cross-examination.

3            JUDGE MCNAMARA:  Very good.  Good morning,

4    Ms. Rubschlager.

5            MS. EVERETT:  Good morning, Your Honor.

6            JUDGE MCNAMARA:  Good morning.  And would you

7    both identify yourself for the record?  I know who you are,

8    but if you could do that.

9            MS. EVERETT:  Uma Everett on behalf of Brita.

10           JUDGE MCNAMARA:  Yes.  Thank you very much.

11                        LAUREN KAHN,

12           having been previously duly sworn and/or

13   affirmed on her oath, was thereafter examined and testified

14   further as follows:

15                     CROSS-EXAMINATION

16   BY MS. RUBSCHLAGER:

17      Q.   Welcome back, Ms. Kahn.  My name is Katherine

18   Rubschlager, and I represent the PUR Respondents.  Nice to

19   meet you.

20      A.   Nice to meet you too.

21      Q.   Yesterday you testified about the Brita legacy

22   and Brita Elite filters.

23           Those are the only two gravity-fed water filters

24   that Brita sells, correct?

25      A.   No, we also sell a Brita stream filter.

1      Q.   But the Brita stream filter is a different filter

2 than the Longlast filters that are at issue in this

3 investigation, correct?

4      A.   Correct.

5           (Clarification by the reporter.)

6           MS. RUBSCHLAGER:  Thank you, Ms. Kinkade.

7      Q.   That is better.  I was having trouble hearing you

8 as well.

9           And the legacy filter is Brita's standard white

10 filter, correct?

11      A.   That's correct.

12      Q.   And just to be clear, Brita Elite filter was

13 previously called the Longlast+, correct?

14      A.   Yes.

15      Q.   And before that the Longlast+ was called the

16 Longlast, right?

17      A.   Right.

18      Q.   So I want to talk about the packaging of Brita's

19 Longlast+, Elite, and then the legacy filter.  Is that

20 right?  Is that okay?

21      A.   Yes.

22      Q.   Can I please have the ELMO?

23           Now, Ms. Kahn, do you see the chart I have up

24 here for you?

25      A.   Yep.

```
 1          Q.   And I would love your help filling out this
 2     chart.  So I have a column here on the left for the Brita
 3     legacy filter and then a column here on the right for the
 4     Brita Longlast+ and Elite filters.
 5               Do you see that?
 6          A.   I do.
 7          Q.   Now the packaging for the Brita legacy filter
 8     does not include a lead claim, correct?
 9          A.   Yeah.  You're talking about our current
10     packaging, current product, yes?
11          Q.   Correct.
12          A.   No, it does not.
13          Q.   And in fact the legacy filter is not certified to
14     remove lead, correct?
15          A.   It is not.
16          Q.   But the Longlast+ or Elite filter, the packaging
17     does advertise that the filter removes lead, correct?
18          A.   Yes.
19          Q.   And the packaging of the Brita legacy also
20     advertises a lifetime of about two months, which is roughly
21     40 gallons, correct?
22          A.   Correct.
23          Q.   And for the Brita Longlast or Elite filter, Brita
24     advertises a lifetime of 120 gallons, right?
25          A.   Right.
```

```
 1              JUDGE MCNAMARA:  Ms. Rubschlager, make sure that
 2     you are -- that you label this document as a demonstrative.
 3              MS. RUBSCHLAGER:  It will be demonstrative
 4     RDX-0020C for the record.  Thank you for the reminder,
 5     Your Honor.
 6              JUDGE MCNAMARA:  Thank you.
 7              MS. RUBSCHLAGER:  And I would also like to go on
 8     the confidential record for the next few questions, if
 9     that's okay.
10              (Whereupon, the hearing proceeded in confidential
11     session.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Appx22289-22290 redacted in their entirety

```
 1                    O P E N   S E S S I O N

 2

 3              JUDGE MCNAMARA:   Okay.

 4     BY MS. RUBSCHLAGER:

 5         Q.   Now let's switch gears and talk about the '141

 6     patent.

 7              Brita does not market to consumers that the

 8     Longlast filters are covered by the '141 patent, right?

 9         A.   It's not exactly that clear-cut.

10         Q.   But nowhere on the packaging is FRAP, correct?

11         A.   The word FRAP does not appear on the packaging.

12         Q.   And the Longlast packaging does not advertise the

13     product's actual flow rate, correct?

14         A.   No, we don't talk about flow rate on the

15     packaging.  We talk about flow rate sometimes in other

16     marketing materials.

17         Q.   Flow rate is important to consumers, right?

18         A.   It is.  It's important to their usage experience.

19     It's more meaningful in the experience than it is in sort of

20     talking about it.  I think it's hard for consumers to

21     understand what a flow rate is in terms of numbers.  It's

22     kind of better understood in how they experience the

23     product.

24         Q.   And consumers want a fast flow rate, is that

25     fair?
```

1      A.    Yeah, typically consumers want their -- they
2  don't want to wait around forever for their water.  They
3  want to be able to kind of fill up the pitcher and drink the
4  water relatively quickly.
5      Q.    And consumers also want a longer lifetime for a
6  filter; is that right?
7      A.    You know, I think the way a consumer would talk
8  about it is they have to change the filter less often or
9  they have to buy less filters per year.
10     Q.    And that equates to having a filter that lasts
11 longer, correct?
12     A.    Correct.
13     Q.    And the main focus of the Longlast was its long
14 lifespan, correct?
15     A.    When it was launched, yes.
16     Q.    And, Ms. Kahn, there were problems with the
17 Longlast after it was launched in 2017; isn't that right?
18     A.    Yes.
19     Q.    And that's because the Longlast filter was
20 experiencing flow rate issues, correct?
21     A.    Yes.  Before my time on the business, but what I
22 understand is that there were certain circumstances under
23 which the flow rate was not performing as it was intended
24 to.
25     Q.    And that was the technical issue you testified

1    about yesterday, correct?

2         A.   That's correct.

3         Q.   And consumers, in fact, complained about the

4    problems that they were experiencing with the flow rate,

5    correct?

6         A.   Right.

7         Q.   And since then the flow rate issues have been

8    fixed, right?

9         A.   Yes, they were finally resolved with the latest

10   product improvement that moved us to the Longlast+ branding.

11        Q.   So what you're telling me is that the current

12   Longlast Elite has a different flow rate than the 2017

13   version -- excuse me -- that was released, correct?

14        A.   I don't know if I would quite put it that way.

15        Q.   But the flow rate -- the 2017 version was having

16   flow rate issues, correct?

17        A.   Right.

18        Q.   And the current models are not having those flow

19   rate issues, correct?

20        A.   Right.

21        Q.   And during that time the flow rate issues have

22   changed, I mean, have been resolved, so the flow rate has

23   changed, correct?

24        A.   No, I wouldn't put it that way.

25        Q.   So I want to make sure I have this right.  Brita

1  advertises lifetime and about the flow and a lead claim on

2  the packaging for the Longlast+ and Elite but no FRAP,

3  right?

4      A.  The word "FRAP" is not on the packaging.

5      Q.  And, of course, Brita does not advertise an

6  expiration date for its filters, right?

7      A.  We do not.

8      Q.  And that's because Brita's filters do not have a

9  shelf life, do they.

10     A.  I'm not -- I'm not totally aware that they have a

11 shelf life.  I think it probably depends on the condition in

12 which they're stored.

13     Q.  And Brita advertises on its website that the

14 shelf life of the filters is indefinite; is that correct?

15     A.  I think, yes.  I think it is caveated with, like,

16 how they're stored.  I don't think it's just indefinite.

17     Q.  Let's pull up RX-1572.

18         And, Ms. Kahn, at the bottom of the page, do you

19 see brita.com, www.brita.com?

20     A.  Yes.

21     Q.  And this is a printout of Brita's Frequently

22 Asked Questions from its website, correct?

23     A.  That's correct.

24     Q.  This question asks:  Do unused filters expire?

25 Do you see that?

```
1        A.   I do.

2        Q.   And I'm going to read the answer to this

3    question, and all I want you to do is to confirm that I read

4    it correctly.  Is that fair?

5        A.   Sure.

6        Q.   "The shelf life of an unused Brita filter is

7    indefinite as long as its pouch is intact and sealed."

8             Do you see that?

9        A.   I see that.

10       Q.   And I read that correctly?

11       A.   You did.

12       Q.   We can take that down.  Let's pull up RX-1573.

13            And this is another printout from Brita's

14   Frequently Asked Questions?

15       A.   Correct.

16       Q.   Is that correct?

17            JUDGE MCNAMARA:  I'm sorry.  Could you pull that

18   up a little more so I can see that?  I'm also looking at the

19   primary document that says Frequently Asked Questions.

20   Could you just blow that up a little bit so I can see the

21   questions before you get to the specific questions?

22            MS. RUBSCHLAGER:  Absolutely, Your Honor.

23            Can we blow this up a little more, Mr. Kotarski?

24   Thank you.

25            Is that better, Your Honor?
```

```
 1              JUDGE MCNAMARA:  Yes.  Thank you.  I just wanted
 2    to see what this was saying generally.  Go ahead,
 3    Ms. Rubschlager.
 4              MS. RUBSCHLAGER:  Thank you, Your Honor.
 5         Q.   Now looking at the bottom of page 1 and on to
 6    page 2, and there's a question there in blue, and it's kind
 7    of cut off, but it says:  What is the shelf life of a Brita
 8    filter?
 9              Do you see that?
10         A.   I do, yes.
11         Q.   And, again, I'm just going to ask you that I read
12    the answer to this question correctly, Ms. Kahn.  Is that
13    okay?
14         A.   Okay.
15         Q.   "The shelf life of an unused, sealed filter is
16    indefinite.  Filters should be kept in a sealed Brita bag
17    and stored in a cool, dry place until you're ready to use
18    it."
19              Did I read that correctly, Ms. Kahn?
20         A.   Yes, you did.
21         Q.   So Brita advertises that the shelf life of a
22    Brita filter is indefinite so long as it's unused and
23    sealed, correct?
24         A.   Yeah.  I think unused, sealed, and then stored
25    kind of in the right conditions.
```

 1      Q.   And if someone were to say that Brita's filters
 2  found on a shelf in a storage room stored in the right
 3  conditions has somehow expired, that would be incorrect,
 4  right?
 5      A.   I mean, it certainly wouldn't be aligned with
 6  this statement.
 7      Q.   Thank you for clarifying that for the court.
 8           MS. RUBSCHLAGER:  And I pass the witness.
 9           JUDGE MCNAMARA:  Thank you, Ms. Rubschlager.
10           Is there another counsel for any of the
11  Respondents who would like to ask questions at this point?
12           MS. RUBSCHLAGER:  There is not.  Just me today,
13  Your Honor.
14           JUDGE MCNAMARA:  Thank you very much.  Okay.
15           Ms. Everett, do you have any redirect?
16           MS. EVERETT:  Just a short amount, Your Honor.
17                     REDIRECT EXAMINATION
18  BY MS. EVERETT:
19      Q.   Ms. Kahn, do you recall Ms. Rubschlager asking
20  you questions about the flow rate of the Longlast filter?
21      A.   I do, yeah.
22      Q.   And she asked you some questions about the
23  quality or technical issues associated with that filter?
24      A.   Yes.
25      Q.   Do you understand why -- what went on?  Is

1    there -- was there something with a filter itself?  Why did

2    the Longlast have these issues?

3        A.   Yeah.  My understanding is that the filter was

4    designed to have a certain flow rate, but then under certain

5    water conditions that people were experiencing in their

6    home, that there was a manufacturing issue that was causing,

7    like, air bubbles to form in the filter, and that was

8    slowing the water down.

9        Q.   So it wasn't an issue with every filter, right?

10       A.   No.  No, it was like very select water

11   conditions, but in those water conditions the filter was

12   failing to perform as designed.

13           MS. EVERETT:  No further questions, Your Honor.

14           JUDGE MCNAMARA:  I do have a follow-up on this

15   one, Ms. Kahn.

16   BY JUDGE MCNAMARA:

17       Q.   What were the water conditions in the residential

18   areas that were causing these problems, if you know?  And

19   presumably you did do some -- obtain some consumer feedback

20   on this.

21       A.   We certainly got consumer feedback on it.

22   Unfortunately, Your Honor, I don't know the exact technical

23   issues that were happening in those water conditions.  I

24   just know that it was not a broadly experienced problem, but

25   where it was experienced it was, you know, very

1    dissatisfying.

2        Q.   Can you find out what that information was,

3    please?

4        A.   Sure, I can.  Yeah.

5        Q.   Yeah, I would like that.  And I would also like

6    to know how widespread the problem was.

7        A.   Okay.

8        Q.   In other words, whatever metrics you have, and I

9    don't want to limit this, on just the nature of the problem

10   and how widespread it was and where it was.  And, again,

11   what the exact conditions were.

12       MS. EVERETT:  Your Honor, how would you like us

13   to get that information back to you?

14       JUDGE MCNAMARA:  That's a good question.  It

15   should come with an affidavit by -- it should be accompanied

16   by an affidavit of someone who has knowledge of the

17   collection of this information, and whoever reviewed it, and

18   what steps were taken, then, to deal with the problem, and

19   it should be an unequivocal declaration of a person with

20   knowledge or persons with knowledge, and how the data were

21   collected contemporaneously.

22       MS. EVERETT:  Thank you, Your Honor.  We will

23   look into that and submit that affidavit.

24       JUDGE MCNAMARA:  I appreciate that.  Thank you.

25       Again, along with whatever information was

1    collected and how it was collected and stored.

2              MS. EVERETT:  Thank you, Your Honor.

3              JUDGE MCNAMARA:  Okay.  Thank you very much,

4    Ms. Everett.  Good question.

5              Okay.  Ms. Rubschlager, do you have any recross?

6              MS. RUBSCHLAGER:  Your Honor, can I please have

7    one minute to confer with my co-respondents?

8              JUDGE MCNAMARA:  Sure.

9              MS. RUBSCHLAGER:  Thank you.

10             Your Honor, no recross from me.  Thank you.

11             JUDGE MCNAMARA:  All right.  Thank you very much.

12             Ms. Kahn, I think you can step down.  Thank you.

13             THE WITNESS:  Thank you very much.

14             JUDGE MCNAMARA:  All right.  Mr. Ainsworth, who

15   are you calling next?  I notice things were a little bit

16   taken out of order from your trial statement.

17             MR. AINSWORTH:  We have changed one witness

18   around, but the next witness we'll be calling is

19   Mr. Nishijima.

20             JUDGE MCNAMARA:  Very good.

21             MR. AINSWORTH:  Your Honor, we're ready to

22   proceed.

23             JUDGE MCNAMARA:  Okay.  Very good.  Good morning,

24   Mr. Nishijima.  How are you?

25             THE WITNESS:  Hello.  Good morning, judge.

1          JUDGE MCNAMARA:  Could you kindly raise your

2     right hand.

3                         RICK NISHIJIMA,

4               having been first duly sworn and/or affirmed

5     on their oath, was thereafter examined and testified as

6     follows:

7          THE WITNESS:  Yes.

8          JUDGE MCNAMARA:  Please state your full name.

9          THE WITNESS:  Rick Nishijima.

10         JUDGE MCNAMARA:  Thank you.

11         Mr. Ainsworth, he is your witness.

12         MR. SWAIN:  Your Honor, before Mr. Ainsworth

13    proceeds, if we could go back on the public record.

14         JUDGE MCNAMARA:  Very good.  Thank you,

15    Mr. Swain, yeah.

16                      DIRECT EXAMINATION

17    BY MR. AINSWORTH:

18         Q.   Good morning, Mr. Nishijima.

19         A.   Good morning.

20         Q.   Where are you presently employed?

21         A.   I'm employed with the Clorox Company.

22         Q.   And how long have you been with the Clorox

23    Company?

24         A.   Roughly 26 years.

25         Q.   And what division of the Clorox Company are you

1    employed with?

2        A.    Brita research and development.

3        Q.    And how long have you been with Brita research

4    and development?

5        A.    Around 24, 24 and a half years.

6        Q.    And prior to joining Clorox, what was your

7    educational background?

8        A.    I have a bachelor's degree in biology.

9        Q.    From what university?

10       A.    Sacramento State University.

11       Q.    What is your current title at Brita?

12       A.    My current title is principal scientist.

13       Q.    Would you describe your general responsibilities

14    as a principal scientist?

15       A.    Yeah.  I work on a lot of discovery and

16    innovation projects, translating consumer insights to

17    technical options.  I work closely with our marketing group,

18    and I also work with our scientists on their programs.

19       Q.    What types of analytical testing are routinely

20    done in the Brita R&D group?

21       A.    It's a wide range of water characteristic

22    testing.  We do pH, alkalinity, hardness, typical wet

23    chemistry is what it's called, and then we also do filter

24    performance testing.

25       Q.    Mr. Nishijima, do you have an understanding as to

1   why you're here today?

2       A.   My understanding to talk about the testing that

3   was done for this case.

4       Q.   And that was testing over which you were

5   responsible?

6       A.   I was overseeing the testing, yes.

7       Q.   And was there a project name or names for that

8   testing you did?

9       A.   Yes, we called that the FRAP testing.

10      Q.   Was there a second project?

11      A.   That second project we called the dispenser

12  testing.

13      Q.   Okay.  Let's start with the FRAP testing.

14           What were the circumstances under which you were

15  asked to perform FRAP testing?

16      A.   I was instructed by counsel to test certain

17  products under the protocol.

18      Q.   And do you have an understanding as to a patent

19  that that testing relates to?

20      A.   Yes, I understand it's the '141 patent.

21      Q.   Mr. Rennick, could we bring up JX-22, please.

22           Mr. Nishijima, do you recognize JX-22?

23      A.   Yes.

24      Q.   And what is JX-22?

25      A.   This is the Brita 141 patent.

1        Q.   Have you read the '141 patent?

2        A.   Yeah, I read it prior to doing some of the

3   testing for this case.

4        Q.   Do you know when you first became aware of the

5   '141 patent roughly?

6        A.   I would say roughly it would have to be after the

7   patent was granted.

8        Q.   What year was that from the date on the document?

9        A.   May 2012.

10       Q.   Did you personally have any involvement in the

11  drafting or prosecution of the '141 patent?

12       A.   No, I did not.  I was not on this program.

13       Q.   And did you have any involvement with the

14  development of technology described in the '141 patent?

15       A.   No, I was not on that project at all.

16       Q.   You can take that down, Mr. Rennick.

17            Mr. Nishijima, if you could just, at a high

18  level, describe the types of tests that were performed in

19  connection with what you called the FRAP project.

20       A.   Yeah.  At a high level, there are three main

21  tests we were doing.  We were doing a lead pH 8.5 water test

22  and then we were looking at the flow rates of the filters,

23  and then we also looked at the volume of the contents of the

24  filter.

25       Q.   So let's break that down.  For the first one you

1    mentioned you did testing with pH 8.5 lead challenge water.

2    Did I get that right?

3        A.    Yes, that's correct.

4        Q.    Could you provide a very brief summary of what

5    that test involves?

6        A.    Yeah.  It's a test where you take reverse osmosis

7    deionized water, you add some typical minerals that are

8    found in tap water, like calcium, magnesium, and other

9    things that add alkalinity, and then once you have that base

10   water characteristic made up, you also adjust the pH to that

11   8.5 range.

12          Once you have those base water characteristics

13   made up, you will add the lead solutions.  You first add an

14   insoluble -- sorry -- a soluble lead solution, and then you

15   let that equilibrate for a while, and then you add an

16   insoluble lead stock solution and let that mix, and then you

17   check the tank for parameters.

18       Q.    Thank you, Mr. Nishijima.  I would actually like

19   to go a level up.

20          When we talk about using pH 8.5 lead challenge

21   water, what are we using that water to do?

22       A.    That water is used to check the filter

23   performance for lead reduction.

24       Q.    And is using pH 8.5 lead challenge water a test

25   that has been performed routinely at Brita lab -- at the

1    Brita labs?

2        A.    Yes, it's one of the tests that's performed

3    routinely.  It's been a water contaminant that's been

4    around, and it's in the standard methods.

5        Q.    In connection with this testing, what -- were

6    there any standard procedures you followed for a pH 8.5 lead

7    challenge test?

8        A.    Yeah, we have an internal lab protocol, and we

9    also will reference the ANSI NSF Standard 53 standard.

10       Q.    And why did you -- how was the Brita standard

11   operating procedure or protocol prepared or developed?

12       A.    We developed it internally, but it's primarily

13   based on what is in the Standard 53 and with learnings from

14   our lab work.

15       Q.    You mentioned NSF/ANSI 53.  What is that?

16       A.    That's an industry standard that you can use to

17   certify your filtration products for certain claims,

18   claims -- performance claims.

19       Q.    For Brita's pH 8.5 lead challenge water standard

20   operating procedure, what is the target total of lead

21   concentration for that challenge water?

22       A.    The target total is, for total lead, we try to

23   target around 150 parts per billion.

24       Q.    And what do you target for the percentage of lead

25   that is total particulate?

1      A.   I believe it's around -- the parts per billion is
2  30 to 60 parts per billion.
3      Q.   And before doing this testing, did you compare
4  Brita's standard operating procedure for pH 8.5 lead
5  challenge testing to the claims of the '141 patent?
6      A.   Yeah, we referenced the makeup of the '141
7  patent.
8      Q.   How does the composition of lead and total lead
9  particulate -- strike that.
10      How does the composition of soluble and insoluble
11  lead in the '141 patent claims compare to your standard
12  operating procedure for pH 8.5 lead challenge testing?
13      A.   They are very similar targets because they are
14  based off the Standard 53.
15      Q.   If we can pull up JX-22.  And go to claim 1,
16  Mr. Rennick.
17      Mr. Nishijima, if I can just turn your attention
18  to the part of the claim that says, effluent concentration
19  lifetime, where it identifies the source water, do you see
20  that?
21      A.   Yes.
22      Q.   Is the challenge water that is prepared as part
23  of Brita's standard operating procedure for pH 8.5 lead
24  challenge water in accordance with the source water
25  definition there in claim 1?

1    A.    Yes.

2    Q.    You can take that down.

3         If we could just -- I think you already started

4    to do this, Mr. Nishijima -- if you could just explain the

5    process in the Brita lab for preparing the challenge water?

6    A.    Yeah, like I mentioned, we would start with a

7    condition tank, we would add reverse osmosis deionized water

8    to that tank.  We would add the base mineral salts to that

9    tank, make sure that they're in line with the

10   specifications.

11        And then we would add the lead solutions to the

12   tank, first the soluble lead solution and then the insoluble

13   lead solution.

14   Q.    In materials of the steps you followed for the

15   FRAP testing, did you follow that standard operating

16   procedure in terms of the components and ratios and

17   ingredients for the challenge water?

18   A.    Yes.

19   Q.    After you have prepared the challenge water, what

20   do you do to confirm that the challenge water is within the

21   specification of your standard operating procedure?

22   A.    So we take samples directly from the tank and we

23   analyze those on a piece of equipment that analyzes for

24   lead.

25   Q.    What is the name of that piece of equipment?

```
 1        A.    It's called a graphite furnace atomic absorption,
 2   GFAA.
 3        Q.    Why do you use a GFAA to measure the lead
 4   concentrations in the challenge tank?
 5        A.    It's one of the stated methods in the standard,
 6   and it's been an instrument used very routinely and for a
 7   long time for drinking water analysis.
 8        Q.    Does it have some advantages for testing for that
 9   particular type of testing?
10        A.    We use it to do the tank checks because, you
11   know, it's a time intensive process to make the tanks, and
12   the graphite furnace, we could efficiently calibrate that
13   while we're making the tank, so it's a good way to keep the
14   efficiency of the tank making process.
15        Q.    And how long does it take to prepare a tank of
16   challenge water for the pH 8.5 test?
17        A.    Anywhere between, you know, four and a half and
18   five hours.
19        Q.    Who was responsible for preparing the tank
20   challenge water for the FRAP project?
21        A.    Our master technician in our group, Kathy.
22        Q.    What is Kathy's last name?
23        A.    Kathy Szuch.
24        Q.    Would you spell that?
25        A.    S-Z-U-C-H.
```

1    Q.   How much experience does Ms. Szuch have in
2    preparing pH 8.5 challenge water at Brita?
3    A.   Kathy has been in Brita for over 20 years also,
4    and she has been making these challenge water tanks probably
5    most of her career, so a very long time.
6    Q.   If we could turn to CX-194.
7         Mr. Rennick, if we can blow this up?  It's a
8    little hard to read.
9         Mr. Nishijima, do you recognize CX-194?
10   A.   Yes, I do.
11   Q.   What is CX-194?
12   A.   These are what we call, you know, the bench
13   sheets for making the tank and the steps that we go through
14   and the values that we get when we check, as we're making
15   the tank.
16   Q.   Is this like the recipe for the challenge water?
17   A.   This is part of the recipe, more aspects of the
18   recipe are in the larger protocol, but, yes, this is a
19   recipe in addition to what the values are.
20   Q.   And these are the standard values used whenever
21   Brita makes a pH 8.5 lead challenge water?
22   A.   There's target values, but obviously when you
23   make a tank, each tank doesn't come out exactly the same for
24   all the water parameters, but we record the values here.
25   Q.   But the quantities and target ranges are the same

1   for whenever you do a pH 8.5 challenge water at Brita?

2       A.   Yes.

3       Q.   We can take that down, Mr. Rennick.

4           JUDGE MCNAMARA:  Can I ask a quick question here?

5           MR. AINSWORTH:  Of course, Your Honor.  I'm

6   sorry.

7           JUDGE MCNAMARA:  What happens --

8           MR. AINSWORTH:  Should we put the exhibit back

9   up?

10          JUDGE MCNAMARA:  No, that's fine.

11          What happens if the tank, as it's prepared, does

12  not meet the specifications or the target specifications?

13  Do you start all over again?

14          THE WITNESS:  It depends on where it is out of

15  specification.  If it's too low, it's usually easier to add

16  a little bit more of the constituents or things you need to

17  bring it up to the level.  If it's too high and over, that

18  would mean we would start all over.  We would drain the tank

19  and then start all over from the beginning.  So we would

20  check those and do that type of process.

21          JUDGE MCNAMARA:  Okay.  Thank you.

22          Thank you, Mr. Ainsworth.

23          MR. AINSWORTH:  Thank you, Your Honor.

24  BY MR. AINSWORTH:

25      Q.   Are you familiar with the term TDS?

```
 1        A.   Yes, I am.

 2        Q.   What is TDS?

 3        A.   TDS stands for total dissolved solids.

 4        Q.   And for the pH 8.5 lead challenge water used at

 5   Brita, is there a target TDS value?

 6        A.   Yeah, typical target TDS value is somewhere

 7   around or greater than 200 milligrams per liter.

 8        Q.   So, Mr. Nishijima, are you, having oversaw

 9   Ms. Szuch make the challenge water for the FRAP testing, are

10   you confident that the challenge water used in Brita's

11   testing was consistent with your standard operating

12   procedures?

13        A.   Yes, like I mentioned, Kathy has been making lead

14   water for a long time, so she always has a very consistent

15   methodology.

16        Q.   After the challenge water is made, let's go to

17   the next step of the challenge water test.  This may seem

18   like a very basic question, but what do you do with the

19   challenge water once it's made?

20        A.   So once the challenge water is made and

21   everything is checked to be okay, that's when we would start

22   introducing this challenge water or test water to the test

23   pitchers.

24        Q.   And I'm just a lay person, Mr. Nishijima.  When

25   you say introducing it to the test pitchers, what would you
```

1    do?

2        A.    So what we do is we would take the water and we

3    would fill a 1,000 milliliter graduated cylinder and then we

4    would hand pour that into the pitchers.

5        Q.    And after you hand poured the liter of challenge

6    water into the pitchers, what would you do?

7        A.    Well, one aspect I didn't mention, when we're

8    hand pouring, we also, as part of the flow rate testing, we

9    would start the stopwatch when we initiate the pouring

10   sequence, and then when the water has finished exiting

11   through the reservoir on the filter, we would stop the

12   stopwatch.

13       Q.    If we turn to CX-12 1C, Mr. Rennick, please.

14             Mr. Nishijima, do you recognize CX-121?

15       A.    Yes.

16       Q.    And, in general, what is this document?

17       A.    This is the written procedure for introducing

18   that test water to the pitchers.

19       Q.    And if you could put that down, Mr. Rennick.

20             If we could bring up CX-911.

21             Do you recognize CX-911?

22       A.    Yes, I do.

23       Q.    And what is CX-911?

24       A.    This is another hard copy bench sheet where we

25   would record the times from the stopwatch for each -- for

1    each test pitcher.

2        Q.    And so who did the recording of the times on

3    CX-911?

4        A.    Myself, scientist, and a technician in our group.

5        Q.    And if I understand your testimony correctly, you

6    would stand there with a stopwatch, click it when it --

7    describe the process one more time for us.

8        A.    Yeah.  So when we have that one liter graduated

9    cylinder, and as soon as we pour it into the pitcher

10   reservoir, as soon as the water hits the reservoir, we would

11   start the stopwatch, and then we visually observe when the

12   water last enters the entrance of the filter, and then we

13   would stop the stopwatch.

14       Q.    And if we look over, just so we can look at the

15   further right-hand column there, Mr. Rennick, there's a

16   label at the top of the column.

17           What is that label, Mr. Nishijima?

18       A.    Oh, the top of the table?  That's the description

19   of the pitcher type that we were testing and then a

20   numerical sample identification number.

21       Q.    So this one is labeled ZeroWater PB, so that

22   refers to ZeroWater filter?

23       A.    ZeroWater filter, yes.

24       Q.    And number 3, that's the sample ID you assign to

25   all the samples related to ZeroWater?

1      A.   For this particular one sample, yes, it was

2   number 3.

3      Q.   And when you say sample, you're referring to that

4   particular pitcher and filter?

5      A.   Yes.

6      Q.   Now if we look in your data here for ZeroWater,

7   the very first entry, there's an asterisk next to the time

8   entry.  Can you explain what that is?

9      A.   Yeah, that's an observation where the flow seemed

10  to have stopped flowing, and I think locked up.  So in order

11  to measure flow rate there needs to be flow through the

12  filter.  So the pitcher was slightly tapped by lifting it

13  and then putting it back down on the table.

14     Q.   When you say "tapped," were you slamming it on

15  the table?

16     A.   No, it would be like a consumer, if they took it

17  out of their refrigerator and set it down on the counter, it

18  would be a similar type of motion of setting it down onto a

19  kitchen counter.

20     Q.   And is that something you would have done before

21  in flow rate testing at Brita apart from FRAP project?

22     A.   Yes, if the flow is not flowing, you can't

23  measure flow, so that would be a typical practice we would

24  do.

25     Q.   If we scroll down a little further on this

1    column, Mr. Rennick, to just below June 2nd, 2021.

2          Do you see the entry where there's text written,

3    Mr. Nishijima?

4    A.    Yes.

5    Q.    And what does that say?

6    A.    That says "missed."

7    Q.    And what does that mean?

8    A.    So as we're doing these timings, there may be a

9    time where we have not caught the time frame of when the

10   last bit of water entered the filter.  So we're being

11   transparent and just said that we missed that flow time.

12   Q.    And is every time that you inadvertently miss a

13   flow time reflected on the -- in your data sheets?

14   A.    Yes.

15   Q.    We can take that down, Mr. Rennick.

16         Mr. Nishijima, did you have -- did you make the

17   determination as to what products would be tested as part of

18   the FRAP project?

19   A.    No, I didn't.  I was given a list of product by

20   counsel.

21   Q.    How did you determine the length of the test in

22   terms of total liters that would be introduced to each

23   particular product?

24   A.    We looked at the product packaging or literature

25   and looked for any reference to the filter capacity.

1      Q.   When you say filter capacity, does that have

2  another name that you sometimes use?

3      A.   Lifetime or gallon capacity.

4      Q.   Now when you were -- let's turn to the lead

5  testing portion of this analysis.

6           How often did you measure the lead concentrations

7  in the influent that was introduced to the pitcher and the

8  effluent that came out of the filter?

9      A.   Sorry.  Can you say the first part of the

10  question again?

11      Q.   Sure.  How often did you measure the lead

12  effluent concentrations that were in the influent that went

13  into the filter and the effluent that came out of the

14  filter?

15      A.   We would measure those when they came up at the

16  appropriate sample points.

17      Q.   And what are those sample points that you used?

18      A.   We used a startup sample for the first liter and

19  then 25, 50, 75, and 100 percent of the stated capacity.

20      Q.   And why did you select those particular sample

21  points for the FRAP project testing?

22      A.   Those are sample elements of what's in the

23  Standard 53 protocol.

24      Q.   How did you analyze the lead concentrations in

25  influent and effluent in your testing?

 1          A.   For those analyses, we used equipment called the

 2    ICPMS, or inductively coupled plasma mass spectrophotometer.

 3          Q.   Why did you use the ICPMS to analyze lead

 4    concentrations in the influent and effluent?

 5          A.   That's another method that is noted in the

 6    Standard 53 method table for analysis.  And ICPMS has a

 7    little bit more sensitivity in reading lower concentrations.

 8          Q.   If we could pull up Exhibit CX-912, please.  And

 9    this is really small, so let's blow up a portion of this.

10    There we go.

11               First of all, do you recognize Exhibit CX-912?

12          A.   Yes.

13          Q.   And what is, at a high level, what is the data

14    we're seeing on CX-912?

15          A.   This is the data that is captured by the ICPMS

16    instrument, and this table has been exported from the ICPMS

17    instrument into this table.

18          Q.   Okay.  And if we, just to sort of explain for Her

19    Honor what we're seeing on this page, if we look in the

20    sample name column, why don't we go down to sample 1, PUR

21    Pb.  Do you see that?

22          A.   Yes.

23          Q.   First of all, could you explain what that sample

24    name is referring to?

25          A.   So that was similar to what we looked at on that

1    one table where it's the sample ID pitcher 1 and it's the

2    PUR lead pitcher.  This is the effluent sample or the

3    filtered sample, and this is the first pour or the startup

4    sample.

5        Q.    And to find the lead concentration in the

6    effluent, which column would we go to for that particular

7    sample?

8        A.    We would go to where it says 208 Pb, the

9    concentration of lead.

10       Q.    Now if we can scroll down a little bit here on

11   this page.  Right there.

12             So we saw the influent for the PUR 1 first pour.

13   If we wanted to find the -- sorry.

14       A.    Effluent.

15       Q.    I got it backwards.  We just looked at what the

16   effluent was, the water that came out of the first pour on

17   the PUR sample 1, right?

18       A.    Yes.

19       Q.    If we wanted to look at what the influent was,

20   the total influent, where would we find that on this table?

21       A.    Those are listed starting under where it says

22   QCS, where it says influent, and then there's a 0.1 or a

23   0.45.

24       Q.    So --

25       A.    Yeah, right there.

1       Q.   Right there?

2       A.   Yes.

3       Q.   And I see there's influent .1, .45, 1.2, and

4   total.  Can you just briefly explain what each of those

5   correspond to?

6       A.   Yes.  The influent total is the straight sample

7   taken from the tank.  And then the other influents, at the

8   0.1 and so forth, those are the samples where that tank

9   sample is filtered through those size filters to get the

10  fractions of particles of lead, particulate lead.

11      Q.   So if we wanted to know the total lead in the

12  first pour in influent, where would we find that value in

13  the table?

14      A.   That would be the influent total under that same

15  column of 208.

16      Q.   So that would be 161.418?

17      A.   Yes.

18      Q.   Okay.  And just -- I think it would be helpful

19  for Her Honor to see, so that gets the total lead that went

20  in.

21           If we want to know the fraction of lead that is

22  insoluble in this particular pour, how would we do the math?

23      A.   So you would subtract the 0.1 micron value from

24  the total value.

25      Q.   So the first pour, 0.1, is 104.73?

```
 1        A.   Yes.
 2        Q.   And that -- does that correspond to the
 3   insoluble -- sorry -- does the 104.7395 correspond to the
 4   soluble lead in the influent?
 5        A.   Yes, because you've filtered out all the
 6   particles greater than 0.1.
 7        Q.   And so if we subtract 104 from 161, what does
 8   that give us -- don't need a number -- but what is the
 9   result -- what information does that give us about the
10   challenge water?
11        A.   That gives you the amount of total particulate
12   lead in the water.
13        Q.   Thank you.  And if we could -- if we were to do
14   that for every influent measurement and effluent measurement
15   that you took, that would all be contained in CX-910 for the
16   FRAP project?
17        A.   Yeah, this is 910, right?
18        Q.   Yes.
19        A.   Yes.
20        Q.   We can take that down, Mr. Rennick.
21             Turning to -- I think there was a third test that
22   you performed as part of the FRAP project you mentioned
23   measuring the volume of the filter media.
24        A.   Yes.
25        Q.   How did you measure the volume of the filter
```

1  media for the products that you were testing?

2     A.   So these filters, they have an external housing,

3  and the filter media is inside these housings, so we would

4  have to take a tool and carefully open up the filter

5  housing.  And then we would pour out a sample or we would

6  pour out the contents of that filter into a graduated

7  cylinder, carefully transfer it with a funnel, and then we

8  would do a volume measurement within the graduated cylinder.

9     Q.   If we could turn to CX-910.

10         Do you recognize CX-910?

11    A.   Yes.

12    Q.   And what is CX-910?

13    A.   This is my lab notebook.

14    Q.   And what information is reflected in these

15  excerpts from your lab notebook?

16    A.   These are the values that I recorded from the

17  volume testing and some photos of the grad cylinders.

18         MR. AINSWORTH:  And I may have to correct the

19  exhibit number, Your Honor.  I think I may have misspoke at

20  one point.  So let me just --

21         Your Honor, I think on the record I said the lead

22  data we were looking at was CX-912.  I said it was CX-910

23  when in fact it was CX-912.  I just wanted to make that

24  correction?

25         JUDGE MCNAMARA:  Thank you.

1         MR. AINSWORTH:  Got ahead of my notes.

2     Q.   Going back to the volume testing that you did,

3  Mr. Nishijima.  What was your objective in measuring the

4  volume of the filter media?

5     A.   To try to get as scientifically accurate a

6  measure of the volume of the media inside the filter.

7     Q.   And is using a graduated cylinder to measure the

8  volume of something like filter media a common practice?

9     A.   It's a typical practice for measuring volume.  We

10  do that with our filters.  And it has the volume graduations

11  listed on the grad cylinder, yes.

12     Q.   Did you also use the graduated cylinder to

13  measure the volumes of -- strike that.

14         Some of the projects you tested contained

15  granulated media or mixed media; is that right?

16     A.   Yes.

17     Q.   Did you also test filters that had other types of

18  filter media?

19     A.   Yes, there were some other nongranular or

20  irregular shaped filter material.

21     Q.   And you used the same technique for each type of

22  filter media material?

23     A.   Yes, for those we used the volume and the

24  graduated cylinder and looked at volume displacement.

25     Q.   Let's turn to the second set of tests you did,

1   what was called the dispenser project.  Do you recall

2   roughly the time frame when you did the --

3           We can take that down, Mr. Rennick.

4           Do you recall roughly the time when you did the

5   dispenser testing project?

6       A.  That was roughly June of 2022.

7       Q.  And what was the nature of the type of testing

8   done in connection with the dispenser testing project?

9       A.  That was similar testing to what we did with the

10  FRAP project with the lead 8.5 and test water and flow rate.

11      Q.  If you turn to CX-212, do you recognize CX-212?

12      A.  Yes.

13      Q.  And what is CX-212?

14      A.  That's the written procedure for testing and

15  introducing water for this dispenser test.

16      Q.  And if we go down under procedure a little bit,

17  under item 1, does that procedure III, item 1, lines (a) and

18  (b), what does that information indicate about the protocol?

19      A.  Those were the test pitcher or test samples that

20  we tested.

21      Q.  How did you obtain those samples?

22      A.  Those were shipped to us directly.

23      Q.  Who shipped them to you?

24      A.  I believe counsel shipped them to us.

25      Q.  I'm sorry.  Who?

    1          A.    Counsel.

    2          Q.    Counsel.  Item 4, do you see where it says

    3    "pouring"?

    4          A.    Yes.

    5          Q.    What information is indicated there?

    6          A.    That's how much water we poured into the test.

    7          Q.    And how much total water for this particular --

    8    for the dispenser testing were you asked to introduce?

    9          A.    It was a total of 20 liters.

   10          Q.    Mr. Nishijima, were you involved at all in the

   11    selection of the filters to be tested for the dispenser

   12    testing?

   13          A.    No, I was not.

   14          Q.    Were you involved in the decision to test only 5

   15    gallons or 20 liters as part of the dispenser testing?

   16          A.    No, I was not.  The protocol came from counsel.

   17          Q.    If we turn to CX-222 --

   18          JUDGE MCNAMARA:  Before we go on.  I'm sorry,

   19    Mr. Ainsworth, I have another question.

   20          Could you go back to the previous document, which

   21    is CX-212?

   22          Okay.  So this says "Attorney Client Work

   23    Product," yet I'm assuming you waived that and produced this

   24    document to the Respondents?

   25          MR. AINSWORTH:  Yes, Your Honor, this was

1   produced.

2          JUDGE MCNAMARA:  Okay.  And were you selectively

3   producing work product, or did you produce all of the

4   testing results?

5          MR. AINSWORTH:  Your Honor, we produced all of

6   the testing results from the FRAP project as well as the

7   dispenser project.

8          If I could clarify, Mr. Nishijima, out of an

9   abundance of caution, would label things attorney-client

10  work product, but we did not rely upon that and we produced

11  that information.

12         JUDGE MCNAMARA:  Okay.  Good.  When Mr. Nishijima

13  testified that counsel selected both which of the filters to

14  test and also the gallons per liter to test, I assume that

15  was your in-house counsel, or was it at your direction, your

16  team's direction?

17         MR. AINSWORTH:  It was at my team's direction,

18  Your Honor.

19         JUDGE MCNAMARA:  All right.  Thank you.  Go

20  ahead.

21     Q.   If we go back to CX-222, what are we seeing on

22  CX-222, Mr. Nishijima?

23     A.   So, again, these are the hard copy bench sheets

24  to record the times from the stopwatch.

25     Q.   And the protocol you followed for recording the

1    flurry times as part of the dispenser project was the same

2    procedure you used that we discussed before for the FRAP

3    project testing?

4        A.   Yes.

5        Q.   Okay.  And if we go now to CX-223, do you

6    recognize CX-223?

7        A.   Yes.

8        Q.   And what is CX-223?

9        A.   Again, this is the export of the data coming from

10   the ICPMS equipment.

11       Q.   And this is similar to the data we looked at on

12   the previous export?

13       A.   Yes, it is.

14       Q.   But this data relates to the testing you did as

15   part of the dispenser project?

16       A.   Yes, it is.

17       Q.   I just want to go back actually to one thing.  If

18   we go back to Exhibit CX-912.

19            Mr. Rennick, if you could blow up the top.  At

20   the top of the table there's a 206 Pb, 207 Pb, 208 Pb, just

21   blow that up for us.

22            Mr. Nishijima, does the ICPMS system produce all

23   this data out as part of its standard export?

24       A.   Yes.

25       Q.   For purposes of determining the levels of lead in

1    influent and effluent under your standard operating

2    procedure, which column do you look to?

3         A.   We look at column 208.

4         Q.   And why is that?

5         A.   That is recommended by Agilent, our equipment

6    manufacturer.  So that is what we use as their

7    recommendation as the equipment experts.

8         Q.   And that's the data you use whenever you do pH

9    8.5 lead testing as part of your normal work at Brita?

10        A.   When we use the ICPMS instrument, yes.

11        Q.   Thank you.  We can take that down, Mr. Rennick.

12             Earlier, Mr. Nishijima, you had mentioned the NSF

13   53 standard.  What was your involvement in the development

14   of the NSF 53 standard in 2007?

15        A.   I was part of a task force to look at the

16   optimization of that standard for lead pH 8.5.

17        Q.   What were the years that you recall being

18   involved with the task force?

19        A.   It was so long ago, I would say around the end of

20   2004 or 2005 time frame.

21        Q.   And how did you contribute and participate with

22   the task force?

23        A.   One way we contributed was we were providing lab

24   support for any testing that was required from the task

25   force and also to provide any other technical information on

1    how we might be testing in our laboratories.

2         Q.   At the time that you were on the NSF task force,

3    do you recall ever being advised or informed of the

4    existence of any patent policy pertaining to your

5    participation on the task force?

6         A.   No, I don't recall that.

7         Q.   And at the time that you were involved on the NSF

8    task force, do you believe you were aware of the existence

9    of the '141 patent or any applications relating to the '141

10   patent?

11        A.   No, I was not aware.

12        Q.   Mr. Nishijima, did anyone at Brita ask you to try

13   and modify the NSF standard, draft standard, in order to get

14   patent claims covering them?

15        A.   No, not at all.

16             MR. AINSWORTH:  Mr. Nishijima, we have no further

17   questions.  Thank you.

18             We pass the witness, Your Honor.

19             JUDGE MCNAMARA:  Okay.  Thank you.  I was just

20   looking at the transcript.

21             All right.  Mr. Swain, who will be

22   cross-examining Mr. Nishijima?

23             MR. SWAIN:  That would be me, Your Honor.  Good

24   morning again.

25             JUDGE MCNAMARA:  Good morning.

```
 1                    CROSS-EXAMINATION
 2  BY MR. SWAIN:
 3      Q.   Good morning, Mr. Nishijima.  It's good to see
 4  you again.  How are you?
 5      A.   Good morning, Mr. Swain.
 6      Q.   And I'm just waiting for my tech to adjust a
 7  couple things and we can begin.
 8           I'll ask you, Mr. Nishijima, can you see and hear
 9  me okay?
10      A.   Yes, I can.
11           MR. AINSWORTH:  Thank you.  Mr. Nishijima, I need
12  to go right on to the Brita confidential record before I
13  begin your examination, if that's quite all right.
14           (Whereupon, the hearing proceeded in confidential
15  session.)
16
17
18
19
20
21
22
23
24
25
```

Appx22331-22386 redacted in their entirety

```
 1                    O P E N   S E S S I O N

 2

 3            JUDGE MCNAMARA:  Okay.  Thank you.

 4   BY MR. BRANDYBERRY:

 5       Q.   Now, Mr. Nishijima, I think I heard you say that

 6   you were not aware of the '141 patent or related

 7   applications during the time frame when you served on NSF

 8   task groups; is that accurate?

 9       A.   Yes, that's correct.

10       Q.   Okay.  You're aware that the NSF launched two

11   task groups to look at changes to the NSF Standard 53 for

12   lead reduction at 8.5 back in the 2004 and 2005, 2006, 2007

13   time frame, correct?

14       A.   It's been so long ago, I don't know the exact

15   number.  I know I participated on the one task force, and I

16   think that was what we talked about in the opening around

17   that time frame of the '04-'05.

18       Q.   Let me see if I can help you here.  Was there a

19   plumbed-in task group and a gravity feed task group that NSF

20   formed during that time period?

21       A.   Yeah, again, it was so long ago, I don't know the

22   time frames, but there was a gravity task force that was

23   formed later, and looking back at some of the documents it

24   looks like I was a participant in that task force for a

25   while.
```

1      Q.   Okay.  And let's pull up RX-0599.

2           Do you see here we've got a Meeting Summary from

3   October 4th, 2006, do you see that, Mr. Nishijima?

4      A.   Yes.

5      Q.   And this is a conference call on Standard 53,

6   gravity feed, lead reduction pH 8.5.  Did I read that

7   correctly?

8      A.   Yes, that's what it says.

9      Q.   Okay.  And so at least in October of 2006 you're

10   serving on the gravity feed task force at NSF, correct?

11      A.   On this date, yes, I participated.

12      Q.   And we know that because we see your name, Rick

13   Nishijima, Brita Clorox, correct?

14      A.   Yes.

15      Q.   And this is a meeting summary.  Do you see the

16   first thing they did here?

17           Let's go up a little bit.  Mr. Kotarski, if we

18   can go up to where it says "Steve, committee chair."

19           I guess there was a welcome.  What do they do

20   after they welcomed the group?

21      A.   It says there was an antitrust statement read.

22      Q.   It said the antitrust statement was read by Rick

23   Andrew, right?

24      A.   Yes.

25      Q.   Let's go to RX-1916, please.

1          And, again, we've got another meeting summary
2    here from August 4th, 2005, correct?
3          A.   Yes.
4          Q.   But this one is the plumbed-in lead reduction
5    task group at pH 8.5, correct?
6          A.   Yes, that's what the document says.
7          Q.   And after Mr. Herman welcomed the group, what's
8    the first thing he did?
9          A.   Antitrust statement was read.
10         Q.   Okay.  And so it appears that you were on both
11   the gravity feed and the plumbed-in task groups during this
12   time period, at least up through 2006, right?
13         A.   That date in 2006, yes.
14         Q.   Okay.  Do you recall serving on any task groups
15   after 2006?
16         A.   Yeah, like I mentioned, when looking back at some
17   of the other documents, I think there was another lead task
18   force brought together again in, I think, 2011 or something
19   like that.
20         Q.   Let's go to RX-2066.
21              And we're we've got a task group meeting, this is
22   lead at 8.5 from October 27th, 2011, correct?
23         A.   Yes.
24         Q.   And there you are attending for Clorox, correct,
25   Mr. Nishijima?

1      A.   Yes.

2      Q.   So it wasn't just in '05 -- '04 and '05.  You

3  were on these task groups up through 2011 at least, right?

4      A.   Not continually.  I think this one later in 2011,

5  there's a big gap between the two task force years.  So I

6  wasn't on a task force from '05 all the way up through 2011

7  continuously.  I think this one got restarted around this,

8  this time frame.

9      Q.   Do you know who Jonathan McDonald is?

10     A.   Yeah, he was an employee in our Brita R&D group.

11     Q.   Do you know if Mr. McDonald participated in any

12  NSF task groups representing Brita?

13     A.   It looks like he participated in this one, and I

14  believe he participated in some other ones, but, based on

15  this document, he is participating in this task force.

16     Q.   Okay.  And let's pull up RX-2131.

17          And here we've got a task group at lead 8.5 from

18  September 10th, 2012, correct?

19     A.   Yes.

20     Q.   And there's not a lot of participants on this

21  one, but Mr. McDonald is on it, right?

22     A.   Yes, he is.

23     Q.   And you said earlier today that you learned of

24  the '141 patent shortly after it issued in May 2012, right?

25     A.   As best as I recall, that's when I was aware of

1    it.

2        Q.    Now earlier today I think, please correct me if

3    I'm wrong, but I believe you said that you were not involved

4    in the development of the subject matter related to the '141

5    patent; is that correct?

6        A.    That's correct.  I was not a member of that

7    project team.

8            MR. BRANDYBERRY:  And at this point we'll need to

9    go on the Brita CBI record.

10            (Whereupon, the hearing proceeded in confidential

11    session.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22392-22413 redacted in their entirety

```
 1                    O P E N   S E S S I O N

 2

 3                    REDIRECT EXAMINATION

 4   BY MR. AINSWORTH:

 5       Q.   Mr. Nishijima, I know it's been a long day.  I'll

 6   try to not keep you much longer.

 7            You were asked some questions about your flow

 8   rate testing by counsel.  Do you recall that line of

 9   questions?

10       A.   Yes.

11       Q.   There were a lot of questions.

12       A.   There were a lot of questions.

13       Q.   If we could pull up CX-911 at page 5.

14            And it will be up on the screen in front of you,

15   Mr. Nishijima.

16       A.   Okay.

17       Q.   On the right-hand side, do you recall being asked

18   questions about the ZeroWater data?

19       A.   Yes.

20       Q.   Mr. Nishijima, was there ever a situation when

21   you were doing the flow rate measurements -- back up.

22            So after you poured the liter into the top

23   reservoir of the pitcher and the water filters out into the

24   lower reservoir, what do you do after that?

25       A.   What do --
```

```
 1        Q.   After the water is all filtered into the lower
 2   reservoir.
 3        A.   Before the next fill, we would pour that -- we
 4   would pour the pitcher.
 5        Q.   You would empty the pitcher before you put in the
 6   next?
 7        A.   Right.
 8        Q.   Was there a situation where the technician or
 9   yourself or whoever was doing the work forgot to empty out
10   the reservoir, the lower reservoir?
11        A.   Yeah, that's the one here where it's noted on No.
12   53, and it is actually still liter 53 because really we just
13   poured the liter on top of the liter that was already in
14   there.
15        Q.   So if there was some confusion in the record on
16   this issue --
17        A.   Yes, sir.
18        Q.   -- Mr. Nishijima, for the total number of liters
19   that were actually filtered through the ZeroWater filter, in
20   terms of total effluent -- can we go to the bottom -- what
21   was the total number of filter liters?
22        A.   It was the 76 liters.
23        Q.   And just to go back up, so when that -- you
24   called it a "2 fill" -- what happened when you realized
25   there was a 2 fill?
```

1          A.    When -- the 2 fill meant that we forgot to dump

2     that one, as we were just talking.  So we just noted the

3     time and noted it as a 2 fill, and then once that event was

4     done where the two fills were in the pitcher, we dumped that

5     out and then that started the next cycle.

6          Q.    Thank you, Mr. Nishijima.

7          A.    I need to shorten my name.

8          Q.    I get tongue-tied sometimes.  My apologies.

9                Let's turn to RX-432.  If we can turn to page 2,

10    Mr. Rennick, and it's under bullet point 2.

11               Do you recall being asked some questions by

12    Mr. Swain about the percent fines in the protocol for the

13    challenge water?

14         A.    Yes.

15         Q.    And the values we're seeing here for percent

16    fines on non-sample days of greater than or equal to 35

17    percent, that's from the Brita protocol, right?

18         A.    Yes.

19         Q.    And below that on sample days, again, above or

20    equal to 37 fines, that's Brita's protocol?

21         A.    Yes.

22         Q.    I want to turn you to now to CX-10.

23               Do you recognize CX-10, Mr. Nishijima?

24         A.    Yes, that's Standard 53 2007.

25         Q.    And you're familiar with this standard?

1          A.    I mean, it's an older standard, so I'm familiar

2    with the Standard 53 in general.

3          Q.    And we've talked about it a bit today.

4          A.    Yes.

5          Q.    If we can turn to page 80 of the standard.  So

6    page 80 of CX-10.

7               Let's try CX- -- go to CX-11.  I think it was --

8    and go to page 12.  We're on page -- Exhibit 11, page 12.

9               Mr. Nishijima, do you recognize the information

10   on this page?

11         A.    Yes, this is the table of the allowable lead

12   values and what's written in the standard.

13         Q.    And this is the lead specifications for the NSF

14   53 standard?

15         A.    Yes, it is.

16         Q.    And on the table, do you see where there's three

17   rows labeled "lead"?

18         A.    Yes.

19         Q.    Does one of those relate to the requirement for

20   fine particulate?

21         A.    Yes, it's lead percent Pb f.

22         Q.    So that's lower --

23         A.    Lower case f.

24         Q.    So for the NSF standard, what percentage do you

25   need to be above for the NSF standard for fine particulate?

1      A.   Greater than or equal to 20 percent.

2      Q.   So where Mr. Swain indicated in at least one

3    example that -- sorry, strike that.  Withdraw that question.

4           So you could be somewhat below Brita's

5    specification for the challenge water but still be above the

6    NSF standard for fine particulate; is that right?

7      A.   Yes, with this value noted here of greater than

8    or equal to 20 percent, yes.

9      Q.   We can take that down, Mr. Rennick.  Actually,

10    no, bring it back up.  One more question on this one.

11           And then if we zoom back out, Mr. Rennick,

12    please, and go to, I think it's footnote 2.  It's in the

13    table, footnote 2.

14           Do you recognize footnote 2, Mr. Nishijima?

15      A.   Yes, it's part of the table and the footnote to

16    the lead numbers.

17      Q.   And what does footnote 2 indicate about the lead

18    challenge testing of pH 8.5 under the NSF standard?

19      A.   This is a footnote for the fines particulate.  So

20    it says, a maximum of one sample point, influent and

21    effluents, if present, may be discarded if these

22    requirements are not met; the discarded sample cannot be the

23    final capacity sample point of the test (120 or 200

24    percent).

25      Q.   And you say this was the footnote for the fine --

1    actually go up to the top of the table one second and look

2    at rows 2 and 3 for lead.

3            Footnote 2 is for both entry 2 and entry 3,

4    right?

5        A.   Yes.

6        Q.   And entry 2, what is that?

7        A.   That is the total particulate.

8        Q.   Okay.  So going back to footnote 2, for both fine

9    particulate and total lead or total particulate, what does

10   the NSF standard allow you to do if you have one sample

11   point that is out of specification for influent or effluent?

12       A.   You can discard that sample point.

13       Q.   And continue the test?

14       A.   Yes.

15       Q.   So earlier -- we can take that down -- earlier

16   when you were shown a sample point from one of your testings

17   that was slightly above 10 parts per billion -- do you

18   recall that?

19       A.   One of the --

20       Q.   Let me withdraw the question.

21            Do you recall being shown data from your test

22   results where one of the samples was above 10 parts per

23   billion?

24       A.   Oh, yes, I do recall that.

25       Q.   And under the NSF standard, if that was just one

1    of the sample points and not the last one, you could be

2    permitted to discard that and continue with the test; is

3    that right?

4        A.   I believe so, yes.

5            MR. AINSWORTH:  Your Honor, could I just have one

6    second?

7            JUDGE MCNAMARA:  Sure.

8            MR. AINSWORTH:  Your Honor, we have no further

9    questions.

10           JUDGE MCNAMARA:  Okay.  Thank you very much,

11    Mr. Ainsworth.

12           Mr. Swain, do you have any recross-examination or

13    do any members or do any of the Respondents, to your

14    knowledge?

15           MR. SWAIN:  I have a couple brief questions,

16    Your Honor, just about what Mr. Ainsworth just asked.

17                         RECROSS-EXAMINATION

18           MR. SWAIN:  Could I have the NSF standard back

19    up, CX-11.12.

20    BY MR. SWAIN:

21        Q.   Mr. Nishijima, you just testified that you know

22    the NSF 53 standard very well, right?

23        A.   I'm familiar with it.  I don't know every single

24    footnote or every single number in there by heart.  I

25    apologize for that.

1    Q.   That's right.  Well, at least you know in Table

2    14 the maximum effluent concentration requirement is there

3    in that first row marked lead Pb sub-t.  Do you see that?

4    A.   I see it on the screen.

5    Q.   And, Mr. Nishijima, you know that that is the

6    requirement of NSF 53 2007 that requires the points to be

7    below 10 ppb at every sample point, correct?

8    A.   If I'm reading that footnote right, it says one

9    sample point influent and effluent may be discarded if it's

10   not the final sample point of 120 or 200 percent.

11   Q.   Well, you're reading footnote 2, are you not,

12   Mr. Nishijima?

13   A.   Yes.

14   Q.   And I will highlight for you on the row for the

15   maximum effluent lead concentration, the only requirement

16   for lead concentration in that row that says lead Pb-t,

17   there's no mention of footnote 2, is there, Mr. Nishijima?

18   A.   No, there isn't.

19   Q.   There is no allowance under the NSF 53 2007

20   protocol to drop a sample point with an effluent over 10 ppb

21   lead, is there, Mr. Nishijima?

22   A.   It looks like that's the case for the total, but,

23   again, this is not a certification test we were doing.

24   Q.   Because you did not follow NSF 53 2007 protocol

25   for your testing water or your testing effluents, did you.

1      A.    We followed it for the water makeup, yes.

2      Q.    Hold on, Mr. Nishijima.  You're telling me that

3   you also followed it for the fines as well?

4      A.    We followed the recipe, that's what I meant to

5   say, we followed the recipe for the water makeup of the

6   water.

7      Q.    You did not meet NSF 53 2007 protocol for the

8   influent water or the effluent water in your testing, yes or

9   no?

10     A.    I think in one instance the fines were below 20

11  percent.

12     Q.    And in one instance the effluent was above 10

13  ppb, correct?

14     A.    But that's related to the filter performance.

15  That's not controlled by us.  That's what came out of the

16  filtering sample.

17          MR. SWAIN:  No further questions.  I do believe

18  ZeroWater has a brief recross.

19                    RECROSS-EXAMINATION

20  BY MR. BRANDYBERRY:

21     Q.    Hello again, Mr. Nishijima.  Jared Brandyberry

22  for the ZeroWater Respondents.

23          If we can bring up CX-911.

24          I believe we'll need to go to page 5,

25  Mr. Kotarski.

1          Okay.  Mr. Nishijima, I believe you discussed

2    this with your counsel just recently, specifically the 2

3    fills on the liter 53 line of this chart, and you just

4    discussed this, correct?

5          A.   Yes.

6          Q.   Now when we talked earlier, I asked you about

7    this, and I gave you a lot of time to look at this and give

8    me an explanation how this impacted the test.  Do you recall

9    that?

10         A.   Yes.

11         Q.   And this was before lunch.  So before lunch I

12   asked you and gave you plenty of time, and you told me that

13   this was 2 liters being inserted at the liter 53 line which

14   meant a total of 73 liters was passed through the filter,

15   correct?

16         A.   Yeah.  I was nervous.  I was confused and trying

17   to work that in my head.  And as I continued to work it in

18   my head, is how I explained it to Mr. Ainsworth is what

19   happened.

20         The water was poured on top of another fill.

21   That's why there was two fills in that pitcher.  So it

22   was --

23         Q.   Let's go back.

24         A.   -- liter 53 was poured into the pitcher on top of

25   liter 52, because it was still in the bottom of the pitcher.

1    That's what was meant by the "2 fills."

2        Q.    Okay.  Mr. Nishijima, I want to get on the same

3    page here.  So before lunch you told me this was 2 liters

4    going in at liter 53, correct?

5        A.    Again, yes, I was confused --

6        Q.    I'm sorry.  That's a yes or no question.

7        A.    Sorry?

8        Q.    That's a yes or no question.  Before lunch did

9    you tell me that this represented 2 liters going in at a

10    single liter 53 level?

11        A.    Before lunch I think that's what I said, yes,

12    but, again, I was nervous and I wasn't working it in the

13    process in my head correctly.

14        Q.    And also before lunch you told me that, because 2

15    liters went in here, that meant that you passed 77 liters

16    through the ZeroWater filter, correct?

17        A.    Yes, I believe that's what I said earlier.

18        Q.    Okay.  And then you told me that the effluent was

19    drawn at 77 liters instead of 76 before lunch, didn't you?

20        A.    Yes, I think that's what I said.

21        MR. BRANDYBERRY:  I have no further questions.  I

22    believe the Respondents have no further questions.

23        JUDGE MCNAMARA:  Okay.  Thank you,

24    Mr. Brandyberry.

25        All right.  Mr. Ainsworth, before we -- well, I

1   think that, then, Mr. Nishijima, may step down.  Thank you.

2        Before we proceed, though, Mr. Ainsworth, there

3   are a couple of things that I would like to mention.

4        First of all, this morning Mr. Swain -- and I

5   wish I had the time on this but I didn't write it in -- he

6   asked about the delivery of the various sealed packages to

7   Brita of the prior art products that were tested, and he

8   asked whether or not, before he started asking about the

9   flow rate, he asked whether or not there were any other

10  Brita legacy filter -- I'm sorry -- any other Brita legacy

11  filters available for comparison purposes for testing, and

12  Mr. Nishijima said he did not know.

13       So I would like to know.  I would like Brita to

14  check to see whether there were other Brita legacy filters

15  available that could have been used for comparison testing

16  at the time, and I would like a declaration on that from

17  Brita, since all of the test protocols and the tests that

18  were done were done at the instruction of counsel.

19       So I would like a declaration on that, please, as

20  to what was available in the form of the same Brita legacy

21  filters that could have been tested by comparison other than

22  those that you bought off of eBay and/or received, just to

23  make sure I understood what happened here correctly.

24       MR. AINSWORTH:  Your Honor, just to -- if I can

25  refresh your recollection on this.

1           JUDGE MCNAMARA:  Sure.

2           MR. AINSWORTH:  We learned at the close of fact

3    discovery that Respondents had tested some products, and we

4    asked Your Honor -- we wanted to be able to test the exact

5    same products that they had tested.  And so you asked them

6    to produce those products -- samples that they had tested so

7    we could test those same results.

8           JUDGE MCNAMARA:  Yeah.

9           MR. AINSWORTH:  I just want you to understand why

10   we have those products.  They came from Respondents.

11          JUDGE MCNAMARA:  No, I'm aware of that, but I

12   want to know if there were any other products, Brita legacy

13   products, that Brita had within its possession, custody, or

14   control, on which comparable tests could have been run.

15   Same products.

16          MR. AINSWORTH:  Okay, Your Honor.  We will

17   investigate that and get you an answer.

18          JUDGE MCNAMARA:  Okay.  Thank you.

19          The other remark I wanted to make concerns the

20   native files.  You had a number of Excel spreadsheets.  And

21   this goes for everyone, please.  Do not try and submit Excel

22   spreadsheets, because they don't show up on EDIS correctly.

23          Please take screenshots of every single page of

24   the Excel spreadsheets that you used as exhibits, and then

25   label them accordingly as the same exhibit, but with a

1    sub-number for the page so that we don't just have an empty
2    file that says, you know, native files.  I would like
3    screenshots, please, of every single exhibit that would have
4    been a native Excel file.
5              MR. AINSWORTH:  Thank you, Your Honor.
6              MR. BRANDYBERRY:  Thank you, Your Honor.
7              JUDGE MCNAMARA:  That goes for everyone.
8              Okay.  Thank you.  So at this point I guess,
9    Mr. Ainsworth, are you ready to call your next witness?
10             MR. AINSWORTH:  We are, Your Honor.  And it's
11   going to be a third party, so we need to give them a chance
12   to sign on.  Mr. Jerome Barrillon, from KX, and my partner,
13   Josephine Kim, will be handling that examination.  I believe
14   Mr. Barrillon is also going to have his counsel, Mr. Curcio,
15   also on the line, but he has his own lawyer.
16             JUDGE MCNAMARA:  Okay.  Very good.  Haven't seen
17   Mr. Curcio in a long time.  This pandemic, of course, has
18   just -- well, it's been a long time for everybody to see
19   each other in person.
20             Okay.  Anytime you're ready, just let me know.
21   And I want to make sure that I can see the witness so that I
22   can see him during the testimony.
23             MR. AINSWORTH:  Your Honor, we're still looking
24   for Mr. Barrillon.  He was set to go this morning, so we're
25   trying to track him down.

```
 1              JUDGE MCNAMARA:  Okay.  Thank you.
 2         Good afternoon.
 3              THE WITNESS:  Good afternoon.
 4                   JEROME BARRILLON,
 5              having been first duly sworn and/or affirmed
 6    on his oath, was thereafter examined and testified as
 7    follows:
 8              JUDGE MCNAMARA:  Please state your full name.
 9              THE WITNESS:  Jerome Barrillon.
10              JUDGE MCNAMARA:  Very good.  Thank you.  And
11    that's how I'll pronounce it as well.
12         Good afternoon, Ms. Kim, and good afternoon,
13    Mr. Curcio.
14              MS. KIM:  Thank you, Your Honor.
15                   DIRECT EXAMINATION
16    BY MS. KIM:
17         Q.  Good afternoon, Mr. Barrillon.  Can you please
18    state your full name for the record?
19         A.  Jerome Barrillon.
20         Q.  How are you currently employed?
21         A.  I'm currently the president of KX Technologies
22    LLC.
23         Q.  How long have you held that position?
24         A.  Since 2019.
25         Q.  And what business is KXT involved in?
```

1      A.   So KX Technologies is a manufacturer of water

2   filters and water filter media predominantly based on

3   activated carbon.

4      Q.   And before your current position what position

5   did you hold?

6      A.   I was the vice president and general manager for

7   KX Technologies since 2015.

8      Q.   And where is KXT's headquarters?

9      A.   KXT's headquarters are in West Haven,

10  Connecticut.

11         MS. KIM:  And, Your Honor, the rest of the

12  examination will involve KX Technologies CBI, so if we could

13  move to the confidential record.

14         JUDGE MCNAMARA:  Before you do that, please

15  confirm that anybody who is not signed onto the protective

16  order jumps off the hearing at this stage.  Ms. Kim, would

17  you please confirm first and then we'll ask Respondents to

18  confirm.

19         MS. KIM:  Confirmed for Brita.

20         JUDGE MCNAMARA:  Okay.  Thank you.  Who is

21  speaking on behalf of Respondents?

22         MR. BRANDYBERRY:  Yes, Your Honor, this is Jared

23  Brandyberry for ZeroWater Respondents.  We're confirmed on

24  our side as well.

25         (Whereupon, the hearing proceeded in confidential

1    session.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22431-22456 redacted in their entirety

```
 1                  O P E N   S E S S I O N

 2

 3           MR. AINSWORTH:  Just so Your Honor knows, we

 4   probably -- the direct will probably be about an hour 15,

 5   hour and 20.

 6           JUDGE MCNAMARA:  Do you want to take a break?

 7           MR. AINSWORTH:  I was going to suggest it might

 8   be --

 9           JUDGE MCNAMARA:  I think it's a good time.  Why

10   don't I see you back here at about 3:30.

11           MR. AINSWORTH:  Thank you, Your Honor.

12           MR. BRANDYBERRY:  Thank you, Your Honor.

13           (Whereupon, the proceedings recessed at 3:17

14   p.m.)

15           (In session at 3:35 p.m.)

16           JUDGE MCNAMARA:  Okay.  Good afternoon again,

17   Mr. Ainsworth.

18           MR. AINSWORTH:  Good afternoon, Your Honor.

19           JUDGE MCNAMARA:  Are you ready to call

20   Dr. Rockstraw?

21           MR. AINSWORTH:  We are.  Brita calls as our next

22   witness Dr. David Rockstraw.

23           MR. SWAIN:  Your Honor, I want to confirm that

24   everyone can hear us.  We have had some audio difficulties

25   on our end.
```

```
 1              JUDGE MCNAMARA:  I think we're okay, Mr. Swain.
 2              Good afternoon, Dr. Rockstraw.  Would you kindly
 3    raise your right hand.
 4                     DAVID ROCKSTRAW,
 5              having been first duly sworn and/or affirmed
 6    on his oath, was thereafter examined and testified as
 7    follows:
 8              THE WITNESS:  I do.
 9              JUDGE MCNAMARA:  Please state your full name.
10              THE WITNESS:  My name is David Arthur Rockstraw.
11              JUDGE MCNAMARA:  Very good.  And would you make
12    sure, Dr. Rockstraw, that you're staying in front of your
13    microphone.
14                     DIRECT EXAMINATION
15    BY MR. AINSWORTH:
16         Q.   Good afternoon, Dr. Rockstraw.  Have you prepared
17    some demonstratives to assist with your testimony today?
18         A.   I have.
19         Q.   Mr. Rennick, if we could please bring up CDX-8.
20              Do you recognize CDX-8, Dr. Rockstraw?
21         A.   Indeed.  This is my demonstratives.
22         Q.   Mr. Rockstraw, would you please summarize your
23    educational background for the Court?
24         A.   I will.  I completed a Bachelor of Science in
25    chemical engineering at Purdue University in 1986, and then
```

1    I completed a Ph.D. also in chemical engineering at the

2    University of Oklahoma in 1989.

3        Q.    And what did you do after finishing your Ph.D.?

4        A.    After finishing my Ph.D., if we can advance the

5    demonstrative slide, I went to work for Ethyl Corporation.

6    Prior to that I had worked at Kraft Foods as both a co-op

7    student and an engineer for the duration of my undergraduate

8    employment as well as the summer after graduation.

9            At Ethyl Corporation, I was in Orangeburg,

10   South Carolina for one year as a senior R&D engineer where I

11   developed catalytic materials that were used in the

12   processing of pharmaceutical intermediates, specifically

13   ibuprofen.

14           I joined Conoco/DuPont as a research engineer in

15   their corporate process development group where I developed

16   commercial processes through pilot plant operation across

17   all business units of the DuPont Company.

18           And in the period from 1997 to 2000 I had the

19   title of Visiting Scientist in the Nuclear Materials

20   Technology Division at Los Alamos National Laboratories.

21       Q.    What did you do next with your career?

22       A.    I left DuPont in 1995 and I joined the chemical

23   engineering faculty at New Mexico State University.

24       Q.    Could we go to slide 4, please.

25           Doctor, would you please describe your work

1    experience in academia?

2        A.    Sure.  As I said, I joined New Mexico State

3    University in 1995 as an assistant professor.  I spent

4    almost a decade doing research, teaching and service, and I

5    climbed through the ranks, and by 2004 I was a full tenured

6    professor in the department.

7            In 2012 I accepted the role of academic

8    department head.  I also served as interim academic

9    department head of the Mechanical and Aerospace Department.

10   And I was the creator and director of the NMSBrew Brewery

11   Engineering Program that I started in 2016 and handed off in

12   2019.  And then in September of 2021 I retired from the

13   university after 26 years of service.

14       Q.    And while at New Mexico State, did you receive

15   any accolades?

16       A.    I did.  In 2012 the university named me a

17   distinguished achievement professor based on my portfolio of

18   work, and in 2013 I was awarded the Robert Davis

19   Distinguished Professorship, titles that I held until my

20   retirement last year.

21       Q.    What experience do you have that's applicable to

22   the field of water filtration?

23       A.    In my graduate research at the University of

24   Oklahoma I studied a water filtration method called

25   electrodialysis, which is used in the filtration of heavy

1  metals and salts, acids from wastewaters.  Specifically, we
2  were looking at abandoned mine wastewaters.  Electrodialysis
3  uses a technique that involves ion exchange membranes to
4  induce the separation.

5         In that period I learned to take water samples
6  and analyze them using various analytical techniques, such
7  as an atomic absorption spectrophotometer with a graphite
8  furnace.

9         The filters in this case are what we call in the
10  industry packed beds.  They essentially are a cylinder with
11  a packing material in them over which a fluid phase flows.

12         While I was at DuPont, I designed, constructed,
13  and operated both pilot and commercial-scale pack beds.  The
14  largest of these pack beds involved one-inch diameter tubes
15  that were 16 feet in length with over 3,000 tubes in a
16  bundle.  So they were some of the largest pack beds you can
17  imagine.

18         At New Mexico State University I had a research
19  project that lasted pretty much the entirety of my tenure
20  there, studying the manufacture of activated carbons from
21  various agricultural waste.  New Mexico State used to be
22  called New Mexico A&M.  It's an agricultural school, and so
23  there was a variety of agricultural products that I could
24  use for making activated carbons.  One of those led to a
25  patent on the production of activated carbon from pecan

1  shell waste.  I also made carbons from materials like cotton

2  seed husks and chili seeds.

3          At Los Alamos National Laboratory, during my time

4  as a visiting scientist, I spent four years studying the

5  plutonium wastewater streams.  Plutonium is an ion in those

6  wastewater streams, and the wastewater streams required

7  treatment.  It's a highly acidic stream.  And when you

8  neutralize it with a base, you form crystals, and, as those

9  crystals are filtered, they form a packed bed.  And so you

10  have water flowing over the packed bed with plutonium ions

11  in it.

12          When the pressure across that packed bed would

13  get too large, it would shut down plutonium processing

14  operations.  And so our goal in the research was to study

15  the shape of the crystals and identify process conditions

16  that affected the shape to make the packed bed flow better

17  for a longer period of time.

18          I've also performed research on projects that

19  involve titanium dioxide.  I have at least two projects that

20  I can recall where we used titanium dioxide to make

21  catalytic materials that were subsequently used in the

22  treatment of contaminants in fluid streams.

23  Q.   Mr. Rennick, could we please bring up CX-701.

24          Scroll to the next page, please.

25          Do you recognize Exhibit CX-701?

1          A.   I do.  This is a copy of my CV.

2          Q.   And does this document accurately reflect your

3     educational and work experience?

4          A.   Yes, it does.

5          MR. AINSWORTH:  Your Honor, Brita respectfully

6     tenders Dr. David Rockstraw as an expert in the field of

7     chemical and material engineering.

8          JUDGE MCNAMARA:  Who is responding for

9     Respondents as to whether or not there's any objection?

10         MR. SWAIN:  This is Mr. Swain.  I apologize.  We

11    were switching headphones at the moment.

12         We do not have an objection to Dr. Rockstraw as

13    tendered by counsel.

14         JUDGE MCNAMARA:  Thank you.  Then Dr. Rockstraw

15    is accepted as an expert in the fields upon which he has

16    been called to testify.

17    BY MR. AINSWORTH:

18         Q.   Dr. Rockstraw, do you know why you're here

19    testifying today?

20         A.   I've been retained by counsel for Brita to study

21    and offer opinions on matters involving the '141 patent.

22         Q.   And if we turn to JX-22.

23         Do you recognize JX-122, doctor?

24         A.   Yes, this is the front page of the '141 patent.

25         Q.   And what is your understanding of the technology

1    that the '141 patent is directed to?

2        A.   The '141 patent is directed to water filters

3    having certain design and performance characteristics.

4        Q.   And have you formed any opinions concerning the

5    '141 patent in connection with this -- in connection with

6    this investigation?

7        A.   Yes, I have.  I've formed opinions relative to

8    Brita's assertions that Respondents have imported and

9    imported after -- sold after importation certain filters

10   that meet the requirements of the claims of the '141 patent.

11   Also that Brita, certain Brita products, practice claims of

12   the '141 patent.

13       Q.   If we could turn back to the demonstratives, to

14   slide 6.

15            Dr. Rockstraw, what claims have you offered

16   opinions on in connection with infringement?

17       A.   As shown here on demonstrative slide 6, those

18   would be claims 1 through 6 and 23.

19       Q.   And what claims have you provided opinions on

20   with respect to domestic industry?

21       A.   That's the same claims.

22       Q.   Could you please provide Her Honor a summary of

23   your opinions about infringement of the '141 patent?

24       A.   I can.  On demonstrative slide 7, I've summarized

25   those opinions.

```
 1            I formed the opinion that the Pur Plus filters
 2   and filter systems directly infringe claims 1 through 3 and
 3   23;
 4            That the Zero filters and filter systems directly
 5   infringe claims 1, 2, 5, and 23;
 6            That the Aqua Crest replacement filters for
 7   Zero's filter system directly infringe claims 1, 2, 5, and 6
 8   and indirectly infringe claim 23;
 9            And that LifeStraw Home Filters and filter
10   systems directly infringe claims 1 through 5.
11       Q.   Would you please summarize your opinions with
12   respect to whether Brita products practice the '141 patent?
13       A.   Yes.  I've developed the opinion that the
14   Longlast and Longlast+ filters and filter systems practice
15   claims 1 through 6 and 23.
16       Q.   Could you summarize the type of evidence that you
17   considered in forming your opinions with respect to the '141
18   meant?
19       A.   I can.  And that summary is provided on
20   demonstrative slide 8.
21            In addition to my own knowledge and experience in
22   the field of chemical engineering, I've studied the '141
23   patent and its prosecution history; I've studied manuals and
24   technical documents for these products; I've studied the
25   marketing materials, packaging and websites for the
```

1  products; I've inspected photographs of the projects --

2  products, and related packaging; I've looked at product

3  testing performed by third-party labs, Respondents as well

4  as Brita.

5         I've had a conversation with Rick Nishijima

6  regarding testing protocols, and I've commissioned chemical

7  and compositional testing, which was performed by

8  independent party S&M Laboratory.

9     Q.   Dr. Rockstraw, did you personally do any testing

10  of any of the accused products or Brita products?

11    A.   I did not do the testing myself.

12    Q.   Did you review or rely upon testing done by other

13  individuals?

14    A.   I did.

15    Q.   Do you have experience reviewing the protocols

16  and test results of other individuals as part of your work?

17    A.   I think in 1990 when I transitioned from Ethyl to

18  DuPont, my role moved from the laboratory to supervision of

19  laboratory.  And at that time and since then I've been

20  directing the work of others and reviewing that work.

21         Both during my time at DuPont as well as my time

22  as an instructor and faculty member at New Mexico State

23  University, I would direct my students in the laboratory,

24  review the data they collected.  In addition to that, I've

25  been a peer reviewer on numerous journals and funding

1    organizations, assisting journals, determine which data and

2    publications are worthy of publication, and assisting

3    funding organizations in determining which projects are

4    worthy of their funding.

5        Q.   Are you aware that Her Honor has issued a Markman

6    decision in connection with this investigation?

7        A.   Yes, I am.

8        Q.   And have you reviewed that Markman decision?

9        A.   I have.

10       Q.   Did you apply the claim constructions adopted by

11   Her Honor when you formed your opinions?

12       A.   I did.

13       Q.   And those were constructions that were proposed

14   at the time you prepared your expert reports; is that right?

15       A.   That's correct.

16       Q.   If we turn to your demonstrative slide 10, are

17   you familiar with what a person of ordinary skill in the art

18   is?

19       A.   I am.  Counsel has advised me that a person of

20   ordinary skill in the art is a hypothetical person presumed

21   to be aware of all pertinent art, thinks along conventional

22   wisdom in the art, and is a person of ordinary creativity.

23       Q.   Are you also aware that Her Honor has adopted a

24   definition of a person of ordinary skill in the art in

25   connection with her Markman decision?

1      A.    I am.  And that is also summarized on

2    demonstrative slide 10 or reproduced on slide 10.

3      Q.    How does the definition of a skilled artisan

4    adopted by the Administrative Law Judge match the

5    definitions of a skilled artisan that you used in preparing

6    your reports?

7      A.    When I prepared my report, I used the proposed

8    definitions of a person of skill in the art proposed by both

9    Brita and Respondents.  So the definition I applied is not

10   exactly the same, but it's very similar.

11     Q.    Does the definition adopted by the Administrative

12   Law Judge for a person of ordinary skill in the art change

13   any of the opinions you have offered in this investigation?

14     A.    It does not.

15     Q.    Putting yourself back in your shoes in 2006,

16   would you have had at least the level of ordinary skill in

17   the art as a person of order -- as a person of ordinary

18   skill in the art as defined by the Administrative Law Judge?

19     A.    I did.

20           MR. AINSWORTH:  Your Honor, at this time we will

21   need to go on the confidential record, and it will be PUR

22   confidential information.

23           (Whereupon, the hearing proceeded in confidential

24   session.)

25

Appx22469-22516 redacted in its entirety

```
 1                     O P E N   S E S S I O N

 2

 3              JUDGE MCNAMARA:  Okay.

 4              MR. AINSWORTH:  Dr. Rockstraw, I have no further

 5       questions.

 6              Your Honor, we pass the witness.

 7              I do want to note that we received about nine

 8       cross binders, so Dr. Rockstraw is going to have a little

 9       juggling to do.  A bit of work on his part to get everything

10       arranged.

11              JUDGE MCNAMARA:  Understood.  Thank you very much

12       for telling me that.  Thank you.

13              So, Mr. Swain, are you starting on behalf of the

14       Respondent PUR?  We have Mr. Tucker up first.

15              Good afternoon, Mr. Tucker.

16              MR. TUCKER:  Oh, good afternoon, Your Honor.

17              THE WITNESS:  Can I go to the restroom before we

18       start?

19              JUDGE MCNAMARA:  Absolutely, Dr. Rockstraw, if

20       that's what you need, of course.  Let's take a ten-minute

21       break.

22              Sorry, Mr. Tucker.

23              MR. TUCKER:  That's okay.

24              JUDGE MCNAMARA:  We need our witness to have an

25       opportunity here to take a break.
```

1            MR. TUCKER:  He was up there a long time.  No
2    problem.  See you in ten.
3            JUDGE MCNAMARA:  Yep.
4            (Whereupon, the proceedings recessed at 5:05
5    p.m.)
6            (In session at 5:17 p.m.)
7            JUDGE MCNAMARA:  Okay, Mr. Tucker.
8            MR. TUCKER:  Do we have a witness?
9            JUDGE MCNAMARA:  We'll soon find out.  There we
10    are.
11            MR. TUCKER:  Your Honor, I probably have about
12    20, 30 minutes, more like 30.  Do you want me to start and
13    just kind of pick a spot in the middle or try to get the
14    whole thing in?  What would you like?
15            JUDGE MCNAMARA:  We'll stop at 5:30.  It's been a
16    long day.
17            MR. TUCKER:  I know it's been long.
18            JUDGE MCNAMARA:  I was just going to say, stop
19    when it makes sense in your questioning.
20            MR. TUCKER:  I'm going to try to use 13 minutes
21    wisely.
22                         CROSS-EXAMINATION
23    BY MR. TUCKER:
24        Q.   Thank you for being here.  I'm Todd Tucker and I
25    am counsel for Ecopure, for Aqua Crest.  I'd like to start

1    with a question about your experience.

2            Do you have any experience in testing the removal

3    of lead from water prior to this investigation?

4        A.    Not specifically lead, no.

5        Q.    Okay.  So you have no -- prior to this case you

6    have no experience with removing lead from water, correct?

7        A.    As I indicated in my direct examination, I have

8    experience removing heavy metals from water, just not lead.

9        Q.    Okay.  Let's try to speed it up.  You have no

10   experience prior to this case with removing lead from water,

11   correct?

12       A.    I have not removed lead from water, that's

13   correct.

14       Q.    Okay.  Thank you.

15           Mr. Kotarski, could we go to CDX-008C 75?  And

16   this is one of your demonstratives.

17           As part of -- as part of your assignment here,

18   you looked at an Aqua Crest 7023B filter, correct?

19       A.    That's correct.

20       Q.    And as part of that assignment, you came up with

21   some opinions about whether that filter satisfies the FRAP

22   limitation of claim 1 of the '141 patent, right?

23       A.    That's also correct.

24       Q.    Okay.  And as part of your work here, you're also

25   familiar with the ZeroWater 5-stage filter, correct?

1        A.    I am.

2        Q.    And for that filter, you also did a FRAP

3   analysis, right?

4        A.    I did.

5        Q.    Okay.  And is it your opinion or understanding

6   that Aqua Crest advertises the 7023B filter as a replacement

7   for the ZeroWater 5-stage?

8        A.    Please repeat the question.

9        Q.    Yes.  Is it your understanding that Aqua Crest

10  advertises its 7023B filter as a replacement for the

11  ZeroWater 5-stage filter?

12       A.    That's my understanding.

13       Q.    Okay.  And you actually say that on this slide,

14  right?  Do you see that bullet point, Aqua Crest expressly

15  advertises the Aqua Crest filters as replacement for

16  ZeroWater filters, right?

17       A.    I do say that on this slide, yes.

18       Q.    And then if we could zoom in on, right below

19  where it says, NSF 53 certified, Mr. Kotarski.  Thank you.

20             And looking at this ZeroWater document, it says

21  that -- do you see where it says, ZeroWater rated service

22  life is 20 gallons?  Do you see that?

23       A.    I do.

24       Q.    So in the FRAP equation, ZeroWater has a lifetime

25  of 20 gallons, right?

1        A.    That's correct.

2        Q.    Okay.  And if we could go to RX-1040C 52.

3              MR. TUCKER:  Your Honor, I apologize.  It is

4    getting late.  I forgot to mention that that last slide had

5    CBI on it and my next couple of slides do as well.  Can I

6    get -- are we okay here?

7              JUDGE MCNAMARA:  Whose CBI is it, just to be on

8    the record?

9              MR. TUCKER:  I believe this was marked as

10   Brita's, correct?

11             JUDGE MCNAMARA:  Double-check and make sure so

12   everybody else who jumps off -- so that all the Respondents

13   who are not on the protective order jump off.

14             MR. TUCKER:  It has Brita on it.

15             JUDGE MCNAMARA:  Okay.  So, Mr. Tucker, would you

16   just confirm, then, what I just mentioned in terms of making

17   sure folks jump off who aren't on the protective order?

18             MR. TUCKER:  I'm looking right now.

19             (Whereupon, the hearing proceeded in confidential

20   session.)

21

22

23

24

25

Appx22522-22525 redacted in their entirety

1                    O P E N   S E S S I O N

2

3            MR. TUCKER:  This is public record.

4    BY MR. TUCKER:

5        Q.   Dr. Rockstraw, this is some information from

6    Aqua Crest.  Have you seen this before?

7        A.   Yes, I have.

8        Q.   Okay.  And did you use this information from

9    Aqua Crest when you were deciding what lifetime to use with

10   the 7023B filter?

11       A.   Yes.  This document informed my decision.

12       Q.   Okay.  Does this document have anything to do

13   with the removal of lead from water?

14       A.   This document specifies lifetimes that Aqua Crest

15   advertises for their filter.

16       Q.   But are those lifetimes based on the removal of

17   lead from water, Dr. Rockstraw?

18       A.   I'd like to see the whole document.  Is that

19   CX-166?

20       Q.   Do you have it in your notebook, Dr. Rockstraw?

21       A.   I did.  I found it.

22       Q.   Okay.  So my question is, does the information in

23   this table relate to the removal of lead from water?

24       A.   No, this document does not explicitly recite

25   lead.

1      Q.   Right.  This document is about something called
2  TDS, correct?
3      A.   The document does identify total dissolved solids
4  concentrations, yes.
5      Q.   Okay.  Is lead a total dissolved solids
6  concentration and included in dissolved solids
7  concentrations?
8      A.   I don't believe so.
9      Q.   Okay.  And when you used this document to come up
10  with what you are saying is the lifetime for the Aqua Crest
11  7023B filter, you used the range 15 to 25 gallons over on
12  the -- in the far right column, correct?
13      A.   I believe that is the range that I recited in my
14  report, yes.
15      Q.   And would you agree with me that 20 falls smack
16  in the middle of 15 to 25 gallons, Dr. Rockstraw?
17      A.   I would agree that 20 is another value of
18  lifetime represented by this particular document.
19      Q.   Okay.  And the lifetime you chose was based on
20  that range of 15 to 25, correct?
21      A.   That's correct.
22      Q.   And 20 is in that range, correct?
23      A.   Yes, it is.
24      Q.   Okay.  Again, the Aqua Crest 7023B, your words,
25  interchangeable with the ZeroWater 5-stage, right?

1        A.    That's correct.

2        Q.    And for the ZeroWater 5-stage, you used 20

3   gallons, right?

4        A.    The ZeroWater 5-stage, the 20 gallons is a

5   certified lifetime that's indicated on their packaging.

6        Q.    And that's what you used with ZeroWater, right?

7        A.    That's correct.

8        Q.    Okay.  But when you had the opportunity to use 20

9   in the interchangeable Aqua Crest 7023B, you didn't use 20,

10  you chose 15, right?

11       A.    That's correct.

12       Q.    Okay.

13            MR. TUCKER:  Your Honor, I'm going to segue into

14  another topic.  I'll also try to speed it up tomorrow.  I'll

15  clean a few things up over the evening.  And I know

16  Dr. Rockstraw has gone a long time, so it would probably be

17  a good time.

18            JUDGE MCNAMARA:  I think so too.  Thank you.

19            All right.  Thank you, Mr. Tucker.

20            Dr. Rockstraw, you are under what's called a

21  sequestration order.  It's part of my ground rules, which

22  means that you may not discuss your testimony or confer with

23  your counsel about your testimony since you are in the

24  middle of testifying on cross-examination.  Do you

25  understand that?

1          THE WITNESS:  I understand, Your Honor.

2          JUDGE MCNAMARA:  Okay.  Very good.  And I know

3    that -- I know that you certainly understand that,

4    Mr. Ainsworth.

5          MR. AINSWORTH:  I do, Your Honor.

6          JUDGE MCNAMARA:  Okay.  Very good.  All right.

7          Then tomorrow morning let's take care of exhibits

8    that you've agreed upon that should be admitted into

9    evidence from the last two days rather than taking care of

10   that this evening.

11         And just make sure that you confer and that we

12   have an agreed-upon list for the witnesses who have already

13   testified.  And I will also -- I said I will give it to you

14   today, but I will give you the ruling on the motion to quash

15   tomorrow and I'll explain the basis for that ruling, okay,

16   before you call Dr. Freeman.  Okay?

17         MR. AINSWORTH:  Thank you, Your Honor.

18         MR. TUCKER:  Thank you, Your Honor.

19         JUDGE MCNAMARA:  Is there any other business that

20   I need to take care of this evening?

21         Anything from you, Mr. Ainsworth?

22         MR. AINSWORTH:  Nothing from me, Your Honor.

23   Thank you.

24         JUDGE MCNAMARA:  Thank you very much.

25         Mr. Swain, anything, or Mr. Tucker, anything from

1   the Respondents?

2           MR. TUCKER:  Thank you for complimenting me by

3   calling me Mr. Swain, but we have nothing further,

4   Your Honor.

5           JUDGE MCNAMARA:  All right.  Very good.  Then, if

6   there's nothing more, then I'll see you tomorrow.  Thank you

7   everybody.

8

9           (Whereupon, at 5:34 p.m., the proceedings

10  adjourned, to reconvene the following day, August 19, 2022,

11  at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C O N T E N T S

 2                INDEX OF WITNESSES

 3
                                      RE-    RE-
     WITNESS              DIRECT CROSS DIRECT CROSS

 5   LAUREN KAHN.................     285   297

 6   RICK NISHIJIMA..............301   330,  414   422

 7                                    370,

 8                                    402,

 9                                    409,

10                                    420

11   JEROME BARRILLON............428   446   454   455

12   DAVID ROCKSTRAW.............458   518

13

14

15   AFTERNOON SESSION                       402

16

17

18   CONFIDENTIAL SESSIONS    289-290         431-456

19                           331-386         469-516

20                           392-413         522-525

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2    TITLE: IN THE MATTER OF CERTAIN HIGH-PERFORMANCE GRAVITY-FED

 3    WATER FILTERS AND PRODUCTS CONTAINING THE SAME

 4    INVESTIGATION NO.:  337-TA-1294

 5    HEARING DATE:  August 18, 2022

 6    LOCATION:  Washington, D.C. - Remote

 7    NATURE OF HEARING:  Evidentiary Hearing

 8          I hereby certify that the foregoing/attached
       transcript is a true, correct and complete record of the
 9    above-referenced proceedings of the U.S. International Trade
       Commission.
10    Date:  August 18, 2022
       Signed:
11    ss//   _____

12    Signature of the Contractor or the Authorized Contractor's
       Representative
13
          I hereby certify that I am not the court reporter
14    and that I have proofread the above-referenced transcript of
       the proceedings of the U.S. International Trade Commission
15    against the aforementioned court reporter's notes and
       recordings for accuracy in transcription in the spelling,
16    hyphenation, punctuation and speaker identification and did
       not make any changes of a substantive nature.  The
17    foregoing/attached transcript is a true, correct and
       complete transcription of the proceedings.
18    Signed:

19    ss//   Raymond G. Bryniteson

20
          I hereby certify that I reported the
21    above-referenced proceedings of the U.S. International Trade
       Commission and caused to be prepared from my record media
22    and notes of the proceedings a true, correct and complete
       verbatim recording of the proceedings.
23    Signed:

24    ss//   Linda Kinkade

25
```

1              UNITED STATES INTERNATIONAL TRADE COMMISSION

2                         Washington, D.C.

3              Before the Honorable MaryJoan McNamara

4                      Administrative Law Judge

5

6       -------------------------------x

7       In the Matter of                    Investigation No.

8

9       CERTAIN HIGH-PERFORMANCE          337-TA-1294

10      GRAVITY-FED WATER FILTERS AND

11      PRODUCTS CONTAINING THE SAME

12      -------------------------------x

13

14

15                      EVIDENTIARY HEARING

16                   Friday, August 19, 2022

17                        Volume III

18

19

20           The parties met via remote videoconferencing

21      pursuant to notice of the Administrative Law Judge at 9:30

22      a.m.  Eastern.

23

24

25      Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

```
 1   A P P E A R A N C E S:

 2   (all parties appeared remotely)

 3

 4   For Complainant Brita LP:

 5           STERNE, KESSLER, GOLDSTEIN & FOX, PLLC

 6           1100 New York Avenue, NW

 7           Washington, DC 20005

 8           (202) 371-2600

 9           painsworth@sternekessler.com

10               Paul A. Ainsworth, Esq.

11               Josephine Kim, Esq.

12               Uma Everett, Esq.

13               Lauren Watt, Esq.

14               Robert E. Niemeier, Esq.

15

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5            ALSTON & BIRD LLP

 6            950 F Street, NW

 7            Washington, DC 20004

 8            (202) 239-3025

 9            Pur-ITC@alston.com

10                  Adam D. Swain, Esq.

11                  Thomas W. Davison, Esq.

12

13

14

15            ALSTON & BIRD LLP

16            101 S. Tryon Street

17            Charlotte, North Carolina 28280

18            (704) 444-1000

19            Pur-ITC@alston.com

20                  Karlee N. Wroblewski, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5          ALSTON & BIRD LLP

 6          1950 University Avenue

 7          East Palo Alto, California 94303

 8          (650) 838-2000

 9          Pur-ITC@alston.com

10                 Katherine G. Rubschlager, Esq.

11

12

13   For Respondents EcoLife Technologies, Inc., and Qingdao

14   Ecopure Filter Co., Ltd.:

15          CALFEE, HALTER & GRISWOLD LLP

16          1405 East Sixth Street

17          Cleveland, Ohio 44114

18          (216) 622-8200

19          ecopure_brita@calfee.com

20                 Todd R. Tucker, Esq.

21                 Jack R. Smith, Esq.

22                 Brad Liu, Esq.

23                 Ashley J. Earle, Esq.

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5          BAKER & HOSTETLER LLP

 6          1801 California Street

 7          Denver, Colorado 80202

 8          (303) 764-4072

 9          zerowater-itc@bakerlaw.com

10              Jared A. Brandyberry, Esq.

11

12          BAKER & HOSTETLER LLP

13          1050 Connecticut Avenue, NW

14          Washington, DC 20036

15          (202) 861-1633

16          zerowater-itc@bakerlaw.com

17              Cassandra J. Simmons, Esq.

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5          BAKER & HOSTETLER LLP

 6          One North Wacker Drive

 7          Chicago, Illinois 60606

 8          (312) 416-6200

 9          zerowater-itc@bakerlaw.com

10               John S. Letchinger, Esq.

11

12          BAKER & HOSTETLER LLP

13          1735 Market Street

14          Philadelphia, Pennsylvania 19103

15          (215) 568-3100

16          zerowater-itc@bakerlaw.com

17               Jeffrey J. Lyons, Esq.

18               Phillip D. Wolfe, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5           BAKER & HOSTETLER LLP

 6           312 Walnut Street

 7           Cincinnati, Ohio 45202

 8           (513) 929-3400

 9           zerowater-itc@bakerlaw.com

10               Derek M. Freitas, Esq.

11

12

13   For Respondent Vestergaard Frandsen Inc. d/b/a LifeStraw:

14           K&L GATES

15           70 W. Madison Street

16           Chicago, Illinois 60602

17           Vestergaard1294@klgates.com

18               Jeffrey R. Gargano, Esq.

19               Nelson M. Hua, Esq.

20               Devon C. Beane, Esq.

21               Ewa Wojciechowska, Esq.

22

23

24

25               ** Index appears at end of transcript **
```

```
 1                P R O C E E D I N G S
 2              (In session at 9:30 a.m.)
 3          JUDGE MCNAMARA:  Before we get started with
 4   Dr. Rockstraw -- good morning, Dr. Rockstraw --
 5          THE WITNESS:  Good morning, Your Honor.
 6          JUDGE MCNAMARA:  Before we get started, there are
 7   a few housekeeping matters that I would like to take care
 8   of.
 9          First of all, I did not receive a joint
10   submission on timekeeping last night, and I looked for one
11   this morning and I have not received one.
12          So, Mr. Ainsworth, can you tell me the status of
13   that email?
14          MR. AINSWORTH:  Your Honor, I thought it went in.
15   Let me just double-check with my team.
16          Your Honor, apparently we're still conferring
17   with the other side.  We'll get that to you this morning.
18          JUDGE MCNAMARA:  Very good.  The second matter I
19   would like to address is the joint submission of exhibits
20   without a sponsoring witness.  Why don't we move those in or
21   why don't you move those into evidence this morning when we
22   move the other exhibits into evidence, let's say, just
23   before lunch for all of those who have testified so far.
24          So are those joint lists from the witnesses ready
25   yet?
```

1          MR. AINSWORTH:  Your Honor, for all the witnesses
2     that have been completed, we have those lists ready.  I
3     think once we start with Dr. Rockstraw, we can prepare his
4     list as well.
5          JUDGE MCNAMARA:  Who is cutting in and out,
6     Mr. Tucker?
7          MR. TUCKER:  Dr. Rockstraw and Mr. Ainsworth are
8     both cutting in and out.  We're trying to figure out if it's
9     on my end.  Can we have one second?
10         JUDGE MCNAMARA:  Sure.  And I think it may be on
11     your end.
12         (Brief interruption to resolve technical issue.)
13         JUDGE MCNAMARA:  Would you like me to repeat what
14     I said?
15         MR. TUCKER:  I heard what you said about -- I
16     believe we were on the joint exhibits.  I could not hear
17     what Mr. Ainsworth said.
18         JUDGE MCNAMARA:  Okay.  Mr. Ainsworth, would you
19     like to repeat what you said?
20         MR. TUCKER:  Sorry.
21         JUDGE MCNAMARA:  No worries.
22         MR. AINSWORTH:  Absolutely, Your Honor.  As for
23     all the witnesses that have been completed, I believe the
24     parties have agreed upon exhibits to come in as well as
25     exhibits that are admitted without a witness and those

1    admitted with a deposition designation.  We can submit that

2    by lunchtime today for everyone who has been completed.

3              JUDGE MCNAMARA:  Were you able to pick that up,

4    Mr. Tucker?

5              MR. TUCKER:  I was, Your Honor.  I think we have

6    it fixed.  Fingers crossed.

7              JUDGE MCNAMARA:  Fingers crossed.  All right.

8              All right.  The third issue I would like to

9    address this morning is Brita LP and Nonparty Dr. Benny D.

10   Freeman's Motion to Quash Respondents' Subpoena Ad

11   Testificandum to Dr. Benny Freeman.

12             It's motion docket number 1294028.

13             Respondents served their subpoena on Dr. Freeman

14   on August 11, 2022.  Brita's, and I'll refer to it as

15   Brita's and Dr. Freeman's, motion to quash was filed on

16   August 15, 2022.

17             On August 16, 2022 Respondents filed Respondents'

18   Opposition to Brita LP and Non-Party Dr. Benny D. Freeman's

19   Motion to Quash Respondents' Subpoena Ad Testificandum, and

20   that is document ID No. 778175.

21             The subpoena that was issued to Dr. Freeman seeks

22   testimony with respect to the facts and opinions that

23   Dr. Freeman disclosed in two expert reports and in

24   deposition testimony, which, I gather, was given -- the

25   latter of which was given on July 13, 2022.

1          Respondents confirmed that they will seek facts

2     and opinions from his expert reports and deposition.  That's

3     in Respondents' opposition at 2.

4          This is the ruling:

5          I am denying the motion to quash.  The facts and

6     opinions stated in the expert reports and testimony at

7     deposition are available to all parties, and I am citing

8     there the case of Net Arris LLC vs. Apple Inc., 213 Westlaw

9     9570686 at 3.

10         The judge observed in the Net Arris case that

11    allowing plaintiffs to call defendant's expert in their

12    case-in-chief would neither reward nor penalize anyone.

13    Courts have repeatedly observed that once a party has given

14    testimony through deposition or expert report, those

15    opinions do not belong to one party or another but rather

16    available for all to use.

17         And it's a quote from Kerns v. Pro-Foam of South

18    Alabama, Inc., 572 F.Supp. Second 1303 at 1311.

19         I took a look at Judge Elliot's Order No. 33 in

20    the, let me see, in the 1140 investigation.  It's

21    distinguishable on its facts.  So that's what we're going to

22    do.  So that's the ruling.  The motion to quash is denied.

23         MR. AINSWORTH:  Thank you, Your Honor.

24         Procedurally, I think the parties have

25    understood, though, that what this means is they may cross

1    Dr. Freeman outside the scope of our direct as part of our

2    rebuttal case as opposed to him coming up twice to testify.

3              And I think Mr. Swain will confirm that's our

4    agreement how we'll handle Your Honor's ruling.

5              JUDGE MCNAMARA:  Mr. Swain, would you like to

6    weigh in on this?

7              MR. SWAIN:  That's right, Your Honor.

8    Mr. Ainsworth is quite correct.  We've agreed we're going to

9    have Dr. Freeman be called once, and he will appear at the

10   date in September on which Dr. Hatch will testify too.  So

11   we'll just do that in one day.  He will be called adversely

12   and within the scope of whatever he opines upon at the

13   hearing on that date.

14             JUDGE MCNAMARA:  Okay.  Good.  I think that's the

15   right way to go.  Apparently you were anticipating this

16   ruling.  It sounds like it.

17             MR. AINSWORTH:  One way or the other, we knew we

18   had to resolve it.

19             JUDGE MCNAMARA:  Fair enough.  And there will be

20   a written order issued, but there's plenty of case law that

21   really supports the outcome in this case.  So that's what

22   we're doing.

23             All right.  Are there any housekeeping matters

24   that you would like to bring up, Mr. Ainsworth?

25             MR. AINSWORTH:  Your Honor --

1        Mr. Swain, would you like to raise the issue I

2  raised with you by email this morning with Her Honor?

3        MR. SWAIN:  There were many issues, but I think I

4  know the one you're talking about, Mr. Ainsworth.

5        With Dr. Freeman not being called in this case

6  and Dr. Hatch not being called in this case, it does take

7  away some of the witnesses in this trial.

8        The one issue we have, though, we had planned

9  witnesses to be interspersed throughout the week, Wednesday

10  through Friday, and then Monday and Tuesday, and so our

11  intention is not to just be aghast and fill up the empty

12  void with additional testimony, not from these witnesses,

13  but, on the other end, we wanted to make sure the witnesses

14  have a chance to testify and testify on the days they were

15  planned to testify.

16        So I suspect we will be able to either end early

17  Tuesday or end early both Monday and Tuesday.  But as of

18  this time I think we will need both days to get all the

19  witnesses in.

20        JUDGE MCNAMARA:  I'm fine with that.  This is

21  your trial time.  As you know, in my scheduling orders, I

22  always let people know that this is your time and you can

23  use it as you choose, and that, if you need more time, you

24  can always let me know a couple months in advance.  If you

25  need less time, you can let me know that too.  So however

1  this gets adapted because of the change in Dr. Hatch's

2  ability to testify and the corresponding change that had to

3  be made with Dr. Freeman, that's just fine.

4       MR. SWAIN:  Thank you, Your Honor.  And we will

5  have -- I notice that since the pre-hearing statement was

6  filed on July 18th, there have been some witnesses withdrawn

7  and moved around.

8       So we are going to submit on the Respondents'

9  side an updated list to you over the lunch break before we

10  begin our case-in-chief so you know what's coming.

11       JUDGE MCNAMARA:  I would appreciate that.  Okay.

12       Are there any other issues that you two would

13  like to raise?

14       MR. SWAIN:  Nothing from Respondents' end.

15       JUDGE MCNAMARA:  Thank you, Mr. Swain.

16       MR. AINSWORTH:  Thank you, Your Honor.  There is

17  one other issue that I think we do need to bring to

18  Your Honor's attention.  I wrote Mr. Swain this morning.

19       As Your Honor recalls, Order 34 resolved an issue

20  involving the KX opinion letter.

21       JUDGE MCNAMARA:  Yes.

22       MR. AINSWORTH:  We found out last night it was in

23  fact sent to us as one of their exhibits.  Mr. Swain has

24  confirmed that was inadvertent.  But we have advised KX of

25  this because we believe it's their information.  We also

1   felt obligated to advise the Court of that development.

2          JUDGE MCNAMARA:  You've clawed it back.  It's

3   been clawed back, hasn't it?

4          MR. AINSWORTH:  We destroyed all copies we have

5   on our end.

6          JUDGE MCNAMARA:  Good.  That's exactly right.

7   Thank you for letting me know that.

8          There is, now that I think of it, on my list

9   there was one other item I wanted to mention and that was

10   with respect to the demonstratives.

11          Mr. Swain, I know that when you were using

12   demonstratives the first day, there was an issue with some

13   of the demonstratives that showed testing and annotated --

14   there were annotated demonstratives that did not have the

15   source exhibits on the demonstratives.

16          Please make sure, and I think -- I'm saying this

17   essentially to both sides, although I know it didn't happen

18   on Brita's demonstratives -- please make sure that any

19   exhibits that comprise the content of your demonstratives

20   are identified on the demonstratives.  And I think,

21   Mr. Swain, you are correcting certain demonstratives.

22          So when you submit those, please label them as

23   such, as corrected demonstratives, so we don't get them

24   confused.

25          MR. SWAIN:  Understood, Your Honor.  Thank you.

1    You anticipated my question, and that error was mine, and
2    mine alone.  The rest of this team takes just pride in their
3    ability to put the evidence on the demonstratives.  That was
4    my oversight, and I take responsibility for that.
5            JUDGE MCNAMARA:  I appreciate that.  We all make
6    mistakes, as we all know.  In any event, I'm not going to go
7    down that road.  That's fine.
8            I think that covers pretty much what I was
9    seeing.  Is there anything else before we proceed with
10   Dr. Rockstraw?
11           MR. SWAIN:  Nothing from Respondents' end,
12   Your Honor.  I'm going to hand it off back to Mr. Taylor for
13   the continued cross-examination of Dr. Rockstraw.
14           JUDGE MCNAMARA:  I think you meant Mr. Tucker.
15           MR. SWAIN:  I did.  I apologize to the court.
16   Mr. Todd Tucker.
17           JUDGE MCNAMARA:  I just saw Todd Taylor for the
18   first time in 28 months about two weeks ago.
19           Dr. Rockstraw, the Commission is just getting
20   back up to fully in-person personnel, and so some of us are
21   seeing each other for the first time in 28 months.
22                        DAVID ROCKSTRAW,
23           having been previously duly sworn and/or
24   affirmed on his oath, was thereafter examined and testified
25   further as follows:

```
 1              JUDGE MCNAMARA:  All right.  Mr. Tucker, good
 2    morning.
 3              MR. TUCKER:  Good morning, Your Honor.
 4              JUDGE MCNAMARA:  Are you ready to get started?
 5              MR. TUCKER:  I am.  I'm excited.
 6              JUDGE MCNAMARA:  Oh, good.  Very good.  Then the
 7    floor is yours.
 8              MR. TUCKER:  Thank you.
 9                   CROSS-EXAMINATION
10    BY MR. TUCKER:
11         Q.   Good morning, Dr. Rockstraw.  How are you?
12         A.   I'm good.  How are you, Mr. Tucker?
13         Q.   Very well.  So let's get at this.
14              Dr. Rockstraw, is activated carbon capable of
15    removing lead from water?
16         A.   I've seen some studies in the literature where
17    scientists have looked at the absorption characteristics of
18    certain carbons toward lead, so it's been studied, but the
19    level of success has been relatively small.
20         Q.   Okay.  But it is capable, right, it is possible?
21         A.   Any material has some level of absorbance for any
22    other solute in a solution.  What matters is the level at
23    which it absorbs.
24         Q.   Okay.  But there is some level, so we can move
25    on, right?
```

1      A.   There is.  It was very small, but there is some
2    level.
3      Q.   Okay.
4           JUDGE MCNAMARA:  Can I ask something there?
5    Sorry, Mr. Tucker.
6           Are you talking about efficacy?  Dr. Rockstraw,
7    there is some capability, but there's an issue of efficacy?
8           THE WITNESS:  Please repeat that.
9           JUDGE MCNAMARA:  Yeah.  Are you talking about
10   there's some capability, but there is an issue of efficacy
11   or effectiveness of the removal?
12          THE WITNESS:  Well, like I said, I've seen
13   studies in the literature.  I looked at them while I was
14   doing my activated carbon research, and the researchers
15   considered the work a failure.
16          JUDGE MCNAMARA:  But there's some capability, as
17   Mr. Tucker asked.
18          THE WITNESS:  There was some lead absorbed to the
19   carbon, but it was extremely small, and the researchers
20   concluded that the carbon did not have an affinity for lead.
21          JUDGE MCNAMARA:  Thank you.
22   BY MR. TUCKER:
23     Q.   Mr. Kotarski, could we go to CDX-008C 62.
24          Now this is marked as CBI, but this is Aqua Crest
25   CBI, and I think this was done perhaps out of an abundance

1    of caution, and it is actually not CBI.  So I don't think we

2    need to clear the room.

3         JUDGE MCNAMARA:  Okay.

4         Q.   Dr. Rockstraw, can you please tell the Court what

5    this demonstrative is that you had put up yesterday?

6         A.   This is a deconstructed Aqua Crest filter.

7         Q.   Let's skip the filter body on the far left, but

8    that photo that has the couple components in it, starting on

9    the left, going left to right, can you tell me what you're

10   showing there?

11        A.   Yeah, the element on the far left is cut from the

12   bottom of the filter housing, and that is the component that

13   contained the activated carbon fiber map.

14        Do you want me to describe all of the four

15   components on the page?

16        Q.   Just to speed it up, just go across the page

17   instead of doing ten questions or whatever.

18        A.   Okay.  The second element is the filter

19   cartridge.  That holds the packed bed material, the media.

20   The third element is the ion exchange resin that was

21   contained in that filter cartridge.  And then the fourth

22   element on the right is the cap and the distributor that

23   were cut from the top of the filter cartridge.

24        Q.   Okay.  So the material in the glass plate that

25   you call the ion exchange resin, that is made of

1    polystyrene, correct?

2        A.    That's correct.

3        Q.    Okay.  And Dr. Rockstraw, did you or Brita test

4    any of the components in that photo, the activated carbon,

5    the polystyrene, individually to see if they reduced lead?

6        A.    No.

7        Q.    So it's correct that you have no testing results

8    that quantify the amount of lead removed just by the

9    polystyrene, right?

10        A.    That's correct.  The testing was done on the

11    entire filter.

12        Q.    Okay.  Let's move on.  I want to go back to TDS.

13    We talked about it a little bit yesterday.

14              Can you remind us what TDS stands for?

15        A.    Total dissolved solids.

16        Q.    Okay.  And lead is not part of what is considered

17    to be total dissolved solids, correct?

18        A.    That's correct.

19        Q.    Could you tell us, just representative, I don't

20    need an exhaustive list, but just tell us what is considered

21    in TDS?

22        A.    It's the minerals and other elements that would

23    be colloidal suspended in the solution.

24        Q.    Okay.  So like calcium, potassium, sodium, those

25    sorts of minerals?

1      A.   Yes.

2      Q.   Okay.  Dr. Rockstraw, it's correct that you based

3   your claim lifetime for the Aqua Crest 7023 B filter on a

4   TDS chart?

5      A.   Well, TDS was an element of that chart.  I based

6   my selection of the range on the fact that the Aqua Crest

7   filter was advertised as a replacement for the ZeroWater

8   filter, and the ZeroWater filter had a claimed lifetime of

9   20 gallons.  So I picked that range based on its comparison

10  to ZeroWater.

11     Q.   Okay.  Did you pick the ZeroWater 20-gallon

12  lifetime based on any relationship to TDS?

13     A.   No, I picked the ZeroWater lifetime because it

14  was -- it had an NSF 53 certification for 20 gallons.

15     Q.   Okay.  So your selection of 20 gallons for the

16  ZeroWater was based in no part and had no relationship with

17  TDS, correct?

18     A.   That's correct.

19     Q.   Mr. Kotarski, can we go to CX-0166.

20          Your Honor, again, this was marked as Aqua Crest

21  CBI, but we will -- it is -- we've realized it is not.  We

22  can redesignate this later, if need be, but this is not CBI.

23  We don't need to clear the room.

24          JUDGE MCNAMARA:  I think you should redesignate

25  it.

```
 1              MR. TUCKER:  Okay.  Let me write myself a note.
 2       Q.   Okay.  Dr. Rockstraw, the far right, you chose --
 3   you see the column that says expected quantity of per
 4   filter?
 5       A.   I see that.
 6       Q.   Okay.  And you chose the row that corresponds to
 7   the 15 to 25 gallons?
 8       A.   That is also correct.
 9       Q.   And if we go across that row, do you see the
10   column labeled contaminant level?
11       A.   I do.
12       Q.   And 15 to 25 gallons corresponds to high under
13   contaminant level, right?
14       A.   Yeah, that's how it's categorized.
15       Q.   And then we go to the next, the far left column,
16   tap water TDS, it has numbers, 201 to 300.  Do you see that?
17       A.   I do.
18       Q.   Could you tell us, what's that a measure of?
19   What's that reflecting?
20       A.   Are you asking me about the number 201-300?
21       Q.   Yeah, just generally, what does tap water TDS,
22   what is that column telling us, those numbers?
23       A.   The total dissolved solids in the tap water.
24       Q.   Okay.  Thank you.  And do you see -- so you
25   chose, under contaminant level, you chose high, correct?
```

1          A.   I didn't choose it based on the label of high.

2     In fact, I didn't even note that.  I choosed -- I chose it

3     based on the comparison to the ZeroWater filter.

4          Q.   And ZeroWater was at 20, correct?

5          A.   That's correct.

6          Q.   And you chose this row because, under expected

7     quantity, it was 15 to 25, correct?

8          A.   I'm sorry.  The question?

9               JUDGE MCNAMARA:  I'm sorry.  You're talking in

10    terms of gallons?  Please be explicit.

11              MR. TUCKER:  Yes.

12         Q.   Let me ask that question again.

13              So when you chose the lifetime for Aqua Crest,

14    you chose the range 15 to 25 gallons because that includes

15    20, which is the lifetime for ZeroWater, correct?

16         A.   That is correct.

17         Q.   Okay.  But you didn't use -- you didn't choose

18    20; you chose 15?

19         A.   That's correct.

20         Q.   Okay.  Now if you will, Mr. Kotarski, let us move

21    to CDX-008C.70.  And this, I believe -- this is not CBI.

22    Never mind.  Next one.

23              Is this your demonstrative illustrating how you

24    calculated FRAP for the Aqua Crest 7023 filter?

25         A.   Yes, it is.

1     Q.   And you have a volume of filter media as 500,

2  correct?

3     A.   Correct.

4     Q.   And you have average filtration unit time of 3.6

5  minutes a liter, correct?

6     A.   That's correct.

7     Q.   And your Ce, which is the effluent lead

8  concentration, is 1.48?

9     A.   That's correct.

10    Q.   And then your filter usage lifetime is 15, right?

11    A.   That is also correct.

12    Q.   And do you see above the equation where it says

13  considered testing performed by Mr. Nishijima?  Do you see

14  that?

15    A.   I do.

16    Q.   Okay.  Could we -- and he performed the testing

17  for you to get the numbers in your little table there on the

18  bottom of CDX-008C.70, right?

19    A.   Yes.  Mr. Nishijima did perform the experimental

20  work.

21    Q.   Okay.  Let's go to CDX-008C.73.

22       Can you tell us, Dr. Rockstraw, what we're

23  looking at on this slide?

24    A.   This slide shows the results of the ICP mass spec

25  testing at various stages of testing of the filter at

1    various points in the lifetime, and the final value is the

2    lead concentration that was measured at 100 percent or after

3    57 liters had passed through the filter.

4         Q.   Okay.  So going through this, filtered gallons,

5    do you see that column?

6         A.   Yes, I do.

7         Q.   That corresponds ultimately to, as you're trying

8    to determine the lifetime of the Aqua Crest 23, 7023B,

9    right?

10        A.   I'm sorry.  Please repeat the question.

11        Q.   That column is showing the measurements

12   Mr. Nishijima was taking to determine the lifetime, the

13   filter usage lifetime, of the FRAP equation?

14        A.   That value represents the lifetime of the filter

15   at the point the sample was taken.  So the sample -- the

16   second sample taken at 19 liters represented a filter

17   lifetime of 5 gallons.

18        Q.   Okay.  And then the third sample is approximately

19   6 gallons?

20        A.   6.34, correct.

21        Q.   10.04 gallons for the second sample?

22        A.   The fourth sample.

23        Q.   I said second.  Yes, fourth sample.  And then the

24   fifth sample, 15.06, correct?

25        A.   That's correct.

1      Q.   Okay.  If we go over to the column effluent Pb,

2   do you see that column?

3      A.   Effluent?

4      Q.   Effluent, yes.

5      A.   I see it.

6      Q.   And Pb stands for lead, correct?

7      A.   Yes, it does.

8      Q.   I got to say, it's plumbum, my high school Latin

9   teacher, Mr. Roddy, would be very proud of me for

10   remembering that.

11          The first sample there is at 2.66, but then the

12   second sample is at 0.2.  Can you explain to us what

13   Mr. Nishijima was doing there?

14      A.   Well, after pouring the first liter through the

15   filter, the water that came out the filter he sampled, and

16   he tested it for lead by ICP mass spec.

17          He then dumped the reservoir, poured a second

18   liter, dumped the reservoir, poured a third liter.  He did

19   that consecutively until the 19th liter, and then he sampled

20   the collection reservoir after the 19th liter and tested it

21   by IC mass spec also.

22      Q.   Okay.  And he ultimately ended up at 15.06 with

23   an effluent lead of 1.48, right?

24      A.   That's correct.

25      Q.   Okay.  Are these the only measurements he took?

1        A.   He took a lot of measurements in the laboratory,

2   so, no, they are not the only measurements he took.

3        Q.   Are these the only measurements for the

4   Aqua Crest 7023B that he reported?

5        A.   I don't believe so.

6        Q.   Okay.  There's one other one, isn't there.

7        A.   I believe he has more, yes.

8        Q.   Okay.  Let's go to CX-0192C.0010.  This is

9   Brita's CBI -- I'm sorry, Ken, I need to make sure that --

10   we're checking the list.  Thank you.

11

12            (Whereupon, the hearing proceeded in confidential

13   session.)

14

15

16

17

18

19

20

21

22

23

24

25

Appx22560-22561 redacted in their entirety

```
1                    O P E N   S E S S I O N

2

3   BY MR. TUCKER:

4        Q.   So a filter usage lifetime in the FRAP equation

5   of 15 has an effluent lead concentration of 1.48, right?

6        A.   That was what Mr. Nishijima's laboratory

7   measured.

8        Q.   And his lab also measured that, when the lifetime

9   is 20.08 gallons, the effluent lead concentration would be

10  approximately 10.5, correct?

11       A.   Those are the measurements his laboratory made,

12  yes.

13       Q.   Okay.  Let's go up to the equation there.

14            So if we were using the ZeroWater 20 gallons, it

15  would substitute for the 15, correct?

16       A.   That's correct.

17       Q.   Okay.  And in your words, the Aqua Crest 7023B

18  and the ZeroWater 5-stage are interchangeable, right?

19       A.   Please repeat that.  I'm sorry.

20       Q.   In your words, the Aqua Crest 7023B filter is

21  interchangeable with the ZeroWater 5-stage filter.

22       A.   I don't recall that I used the word

23  interchangeable.  I believe I said that Aqua Crest

24  advertises that as a replacement.

25       Q.   Actually I believe in your report, and we read
```

1  this yesterday, you used the phrase "interchangeable."  I

2  don't want to split hairs since we've got a lot to do today,

3  so let's move on.

4          But as a replacement, you could put that 20 in

5  there, right?

6      A.   Well, 20 is another claimed lifetime for the

7  Aqua Crest filter on their product literature.

8      Q.   Okay.  So it's a claimed lifetime, right?

9      A.   Correct.

10     Q.   Okay.  And it has a dramatic effect, because if I

11 put 20 into that equation, so now the denominator is 40

12 instead of 30, what happens to the effluent lead

13 concentration, Dr. Rockstraw?  I can't keep using 1.48, can

14 I?

15     A.   No, you would use the 10.5.

16     Q.   Okay.  And if I do the 10.5, that's going to come

17 out to north of 470, 471, somewhere around there.  Do you

18 want to do the math or will you accept my representation on

19 the arithmetic?

20     A.   I'll accept your representation.

21          JUDGE MCNAMARA:  I just wanted you to drive home

22 that point.

23     Q.   So when you use 20 gallons with an Aqua Crest

24 7023B filter versus 15, the effluent lead concentration

25 increases not quite tenfold, but near tenfold, correct?

1     A.   Not quite, but almost an order of magnitude,
2  that's correct.
3     Q.   Thank you.  Almost an order of magnitude.  So you
4  just testified that 20 is a claimed lifetime for the
5  Aqua Crest 023 B filter, right?
6     A.   Correct.  The document you put up earlier in the
7  day showed that Aqua Crest claims lifetime from under 8 to
8  over 40.
9     Q.   Does Aqua Crest ever claim a lifetime related to
10  the removal of lead?
11     A.   No, the document does not mention lead.
12     Q.   Okay.  The document you relied on for
13  Aqua Crest's purported claimed lifetime has nothing to do
14  with lead, correct?
15     A.   It does not mention lead, you're correct.
16     Q.   So this FRAP equation is about determining lead
17  removal, right, on a high level, right?
18     A.   Correct.
19     Q.   Okay.  So the ZeroWater 20 gallons comes off of a
20  lead removal measurement, right?
21     A.   That's certified by NSF 53 for lead removal,
22  correct.
23     Q.   Okay.  And this equation, this FRAP equation, is
24  about lead removal, right?
25     A.   Yes, it is.

1    Q.   But when you ran this equation for Aqua Crest,

2  you didn't use a number based on lead removal; you used a

3  number based on TDS, correct?

4    A.   No, just because the document correlates TDS with

5  lifetime, that's not the reason I selected it.  I selected

6  it, the range, based on the comparison to the ZeroWater

7  filter, not only through the advertisement, but through my

8  analysis of the composition of the filter, that they were

9  compositionally similar and they both removed lead.

10    Q.   And the range goes from 15 to 25, correct?

11    A.   I don't understand the question.

12    Q.   The range you chose goes from 15 to 25 gallons.

13    A.   That's correct.

14    Q.   Okay.  And ZeroWater is at 20, correct?

15    A.   That's correct.

16        JUDGE MCNAMARA:  Twenty gallons, please.

17        MR. TUCKER:  Twenty gallons.

18    Q.   ZeroWater is at 20 gallons, right?

19    A.   That's correct.  It's certified by NSF 53 at 20

20  gallons.

21    Q.   And the 023 B is a replacement for the ZeroWater

22  5-stage, right?

23    A.   I'm sorry.  Please say that again.

24    Q.   The Aqua Crest 7023B is a replacement for the

25  ZeroWater 5-stage.

 1        A.   That's correct.

 2        Q.   Okay.  And even though it's a replacement and

 3   even though in the range of 15 to 25 gallons that you looked

 4   at, 20 gallons was available in that range, but you did not

 5   choose it, correct?

 6        A.   That's correct.

 7        Q.   You chose 15, correct?

 8        A.   I did.

 9        Q.   Because 15 gets you under the 350 limitation on

10   FRAP, right?

11        A.   15 does result in a FRAP value of less than 350

12   based on the measured effluent lead concentration at the end

13   of a 15-gallon lifetime.

14        Q.   And when you use 20 gallons as the lifetime with

15   the Aqua Crest 7023B filter, and the proper effluent lead

16   concentration, you get a number above 350 for FRAP, correct?

17        A.   That was the calculation you just walked me

18   through, correct.

19        Q.   Thank you.  So you understand, Dr. Rockstraw,

20   what it seems to me is you have the Aqua Crest 7023B as a

21   replacement to ZeroWater, but instead of using the ZeroWater

22   number, because it ends up over 350, you cherry-picked 15 to

23   get under FRAP, right?  Is that what happened here?

24        A.   I wouldn't say it was cherry-picked.  I had a

25   number of values I could have performed the calculation at

1  based on the values collected by Mr. Nishijima's laboratory.

2      Q.   And you didn't even report the 20 gallon

3  Nishijima number to the court yesterday, did you?  It wasn't

4  in your slide, was it?

5      A.   It was not in my demonstrative, but I believe it

6  was in discovery.

7      Q.   Right.  But you didn't use it yesterday.  That

8  wasn't part of your testimony yesterday.  You left it out.

9      A.   It was not included in my demonstratives, that's

10  correct.

11      Q.   Okay.  So at the end of the day, the Aqua Crest

12  7023B is a replacement for the ZeroWater 5-stage, correct?

13      A.   That's how it's advertised, yes.

14      Q.   Okay.  And at the end of the day, ZeroWater, the

15  lifetime you used for ZeroWater, is 20 gallons, correct?

16      A.   Based on their NSF 53 certification for 20

17  gallons, that's correct.

18      Q.   And at the end of the day, for the Aqua Crest

19  7023B, which you have testified is a replacement for the

20  ZeroWater 5-stage filter, you did not use the same lifetime,

21  did you?

22      A.   No, I used a lifetime advertised or claimed by

23  the manufacturer.

24      Q.   And you got that lifetime quote advertised by the

25  manufacturer from a range of 15 to 25, correct, 15 to 25

1    gallons, correct?

2        A.    I believe I got it from a range of under 8 to

3    over 40, but I zeroed in on the 15 to 25 range first.

4        Q.    Okay.  You honed in.  You zeroed in on the 15 to

5    25 gallons, right?

6        A.    Correct.

7        Q.    And you could have chose 20 in that, right, 20

8    gallons?

9        A.    I could have chose any value for which

10    Mr. Nishijima's laboratory had an effluent lead

11    concentration after pouring a particular amount of water

12    through that filter, so I could have chosen anything from 1

13    to 20.

14        Q.    So when I questioned Mr. Nishijima yesterday, do

15    you recall that I put up the 15 gallons and I put up the 20

16    and I asked him, were there anything in between or any other

17    measurements, and he said no?  Do you remember that?

18        A.    I do.

19        Q.    Okay.  So you had two numbers to pick from.  You

20    had 15 or 20.  You chose 15 because that gets you a FRAP

21    under 350, correct?

22        A.    Again, I chose 15 because it was a claimed

23    lifetime for the filter by the manufacturer.

24        Q.    And when you use 15, you're under 350, right?

25        A.    That's correct.

1    Q.   Okay.  But when you use 20, which is -- 20

2   gallons -- which is the lifetime that ZeroWater says use for

3   this 7023B filter that is a replacement for ZeroWater, when

4   you use 20, that takes you up to a 10.5 effluent lead

5   concentration and that gets you a FRAP of 470 and change,

6   correct?

7    A.   That's the calculation you walked me through,

8   correct.

9    Q.   Okay.  And if the 7023B's FRAP is 470, it does

10   not infringe the claims of the '141 patent, correct?

11    A.   If you select a lifetime of 20 gallons, you get a

12   FRAP of above 350, that's correct.

13    Q.   Okay.

14    JUDGE MCNAMARA:  I think he asked a different

15   question.  And so I would like you to provide your opinion

16   on that, and I think the question was correct, and I think

17   it was direct.

18    So, Dr. Rockstraw, the question is:  If there is

19   a FRAP of 470 when the Aqua Crest 0203 B is used as

20   replacement, it does not infringe; isn't that correct?

21    THE WITNESS:  I guess I'm not understanding the

22   nuance of the question.

23    JUDGE MCNAMARA:  Well, you came here to testify

24   about infringement of products, of accused products,

25   correct?

1           THE WITNESS:  That's correct.

2           JUDGE MCNAMARA:  So what's the conclusion here if

3    a 20-gallon -- if the 20 gallons is used for the 7203 B

4    replacement filter and you end up with a FRAP above 350, it

5    cannot infringe the claim at issue.

6           THE WITNESS:  If you use a lifetime of 20

7    gallons, that would be correct.

8           JUDGE MCNAMARA:  Thank you.

9           MR. TUCKER:  I don't think I could have asked

10   that better, so at this point, Dr. Rockstraw, I thank you

11   for your time and I'm going to pass you to my colleague

12   Jared Brandyberry.  So give us one second to hand off here.

13          JUDGE MCNAMARA:  Sure.  Thank you.

14          MR. BRANDYBERRY:  Good morning, Your Honor.

15   Jared Brandyberry for the ZeroWater Respondents.

16          JUDGE MCNAMARA:  Good morning, Mr. Brandyberry.

17          MR. BRANDYBERRY:  Are we on the CFPB record right

18   now?

19          JUDGE MCNAMARA:  I think we're on public.

20          THE REPORTER:  Yes, Your Honor.

21          MR. BRANDYBERRY:  I'm fine staying on the public

22   record.

23                          CROSS-EXAMINATION

24   BY MR. BRANDYBERRY:

25       Q.  Mr. Kotarski, if we can pull up CDX-8 at page 37,

1    please.

2           And so this slide here discusses the ZeroWater

3    redesign products, correct, Dr. Rockstraw?

4    A.    Yes, it does.

5    Q.    And here you're saying that the redesign products

6    infringe for just the same reason as the original products

7    because the filters are identical, correct?

8    A.    That's correct.

9    Q.    But you admit here that there is a difference,

10   and the difference is on the printed material on the

11   packaging, correct?

12   A.    That's correct.

13   Q.    And you were here yesterday when Mr. Nishijima

14   testified that he ran the testing of the ZeroWater filter to

15   76 liters because he looked at ZeroWater's packaging and saw

16   the lifetime was 20 gallons, right?

17   A.    I don't recall that specific testimony, but I

18   believe that's correct.

19   Q.    Okay.  And let's start going through the

20   redesigns here.

21          Do you remember the changes that were on

22   ZeroWater Redesign A?

23   A.    No.  You'd have to show me.

24   Q.    Sure.  Let's look at your expert report where you

25   walk through these.

1          If we can pull up RX-1040C, and we'll have to go

2    to paragraph 406.

3          Do you see here in the middle that ZeroWater is

4    claiming that it doesn't possess -- Redesign A does not

5    possess a lifetime because it does not include an alleged

6    lifetime in gallons anywhere on the packaging?  Do you see

7    that?

8          A.   I do.

9          Q.   And so you agree that ZeroWater's Redesign A

10   product doesn't have a lifetime in gallons anywhere on the

11   packaging, right?

12         A.   That's my understanding of the redesign, yes.

13         Q.   Let's go to Redesign B.

14         Do you recall the differences in ZeroWater's

15   Redesign B product?

16         A.   I don't recall them, no.

17         Q.   Okay.  And let's go to paragraph 488 of your

18   report.

19         Do you see here that ZeroWater is claiming the

20   Redesign B does not possess a lifetime because it doesn't

21   include a lifetime in gallons anywhere in the packaging and

22   further does not contain an NSF Standard 53 certification

23   anywhere on the packaging, sorry, Standard 53 certification

24   anywhere on the packaging?  Do you see that, Dr. Rockstraw?

25         A.   I do.

1          Q.    And so you agree that ZeroWater's Redesign B
2    product does not have a lifetime in gallons on the packaging
3    or an NSF Standard 53 claim anywhere on the packaging,
4    right?
5          A.    That's correct.
6          Q.    Okay.  And let's go to Redesign C.
7                Do you remember the change that was on Redesign C
8    for the ZeroWater product?
9          A.    No.  Please show me.
10         Q.    Okay.  Let's go to paragraph 569 of your report.
11               And do you see for ZeroWater Redesign C the
12   changes that it doesn't include a lifetime in gallons on the
13   packaging and further doesn't contain any NSF ANSI
14   certification anywhere on the packaging?  Do you see that?
15         A.    I do.
16         Q.    And so we're in agreement that ZeroWater's
17   Redesign C product doesn't have a lifetime in gallons on the
18   packaging or any NSF standard claim anywhere on the
19   packaging, right?
20         A.    No, the verified lifetime is no longer on the
21   packaging.
22         Q.    And do you recall the differences in ZeroWater's
23   redesign D product?
24         A.    I don't recall them as I sit here.
25         Q.    Okay.  Let's go to paragraph 650 of your report.

1    You see here in the middle that redesign D does

2    not have a lifetime in gallons anywhere on the packaging, it

3    doesn't have any NSF certification on the packaging, and it

4    further doesn't have a reference to ZeroWater's website on

5    the packaging?  Do you see that?

6    A.   I do.

7    Q.   And so do we have an understanding now of the

8    differences between ZeroWater Redesign A, B, C, and D?

9    A.   I now have a full recollection, yes.

10    Q.   So it's your opinion, as Brita's expert in this

11    investigation, that despite not having a lifetime anywhere

12    on the packaging in gallons, the ZeroWater redesign products

13    infringe because the filter was certified under Standard 53;

14    is that correct?

15    A.   Yeah, the filter still has a validated lifetime

16    even though it's not on the packaging.

17    Q.   And so it's your opinion that, even if a

18    manufacturer or seller doesn't claim a lifetime on their

19    packaging or advertising, that the mere act of obtaining a

20    certification under Standard 53 can be used to show lifetime

21    under the '141 patent.

22    A.   As a person of skill that defines lifetime for me

23    for purposes of performing the FRAP calculation.

24    Q.   So I want to be clear.  So you're a person of

25    ordinary skill in the art, you're conducting the FRAP

1  calculation, to obtain a lifetime, what the manufacturer and

2  seller claims on their packaging and advertising is

3  irrelevant to you deciding lifetime for the FRAP calculation

4  under the '141 patent.

5      A.    Please repeat the question.

6      Q.    I just want to be clear here.  So you, as an

7  expert in this case, a person of ordinary skill in the art,

8  doing a FRAP calculation, what the manufacturer and seller

9  claims on their packaging is irrelevant for you selecting

10  lifetime under the '141 patent.

11      A.    Well, I believe the NSF 53 certification tells

12  the manufacturer they cannot make a claim unless it's been

13  certified.  So something claimed on the package would have

14  to be certified.

15      Q.    But, Dr. Rockstraw, we just walked through the

16  different redesigns here, and you would agree that, for

17  example, Redesign C and Redesign D, there is no claim in

18  lifetime in gallons on the packaging and there is no NSF

19  certification claim on the packaging, correct?

20      A.    I understand that those things are not on the

21  packaging, that's correct.

22      Q.    So for Redesign C and Redesign D for the

23  ZeroWater products, is it your opinion that it's irrelevant

24  to determine lifetime under the '141 patent -- let me

25  rephrase that.

1        So is it your opinion for ZeroWater Redesign

2  Products C and D that the lack of a lifetime in gallons and

3  the lack of an NSF certification on the packaging is

4  irrelevant to determining lifetime in the FRAP equation of

5  the '141 patent?

6        A.    It didn't guide my decision on what lifetime to

7  use.  What guided my decision was the fact that the filter,

8  the physical filter, contained in that packaging that make

9  no claims is still the same filter that was certified by NSF

10  53.

11        Q.    So it's your opinion that if a manufacturer and

12  seller does not claim a lifetime on their packaging or

13  advertising and also does not seek certification under NSF

14  Standard 53, that the filter can still have a lifetime under

15  the '141 patent.

16        A.    Well, a lifetime is knowable and measurable.

17  It's a characteristic of the filter.  So just because it's

18  not on the packaging doesn't tell me that it doesn't have a

19  lifetime.

20        Q.    So it's knowable and measurable, that's your

21  opinion as you sit here today, that despite it not being on

22  the packaging, it not being certified, lifetime is knowable

23  and measurable, that's your opinion, correct?

24        A.    That's correct.

25        Q.    Okay.  And that knowable and measurable lifetime

1    is not being claimed anywhere on the packaging or

2    advertising in that situation by the manufacturer or seller,

3    correct?

4        A.    Not being claimed, but the measurement has been

5    performed.

6        Q.    Who has performed the measurement?

7        A.    Well, water quality authority under NSF 53.

8        Q.    Who has authorized them to perform it?

9        A.    Well, they performed it on the first version of

10   the Aqua Crest filter, which -- I'm sorry -- the ZeroWater

11   filter, which, it's my understanding, has not been

12   physically changed.

13       Q.    Let's take a step back.  So let's have a filter

14   here that has never been certified by the NSF, okay, can we

15   have that understanding?

16       A.    Yes.

17       Q.    Okay.  That filter, is it your opinion here today

18   that, when selling that filter, if the packaging does not

19   claim a lifetime in gallons and does not have an NSF

20   certification on the packaging, is it your opinion that that

21   filter can still have a lifetime under the FRAP equation for

22   the '141 patent?

23       A.    It is.

24       Q.    And that's because it's knowable and measurable,

25   right?

1      A.    It's a characteristic of the filter, that's
2  correct.
3      Q.    But in that situation we just discussed where it
4  has not been certified by the NSF, it is not the
5  manufacturer and seller claiming the lifetime on the
6  packaging, correct?
7      A.    The manufacturer has not claimed it on their
8  packaging, that's correct.
9      Q.    And in fact, in that situation the manufacturer
10  or seller wouldn't know the lifetime of the filter.
11      A.    I can't imagine a manufacturer would put a filter
12  on the market without having understood or measured the
13  filter's performance characteristics.
14      Q.    Okay.  In that situation we're talking about,
15  would it be sufficient for a third party to obtain the
16  filter and measure the lifetime?
17      A.    Did you say would it be sufficient?
18      Q.    Let's say the manufacturer and seller have never
19  tested it, haven't claimed a lifetime, haven't sought
20  certification.  Could a third party obtain the filter and
21  determine the lifetime, would that be sufficient in your
22  opinion under the '141 patent?
23      A.    If the third party obtained the filter by
24  purchasing it on the open market, they could do testing on
25  it, yes.

1      Q.   And that testing could be used to establish a

2   lifetime for the FRAP equation on the '141 patent, right?

3      A.   That's correct.

4      Q.   Now did you know the average price of the

5   ZeroWater pitchers are somewhere between $23 and $38?

6      A.   I don't know that, no.

7      Q.   Okay.  Would it surprise you to learn that that's

8   about the average retail price of those pitchers?

9      A.   That wouldn't surprise me.

10     Q.   Okay.  To do the testing that Mr. Nishijima

11  outlined yesterday, my understanding is you need a lot of

12  tanks, personnel that know how to prepare the challenge

13  under Standard 53, and you need a mass spec machine to

14  measure the effluent lead concentration; is that correct?

15     A.   That's correct.

16     Q.   So if a consumer is the third party and they want

17  to determine the lifetime, they have to take their $25

18  pitcher and buy thousands of dollars worth of equipment to

19  determine the lifetime, right?

20     A.   That's not true.

21     Q.   Why not?

22     A.   I contract third-party laboratories to do

23  analyses for me all the time.  This could be a contracted

24  job to somebody who already has the capabilities.

25     Q.   So the consumer is going to buy his $25 pitcher

1    and then he is going to contract with a laboratory so that

2    laboratory can determine the lifetime for his pitcher so he

3    knows when to replace it.  That's your testimony here today?

4        A.   If a consumer wants to know a lifetime on a

5    filter they purchased that doesn't have a lifetime, that's

6    the procedure they would have to follow, yes.

7        Q.   Let's go back to Dr. Rockstraw's slides at slide

8    47.

9             Dr. Rockstraw, the volume measurement that we

10   have here used in your infringement opinion relies on

11   Mr. Nishijima's testing, correct?

12       A.   Yes, Mr. Nishijima's laboratory performed those

13   measurements.

14       Q.   Okay.  And you yourself, you did not actually

15   measure the volume of the filter media in the ZeroWater

16   filter, correct?

17       A.   I did not do the work myself, that's correct.

18       Q.   Okay.  And I believe you said yesterday that in

19   your opinion it only needed perhaps a high school level of

20   education to measure the volume of filter media in a

21   gravity-fed filter, right?

22       A.   That was my testimony, yes.

23       Q.   But Mr. Nishijima made some mistakes in measuring

24   the volume of the filter media in the ZeroWater filter,

25   right?

```
 1          A.   I don't recall him making mistakes, no.
 2          Q.   Let's go to your next slide here.  Do you see
 3     this bullet 2 down here?
 4               JUDGE MCNAMARA:  I'm sorry.  Could you identify
 5     the slide, please?
 6               MR. BRANDYBERRY:  Thank you, Your Honor.  We're
 7     on CDX-8 at slide 48.  Previously we were on CDX-8 slide 47,
 8     but we're now on slide 48.  Thank you, Your Honor.
 9          Q.   So you talk in bullet 2 here that the volume of
10     the screens and foam pad is trivial relative to the granular
11     activated carbon and ion exchange.
12               Did I read that correctly?
13          A.   Yes, you did.
14          Q.   And this reference to the screen and foam pad are
15     related to other stages of ZeroWater's 5-stage filter for
16     which Mr. Nishijima failed to measure the volume, correct?
17          A.   Zero considers them stages in the filter.  I
18     don't consider them media in the filter, though.
19          Q.   Okay.  And, in fact, if we can pull up -- let's
20     go to CDX-8 at slide 42.
21               Here we have the five stages claimed by
22     ZeroWater, correct?
23          A.   Correct.
24          Q.   And, in fact, Mr. Nishijima only measured two of
25     these stages, stage 3 for activated carbon and stage 4 for
```

1    the ion exchange, correct?

2        A.    That's correct.

3        Q.    And there are three stages that Mr. Nishijima

4    failed to measure, correct?

5        A.    He didn't measure the two filters or the foam

6    distributor, but, in my mind, those are not active media.

7    The screens are functioned to keep the media in place and

8    the foam distributor functions to assure the water is evenly

9    distributed across the top of the bed.

10        Q.    Okay.  Yesterday you said you read the claim

11    construction in between your opinion and yesterday's

12    testimony, right?

13        A.    I did read the claim construction, yes.

14        Q.    Mr. Kotarski, can we go to page 11 of the claim

15    construction opinion, please.

16            JUDGE MCNAMARA:  And that, for the record, is

17    Order No. 30.

18            MR. BRANDYBERRY:  Thank you, Your Honor.

19        Q.    Do you see the sentence here where it says,

20    therefore, the volume, V, includes the volume of filter

21    media, but is not limited to mixed media volume or carbon

22    block volume within the gravity-fed filter because the

23    volume may also include the volume of membranes or other

24    features associated with filtering techniques that may be

25    present in the filter.

1          Did I read that correct?

2     A.   You did.

3     Q.   Wouldn't you agree that some of those three

4  stages that Mr. Nishijima failed to measure are associated

5  with filtering techniques that --

6     A.   I'm sorry.  I didn't hear the end of the

7  question.

8     Q.   I apologize.  I kind of stumbled there.

9          Dr. Rockstraw, wouldn't you agree that some of

10  the three stages that Mr. Nishijima failed to measure are

11  associated with filtering techniques in the ZeroWater

12  filter?

13    A.   Well, if you have chunks in your tap water, the

14  initial screen would take out those chunks and that would be

15  considered filtration, but it really has nothing to do with

16  lead.

17    Q.   Is there anything in here that limits filtering

18  techniques to lead?

19    A.   Well, when I read claim 1 in context of the '141

20  patent, it's referring me to lead separation, yes.

21    Q.   Didn't you just give testimony about activated

22  carbon and you were talking about how it really didn't

23  remove lead, maybe it removed a little, but essentially the

24  efficacy was extremely limited?

25    A.   Yes.

1      Q.   Okay.  So does activated carbon remove or not
2  remove lead?
3      A.   No engineer designing a filter would include
4  activated carbon for the purpose of removing lead.  So, from
5  that perspective, I would say it does not remove lead.
6      Q.   But you measured the activated carbon, you and
7  Mr. Nishijima, came to an understanding you measured the
8  activated carbon to measure the volume of filter media,
9  correct?
10     A.   I did, because activated carbon is explicitly
11  called out in the limitations of claim 1.
12     Q.   Let's go to JDX-22, Mr. Kotarski, and if we can
13  go to claim 1.
14          You're familiar with claim 1 of the '141 patent,
15  I think, Dr. Rockstraw, right?  Do you see here where it
16  says filter media including at least activated carbon and a
17  lead scavenger?
18     A.   I do.
19     Q.   And what do you understand by that "at least"?
20     A.   That it at least includes those two components.
21     Q.   And that it may contain other components
22  constituting the filter media?
23     A.   It could be interpreted as that, yes.
24     Q.   Let's go back to CDX-8 at slide 48.
25          Dr. Rockstraw, Mr. Nishijima only measured the

1    activated carbon and the ion exchange in the ZeroWater

2    filter, correct?

3        A.    Correct.

4        Q.    So his measurement of 550 cubic centimeters is

5    the volume he measured just for the two stages, one with

6    activated carbon and one with ion exchange, correct?

7        A.    That is correct.

8        Q.    And even if he made a trivial error, you're still

9    relying on this 550 cubic centimeters volume for your FRAP

10   calculation to claim that the ZeroWater product infringes,

11   correct?

12       A.    I did use the 550, and I got a FRAP value on the

13   order of 22, and so even if this volume of filter media was

14   off by maybe 1 percent, it wouldn't change the FRAP

15   calculation by that much, and definitely would not have

16   changed my opinion.

17       Q.    What if the volume of the filter media was off by

18   25 percent, would that change your opinion?

19       A.    I would have to redo the FRAP calculation for a

20   25 percent difference in the volume of media, but I know he

21   didn't make a 25 percent error in the calculation or the

22   measurement.

23       Q.    Let's make it -- you would agree that, if it's a

24   25 percent error in the volume of the filter media, the FRAP

25   is still going to be below 200 and 350, correct,

```
 1   Dr. Rockstraw?

 2        A.   I believe that's correct, yes.

 3        Q.   Okay.  Let's go to slide 49.

 4             Dr. Rockstraw, here you have flow rate testing

 5   that Mr. Nishijima did that you relied on, correct?

 6        A.   That's correct.

 7        Q.   As noted here, the average flow rate measurement

 8   that you rely on in your opinion is 11.8 minutes per liter,

 9   correct?

10        A.   That's correct.

11        Q.   And it's also noted here that you relied on

12   measurements of 72 of 76 filtered liters, correct?

13        A.   That's also correct.

14        Q.   Claim 5 of the '141 patent concerns average

15   filtration unit time less than 12 minutes per liter,

16   correct?

17        A.   That's correct.

18        Q.   If we can remove the blowup.

19             So four flow rate measurements were discarded

20   when calculating the average flow rate for the ZeroWater

21   filter, correct?

22        A.   That's correct.

23        Q.   And we'll probably have to blow these up so we

24   can see them, but this includes measurements that were

25   simply missed at liters 29 and 64; is that correct?
```

```
 1        A.   That's correct.

 2        Q.   Okay.  And then for two measurements there were

 3   measurements at liter 6 and 53 that were discarded because

 4   of timing or fill errors, correct?

 5        A.   Correct.

 6        Q.   If we can pull up RDX-14C.

 7             Here, Dr. Rockstraw, you'll see that I've

 8   highlighted the missed liters in yellow and the erroneous

 9   liters in red.  Do you see that?

10        A.   I do.

11        Q.   And the discarded liter at liter 6 for an error,

12   the time entered by Mr. Nishijima was 2,754 seconds,

13   correct?

14        A.   That's correct.

15        Q.   And the time discarded at liter 53 was 1,019

16   seconds, correct?  I guess you have to round up there.

17             Who decided to discard the measurements at liters

18   6 and 53?

19        A.   Mr. Nishijima decided and I concurred.

20        Q.   Okay.  Here on this slide you'll see that, in

21   fact, if those values were included in the average,

22   ZeroWater's filter would actually have an average flow rate

23   of 12.37 minutes per liter.

24             Do you see that?

25        A.   I see that number is up there, but a rational
```

1    statistician would never include those two values in their

2    calculation of an average.

3        Q.    Do you have any reason to doubt the math that, if

4    you include the time from liter 6 and liter 53, the average

5    would come out to 12.37 minutes per liter?

6        A.    I accept your math.  I don't accept your logic

7    for including them.

8        Q.    But you would agree that your decision to exclude

9    these two measurements, move the ZeroWater filter from not

10   infringing claim 5 to infringing claim 5, correct?

11       A.    Well, I was attempting to get a representative

12   average flow rate based on the claims of the patent.  And

13   the 2754 number is obviously an outlier.  If you calculate

14   the average of all these values, and you look at the

15   standard deviation, the standard deviation represents where

16   99 percent of the samples fall relative to the average.

17   That particular value is somewhere around 10 standard

18   deviations from the medium.  So it's an obvious outlier.

19          The 1018 value, as Mr. Nishijima discussed

20   yesterday, was because they failed to empty the reservoir

21   before adding a second liter of water.  And when you do

22   that, the water level reaches the bottom of the filter, and

23   you change the pressure gradient across the filter, and you,

24   therefore, change the amount of time it takes for that liter

25   of water to filter through.  So that one was a procedural

1    error making that value not representative of the actual

2    flow rate.

3            So, statistically, you're obligated to throw

4    those values out.

5        Q.    That was a very long answer.  Thank you.  My

6    question is simple.

7            Dr. Rockstraw, you decided to throw out two times

8    here and the result of that, throwing those two times out,

9    moved the ZeroWater filter from not infringing claim 5 to

10   infringing claim 5, correct?

11       A.    That's the way you look at it.  I look at it as

12   throwing them out because I was looking to get an

13   appropriate value of flow rate.

14       Q.    Let's look at the math.  You used 11.8 to say

15   it's infringing claim 5, correct?

16       A.    That's correct.

17       Q.    If you include the two numbers that you threw

18   out, the flow rate is 12.37, correct?

19       A.    If you include them, that's what you get.  I

20   would not include them.

21       Q.    And if the flow rate is 12.37, the ZeroWater

22   filter does not infringe claim 5, correct?

23       A.    That would be correct.

24       Q.    Okay.  Dr. Rockstraw, there's been some

25   conversations about a TDS meter earlier, and you know what a

1    TDS meter is, correct?

2        A.    I do.

3        Q.    And are you aware that explicitly on ZeroWater's

4    packaging it tells the consumer to replace its filter when

5    it reaches 006 TDS?

6        A.    I recall that element of the packaging, yes.

7        Q.    And so ZeroWater's packaging tells consumers

8    replace your filter when it reaches 006 TDS, correct?

9        A.    That's correct.

10            MR. BRANDYBERRY:  I have no further questions.  I

11   will pass to Mr. Hua.

12            JUDGE MCNAMARA:  I have a quick question before.

13            Can you be more explicit about, then, what the --

14   what that would mean to a consumer in terms of getting to

15   the 006 TDS, how they would do that?

16            Dr. Rockstraw, can you explain that?

17       A.    Please repeat the question.  I didn't hear it

18   all.

19       Q.    Yes.  How would a consumer get to -- how would a

20   consumer know to replace a ZeroWater filter at 006 TDS?

21   What would they have to do?

22       A.    They would have to place the probe in the

23   filtered water and read the measurement.

24       Q.    And that's all they would have to do?

25       A.    That's it.

```
 1              JUDGE MCNAMARA:  Okay.  Thank you.  I just wanted
 2   to be sure.  And the probe in your understanding comes with
 3   the package?
 4        A.   That's my understanding.
 5              JUDGE MCNAMARA:  Okay.  I just wanted -- you need
 6   to nail down -- Mr. Brandyberry, you all need to nail down
 7   some of those details, because there are a lot of documents.
 8   So just going forward, make sure that you're rounding these
 9   things out so that nothing is left to inference.
10              MR. BRANDYBERRY:  Thank you, Your Honor.  I will
11   do so in the future.
12              JUDGE MCNAMARA:  Okay.  Thank you.
13              MR. HUA:  Good morning, Your Honor.  Nelson
14   Hua --
15              JUDGE MCNAMARA:  Good morning, Mr. Hua.
16              MR. HUA:  Good morning.  Nelson Hua on behalf of
17   defendant LifeStraw.  May I proceed?
18              JUDGE MCNAMARA:  Yes.  Thank you.
19                        CROSS-EXAMINATION
20   BY MR. HUA:
21        Q.   Good morning, Dr. Rockstraw.
22        A.   Good morning, Mr. Hua.
23        Q.   When you reviewed the testing data for the
24   accused products in this case, you found that flow rates
25   were especially nonuniform in the tested LifeStraw product;
```

1    is that correct?

2         A.   I found those, the measured values, to be

3    somewhat sporadic, yes.

4         Q.   And you took no steps to try and explain why the

5    flow rates for LifeStraw were especially sporadic; is that

6    correct?

7         A.   Please repeat the question.

8         Q.   You took no steps at that point to try and

9    explain why the flow rates for the LifeStraw product were

10   especially sporadic, in your words, correct?

11        A.   I did not look to explain why, correct.

12        Q.   Okay.  Ken, can we please pull up CX-24.

13             Dr. Rockstraw, you inspected and relied on some

14   of LifeStraw's packaging materials in this case; is that

15   correct?

16        A.   Yes, I did.

17        Q.   And this is some of that packaging?

18        A.   Yes, it is.

19        Q.   So as it notes here, the LifeStraw filter you

20   examined has a first stage membrane microfilter; is that

21   correct?

22        A.   That's correct.

23        Q.   And the membrane microfilter, in your words,

24   contains polycell foam fine tubes; is that correct?

25        A.   I believe that's what we analyzed them to be,

1    yes.

2        Q.   And those fine tubes have pores for water to pass

3    through?

4        A.   Yes, the water will pass radially through the

5    tubes and enter the hollow axial center of the tubes.

6        Q.   And as it states here, the pore size or, rather,

7    yeah, the pore size is .2 microns.  Did I read that

8    correctly?

9        A.   Yes.  I would expect that to be the average pore

10   size because hollow membranes don't have a mono dispersed

11   pore size; it's a distribution around an average.

12       Q.   So the pores on average would mechanically filter

13   out particles larger than .2 microns; is that correct?

14       A.   The pores that are .2 microns would filter out

15   particles larger than .2 microns.  Again, there's a

16   distribution, so there are some pores smaller and there are

17   some pores larger.

18       Q.   So on average, though, those pores would filter

19   out particles larger than .2 microns?

20       A.   On average, that is correct.

21       Q.   And that would include particulate lead larger

22   than point 2 microns?

23       A.   That would include anything larger than .2

24   microns.

25       Q.   And you don't know for any given pore how much

1   particulate lead is filtered out by the pores in the

2   membrane; is that correct?

3        A.   Please repeat that.  I'm sorry.

4        Q.   So in the course of the testing you examined, you

5   don't know for any given pore or for any given liter how

6   much particulate lead was filtered out by the pores in the

7   membrane microfilter; is that correct?

8        A.   No.  We tested the product as it was intended to

9   be used, which include both stage, and we did no analysis of

10  either stage individually.

11       Q.   But it's still your opinion that the LifeStraw

12  product meets the FRAP limitation?

13       A.   Correct.

14       Q.   Okay.

15            MR. HUA:  No further questions.  I will pass the

16  witness to Mr. Swain.

17            JUDGE MCNAMARA:  Thank you, Mr. Hua.

18            MR. AINSWORTH:  Your Honor, it's Paul Ainsworth.

19  We're at almost 11:00.  Would this be a good time for a

20  break?

21            JUDGE MCNAMARA:  Sure.  I think that's a good

22  idea.  So why don't I see you back here at about five past

23  11:00.

24            MR. AINSWORTH:  Thank you, Your Honor.

25            (Whereupon, the proceedings recessed at 10:51

1    a.m.)

2              (In session at 11:05 a.m.)

3              JUDGE MCNAMARA:  We are back.

4              MR. SWAIN:  Welcome back, Dr. Rockstraw.

5                    CROSS-EXAMINATION

6    BY MR. SWAIN:

7        Q.  Good to see you again.

8        A.  Good to see you also.

9        Q.  Now if I heard you earlier, actually yesterday, I

10   believe you don't have any lead testing experience before

11   this litigation, correct?

12       A.  Well, I've never run the analytical devices for

13   the purpose of measuring lead, that's true.

14       Q.  Okay.  Thank you.  And because of that, you rely

15   on Mr. Nishijima's testing for the lead results that you've

16   calculated the FRAP values for infringement; is that

17   correct?

18       A.  That's one reason.  He had all the

19   instrumentation also.

20       Q.  Great.  You've never interacted with NSF before,

21   correct?

22       A.  That's correct.

23       Q.  You've never run or taken part in any NSF tests,

24   correct?

25       A.  That's correct.

1      Q.   You didn't inspect or physically open or look
2  inside any of the accused filters, correct?
3      A.   I looked at photographs of the filters and the
4  deconstructed photographs of the filters.
5      Q.   Did you ever --
6      A.   I didn't handle them before my report.
7      Q.   Okay.  So before rendering an expert
8  investigation -- before rendering your expert report, you
9  did not physically hold the filters, correct?
10     A.   Not the filters involved in this particular case.
11 As I mentioned in my deposition, my wife had purchased some
12 of these types of devices and we have them around the house,
13 so I was generally familiar with how they operate.
14     Q.   Okay.  And based upon that experience of your
15 wife purchasing filters and supervising high school students
16 measuring volume, you feel comfortable testifying as an
17 expert in gravity-fed water filters in this case, correct?
18     A.   That's correct.
19     Q.   I want to talk, hopefully -- as the judge
20 recommended, let's nail down some details.
21          Could I have CDX-8C.16, Mr. Kotarski.
22          Okay.  Dr. Rockstraw, here you've got the PUR
23 pitcher filters that are involved in this investigation,
24 correct?
25     A.   Correct.

1     Q.   Okay.  Now I didn't hear any testimony from you

2   about the PUR Fast pitcher filter on the left and whether it

3   meets the claims of the '141 patent, correct?

4     A.   That's correct.

5     Q.   Because the PUR Fast pitcher filter shown on the

6   left, the standard filter, that does not infringe the claims

7   of the '141 patent, correct?

8     A.   I didn't perform any measurements on the PUR

9   Fast.

10     Q.   Are you accusing the PUR standard fast filter in

11   your expert opinion, Dr. Rockstraw?

12     A.   I'm accusing the Pur Plus filter.

13     Q.   And not the PUR standard filter, correct?

14     A.   That one was not measured, correct.

15     Q.   And I didn't hear any testimony about CRF 950 Z

16   product being accused, correct?

17     A.   The specific products that were accused were

18   identified on one of my demonstratives.

19     Q.   Okay, Dr. Rockstraw, we can come back to that.  I

20   actually want to talk about the lead testing you got from

21   Mr. Nishijima.

22          Could I have CDX-8C.26.

23          On CDX-8C 26, this is the lead measurements from

24   Mr. Nishijima that you rely upon for the FRAP calculation

25   for the Pur Plus filters, correct?

```
 1        A.   That is correct.
 2        Q.   And I believe your testimony earlier was that
 3   this is not an NSF 53 certification test, correct?
 4        A.   That's correct.
 5        Q.   And you agree with me, to define a lifetime in
 6   the 141 patent, the lifetime need not be validated through
 7   NSF 53 testing, correct?
 8        A.   I'm sorry.  Please repeat the question.
 9        Q.   Would you agree with me, then, to define a
10   lifetime for claim 1 of the '141 patent, you do not need to
11   use NSF 53 testing?
12        A.   That is the mechanism that I believe you need to
13   do to determine a lifetime.
14        Q.   Okay.  I want to just make sure we nail down some
15   details, then.
16             So if I -- you understand the construction of
17   lifetime is the total number of gallons of water that a
18   manufacturer or seller has validated can be filtered before
19   the filter is replaced, correct?
20        A.   That's correct.
21        Q.   And is it your opinion that the word "validated"
22   needs to be NSF 53 testing for lead?
23        A.   Please repeat.
24        Q.   Is it your opinion that in order to have a
25   lifetime it must be NSF 53 certified lifetime for lead,
```

1    correct, for that validation?

2         A.   The method needs to be used, whether it's

3    performed by Water Quality Association or whether it's

4    actually certified, I don't believe is relevant, but that's

5    the method by which you determine lifetime.

6         Q.   Okay.  So I don't care who performs it.  It can

7    be in-house, WQA, UL, somebody.

8              My question is, as long as your requirement for

9    lifetime is that it must be by someone, the NSF 53 testing,

10   for lifetime, correct?

11        A.   That's my understanding of how it's validated.

12        Q.   So if I were to say that the NSF 53 standard is

13   not required as a method of validation to determine lifetime

14   in the 141 patent, that would be an incorrect statement?

15        A.   I guess I would have to understand the

16   alternative that you're proposing.

17        Q.   Well, I'm asking you is NSF 53 lifetime for lead,

18   is that required to calculate lifetime, yes or no?

19        A.   Please repeat it.  Is that required?

20        Q.   In order to calculate a lifetime, claim 1 of the

21   '141 patent, it needs to be a lifetime determined by NSF 53

22   testing, yes or no?

23        A.   Yes, that's the method of validation of the

24   lifetime.

25        Q.   So the NSF -- so you say the NSF 53 standard is

1    required as the method of validation for lifetime, correct?

2        A.    In reading the '141 patent, the NSF 53 method is

3    called out, and a person of skill in the art recognizes that

4    as a standardized method for determining lifetime.

5        Q.    So it must be NSF 53 standard, correct?

6        A.    Well, that's what I would turn to based on the

7    patent.  If you have an alternative, I guess I would be

8    entertained to hear it.

9        Q.    Did you entertain or hear of any other methods

10   that you applied in your case for lifetime?

11       A.    I did not.

12       Q.    Okay.  So it's your opinion that NSF 53 is

13   required as the method of validation for lifetime under

14   claim 1 of the '141 patent.

15       A.    Again, the '141 patent informs me that that is a

16   method by which I can validate the lifetime.

17       Q.    The required method, correct?

18       A.    I don't know of any other method.

19       Q.    Could I have -- let's talk about flow rate for a

20   minute, Dr. Rockstraw.

21           You calculated the average flow rate for the

22   accused products, correct?

23       A.    I did.

24       Q.    And you didn't measure them.  You relied on

25   Mr. Nishijima to measure them, and then you calculated them

1    based upon what he happened to measure, correct?

2        A.    That's correct.

3        Q.    You didn't direct him to measure every liter,

4    correct?

5        A.    Repeat that.

6        Q.    You did not direct Mr. Nishijima to measure every

7    liter, correct?  He had already measured those liters.

8        A.    Correct.

9        Q.    Okay.  Could I have RDX- -- and you understand,

10   Dr. Rockstraw, that Brita is arguing that one must measure

11   flow rate at every liter to determine average flow rate,

12   correct?

13       A.    According to the wording in the patent, it says

14   that you measure every liter over the lifetime of the

15   filter.

16       Q.    Okay.  Could I have RDX-14.1?

17           We can blow this up.  This is from Respondents'

18   pre-hearing brief.

19           Do you agree with that statement, Dr. Rockstraw,

20   that one cannot show average filtration unit time over

21   lifetime L because one fails to test the flow rate at every

22   liter?  Do you agree with that statement?

23       A.    I'm sorry.  Please repeat the question.

24       Q.    Do you agree with what's written in

25   Respondents' -- or Complainants' pre-hearing brief that one

1    cannot show an average filtration unit time over lifetime L

2    because one fails to test the flow rate at every liter of

3    the lifetime?

4        A.   I agree that's what the statement says.

5        Q.   Do you agree with that statement as a matter of

6    substance, sir?

7        A.   In my opinion, the Respondents did not calculate

8    a statistically significant value of the filtration unit

9    lifetime.

10        Q.   I'm trying to nail down some details,

11    Dr. Rockstraw.  I just want a yes or no question.

12        Must one measure every liter up to the lifetime

13    in order to determine average flow rate, yes or no?

14        A.   Well, as I mentioned during my deposition, the

15    target is every liter.  During testing where you have

16    difficulties, if you miss a liter and the value that you

17    measure at that particular point is invalid, I don't think

18    that necessarily invalidates the calculation for average

19    filtration unit lifetime.

20        Q.   Does the '141 require a measurement in every

21    liter, Dr. Rockstraw, for average flow rate, can you answer

22    that question, yes or no?

23        A.   I don't know that it requires it.  It suggests

24    that that's the way you calculate it.

25        Q.   Are you aware of how many sample points that the

1    inventors took of the flow rate of the prototypes in the

2    prior art in the 141 patent?

3        A.   I'm not.  I didn't see the underlying data for

4    the patent.

5        Q.   And you didn't bother to even talk to the

6    inventors in this investigation, did you, Dr. Rockstraw?

7        A.   I did not talk to the inventors, that's correct.

8        Q.   And I believe your testimony is you measured many

9    but not all of the liters for the Pur Plus product for

10   average flow rate, correct?

11       A.   In excess of 96 percent of the population of

12   measured values.

13       Q.   That's a great memory, Dr. Rockstraw.  This is

14   just going to seem redundant to do.

15            CDX-8C 25, please.

16            We talked about statistically significant, sir.

17   Is it your testimony that it was necessary to test 146 of

18   152 liters?

19       A.   I'm sorry.  I misunderstood your question.  I

20   thought you said it's necessary to measure 146.

21       Q.   Yes.  I must have misspoken.  I'm sorry,

22   Dr. Rockstraw.

23            Was it necessary to measure 146 of 152 filter

24   liters in order to determine the average flow rate of the

25   PUR filter?

1     A.    I think you said it the same way.  I suspect
2     you're misstating again.
3     Q.    Dr. Rockstraw, in order to determine -- okay.
4     Dr. Rockstraw, in order to determine the average flow rate
5     of the Pur Plus product that you accuse in this
6     investigation, was it necessary to measure 146 of 152
7     filtered liters in order to get that measurement?
8     A.    Well, we measured 146 of 152, which represents 96
9     percent of the population of samples, and the value we got I
10    consider to be statistically significant.
11    Q.    You didn't answer my question because you know it
12    wasn't necessary to measure that many liters, correct?
13    A.    No, I don't know that, because I had no
14    experience with this particular filter at the time.
15    Q.    Did you ever bother to measure what the flow rate
16    was if you measure it as the invention describes in the
17    patent, once every fifth flow rate, 1 liter, 38 liters, and
18    so on?
19    A.    I'm sorry.  I didn't understand the question
20    again.
21    Q.    Sure.  Did you bother to even look at sampling
22    rates, for example, did you ever bother to measure the
23    average flow rate of the Pur Plus product sampling it in the
24    way it's done in the '141 patent using five or three
25    measurements?

1      A.   I don't know that that's the way the '141 patent

2   did it with five or three measurements.  They reported five

3   or three, but I don't believe that that's the way they

4   actually performed the calculation.

5      Q.   Well, Dr. Rockstraw, honestly, how would you

6   know, because you never talked to the inventors, did you?

7      A.   I did not talk to the inventors.

8      Q.   And that's right, because had you done so --

9   RDX-14C.6 -- you would know that, had you measured, as they

10   had done so in the '141 patent, that the average flow rate

11   of the Pur Plus filter, if you did it with five samples,

12   there's a variance of just over 1 percent, correct,

13   Dr. Rockstraw?

14      A.   I'm not sure what I'm looking at here.  Could

15   you --

16      Q.   Are you unfamiliar with the flow rates of the

17   Pur Plus filter, Dr. Rockstraw?

18      A.   No, I am familiar.

19      Q.   Okay.  These are from your flow rate calculations

20   that you made, right, from the 1 liter, 38 liters, 76

21   liters, 114, and 152, and so on, correct?

22          JUDGE MCNAMARA:  Could you blow that up a little

23   bit, Mr. Swain?

24          MR. SWAIN:  I'd be happy to.  Sure.

25      Q.   Dr. Rockstraw, do you agree with the math here

1    shown on 14C.6 that the average flow rate as calculated

2    using the sampling method of five samples is 15.6 minutes

3    per liter?

4            JUDGE MCNAMARA:  This is taken from RX-1005C.008?

5            MR. SWAIN:  Correct, Your Honor.

6            JUDGE MCNAMARA:  Okay.  And that's on the screen.

7    So why don't you blow that up.

8            THE WITNESS:  I'd like to get that document

9    first.

10           JUDGE MCNAMARA:  I think that's fair enough.

11   It's RX-1005C at 0008.

12           MR. AINSWORTH:  Your Honor, this is Paul

13   Ainsworth.  Can I approach to help him find that in his

14   binders?

15           JUDGE MCNAMARA:  Yes, of course.

16           MR. AINSWORTH:  Thank you.

17           MR. SWAIN:  Your Honor, I might be able to speed

18   this up just a little bit so Dr. Rockstraw doesn't have to

19   do calculations he didn't do in his opinion.  I don't think

20   that's necessary for my examination.

21           JUDGE MCNAMARA:  Okay.

22       Q.   Dr. Rockstraw, you didn't measure the sampling

23   rate as shown here on RDX-14C.6, correct?

24       A.   I didn't do this calculation, correct.

25       Q.   Okay.  I'd like to then talk about flow rate a

1    little bit more, Dr. Rockstraw.

2            Do you agree with me, sir, that in the FRAP

3    equation, RDX-14.7, do you agree with me, in the FRAP

4    equation, for claim 1 of the '141 patent, that the lower the

5    flow rate goes the faster the filter goes, do you agree with

6    that convention?

7        A.   The lower the f value, f is not flow rate, it's

8    actually inverse flow rate.

9        Q.   Thank you.

10       A.   The value -- the faster material it goes through

11   the filter, correct.

12       Q.   Thank you.  That's very helpful.  And the patent

13   tells us and just general filter law tells us we want a

14   faster flow rate, correct?

15       A.   Correct.

16       Q.   Great.  So just generally a flow rate of 5 would

17   be better than a flow rate of 7 in the FRAP equation,

18   correct?

19       A.   In the FRAP equation the flow rate is an inverse

20   flow rate.

21       Q.   I'm asking you, is 0.5 minutes per liter, is that

22   a faster flow rate in terms of gallons or liters per minute

23   than 4 minutes per liter?

24       A.   Well, .4 would be faster flow rate than 4 minutes

25   per liter.

1      Q.   Thank you, Dr. Rockstraw.  Okay.  Now you agree

2  that --

3           Can I have CDX-8.7 -- 8C.79, please.

4           Do you agree with me, Dr. Rockstraw, that there

5  are dependent claims in the '141 patent that gives you

6  limitations on what does and does not meet the flow rate --

7  the average flow rate limitation for the '141 patent,

8  correct?

9      A.   Correct.

10     Q.   Right.  So for claim 6 here, the Aqua Crest.  You

11  allege it has a 3.6 minutes per liter flow rate and thus

12  meets the limitations of claims 5 and 6, correct?

13     A.   Correct.

14     Q.   Okay.  In CDX-8C.58 for our friends at ZeroWater,

15  you calculated the average filtration unit time of 11.8

16  minutes per liter, correct?

17     A.   Correct.

18     Q.   And you of course don't accuse them of claim 6

19  because they do not have a flow rate under 6 minutes per

20  liter, is that fair?

21     A.   That's fair.

22     Q.   You accuse them of claim 5 because there's some

23  limitations here set out by the inventor as to what does and

24  does not infringe claim 5 as far as flow rate, correct?

25     A.   Correct.

1      Q.   Okay.  Now claim 1, we agree, Dr. Rockstraw,

2  claim 1 has no such limitations on flow rate, correct?

3      A.   There's not a limitation on flow rate, correct.

4      Q.   Correct.  And we know this from CDX-8C.23, for --

5  I'm biased, but my favorite filter here, the Pur Plus

6  product, has a flow rate of 15.6 minutes per liter, correct?

7      A.   Correct.

8      Q.   Okay.  Dr. Rockstraw, we discussed earlier and I

9  think you would agree with me that a gravity-fed filter with

10  a flow rate of 3.6 minutes per liter can meet claim 1 of the

11  '141 patent, correct?

12      A.   Correct.

13      Q.   Okay.  Could I have CDX-8C.47.

14           Make that 70.  I apologize.

15           You show that here for claim 1, 3.6 minutes per

16  liter can meet -- claim 1 can be met with a flow rate of 3.6

17  minutes per liter, correct?

18      A.   Correct.

19      Q.   Even a gravity-fed filter of a flow rate of 2.4

20  minutes per liter can meet claim 1 of the '141 patent,

21  correct?

22      A.   I believe that to be correct also.

23      Q.   Okay.  And we know that because you say 2.4 is

24  the flow rate of the Longlast filter and you opine that that

25  meets claim 1 of the '141 patent here in CDX-8C.114?

1        A.    That's correct.

2        Q.    Okay.  And the Longlast is a gravity-fed filter

3    with a 2.4 minutes per liter flow rate, and you're confident

4    in opining that is a gravity-fed filter that meets claim 1

5    of the flow rate of 2.4, correct?

6        A.    Correct.

7        Q.    Okay.  But, Dr. Rockstraw, you agree with me that

8    you cannot have, it is not possible to have a gravity-fed

9    water filter that meets claim 1 of the '141 patent with a

10   flow rate of 0.45 minutes per liter as an average flow rate,

11   correct?

12       A.    Please repeat the question.

13       Q.    I'm asking you, Dr. Rockstraw, you agree with me

14   that it isn't even possible to have a gravity-fed filter

15   meet claim 1 of the '141 patent with an average flow rate f

16   of 0.45 minutes per liter.

17       A.    I don't know that that's impossible, because the

18   FRAP calculation requires three other variables.

19       Q.    So are you -- no, Dr. Rockstraw, are you saying

20   that it is possible to have a -- to meet claim 1 of the '141

21   patent with an average flow rate of 0.5 minutes per liter,

22   is that your testimony?

23       A.    That depends on what the volume of the filter

24   media is and the effluent lead concentration at end of

25   lifetime.

1      Q.   A flow rate of 0.5 minutes per liter, that could
2  be achieved by a gravity-fed water filter, correct?
3      A.   I'm not sure how it would do that.
4      Q.   Because it's not possible, sir, to have a water
5  filter that meets claim 1 of the '141 patent with a flow
6  rate of 0.5 minutes per liter, correct?
7      A.   I don't know that it's not possible.  I would
8  need to see the data for that particular filter.
9      Q.   This is a -- 0.5 minutes per liter is a flow rate
10  that can only be achieved, sir, by a pressurized system, not
11  a gravity-fed system, correct?
12      A.   Again, I haven't seen data that supports that.
13      Q.   Can I have RX-0848C at paragraph 264,
14  Mr. Kotarski.
15           In your opinion, in your expert report that you
16  submitted in this investigation, you opined that a flow rate
17  of 0.5 minutes per liter is a flow rate that could only be
18  achieved by a pressurized system, not a gravity-fed system.
19  Did I read that correctly, Dr. Rockstraw?
20           MR. AINSWORTH:  Objection, Your Honor.
21           JUDGE MCNAMARA:  Why?
22           MR. AINSWORTH:  This is outside the scope.  This
23  goes to his invalidity opinions, not his infringement
24  opinions.  It's a little unfair here.  We haven't gotten to
25  the invalidity portion of the case.  This is outside the

1    scope of infringement.

2          JUDGE MCNAMARA:  Well, I don't know.  I only see

3    paragraph 264 here.

4          Mr. Swain, I think you have to give me a date and

5    the name of the report.

6          MR. SWAIN:  Sure.  Absolutely.  This is

7    Dr. Rockstraw's rebuttal report, and in which he opines what

8    the metes and bounds of the '141 patent can and cannot be,

9    and that includes in paragraph 264 of his June 20th rebuttal

10   report that a flow rate of 0.5 minutes per liter could only

11   be achieved by a pressurized system, not a gravity-fed

12   system.

13         JUDGE MCNAMARA:  Okay.  So at this point,

14   Mr. Ainsworth has claimed that this paragraph falls under

15   invalidity, not infringement.  Do you have any response to

16   that?

17         MR. SWAIN:  Well, Your Honor, I was asking him

18   before, and we were discussing what the ranges of flow rates

19   could be and still meet claim 1 of the '141 patent.  He

20   opined anywhere from 2.4 to 15.6 minutes per liter.  And I

21   recall you stating earlier that his facts and statements in

22   his expert reports are available to the parties for

23   examination, and this is an opinion that he made, and I'm

24   just probing what the boundaries are that the flow rate can

25   be and still meet claim 1 of the '141 patent.

1          JUDGE MCNAMARA:  So what is your -- on what

2     grounds, which Federal Rules of Evidence would you say this

3     was excluded given the fact that flow rate has been talked

4     about all morning?  You asked about flow rate.

5          MR. AINSWORTH:  Certainly, Your Honor.  We asked

6     about flow rate.  But he is really asking about his opinion

7     related to an obvious combination that apparently is no

8     longer in the investigation.

9          We agree he can use prior statements, but this is

10     not a flow rate -- a particular system that they propose was

11     an obvious combination, they are not even alleging anymore.

12     I just want that -- they are going to an invalidity issue

13     here, not to an infringement issue.  That's our objection,

14     Your Honor.  It's outside the scope of the direct.

15          JUDGE MCNAMARA:  Okay.  Well, it is and it isn't.

16     It is and it isn't.  There has been talk the entire time and

17     questioning about the metes and bounds of the flow rate.

18     That has been asked with respect to all of the testing of

19     all of the products.

20          So that part of it is not -- is not out and can't

21     be out.  That's what this is -- that's what this is about.

22          So I'm going to allow this.  I think it's within

23     the scope for sure.  This is cross-examination of a witness

24     who offered these opinions as part of his expert rebuttal

25     report, and this explicitly talks about flow rate.  So I'm

1    going to allow this.

2         MR. AINSWORTH:  Thank you, Your Honor.

3    Q.   Dr. Rockstraw, okay, claim 1 of the '141 patent

4    requires a gravity-fed water filter, correct?

5    A.   That's correct.

6    Q.   Okay.  And your opinion is that 0.45 minutes per

7    liter as an average flow rate f could only be accused by a

8    pressurized system, not a gravity-fed system, correct?

9    A.   I expressed this opinion in reference to a

10   particular filter that Mr. Hatch had cited in his report,

11   and so this was stated relative to that particular filter.

12   Q.   Your opinion, sir, is that 0.45 minutes per liter

13   is a flow rate that could only be achieved by a pressurized

14   system, not a gravity-fed system.  Did I read the words of

15   your signed expert report correctly?

16   A.   You read it correctly, yes.

17   Q.   Thank you.  Let's talk about volume now,

18   Dr. Rockstraw.

19        Could I have CDX-8C.122.

20        The volume of the filter media, we've obviously

21   discussed a lot in your direct, and now we're discussing it

22   now.

23        Claims 3 and 4 provide limitations, at least

24   upper limitations, on what the volume of the filter media

25   can be, correct, 300 and 150 cubic centimeters,

1    Dr. Rockstraw?

2         A.    That's correct.

3         Q.    Okay.  And you've opined that you also have

4    opined in CDX-119 at volumes such as 48, as low as 48 cubic

5    centimeters, can meet claim 1 of the '141 patent, correct?

6         A.    That's correct.

7         Q.    And you opine so even though there's no actual

8    expressed volume limitations in claim 1 of the '141 patent,

9    correct?

10        A.    There's not a volume limitation.

11        Q.    Correct.  Because it's possible to even accuse a

12   product of 550 cubic centimeters or perhaps more, as your

13   examination for the ZeroWater product revealed, that would

14   still fall within claim 1 of the '141 patent, correct?

15   CDX-8C 47.

16        A.    That's correct.

17        Q.    Okay.  Dr. Rockstraw, you agree with me that it

18   is possible to make a filter that at least meets limitation

19   of claim 1 with a volume of 155 cubic centimeters, correct?

20        A.    That's correct.

21        Q.    Okay.  And you opine it is possible to make a

22   filter that meets the limitations of claim 1 of the volume

23   of 100 cubic centimeters, correct?

24        A.    Yeah, these are all filters that I've analyzed,

25   so that would be correct.

1     Q.  Dr. Rockstraw, it's possible, as we saw before,

2  to make a filter that meets the limitations of claim 1 with

3  a volume of 48 cubic centimeters, correct?

4     A.  Yes, I've analyzed a filter with a volume of 48

5  cubic centimeters that meets the limitations of claim 1.

6     Q.  But it is not possible, correct, Dr. Rockstraw,

7  to create a gravity-fed filter that meets claim 1 of the

8  '141 patent with a filter media volume of 2 cubic

9  centimeters, correct?

10     A.  I have not seen one and I would not expect it to

11  be possible.

12     Q.  You don't think it's possible at all to create a

13  filter with 2 cubic centimeters that would meet claim 1 of

14  the '141 patent, correct?

15     A.  I don't know what elements I would put together

16  to achieve that.

17     Q.  And despite claim 1 of the '141 patent having no

18  volume restrictions, it is nonetheless not possible to

19  have -- let me reask the question.

20       And despite there being no volume limitations in

21  claim 1 of the '141 patent, your opinion, you agree with me,

22  that it is not possible to have a filter with a filter media

23  volume of 2 cubic centimeters and still meet claim 1 of the

24  '141 patent, correct?

25     A.  Yeah, I find that hard to understand how you can

1   make a filter with a volume that small that would still meet

2   the limitations of claim 1.

3        Q.   There's no examples even in the patent that even

4   come close to 2 cubic centimeters, are there, Dr. Rockstraw?

5        A.   I don't recall seeing one around 2 cubic

6   centimeters, no.

7        Q.   Thank you, Dr. Rockstraw.

8             MR. SWAIN:  No further questions.

9             JUDGE MCNAMARA:  Okay.  Thank you.

10            Are there any other Respondents who are asking

11  questions, Mr. Swain?

12            MR. SWAIN:  No, Your Honor.  I believe I was the

13  anchor point in that.  I believe Mr. Ainsworth will probably

14  have some redirect.

15            JUDGE MCNAMARA:  Well, thank you for reminding

16  me.

17            Mr. Ainsworth, do you have any redirect?

18            MR. AINSWORTH:  Your Honor, could I have one

19  moment to confer?

20            JUDGE MCNAMARA:  Sure.

21            MR. SWAIN:  Your Honor, I'd like to apologize.

22  We just get very -- we get ahead of ourselves sometimes, so

23  I apologize for that.

24            JUDGE MCNAMARA:  Thank you.

25            MR. AINSWORTH:  Your Honor, thank you for the

1    moment.  We have no further questions.

2              JUDGE MCNAMARA:  Okay.  Then, if that's the case,

3    then I think, Dr. Rockstraw, you may step down.

4              THE WITNESS:  Thank you.

5              JUDGE MCNAMARA:  Mr. Ainsworth, who are you

6    calling next?

7              MR. AINSWORTH:  Your Honor, our next witness will

8    be Mr. Joel Ramirez from the Brita company.  Just give us a

9    moment to bring him in.

10             JUDGE MCNAMARA:  Very good.

11             MR. AINSWORTH:  My partner Josephine Kim will be

12   handling that examination.

13             JUDGE MCNAMARA:  Very good.  Thank you.

14             MR. AINSWORTH:  I apologize for the delay,

15   Your Honor.  Mr. Ramirez is down the hallway.

16             MS. KIM:  Good morning, Your Honor.

17             JUDGE MCNAMARA:  Good morning, Ms. Kim.  How are

18   you?

19             MS. KIM:  I'm doing well.  Thank you.

20             JUDGE MCNAMARA:  I see that Mr. Ramirez is

21   seated.

22             Mr. Ramirez, would you kindly raise your right

23   hand.

24                        JOEL RAMIREZ,

25                having been first duly sworn and/or affirmed

1    on his oath, was thereafter examined and testified as

2    follows:

3             JUDGE MCNAMARA:  Please state your full name.

4             THE WITNESS:  My name is Joel Ramirez.

5             JUDGE MCNAMARA:  Very good.  Thank you very much.

6             Ms. Kim, you have the floor.

7                     DIRECT EXAMINATION

8    BY MS. KIM:

9        Q.   Good morning, Mr. Ramirez.

10       A.   Good morning.

11       Q.   Have you prepared some demonstratives to assist

12   in your testimony today?

13       A.   Yes, I have.

14       Q.   Mr. Ramirez, how are you currently employed?

15       A.   Currently I am the associate director of

16   corporate financial planning and analysis at the Clorox

17   Company.

18       Q.   How long have you held this position?

19       A.   Since November of 2021.

20       Q.   What position did you hold before this current

21   position?

22       A.   Prior to this role I was the associate director

23   of finance for Brita LP as well as the associate director of

24   transformational growth in the cleaning division for the

25   Clorox Company.

```
 1        Q.   How long did you hold this dual role?

 2        A.   For about a year.

 3        Q.   And how long have you been employed by Brita and

 4   Clorox?

 5        A.   Over 11 years.

 6        Q.   And were you in finance-related roles for the

 7   entire duration?

 8        A.   Yes.

 9        Q.   Can you briefly tell us about your educational

10   background?

11        A.   Sure.  I have a bachelors of economics from

12   Stanford University and I also have an MBA from UC

13   Berkeley's Haas School of Business.

14        Q.   Mr. Ramirez, do you understand why you're here

15   today?

16        A.   Yes.  I understand I'm here to provide testimony

17   about Brita's numerous domestic investments related to

18   Longlast and Longlast+ products.

19        Q.   Generally, what are those investments?

20        A.   So, in general, those involve research and

21   development, manufacturing, as well as product support for

22   those products.

23        Q.   When you say Longlast products, what exactly do

24   you mean?

25        A.   We mean the Longlast filter, the Longlast+
```

1  filter, the Elite filter, and the compatible containers.

2      Q.   And before we go into Brita's financial

3  records --

4          MS. KIM:  Your Honor, the rest of the examination

5  will elicit Brita CBI, so if we could move to the

6  confidential record.

7          (Whereupon, the hearing proceeded in confidential

8  session.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22622-22660 redacted in their entirety

```
 1                O P E N   S E S S I O N

 2                   AFTERNOON SESSION

 3              (In session at 1:32 p.m.)

 4         JUDGE MCNAMARA:  Good afternoon, everyone.

 5         MR. AINSWORTH:  Good afternoon, Your Honor.

 6         JUDGE MCNAMARA:  So I did catch a little bit of

 7   that back and forth between the two of you.

 8         Ms. Simmons, hello.

 9         MS. SIMMONS:  Good afternoon, Your Honor.

10         JUDGE MCNAMARA:  And I think it might make sense,

11   I think we have time to actually admit the exhibits into

12   evidence from yesterday and those folks who have completed

13   their testimony.

14         The list, of course, was sent, or I received a

15   list this morning, that's correct, but they still have to be

16   admitted into evidence.

17         MR. AINSWORTH:  Yes, Your Honor.  Brita

18   respectfully moves admission of the exhibits and deposition

19   designations in the emails that we have sent to Your Honor.

20         JUDGE MCNAMARA:  Okay.  Is there any objection,

21   Ms. Simmons, on behalf of the Respondents?

22         MS. SIMMONS:  No objection.

23         JUDGE MCNAMARA:  All right.  Then the

24   submissions, and I will double-check and put on the record

25   the time that I received the joint list this morning, and
```

1    I'll just make sure that the admission covers all of those

2    exhibits.

3            (Whereupon, the exhibits as recited by counsel

4    and reflected in the attached index were submitted and

5    received in evidence.)

6            JUDGE MCNAMARA:  Are there any other exhibits

7    that you're still working that need to come in or any from

8    any of the testimony that just concluded?

9            MR. AINSWORTH:  Yes, Your Honor, we're still

10   working on compiling with Respondents for the exhibits for

11   Dr. Rockstraw as well as --

12           JUDGE MCNAMARA:  Okay.

13           MR. AINSWORTH:  Our last witness, Mr. Green, our

14   next witness and the last witness in our case-in-chief,

15   leads to one final submission for all of our case-in-chief

16   witnesses.

17           JUDGE MCNAMARA:  That makes sense.  That makes a

18   lot of sense.  Thank you, Mr. Ainsworth.

19           Are you ready to start?

20           MR. AINSWORTH:  We are, Your Honor.  Brita's next

21   witness will be Mr. Phil Green, and my partner, Josephine

22   Kim, will be handling that examination.

23           JUDGE MCNAMARA:  Thank you very much,

24   Mr. Ainsworth.

25           Good afternoon again, Ms. Kim.

1          MS. KIM:  Good afternoon, Your Honor.

2          JUDGE MCNAMARA:  I can see Mr. Green just popped

3    up on the screen there.

4          Good afternoon, Mr. Green.

5          THE WITNESS:  Good afternoon, Your Honor.

6                    PHILIP GREEN,

7          having been first duly sworn and/or affirmed

8    on his oath, was thereafter examined and testified as

9    follows:

10         JUDGE MCNAMARA:  Please state your full name.

11         THE WITNESS:  My full name is James Philip Green.

12   I go by Philip.

13         JUDGE MCNAMARA:  Okay.  Thank you very much.

14         Ms. Kim, you have the floor.

15                 DIRECT EXAMINATION

16   BY MS. KIM:

17     Q.   Good morning, Mr. Green.

18     A.   Well, good afternoon.

19     Q.   Oh, yes, good afternoon.

20     A.   A long day already.

21     Q.   Mr. Green, did you prepare any demonstratives to

22   illustrate your testimony?

23     A.   Yes, I did.

24     Q.   Is it -- can we please bring up CDX-10C.

25          Is CDX-10C on the screen here the demonstratives

1    you prepared?

2         A.    Yes, they are.

3         Q.    Are you currently employed?

4         A.    Yes, I am.

5         Q.    Who are you employed with?

6         A.    As you can see from this slide, slide 2, I'm

7    employed by a firm called Hoffman Alvary & Company, which is

8    located just outside of Boston.

9         Q.    What are your primary responsibilities at Hoffman

10   & Alvary?

11        A.    So at Hoffman & Alvary I'm responsible for doing

12   financial analysis related to intellectual properties,

13   patents, copyrights and trademarks, and those financial

14   analyses can include accounting issues, so how companies

15   record them on their books, how do you value them, in case

16   you're doing a transaction, licensing, and also I assist

17   people with situations where they are trying to just buy and

18   sell these kinds of things, so trying to --

19             (Clarification by reporter.)

20             JUDGE MCNAMARA:  You're breaking up a great deal,

21   Mr. Green.  I'm not sure what's going on.  You might want to

22   try moving your microphone closer to you.

23             THE WITNESS:  I just did.  Is this better?

24             JUDGE MCNAMARA:  Yes, it is.  Thanks.  We'll keep

25   rolling and we'll see what happens.

1          THE WITNESS:  Okay.  Please let me know if it

2    gets to be -- if I get to be too soft and I will pick it up

3    again.

4          JUDGE MCNAMARA:  Thank you very much.  We'll let

5    you know for sure.

6          THE WITNESS:  Okay.

7      A.   So, as I was saying, much of my work comes down

8    to doing things like helping people value intellectual

9    property and transactions.  I do damage analysis in

10   infringement cases.  I help people with licensing.  And I

11   also do other types of financial analysis, like what we

12   might would bring us into or bring me into the ITC to help

13   out with domestic industry and those kinds of things.

14     Q.   What is your educational background?

15     A.   So as you can see from this exhibit, I have an

16   undergraduate degree from Rutgers University that I got in

17   1984, and I have a Masters of Business Administration degree

18   from Rutgers as well that I got in 1987.  My MBA had a

19   concentration in accounting.

20     Q.   Do you hold any professional certifications?

21     A.   Yes, I do.  I'm a licensed certified public

22   accountant.  I maintain my license through the state of

23   New York.  I'm also a certified management accountant.  And

24   I'm also accredited by the AICPA, the American Institute of

25   Certified Public Accountants, and the American Society of

1  appraisers in business and intangible valuation.

2      Q.   You mentioned that you are a certified management

3  accountant.  What does that mean?

4      A.   So that means that I've taken a sequence of

5  courses as well as a number of tests that relate to how

6  companies report information internally.

7          CPAs tend to work with how companies report their

8  information externally.  CMAs are really focused on how

9  companies identify profits and allocate costs in order to be

10  able to come up with product profits.

11      Q.   Thank you.

12          MS. KIM:  Your Honor, I think we're getting some

13  feedback perhaps from the Respondent.  If they could mute

14  their mic.

15          JUDGE MCNAMARA:  It could be.  Please be sure

16  your mics are off if you're not speaking.  Thank you.

17          Let's see if it continues, Ms. Kim.  If there's

18  still a problem, let me know.

19          MS. KIM:  Thank you.

20      Q.   Mr. Green, you mentioned you have experience

21  testifying in ITC cases?

22      A.   Yes, I do.

23      Q.   In those past ITC investigations were you

24  accepted as an expert with respect to the opinions you were

25  offering?

1     A.  Yes, I was.

2     MS. KIM:  Your Honor, Complainants proffer James

3  Philip Green as an expert in the areas of accounting and the

4  analysis of economics associated with intellectual

5  properties.

6     JUDGE MCNAMARA:  All right.  Who is speaking on

7  behalf of the Respondents?

8     MS. SIMMONS:  This is Cassandra Simmons on behalf

9  of the Respondents.

10     We have no objection to Mr. Green being entered

11  as an expert in this case.

12     JUDGE MCNAMARA:  Okay.  Thank you, Ms. Simmons.

13     Then Mr. Green is accepted as an expert witness

14  on the issues or topics upon which he has been called to

15  testify.  Thank you.

16     MS. KIM:  Thank you, Your Honor.  We were just

17  discussing slide 2.

18     Q.  Can we please move to slide 3.

19     Mr. Green, for which party are you offering

20  expert opinions in this investigation?

21     A.  So I've been retained on behalf of Brita LP, the

22  Complainant.

23     Q.  Are you being compensated for your time?

24     A.  Sure.  My firm, Hoffman Alvary & Company, is

25  being compensated for my time.

1    Q.   Does your firm's compensation depend on the

2    outcome of this investigation?

3    A.   No, it does not.

4    Q.   On what issues have you been retained to offer

5    opinions?

6    A.   So as you can see from this slide, slide 3, I've

7    been asked to provide opinions on four different areas

8    related to this investigation.

9         The first is domestic industry, the second is

10   analyzing inventories as it might relate to a cease and

11   desist order, the third is the discussion of bond, and then,

12   lastly, I was asked to provide an opinion regarding

13   commercial success of the '141 patent as it relates to

14   secondary considerations of non-obviousness.

15   Q.   Before we get into the details of your opinions,

16   what information did you review in forming your opinions?

17   A.   So I summarized some of these things on my next

18   slide, slide 4.  And what I looked at were a variety of

19   different documents, so Brita's financial information, KXT's

20   financial information, accounting records that were provided

21   by the Respondents.  I also looked at publicly available

22   information.

23        I do my own research when it comes down to trying

24   to understand industries, who is in them, the competition

25   and so forth.  I issued an expert report.  And then since

1    over the course of the last few days I've been attending the

2    hearing and I've heard Mr. Ramirez, Ms. Kahn, and

3    Mr. Barrillon's testimony, all of which I've considered in

4    forming the opinions that I have in this matter.

5         Q.   Have you also heard the testimony of

6    Dr. Rockstraw?

7         A.   Yes, I have.  And I discussed my opinions with

8    Dr. Rockstraw before I rendered them.

9         Q.   What assumptions, if any, have you made in

10   forming your opinions?

11        A.   So in forming my opinions I've assumed that the

12   domestic industry products in this matter actually are

13   practicing the '141 patent covered by the '141 patent.  I've

14   also assumed that the patent, the '141 patent, is valid and

15   infringed except that when we're thinking about secondary

16   considerations of non-obviousness I've kind of had to switch

17   a little bit of the hat, because obviously, when I'm

18   thinking about non-obviousness, if we're having a challenge

19   to validity.

20        Q.   What is your understanding of the products Brita

21   asserts practice the asserted patent?

22        A.   So this slide, slide 5, shows what I understand

23   to be the domestic industry products, and they include the

24   Brita Longlast, the Longlast+, and now the Brita Elite

25   filter, as well as when they are sold individually as

 1    filters and also when sold in combination with a container

 2    of some sort.

 3         Q.   Thank you.  Let's move on to your first opinion.

 4    This one relates to domestic industry, correct?

 5         A.   Yes, it does.

 6         Q.   Can you please tell the Court what your opinion

 7    is?

 8         A.   So my opinion is that a domestic industry exists

 9    related to the articles protected by the asserted patent

10    based on the significant employment of labor and capital and

11    the investment in plant and equipment by Brita and its

12    contract manufacturer.

13         Q.   And is there any particular process that you

14    followed?

15         A.   Yes.  So I started off with, of course, taking a

16    look at the statute.  I mean, I work within what I

17    understand to be the relevant statutory framework.  And so I

18    looked at 19 USC 1337(a), (a)(3), and evaluating domestic

19    industry in accordance with whether there was a significant

20    investment in plant and equipment under subsection (a), and

21    whether there was significant employment of labor or capital

22    under subsection (b).

23         Q.   Before you move on to the next slide --

24         MS. KIM:  Your Honor, the rest of the examination

25    will elicit material that is CBI as to Brita and KXT.  If we

1    could move to the confidential record, we would appreciate

2    that.

3                (Whereupon, the hearing proceeded in confidential

4    session.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22672-22746 redacted in their entirety