**Vol. 3 of 5 (Appx22747-23381)**
**No. 24-1098**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

BRITA LP,

*Appellant*,

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

ZERO TECHNOLOGIES, LLC, CULLIGAN INTERNATIONAL CO., VESTERGAARD FRANDSEN INC., d/b/a LIFESTRAW, KAZ USA, INC., HELEN OF TROY LIMITED,

*Intervenors*.

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1294

## NON-CONFIDENTIAL JOINT APPENDIX

PANYIN A. HUGHES
DOMINIC L. BIANCHI
HOUDA MORAD
OFFICE OF THE GENERAL COUNSEL
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
*Counsel for ITC*

JEFFREY R. GARGANO
DEVON C. BEANE
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602
Tel: (312) 372-1121
*Counsel for Vestergaard Frandsen Inc.,
d/b/a LifeStraw*

DEANNE E. MAYNARD
SETH W. LLOYD
NOAH PRILUCK*
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

PAUL A. AINSWORTH
STERNE KESSLER GOLDSTEIN
& FOX PLLC
1101 K Street NW, 10th Floor
Washington, DC 20005

*Counsel for Brita LP*

*Additional Counsel Listed on Inside Cover*

AUGUST 2, 2024

ADAM D. SWAIN
THOMAS W. DAVISON
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004

KIRK T. BRADLEY
KARLEE WROBLEWSKI
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203

KATHERINE RUBSCHLAGER
ALSTON & BIRD LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105

*Counsel for Helen of Troy Limited and Kaz USA, Inc.*

JOHN LETCHINGER
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 3700
Chicago, IL 60606

JARED BRANDYBERRY
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202

ALAINA LAKAWICZ
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103

*Counsel for Zero Technologies, LLC and Culligan International Co.*

*Admitted only in Iowa and Nebraska. Practice supervised by principals of the firm admitted to the DC bar.

# TABLE OF CONTENTS

| **Date** | **Document** | **Appx** |
|---|---|---|
| | **Volume I** | |
| 09/19/2023 | Commission Opinion | Appx1 |
| 02/28/2023 | Final Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond | Appx62 |
| | U.S. Patent No. 8,167,141 | Appx378 |
| 12/12/2023 | Certified List | Appx427 |
| 12/23/2021 | Brita's Complaint | Appx476 |
| 01/31/2022 | Federal Register Notice of Institution of Investigation | Appx648 |
| 07/18/2022 | Brita's Pre-Hearing Brief | Appx3703 |
| 07/20/2022 | Order No. 30 – Markman Order | Appx4514 |
| 08/02/2022 | Order No. 33 – Denying-In-Part and Granting-In-Part Respondents' Motion to Strike Undisclosed Conception and Reduction to Practice Theories in Dr. Benny Freeman's Expert Report | Appx5382 |
| 03/13/2023 | Excerpts of Respondents' Petition for Review of the Final Initial Determination | Appx6718 |
| 06/28/2023 | Notice to Review in Part Final ID | Appx7033 |
| 07/14/2023 | Complainant Brita LP's Response to Notice to Review | Appx7046 |
| | **Volume II** | |
| 07/14/2023 | Respondents' Response to Notice to Review | Appx7136 |
| | Evidentiary Hearing Transcript – Aug. 17, 2022 (Day 1) | Appx22000 |
| | Evidentiary Hearing Transcript – Aug. 18, 2022 (Day 2) | Appx22273 |
| | Evidentiary Hearing Transcript – Aug. 19, 2022 (Day 3) | Appx22533 |

| Date | Document | Appx |
|------|----------|------|
| | **Volume III** | |
| | Evidentiary Hearing Transcript – Aug. 19, 2022 (Day 3) cont. | Appx22747 |
| | Evidentiary Hearing Transcript – Aug. 22, 2022 (Day 4) | Appx22822 |
| | Evidentiary Hearing Transcript – Aug. 23, 2022 (Day 5) | Appx23123 |
| | **Volume IV** | |
| | Evidentiary Hearing Transcript – Oct. 13, 2022 (Day 6) | Appx23382 |
| | CDX-001C:  Brita Opening Demonstratives | Appx30000 |
| | CX-0010:  Drinking water treatment units (NSF/ANSI 53 International Standard) | Appx30560 |
| | CX-0836:  Fabrication of blend biodegradable nanofibrous nonwoven mats | Appx30684 |
| | CX-0842:  Handbook of Filter Media | Appx30693 |
| | CX-0843:  Handbook of Non-Woven Filter Media | Appx30754 |
| | CXM-0005:  Why Brands Should Verify Their Marketing Claims | Appx31247 |
| | JX-0023:  '141 Patent Prosecution History Excerpts | Appx31253 |
| | JXM-0003:  Drinking water treatment units (NSF/ANSI 53 International Standard) | Appx32039 |
| | RX-0631:  U.S. Patent Application Pub. No. 2006/0000763 to Rinker | Appx32163 |
| | RX-2601C:  Reid Deposition Excerpts | Appx32186 |
| | RX-2602C:  Saaski Deposition Excerpts | Appx32382 |
| | **Volume V** | |
| | RX-2607C:  Knipmeyer Deposition Excerpts | Appx32657 |
| | RXM-0020C:  Dr. Harrison Claim Construction Declaration | Appx34993 |

| **Date** | **Document** | **Appx** |
|---|---|---|
| | CX-0042:  U.S. Application No. 11/927,372 Prosecution History Excerpts | Appx40213 |
| | CX-0917:  U.S. Application No. 11/927,372 Prosecution History Excerpts | Appx40288 |
| | (Unadmitted) U.S. Application No. 11/858,765 Prosecution History Excerpts | Appx41067 |
| | RX-0425C:  Brita Monthly Update | Appx41133 |
| | RX-0437C:  Brita Project Update | Appx41154 |
| | CX-0108C:  Knipmeyer Lab Notebook | Appx41160 |

NOTE:  Confidential information is indicated by green highlighting.  The green shading in the table on Appx259 is not highlighting and does not indicate confidentiality.  Markings of any other color are part of the document as filed at the Commission and do not indicate confidentiality.

The non-confidential version of this appendix redacts material filed under seal pursuant to the Commission's protective order. As required by Federal Circuit Rule 25.1(e)(1)(B), the table below notes the specific pages with redacted material in the non-confidential appendix and the general nature of that material.

**Description of Redacted Material in Non-Confidential Appendix**

| **Document** | **Pages** | **Description** |
|---|---|---|
| Final Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond | Appx92, Appx107, Appx114-16, Appx121, Appx144, Appx148, Appx175-76, Appx178, Appx182, Appx185-86, Appx202, Appx204, Appx232-35, Appx351-62, Appx366-68, Appx370 | Confidential product, technical, and financial information |
| Brita's Pre-Hearing Brief | Appx3703-867 | Confidential product, technical, and financial information |

| | | |
|---|---|---|
| Respondents' Petition for Review of the Final Initial Determination | Appx6820 | Confidential technical information |
| Complainant Brita LP's Response to Notice to Review | Appx7087 | Confidential product and technical information |
| Respondents' Response to Notice to Review | Appx7162, Appx7164-65, Appx7172-73 | Confidential business and product information |
| Evidentiary Hearing Transcripts – August 17-19, 22-23 and Oct. 13, 2022 (Days 1-6) | Appx22040-51, Appx22238-61, Appx22289-90, Appx22331-86, Appx22392-413, Appx22431-56, Appx22469-516, Appx22522-25, Appx22560-61, Appx22622-60, Appx22672-746, Appx22797-807, Appx22891-97, Appx22911-15, Appx22921-23, Appx22947-68, Appx23031-33, Appx23039-54, Appx23068-69, Appx23086-114, Appx23144-54, Appx23193-99, Appx23227-31, Appx23236-37, Appx23244-315, Appx23407-09, Appx23561-68 | Confidential product, product, technical, and financial information |
| RX-2607C: Knipmeyer Deposition Excerpts | Appx32657-3021 | Confidential product development and technical information |

| RX-0425C: Brita Monthly Update | Appx41133-53 | Competitively sensitive business and technical information |
|---|---|---|
| RX-0437C: Brita Project Update | Appx41154-59 | Confidential product development and technical information |
| CX-0108C: Knipmeyer Lab Notebook | Appx41160-69, Appx41268 | Confidential product development and technical information |

```
 1                    O P E N   S E S S I O N

 2

 3          JUDGE MCNAMARA:  Good afternoon, Mr. Ainsworth.

 4          MR. AINSWORTH:  Your Honor, I believe that was

 5   our last witness, so subject to putting in our exhibits and

 6   what have you, which we'll get to you for the last witnesses

 7   hopefully later today, we are finished with our

 8   case-in-chief.

 9          JUDGE MCNAMARA:  Okay.  Thank you, Mr. Ainsworth.

10          Okay.  Are you ready to start, Mr. Swain?

11          MR. SWAIN:  Absolutely, Your Honor.  It is my

12   distinct pleasure as Respondents' case-in-chief begins to

13   call Mr. Mike Mitchell from Helen of Troy.

14          JUDGE MCNAMARA:  Okay.  Good afternoon,

15   Mr. Mitchell.

16          I can't hear you.  Cannot hear you.  You are on

17   mute.

18          THE WITNESS:  Hello.  Can you hear me now?

19          JUDGE MCNAMARA:  I can hear you now.

20                    MICHAEL MITCHELL,

21           having been first duly sworn and/or affirmed

22   on his oath, was thereafter examined and testified as

23   follows:

24          JUDGE MCNAMARA:  Please state your full name.

25          THE WITNESS:  Michael Donovan Mitchell.
```

1          JUDGE MCNAMARA:  Thank you very much.

2          Mr. Swain, your witness.

3                    DIRECT EXAMINATION

4     BY MR. SWAIN:

5          Q.   Welcome, Mr. Mitchell.  Could you please describe

6     your educational background?

7          A.   Yes.  I have a little echo.

8          Q.   There's some --

9          Could I have one moment, Your Honor?

10          JUDGE MCNAMARA:  Sure.

11          A.   I have a bachelor's in science and engineering

12     from the University of Michigan in material science.

13          MR. SWAIN:  I apologize, Your Honor.  We're

14     trying to fix this.

15          Your Honor, could I request that we go off the

16     record for five minutes while we fix this?

17          JUDGE MCNAMARA:  Yes, please.  And just let me

18     know when you're ready.  Five minutes, Mr. Swain.

19          MR. SWAIN:  Five minutes will do it.  Thank you.

20          (Whereupon, the proceedings recessed at 4:26

21     p.m.)

22          (In session at 4:27 p.m.)

23          MR. SWAIN:  Hello Your Honor.  You were

24     listening.

25          JUDGE MCNAMARA:  I can hear you now.

1    BY MR. SWAIN:

2        Q.    Mr. Mitchell, could you please describe your

3    educational background?

4        A.    I have a bachelor's in science and engineering

5    from the University of Michigan in material science.

6        Q.    Mr. Mitchell, where do you work?

7        A.    I work for a consumer products company called

8    Helen of Troy that has U.S. headquarters in El Paso, Texas.

9        Q.    For your testimony today have you prepared some

10   demonstratives?

11       A.    Yes, I have.

12       Q.    Could I have RDX-22 up?

13             Mr. Mitchell, could you please explain to the ALJ

14   a little bit about Helen of Troy, please?

15       A.    Certainly.   There are three main divisions of

16   Helen of Troy.   We have a beauty division that's down in

17   El Paso that sells volumizers, hair dryers, curling irons,

18   and things like that under the Hot Tools and the Drybar

19   brands.

20             And in New York City we have a kitchen and

21   outdoor group that sells OXO, the Good Grip kitchen

22   appliances, as well as the Honey or the Hydro Flask water

23   bottles, and the Osprey backpacks for camping and hiking and

24   things of that nature.

25             In the Boston area, where I am, the health and

1  wellness group, we have the Honeywell Home Environment
2  business, which has Honeywell air purifiers, heaters, fans,
3  humidifiers.  We sell humidifiers under the Vicks brand.  We
4  also do thermometers for like temperature measurement for
5  fever under Braun and Vicks, and then we have the water
6  purification business, which is under PUR.
7       Q.   At Helen of Troy, Mr. Mitchell, do you work on
8  the PUR line of products?
9       A.   I do.  I do support all of our businesses from an
10 innovation and technology development standpoint.
11      Q.   And in that innovation and technology standpoint
12 role, does in include gravity-fed water filters?
13      A.   Yes.  My responsibility is I kind of lead the
14 engineering and the development of new technologies
15 associated with PUR filtration, yeah.
16      Q.   And how long, Mr. Mitchell, have you worked in
17 the PUR line of gravity-fed water filters?
18      A.   So in 1999 I was recruited by Procter & Gamble to
19 join that company because they decided that they were going
20 to do a drinking water product, a consumer product, in the
21 drinking water space in the United States and globally.
22           And after I joined, probably several months into
23 that, they decided they wanted to buy a brand rather than
24 create a new brand inside of P&G.  So they purchased the PUR
25 business from Recovery Engineering.  I was involved in some

1    of that initial transfer of the engineering from Recovery

2    Engineering to P&G.

3            I supported that brand for the time that it was

4    at P&G, and was there when it was sold to Helen of Troy late

5    2011.  I moved with my family to the Boston area in 2012 to

6    Helen of Troy, and I've been supporting the business pretty

7    much ever since.

8    Q.    Thank you, Mr. Mitchell.  As part of your 20 plus

9    years of work in the water filtration industry, have you

10   been recognized for your contribution in the water

11   filtration industry?

12   A.    Yeah.  No, I won the Key Award from the Water

13   Quality Association in 2017.

14   Q.    Can I show RDX-23, please.

15         Mr. Mitchell, is that you on RDX-23?

16   A.    Yes.

17   Q.    Can you explain to the ALJ who WQA is?

18   A.    So the Water Quality Association is a trade

19   association.  It represents about 2500 companies that do

20   water treatment and water filtration in the United States

21   and some globally, and I'm currently on the Board of

22   Governors for that organization.

23   Q.    I believe you said that you were awarded the WQA

24   Key Award.  Can you explain what the Key Award is?

25   A.    It's one of the higher awards that WQA offers.

1    It represents or recognizes a member for leadership and
2    integrity in the water filtration industry.
3        Q.   For what reason, Mr. Mitchell, did the WQA give
4    you one of its highest and best honors in the Key Award?
5        A.   Well, it was really based on a lot of the work
6    that we did in Flint during the early days of the lead
7    crisis.
8            We were approached by several retailers wanting
9    to know if we could support with product in that area.  In
10   the early days when this problem first surfaced, and we
11   really didn't have a good idea what the lead levels were
12   going to be in Flint, we hadn't really seen any data on how
13   much soluble or particulate lead or anything like that.
14           And so I went to Flint in some of those early
15   days.  I worked with the Red Cross to gain access to
16   residents' home and businesses there.  We tested or sampled
17   water coming out of the tap.  We actually put some product
18   on and tested the water that was being filtered.
19           And we partnered with WQA.  We sent all of that
20   water to WQA because they had labs at the time and we hadn't
21   developed that yet.  And what we were able to demonstrate
22   was that the filters could be effective and in Flint, and
23   that it was really good.
24           So we then went back.  We went back as a team
25   with some of the marketing folks, and we went into the

1  community and we kind of handed out literature and product,

2  and really worked with them to help them understand how to

3  protect themselves and their families against lead.  And for

4  those reasons I was given the Key Award.

5      Q.   Thank you, Mr. Mitchell.  I think did I hear

6  you're from University of Michigan?

7      A.   I am, yes.

8      Q.   Are you from Michigan, Mr. Mitchell?

9      A.   Yes, I am.  I was born in Benton Harbor,

10  Michigan, which is very similar to Flint.  It's one of the

11  poorer cities in the United States.  And it's currently

12  going through its own lead crisis right now.

13      And so I would say we've got to do more for these

14  communities, both as an industry, and that's something WQA

15  supports, but also as a country, as the underserved

16  communities are really suffering, and they typically have

17  the worst water quality issues.

18      Q.   Mr. Mitchell, did your work, award-winning work

19  in Flint, lead to any more work for lead affecting

20  municipalities?

21      A.   It did.  A few years after that we were contacted

22  as a company by the mayor's office in Newark and the

23  director that ran the water treatment area there.  And they

24  were coming to us because they were trying to be a little

25  different than what happened in Flint.  They were trying to

1    be more proactive.  So they were switching to a different

2    corrosion control system.

3            They were going to use an orthophosphate which is

4    better at actually coating the inside of the pipes and

5    preventing the leaching of lead.  They were also going for

6    grants to pull all of the lead pipes out of Newark, which is

7    a very -- it was a very positive thing, but they knew that

8    there was going to be some time period while that was

9    happening that residents were going to have the risk of

10   seeing higher lead levels, and they were looking for help in

11   order to get product in place during that time period to

12   kind of protect against that.

13           So we did -- we did that.  We started that.  And

14   probably, I don't know, two or three months into that, they

15   were doing some routine testing of water and filtration

16   systems, and they saw higher levels of lead coming out of

17   the products or the filters than they expected.  So they

18   called and asked us to come quickly and try to help them

19   understand what was going on.

20           So I went to Newark, spent a couple weeks there,

21   going into homes, testing water, both coming out of the

22   faucets as well as going into our product.  Sent a lot of

23   water samples back to our labs, because at this point we had

24   invested pretty heavily in the kind of equipment that you

25   need to do lead testing.

1          And so what we were able to determine were a few

2     things.  The lead levels going into Newark were much higher

3     than what we typically test against in the NSF standards.

4     Two, it was much higher in particulate than we typically

5     have seen in a lot of our testing.  And then, three, the

6     size of the particulate was much smaller or much finer than

7     we typically see in any of our testing.

8          And so I shared that information with the EPA and

9     with the city of Newark.  And what we were able to do with

10    the engineering firm was we started working with residents

11    and we put a protocol together where we would have the

12    residents flush their lines five minutes in the morning

13    every day, and it kind of made sure that the lead levels

14    were low enough during the day that the products could be

15    effective.

16         And so what we were able to show was that 99 or

17    better than 99 percent of the filtration systems when used

18    in that manner really protected the residents of Newark.

19    And so that worked out and we got what we needed out of

20    that.

21         And so we then went back as a group, so some of

22    the marketing team and more of the engineers at Helen of

23    Troy, we went back and we participated when we were invited

24    by the mayor's office to participate in the health fair that

25    was -- that was put together by the city of Newark.

1          And there we set up a table and a booth where we
2   could give away product and literature, essentially just
3   really helping the residents understand how to protect
4   themselves against lead and how to use these products
5   effectively, and really making sure that they were using
6   things properly, changing the filters when they needed to be
7   changing, and things of that nature.
8          Q.   Thank you, Mr. Mitchell.  For your work in
9   Newark, New Jersey we just discussed, did you win any awards
10  for that?
11         A.   We did as a team.  Internally we were awarded the
12  CEO Award of Helen of Troy for the team's work and what we
13  did in Newark.
14         Q.   Thank you.  We'll talk more about Newark in a
15  little bit, but I want to take you back to 2005, Cincinnati,
16  Ohio, your time at Procter & Gamble with the PUR Group.  Are
17  you with me?
18         A.   Yep.
19         Q.   Great.  Now in 2005 what gravity-fed water
20  filters did PUR offer in the United States?
21         A.   There would have been two -- a 1-stage and a
22  2-stage.
23         Q.   What are the 1-stage and 2-stage PUR filters?
24         A.   The 1-stage is a granular mixed bed media, and
25  the 2-stage was similar, it was a granular mixed bed,

1    actually had the same carbon, the same resin as the 1-stage,

2    but it had a pleated paper in the bottom that made it a

3    little better for removing particulate than the 1-stage.

4         Q.   Thank you, Mr. Mitchell.  I'm going to talk to

5    you today about just the 1-stage.

6              Where was the PUR 1-stage filter sold in the

7    United States in 2005?

8         A.   It was pretty broad.  I mean, it would have been

9    at national retailers like a Walmart, Home Depot, a Bed,

10   Bath & Beyond, places like that.

11        Q.   Was the PUR 1-stage a popular filter in the

12   United States, Mr. Mitchell?

13        A.   I would say it would had to have been.  We

14   manufactured millions of those a year at Procter & Gamble.

15        Q.   In and around 2005?

16        A.   Yes, yeah.

17        Q.   Now in 2005, Mr. Mitchell, how many variants of

18   the PUR 1-stage filter were there?

19        A.   There were two, 1450 and a 1450Z.

20        Q.   Can I have RDX-25, please.  RDX-25, for the

21   record, is showing RX-659C and RX-192C.

22             Do you see those, Mr. Mitchell?

23        A.   I do, yes.

24        Q.   Could you please explain what's shown on RDX-25?

25        A.   This is the artwork essentially these are the

1    boxes that those filters came in.  The one on my left, I

2    guess, is the 1450, and the one on my right is the 1450Z.

3    So this was how the products would have looked on the shelf

4    with the filter inside.

5        Q.   Are you familiar with the makeup, Mr. Mitchell,

6    of the CRF 1450 and 1450Z variants?

7        A.   I am, yes.

8        Q.   I'm showing you RDX-26 with Exhibits RX-210C and

9    RX-194C on the right.  Do you see those, Mr. Mitchell?

10        A.   I do, yes.

11        Q.   Can you please explain to the Court what is shown

12    in RDX-2C?

13        A.   This is a controlled document or a version of a

14    controlled document that would have existed in the P&G

15    manufacturing process called CSS.  It has things like

16    formula cards, making instructions and things likes that

17    that dictate both how to make a product as well as what a

18    product is made out of.

19            So the formula card here is a recipe,

20    essentially, for how to make or what the 1450 is made out

21    of.

22        Q.   Now, Mr. Mitchell, looking at these two formula

23    cards for the PUR CRF 1450, did the formula change at all

24    between August 2005 and 2010?

25        A.   No, it did not.  And so it was essentially the

1    same carbon, the same resin, at the same ratios with 65

2    percent carbon and 35 percent resin.  And I think you can

3    see from the documents it had a fill volume target between

4    175 and 185 milliliters.  That's what defines a CRF 1450,

5    those particular -- that particular recipe.

6        Q.    Thank you, Mr. Mitchell.  I want to talk to you

7    now about the other variant, if you will, the 1-stage

8    filter, CRF 1450Z.

9             Could I have RDX-27, please.

10            Mr. Mitchell, can you explain what is shown on

11   RDX-27, which is showing RX-195C and RX-214C?

12       A.    Certainly.  This is the formula card that existed

13   at the time for the 1450Z.  It has the same activated

14   carbon, same resin.  There is a different IR number for the

15   resin only because we added a different supplier.

16            So it was the same specification, but we were

17   buying it from two suppliers instead of just the one that

18   existed before.  It's the same ratios with 65 percent carbon

19   and it's 35 percent resin.  And then it has the same target

20   fill volumes in that cup, which is 180 milliliters for the

21   target with a range between 175 and 185.

22       Q.    Thank you, Mr. Mitchell.  Now looking at all

23   these formula cards and based on your history with the PUR

24   filters, is there any difference between the 1450 or 1450Z

25   as far as filter media goes?

1        A.    No, there is not.

2        Q.    Does that hold for all of 2005 through 2010?

3        A.    It does, yes.

4        Q.    Now, Mr. Mitchell, I want to talk about PUR

5    filters, both the 1-stage you just talked about, or maybe

6    generally, but do any PUR filters have a shelf life?

7        A.    No, there's no shelf life on PUR filters.

8        Q.    How about expiration date?

9        A.    We don't have expiration dates on PUR filters.

10        Q.    Why no expiration date, Mr. Mitchell?

11        A.    Well, if the materials that are used are the

12    materials in the specification and they have been sealed

13    properly, the filters do not age.

14        Q.    Is that lack of expiration date or shelf life, is

15    that unique to PUR, Mr. Mitchell?

16        A.    From what I've looked and seen, all of our

17    competitors, none of them have expiration dates, and PUR has

18    never had expiration date.

19        Q.    PUR 1-stage filter that was sealed but

20    manufactured in 2005 or 2006, how would you expect that to

21    perform today?

22        A.    I would say similar to when it was manufactured.

23        Q.    Okay.  Mr. Mitchell, we're going to leave

24    Cincinnati and we're going to go to Marlborough,

25    Massachusetts.  I'm sure your family is happy to see you

1    back?

2         A.   Yep.

3         Q.   Let's talk about PUR's modern-day product.

4         A.   Yep.

5         Q.   All right.  Mr. Mitchell, I'm going to show you

6    RDX-29.

7              Mr. Mitchell, could you explain what is shown on

8    29?

9         A.   These would be the, I'd say, the two kinds of

10   filters that PUR sells today, the Pur Plus on the left, and

11   then what we would call a PUR standard or "Shorty" on the

12   right.

13        Q.   I'm going to talk about the Pur Plus filter

14   first, Mr. Mitchell.  How many variants of the Pur Plus

15   filter are there?

16        A.   There should be two in the market today, one we

17   would call Mario 2 and the second would be Mario 3.

18        Q.   Mr. Mitchell, what kind of filter is the

19   Pur Plus?

20        A.   We consider that a granular mixed-media filter

21   and it has a pleat pack in the bottom.

22        Q.   Now, to be clear, Mr. Mitchell, are PUR's -- is

23   the Pur Plus filter a carbon block?

24        A.   No, we don't use carbon blocks for our gravity

25   systems.

1          Q.    I'm showing you a carbon block, Mr. Mitchell.

2    Nothing like this in our filters?

3          A.    No.

4          Q.    No binders?

5          A.    No.

6          Q.    No minced-up carbon?

7          A.    No.

8          Q.    Okay.  Thank you.  Now how does mixed media,

9    Mr. Mitchell, differ from a carbon block filter like the one

10   I'm holding?

11         A.    Well, typically in a mixed -- a granular, we say

12   granular because the particles are large, they are in the

13   500 to 600 to 700 micron kind of size, ten times larger than

14   the diameter of a human hair kind of a thing.  And so

15   because they are so big, we don't really need to hold them

16   much.  So we can take a plastic part or a plastic cup, we

17   can mold a screen into the bottom of that, and we can just

18   pour the media into it and it's loose.

19              With carbon blocks, you're tending to use finer

20   particles, so you have something in the 50 microns to 70

21   micron, so more in line with the human hair.  You can't

22   really hold it.  If you pour water in it, it will float or

23   fall through.

24              And so what you do is you turn that into a block.

25   You take a binder like a polyethylene.  That's the same kind

1    of size as that carbon powder.  You blend it together, you

2    put it in a mold, you heat hold to soften that plastic.  It

3    sticks the carbon today, and then you bring the temperature

4    back down, and then you take it out of the mold.

5         When you take it out of the mold, you've got a

6    rigid structure then that's got pores through it that you

7    can then push water through.

8    Q.   Thank you, Mr. Mitchell.  Now I want to go back

9    to the mixed media world now.

10        Can we talk about the Mario 2 filter?  What is

11   the basic structure of the Mario 2 filter?

12   A.   So the Mario 2, again, it's a granular filter so

13   the particles are in that 500 to 600 micron kind of range.

14   It's the same carbon that we talked about earlier in the

15   1450s back in the 2005 time period.  We used the exact same

16   carbon.  It's the exact same resin from that time period as

17   well.

18        The main difference is the pleat pack in the

19   bottom of Mario 2 is a pleat pack that we've designed to

20   help remove particulate lead.

21   Q.   Thank you, Mr. Mitchell.  Now I want to go from 2

22   to 3.

23        Could I have RDX-28, please?

24        I want to discuss the formula and the basic

25   structure of Mario 3.  Could you explain that to the Court?

1       A.   So in this demonstrative it's -- some of the

2  things that I would first say is, when you see where it says

3  PUR's extreme lead test, this test is actually two times

4  higher in concentration than what's typically talked about

5  in the '141 or in the NSF.  So these are well over 300 parts

6  per billion challenges.

7            We also have mimicked more the water that we

8  tested and saw in Newark.  So it has higher particulates and

9  higher amounts of that really fine particulate that we saw

10  there.

11            And so in Mario 3 we really tried to focus on how

12  do we solve for that water, how do we make a better filter

13  that's better for this fine particulate lead.

14            And so Mario 3 has the same activated carbon that

15  was in the 1450.  It has the same pleat pack in the bottom

16  that we put in there for particulate lead as Mario 2.  But

17  it has a new blend of three ion exchange resins that we came

18  up with that we blend with that activated carbon that allows

19  us to achieve the performance that you see here.

20       Q.   And in addition to your learnings at Newark that

21  helped you develop the Mario 3 filter, how long, generally,

22  did it take in the lab to develop the Mario 3 filter?

23       A.   I mean, it's probably hundreds of hours, really

24  just trying to analyze what's in the water.  So you go and

25  you sample the water that's coming out of your filters and

1    find out if you're seeing lead break through, what's that

2    lead like.  Is it soluble lead, is it particulate lead, is

3    it really fine lead, and understanding is it a lead oxide, a

4    lead phosphate, a lead carbonate, and what are the

5    properties of that, does it have a charge, is it neutral.

6          When you start to learn those things, you can

7    start to look at either creating new particles or creating

8    different blends of materials that, when you bring that

9    together, really targeted at what those things -- what that

10   filter couldn't do, and the result of that is you come up, I

11   think, with this nice blend of resins that we can then add

12   with the existing Mario 2 base to make a better filter.

13        Q.   Thank you, Mr. Mitchell.  We'll talk a little bit

14   more about Mario 3 in a moment.

15          I want to talk about Helen of Troy's

16   laboratories.  Mr. Mitchell, as part of your water

17   filtration work at PUR, do you perform lead testing of

18   gravity-fed filters?

19        A.   We do.  Our experience in Flint said that we

20   needed to be more involved, we needed to have the kinds of

21   equipment so that we could go into these communities and

22   understand what they were facing.  And then we needed it to

23   help us develop and create products to make a difference in

24   those communities.  So we did -- we brought in the equipment

25   and we do the lead testing.

1     Q.   And this lead testing equipment, is that in the
2  Marlborough headquarters?
3     A.   It is, yes.
4     Q.   Thank you.  Did you perform in PUR's laboratories
5  any testing on gravity-fed filters for this litigation?
6     A.   We did, yes.
7     Q.   I'm showing you RX-986C.  Do you see that
8  document, Mr. Mitchell?
9     A.   I do, yes.
10     Q.   What is shown on this document?  To be specific
11  for the Court, I'm at page 15 here.
12     A.   So this is what we call an SOP or a standing
13  operating procedure on the testing that we wanted to do
14  towards this '141 patent.
15     So it talks about how to create the right 8.5
16  lead water to address what's in the '141, how to collect the
17  sample, how to operate the ICP to analyze the lead as well
18  as at the bottom how to actually test the individual filters
19  for lead effluence.
20     Q.   Thank you.  We can take that down for a moment.
21     Do you know, Mr. Mitchell, in your 20 years of
22  water experience, water filtration experience, do you know
23  who Rob Herman is?
24     A.   Yeah, I think everybody in the industry knows
25  Rob, yeah.

1   Q. Who is Rob Herman?

2   A. Rob has a 30-year career plus in the industry.

3 He was the director, so he was in charge of the labs that

4 did a lot of the -- almost all of the certification testing

5 for our industry.

6   Q. And did Rob Herman approve the protocol that you

7 used to test the filters in this investigation?

8   A. Yeah, he did.  We brought Rob in a little after

9 we started testing.  He was able to watch the technicians

10 and the engineers perform the operation and approved.  There

11 were some things he advised.

12   And so when we run the ICP, he added some

13 controls and standards additional to what we were doing, and

14 so we added those.  And then Rob came back in a week or two

15 to make sure that we were doing all of that, and then gave

16 us an approval, yes.

17   Q. Mr. Mitchell, what filters did you run lead

18 testing on for this litigation?

19   A. So we started with the filters that were accused,

20 and then we also added filters that we had in our possession

21 that we thought might be prior art.

22   Q. Thank you, Mr. Mitchell.  I'm showing you

23 RDX-210.  Do you see -- is that on the screen, Mr. Mitchell?

24   A. Yep.

25   Q. It's citing RX-986C at page 1.  Could you explain

1    to the Court what is shown on RDX-210?

2        A.    Well, the table, the IT numbers, those are

3    electronic logbooks that we give specific numbers to

4    products or that we enter into, and then this would be an

5    indication of the filters that we tested in our lab.

6        Q.    And on the left there, there's some pictures, are

7    there not, Mr. Mitchell?

8        A.    Yeah, I don't want to brag, but that's me.

9    That's me on the SCM.  We have the capability to do some

10    analytical work as far as looking at inorganics and organics

11    and understanding the makeup of some things.  We did do some

12    testing for that.

13        Above that is just a picture showing some of the

14    devices that we had set up where we're running water through

15    those samples.  That's where we would collect water for the

16    analysis.

17        Q.    Thank you, Mr. Mitchell.  Now did any of the

18    products, specifically the PUR products, have lot codes on

19    them that you tested?

20        A.    So as long as the business was at P&G and we

21    continue to practice today at Helen of Troy all PUR filters

22    have date codes or lot codes stamped on the plastic parts.

23        Q.    Let's talk about one of those, Mr. Mitchell.  I'm

24    going to have RPX-116, it should be in front of you,

25    Mr. Mitchell.

1      A.   Yep.

2      Q.   I'm going to ask you to pull the filter out of

3 that box, if you don't mind.

4           Mr. Mitchell, do you recognize RPX-116?

5      A.   Yeah, this is one of the filters that we tested.

6      Q.   Which filter is it?

7      A.   It's IT 1371, and it's a 1-stage PUR pitcher

8 filter.

9      Q.   Mr. Mitchell, I know we're in a conference room

10 here and the lighting is the way it is, but I want you to

11 strain your eyes and tell me, do you see the numbers printed

12 on the side of that filter?

13     A.   Yep, I do.

14     Q.   Okay.  And now since we can't see that through

15 the camera, I'm going to ask RDX-212 to be brought up.

16          Do you see that, Mr. Mitchell?

17     A.   It's easier for me to say that than this.

18     Q.   You and me both, Mr. Mitchell.

19     A.   Yep.

20     Q.   Now could you please explain to the Court what

21 the significance of the number that is shown on the side of

22 the filter is in RX-212?

23     A.   Yep.  So on this filter the first number is the

24 last number of the year that it was manufactured.  So the 6

25 would stand for 2006.  The next three is the Julian date, so

1    that 171 would be June 20th of that year.  The next four is

2    the plant that it was manufactured in.  And the last two

3    numbers are, if there is multiple lines in that plant, it

4    would be the line that it was manufactured on.

5         So the first four have the information on when it

6    was manufactured, the 6 and the 171.

7    Q.   Let's test your knowledge.  What date was

8    RPX-116, the PUR 1-stage you just handled, when was this

9    manufactured?

10   A.   It was manufactured on June 20th of 2006.

11   Q.   Now if I recall your testimony earlier, and I

12   want to make the Court very clear about this, did PUR change

13   the filter media or the volume of that filter media in the

14   PUR 1-stage including the one you just handled between

15   August 2005 and 2010?

16   A.   No, it did not.  And, again, that's based on the

17   engineering documents that we have.  So the formula did not

18   change in that time period.  It was the same activated

19   carbon, the same resin, and the same ratios to the same fill

20   volume for that entire time that P&G manufactured it.

21   Q.   To be clear, the PUR 1-stage that you just

22   demonstrated to the Court, would that be representative of

23   the PUR 1-stage filters manufactured from August 2005 to

24   2010?

25   A.   Yeah.  I mean, again, the manufacturing documents

1    is the recipe for the 1450 and the 1450Z.  So all of these

2    filters are considered identical and match that formula

3    card.

4         Q.   Thank you, Mr. Mitchell.  There's two other

5    filters I want you to identify for the record that will be

6    handed to you.

7              There's RPX-117 and I believe RPX-114.  Do you

8    recognize those filters, Mr. Mitchell?

9         A.   Yep.  These are filters, yeah, these are filters

10   that we tested in our lab.

11        Q.   Thank you, Mr. Mitchell.  Now how were the

12   filters that you tested obtained?

13        A.   So I believe when the business was at P&G the

14   marketing team purchased store-collected product and stored

15   it.  And when that business was sold to Helen of Troy, we

16   received all of that product.

17             So all the product that they had retained, that

18   we received, all the engineering documents that went with

19   the business, all the logbooks that go with the technology,

20   all of that information was part of the sale, and so it all

21   came to us.  And the product has been stored in an office or

22   a part across the hallway from our lab since the business

23   moved over.

24        Q.   Thank you, Mr. Mitchell.  Now is that storeroom,

25   is that dry and cool in there?

1      A.   Yeah, I mean, it's air-conditioned, heated.  It's
2   in an office building, so it's in a similar environment to
3   the lab.
4      Q.   Were all the test products that you tested, were
5   they in original packaging?
6      A.   Yes, they were in their original color boxes.
7      Q.   Sealed?
8      A.   Yes.
9      Q.   Any evidence that they might be counterfeit?
10     A.   No.
11     Q.   Thank you.  I want to talk about the results now
12   of your lead testing.  When did you conduct your lead
13   testing?
14     A.   It would have been April and May of 2022.
15     Q.   Okay.  Can I ask you to give a 30,000 foot
16   overview?  I realize there's a lot more steps involved --
17     A.   Yeah.
18     Q.   -- how you tested prior art filters?
19     A.   Yeah, absolutely.  So it starts in the morning.
20   So the engineers and the technicians, we make the tank of
21   water towards that -- to that SOP that earlier was based on
22   that '141 claim.
23          And so they add the right salts, the add the
24   lead, they do the stirring.  They take a sample and they run
25   it through the ICPOES.  If it meets the requirement of that

1    first claim, then we start testing one liter at a time

2    through those filters.  If it doesn't, they basically either

3    dilute that tank or they add more lead to that tank.  They

4    retest it, make sure it's in spec, and then they start doing

5    the testing through the filter.

6        Q.   Thank you, Mr. Mitchell.  You talk about the lead

7    challenge water.  How often did you test that lead challenge

8    water?

9        A.   So, again, we wanted to make sure that it was

10   right before we used it.  So every day the influent

11   concentration gets tested.  We make sure it's in spec before

12   it's used.  So it is tested every day.

13       Q.   And --

14       A.   It was tested every day.

15       Q.   Thank you, Mr. Mitchell.  How often did you test

16   the effluent lead through these filters?

17       A.   That was five times during the test and then once

18   at the end.

19       Q.   Was that five times after certain volumes were

20   run through?

21       A.   Yep.

22       Q.   And how much challenge water, if you will, were

23   added the day to these filters?

24       A.   Typically around two gallons per day we ran.

25       Q.   Okay.  I'm going to show you two more exhibits

1    now, Mr. Mitchell, RX-709 and 710.

2         Do you recognize these exhibits, Mr. Mitchell?

3    A.    Yep.  So those are outputs that came out of our

4    ICPOES.  Essentially it would have the calibration curve for

5    each time they ran it.  All of the data for the influent

6    tanks is in this bunch of paper.  As well as we said, you

7    know, we tested the effluent five times and then once at the

8    end, all of that data is in this packet of papers as well.

9    Q.    Thank you.  You mentioned, I believe, ICPOES; is

10   that correct?

11   A.    Yes.

12   Q.    How does that differ from ICPMS in terms of

13   measuring lead?

14   A.    So the OES was the first one we purchased.  It

15   has a limited detection of 3 parts per billion.  We

16   purchased a year or so after that a mass spec which can go

17   down much lower than that.

18        And so the difference is, for samples where the

19   lead concentration is higher than 3, there is no difference.

20   You'll get a similar number as the MS.

21        But because the MS can go lower, we're limited

22   when we're either going to calculate a FRAP or something to

23   the 3.  We can't really say if it was lower than that.  So

24   if we use the MS, we would get a lower number and probably a

25   lower FRAP than what we reported.

1    Q.    Thank you, Mr. Mitchell.  With the lead testing

2  results, what did you do with them once you were complete?

3    A.    I gave all that information to Rob Herman.

4    Q.    Thank you.  Now when testing these filters,

5  Mr. Mitchell, did you also determine the average flow rate

6  it takes one liter to enter that filter?

7    A.    Yep, we did.

8    Q.    How did you measure that flow rate?

9    A.    We essentially just took a graduated cylinder,

10 put a liter of water it in, and then placed that in the back

11 or the top of the pour tray, hit a stopwatch.  And when the

12 pour tray was empty, we stopped the stopwatch and just

13 reported that in minutes per liter.

14    Q.    And how often throughout your testing did you

15 test or sample the time it takes 1 liter to pass through the

16 filter?

17    A.    It would have been like five to seven, five to

18 seven times.

19    Q.    And how many liters of challenge water did you

20 run through each filter?

21    A.    That would have been 40 gallons.

22    Q.    151 liters?

23    A.    Yes.

24    Q.    Thank you, Mr. Mitchell.  Is the frequency by

25 which you tested the average flow rate it takes one liter of

1    water to pass through these filters, is that consistent with

2    how PUR tests its own filters in manufacturing?

3        A.    I'd say it's consistent with what we do with

4    certification testing.  It's more than what we typically do

5    in manufacturing.

6            We make thousands of filters a shift and we test

7    four filters for that whole shift and we only test the first

8    beginning.  We don't test the life of the -- the flow rate

9    during the life of the filter.

10        Q.    One sample rate?

11        A.    Yeah, just one.

12        Q.    One sample point?

13        A.    Right, one sample point.

14        Q.    Could I have RX-210 back up, Mr. Kotarski?

15            I notice we talked about three filters here,

16    Mr. Mitchell, but there's a PUR, quote/unquote, Shorty on

17    here.  Could you explain to the Court who Shorty is?

18        A.    I didn't, but someone on the marketing team

19    probably called it Shorty because it's essentially a

20    standard filter.  So it has the exact same carbon and resin

21    that we talked about in the 1450, but it doesn't have a

22    pleat pack at the bottom.  So it looks shorter when you set

23    it next to the Pur Plus, which is, I think, why they call it

24    Shorty, but it's essentially the exact same carbon, exact

25    same resin going back to the 1450.

1      Q.   And you tested Shorty in your labs; is that

2  correct, Mr. Mitchell?

3      A.   Yep, we did.

4      Q.   Why did you test the Shorty?

5      A.   Well, when we started this testing, Shorty was

6  part -- it was included, so it was part of this case, but we

7  also had information that it had been tested by the other

8  lab, and we wanted to kind of see how our data compared to

9  that lab's data.

10     Q.   Thank you.  Just for anyone reading at home so

11 it's clear, is the PUR Shorty the same as the PUR standard

12 filter?

13     A.   It is, yes.

14     Q.   Thank you, Mr. Mitchell.  Do you have a

15 demonstrative to show the comparison of your Shorty test

16 results, PUR standard test results, to what you understand

17 Brita's test results to be?

18     A.   Yes.

19     Q.   May I please have RDX-213?  For the record, this

20 is citing RX-986C, RX-709 and 710.

21          Mr. Mitchell, could you please explain to the

22 Court what is shown on RDX-213?

23     A.   Certainly.  The first column is the data that

24 represents how the Shorty filter was tested in the lab that

25 Brita used, and the second column is the data that we

1    generated in our lab.

2         And so the first column or the first row is the

3    average flow rate.  They measured about 2.98 in minutes per

4    liter.  We got a 2.32, which could be the variation just in

5    different filters.

6         They measured a volume of 107.  We measured it at

7    118, which I would also say is close.

8         They picked the certification volume at 40, which

9    is what it is.  Shorty is certified for 40 gallons for a

10   number of claims.

11        The lead coming out of their Shorty was 29.4 and

12   we got 35.9.  So, again, very similar.  And so when you

13   calculate the FRAP, I think they calculated it at 117 and we

14   independently calculated at 123.

15        So it would appear that I think the data that we

16   were generating in our lab was very similar to the data that

17   they were doing.

18   Q.   Thank you, Mr. Mitchell.  We can take that down.

19        Did you measure the filter media volumes of the

20   specimens you tested, Mr. Mitchell?

21   A.   Yes, we did.

22   Q.   Showing you RDX-214.

23   A.   Yep.

24   Q.   What is shown here, Mr. Mitchell?

25   A.   This is the volume, the result of the volume

1    measurements for some of the filters that we tested.

2        Q.    Could you tell the Court what you measured for

3    the DuPont PTC 2007 and 2005 filters?

4        A.    About 105 milliliters.

5        Q.    How did you measure the volume for the DuPont PTC

6    100 2005?

7        A.    It's similar to what we do in the plant.  So we

8    use fill volume.  As I mentioned, in the formula card each

9    of those 1450s was required to have 180 milliliters of media

10   in it.

11            And so from our manufacturing side, on our

12   control documents, there's actually a test where the

13   operators are required every so often to pull PUR filters

14   and measure the volume.  And in that process they open up

15   one of the manufactured filters, they put it in a graduated

16   cylinder, and they vibrate it on the vibratory table to take

17   some of the excess air out of it, and they take the number

18   where the fill line is.  And that's what we did specifically

19   in our lab as well.

20       Q.    Would you consider that a hydrated volume of the

21   filter media?

22       A.    Yeah.  Well, there were cases, I think, where

23   the -- where it wasn't as hydrated.  I think we added water

24   to make sure that they were hydrated.  So I think all of the

25   samples that we tested were properly hydrated, and we

1    measured the volume based on that vibratory testing.

2        Q.   Could you explain to the Court what your volume

3    measurement was for the PUR 1-stage filter?

4        A.   So the target, the target was 180 based on the

5    formula card, and we measured it at 176.

6        Q.   Thank you, Mr. Mitchell.  We can take that down

7    as well.

8            Did you do any chemical assays of the prior art

9    filters that you tested?

10       A.   Only on the DuPont, because, again, based on what

11   we were seeing in the '141 claim, it requires both activated

12   carbon and a lead absorbent.  In most cases when we open the

13   filter, we can identify relatively quickly if it has an ion

14   exchange resin in it, but the DuPonts weren't -- they didn't

15   use an ion exchange resin.

16           So they had a white granular media in it, and so

17   I collected some of that granular media.  I put it on the

18   SCM, and I just did a quick EDS, not exhaustive, but a quick

19   EDS, to try to understand what elements were present.

20           I think in the information we shared it showed,

21   you know, sodium, silica, and a pretty good peak for

22   titanium, which is, in our industry, pretty common for lead

23   absorbent -- that's an inorganic lead absorbent.

24       Q.   Thank you, Mr. Mitchell.  With your volume and

25   your chemical assays, what did you do with those results

1    once you obtained them?

2         A.   All that information was given to Rob Herman.

3         Q.   Looking back, briefly, on RX-986, page 2, there's

4    some samples here listed as QFT.  Do you see those?

5         A.   Yep.

6         Q.   Okay.  Who is QFT?

7         A.   So QFT is an independent lab in New Jersey.  They

8    do certification testing to the NSF standards for a trade

9    association called IAPMO.

10        Q.   Who is IAPMO?

11        A.   So it's plumbing and machine professionals.  And

12   so it's more plumbers than water filtration people.  Because

13   they also do a lot of installation of water filtration

14   products, they offer a certification process as well.  And

15   so QFT is the lab that they typically use for that

16   certification process, and they run everything through the

17   same NSF standards.

18        Q.   Do you trust the results from QFT, Mr. Mitchell?

19        A.   Yes.

20        Q.   Were all the samples you sent here, from 1 to 10,

21   were all of those sealed?

22        A.   All of them except 9-A and 10-A.

23        Q.   How were the samples for QFT obtained?

24        A.   All of those were in our possession except for a

25   few that we were able to get off of eBay.

1      Q.   Can you please explain to the Court what is shown

2   on RDX-215?

3      A.   It's just a collection of the information off

4   these -- what we would consider these prior art filters.  So

5   it's who the manufacturer is, the kind of information as far

6   as timing of year that we had on it.  The ones that were

7   sealed, we're just going to say those were sealed, but also

8   the packaging that was -- some of those were in yellow boxes

9   that were three packs, some of them were five packs.  It was

10   just a way of documenting more the artwork where those

11   filters were taken before they were sent.

12      Q.   RDX-216, please.

13           This is the same information here shown for 5-A

14   through 10-A, Mr. Mitchell?

15      A.   Yes.

16      Q.   Thank you.  Now, Mr. Mitchell, why was QFT used

17   --  you can take that down.

18           Why was QFT to test these additional samples in

19   addition to what you were already testing?

20      A.   I think we felt good about the work that we were

21   doing in our lab, but we wanted to have an independent lab

22   do the same type of testing.

23      Q.   And when you were doing that, Mr. Mitchell, did

24   you ever tell QFT why they were being asked to test these

25   filters?

1        A.    No.  We only shared with them the SOP so they

2    would be doing the same thing that we were doing.

3        Q.    Did QFT have any idea about this litigation?

4        A.    No, the '141 patent, no.

5        Q.    Thank you, Mr. Mitchell.  Just a couple more

6    questions for you.  I'd like to go back to Mario 3 and

7    Newark for a moment.

8              Could I have RDX-28 back on?

9              Mr. Mitchell, I'll ask you this.  The superior

10   performance of the Mario 3 that you described earlier shown

11   here on the right, would this performance out of a

12   mixed-media filter been possible 15 or 20 years ago?

13       A.    I think, because it's a big granular mixed media,

14   I don't think so.  I think it took the work that we did in

15   Newark to really understand the type of lead that some of

16   these filters could see, and then really the creation of

17   that unique blend of ion exchange resins that really lead to

18   that performance.  So I think it's a much better product.

19       Q.    Does your work at Newark lend itself to the

20   development of Mario 3?

21       A.    Absolutely.  It's unfortunate, but because they

22   were having such high levels of lead and the combination of

23   the soft water with this orthophosphate was really creating

24   this really challenging water, we were able to learn a lot

25   from it.

1          So by really studying what was coming through our

2     filters and what we weren't being able to catch, and then

3     understanding and then working to understand what we could

4     use that would grab those things that we couldn't do better

5     at, we were able to create something a lot better.

6          And I think that's the process.  I think all of

7     the times you need to always try to get better.  And so

8     you're looking at where you're not doing well, you're coming

9     up with different solutions for that.  And at the end you

10    want to think that you're doing something better.  And it

11    matters for these communities.

12         Q.   Thank you, Mr. Mitchell.  One last question.

13         When you were doing things for the community in

14    Newark and developing the Mario 3 filter, did you ever bump

15    into anyone from Brita up there?

16         A.   No.  I did not.

17         Q.   Thank you, Mr. Mitchell.

18         MR. SWAIN:  I pass the witness.

19         JUDGE MCNAMARA:  Thank you, Mr. Swain.

20         Mr. Ainsworth.

21         MR. AINSWORTH:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23    BY MR. AINSWORTH:

24         Q.   My name is Paul Ainsworth.  I'm counsel for

25    Brita.  Nice to meet you.

```
 1        A.   Nice meeting you.
 2        Q.   Now, Mr. Mitchell, I heard you mention a few
 3   times the '141 patent.  You're familiar with the '141
 4   patent, right?
 5        A.   Yes.
 6        Q.   You've read it before several times?
 7        A.   A few, yes.
 8        Q.   You've offered expert opinion on the '141 patent,
 9   right?
10        A.   Yes.
11        Q.   And you're also familiar with an application to
12   Knipmeyer, the '372 application, right?  You offered
13   opinions --
14        A.   I'm not.
15        Q.   You're not?  Let me see if I can refresh your
16   recollection.
17             If we could have CX-346.  I'm sorry.  RX-1043.
18             Do you recognize RX-1043, Mr. Mitchell?
19        A.   Yes, I've seen that before.
20        Q.   You've offered an opinion on RX-1043, right?
21        A.   Yep.
22        Q.   And it was your opinion that the claims of the
23   '141 patent were disclosed in RX-1043, right?
24        A.   Yes.
25        Q.   You can take that down.
```

1          Mr. Mitchell, going back to the '141 patent, you

2     reviewed the '141 patent to help prepare your protocol that

3     you -- for testing in your lab?

4          A.   I did.

5          Q.   And you are familiar with claim 1 of the '141

6     patent, right?

7          A.   I am.

8          Q.   Could we have JX-22, please.

9          Mr. Mitchell, you would agree with me that the

10    source water recited in claim 1 has 90 to 120 parts per

11    billion soluble lead and 30 to 60 parts per billion

12    colloidal lead, right?

13         A.   Yep.

14         Q.   And if I say insoluble lead instead of colloidal

15    lead, you'll know what I'm referring to?

16         A.   Could you say that again?

17         Q.   If I say insoluble lead instead of colloidal

18    lead, will you know what I'm referring to?

19         A.   Yes.

20         Q.   Okay.  Or is particulate lead also

21    interchangeable?

22         A.   Yes, I think so.

23         Q.   Just to make sure we're on the same page, if I

24    mix up my terms.

25         A.   Yep.

1    Q.    So the total lead permitted by the '141 patent

2    would be 120 parts per billion to 180 parts per billion,

3    right, total lead?

4    A.    Looks like it, yes.

5    Q.    And that's consistent with the NSF 53 standard

6    where you have between 120 to 180 parts per billion lead in

7    the challenge water, right?

8    A.    I don't think that's true.  I don't think the NSF

9    standard goes down to 120.

10    Q.    Isn't the NSF standard -- the NSF 53 standard

11    starts at 150 parts per billion with a 30 percent deviation

12    on either side?

13    A.    My understanding, and I don't have it in front of

14    me, is that the allowable range is from 135 to 165.

15    Q.    Let me see if I can refresh your recollection.

16    Just give me one second.

17          I misspoke.  I don't like to misspeak.  Could I

18    have CX-10 at page 80.

19          Do you recognize CX-10, the page we're on,

20    Mr. Mitchell?

21    A.    Yep.

22    Q.    I did misspeak.  I want to apologize.  I said 30

23    percent.  I think it's 20 percent.

24          But the effluent challenge can be -- that's 150

25    parts per billion, right, .15 milligrams?

1          A.   Yep.

2          Q.   And at 20 percent tolerance, that would give you

3     on either side all the way down to .12 or up to .18, right?

4          A.   I think, yeah, I think so.

5          Q.   Okay.  So we're on the same page that the

6     specification for the '141 patent claim 1 as well as the NSF

7     Standard 53 2007 both allow between 120 to 180 parts per

8     billion, right?

9          A.   Yes.  Yep.

10         Q.   So let's talk about the protocol you did.

11    Mr. Swain had it up for you there.  I believe it was -- make

12    sure we're on the same page here.  On mine it's CX-957.

13    Let's turn to page 15, and go down to the bottom to your

14    tank specifications.

15              Those are the tank specifications that you

16    selected for the test, correct?

17         A.   Yep.

18         Q.   And for the total lead you selected 120 to 140

19    parts per billion, right?

20         A.   Yep.

21         Q.   So you went for a narrower range for the amount

22    of lead in the total lead in the challenge water than what

23    is provided for in the specification of claim 1 of the '141

24    patent, right?

25         A.   Yes.

1      Q.   And a narrower range than was provided for in the
2  NSF 53 standard?

3      A.   Yep.

4      Q.   Okay.  If we go to the very top of the page, the
5  title there, I'm just curious, it says "Standard Operating
6  Procedure for Lead pH 8.5."  Do you see that?

7      A.   I do.

8      Q.   Is that a standard operating procedure for
9  anytime you do a lead challenge at Helen of Troy or just
10 when you're doing it for purposes of the '141 patent?

11     A.   This procedure was put together for the '141.

12     Q.   Okay.  So this isn't the tank water specification
13 that you use normally for challenging with pH 8.5 lead,
14 right?

15     A.   No.  And I think there are -- when we do a normal
16 8.5, we're keeping track of the .1 soluble and then the .1
17 to the 1.2 because we need to be able to talk about how much
18 fine particulate and how much coarse particulate in order
19 for us to really do towards the NSF 8.5.  And I didn't see
20 that in the '141.

21          So I de-couple what's required from the '141 from
22 the NSF, because there really isn't enough information for
23 us, again, because we're missing that amount of fine
24 particulate and the amount of coarse particulate that's
25 typical when we do NSF testing to the 8.5.

1      Q.   Let me ask again.  You used a different protocol

2  when you're testing for the '141 patent than you normally

3  use when challenging with a pH 8.5 lead challenge water,

4  right?

5      A.   Yes.  Yep.

6      Q.   Now if we turn to page 18 of this same exhibit,

7  this is the data you recorded for a portion of your testing

8  that you did in your labs involving a DuPont filter and a

9  PUR 2-stage filter as well as one of the Shorty filters,

10  right?

11      A.   Yes.

12      Q.   I just want to focus on the column with the

13  DuPont filter.  That's labeled IT1326, right?

14      A.   Okay.

15      Q.   And that's a sample ID you assigned to that

16  particular filter, correct?

17      A.   Yes.  Yes.

18      Q.   Okay.  So when you did your flow rate

19  measurements, I believe, for this one, and we can scroll

20  down and count them for you, but I think you did a total of

21  seven flow rate measurements for this particular filter,

22  right?

23      A.   Yes.  Probably, yes.

24      Q.   Mr. Rennick, we can just scroll back out.

25           Let's just go through them.  The first flow rate

1    there is the initial flow.  If we can just highlight that.

2         A.   Yep.

3         Q.   The initial flow at the very top row there.  The

4    next flow rate was at 4 liters, right?

5         A.   Yep.

6         Q.   Okay.  And the next flow rate was at 20 liters,

7    right?

8         A.   Yep.

9         Q.   To make sure I'm getting this right.  The next

10   flow is at 50 liters.

11        A.   Yep.

12        Q.   Okay.  And correct me if I'm wrong, the next flow

13   is at 80 liters?

14        A.   Yep.

15        Q.   And then if we keep on going down, 114 liters was

16   the next flow rate data; is that right?

17        A.   Yep.

18        Q.   Okay.  Then the last one was 167 --

19        A.   Right.

20        Q.   -- the next flow rate measure.

21             So one, two, three, four, five, six, seven --

22   good, I can still count -- seven flow rates.

23             I'm curious, Mr. Mitchell, you didn't sample at

24   regular intervals, did you.

25        A.   No.  Those are the -- as regular as it could be,

1    yeah.

2        Q.   Okay.  Because the first time you took a flow

3    rate at 4 liters, right?

4        A.   Yep.

5        Q.   And the next interval was 16 liters, right?

6        A.   Yep.

7        Q.   And the next interval was a 30-liter difference,

8    right?

9        A.   Yep.

10        Q.   Any reason why you picked those different

11    intervals for the flow rate testing?

12        A.   So I think the testing of the flow rate is more

13    relevant or consistent to when we did the lead testing.  The

14    flow rate is something we measured because we needed to know

15    what it was, and so we typically measured it whenever we did

16    lead testing, and that's kind of what drove when we did the

17    flow testing.

18             And so I would say that's why it's those

19    intervals.  It's when we tested for lead, we tested for

20    flow.

21        Q.   So I'm looking at the -- another question I have

22    on your flow rate measurements.  You seem to have perfect

23    timing to land on almost exactly a minute every time you

24    took a flow rate measurement.

25             The first one is 9.5, the next one is 10, the

1    next one is 8, the next one is 9.  How did you manage to

2    have flow rates that were perfectly on the minute?

3        A.   Well, they are averaged.  And so it might have

4    been -- it was rounded, and it's -- you know, when you're

5    measuring a flow rate, you're trying to look at the top of a

6    tank and you're measuring when the last drop of water comes

7    out of that.

8            So if it was eight minutes and 57 seconds, I

9    could have recorded it at 8 minutes and 57 seconds, but I

10   just put it as 9.

11       Q.   So did you just round to nearest half minute

12   or --

13       A.   Probably sometimes, if it was 9.1, I probably

14   said it was 9.  Because, you know, you're trying to measure

15   something that, when the last drop of water or something

16   leaves a tray, and trying to ascribe too much accuracy to

17   that is probably tough to do or tough to justify.

18       Q.   You weren't trying to be perfectly accurate,

19   then, in your flow rate measurements.

20       A.   I don't think the measurement can be perfectly

21   accurate, because it's hard to know when a tray is devoid of

22   water.

23       Q.   Now, by chance, did you ever see the testing that

24   Brita did on PUR's products, the infringement testing that

25   was done by Brita's lab?

1         A.   I did not.

2         Q.   You never saw that?

3         A.   No.  I saw the results that we showed where we

4    compared our lab data for Shorty with the lab data that was

5    generated by Brita, but that's all I've seen.

6         Q.   You never saw the flow rate data that Brita took

7    where they took it down to a second on the measurement at

8    every liter of your filter?

9         A.   I did not.

10        Q.   We can take that down.

11             If we can go and talk for a minute about -- you

12   mentioned early on in your discussion, your direct

13   examination with your counsel, the PUR 1-stage and the PUR

14   2-stage back from 2005 to -- forgive me if I have the wrong

15   years -- 2005 to 2009.  Is that approximately what you said?

16        A.   Yep, approximately.

17        Q.   Okay.  Let's start with the PUR 1-stage.

18             Did the PUR 1-stage ever have a lead

19   certification under the NSF 53 standard, either the old

20   standard or the new standard?

21        A.   I don't believe so.

22        Q.   And did the PUR 2-stage ever have a lead

23   certification under the old -- we'll start with the old --

24   under the old NSF 53 standard created in 2007?

25        A.   Yes.

1        Q.    It did?

2        A.    Yep.

3        Q.    And did it lose that certification when the new

4    standard came out?

5        A.    It did.

6        Q.    And that's because it was not able to

7    sufficiently remove lead from the NSF 53 challenge water,

8    right?

9        A.    Yes.

10       Q.    Now you've mentioned, Mr. Mitchell, that you were

11   familiar with some -- the records that had come over there

12   Procter & Gamble when the company was sold from P&G to Helen

13   of Troy.  Did I hear that testimony correctly?

14       A.    You did.

15       Q.    If we could pull up CX-944.

16             Do you recognize CX-944?

17       A.    I think I can -- when you say "recognize," I'm

18   not sure what you're asking.  I remember the wet lab and I

19   remember there was Eva Bozso that worked the wet lab.

20       Q.    This looks like the kind of record that you saw

21   from P&G?

22       A.    Yes, I would say yes, absolutely.

23       Q.    And if you turn -- if we turn to page 6 of

24   CX-944.  Can we blow up the top of that.

25             And you see it's dated August 13th, 2008?

1      A.   Yep.

2      Q.   And there's a submitter, Steve Diebold.  Do you

3  know Mr. Diebold?

4      A.   I did know Steve, yes.

5      Q.   Was he a P&G employee?

6      A.   He was.  He is a researcher.

7           MR. AINSWORTH:  And, Your Honor, I just realized

8  we're showing some PUR CBI.  If we can go on the

9  confidential record.  I apologize.

10          JUDGE MCNAMARA:  Why don't you take it down for

11  just a moment.

12          (Whereupon, the hearing proceeded in confidential

13  session.)

14

15

16

17

18

19

20

21

22

23

24

25

Appx22797-22807 redacted in their entirety

```
 1                    C O N T E N T S

 2                  INDEX OF WITNESSES

 3
                                         RE-    RE-
     WITNESS                 DIRECT CROSS DIRECTCROSS

 5   DAVID ROCKSTRAW.............      549

 6                                     570

 7                                     591

 8                                     595

 9   JOEL RAMIREZ................619          650   655

10   PHILIP GREEN................663   722

11   MICHAEL MITCHELL............748   784

12

13

14   AFTERNOON SESSION                       661

15

16

17   CONFIDENTIAL SESSIONS                   560-561

18                                           622-660

19                                           672-746

20                                           797-end

21

22

23

24

25
```

```
 1                    INDEX OF EXHIBITS

 2   EXHIBITS SUBMITTED FOR ADMISSION FROM DAY 1:

 3           CDX-0001C

 4           CPX-0011C

 5           CPX-0012C

 6           CX-0108C

 7           CX-0114C

 8           CX-0118C

 9           CX-0119C

10           CX-0139C

11           CX-0143C

12           CX-0186C

13           CX-0922C

14           CX-0932C

15           JX-0022

16           RDX-0001

17           RDX-0015

18           RDX-0018

19           RDX-0019

20           EXHIBITS SUBMITTED FOR ADMISSION FROM DAY 2:

21           CDX-0004C

22           CPX-0070C

23           CPX-0073C

24           CPX-0152C

25           CX-0010
```

| | |
|---|---|
| 1 | CX-0011 |
| 2 | CX-0063C |
| 3 | CX-0075C |
| 4 | CX-0108C |
| 5 | CX-0121C |
| 6 | CX-0127C |
| 7 | CX-0133C |
| 8 | CX-0168 |
| 9 | CX-0170 |
| 10 | CX-0171 |
| 11 | CX-0173 |
| 12 | CX-0191C |
| 13 | CX-0194C |
| 14 | CX-0211C |
| 15 | CX-0212C |
| 16 | CX-0222C |
| 17 | CX-0223C |
| 18 | CX-0227C |
| 19 | CX-0237C |
| 20 | CX-0238C |
| 21 | CX-0240C |
| 22 | CX-0242C |
| 23 | CX-0245C |
| 24 | CX-0247C |
| 25 | CX-0249C |

| | |
|---|---|
| 1 | CX-0251C |
| 2 | CX-0252C |
| 3 | CX-0253C |
| 4 | CX-0269C |
| 5 | CX-0273C |
| 6 | CX-0319 |
| 7 | CX-0910C |
| 8 | CX-0911C |
| 9 | CX-0912C |
| 10 | JX-0022 |
| 11 | RDX-0013C |
| 12 | RDX-0020C |
| 13 | RPX-0043C |
| 14 | RPX-0054C |
| 15 | RPX-0060C |
| 16 | RPX-0102C |
| 17 | RPX-0159C |
| 18 | RX-0379C |
| 19 | RX-0416C |
| 20 | RX-0432C |
| 21 | RX-0511C |
| 22 | RX-0555C |
| 23 | RX-0599 |
| 24 | RX-1005C |
| 25 | RX-1010 |

| | |
|---|---|
| 1 | RX-1572 |
| 2 | RX-1573 |
| 3 | RX-1916 |
| 4 | RX-2066 |
| 5 | RX-2131 |
| 6 | RX-2579C |
| 7 | Joint Submission of Admitted Exhibits |
| 8 | CX-0690C |
| 9 | CX-0691C |
| 10 | CX-0692C |
| 11 | CX-0693C |
| 12 | CX-0694C |
| 13 | CX-0695C |
| 14 | CX-0696C |
| 15 | CX-0698C |
| 16 | CX-0699C |
| 17 | RX-2600C |
| 18 | RX-2607C |
| 19 | RX-2608C |
| 20 | RX-2609C |
| 21 | RX-2610C |
| 22 | RX-2611C |
| 23 | CX-0006C |
| 24 | CX-0165 |
| 25 | CX-0166 |

| | |
|---|---|
| 1 | CX-0228C |
| 2 | CX-0274C |
| 3 | CX-0275C |
| 4 | CX-0276C |
| 5 | CX-0277C |
| 6 | CX-0278C |
| 7 | CX-0279C |
| 8 | CX-0280C |
| 9 | CX-0281C |
| 10 | CX-0284C |
| 11 | CX-0291C |
| 12 | CX-0292C |
| 13 | CX-0294C |
| 14 | CX-0295C |
| 15 | CX-0301C |
| 16 | CX-0303C |
| 17 | CX-0306C |
| 18 | CX-0307C |
| 19 | CX-0308C |
| 20 | CX-0311C |
| 21 | CX-0312C |
| 22 | CX-0313C |
| 23 | CX-0314C |
| 24 | CX-0325C |
| 25 | CX-0326C |

```
1           CX-0327C

2           CX-0328C

3           CX-0329C

4           CX-0330

5           CX-0334

6           CX-0455C

7           CX-0457C

8           CX-0458C

9           CX-0459C

10          CX-0463C

11          CX-0464C

12          CX-0466C

13          CX-0470C

14          CX-0471C

15          CX-0476C

16          CX-0481C

17          CX-0482C

18          CX-0484C

19          CX-0485C

20          CX-0486C

21          CX-0487C

22          CX-0488C

23          CX-0489C

24          CX-0490C

25          CX-0491C
```

| | |
|---|---|
| 1 | CX-0492C |
| 2 | CX-0520C |
| 3 | CX-0545C |
| 4 | CX-0568C |
| 5 | CX-0569C |
| 6 | CX-0571C |
| 7 | CX-0587C |
| 8 | CX-0588C |
| 9 | CX-0590C |
| 10 | CX-0868C |
| 11 | CX-0870C |
| 12 | RPX-0039C |
| 13 | RPX-0040C |
| 14 | RPX-0041C |
| 15 | RPX-0042C |
| 16 | RPX-0043C |
| 17 | RPX-0061 |
| 18 | RPX-0062 |
| 19 | RPX-0066C |
| 20 | RPX-0102 |
| 21 | RX-0111C |
| 22 | RX-0157C |
| 23 | RX-0169C |
| 24 | RX-0177C |
| 25 | RX-0179C |

| | |
|---|---|
| 1 | RX-0359 |
| 2 | RX-0362C |
| 3 | RX-0379C |
| 4 | RX-0380C |
| 5 | RX-0381C |
| 6 | RX-0382C |
| 7 | RX-0383C |
| 8 | RX-0384C |
| 9 | RX-0385C |
| 10 | RX-0386C |
| 11 | RX-0387C |
| 12 | RX-0388C |
| 13 | RX-0389C |
| 14 | RX-0390C |
| 15 | RX-0392C |
| 16 | RX-0393C |
| 17 | RX-0394C |
| 18 | RX-0396C |
| 19 | RX-0402C |
| 20 | RX-0403C |
| 21 | RX-0405C |
| 22 | RX-0406C |
| 23 | RX-0413C |
| 24 | RX-0414C |
| 25 | RX-0415C |

```
 1              RX-0416C

 2              RX-0417C

 3              RX-0418C

 4              RX-0425C

 5              RX-0426C

 6              RX-0427C

 7              RX-0428C

 8              RX-0432C

 9              RX-0433C

10              RX-0434C

11              RX-0437C

12              RX-0438C

13              RX-0441C

14              RX-0444C

15              RX-0445C

16              RX-0446C

17              RX-0447C

18              RX-0452C

19              RX-0454C

20              RX-0460C

21              RX-0461C

22              RX-0462C

23              RX-0466C

24              RX-0467C

25              RX-0468C
```

| | |
|---|---|
| 1 | RX-0473C |
| 2 | RX-0474C |
| 3 | RX-0476 |
| 4 | RX-0477 |
| 5 | RX-0500C |
| 6 | RX-0502C |
| 7 | RX-0511C |
| 8 | RX-0597 |
| 9 | RX-0598 |
| 10 | RX-0599 |
| 11 | RX-0600 |
| 12 | RX-0601 |
| 13 | RX-0602 |
| 14 | RX-0604 |
| 15 | RX-0605 |
| 16 | RX-0607 |
| 17 | RX-0609 |
| 18 | RX-0610 |
| 19 | RX-0614C |
| 20 | RX-0618C |
| 21 | RX-0620C |
| 22 | RX-0625C |
| 23 | RX-0631 |
| 24 | RX-0632 |
| 25 | RX-0633C |

| | |
|---|---|
| 1 | RX-0634C |
| 2 | RX-0635C |
| 3 | RX-0715C |
| 4 | RX-0716C |
| 5 | RX-0723C |
| 6 | RX-0852 |
| 7 | RX-0853 |
| 8 | RX-0854 |
| 9 | RX-0855 |
| 10 | RX-0856 |
| 11 | RX-0857 |
| 12 | RX-0858 |
| 13 | RX-0859 |
| 14 | RX-0860 |
| 15 | RX-0861 |
| 16 | RX-0989 |
| 17 | RX-0991 |
| 18 | RX-0995 |
| 19 | RX-0998 |
| 20 | RX-0999 |
| 21 | RX-1003 |
| 22 | RX-1005C |
| 23 | RX-1006 |
| 24 | RX-1007 |
| 25 | RX-1043 |

```
1          RX-1059

2          RX-1060

3          RX-1066

4          RX-1657

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     C E R T I F I C A T E

2      TITLE: IN THE MATTER OF CERTAIN HIGH-PERFORMANCE GRAVITY-FED

3      WATER FILTERS AND PRODUCTS CONTAINING THE SAME

4      INVESTIGATION NO.:  337-TA-1294

5      HEARING DATE:  August 19, 2022

6      LOCATION:  Washington, D.C. - Remote

7      NATURE OF HEARING:  Evidentiary Hearing

8            I hereby certify that the foregoing/attached
       transcript is a true, correct and complete record of the
9      above-referenced proceedings of the U.S. International Trade
       Commission.
10     Date:   August 19, 2022
       Signed:
11     ss//       _____

12     Signature of the Contractor or the Authorized Contractor's
       Representative

13

           I hereby certify that I am not the court reporter
14     and that I have proofread the above-referenced transcript of
       the proceedings of the U.S. International Trade Commission
15     against the aforementioned court reporter's notes and
       recordings for accuracy in transcription in the spelling,
16     hyphenation, punctuation and speaker identification and did
       not make any changes of a substantive nature.  The
17     foregoing/attached transcript is a true, correct and
       complete transcription of the proceedings.
18     Signed:

19     ss//      Raymond G. Brynteson

20

           I hereby certify that I reported the
21     above-referenced proceedings of the U.S. International Trade
       Commission and caused to be prepared from my record media
22     and notes of the proceedings a true, correct and complete
       verbatim recording of the proceedings.
23     Signed:

24     ss//      Linda Kinkade

25


                    Heritage Reporting Corporation
                          (202) 628-4888

1           UNITED STATES INTERNATIONAL TRADE COMMISSION

2                        Washington, D.C.

3               Before the Honorable MaryJoan McNamara

4                      Administrative Law Judge

5

6     -------------------------------x

7     In the Matter of                    Investigation No.

8

9     CERTAIN HIGH-PERFORMANCE          337-TA-1294

10    GRAVITY-FED WATER FILTERS AND

11    PRODUCTS CONTAINING THE SAME

12    -------------------------------x

13

14

15                      EVIDENTIARY HEARING

16                   Monday, August 22, 2022

17                        Volume IV

18

19

20          The parties met via remote videoconferencing

21    pursuant to notice of the Administrative Law Judge at 9:30

22    a.m. Eastern.

23

24

25    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

```
 1   A P P E A R A N C E S:

 2   (all parties appeared remotely)

 3

 4   For Complainant Brita LP:

 5          STERNE, KESSLER, GOLDSTEIN & FOX, PLLC

 6          1100 New York Avenue, NW

 7          Washington, DC 20005

 8          (202) 371-2600

 9          painsworth@sternekessler.com

10              Paul A. Ainsworth, Esq.

11              Josephine Kim, Esq.

12              Uma Everett, Esq.

13              Lauren Watt, Esq.

14              Robert E. Niemeier, Esq.

15

16

17

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           950 F Street, NW

 7           Washington, DC 20004

 8           (202) 239-3025

 9           Pur-ITC@alston.com

10               Adam D. Swain, Esq.

11               Thomas W. Davison, Esq.

12

13

14

15           ALSTON & BIRD LLP

16           101 S. Tryon Street

17           Charlotte, North Carolina 28280

18           (704) 444-1000

19           Pur-ITC@alston.com

20               Karlee N. Wroblewski, Esq.

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

1   A P P E A R A N C E S (continued):

2

3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

4   Limited:

5          ALSTON & BIRD LLP

6          1950 University Avenue

7          East Palo Alto, California 94303

8          (650) 838-2000

9          Pur-ITC@alston.com

10              Katherine G. Rubschlager, Esq.

11

12

13  For Respondents EcoLife Technologies, Inc., and Qingdao

14  Ecopure Filter Co., Ltd.:

15         CALFEE, HALTER & GRISWOLD LLP

16         1405 East Sixth Street

17         Cleveland, Ohio 44114

18         (216) 622-8200

19         ecopure_brita@calfee.com

20              Todd R. Tucker, Esq.

21              Jack R. Smith, Esq.

22              Brad Liu, Esq.

23              Ashley J. Earle, Esq.

24

25  CONTINUED ON FOLLOWING PAGE

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5         BAKER & HOSTETLER LLP

 6         1801 California Street

 7         Denver, Colorado 80202

 8         (303) 764-4072

 9         zerowater-itc@bakerlaw.com

10             Jared A. Brandyberry, Esq.

11

12         BAKER & HOSTETLER LLP

13         1050 Connecticut Avenue, NW

14         Washington, DC 20036

15         (202) 861-1633

16         zerowater-itc@bakerlaw.com

17             Cassandra J. Simmons, Esq.

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5           BAKER & HOSTETLER LLP

 6           One North Wacker Drive

 7           Chicago, Illinois 60606

 8           (312) 416-6200

 9           zerowater-itc@bakerlaw.com

10               John S. Letchinger, Esq.

11

12           BAKER & HOSTETLER LLP

13           1735 Market Street

14           Philadelphia, Pennsylvania 19103

15           (215) 568-3100

16           zerowater-itc@bakerlaw.com

17               Jeffrey J. Lyons, Esq.

18               Phillip D. Wolfe, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
1    A P P E A R A N C E S (continued):

2

3    For Respondents Zero Technologies, LLC and Culligan

4    International Co.:

5           BAKER & HOSTETLER LLP

6           312 Walnut Street

7           Cincinnati, Ohio 45202

8           (513) 929-3400

9           zerowater-itc@bakerlaw.com

10               Derek M. Freitas, Esq.

11

12

13    For Respondent Vestergaard Frandsen Inc. d/b/a LifeStraw:

14           K&L GATES

15           70 W. Madison Street

16           Chicago, Illinois 60602

17           Vestergaard1294@klgates.com

18               Jeffrey R. Gargano, Esq.

19               Nelson M. Hua, Esq.

20               Devon C. Beane, Esq.

21               Ewa Wojciechowska, Esq.

22

23

24           ** Index appears at end of transcript **

25
```

```
 1                P R O C E E D I N G S
 2            (In session at 9:30 a.m.)
 3           JUDGE MCNAMARA:  I did receive -- since we're on
 4    the record, good morning again, everybody.  Sorry about
 5    that.  It's Monday morning.  What can I tell you.
 6           I did receive the joint email from Mr. Swain and
 7    Mr. Ainsworth about Mr. Mitchell, so thank you for that.
 8    And I know Nicole sent out to you an email saying that
 9    that's fine, no problem with that.
10           So by the way, I also received the time report.
11    I haven't had a chance to look at it very closely, but I
12    will, and I just want to make sure that the little bit of a
13    kerfuffle over the cross-examination slides, the revised
14    cross-examination slides, should not be held against
15    Respondents, and I just want to make sure that that's
16    included in the time.  Again, because we've opened up time,
17    I'm sure in the next two days there will be enough time for
18    both sides to ensure their complete cases are in.
19           Okay.  So is there any other business that you
20    would like me to address this morning, Mr. Ainsworth?
21           MR. AINSWORTH:  Yes, please, Your Honor.  Good
22    morning.
23           JUDGE MCNAMARA:  Good morning.
24           MR. AINSWORTH:  On the time issue, we did add ten
25    minutes to Brita's time or subtract minutes from Brita's
```

1    time for that.  And the 30 minutes you gave Respondents to

2    prepare for their cross did not count against their time.

3              JUDGE MCNAMARA:  Good.

4              MR. AINSWORTH:  That's how the parties handled

5    that.

6              You'll see in the email we have an agreement on a

7    number of exhibits.  There are some exhibits to which

8    Respondents are objecting.  And I don't know if you want to

9    address that now or we can address that later in the day,

10   depends upon when you would like to address it.

11             JUDGE MCNAMARA:  Why don't you give me a synopsis

12   of the types of exhibits to which they're objecting and why.

13             Or maybe, Mr. Tucker, it looks like you're ready

14   to go.  It looks like you're on stage there.

15             MR. TUCKER:  I'm not addressing this.  The one

16   thing I would say is our witness, it's 9:35 at night for

17   him, if this is going to go on for a long time, we may want

18   to do him first and come back to this.

19             JUDGE MCNAMARA:  I think that's right.  Let's

20   come back around.  Thank you for that.

21             MR. TUCKER:  Okay.

22             JUDGE MCNAMARA:  All right.

23             MR. AINSWORTH:  That's fine, Your Honor.

24             JUDGE MCNAMARA:  Are you ready to go, then,

25   Mr. Ainsworth?  I'm sorry.  This is Respondents' witness.

1           MR. TUCKER:  Yes.  We are ready to go,

2    Your Honor.

3           JUDGE MCNAMARA:  Okay.  Are you handling it,

4    Mr. Tucker?

5           MR. TUCKER:  I am, Your Honor.

6           JUDGE MCNAMARA:  Very good.  You have the floor.

7    Let me swear him in.

8           MR. TUCKER:  Your Honor, our witness, Mr. Aiden

9    Zhang, he has a translator, Ms. Amanda Lin.

10           JUDGE MCNAMARA:  Good morning, Ms. Lin.  How are

11    you?  Good morning.  I'm going to administer the

12    interpreter's oath to you first, and then I will ask you to

13    translate for Mr. Zhang.

14           (Whereupon, Ms. Amanda Lin, interpreter, was

15    sworn to translate the English language into the Mandarin

16    Chinese language and the Mandarin Chinese language into the

17    English language, and a true recitation offered thereof, to

18    the best of her ability.)

19           JUDGE MCNAMARA:  Please state your full name.

20           THE INTERPRETER:  Amanda Lin.

21           JUDGE MCNAMARA:  You have been agreed upon as an

22    interpreter by both Complainants and Respondents; is that

23    correct?

24           MR. TUCKER:  That's correct, Your Honor.

25           MR. NIEMEIER:  That's correct, Your Honor.  This

1    is Robert Niemeier for Complainant.  Yes, we have agreed on
2    the interpreter.
3            JUDGE MCNAMARA:  Very good.  Mr. Tucker, if you
4    would like to -- I'm sorry.  Now I have to swear in
5    Mr. Zhang.
6                        AIDEN ZHANG,
7             having been first duly sworn and/or affirmed
8    on his oath, was thereafter examined and testified through
9    the interpreter as follows:
10           JUDGE MCNAMARA:  Please state your full name.
11           THE WITNESS:  My full name is, the first name is
12   spelled as S-H-E-N-G-E-A, the last name is spelled as
13   Z-H-A-N-G.
14           JUDGE MCNAMARA:  Where are you located,
15   Mr. Zhang?
16           THE WITNESS:  Macao.
17           JUDGE MCNAMARA:  Is there anyone in the room with
18   you in Macao?
19           THE WITNESS:  No, I am by myself.
20           (Clarification by reporter.)
21           JUDGE MCNAMARA:  What is the native language that
22   Mr. Zhang is testifying in?
23           THE WITNESS:  Mandarin Chinese.
24           JUDGE MCNAMARA:  Thank you very much.
25           Thank you, Ms. Kinkade.

1           All right.  Mr. Tucker, you have the floor.

2   Please remember to break up your sentences so that the

3   translator can translate and we have a nice flowing

4   transcript.

5           Go ahead and translate, Ms. Lin.

6           Just remember to stop, Mr. Tucker.  She has to

7   translate.

8           JUDGE MCNAMARA:  Go ahead and translate for

9   Mr. Zhang what I just said.

10          THE WITNESS:  Okay.  Thank you.

11                   DIRECT EXAMINATION

12  BY MR. TUCKER:

13      Q.   Good evening, Mr. Zhang.

14      A.   Good evening.

15      Q.   Mr. Zhang, can you let us know your position at

16  Ecopure?

17      A.   Deputy general manager.

18      Q.   Mr. Zhang, are you an engineer?

19      A.   I am not.

20      Q.   Mr. Zhang, in this case for the patent at issue

21  there is a hypothetical person who is considered one of

22  skill in the art.

23          Are you a person of skill in the art in this

24  case?

25      A.   I am not.

1    Q.   Mr. Zhang, do you have a college degree?

2    A.   Yes.

3    Q.   Where is your degree from, Mr. Zhang?

4    A.   I obtained it in China.

5    Q.   What was the name of the university, Mr. Zhang?

6    A.   Shanbong University of Finance and Economics.

7   The first word is spelled as S-H-A-N-B-O-N-G.

8    Q.   Mr. Zhang, I believe Mr. Lou's family is actually

9   from Shanbong.

10        From Shanbong University, what was your degree

11  in?

12   A.   Economy and trade -- economics and trade.

13   Q.   Mr. Zhang, do you know what water filter Brita

14  has accused of infringement in this case?

15   A.   I know it.

16   Q.   Could you tell us what brand the 7023B filter is

17  a replacement for?

18   A.   ZeroWater.

19   Q.   Thank you, Mr. Zhang.

20        MR. TUCKER:  I have no further questions, so I'll

21  turn it over to Complainant's counsel.

22        JUDGE MCNAMARA:  Good morning, again,

23  Mr. Niemeier.  You're on.

24

25

```
 1                      CROSS-EXAMINATION
 2   BY MR. NIEMEIER:
 3        Q.   Good evening, Mr. Zhang.  Thank you for being
 4   here.  I understand you had to travel a fair ways to be
 5   here.
 6        A.   Thank you.
 7        Q.   Aqua Crest sells products on Amazon; is that
 8   right?
 9        A.   Yes.
10        Q.   And that includes the 7023B filter product?
11        A.   Yes.
12        Q.   Mr. Rennick, could we bring up CX-159, please.
13             Mr. Zhang, do you recognize this Amazon listing?
14        A.   Yes.
15        Q.   And does this page contain statements that
16   Aqua Crest makes to its customers about this product?
17        A.   Yes.
18        Q.   As part of your work at Aqua Crest or Ecopure,
19   are you involved in supervising or preparing the marketing
20   and the statements on webpages like this?
21        A.   I will not supervise it.
22        Q.   Do you have responsibility for the marketing
23   materials like this?
24        A.   No.
25        Q.   Mr. Rennick, could you pull up the deposition
```

1    transcript at page 101, please.

2              JUDGE MCNAMARA:  Please give me the date of that

3    deposition transcript.

4              MR. NIEMEIER:  April 29th, 2022.

5              JUDGE MCNAMARA:  Thank you.

6        Q.   If you could go to line 18 and then down to page

7    102, line 1, Mr. Rennick.

8              Mr. Zhang, do you remember testifying at your

9    deposition that your colleagues provide proposals regarding

10   the marketing and you make a determination?

11       A.   I don't quite remember this.

12       Q.   You don't remember making this statement at your

13   deposition in April?

14       A.   Our job -- our job responsibility actually

15   changed, so I did not -- I do not quite remember what I

16   stated back at my deposition.

17            Right now I am in charge of the sales to the 2B

18   business, number 2 and letter B.

19       Q.   Okay.  At the time of your deposition were you

20   responsible for marketing?

21       A.   Yes.  Yes.

22       Q.   Can I go back to CX-159, Mr. Rennick.

23            I think you said when you were speaking with

24   Mr. Tucker earlier that the Aqua Crest 7023B product is a

25   replacement for ZeroWater; is that right?

    1       A.   Yes.

    2       Q.   And if you could zoom in on the third bullet

    3   point there, Mr. Rennick.

    4            And that's what this is telling us here, right,

    5   that this is a replacement for ZeroWater?

    6       A.   Yes.

    7       Q.   If you would go to the last bullet point on that

    8   page, please.

    9            And this bullet point says that the product

   10   provides lead-free filtration; is that correct?

   11       A.   Yes.

   12       Q.   ZeroWater or, excuse me, Aqua Crest doesn't do

   13   any testing to determine how much lead the 7023B product

   14   removes; is that right?

   15       A.   I think the opposing counsel misunderstood what I

   16   meant earlier.  What it means here is that lead is not

   17   contained in the material of the product.

   18       Q.   So the Amazon listing says the product provides

   19   lead-free filtration, but it's your testimony that this

   20   isn't referring to the ability of the filter to remove lead?

   21       A.   That's correct, and also you can see the bullet

   22   point says what's the label or title.  That means food-grade

   23   material.

   24       Q.   Do you know if the ZeroWater filter removes lead?

   25       A.   Water filter is capable of removing TDS.

1  Removing TDS is main selling point.

2      Q.   Are you saying the ZeroWater filter is capable of

3  removing TDS or the Aqua Crest filter?

4      A.   The ZeroWater filter can remove TDS.  Our product

5  is a replacement of the ZeroWater filter.

6          JUDGE MCNAMARA:  This is a yes or no question,

7  Mr. Zhang.  Does the Aqua Crest filter remove lead or does

8  it not?

9      A.   We have not done such a testing before.

10         JUDGE MCNAMARA:  So you don't know one way or

11  another whether the Aqua Crest filter actually removes lead?

12     A.   That's correct.

13         JUDGE MCNAMARA:  Okay.  Go ahead, Mr. Niemeier.

14         MR. NIEMEIER:  Thank you.

15     Q.   Mr. Rennick, if we could go to page 3 of CX-159,

16  please.  And if you could zoom in on that box labeled

17  "Highlights" about halfway down the page.

18         The second bullet point here indicates that the

19  filter contains activated carbon particles and ion exchange

20  resin; is that right?

21     A.   Yes.

22     Q.   And ion exchange resins can remove lead?

23     A.   I do not know how to answer this question.

24     Q.   So is it your testimony you don't know if an ion

25  exchange resin can remove lead from water?

1      A.   That's right.

2      Q.   Mr. Rennick, could you pull up the deposition

3   transcript again at page 79.  And specifically lines 4

4   through 6.

5           Do you remember testifying at your deposition

6   that you think ion exchange resin reduces lead in water?

7      A.   I remember, yes.

8      Q.   Does this refresh your recollection about whether

9   ion exchange resin reduces lead in water?

10     A.   Yes.

11     Q.   Mr. Rennick, could you pull up CX-165, please?

12          Do you recognize this document, Mr. Zhang?

13     A.   Yes.

14     Q.   Is this an instruction document prepared by

15   Aqua Crest for its customers?

16     A.   This is an instruction manual, yes.

17     Q.   As prepared by Aqua Crest?

18     A.   Yes.

19     Q.   And just to confirm, this instruction manual goes

20   with the 7023B filter?

21     A.   Yes.

22     Q.   And, again, it says it's a replacement for the

23   ZeroWater filter?

24     A.   Yes.

25     Q.   And do you see anywhere on this page where it

1    says that the Aqua Crest replacement for the ZeroWater

2    filter does not remove lead?

3         A.   No.

4         Q.   So we've looked at the Amazon page and now the

5    instructions, and in both places Aqua Crest is telling

6    customers that the filter is a replacement for ZeroWater,

7    but there is no mention that the filter has a different

8    level of performance versus the ZeroWater filter, right?

9         A.   That's correct.

10            MR. NIEMEIER:  Your Honor, I have no further

11   questions for the witness.

12            JUDGE MCNAMARA:  Thank you very much.

13            Mr. Tucker?

14            MR. TUCKER:  I have no further questions.

15            Mr. Zhang, thanks for going a long ways for this

16   little time.  We appreciate it.

17            JUDGE MCNAMARA:  Thank you, Mr. Zhang.  You may

18   step down and you, I assume, can leave Macao.

19            THE INTERPRETER:  Thank you, counsel.  Thank you,

20   Your Honor.

21            JUDGE MCNAMARA:  Thank you.

22            All right.

23            MR. TUCKER:  Turning the podium over to my

24   colleagues from ZeroWater, Your Honor, and I will probably

25   see you later today.

```
 1              JUDGE MCNAMARA:  Very good.  Thank you,
 2    Mr. Tucker.
 3              MR. AINSWORTH:  Your Honor, this is Paul
 4    Ainsworth.  Should we address the exhibit --
 5              JUDGE MCNAMARA:  Let's do it before lunch.
 6              MR. AINSWORTH:  Very good.  Thank you.
 7              MS. EVERETT:  Good morning, Your Honor.  Uma
 8    Everett on behalf of Brita.
 9              JUDGE MCNAMARA:  Good morning again, Ms. Everett.
10              MR. LETCHINGER:  This is John Letchinger for
11    Zero.
12              JUDGE MCNAMARA:  Good morning, Mr. Letchinger.
13    How are you?
14              MR. LETCHINGER:  I'm well.  How are you,
15    Your Honor?
16              JUDGE MCNAMARA:  Very well.  Thank you.
17              MR. LETCHINGER:  Good.  If you're ready, we're
18    prepared to call Mr. Doug Kellam.
19              JUDGE MCNAMARA:  Please go ahead.  Good morning,
20    Mr. Kellam.
21              MR. LETCHINGER:  If I may proceed, Your Honor.
22              JUDGE MCNAMARA:  No.  I haven't administered the
23    oath.
24                        DOUG KELLAM,
25                having been first duly sworn and/or affirmed
```

1    on his oath, was thereafter examined and testified as

2    follows:

3              JUDGE MCNAMARA:  Please state your full name.

4              THE WITNESS:  Doug Kellam, K-E-L-L-A-M.

5              JUDGE MCNAMARA:  Just for the record, where are

6    you testifying from?

7              THE WITNESS:  I'm testifying from the offices of,

8    I'm sorry, Alston & Bird.

9              JUDGE MCNAMARA:  Okay.  Thank you.

10             Mr. Letchinger, you have the floor.

11                     DIRECT EXAMINATION

12   BY MR. LETCHINGER:

13        Q.   Mr. Kellam, by whom are you employed?

14        A.   ZeroWater.

15        Q.   How long have you been with ZeroWater?

16        A.   Fourteen years.

17        Q.   Sir, what is your title?

18        A.   CEO of ZeroWater.

19        Q.   And has that always been your title?

20        A.   Yes.

21        Q.   Okay.  And let's get something out of the way.

22             Are you a scientist?

23        A.   I am not a scientist.

24        Q.   We're going to move kind of quickly through your

25   examination, Mr. Kellam, because we're short on time.

1          Can you please tell the Court why you joined
2     ZeroWater?
3          A.   I was previously president of Dyson, which was
4     fun rolling Dyson across the U.S., and this job reminded me
5     very much of that experience with a smart, confident founder
6     and inventor, and, more important yet, a product that was
7     really well put together, a product that was proven, a
8     product that was proven both in terms of the technology and
9     the market, application of a known technology just into a
10    new segment.
11         And there was a couple of really good
12    differentiators in the product that really were critical to
13    me.  One was the removal of dissolved solids.  The other is
14    it was the only simple pour-through pitcher filter that was
15    certified to remove lead at that point in time.  And we
16    actually kept that as an exclusive benefit for quite some
17    time.
18         Q.   How long was ZeroWater exclusive in that
19    category, sir?
20         A.   Well, at least through -- at least amongst any
21    big players, 2015-2016, and this started in 2008, end of
22    2007.
23         Q.   Is there anything about the 2015-2016 period that
24    stands out in your mind?
25         A.   It was a pretty important period for us as a

 1    company and for me personally.  You remember the Flint lead

 2    disaster.  The reason I know that we were still exclusive,

 3    at least amongst any known players, was that we got the call

 4    back early in that disaster, in September of '15, before the

 5    press really hit it hard and Washington got involved,

 6    because we were the one that removed lead.

 7          And so we immediately -- we still weren't making

 8    money as a company, so we were trying to find a way to get

 9    into that market.  So we went out and we searched out

10    partners.

11          So we got some of our retailers, Target, Home

12    Depot, we got the United Way to help with distribution.  We

13    actually partnered with the GM Foundation, who also got

14    involved very early.

15          We immediately got filters into all the schools,

16    because really this is all about the kids, that's where the

17    danger is.  And then by the end of the program we had, I

18    forget how many filters it was, but I'm fairly certain we

19    had at least a filter for every man, woman and child in

20    Flint.

21          Some of our colleagues at PUR came in a few

22    months after us, and I think Clorox got involved at one

23    point too.

24    Q.    Thank you for that, Mr. Kellam.  Turning back to

25    your decision to join ZeroWater, were you currently employed

1    at that point?

2        A.    I was.

3        Q.    And you were contacted by a recruiter?

4        A.    That's true.

5        Q.    What, if any, due diligence did you do besides

6    what you just testified about in terms of your examination

7    of the product?

8        A.    Well, based on what you just said, the fact that

9    I was currently making money and the company that I was

10   considering going to had about five months' worth of cash

11   left in the bank, not atypical of a startup like this, I did

12   a lot of due diligence.

13            The kind of obvious things, the first thing you

14   talk to everybody, you talk to the Board, you talk to the

15   founder, you talk to some of the key investors.

16            I spent probably two days with the founder and

17   inventor and his immediate team before I made the decision

18   to join.  I dug into the financials, I looked at all the

19   market results, and what really intrigued me is there was

20   absolutely no evidence of any, I guess I'd call it

21   last-minute product changes as they were launching.

22            I had been in a situation like that before where

23   the product was not good and it was changed with a

24   replacement product and it didn't end well for me or for the

25   company.

1        So that was one thing that really intrigued me.

2   The other is the market results initially were really

3   encouraging.  As you suggest or as you asked, I'm not an

4   inventor, I'm not a creator.  I'm a person that takes a

5   well-put-together product and grows it.  And I saw a market

6   opportunity here.

7      Q.   You mentioned financials and some other documents

8   you looked at.  If you can please turn to RX-779 in one of

9   the 27 binders that are accumulated.  It would be in the

10  binder that says "Nontesting Binder."

11     A.   What was it -- I recognize this document.

12     Q.   We're on RX-779.

13     A.   Got it.

14     Q.   Okay.  Can you identify what the first page of

15  the group --

16        It's a group exhibit, Your Honor, with Bates

17  numbers ending in 867 and concluding with Bates number

18  ending in 883.  We're on Bates number 867.

19     A.   The first page is a cover letter that the founder

20  put on top of my first statement of the business situation

21  to the inventors.  And then following that is that letter,

22  my initial, after about two months of time with the company.

23     Q.   Okay.  And what follows that?

24        We would be, Your Honor, looking -- still in the

25  same exhibit but starting with page with the Bates number

1    871.

2        A.    The document starting with 871 are the auditors

3    audited financial statements from KPMG for the years --

4    well, for 2007 and then with a comparison to full year 2006.

5        Q.    Okay.  So these are formal financials?

6        A.    Yes, these are final.

7        Q.    And was this part of the materials that you

8    reviewed before joining ZeroWater?

9        A.    It was.  Amongst many other financial documents.

10       Q.    Okay.  I would like to just walk through a couple

11    entries, Your Honor, on the financials.

12            Looking at Exhibit 779, now at the page which

13    ends in 873 at the bottom right, when you get there, if you

14    can just identify the title at the top.

15       A.    Yeah, this is the balance sheet for the two years

16    previously mentioned.

17       Q.    Zero Technologies balance sheets?

18       A.    That's right.

19       Q.    I'm focusing at the moment, Mr. Kellam, on the

20    2006 column.  If you can look at what I think is the third

21    entry down, there's a number for inventory.

22            Can you explain to the Court what that number

23    reflects?

24       A.    That's the inventory of product, largely finished

25    goods, I'm fairly certain, for the rollout of Home Depot

1    that occurred in the back half of that year.

2        Q.    Okay.  And you mentioned in your opening remarks

3    that a company, when you joined, had about, I think you

4    said, five months left -- of cash left.

5            If we look at the first entry, the 2,249,691

6    entry, what comprises, if you know, those assets?

7        A.    The margins are very small, so most of that money

8    was from fundraising prior to 2006.

9        Q.    If we can flip to the next page ending in 874.

10           And you mentioned margin, so I'm going to take a

11   look at this with you.  Under 206 -- 2006, again at the very

12   top, there's an entry for net sales and then an entry for

13   cost of sales.

14           Can you explain that, please?

15       A.    Net sales for 2006 were from the sale of

16   products, including the Home Depot rollout in the back four

17   or five months of 2006.

18           And the margin -- you can see the cost of sales

19   are very close to the net sales, so the margins are not very

20   good on the product at this point in time.

21       Q.    Was this part of the financial picture that kind

22   of counterintuitively interested you in the company?

23       A.    It is.  While I'm not a scientist, I'm not an

24   inventor, I'm very good at fixing broken companies or

25   finding opportunities to expand those companies.

1    Q.    Either during your due diligence or shortly after

2  you joined, did you raise any issues with the founder or the

3  board or the inventors with trying to reduce the cost of the

4  filter?

5    A.    Not until after I had started with the company.

6  I did bring up the cost.  Obviously it's a tough point.

7  Plus, the overhead costs are very high for the size of the

8  company also.  And I won't say he backhanded me, but it was

9  pretty close.  He was a very stubborn, confident, not

10  atypical of an inventor that spent all that time putting

11  that product together, and, frankly, not just him, but

12  everybody in the company was very, very, I guess I'd say,

13  enamored by the product.  It was a perfect water filter,

14  overbuilt perfect water filter.

15         And so based on that reaction, I made the

16  decision not to try to touch the product costs at that

17  point, leave the product unchanged, continue to leave the

18  product unchanged until we had some more market momentum,

19  and we focused on other areas to save cash.

20    Q.    Okay.  If I can ask you to direct yourself to the

21  very last page of the exhibit, which ends in 2883.  And just

22  because we've been on this for a while, this is RX-779.

23         I'm just going to ask you to look, Mr. Kellam,

24  at -- this is part of the notes, the financials, is that

25  right, from KPMG?

1          A.    That's right.

2          Q.    Is that common in a financial statement?

3          A.    Yes.

4          Q.    And if we can go down to No. 14, please,

5     Mr. Kotarski.

6                I'm not going to ask you to read the whole thing.

7     I'm focused -- the title is Significant Customers; is that

8     right?

9          A.    That's right.

10         Q.    Okay.  And the very last phrase says, and one

11    additional customer accounted for 13 percent of total

12    accounts receivable as of December 31, 2006.

13               Do you see that?

14         A.    Yes.

15         Q.    Do you know what customer that was?

16         A.    Yeah.  The only major new customer at that time

17    was Home Depot, the Home Depot.

18         Q.    Okay.  If I can ask you to please close this

19    exhibit and go to RX-774, please.  If you can take a

20    moment -- do you have it in your book?

21         A.    I do.

22         Q.    Okay.  Take a moment and look through it.  After

23    you do that, if you can please identify it for the Court.

24         A.    Yeah, this is an inventor presentation from

25    October of 2008.

     1        Q.   So you had just joined the company a couple
     2   months before?
     3        A.   I had.
     4        Q.   By the way, the prior letter and financials that
     5   I asked you about, did those come out of ZeroWater's files
     6   in connection with this lawsuit?
     7        A.   Yes, they did.
     8        Q.   Okay.  Same for this document, sir, Exhibit 774?
     9        A.   Yes, sir.
    10        Q.   Thank you.  Okay.  First page, what are we
    11   looking at on this graphic?
    12        A.   The graphic itself is a depiction of recent
    13   change in graphics that we had implemented, which shows I
    14   think pretty clearly the new strategy that we had taken on
    15   as a company.
    16             It shows the current -- the TDS meter that we
    17   sold since the beginning as part of the pitcher in a glass
    18   of ZeroWater reading 000 TDS.
    19             And then across the bottom, comparing that to
    20   other potential comparables, tap water, conventional
    21   filtered water, bottled water.
    22        Q.   There has been a lot of discussion outside of
    23   your presence, Mr. Kellam, about TDS.
    24             Can you explain -- because I didn't know what it
    25   was -- can you explain for the Court what TDS is and what a

1    TDS meter does?

2         A.   Sure.  The TDS is simply the dissolved solids in

3    the water.  The primary impact of the dissolved solids at

4    the kind of levels we're talking about are taste and smell

5    oriented.  We measure in parts per million.

6              The meter actually measures conductivity within

7    the water.  The more TDS in the water, the greater the

8    conductivity.  There's a chip in the meter that converts it

9    into parts per million reading.

10        Q.   Okay.  And, first of all, I see its setting in

11   the very nice, pretty glass of water.

12             Does it come with ZeroWater products?

13        A.   It always has come with the ZeroWater products.

14        Q.   What's the consumer supposed to do with it?

15        A.   Two things.  One is they use the TDS meter to, as

16   we see in this graphic, just compare it to whatever they

17   were using before, whether it is tap water or competitive

18   filter, or whatever.

19             And the second, importantly, is to know when to

20   change the filter, because water quality impacts the

21   longevity of our filter very dramatically.  So the meter is

22   the primary reason -- really the only reason, the only

23   tool -- to determine whether or not you need to change your

24   filter.

25        Q.   For ZeroWater?

1    A.    For ZeroWater, yes.

2    Q.    And exactly what do the instructions say?

3    A.    They say to change it when it gets to 006, so 6

4    parts per million.

5    Q.    So for the life of the product, while it's

6    measuring less than that amount, that means there's

7    basically no solids in the water after it's been filtered,

8    but when it hits .006, that means that there are solids

9    starting to develop; is that right?

10    A.    As measured in parts per million.  I mean, in all

11    transparency you can measure in parts per billion or

12    trillion or whatever, but in parts per million, yes, it

13    would show no parts per million.

14    Q.    So when it hits that number 6, our customers are

15    supposed to change filter?

16    A.    Yes.

17    Q.    Okay.  And does that happen at the same time

18    throughout the country?

19    A.    No, absolutely not.  There's a huge range.

20    Q.    Can you give an example of where it might last a

21    lot longer?

22    A.    Sure.  Say New York City, which has really,

23    really pure water, or a lot of the state of Oregon, some

24    other places too, they have TDS of anywhere from 20 to 50 or

25    20 to 40, whereas places like Phoenix or Las Vegas, mountain

1  states, desert states, tend to have very high TDS, a lot of

2  minerality in the water, could be as high as 700 or 800

3  parts per million.

4         So if you divide 800 by 20, you get an idea of

5  the range of how many gallons you get out of, how many

6  months or gallons, however you want to measure, you get out

7  of a ZeroWater filter.

8         Q.   Does the filter also remove lead?

9         A.   The filter does remove lead, yes.

10        Q.   Can you briefly describe the general makeup of

11  the filter?

12        A.   Yeah, I mean, we always promote its five layers.

13  It actually has more than five layers, but we call it five

14  because we combine some.  The first -- it starts with a

15  filter that just keeps out, you know, large particles and it

16  also keeps the guts of the filter in.  Then there's a very

17  thin layer of foam that has a -- kind of the same purpose,

18  but it also helps eliminate any air bubbles that accumulate

19  in the top of the filter that can cause clogging.

20        And there is a layer of carbon with KDF, and KDF

21  is there simply to keep any mold from developing because our

22  filter is packed wet.

23        Then underneath the carbon -- and the vast

24  majority of the filter is a mixed-bed ion exchange, both

25  positively and negatively charged.  So that's why it cleans

1    the water of both negatively and positively charged

2    non-water ions that are in the water molecules.

3         And then there's a micron filter, like a nonwoven

4    cloth filter, and a screen at the bottom to both catch any

5    additional particulate matter and also keeps, again, the

6    guts of the filter inside the filter.

7    Q.   Okay.  You mentioned something in that that I

8    didn't pick up on.  You said -- what did you mean when you

9    said it's packed wet?

10   A.   Our product is different than any product I know

11   about in that the mixed bed ion exchange resin arrives very,

12   very wet.  You have to be careful and keep it consistently

13   wet.

14        And we also wash our resin -- I'm sorry -- we

15   wash our carbon granules to avoid any type of cloudiness you

16   get.  A lot of standard filters end up with a cloudy,

17   blackish water in the first use or two.  So to avoid that,

18   we actually wash our carbon.  So it's still wet when it goes

19   inside the filter.

20   Q.   If you opened your filter up right now --

21        In fact, can we hand Mr. Kellam the actual

22   product we're selling right there?  Can you hold that up for

23   Judge McNamara, please?

24        So right now we're looking at the actual

25   dispenser or filter; is that right?

```
 1        A.    Yes.  So this is a 7-cup pitcher we call it.
 2        Q.    Okay.  And can you take the filter out from
 3   inside and show the Court?
 4        A.    It's on pretty tight.  Yes, of course, I can.
 5        Q.    Can you hold it up?
 6        A.    It's in a plastic bag.  I'll take it out of the
 7   plastic bag.  It has -- it also has a cap on the top of it.
 8        Q.    Go ahead.
 9        A.    Take the cap off.  And there's a little bit of
10   dampness in here.  This one is not overly wet.  I don't know
11   if you can see that or not, but it is definitely damp.
12        Q.    Can you hold it up a little bit higher?
13        A.    I'm sorry.
14        Q.    It's a little awkward.  Okay.  Great.
15              And that's the current filter?
16        A.    That's the current filter.
17        Q.    Okay.  You mentioned that early on you -- very
18   early on -- you did, as I would expect any person in your
19   position, the kind of fixer as opposed to the developer, you
20   merely suggested, hey, we need to look at how to make this
21   less expensively because as we just saw in the financials
22   you basically were selling it for what you were making it
23   for.
24              Did you ever have that conversation again with
25   Mr. Rajan?
```

1        A.    I think I already mentioned the first time I had

2   the conversation, which was probably weeks within the time I

3   started, yeah, the next -- we did end up having a more

4   in-depth conversation on that, and I can't really nail the

5   exact date, but it was probably early 2011.

6        Q.    Okay.  And how did that conversation go?

7        A.    Well, different than the first one.  There was

8   still -- there was a definite hesitancy on the part of

9   Mr. Rajan to make changes to the filter.  However, I had

10  been at the company a few years at that point.

11        The company had a few years of -- four or five

12  years of retail exposure behind it.  We had -- I had a

13  confidence personally and the -- there was more equity in

14  the brand that I was willing to push harder on making some

15  cost changes.  Plus, the investors were all over me.  We had

16  to get some positive margin on this product.  So we did

17  start a project to reduce the cost on the product.

18        Q.    And what was the result as between you and

19  Mr. Rajan's relationship?

20        A.    We ended up parting ways.

21        Q.    Okay.  From that time on Mr. Rajan has been

22  separated from the company?

23        A.    I can't attest to the exact date of his

24  departure, but it was sometime after that, yes.

25        Q.    Okay.  And that resulted in the changes that you

1    just discussed.  Was that reflected in --

2              By the way, that was RPX 120, Your Honor, the

3    filter and the product.

4              Can you hold up the filter for the Court again?

5         A.   I apologize.

6         Q.   Keep it high so we can see the bottom.  That's

7    perfect.  Okay.

8              Can you explain, to the best you can for the

9    Court, what the changes were and what, I think everyone has

10   referred to in this case as the Gen 2 Zero filter?

11        A.   Sure.  The key change to the Gen 2 versus the

12   Gen 1 is the plastic shell.  We made the plastic shell out

13   of -- the original plastic shell was ABS, which is very

14   stiff, very expensive plastic, and also has issues with BPA

15   sometimes.

16             So we went to simple polypropylene, which is a

17   more typical food-grade product.  It's massively less

18   expensive.  It's a little more flexible, so it didn't hurt

19   the product when it shifted in shipping.  We used to break

20   pitchers sometimes.  And we lightened it up.  We took a lot

21   of plastic out of it.  I don't recall how much, but we saved

22   an awful lot of plastic too.  That was the primary change.

23             There was a disk in the middle here that

24   separated -- that cut through a cross-section that separated

25   the carbon on top from the resin on the bottom.  And we took

1    that out because we were getting air bubbles forming on the

2    bottom of that.  And it would cause clogging.  And when I

3    say clogging, the filter would stop completely.

4         Q.   Okay.  Can you hold it up again?

5         A.   Sorry.

6         Q.   That's okay.  And I don't know if you addressed

7    this or not, but did the shape of the bottom change?

8         A.   I'm sorry.  I did not address that.  We also

9    tapered it a little bit, which was largely aesthetic, but it

10   did -- it did require the reduction of just a little bit of

11   ion exchange resin out of the filter also.

12             So there was -- I guess there was a cost savings

13   there, but not -- not very significant, a couple percent.

14        Q.   Okay.  And with respect to what you said rather

15   minor changes, how long did that take?

16        A.   I can't give you an exact number of months, but

17   it was at least 18 months.  I know we started this in 2010,

18   worked all the way through it in '11, and we didn't launch

19   it until 2012.

20             And even when we launched in 2012, we still had

21   unintended consequences we had not been able to fix yet, but

22   we felt that the launch was important enough because we were

23   still in a very difficult cash position and profitability

24   position.

25        Q.   So it sounds like Mr. Rajan was right.

1      A.    I hate to admit it, but, yes, he was, back in

2   2008 when I started to not address the cost.  It's one of

3   the reasons that I'm very happy no changes were made during

4   that period of time because, if you were to make a change

5   during that initial phase of launching to a customer or, you

6   know, also what I didn't mention 2006, 2007, they were

7   raising $17 million in cash, which helped keep the company

8   alive, there was no investor -- the biggest investor was

9   NutriSystem.  So a big, legitimate investor did not want to

10  risk the embarrassment of having a product issue or a

11  product change of some sort in the middle of investing that

12  kind of cash.

13      Q.    Okay.  After 2012, you said you had some

14  problems.

15          When did you ultimately stabilize or kind of

16  rectify the issues that you had immediately after the

17  redesign?

18      A.    Well, it wasn't an immediate thing.  It wasn't --

19  the biggest, the biggest issue that we had was -- remember I

20  mentioned we took out this disk here, but it separated the

21  carbon from the resin, but what that did was it just gave

22  the product a little bit more room to move.

23          I had mentioned earlier the product is wet.  The

24  product starts wet and it dries out over time.  And if it

25  becomes too dry, it gets very loose in there.  Think about a

1    sandcastle.  It holds its shape real nicely if it's damp,

2    but when it dries out, it just flows.  That's what happened

3    to our filter.

4            So in some earlier tests, depending on how you

5    ship the filter, the resin might end up being angled like

6    this or the carbon angled like this up here.

7            But when we took out this disk, it got even

8    worse, to the point where sometimes there was no carbon on

9    top of the resin, if you had a severe shifting of the

10   product because it dried out.

11           So you had some -- we had very strange results

12   when that happens, because the carbon protects the resin and

13   the carbon has a function that removes things other than --

14   that the resin does not, so we had a serious issue with

15   that.

16           We fixed it 99 percent of the time by adding the

17   cap.  So the plastic bag that you saw was not enough to keep

18   the moisture in the filter, so we actually created this cap,

19   put the cap on there.  And for all intents and purposes, the

20   issue has gone away, at least in the United States where the

21   filters move fairly quickly.

22   Q.   Did you have to report this what you call

23   redesign to NSF at that point since you-- you were already

24   certified, right?

25   A.   You're talking about going into 2012?

1        Q.    Going into 2012 -- I asked a bad question.

2              Were you already certified with this filter, the

3    prior version of the filter, under the 2007 NSF 53 lead

4    standard?

5        A.    Yes, we were.

6        Q.    Okay.  Were you allowed to just keep putting that

7    certification on this new product?

8        A.    No, any change to the product whatsoever you need

9    to talk to NSF and find out what their rule is going to be.

10   Typically they make you retest.  There are some times, if

11   you change almost nothing, they might just grandfather you

12   in somehow, but that was not the case.  This was too much of

13   a change for that.

14       Q.    Okay.  I want to draw a line in the sand, excuse

15   the pun, we have the 2012 redesign changes you talked about.

16       A.    Yes.

17       Q.    Going backwards in time, all the way to the first

18   Sam's Club rollout, which I think was in 2006 --

19       A.    2006; that's right.

20       Q.    -- between the 2006 rollout, which then was

21   followed by, which we'll see in a moment, I believe, Costco,

22   and then Home Depot, and then Walgreen's, and then there was

23   the NSF 2007 53 testing at the end of 2007, during that time

24   period whatsoever were there any changes to the filter?

25       A.    No.

1     Q.   Were there any changes to the filter after you
2  were certified under the 2007 lead standard through the
3  redesign you just testified about?
4     A.   Not until 2012.
5     Q.   Okay.  If we can please return to -- it should be
6  in front of you --
7          We're back to RX-774, Your Honor.
8          And if I can just ask Mr. Kellam to look at page
9  10, which I will correspond with the Bates number at the
10 bottom ending in 2795.
11    A.   Okay.
12    Q.   Again, Exhibit RX-774, that's an investor
13 presentation, correct?
14    A.   That's correct.
15    Q.   I think we need to go one more, Mr. Kotarski.
16 That's perfect.  And if you can show the Bates number for a
17 moment.
18         JUDGE MCNAMARA:  I think you have to blow that
19 up.
20         MR. LETCHINGER:  There we go.  I agree.  So this
21 is ending 2795.
22    Q.   This may be a stupid question, but what did
23 investor presentation for?
24    A.   To raise capital to keep the company going.
25    Q.   This is included in a presentation that's going

1    to third parties?

2        A.    That's correct.

3        Q.    Okay.  Can you explain what we're looking at here

4    on the page ending 2795?

5        A.    This is just a graphical demonstration of our

6    rollout strategy, what's happened and what's about to happen

7    to the investors.  Starting with basically what you just

8    described, 2006, we were on road shows with Sam's Club, and

9    then that continued into '07 with Costco also.

10        Q.    What's a road show as compared to some other type

11    of sales mechanism?

12        A.    It's a way -- typically local, but also small

13    national companies are able to start getting involved with

14    Costco and Sam's because it's almost impossible to launch a

15    big account like that off the bat.  It's just too much

16    capital risk.

17              You actually visit a single market, a single

18    store, with an employee, you set up a display, and you sell

19    in the store.  I'm sure you've seen it in Costco and Sam's

20    with barbecue sauce or whatever the local company is.

21    That's what these were.

22        Q.    Okay.  I try to stay away from Sam's Club and

23    Costco because I can't stand shopping in big places like

24    that, but I'll take your word for it.

25              During this period in 2006 were there actual

1    sales made of the ZF-201 filter?

2    A.   Yes.

3    Q.   In all the efforts you undertook to locate

4    documents and things in this case to produce at our urging,

5    were you able to find necessarily actual invoices for Sam's

6    Club or Costco?

7    A.   No, I was not, but I'm fairly certain it's

8    because of the sales process for these road shows is very,

9    very different than just selling to a national account and

10   having their trucks picking up and invoicing nationally.

11   It's all done locally at the store level.

12   Q.   How big a company was ZeroWater in 2006?

13   A.   I think we saw the sales were about $1.4 million.

14   Q.   How many employees?

15   A.   There was a period of hiring for the Home Depot

16   rollout, so if I had to guess, by the end of 2006 it was

17   probably about, maybe a hundred people.

18   Q.   Most of those were salespeople in the stores?

19   A.   Yeah, almost all of them were salespeople in the

20   stores.

21   Q.   I think about a company like Clorox and what

22   their record looks like and what corporate looks like.  What

23   did your corporate look like when you joined in 2008?

24   A.   I don't think I would call it corporate.  It was

25   still really a family business.  There were four family

1    members still involved, two sons of the founder and his

2    wife.  It was corporate in terms of having an official board

3    and we had investors.

4          You saw KPMG audited financials, so that was all

5    on the very much up-and-up, but corporately it wasn't like

6    you would expect a larger company to be.

7        Q.  Did you have a nice, big manufacturing facility

8    in 2008?

9        A.  No.  You wouldn't want to hear the stories about

10   our facility.  It was in the -- it was in a factory in the

11   Philadelphia area, 1940s building.

12       Q.  Okay.  How long did you manufacture or assemble

13   the ZF-201 filter before you moved it outside the country?

14       A.  It was -- it was along with the 2012 redesign.  I

15   can't give you the exact date, but it was late 2011, early

16   2012 when we moved the operation to Mexico.

17       Q.  Okay.  I want to stay on the same page ending in

18   2795 and focus on right in the middle where it discusses

19   Home Depot.

20       I'm sure you've thought of nothing less than my

21   brilliant opening statement to Judge McNamara when I

22   promised her that we would prove that we were selling this

23   filter into Home Depot starting in September of 2006.  This

24   slide says 2007.

25       Can you explain it for the Court?

1      A.    Yeah, that was really -- that's a milestone of

2   hitting the 200-store mark.  We started shipping in early

3   September of 2006.  I can't tell you -- I could figure it

4   out pretty quickly, but the number of stores was in the

5   dozens, in that initial rollout, maybe 20, 30, and then we

6   phased it out to the point where it was 200 by January.

7      Q.    Other than my promise and your good word, unlike

8   with Costco and Sam's Club, were you able to locate any

9   actual sales documents relating to that time period for Home

10  Depot?

11     A.    Yes.  We do have -- we have the POs that they

12  sent us, we have the invoices where we billed them that

13  match those POs, and then we have the bill of lading for the

14  pickup by the truck that matches those POs too.

15     Q.    Okay.  If we can briefly turn to group Exhibit

16  RX-810, which, Your Honor, starts with Bates number ZT

17  ending in 6437 and goes all the way through ZT 6554.

18           Once you locate that, Mr. Kellam, and take a

19  look, could you please identify it?

20     A.    This first page that you see on the screen is the

21  purchase order for one of the Home Depot stores, and it was

22  dated in 2006, September 7th.

23     Q.    Okay.  So this is an actual purchase order

24  received by Zero from Home Depot?

25     A.    That's correct.

1      Q.   And when is it dated?

2      A.   September 7th, '06.

3      Q.   Okay.  And if I look down, it says -- perfectly

4    where it is -- perfectly where it was -- at the very bottom

5    there it says delivery requested, and cancel if not

6    delivered by.

7      A.   Yes.

8      Q.   Can you read those two dates?

9      A.   Yes.  September 11th for the delivery request,

10   and the 16th is the do not deliver by or cancel if not

11   delivered.

12     Q.   Okay.  And based on your observation of even

13   going into '08 when you started with the company, did Zero

14   actually put product on a truck and ship it to Home Depot or

15   did Home Depot come pick it up?

16     A.   Generally they came and picked it up, but I can't

17   swear for all these POs that was the case.  I do know a year

18   later or year and a half later I used to see Home Depot

19   trucks drive by my office all the time, so I believe most of

20   this was actually picked up by Home Depot.

21     Q.   I see the handwriting on the right.  I think it

22   says shipped 09-01 -- I can't tell if it's 01 or 07 -- do

23   you recognize the handwriting?

24     A.   I do.  That's June Roverend's handwriting.

25     Q.   Who is that?

 1      A.   Our sales administrative person.  She just left
 2   the company six months ago.
 3      Q.   Okay.  When these documents were located and
 4   produced, did someone put that notation on there, or was
 5   that on there back when this took place?
 6      A.   No, to your point about corporate environment, I
 7   mean, our corporate environment was basically in the
 8   factory, and this was -- she would just go back and make
 9   sure that she checked off anything that shipped out.
10      Q.   Okay.  And if we turn to the second page of the
11   group exhibit, which is at 6438, actually, my bad, if we can
12   go back to the first page -- I missed kind of an important
13   part -- can you explain for Judge McNamara what numbers 1, 2
14   and 3 relate to at the bottom?
15      A.   These are the three products that Home Depot
16   carried in all these stores and eventually about 2,000
17   stores.
18           The first is the J-20 filter bottle system, which
19   I'm not sure if we've seen this yet, but it was the original
20   product using this filter.  It's equivalent to, like, think
21   of a 5-gallon jug that you put upside down in a bubbler, but
22   it has a filter, it was two filters in it, two of our
23   filters.
24           And then the second piece is the, number 2 is the
25   glass crock dispenser, which is a cheap replacement for that

1    bubbler.  So it just sets on the countertop and you put the

2    J-20 in it and then use that as your dispenser.

3            And then the fourth item is a four-pack of

4    replacement filters, two of these filters come with the

5    J-20, the number 1 item, and then the four-pack is for when

6    they come back to replace them when they wear out.

7        Q.   Why does it say J-20 filter cartridge instead of

8    ZF-201?

9        A.   J-20 was the only one that we made at that time,

10   the only dispenser that we made at that time, so it was just

11   clearer for the consumer that it's replacement cartridge for

12   their J-20.

13       Q.   Was it always submitted to NSF as the ZF-201?

14       A.   ZF-201 is actually the -- that's the -- get the

15   terminology wrong here -- component number.  We don't sell

16   the 201.  The 201 goes into other products.  So, for

17   instance, a four-pack would have four 201s in it, and that's

18   what the bill of material would say and how the factory

19   knows to put it together.

20       Q.   I see.  To your point about not looking at the

21   different dispensers, if we can go back to RX-774, please,

22   for a moment, and if we can look at the page that ends in

23   2793, please.

24       A.   I think it's one more.

25       Q.   There we go.  Bates number 2793 at the bottom.

1           Can you explain what we're looking at -- first of
2  all, on the left at the bottom, is that the TDS meter?
3       A.   Yes, the far -- the second from the right
4  picture, that is with the cap off, that's the TDS meter, and
5  right next to it is the pitcher that we had not yet made
6  when we launched Home Depot.
7       Q.   Okay.  Is that what ultimately went into
8  Walgreen's?
9       A.   Yes, it is.
10      Q.   All right.  If we look all the way to the right,
11  I see it's got an orange and blue packaging.
12           Is that the old packaging you were talking about
13  that you replaced?
14      A.   That is.
15      Q.   Okay.  And is that the ZF-201 filter that we're
16  looking at?
17      A.   It is.
18      Q.   Okay.  If we look to the left, can you explain
19  for Judge McNamara what we're looking at?
20      A.   Which left, the middle?
21      Q.   The middle.
22      A.   That's basically what I just described that was
23  sent to Home Depot.  The part on top is the J-20 and it came
24  with those two filters, and then the bottom is the carafe
25  that you place it into.

1     Q.    Look at the filters inside the J-20 and compare

2     them to the filters on the right in the packaging, on the

3     right the filters look to be flat on top like you just

4     showed the Court.  What's the round or kind of rounded cap

5     thing on top of the filters in the G-20 -- J-20?

6     A.    The rounded cap is just an aesthetic attachment

7     to the J-20.  Remember, this thing sits in your kitchen, you

8     want it to look nice.  It looks better with those round caps

9     on than it does without them.  We don't use the round caps

10    anymore.  We saved a little money and took them off.

11    Q.    Can we now go back to RX-788, which is the big

12    group exhibits of Home Depot documents.  I think it's -- did

13    I say the wrong number?

14    A.    810, yeah.

15    Q.    There's actually two of them.

16    MR. LETCHINGER:  Actually, Your Honor, 788 and

17    810, I think, are the exact same documents.

18    Q.    So we're looking at 810 at this moment.  Skip to

19    the next page.

20    A.    Okay.  Got it.

21    Q.    And one more, please.  No, I'm sorry, go back.

22    I'm sorry.

23          So this is the invoice for the purchase order we

24    just saw; is that right?

25    A.    That's correct.

1      Q.   Okay.  Does it have the same purchase order

2   reference number --

3      A.   Yes.

4      Q.   -- ending in 207?

5      A.   Yes.

6      Q.   Do you invoice companies like Home Depot before

7   you ship to them?

8      A.   Not if you want to get paid, no.

9      Q.   Okay.  And if we can skip to the next page at the

10   bottom, which ends in -- one more -- there we go, it ends in

11   6440.

12           What's the title of this document?

13      A.   This is the Bill of Lading.  So this is simply

14   proof that the product did go on the truck.

15      Q.   Okay.  And if we go down a little bit, do you see

16   the same reference to the same 207 purchase number?

17      A.   Yes.

18      Q.   And I'm not going to go through all these.  Is

19   that same three-document configuration the same for the rest

20   of the exhibit?

21      A.   Without having -- I mean, it looks like it, yes,

22   without taking the time to go through each one, there's all

23   three, the bill of lading, the purchase order, and the

24   invoice for each one.

25      Q.   So this was the beginning of what ultimately

1    ended up in a 2,000-store rollout for Home Depot?

2        A.    That's right.

3        Q.    When was that rollout finished?

4        A.    It was finished by one year -- maybe summer of --

5    summer of '07.  We were at 200 by January of '07, and then

6    it ran for a little bit while they watched it, it did well,

7    and they rolled it out to the remaining stores -- 90 percent

8    of their total store count.

9        Q.    Okay.  And if we can go all the way to the back

10   of the exhibit that ends in Bates number 6545.

11            This is 35.  We need 6345, please.  That's 54.

12       A.    In the middle of those.

13       Q.    We need 6545.  Perfect.  Thank you.

14            And this page is called Home Depot Remittance

15   Advice.  Does this reflect that you've actually started to

16   get paid in September by Home Depot?

17       A.    Yes.

18       Q.    Who started off supplying the resin for the 201

19   filter?

20       A.    Thermax.

21       Q.    Is Thermax still a vendor?

22       A.    Yes.  They are our biggest vendor in that regard.

23       Q.    And at some point didn't the number for the resin

24   change from MB-106 to ZT-106?

25       A.    It did, but it was the same resin.

```
 1        Q.    And why the change in the preface to the number?

 2        A.    Given where we were in our stage of development,

 3   we insisted that it be exclusive to us.

 4        Q.    So that's what's reflected by the ZT?

 5        A.    That's right.

 6        Q.    Okay.  I think we can put this big binder aside

 7   for the moment.  And if you can please pull out the binder

 8   that's called Testing Binder.  Let me know when you've got

 9   it in front of you.

10        A.    I've got it.

11        Q.    Okay.  My first question I'm going to ask you --

12   just try to keep your thumb in there -- I'll list off

13   several numbers in a row.

14              If you can please have available RX-2449, 800,

15   2450, 798, 247, I'm sorry, 2447, 2445, 799, and 803.

16        A.    Okay.  I think I have them all.

17        Q.    My question to you is, number one, did these

18   documents come from ZeroWater's files in connection with

19   this litigation?

20        A.    Yes.

21        Q.    Okay.  What are they generally?

22        A.    They appear to all be test reports from Pace

23   Analytical.

24        Q.    What is Pace Analytical?

25        A.    It's a third-party water testing organization.
```

1      Q.   And by my look at the documents, they go from

2   about August of 2006 through February of 2007.

3           Does that square up with you?

4      A.   That's what I see too.

5      Q.   Okay.  Is Pace Analytical a certifying testing

6   body or just a third-party --

7      A.   Not that I know of.  They just do testing.  They

8   are much cheaper than NSF that certifies.

9      Q.   How much does it cost to test with NSF when

10  you're trying to get qualified?

11     A.   It depends on the test.  It could be $15,000, it

12  could be $50,000, $70,000.  Typical, like, lead test, would

13  probably be like 40, $50,000.

14     Q.   Okay.  And if we could just look at, by way of

15  example, the very first one, RX-2448, and if we go a couple

16  pages in to the Bates ending 5985.

17     A.   Hold on a second.  I couldn't find 48.

18     Q.   Can you see it on the screen?

19     A.   I can.  That works.

20     Q.   Let's do that.  Just right of the middle, do you

21  see that Pace is reporting the flow rate in milliliters per

22  minute there in the middle?

23     A.   Yes.

24     Q.   Is that the same on all the documents?  I don't

25  mean the same values.

1       A.   I understand.  Yes.

2       Q.   Okay.  Let's move on to RX-760, please.

3       A.   Got it.

4       Q.   And then if we go to the second page, can you

5   identify what this is?

6       A.   This is an NSF test report out.

7       Q.   And what's it measuring?

8       A.   Standard 53 lead reduction, high pH.

9       Q.   When you say "high," 8.5?

10      A.   8.5.

11      Q.   And it notes the 200 percent.

12           I'm sorry.  Go ahead, judge.

13           JUDGE MCNAMARA:  I just saw the date.  Could you

14   read the date into the record, please?  And that would be

15   you, Mr. Kellam.

16      A.   Sure.  The report date was November 16th, 2007.

17           JUDGE MCNAMARA:  Thank you.

18      Q.   Thank you, Your Honor, for helping carry my

19   water.

20           In the middle it also says status complete.  What

21   does that mean?

22      A.   We don't see many of these, but this means we

23   stopped the test.

24      Q.   Okay.  If you turn to the next page, please.  It

25   should be ending in 3019.  You see this is signed by

1    Mr. Robert Herman.

2         Have you ever met Mr. Herman?

3    A.   I don't believe I have.

4    Q.   Just for clarity, what product is being tested

5    here?

6    A.   It's the ZF-201.

7    Q.   And if we can turn to the next page, please.

8         This is new for me.  In my review of all this, it

9    looked like this was the page with a lot of information

10   followed by some testing results.

11        So at the very top, what's the manufacturer

12   identified as?

13   A.   Zero Technologies.

14   Q.   Yep.  I said very top and I didn't mean that.

15   You got it right.

16        At the very top, this is just repeating what the

17   test is, correct?

18   A.   That's right.

19   Q.   And looking at in the middle it references

20   ZF-201, before we get to there, though, it talks about the

21   date of job creation.  Can you read that into the record?

22   A.   Yes, created on October 22nd, 2007.

23   Q.   And just below that it says date sample received?

24   A.   October 23rd, 2007.

25   Q.   Okay.  So ZeroWater obviously shipped them at

1    some point prior to October 23rd, 2007?

2         A.   That's correct.

3         Q.   And this test was completed, although it wasn't

4    completed, in November of 2007, correct?

5         A.   That's correct.

6         Q.   Okay.  Can you explain to the Court a couple

7    lines down where it says filter capacity 25 gallons?

8         A.   Yeah.  That's -- we set that as an aspirational

9    goal for the test.  So the test would -- they would stop

10   testing at 25 gallons.

11        Q.   Okay.  And if you go down about four more rows,

12   it says percent capacity 200 percent.  It's been discussed

13   quite a bit in this case, but maybe you can explain your

14   understanding of what that means.

15        A.   Sure.  In simple terms, you have to achieve lead

16   removal to spec at two times the capacity that you're going

17   to state on it in the box.

18        Q.   So if you wanted to be able to state filter

19   capacity of 25, as it says here, you'd have to test -- you'd

20   have to meet the test at 50 gallons?

21        A.   Correct.

22        Q.   Okay.  And a couple lines further down it says

23   what the pass/fail criteria are, and it's, once you hit 10,

24   what does ug stand for?

25        A.   Micrograms per liter.

```
 1       Q.   Thank you.  Great.  If we can go to the next
 2  page, please.
 3            It's called Data Summary Table.  And I want to
 4  look at -- we'll only have to do this hopefully once.
 5            If you look at the very left, it says sample
 6  point, can you explain what that is for the Court, if you
 7  know?
 8       A.   So 100 percent represents the aspirational goal
 9  that we talked about, and then 150, for example, would be 50
10  percent more than that.
11       Q.   Okay.  And --
12       A.   And so on.
13       Q.   Okay.  And if you start moving over the page, I
14  see the lead ug/L and underneath it is R, two columns,
15  effluent 1 and effluent 2.  Can you explain what that is?
16       A.   Yeah, those two samples, given and tested.
17       Q.   And here we're measuring -- are we measuring the
18  lead at the very last point?
19       A.   That's correct.  It's after that 100 percent
20  sample taken.
21       Q.   Okay.  So at the point -- let's just for ease of
22  my math, at the 100 percent mark, that represents testing up
23  to 25 gallons?
24       A.   That's correct.
25       Q.   And at 25 gallons, what were the effluent
```

1   results?

2        A.   One sample was not detectable; the other sample

3   had 2 micrograms.

4        Q.   So at that point, if you wanted to, would you be

5   able to advertise half of 25 gallons as your lifetime?

6        A.   Yes, 12.5.

7        Q.   Okay.  And if we just finish off this process, if

8   we move to 150 percent, and the results are 3 and 5,

9   correct?

10       A.   Correct.

11       Q.   So the same filter, ZF-201, and at this point

12   we're starting to see some variability in the results,

13   correct?

14       A.   Yes.

15       Q.   And are 3 and 5 passing?

16       A.   Yes.

17       Q.   So at this point, if you had chosen, could you

18   have marked your packaging however you wanted to mark it at

19   half of 38 gallons, so 19 gallons?

20       A.   Yes, that's correct.

21       Q.   Let's move, please, to RX-750.

22            I want to just look quickly at the very last page

23   of the exhibit, which is marked ZT 3025 at the bottom,

24   Your Honor.

25            Can you explain, Mr. Kellam, what we're looking

1    at here?

2        A.    NSF always takes a picture of the items that are

3    being tested.  So these dispensers are dispensers we don't

4    sell anymore.  They are just generic, similar to the J-20

5    dispenser tops, and each one has a single filter.  So the

6    test was for a single filter, not two filters.

7        Q.    Okay.  And we see that same round aesthetically

8    pleasing cap?

9        A.    Yes.

10       Q.    Okay.  So, basically, all the results we just saw

11   came from NSF doing its test on these two devices?

12       A.    That's correct.

13       Q.    Okay.  Thank you for that.  Now if we can please

14   move to RX-750.  While the exhibit is being pulled up,

15   Mr. Kellam, is it unusual to retest with NSF?

16       A.    Not for us.

17       Q.    Is it available to everybody?

18       A.    Yes.

19       Q.    Can you please take a moment and satisfy yourself

20   that what we're looking at is another test result from NSF?

21       A.    It is.

22       Q.    Okay.  And if we go back a page, I'm sorry, I'm

23   not doing a very good job -- we can go back to the page you

24   were on, Mr. Kotarski, the blue one.

25           Same product, ZF-201; is that right?

```
 1        A.   That's right.

 2        Q.   And this report date is a month later, December

 3   of 2007, 26?

 4        A.   That's right.

 5        Q.   And we're still at this point talking about the

 6   ZF-201?

 7        A.   Correct.

 8        Q.   Now if we can turn the page one to 2876.  Do you

 9   see Mr. Herman's signature again?

10        A.   Yes.

11        Q.   Still don't know who is he?

12        A.   Still don't know who he is.  I know who he is.  I

13   just have never met him.

14        Q.   If we can turn to the next page after that which

15   is 2877 at the bottom.  Very similar format to what we just

16   saw a minute ago, correct?

17        A.   Correct.

18        Q.   Okay.  So, again, this is the manufacturer is

19   Zero Technologies; is that right?

20        A.   Right.

21        Q.   We're still testing the ZF-201?

22        A.   Correct.

23        Q.   And the date of job creation, can you read that

24   for the Court?

25        A.   Job was created October 22nd, 2007.
```

1      Q.   And the date the sample received?

2      A.   October 23rd, 2007.

3      Q.   And this test was completed December 21st of

4   2007; is that right?

5      A.   That's right.

6      Q.   Okay.  And if we go -- you don't have to go

7   anywhere, Mr. Kotarski.

8           At the very top it, again, references the pH 8.5

9   that's the higher lead, right?

10     A.   That's right.

11     Q.   At 200 percent?

12     A.   Yep.

13     Q.   Okay.  We also designated at this point 25

14   gallons; is that right?

15     A.   That's right.

16     Q.   And same aspirational goal?

17     A.   Yes.

18     Q.   Just to be clear, Zero picks a number and then

19   asks NSF to test to that point; is that right?

20     A.   That's correct.

21     Q.   Okay.  Same criteria, 10 ug/L?

22     A.   Yeah, that did not change.

23     Q.   If we can flip to the next page, at the bottom is

24   marked 2878.  We see a more fulsome data summary table this

25   time, correct?

1      A.   Yes, our request at higher increments it appears.

2      Q.   And it went all the way to 300 percent?

3      A.   It did.

4      Q.   And so if we quickly go through a similar

5   exercise, and if we again go to 100 percent, 25 gallons, we

6   see a measure of 1 and nondetectable in the effluent lead,

7   correct?

8      A.   Correct.

9      Q.   At 150, we're at 4 and 3?

10     A.   Correct.

11     Q.   At 180 percent, what are the values?

12     A.   6 and 3.

13     Q.   Okay.  So just being fancy with my math, we're

14  now showing this same exact test, same filter, testing with

15  100 percent variance, correct?

16     A.   Yes.

17     Q.   And are you passing at 180 percent?

18     A.   Yes, on both samples.

19     Q.   And, for the record, that's at 45 gallons?

20     A.   Right.

21     Q.   So if we drop down to the 200 percent, which is

22  what the test -- where it ends, how did the ZeroWater

23  filters do?

24     A.   Well, one sample failed by 1 microgram and the

25  other one still passed at 6.

 1      Q.   And we're still seeing a pretty big spread in

 2  variability.  Let me pause here for a second.  This is a

 3  test with samples submitted in October of 2007, tested in

 4  December.

 5           You testified earlier, Mr. Kellam, that ZeroWater

 6  was the first to get certified for lead removal under the

 7  2007 NSF 53 ANSI 53 standard, correct?

 8      A.   That's correct.

 9      Q.   Is this a test from which the company was able to

10  make that claim?

11      A.   This is it.

12      Q.   Okay.  So at 180 percent, that's 45 gallons, and

13  if we divide it by 2, it's 22 and a half, correct?

14      A.   Correct.

15      Q.   And is that what ZeroWater started putting on its

16  packaging at NSF's instructions?

17      A.   It is.

18      Q.   Okay.  So at this point the company is certified

19  under the new NSF standard, and you're on your way.  Is that

20  right?

21      A.   That's correct.

22      Q.   Okay.  Okay.  Very quickly, if we go to RX-735,

23  please.  It looks like things got a little fancier at NSF,

24  but can you read the date of the report?

25      A.   It was -- they changed the format, sorry.  May

1    18th, 2012.

2        Q.   Okay.  And let's just go to the next page real

3    fast.  They kind of summarized everything in the same format

4    here in 2012?

5        A.   Yes.

6        Q.   So, again, we're at the high pH 8.5, 200 percent,

7    Standard 53.

8             At this point was the ZF-201 certified under that

9    standard?

10       A.   Yes.

11       Q.   Okay.  What I really want to direct your

12   attention to are a couple of things.

13            One, who is the manufacturer identified as?

14       A.   MMI.

15       Q.   So that is a change, right?

16       A.   It is.

17       Q.   And is that the company in Mexico that now

18   assembles products?

19       A.   That's correct.

20       Q.   If we go down further in the page, we're still

21   looking at 200 percent, correct?

22       A.   Correct.

23       Q.   And if you look at three lines down from there,

24   test description, can you read this for the Court, please?

25       A.   It says that's lead 8.5 or high pH retest of the

1    ZF-201 with the cartridge redesign.

2        Q.   Is that referencing the redesign you just

3    testified about 20 minutes ago?

4        A.   It is.

5        Q.   Okay.  Why did you have to get this recertified?

6        A.   Because the filter changed.

7        Q.   Is that an NSF rule?

8        A.   It is.

9        Q.   And you called it out when you submitted this to

10   NSF?

11       A.   Yes.

12       Q.   And that's why it's noted there as cartridge

13   redesign?

14       A.   That's correct.

15       Q.   And you also have to identify the manufacturer

16   for the same reason, correct?

17       A.   Yes.

18       Q.   And just very quickly, looking at RX --

19            Before we do that, this is the ZF-201 redesign,

20   correct?

21       A.   Yes.

22       Q.   Looking at RX-740, I think you'll find everything

23   is the same here except this is now testing for mercury,

24   correct?

25       A.   That's right.

```
 1        Q.   Because when you have to recertify for any

 2   changes, you have to recertify everything you're certified

 3   for, right?

 4        A.   Right.

 5        Q.   And if we turn the page one, looking at the

 6   bottom, 2632, again, two-thirds down, you're identifying

 7   that this is a cartridge redesign?

 8        A.   Correct.

 9        Q.   And at the top you're identifying a new

10   manufacturer, correct?

11        A.   That's correct.

12        Q.   And the last one if we can -- and this is the

13   ZF-201 filter, just redesign, correct?

14        A.   That's right.

15        Q.   The last, 742.  I want to go straight to the

16   second page.

17             At this point, this is now -- this is just the

18   end of 2011, so you're not submitting your redesign yet,

19   correct?

20        A.   That's right.

21        Q.   But you're going through another qualification

22   test.

23        A.   That's right.

24        Q.   And if I go two-thirds of the way down, it

25   identifies qualification of Gravex.
```

1          Do you see that?

2     A.   I do.

3     Q.   Why the need to recertify here?

4     A.   We were taking in a second supplier for our key

5 component, the ion exchange resin, and hoping to qualify

6 them.

7     Q.   So just with a switch of the manufacturer for the

8 same part you have to recertify?

9     A.   Yes.

10    Q.   Okay.  I think we can close the testing book.

11         MR. LETCHINGER:  Your Honor, while I'm doing my

12 housekeeping here, I'd like to go on the nonpublic record,

13 please.

14         (Whereupon, the hearing proceeded in confidential

15 session.)

16

17

18

19

20

21

22

23

24

25

Appx22891-22897 redacted in their entirety

```
 1                    O P E N   S E S S I O N

 2

 3             JUDGE MCNAMARA:  Go ahead, Ms. Everett.

 4             MS. EVERETT:  I would like to take this part of

 5    the examination on the public record, please.

 6             JUDGE MCNAMARA:  Yes.  Thank you.

 7                    CROSS-EXAMINATION

 8    BY MS. EVERETT:

 9       Q.   Thank you for your testimony this morning,

10    Mr. Kellam.  I'm Uma Everett, and I represent Brita in this

11    case.

12             First I'd like to focus on your testimony about

13    the ZF-201 filter as it existed in September 7th, 2006.

14             So ZeroWater didn't produce a product in this

15    case, right?

16       A.   I'm not sure I understand the question.

17       Q.   You didn't produce in litigation a ZeroWater

18    product as it existed in 2006.

19       A.   No, I don't believe so.

20             JUDGE MCNAMARA:  So, in other words, you didn't

21    produce a sample that was in a package?

22             THE WITNESS:  Correct.

23             JUDGE MCNAMARA:  Okay.  Thank you.

24       Q.   And you're the only company asserting a prior art

25    product that didn't do so, right?
```

1      A.   Yes.

2      Q.   So you've come today to show us the features of

3   the ZF-201 as of September 2006 using a variety of

4   documents; is that right?

5      A.   That's correct.

6      Q.   So I believe earlier this morning you testified

7   and showed us some testing material from pace analytics.

8           Do you recall that?

9      A.   I do.

10     Q.   And those documents showed the flow rate or you

11  allege those documents showed the flow rate of the product

12  that was sold in September 2006, right?

13     A.   That's correct.

14     Q.   So why don't we take a look at a couple of the

15  documents you talked about.

16          First, why don't we pull up RX-2448 and take a

17  look at those flow rates.

18     A.   Is it possible to know which -- here we go.  All

19  right.  Can you repeat that?

20     Q.   RX- -- I got it wrong.  RX-2448.  And it's on the

21  screen.

22     A.   Oh, okay.

23     Q.   If we can go to the page with flow rates, please.

24          This is the page that you looked at to show us

25  what the flow rates were --

```
 1          A.   Is this in the book?  I'm sorry to interrupt.

 2          JUDGE MCNAMARA:  I think you should have a

 3  cross-examination binder, Mr. Kellam.

 4          THE WITNESS:  I do.

 5          JUDGE MCNAMARA:  Okay.

 6          THE WITNESS:  There's a second page.  I didn't

 7  see it.  I'm sorry.  I see it.  I see it.

 8          Q.   Before I continue, I just want to make sure

 9  you're comfortable, Mr. Kellam, and you have the document in

10  front of you.  We can blow it up here in a moment.

11          So this is one of the lab reports that you

12  testified about on direct exam, right?

13          A.   Yes.

14          Q.   And you said this document shows what the flow

15  rate is of the ZF-201 filter as it was sold September 2006,

16  right?

17          A.   Yes.

18          Q.   So why don't we go to -- and here they are

19  testing two pieces, two different ZF-201 filters; is that

20  right?

21          A.   Two samples?

22          Q.   Yes.

23          A.   It looks like more than two samples.  Three

24  samples?

25          Q.   Do you see at the bottom of the page, Test Unit?
```

 1      A.   Okay.

 2      Q.   And there are two different test units that are

 3  identified.

 4      A.   Yes, but then contradicting that there's a sample

 5  number that has more -- that's just the sampling.  Okay.

 6  That's fine.  Yes, two test units.

 7      Q.   Okay.  Just to make sure we're on the same page,

 8  Pace Analytical analyzed two test units of the product you

 9  claim was sold September 2006, right?

10      A.   That's correct.

11      Q.   And there is an average flow rate of 230

12  milliliters per minute and then average flow rate of 190

13  milliliters per minute.

14           Do you see that?

15      A.   Yes.

16      Q.   Mr. Kellam, what is -- what was the flow rate of

17  the ZF-201 filter that was sold September 2006?

18      A.   Equivalent to this, so it would be somewhere

19  between, based on this sample, around 200.

20      Q.   So it would be between 190 and 230 is your

21  testimony?

22      A.   Yes.

23      Q.   Okay.  Can we bring up RX-2445, please.

24           Please let me know when you have the document in

25  front of you.

1      A.    Yeah, that one didn't -- the numbers didn't

2   match, by the way, but I saw it on the screen fine.

3           You say 244 --

4      Q.    -- 5.

5           JUDGE MCNAMARA:  I'm sorry.  Mr. Kellam, what did

6   you mean by the numbers didn't match?

7           THE WITNESS:  Let me just double-check so I don't

8   misstate.

9           JUDGE MCNAMARA:  We just need to be sure on the

10  record that everybody is referencing the same document.

11          THE WITNESS:  It was just on the tab, just in the

12  book.  The numbers on the bottom did match, but the 2448 we

13  were looking at before, there's an NSF document under that

14  tab, not a Pace document under that tab.  I guess it was

15  just mistabbed.

16          I'm sorry.  This one is, again --

17          JUDGE MCNAMARA:  2445.

18          THE WITNESS:  And the number at the bottom, is it

19  2800?

20          MS. EVERETT:  The last four digits are -- the

21  last is 70.

22          JUDGE MCNAMARA:  Can you blow that up, please,

23  the last four digits again, Mr. -- can you have the last

24  four numbers of the Bates blown up?  There we go.  5970 of

25  RX-2445.

1        THE WITNESS:  Okay.  I'm just unable to track to

2   the paper copy at all.  Under 2448 in the binder here, it's

3   tab 77, and under -- I'm sorry, under tab 75 for 2445 and

4   when I go under tab 75 the Bates number 2800.

5        JUDGE MCNAMARA:  Okay.  Is there anyone in the

6   room with you, Mr. McKellam -- I'm sorry, Mr. Kellam -- is

7   there anyone with you that can help you, or is there a --

8        THE WITNESS:  Yeah, do you want to see if you can

9   find that number.

10        JUDGE MCNAMARA:  I think we need to get this

11   sorted.

12        When was the cross binder sent over?  When were

13   the documents sent over, last night, Ms. Everett?

14        MS. EVERETT:  I believe they were sent Thursday

15   night.

16        JUDGE MCNAMARA:  That should have been sorted by

17   now.

18        THE WITNESS:  Can you find the correct document?

19        JUDGE MCNAMARA:  Anything yet?

20        MS. EVERETT:  These exhibits were also used in

21   Mr. Kellam's direct.  So if it's easier for him to use the

22   direct binder, that would be okay.

23        JUDGE MCNAMARA:  Give that a shot as well.

24        THE WITNESS:  Okay.  We just found 5970.

25   Q.   We also have it on the screen, that is RX-2445.

1    I just want to confirm that you're with me.

2        A.    Okay.

3        Q.    So RX-2445 is also a Pace Analytical report that

4    you testified to on your direct examination, which shows the

5    flow rate of ZF-201 filter that was sold September 2006,

6    right?

7        A.    Yeah.  Now there's a mismatch -- behind 5970 my

8    next page is 5972, not 5985.  So on the left side of the

9    screen you're showing 5985.

10       Q.    Are you seeing a mismatch on the screen or in

11   your notebook?

12       A.    Oh, you know what, this is 2445C.  This is dated

13   August of '06, not June of '06; and the follow-up table of

14   data is dated August also.

15       Q.    Just for identification purposes, can we go to

16   the exhibit page, the first page?  Thank you.

17             Just to make sure you're looking at the two

18   correct exhibits, Mr. Kellam, on the left-hand side of the

19   screen we have RX-2448, on the right side we have RX-2445.

20             Are you able to see both those exhibits?

21       A.    Yes.

22       Q.    Okay.  So on the left-hand side, 2448, I'm going

23   to return us to the screen we were looking at on flow rate.

24   Okay?  Are you with me?

25       A.    Yeah, except, again, the dates -- these are --

1    mine are noted 2448 C and 2445 C, and the dates are a little

2    bit later in each of these.

3         JUDGE MCNAMARA:  Are you referencing the

4    documents you have in front of you, Mr. Kellam?

5         THE WITNESS:  Yes.

6         JUDGE MCNAMARA:  Okay.  There's a problem

7    obviously with your cross binder.  So for the time being,

8    what I would appreciate your doing, and it's unfortunate

9    that this is happening again, but you should just look at

10   what's on the screen.

11        THE WITNESS:  Okay.

12        JUDGE MCNAMARA:  Ms. Everett, if your team could

13   correct that by sending over the correct documents by email,

14   if necessary.

15        MS. EVERETT:  Your Honor, I believe we have sent

16   the correct documents.  I'm not sure how they were printed

17   off and presented to Mr. Kellam.  So these are Respondents'

18   exhibits that we had identified.

19        JUDGE MCNAMARA:  Okay.  I need to make sure

20   Mr. Kellam has the correct documents.

21        Mr. Kellam, unfortunately, we will need to direct

22   your attention at the screen.

23        THE WITNESS:  That's fine.

24        JUDGE MCNAMARA:  Apparently something got mixed

25   up.

1            THE WITNESS:  That's fine, Your Honor.  Thank

2    you.

3    BY MS. EVERETT:

4        Q.   So we had just finished looking at RX-2448.  Do

5    you recall that?

6        A.   Yes.

7        Q.   And that was the flow rate we decided this

8    document -- based on this document, it's your testimony that

9    the ZF-201 filter sold in September 2006 would have had a

10   flow rate between 190 and 230 milliliters per minute.

11            Do you recall that?

12       A.   Yes.

13       Q.   Okay.  So now let's go to the other flow rate

14   document you testified to on your direct exam, RX-2445.

15            Do you see that on the screen?

16       A.   I do.

17       Q.   Okay.  And you testified that this document also

18   shows the flow rate of the product that was sold, September

19   2006.

20            Do you recall that?

21       A.   That's correct.

22       Q.   So let's go to the flow rate data.

23            So here they are testing all the samples, as we

24   looked at on the other page; is that right?

25       A.   That's right.

1      Q.   And then they give an average result.  And there
2  were two units tested; is that right?
3      A.   Yes.
4      Q.   And the flow rate for those two units were 440
5  milliliters per minute.
6           Do you see that?
7      A.   I do.
8      Q.   And 470 milliliters per minute.
9      A.   I see that.
10     Q.   So, Mr. Kellam, you have now presented the Court
11 with data that the flow rate can vary from 100 milliliters
12 per minute all the way to 470 milliliters per minute; is
13 that right?
14     A.   So it appears, yes.
15     Q.   What was the flow rate of the product that was
16 sold in September 2006, the ZF-201 product that was sold in
17 September 2006?
18     A.   It should be -- the lower one should be in that
19 range, 150 to 2-something.  I don't know the exact numbers,
20 but it was -- it was the lower one in these two examples, it
21 would be within that range.
22     Q.   Mr. Kellam, the Exhibit on the top is the exhibit
23 that you presented to this Court as showing the flow rate
24 data for ZF-201; is that right?
25     A.   That's right.

```
 1       Q.   Are you recanting that?

 2       A.   No.

 3       Q.   So the data you have presented shows the flow

 4  rate for the ZF-201 filters sold in September could be

 5  anywhere from 190 milliliters per minute all the way to 470

 6  milliliters per minute, right?

 7       A.   No, I don't believe they could be.

 8       Q.   That's the data you've presented.

 9       A.   I'm sorry.  Was that a question?

10       Q.   Yes.  You've presented data to this Court showing

11  that the flow rate of the ZF-201 filter could be all the way

12  up to 470 milliliters per minute.

13       A.   Yes.

14       Q.   Thank you.  Now I'd like to talk about your

15  experience.  You weren't there when these Pace Analytical

16  reports were -- products were tested at Pace Analytical,

17  correct?

18       A.   That's correct.

19       Q.   You actually joined the company in about June,

20  May-June 2008?

21       A.   That's correct.

22       Q.   So by the time you joined in May or June of 2008,

23  the ZF-201 filter had been on sale, right?

24       A.   That's correct.

25       Q.   It had been on sale for nearly two years by that
```

1    point, right?

2        A.    Right.

3        Q.    Okay.  And you were not an inventor, we talked

4    about in your direct, of the ZF-201 filter?

5        A.    That's correct.

6        Q.    You didn't determine what went into the

7    cartridge?

8        A.    I did not.

9        Q.    You were not involved in any development or

10   changes to the filter, the ZF-201 filter, prior to your time

11   joining the ZeroWater Company?

12       A.    No, I would not have been.

13       Q.    You testified a lot today to what happened prior

14   to what happened to your joining at ZeroWater.

15             Do you recall that?

16       A.    I do.

17       Q.    Okay.  So you were not actually at the company

18   during the period 2004, 5, 6, 7, and part of 2008, right?

19       A.    That's correct.

20       Q.    There's also one thing you said today about --

21   you said the product could not change once you get NSF

22   certification.

23             Do you recall that?

24       A.    Not exactly, no.

25       Q.    You don't recall saying, once a product receives

1  NSF certification, it can't be modified?

2      A.   No, it has to be recertified.

3      Q.   Recertified.  Excuse me.  So it was your

4  testimony that, once a product receives NSF certification,

5  if it is modified, it has to be recertified.

6      A.   That's correct.

7      Q.   And it's your testimony that the ZF-201 filter

8  received the data from NSF that allowed it to be certified

9  December 26th, 2007, right?

10     A.   That's correct.

11     Q.   Just more of a housekeeping thing, I just want to

12  make sure I'm straight on this.  We've been talking about

13  the ZF-201 filter.  I just want to talk about the Gen 2 and

14  the current products.

15          All of those products are assembled by Mexican

16  Manufacturers, Incorporated?

17     A.   That's correct.

18     Q.   And you don't have any assembly or manufacturing

19  in the United States for your filters?

20     A.   Nothing of substance.

21          MS. EVERETT:  At this point I'm going to go on

22  the confidential record, Your Honor.

23          JUDGE MCNAMARA:  Okay.

24          (Whereupon, the hearing proceeded in confidential

25  session.)

Appx22911-22915 redacted in their entirety

```
 1                    O P E N   S E S S I O N

 2

 3          JUDGE MCNAMARA:  Then we're staying on the public

 4   record.  Thank you.

 5          MR. LETCHINGER:  May I proceed, Your Honor?

 6          JUDGE MCNAMARA:  Yes.  Thank you.

 7          MR. LETCHINGER:  Thank you.

 8      Q.   Mr. Kellam, do you remember when we looked at a

 9   visual of the J-20 jug earlier today?

10      A.   Yes.

11      Q.   And that was the product sold to Home Depot,

12   correct?

13      A.   Yes.

14      Q.   How many filters were in that product?

15      A.   Two.

16      Q.   So if we can turn to the testing results that

17   counsel was showing you, counsel was careful to point out

18   that there were two units tested, correct?

19      A.   Yes.

20      Q.   And the flow rate that's being measured is for

21   the combination of the two filters inside that big jug,

22   correct?

23      A.   That's correct.

24      Q.   So I know you're not an expert.  I know you

25   weren't there when these samples were made.  But for the
```

 1   flow rate, if you're looking at just half, one of the

 2   samples, all those values would be cut in half, correct?

 3           MS. EVERETT:  Objection, that's leading.

 4           JUDGE MCNAMARA:  Well, it is, but I think in the

 5   interest of time I'm going to allow this.  It's -- you know,

 6   we have to keep moving.

 7           So go ahead, if you can answer, Mr. Kellam.

 8       A.   Yes, that's correct.

 9           MR. LETCHINGER:  Thank you, Your Honor.  We can

10   take this down.

11       Q.   Mr. Kellam, you were asked why -- I think

12   essentially why you didn't produce samples of the Gen 1

13   filter that was discontinued at some point on or before

14   2012.

15           Did you search for any?

16       A.   Yes.

17       Q.   Did you search hard?

18       A.   Yes.

19       Q.   Did you find any?

20       A.   I did not.

21       Q.   And I think I made this point in direct, but

22   unlike a Procter & Gamble or Clorox that has nice fancy

23   libraries of all their products, do you have anything like

24   that?

25       A.   No.

1     Q.   Actually, back in 2008, 2007, 2006, 2009, 2010?

2     A.   No.  And we've changed locations.

3     Q.   Okay.  I want to quickly -- you were asked

4  questions -- I'm surprised you were asked questions about

5  your knowledge of the patent and what you did or didn't do.

6  I'll ask a question too.

7          When you received notice of the patent in 2019,

8  was it in connection with your products or a different

9  product?

10    A.   A different product.

11    Q.   Can you explain that for the Court?

12    A.   I was working with Brita GmbH on potentially

13  importing a product they had developed that they were

14  currently selling in Europe, and they -- I wanted to import

15  it, and they declined to let me import it and pointed out

16  this patent that they were -- they just didn't -- they

17  didn't understand it.  They weren't saying their patent

18  infringed, but they said there certainly is -- the question

19  has been raised, and I don't know anything more than that

20  about how the question was raised, but they did not want me

21  to import it because of that.

22    Q.   Was that a granular filter product or a filter

23  carbon block product?

24    A.   No, it's a carbon block.

25    Q.   Okay.  And did Brita GmbH make any comments about

1    your current filters as it relates to that patent that you

2    were provided in 2019?

3        A.   No.  I can't speak for either side, but there was

4    never any real concern over ZeroWater product infringing.

5        Q.   And did you, nonetheless, send the patent to your

6    patent counsel?

7        A.   Of course.  I sent it to my patent counsel in

8    regards to importing the other filter.

9        Q.   Was your patent counsel familiar with your

10   products?

11       A.   Of course.

12       Q.   Did your patent counsel identify any concerns

13   without divulging privilege?

14       A.   No.

15            MR. LETCHINGER:  I'm just going to take 30

16   seconds, if I may, Your Honor, to consult with my

17   co-counsel.  Is that okay?

18            JUDGE MCNAMARA:  Yes, that's fine.  Thank you.

19            MR. LETCHINGER:  Thank you.  Thank you for that,

20   Your Honor.

21       Q.   Mr. Kellam, you were asked about your redesign

22   products, and we don't need to go back on the private

23   record, I'm not going to ask you --

24            Well, I guess we have to go back on the private

25   record, Your Honor.  I'm sorry.

1                    (Whereupon, the hearing proceeded in confidential

2    session.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx22921-22923
redacted in their
entirety

```
 1                 O P E N   S E S S I O N

 2

 3              JUDGE MCNAMARA:  All right.  Good morning,

 4   Ms. Hill.

 5              THE WITNESS:  Good morning.

 6                        ALISON HILL,

 7              having been first duly sworn and/or affirmed

 8   on her oath, was thereafter examined and testified as

 9   follows:

10              JUDGE MCNAMARA:  Please state your full name.

11              THE WITNESS:  It's Alison Hill.

12              JUDGE MCNAMARA:  Thank you very much.

13              All right, Mr. Gargano, you have the floor.

14                     DIRECT EXAMINATION

15   BY MR. GARGANO:

16        Q.   Good morning, Ms. Hill.  What is your current

17   position at LifeStraw?

18        A.   I'm the chief executive officer.

19        Q.   And how long have you worked at LifeStraw?

20        A.   I have worked with LifeStraw and our former

21   parent company for 13 years as of next month.

22        Q.   Can you briefly summarize your educational

23   background for us?

24        A.   Sure.  I went to undergraduate at the University

25   of California at Santa Cruz and received a bachelor's in
```

1    sociology with a focus in medical sociology, and then some

2    years later did two masters degrees at Johns Hopkins

3    University, one in public health with a focus on infectious

4    diseases and the second in business.

5         Q.   What did you do professionally before joining

6    LifeStraw?

7         A.   I started my professional career in reproductive

8    health working for Planned Parenthood.  After graduate

9    school, I worked for the Johns Hopkins Center for

10   Communication Programs doing international malaria policy

11   and malaria advocacy with rollback malaria partnership of

12   the World Health Organization, and then after

13   undergraduate -- sorry, I'm jumping around in the timeline.

14        After undergraduate work as the director of

15   Mother of Mercy Hospice in Zambia running an HIV clinic,

16   hospice and hospital.

17        Q.   Okay.  Can you just generally describe your role

18   and your responsibilities as LifeStraw's CEO?

19        A.   I can.  I oversee the brand and company strategy,

20   our financial performance, our operations, as well as

21   communication with our shareholder and the board of

22   directors.

23        Q.   Did you prepare some demonstratives for your

24   examination today?

25        A.   I did.  I worked with counsel to do so.

1        Q.    Can we pull up RDX-5.1?

2              Are these the slides, Ms. Hill, that you worked

3    to prepare for your examination today?

4        A.    They are.

5        Q.    Okay.  Can you explain how LifeStraw first got

6    started in the water filtration industry?

7        A.    We started with a partnership with President

8    Carter and the Carter Center on Guinea worm eradication in

9    the mid to late '90s working on a filter that could remove

10   Guinea worm larva from water.

11             We then, I would say, through that partnership

12   and after the partnership, recognized water issues

13   across underresourced communities, more significant than

14   Guinea worm larva, and started developing both technology

15   and products that could address microbiological contaminants

16   and pathogens that cause human disease, primarily focused on

17   microbiological contaminants, bacteria, protozoa and virus.

18       Q.    What was LifeStraw's first water filtration

19   product?  What was its name?

20       A.    Our first water filtration product that we

21   commercialized we call the LifeStraw.  It's an individual

22   straw with a hollow fiber membrane or microfilter membrane

23   that can remove your microbiological contaminants from

24   water.

25       Q.    Now, Ms. Hill, are you familiar with the term

1    "humanitarian entrepreneurship"?

2         A.    I am.

3         Q.    Can we pull up slide RDX-5.2?

4               Ms. Hill, can you just explain to us what the

5    term humanitarian entrepreneurship means to LifeStraw?

6         A.    Yeah.  Humanitarian entrepreneurship is really

7    the foundation of everything we do.  We -- we are a

8    for-profit company and believe that the private sector not

9    just has a role to play in addressing global issues but,

10   frankly, an obligation to come to the table with both

11   innovation around product technology and programs that can

12   develop or address big issues like safe drinking water.

13              We look at our innovation and our business models

14   with relation to scale of our safe water programs.

15        Q.    Is LifeStraw involved in humanitarian

16   initiatives?

17        A.    We are.

18        Q.    And can you describe some of those initiatives

19   for us?

20        A.    Sure.  We are involved in a number of different

21   humanitarian initiatives.  We describe them a little bit

22   differently.  We are involved in emergency response work.

23   We're involved in community-based safe water programs both

24   in the U.S. and internationally.  And then we're involved in

25   a giveback program that connects our commercial endeavors to

1  measurable impact that our own team that work in schools

2  across several countries implement.

3      Q.   Can we have the next slide, Ken, RDX-5.3.

4          And can we blow up the text at the top of the

5  slide under the heading Impact Around the World.  And then

6  also can we blow up the legend down at the bottom of the

7  slide as well.  Thank you.

8          Ms. Hill, can you describe the impact of

9  LifeStraw's initiatives with reference to RDX-5.3?

10     A.   I can.  So this is a little bit what I just spoke

11  about.  We work across many different parts of programmatic

12  as well as technology and product sector through our

13  giveback program tied to our retail humanitarian aid, which

14  is linked to community-based programs or household-based

15  programs.

16         Our Guinea worm work that we still work with

17  President Carter and the Carter Center on Guinea worm

18  eradication emergency response, and so that is going to be

19  responding to acute emergencies, be they natural or

20  political based, as well as our partnerships, as partners

21  with international organizations and domestic ones.

22     Q.   And can we just go back to the slide again, take

23  the blowup down.

24         What communities does LifeStraw serve through its

25  humanitarian initiatives, Ms. Hill?

1      A.   So this is just an impact map from last year.  So
2  2021 programs that we implemented.  You'll see across around
3  23 countries we've implemented a number of types of
4  programs, including in the U.S.
5      Q.   Okay.  Are you personally involved in these
6  initiatives at LifeStraw?
7      A.   I am.
8      Q.   Can we pull up RDX 5.4, please.
9           Can you describe what we have here on slide 4?
10     A.   Yeah.  I would say humanitarian initiatives, be
11  they community-based programs or emergency response are core
12  to not just the company and the program and the brand but
13  core to who I am as a public health professional.  It's the
14  reason I started the brand and the business.  It is what the
15  team works for every day.
16          What's on the slide here is recently a couple of
17  weeks ago both myself and a number of our team members
18  worked on the ground with the communities across four
19  counties in eastern Kentucky.  As many of you are likely
20  aware, there was devastating flooding there.  Not only did
21  families across those four counties very much lose
22  everything, there's systemic poverty in this area, there's
23  already struggles with safe drinking water, microbiological
24  contaminant, mine chemical contaminant.  We were in a unique
25  position, both as a company who is experienced in emergency

1  response, but also with the technology that could provide

2  very broad scope protection against both microbiological

3  contaminants as well as a host of chemical and heavy metal

4  contaminant that is we were able to respond.

5      Q.   Did LifeStraw distribute some of its products to

6  the local communities as part of its emergency response

7  initiative in eastern Kentucky?

8      A.   We did.  So we partnered with a member of the

9  U.S. Department of Agriculture, who you'll see in the top

10  left photo, the woman in the middle.  She contacted us,

11  because the USDA is really responsible for looking at water

12  quality and watersheds and water treatment in the area, and

13  asked if we would be able to come down and help.  Within 48

14  hours my operations team had sent around 1250

15  household-level LifeStraw Home water filter pitchers to be

16  able to go door to door in these very remote areas of

17  eastern Kentucky, as well as large system purifiers to be

18  able to address families that were mass sheltering, and

19  LifeStraw Go Bottles or the original straw for those

20  families that were on the move and not able to have access

21  to larger systems.

22      Q.   Thank you, Ms. Hill.

23          We can take that down, Ken.

24          Ms. Hill, you specifically testified about

25  humanitarian aid.  Can you describe LifeStraw's humanitarian

1   aid initiatives?

2       A.   I can.  We work with both individually with our

3   own team, so LifeStraw has a large amount of our employee

4   base that are implementing safe water programs in schools or

5   clinics.  We either work with our own teams or we work with

6   partners, like UNICEF, World Vision and other organizations

7   like that, to implement community-based programs.

8            So if a community does not have the

9   infrastructure to bring in safe water, we pair the right

10  product with the need of that community to do longer term

11  sustainable programs.

12      Q.   How does the LifeStraw's humanitarian aid

13  initiatives differ from their emergency response

14  initiatives?

15      A.   Emergency response initiatives are going to be in

16  response to acute emergencies like the flooding we saw in

17  Kentucky, we're very active in the Ukraine with the

18  political war that's happening there.  The humanitarian aid,

19  the way we refer to that is longer term commitments at a

20  community level, either at the household, school, or

21  clinic-based level.

22      Q.   Thank you, Ms. Hill.  You mentioned that

23  LifeStraw has a giveback program.

24           Can you describe that in more detail for us,

25  please?

1          A.   Yeah.  It ties back to this idea that we're a

2    public health company and built on humanitarian

3    entrepreneurship.  We built a brand with the objective to

4    reach everybody who didn't have access with safe drinking

5    water with technologies and products that could offer them

6    that as well as public health training and education.

7          The retail business model with which we went

8    forward with allows us the ability to fund that.  So as we

9    look at expanding retail efforts, it is with the objective

10   to be able to expand our safe water programs.  The way we do

11   this and the rigor with which we do this is from a public

12   health standard as a public health professional.

13         And so on our packaging we say the sale of one

14   LifeStraw product provides safe drinking water for a child

15   for an entire school year.  That is specific to our primary

16   school-based programs.  As of last year we've covered just

17   over six million kids with safe drinking water and full

18   program health education training and sanitation work.

19         That giveback program has to be measurable.  So

20   if I sell a product at REI on September 22nd and the board

21   asks me where did that have impact, how much impact, did you

22   do training and education, have you done maintenance on

23   these large system purifiers, how many children have you

24   reached, what's the diarrheal incident for that school.  I

25   have to be able to answer all those questions.

1    Q.   Thank you.  I think you mentioned that LifeStraw

2  oftentimes partners with other organizations.

3         Does LifeStraw engage with federal and local

4  governments as part of its humanitarian initiative?

5    A.   We do.  It's on a case-by-case basis.  So I will

6  just give you a few examples.

7         At a federal level, with the work that I do with

8  the Outdoor Industry Association, I work with Secretary

9  Holland, for example, on infrastructure-related watershed

10  protection and protection of public lands.

11         We have worked at the federal as well as

12  municipal level with utilities on addressing issues like

13  microplastics in water or how we test what's called PFAS or

14  forever chemicals in water.

15         This has been a large focus of the Biden-Harris

16  administration and one that we've been active in

17  communication with them about.

18    Q.   Do you know what LifeStraw products are accused

19  of infringing the '141 patent in this investigation,

20  Ms. Hill?

21    A.   I do.

22    Q.   Let's turn back and focus, what are the products

23  included in LifeStraw's Home product line?

24    A.   We have a number of products in this product

25  portfolio.  They are the LifeStraw Home 7-cup pitcher made

1    from BPA-free plastic, a 7-cup LifeStraw Home pitcher made

2    of silicate glass, a 10-cup LifeStraw Home pitcher made of

3    the BPA-free plastic, as well as an 18-cup dispenser product

4    as well.

5        Q.    Are there replacement filters for these products

6    as well?

7        A.    There are.

8        Q.    Okay.  And are those part of the accused products

9    in this case to your knowledge?

10       A.    They are.

11       Q.    When did LifeStraw commercialize its Home product

12   line?

13       A.    We came to market with our first LifeStraw Home

14   product toward the end of 2019.

15       Q.    And when did development of that product begin?

16       A.    I would say the concept around emerging

17   contaminants and the need for better technology for U.S. tap

18   water became a discussion in 2016, development in earnest, I

19   would say, started in 2017.

20       Q.    Thank you.  Why did LifeStraw decide to enter the

21   Home product line?

22       A.    It goes back to, again, the foundation of what

23   we're in business to do.  We saw the need for technology

24   that addressed a very broad spectrum of contaminants in U.S.

25   water.  We were seeing, not only the Flint, Michigan, issue

1    around heavy metals in lead, which I think has got a lot of

2    notoriety, but, frankly, we saw the need and were being

3    requested for the need to create a product with our

4    foundational technology and the technology that comes across

5    all LifeStraw products, which is this microbiological hollow

6    fiber membrane.

7          We were seeing increase with aging

8    infrastructure, we were seeing an increase in boil

9    advisories across the U.S., and at the same time we were

10   seeing emerging contaminants that really put a question mark

11   on human health, right.

12         At that time PFOS, very little was known about

13   these forever chemicals.  Similarly, I don't think we know a

14   lot about microplastics other than they are in U.S. tap

15   water as well as human tissue.

16         So I would say at that time we were developing a

17   product to provide U.S. households and families with

18   broadest -- the broadest protection we could with our

19   fundamental technology around microbiological and then

20   address the host of things that we saw emerging in U.S.

21   water.

22   Q.    Okay.  I'd like to switch gears and talk

23   specifically about the filtration system that LifeStraw uses

24   in the Home product line, Ms. Hill.

25         Can we bring up slide RDX-5.5?

1          Ms. Hill, at a high level, can you describe the

2   two-stage filtration system in the accused LifeStraw Home

3   products?

4          A.   I will.  I brought them here today in two

5   different forms.  This is what they look like.  As you will

6   see, stage 1 in this slide is this one here, that is going

7   to be our membrane microfilter.  And the second one is the

8   activated carbon and ion exchange microfiber filter, just

9   for ease of description.  I then sawed them apart, sawed

10  them open so we can pull out and look a little bit closer at

11  the technology.

12         But, at a high level, the membrane microfilter is

13  the one that's core to all of LifeStraw products and

14  technologies.  This is going to be a microbiological filter

15  that also filters out anything suspended in water.

16         So it will remove bacteria, parasites, and

17  microplastics.  It also removes silt, turbidity, and any

18  particulate that is above this .2 micron pore size.

19         Q.   Let's focus on the first page.  Can we pull up

20  slide 6, please.

21         Ms. Hill, can you take the cutaway portion of the

22  first stage of the filter and hold that up so Judge McNamara

23  can see that, and can you describe the membrane microfilter

24  that's in the first stage?

25         What material is that made from?

1      A.   It's a polycell foam.

2      Q.   And how does that work in the first stage of the

3  filtration process?

4      A.   Yeah, I mean, I would say, simply put, through

5  the extrusion process you're able to extrude into a number

6  of little straws and manage the pore size within those.

7           So what you'll see here is there is a closed loop

8  of straws.  Each of those straws have lots of little .2

9  micron pore sizes in them.  The bottom is the closed loop

10  here and is potted around.

11           So the way it works is dirty water comes into the

12  top, it goes around each of those straws, anything

13  microbiologically or silt or particulate that is .2 microns

14  or larger gets caught on the outside, and the water goes

15  into those straws and then comes out the bottom here.

16      Q.   Is the first stage, does it utilize activated

17  carbon?

18      A.   It does not.

19      Q.   Does the first stage utilize an ion exchange

20  resin?

21      A.   It does not.

22      Q.   Okay.  Let's take a look at the second stage of

23  the filter.

24           Do you have the second stage of the filter with

25  you?

1      A.   I do.

2      Q.   Okay.  Can you describe the second stage of the

3  filter that's in the LifeStraw Home product line?

4      A.   Yeah.  So the second stage is an activated carbon

5  with an ionized resin.  The way it is created and

6  engineered, it is created with microfibers so it is

7  microfibers of both activated carbon as well as the ion

8  exchange resin.

9           What you will see here is that, when you pull it

10  out, it has a pretty -- it has a pretty unique configuration

11  that, I joke, looks a little bit like Hubba Bubba, the

12  chewing gum of the '90s.

13           But, yes, it is wrapped tightly in a microfiber

14  weave.  And that does a number of things.  Number one, we

15  knew limitations of this technology, and so we did two

16  things in engineering to make this product the most

17  efficient product and effective product we could for a host

18  of contaminant removal.

19           Number one, if you put a physical hollow fiber

20  membrane or microfiber filter on top, it inherently slows

21  the flow of the water, and you want the water flow to be

22  very slow before it enters an activated carbon and ionized

23  resin filter, and you want it because it activates contact

24  time.

25           The second and third decision was about the

1    filter itself.  The first piece was the use of microfibers,

2    maximizes your surface area, and the grade of carbon that we

3    used to do this is a high-grade carbon to maximize the

4    performance across PFAS or chemicals, herbicides,

5    pesticides, as well as heavy metals.

6         Q.   Did LifeStraw use microfibers in any of their

7    products before the Home product line?

8         A.   We did.

9         Q.   What products did you use it in?

10        A.   We used it in a couple of portfolios of outdoor

11   products.  So when you are creating products for use in

12   outdoor with backcountry water, you have issues of algae.

13   And algae comes in two forms, both in a cyst form as well as

14   a cytotoxin when the algae cyst ruptures.

15             So we looked at the combination of these two

16   technologies for our outdoor products as well, which were

17   the LifeStraw Go, which is a bottle that you suck through

18   the filter, as well as the LifeStraw Flex products.

19        Q.   Does LifeStraw's two-stage filtration technology

20   allow it to differentiate its products from its competitors?

21        A.   It does.

22        Q.   And how does it do that?

23        A.   The combination of filters and the engineering of

24   each of those filters is designed to work together to create

25   effectiveness.

1       We launched the -- we launched the combination of

2   technology and designed the product to be able, again, to

3   address a broad spectrum of contaminants for U.S.

4   households.

5       So to my knowledge we're one, if not the only,

6   household water filter pitcher that can address

7   microbiological contaminants, microplastics, PFAS,

8   herbicides, pesticides, as well as heavy metals.

9       Q.   Thank you, Ms. Hill.  Has the Home product line

10  met LifeStraw's objectives since it was first commercialized

11  in 2019?

12      A.   It has.  And I will explain a little bit more

13  about how we define success within LifeStraw.

14      It's not a traditional consumer goods product

15  company that is success just in a retail basis.  To be

16  successful as a product line for the LifeStraw company, it

17  has to do three things:

18      Number one, it has to add technological

19  performance to the market, so it has to provide the

20  consumers that use these products with a level of protection

21  they don't otherwise have, and that way we would say that

22  this was successful.

23      Number two, it has to contribute to the company

24  overall revenue.  We cannot invest in innovation if we're

25  not a profitable company.  And we believe that you need to

1    be profitable in order to take to scale our safe water

2    programs.

3             And, number three, it has to expand our safe

4    water program with that measurable impact that we have.

5             So I would say from the perspective of each of

6    those three it has been successful.

7        Q.    So the record is clear, Your Honor, the

8    demonstrative physical exhibit that Ms. Hill used in

9    demonstrating the two-stage filtration process is RDX-21.

10            Ms. Hill, if LifeStraw could no longer offer its

11   Home product line for sale in the U.S., what impact would

12   that have on LifeStraw?

13       A.    I would say, as a company, it would have a number

14   of impacts.

15            Number one, we would not be able to --

16            MS. WATT:  Objection.  Sorry, Your Honor.

17            JUDGE MCNAMARA:  What's the basis of the

18   objection, Ms. Watt?

19            MS. WATT:  The question that's being asked is

20   directly to public interest, and the effect that remedy

21   would have if a remedy was -- public interest has not been

22   delegated in this investigation, so under the Commission

23   rules the Court should not be taking evidence on that issue.

24            JUDGE MCNAMARA:  Do you have any response to

25   that, Mr. Gargano?

1          MR. GARGANO:  I do, Your Honor.  I specifically

2     asked Ms. Hill what impact it would have on LifeStraw as a

3     company.  I also think, Your Honor, we all know that the

4     Commission has not charged you with finding public interest

5     in this initial part of the case, and I think, to the extent

6     some of this overlaps, which it probably does, I think you

7     can determine what's relevant to the issues you're charged

8     with as opposed to the public interest.

9          JUDGE MCNAMARA:  Ms. Watt, I'm overruling your

10    objection.  This was a general question that was asked

11    similar to the question that was asked about one of the

12    other companies as well, the impact of infringement or

13    potential finding of infringement.  So I'm going to allow

14    it.

15         Go ahead, please, Mr. Gargano.

16    Q.   Let me reput the question to you, Ms. Hill.

17         If LifeStraw could no longer offer its Home

18    product line for sale in the U.S., what impact would that

19    have on LifeStraw?

20    A.   Yeah.  I would say, similar to my past answer,

21    the impact would be threefold.

22         Number one, there would be a reduction in revenue

23    as a company; number two, we would lose our ability to

24    respond to U.S. emergencies and natural disasters; and,

25    three, we would not -- it would have an impact on the scale

1      of our safe water program in schools.

2              MR. GARGANO:  I have no further questions.  I

3      pass the witness, Your Honor.

4              JUDGE MCNAMARA:  Okay.  Thank you very much,

5      Mr. Gargano.

6              Ms. Watt, are you ready to proceed with

7      cross-examination?

8              MS. WATT:  Yes.

9              JUDGE MCNAMARA:  Okay.  Very good.

10                        CROSS-EXAMINATION

11     BY MS. WATT:

12         Q.   Good afternoon, Ms. Hill.  Can you hear me okay?

13         A.   I can.  Thank you.

14         Q.   Great.  LifeStraw sells goods to consumers,

15     correct?

16             JUDGE MCNAMARA:  Pardon me.  Before you keep

17     going and before you answer, Ms. Hill, are we going to stay

18     on the public record?

19             MS. WATT:  Yes.  I have a few questions at the

20     end that I think we'll need to switch over, but my initial

21     questions can stay on the public record.

22             JUDGE MCNAMARA:  Okay.  Thank you.  Just let us

23     know.

24             MS HILL:  Thank you.

25         Q.   I'll repeat my question.  LifeStraw sells goods

1    to consumers; is that right?

2        A.   Yes, we sell goods to both consumers as well as

3    organizations.

4        Q.   Okay.  But LifeStraw has not always just sold --

5    LifeStraw has not always sold its products to consumers; is

6    that right?

7        A.   That's correct.

8        Q.   It actually switched to a retail model around

9    2011, 2012; is that right?

10       A.   I wouldn't -- I wouldn't say we switched.  I

11   would say we expanded into a retail model.

12       Q.   And so prior to that expansion the company was

13   selling its products to humanitarian companies, correct?

14       A.   Yes, the same way we do today.

15       Q.   And so LifeStraw expanded the retail model

16   because the business was not profitable just working in the

17   humanitarian space; is that right?

18       A.   That's correct.

19       Q.   And it wasn't profitable because the cost of

20   selling products to humanitarian partners and supplying and

21   training them was more than the revenue that LifeStraw

22   received for the products; is that right?

23       A.   I wouldn't say that it wasn't -- I would say, no,

24   that's not correct.  I would say that the cost of the

25   organization was not -- would not be supported by only the

1    cost of sales to humanitarian organizations.

2        Q.    Okay.  And then there were multiple other

3    business models that you considered before this expansion to

4    the retail model in 2011; is that right?

5        A.    That's correct.

6        Q.    And so after making the decision to expand

7    LifeStraw's products in the company were profitable in that

8    retail model, correct?

9        A.    They are, yes.

10       Q.    And today LifeStraw's products are still

11   profitable in that retail model?

12       A.    They are, correct.

13       Q.    And you had said that LifeStraw launched its

14   first product in the home market space in 2019, right?

15       A.    Yes.

16       Q.    And entering the home market space was an

17   opportunity for the company to grow financially, correct?

18       A.    I would say that we looked at this from three

19   perspectives before that decision was made:  were we able to

20   expand our impact with our safe water program; were we able

21   to expand financially; and were we offering something unique

22   to the market.

23            So all three of those were taken into account

24   before this decision was made.

25       Q.    Okay.  So you said expand financially was number

1    two on your list.  So it was an opportunity to expand

2    financially, correct?

3         A.   Correct.

4         Q.   And then we went over two parts in the LifeStraw

5    product -- the membrane microfilter and the activated carbon

6    and ion exchange microfiber filter -- and you had said that

7    consumers use both together, correct?

8         A.   That's correct.

9         Q.   And LifeStraw recommends that the filter in the

10   Home pitcher products be replaced every 40 gallons; is that

11   right?

12        A.   Not both filters, just the ionized carbon with

13   ion exchange, the activated carbon with ion exchange.

14        Q.   You're right.  I misspoke.  It's for the

15   activated carbon and ion exchange microfiber filter,

16   LifeStraw recommends that that filter be replaced every 40

17   gallons.

18        A.   We do.

19        Q.   My last two questions, I think, is best to move

20   to the CBI record.

21             (Whereupon, the hearing proceeded in confidential

22   session.)

23

24

25

Appx22947-22968 redacted in their entirety

1                 O P E N   S E S S I O N

2

3          MR. TUCKER:  And we're going to RDX-0010C.4.

4    BY MR. TUCKER:

5      Q.   Dr. Crittenden, this is claim 1 of the '141

6    patent.  Did you have any particular assignments related to

7    this patent -- to this claim, excuse me?

8      A.    Absolutely.  I wanted to -- I was hired by the

9    Aqua Crest Respondents to evaluate whether or not there was

10   an infringement, and one of the key things to focus on was

11   claim 1.

12          And there are two important parts to claim 1.

13   One is the performance metric, that's known as the FRAP.

14   The FRAP has to be less than 350, and if it's greater than

15   350, then there is no infringement.

16          The other piece is that the filter media must

17   include at least activated carbon and a lead scavenger.  So

18   those are the two parts that I have looked at.

19      Q.   Okay.  And when we look at FRAP, what was the

20   lifetime that you believed was appropriate for this

21   equation?

22      A.    Twenty gallons.  I think that's the appropriate

23   total flow.  After 20 gallons, you would replace the filter,

24   so 20 gallons is the answer.

25      Q.   Now did you see some Brita testing results that

1    were at about 20 gallons?

2        A.    I did.

3        Q.    And I believe it was actually 20.08 gallons.

4    What approximately was the effluent lead, the Ce, of the

5    7023B filter when it was measured at 20.08 gallons for

6    lifetime?

7        A.    It was 10 plus a little bit.  I don't remember

8    the last digits there.  I want to say 10.4, but I -- unless

9    I have the numbers in front of me -- but it's slightly

10   greater than the 10 micrograms per liter.

11       Q.    And the 20.08 gallons is a little bit higher than

12   the 20 gallons that ZeroWater had in their documentation.

13       A.    Yeah, that's correct.  So slightly more.

14       Q.    So when you run the FRAP with the 20.08 and the

15   approximately 10.4, can you tell us what would be roughly

16   the FRAP number at that measurement?

17       A.    Yeah, the FRAP number for that is about 470.

18       Q.    Is that FRAP measurement higher than the FRAP

19   factor of about 350 or less, as shown to you in the claim

20   there?

21       A.    Absolutely.  Yeah, 470 as compared to 350, it

22   definitely is higher, so there's no infringement.

23       Q.    Okay.  Let's turn to RDX-10010C.11.

24             Can you tell Judge McNamara what we're looking at

25   here?

1    A.    Okay.  So on the left is the ZeroWater

2  recommendations for the service life of the filter.  So just

3  to remind everybody, the service life of the filter is --

4  can be -- is determined by the manufacturer or seller and is

5  founded upon the fact that they have done some testing and

6  it satisfies their requirements.

7          So now we see in the center here is the number of

8  gallons that can be treated by the ZeroWater filter, which

9  the Aqua Crest filter has replaced, and there's two

10  important things that are shown here.

11          We get a range of total dissolved solids and we

12  get a range of number of water, gallons of water per pour

13  that we can use before the filter has to be replaced.

14    Q.    If we could go -- if we could zoom out,

15  Mr. Kotarski.

16          And when we look at the Aqua Crest chart on the

17  right, the presentation is different, but the information

18  and the numbers are the same as the ZeroWater on the left?

19    A.    It is.  It's exactly the same.  And I might want

20  to point out on the right is a -- is a Brita demonstrative.

21    Q.    Yes.  Thank you.  I forgot to say that.

22          Let's go to RDX-10010C.3.  And this -- can we

23  start with -- you've got the Aqua Crest TDS chart, but in

24  the upper left corner, where it says TDS of Brita source

25  water, and it's highlighted, 202.8, what's the significance

1    of that?  What does that mean?

2        A.   Okay.  So for the test that was conducted by

3    Brita, which had 202.8 milligrams per liter of TDS, if we

4    wanted to look at the recommendations for how much water

5    could be treated, based on the ranges that are provided in

6    this table, you can see that that would correspond to 25

7    gallons.

8        Q.   Okay.  So Brita, when they ran the testing, they

9    ran it at 2.28 TDS, is that what you're telling us?

10       A.   202.8 TDS, yes.

11       Q.   Okay.  And how are you getting from the

12   Aqua Crest chart, the 25 gallons corresponds to

13   approximately 200?  Walk us through that, please.

14       A.   Okay.  Let's start with step 1 and see how that

15   goes.

16            So, first of all, we have to understand that TDS

17   has an impact on the capacity of the sorbent.  Think of the

18   sorbent as a fixed quantity.  There's only so many ions that

19   can fit in that sorbent.  So if you have a higher

20   concentration of TDS, then the amount of water that you can

21   treat would be less before it's saturated.  And if you have

22   a lower concentration of TDS, then you can treat more water

23   before it's filled or has absorbed all of those ions.  Okay.

24       Q.   Hang on, Dr. Crittenden.  So you've got the 200

25   highlighted in that left column, and then in the right

1    column you have the 25s highlighted.

2        A.    Exactly.

3        Q.    Explain to us what you're showing us there.

4        A.    Okay.  So here we have -- we're trying to figure

5    out what the test -- trying to figure out the manufacturer's

6    recommendation based on Brita's test containing TDS.

7            And what you'll see there, let's take the first

8    one, there's a range that goes from 51 milligrams per liter

9    to 200 milligrams per liter.

10           And as I just talked about, you know, higher

11   concentrations would treat less water.

12           So if you look on the right, you see that the

13   other number on the right is 25, so the 25 would be the one

14   that would correspond to a TDS of 200.

15           And you'll notice that the number next to it, 40

16   gallons, that would correspond to a TDS of 51 milligrams per

17   liter.

18           So, as I stated, higher concentrations of TDS

19   treats less water, and that's what you see here.  We see

20   that, for 200 milligrams per liter of TDS, we can treat 25

21   liters of water before the filter has to be replaced.

22       Q.    So if I -- if I'm repeating Brita's lead testing

23   of the 7023 filter, and I'm trying to figure out how much

24   lead it removes, and I know the TDS of the test water is

25   202.8, what would be the correct lifetime in your opinion?

1      A.   Well, the correct lifetime is in this chart, as I
2   said before, Aqua Crest has full power over telling the
3   consumer how much water can be treated before the filter is
4   replaced.  That's their prerogative.
5           It's based on, I'm sure, their decision-making
6   regarding safety and other things, and they say in this
7   case, for the 200, that corresponds to 25 gallons.
8      Q.   Okay.  And if I did the FRAP calculation with 25
9   gallons, what would be the effect?  Would it be higher or
10  lower than the calculation at 20 gallons?
11     A.   It would be higher.
12     Q.   TDS, can you tell us -- what's in TDS?  What's
13  included in TDS?
14     A.   So TDS is really a measure of the salinity of the
15  water, and the ions that are -- that would contribute to
16  that would be sodium, potassium, calcium, magnesium,
17  manganese, iron, and also for the anions we would see
18  chloride, hydroxide, sulfate, and sulfate -- what are the
19  other ones -- well, that's most of them.
20     Q.   And is lead --
21     A.   So those ions would contribute to the TDS.
22          Okay.  So --
23     Q.   Thank you.  Let's -- we're talking over each
24  other, so let's slow down a little bit.
25          So my question is, is lead part of TDS?

1     A.   Okay.  So we need to understand the concentration

2  of lead.  Lead qualifies as a contributor to TDS.  There's

3  no doubt about it.

4          However, the concentration is very tiny, you

5  know, let's say, 100 micrograms per liter, as compared to

6  100 milligrams per liter, if TDS was 100 milligrams per

7  liter, that's a thousand times higher.

8          So it would barely budge the needle in terms of

9  increasing the TDS, if we start to consider lead.  And we

10  do.  I mean, the lead would be part of the TDS, but it's a

11  very small component.

12     Q.   Okay.  But when you're using TDS as a

13  measurement, you're not using that as a measurement for lead

14  removal.

15     A.   No.  As I said, the key thing here is that the

16  TDS has an impact on the filter in terms of how much lead

17  could be removed.  And that's reflected in the number of

18  gallons that can be treated, which is as a function of TDS.

19          The higher TDS value means we have to replace the

20  filter more often because, in a sense, there's no more room

21  at the inn.  There's no more room in the sorbent to continue

22  to remove lead.  So that's how --

23     Q.   Okay.  So TDS -- we're really looking at what's

24  the hardness of the water with TDS?

25     A.   Well, salinity.  I mean, hardness can make up a

1    big piece of it, but it also includes sodium and potassium.

2            Hardness, as you know, is multivalent ions, and

3    there could be a significant amount of sodium and chloride

4    and potassium, which are not minerals that make up hardness,

5    but, yeah.

6        Q.   And TDS, the health risks from exceptional high

7    TDS versus the health risks of exceptionally high lead, are

8    they different?

9        A.   Absolutely they're different.

10       Q.   How would they manifest themselves?

11       A.   Okay.  So for, let's start with TDS, the

12   secondary standard for TDS, according to the EPA, is 500

13   milligrams per liter and has been basically noted that --

14   it's been noted that when the -- yeah, when you have high

15   TDS in the water, it causes diarrhea, and that's one reason,

16   for example, you can't drink seawater, it will just

17   dehydrate you.

18       Q.   What are the effects lead has on a person?

19       A.   Well, it has significant neurological damage to

20   the brain and nervous system.  So, yeah, that's important.

21       Q.   If I'm looking at the number in the right of the

22   expected quantity of per filter at 15, what is the

23   corresponding TDS at 15, Dr. Crittenden?

24            JUDGE MCNAMARA:  Pardon me.  That's 15 gallons.

25            MR. TUCKER:  Fifteen gallons.  I wrote myself a

1  note to say gallons again.  I'm sorry.

2       JUDGE MCNAMARA:  That's why you didn't say it.

3       Go ahead.  I'm sorry, Dr. Crittenden.  Go ahead.

4    Q.   Fifteen gallons.

5    A.   That's no problem.  Let's see here.  300, I

6  guess, in this case, so 15 would correspond to 300, yeah,

7  that's right.

8       And you can also see that below when you see

9  another 300 appear, 301 actually, and you'll see the 15 is

10 there as well.  Yeah, that's correct.

11   Q.   So, in summary, Dr. Crittenden, what is your

12 opinion that, if we ran the FRAP calculation at 20 values,

13 do we meet the FRAP of 350 or less as required by the claim?

14   A.   No, no.  I mean, we did another calculation.

15 Instead of using 20.08, we used 20, and --

16      JUDGE MCNAMARA:  Twenty gallons, 20.8 gallons,

17 folks.  Let's be clear about this.

18   A.   28.08, I believe.  But, anyway, so that was the

19 original test.  And we were -- we redid the calculation for

20 20 gallons, because that's the number that we think is -- is

21 the correct number, and so we used 20 gallons.

22      And then the effluent concentration, rather than

23 being 10.4 or so, we used 10.  And when we ran the FRAP

24 calculation for that, it was 450.  So showing that we were

25 not infringing on the patent.

1  Q. So, Dr. Crittenden, is it your opinion that, when

2 we run the FRAP calculation for the 7023B at 20, 20.08

3 gallons, the FRAP limitation of the patent claims is not

4 met?

5  A. That's correct.

6  Q. Okay.  Thank you, Dr. Crittenden.

7   JUDGE MCNAMARA:  Okay.  Thank you, Mr. Tucker.

8   Thank you, Dr. Crittenden.

9   All right.  Ms. Everett, Dr. Crittenden is your

10 witness.

11   MS. EVERETT:  Thank you, Your Honor.

12      CROSS-EXAMINATION

13 BY MS. EVERETT:

14  Q. Thank you, Dr. Crittenden.  I just want to

15 clarify a few points of your testimony.

16   You're providing a noninfringement product for

17 Aqua Crest 7023B; is that right?

18  A. Yeah, mm-hmm.

19  Q. You're not providing a noninfringement opinion

20 for any of the other products in this case.

21  A. No.

22  Q. You didn't perform a chemical analysis on

23 Aqua Crest's product?

24  A. No, I --

25  Q. You didn't tear it down?

1          A.   Well, I think Brita did that, and that was

2     provided to us.  We had a look at that.  But I'm certain

3     that the manufacturer knows what's inside.

4          Q.   Okay.  I just want to make sure I understand the

5     scope of your analysis.

6               So you looked at Brita's testing; is that right?

7          A.   Yes.

8          Q.   And by Brita, I'm including Dr. Rockstraw, any

9     third-party lab, you looked at that testing?

10         A.   I did.

11         Q.   You looked at documentation from Aqua Crest?

12         A.   Documentation... what do you mean?

13         Q.   So we looked earlier about the TDS -- you know,

14    the papers that Aqua Crest produces with its products.

15         A.   Right.  And, of course, many of those were

16    Brita's demonstratives just for the record.

17              MR. TUCKER:  Dr. Crittenden, you might want to

18    speak up.  I think we're having a hard time hearing you.

19              THE WITNESS:  Sorry.

20    BY MS. EVERETT:

21         Q.   And you also looked at some ZeroWater documents,

22    right?

23         A.   That's correct, some.

24         Q.   And in your analysis you are not questioning

25    Dr. Rockstraw's opinion on the flow rate of Aqua Crest,

1    right?

2        A.    No, I just use it, the 3.7 minutes per liter, I

3    think, is the number.

4        Q.    And you're not questioning his calculations on

5    volume?

6        A.    No.  We have a small discrepancy, but, yeah, 500

7    cubic centimeters.

8        Q.    And you agree that Aqua Crest's product reduces

9    lead?

10       A.    So in this case it will reduce lead.  The

11   question here is whether it meets the FRAP criteria, the

12   performance criteria that's put forward by Brita.  That's

13   what we use to determine whether there is infringement.

14       Q.    Before we get to the amount of lead reduced, you

15   agree that Aqua Crest product reduces lead?

16       A.    It's clear that that's from the test results that

17   was provided by Brita that it does remove some lead,

18   absolutely.

19       Q.    And you are not challenging any of that testing,

20   right?

21       A.    Well, here's the fine point.  I'll put a fine

22   point on this.  The question that comes up is what is a lead

23   scavenger.  And as stated in claim 1, the filter contains

24   activated carbon and -- has to contain activated carbon and

25   a lead scavenger.

1        So the question comes down to is there a lead

2   scavenger in the Aqua Crest filter, and to my opinion they

3   have not proven that any component or all the different

4   components, which component is responsible for removing

5   lead.

6        Q.   My question is a little different.  I just want

7   to make sure we're not crossing wires here.

8        So there was testing provided in this case about

9   the amount of lead that the Aqua Crest product reduces,

10  right?

11       A.   Can you repeat that?

12       Q.   Sure.  Were you here for Dr. Rockstraw's

13  testimony?

14       A.   I was not.  I was not.

15       Q.   Okay.  Were you able to read it?

16       A.   I got some of the high points that related to

17  whether we have infringement or not.

18       Q.   Okay.  So I'm going to pull up one of the

19  demonstratives that Dr. Rockstraw used in his direct,

20  CDX-8C.73.

21       A.   Okay.

22       Q.   Are you able to see that?

23       A.   I can see that.  I see what you're saying, yep.

24       Q.   This is the testing that was conducted on

25  Aqua Crest's product, right?

     1          A.   This is correct.

     2          Q.   And this testing shows that Aqua Crest's product

     3     reduces lead, right?

     4          A.   Yes, it does show that.

     5          Q.   You have provided no challenge to this testing.

     6          A.   I have not.

     7          Q.   Okay.

     8          A.   Other than --

     9          Q.   Dr. Crittenden, I wasn't sure if you were still

    10     speaking.

    11          A.   I just -- just continue.

    12          Q.   Okay.  Are you familiar with the term "filter

    13     usage lifetime" claimed by the manufacturer or seller?

    14          A.   Just one moment.  I'm sorry.

    15               MR. TUCKER:  He can't hear.

    16               JUDGE MCNAMARA:  I think he has stepped away.

    17               MR. TUCKER:  He is having a problem with his

    18     headphones, I think.  Should we take a couple minutes,

    19     Your Honor?

    20               JUDGE MCNAMARA:  I think that makes sense.  Why

    21     don't I see you back here in five minutes roughly.

    22               MR. TUCKER:  Okay.  Your Honor, do you mind if I

    23     call -- what do you want me to do?

    24               JUDGE MCNAMARA:  However -- he is back, I think.

    25               THE WITNESS:  I'm sorry.

```
 1              MR. TUCKER:  Is it working better?
 2              THE WITNESS:  What's working better?
 3              MR. TUCKER:  You've been cutting in and out.
 4    That sounds better to me.  How about everyone else?
 5              THE WITNESS:  I'll try to speak up.
 6              JUDGE MCNAMARA:  That's better.
 7    BY MS. EVERETT:
 8         Q.   Dr. Crittenden, are you able to hear me?
 9         A.   Yes, I am.
10         Q.   Okay.  Are you familiar with the claim term
11    "filter usage lifetime"?
12         A.   I am.
13         Q.   And are you aware that the Court has provided a
14    construction on that?
15         A.   Yes, I'm familiar with the construction.
16         Q.   And the construction is the total number of
17    gallons of water that a manufacturer or seller has validated
18    can be filtered before the filter is replaced.
19         A.   That's correct.
20         Q.   Okay.  And you provided some opinions on that
21    construction during the claim construction phase of this
22    case; is that right?
23         A.   Mm-hmm, that's correct.
24         Q.   And it was your interpretation that if that
25    construction was selected, that a product would have to be
```

1    validated under the NSF/ANSI 53 standard; is that right?

2         A.    That's not right.  It doesn't say that.

3         Q.    That was your -- go ahead.

4         A.    Go ahead.  Validated -- it means that, that

5    construction, basically, one would not necessarily choose

6    the same as the NSF 53 results because maybe you want a

7    safety factor.

8              So it's up to the discretion of the manufacturer

9    to choose what the total volume that can be treated before

10   the filter is replaced.

11        Q.    Was it your position during claim construction

12   that, if Brita's expert and Brita's construction was

13   selected, that they were advocating that lifetime should be

14   set forth under NSF/ANSI 553?

15        A.    Again, I think the claim construction, the way

16   it's written, does not -- it's obviously related to 53.  You

17   certainly wouldn't want to put a filter out there that would

18   poison people.

19             But in terms of the interpretation of it, it says

20   that it's validated, according to -- anyway, validated.  And

21   that validated does not necessarily mean 53.  As I said, I

22   think if you're the manufacturer of a filter and you're

23   trying to protect the public from lead poisoning, you

24   certainly wouldn't choose it to be exactly 53.  You would

25   choose it to be whatever you're comfortable with in terms of

1    providing a level of safety.  So that's my point.

2         JUDGE MCNAMARA:  I'm hoping someone is handing

3    you a copy of his opinion during claim construction.  Do you

4    have it?  Do you have Dr. Crittenden's opinion that you were

5    just describing so I can see it verbatim?

6         MS. EVERETT:  Sure, we can put this up.  If we

7    can go to paragraph -- page 47 of the second report.

8         Q.   And you provided two reports in this case, right,

9    Dr. Crittenden?

10        A.   I did.

11        Q.   And I'm going to go to your second report on May

12   24th.  And you, on page 47, said Brita's expert's

13   interpretation of L.  Do you see that?

14        A.   All I see is the first page.  I don't see -- I

15   think you said 54 or whatever it was.  The first page is

16   just the title page is what I'm seeing.

17        MS. EVERETT:  For the record, this is RX-850.

18        THE WITNESS:  Okay.

19        Q.   It is paragraph 149 where you start on Brita's

20   expert's interpretation.

21        A.   I can't read --  I can't read it.

22        JUDGE MCNAMARA:  I think you have to blow that

23   up.

24        MS. EVERETT:  Your Honor, why don't I take this

25   down for a moment and we'll sort it out.  I think we have a

1    numbering issue on our end.

2         JUDGE MCNAMARA:  Dr. Crittenden, she's going to

3    move on and come back around with that.

4         THE WITNESS:  Okay.  That's fine.

5    Q.   So in your --

6         MS. EVERETT:  Actually, Your Honor, may I have a

7    two-minute break to identify -- to get the right exhibit up?

8         JUDGE MCNAMARA:  Yes.

9         (Brief interruption.)

10        JUDGE MCNAMARA:  Okay.  Are you back?  Are you

11   ready, Ms. Everett?

12        MS. EVERETT:  I am.  Thank you for that break,

13   Your Honor.

14   BY MS. EVERETT:

15   Q.   So I'm going to pull up RX-845, which is

16   Dr. Crittenden's expert report.

17        Do you see that in front of you?

18   A.   I do.

19   Q.   There is a paragraph that starts, "Brita's

20   expert's interpretation of lifetime."

21   A.   Yes, I see it.

22   Q.   Okay.  And does this refresh your recollection

23   that you interpreted Brita's construction of lifetime to

24   include that the standard -- that the filter lifetime is

25   calculated according to NSF/ANSI 53?

1        MR. TUCKER:  I'm going to object to this.  She is

2   just quoting -- this is completely misleading, what she is

3   asking.

4        JUDGE MCNAMARA:  What's your response to that,

5   Ms. Everett?

6        MS. EVERETT:  Well, I'm orienting him.  This is a

7   claim construction.  He was giving his interpretation of how

8   we were positioning the claim.

9        If you recall, during the opening, Mr. Tucker

10   said that, if Brita got their instruction, they should be

11   held to the standard that a product should be validated

12   under NSF/ANSI, so this goes to that.

13        JUDGE MCNAMARA:  Well, I think you need to ask

14   the questions a little bit differently, because I'm -- well,

15   I think you need to ask him questions about this paragraph,

16   and I'm not quite --

17        Why don't you go ahead and see if you can

18   structure your questions that get at what he meant by this

19   paragraph and if, in fact, it does confirm what you're

20   saying it does confirm.

21   Q.   Dr. Crittenden, do you recall submitting an

22   report --

23   A.   Yes.

24   Q.   -- regarding noninfringement claims?

25   A.   Yes, yes.

1      Q.   And in that expert report you analyze the term

2   lifetime, filter usage lifetime; is that right?

3      A.   Yes.

4      Q.   And you also responded and analyzed Brita's

5   expert's usage of lifetime.

6      A.   Right.

7      Q.   And here are you saying that Brita and its

8   experts' construction would require that a filter would have

9   a single lifetime that is calculated according to

10   well-understood industry standards set forth in NSF/ANSI 53?

11          MR. TUCKER:  I'm going to object for the same

12   reason.  Plus, I feel like we're rearguing claim

13   construction here.  It's a claim construction that Brita

14   won.

15          JUDGE MCNAMARA:  Well, let me put it this way.

16          What are you getting at here, Ms. Everett?

17   What's your rationale and what's your response to the

18   objection?

19          MS. EVERETT:  The rationale of getting at this

20   is, if Brita did win their construction, then lifetime has

21   to be calculated under NSF/ANSI 53 2007.  And so if

22   Mr. Tucker is willing to say that, then I wouldn't need to

23   ask any of these questions.  That was in his opening.

24          JUDGE MCNAMARA:  So here's the thing.  This is

25   appropriate cross-examination on what his application was of

1   the claim construction that I issued.  And because I am

2   quite familiar with the fact that, when we go through a lot

3   of these hearings, people end up having different

4   applications of what they think the claim construction is.

5           So I'm going to allow her to pursue some of this.

6   This is no longer about whether or not I adopted a certain

7   claim construction; it's whether his interpretation or his

8   application of the claim construction says what it says or

9   what Ms. Everett is trying to get at.

10          Go ahead, Ms. Everett.

11          MS. EVERETT:  Should I repeat the question?

12          JUDGE MCNAMARA:  No.  Also Dr. Crittenden needs

13   to hear it.

14          Mr. Tucker, you will be able to come around if

15   there are any other paragraphs that deal with this

16   differently.

17          Go ahead.

18          THE WITNESS:  So I'd like to hear the question

19   again.  We've got a little pause there and I want to make

20   sure I'm clear.

21          (Record read.)

22   A.   Okay.  So as we look at the Court's claim

23   construction, it does not -- I think a little more

24   complicated than just setting it equal to what came from NSF

25   53.

1          As I stated before, you conduct the NSF 53, and

2     then, if you're trying to build a filter that has -- is able

3     to remove lead, so you certainly want to do that test, but

4     in terms of actually -- what lifetime -- what lifetime would

5     you use for the amount of water that you could filter, you

6     certainly wouldn't want to set it equal to that, because

7     what you would really want to have is a filter with some

8     safety factors.

9          So it's up to the discretion of the manufacturer

10    to choose what that is.  It's based on NSF 53 but it's not

11    equal to.  I think this is sort of -- you're alluding to.

12    It doesn't say that.  It just says that, hey, you should

13    look at industry standards, and then base your decision

14    based on that.  It has to make sense.  Does that help?

15         Q.   The standard could be even more strict than

16    NSF/ANSI 53 2007.

17         A.   Absolutely.  And I would, if I was the one who

18    was going to make a water filter, I don't want to poison the

19    public, I'm going to want a safety factor.  So I would

20    certainly do the test, see how many gallons you can treat,

21    but that wouldn't be the number I would select for the

22    amount of water -- well, I wouldn't select that number for

23    the amount of water that you can treat before the filter has

24    to be replaced.

25         Q.   And you're familiar with the NSF/ANSI 2007

1    standard?

2         A.   I am.

3         Q.   And that requires that the effluent lead not be

4    more than 10 parts per billion during twice the lifetime?

5         A.   Yes, I'm familiar with that.

6         Q.   So if a lifetime was 20, then the effluent lead

7    could not exceed 10 parts per billion; is that right?

8         A.   You didn't say it quite right.  You got to repeat

9    that.  I think you made a mistake.  You didn't add all the

10   other things you said a moment ago.

11        Q.   So if there was a lifetime of 20 --

12        A.   That lifetime is referring to the 53, or what are

13   we talking about?

14        Q.   Sure.  And I appreciate that I did not label my

15   numbers, Your Honor.  I apologize.

16             So if there is a lifetime of 20 gallons as

17   measured by NSF/ANSI 53 --

18        A.   Yeah.

19        Q.   -- could there be higher than 10 parts per

20   billion during the 20-gallon lifetime?

21        A.   Well, again, that's getting into the details of

22   the design, but it's likely that it would be higher than

23   ten.

24        Q.   So it would fail.  You couldn't have a lifetime

25   of 20 if you had higher than 10 parts per billion -- excuse

1   me.

2          Strike that, Your Honor.  I recognize I didn't

3   put labels on there.

4          You couldn't have a lifetime of 20 gallons if

5   lead exceeded 10 parts per billion during that 20-gallon

6   lifetime.

7      A.   Yeah, but, again, I'm a little concerned here.  A

8   moment ago we were talking about double the lifetime from

9   the ANSI standard, and now I don't know which one you're

10  talking about, the result from the ANSI test or the ANSI

11  test times two, or what are we talking about?

12     Q.   So if the gallons is a 20-gallon lifetime, could

13  I end my 20-gallon lifetime above 10 parts per million?

14     A.   Okay.  So, again, this is for the ANSI 53 --

15     Q.   Yes.

16     A.   -- test?  Okay.  So the ANSI 53 test gives you a

17  number of 20.  Is that what we're saying?

18     Q.   Gallon lifetime.

19     A.   Right.  Okay.  So then your question?

20     Q.   So to meet NSF/ANSI 53 2007, if there were more

21  than 10 parts per billion within 20 gallons, that would be a

22  fail, right?

23     A.   Yeah.  Yeah, that would be a fail, exactly.

24     Q.   Okay.  And actually, during Brita's measurements

25  of the Aqua Crest product, you stated that, after 20

1    gallons, it actually met 10.47 parts per billion lead,

2    right?

3        A.    That is true.  And it gets back to the point that

4    you made earlier and the point that I've been making about

5    the claim construction, and that is, I would not choose the

6    lifetime to be exactly equal to the ANSI standard.  I just

7    wouldn't.

8            So what we need to do is have a safety factor,

9    and the claim construction shows it's up to the manufacturer

10   to choose whatever that number is.

11       Q.    So, Dr. Crittenden, I just want to make sure I've

12   gotten your answer.

13           You agree that at 20 gallons in your analysis you

14   noted that it exceeded 10 parts per billion lead.  It was

15   10.47, right?

16       A.    Yeah.  I don't remember the exact number, but it

17   was 10.47, I take that, yeah.

18       Q.    And so, therefore, that's a fail, right, as we

19   just talked about?

20       A.    That's a fail.

21       Q.    Then we couldn't have a 20-gallon lifetime.

22       A.    Okay.  Now it depends -- wait a minute.  I can

23   see where this is going.

24           The question really comes down to what does a

25   manufacturer claim as the lifetime.  In this case the

1  number -- the numbers that they are saying, the Aqua Crest

2  people are saying, is 20, and it depends a little bit on the

3  TDS, but 20 is the number.

4          So you run the test for 20 and see if it fails.

5  And also, if it fails, and the FRAP number is greater than

6  350, there's no infringement.  That's the end of the story.

7      Q.   Right.  So Aqua Crest couldn't claim a 20-gallon

8  lifetime --

9      A.   They don't -- they have a 20-gallon lifetime, but

10 for what.  Anyway, keep going.

11     Q.   I'm just going to ask the question again.  I

12 think we just had a bit of crosstalk.

13         So Aqua Crest could not claim a 20-gallon

14 lifetime if at the 20-gallon mark the lead was actually

15 10.47 parts per billion, right?

16     A.   That's correct, yeah.

17     Q.   And now I just want to look at one document that

18 you went through in your direct examination.

19         If we could pull up RDX-10C page 11.

20         Do you recall talking about this on direct?

21         JUDGE MCNAMARA:  You're cutting out.  Hold on.

22 Hold on.  Ms. Everett, you just cut out completely.

23 BY MS. EVERETT:

24     Q.   Dr. Crittenden, do you recall testifying about

25 this slide, RDX-10C.11, on your direct testimony?

1      A.   Yes, I do.

2      Q.   And you were referring to that line that's 201 to

3  300 on the right-hand side?

4      A.   Yes.  Yes, I was.

5      Q.   Just to confirm, where the TDS is 202.8, you

6  would look at that line that says high?

7      A.   Mm-hmm.

8           JUDGE MCNAMARA:  Can you give a yes or no,

9  please, Dr. Crittenden?

10          THE WITNESS:  Yes.  Yes, I'm sorry.  I remember

11  I'm supposed to do that.  Yes.

12      Q.   And this is material that Aqua Crest publishes,

13  right?

14      A.   This is, yeah, this is in their consumer -- their

15  consumer guidance for use of the filter.

16      Q.   And Aqua Crest tells the world it's 15 to 25

17  gallons, right?

18      A.   That's correct.

19          MS. EVERETT:  No further questions.

20          THE WITNESS:  By the way --

21          MR. TUCKER:  Just one quick thing, doctor.

22          JUDGE MCNAMARA:  Just a second, Mr. Tucker.

23          Dr. Crittenden, I think when counsel said no

24  further questions, your counsel can come back around and ask

25  if there's something else you need to add.

1          Okay.  Mr. Tucker, go ahead, please.

2                    REDIRECT EXAMINATION

3    BY MR. TUCKER:

4        Q.   Could we have CDX-8C 73 back up.  CDX-8C.73.

5    It's the slide you had up a minute ago that I looked at

6    during the break.

7               We're getting it, Your Honor.  Too many numbers

8    on all these slides.

9               Okay.  Dr. Crittenden, this is a demonstrative

10   that Dr. Rockstraw used.  Do you see that he has the testing

11   data in the middle of that chart on the -- on this exhibit?

12       A.   I do see that.

13       Q.   Let's highlight that.  Thank you.

14               He left off one datapoint, right?  Let me ask it

15   another way.

16       A.   Yeah, yeah, yeah --

17       Q.   Do you see -- Dr. Crittenden, so we're clear, do

18   you see the datapoint on this chart of filtered gallons at

19   20.8 corresponding to an effluent lead of 10.47?  Is that

20   measurement in the chart?

21       A.   It is not.  And just to correct things, it's

22   20.08 gallons.

23       Q.   Thank you.  So 20.08.  So when you look -- and

24   are you aware -- does Brita have any testing data between

25   15.06 and 20.08 that was shared with us?

1      A.    No, there's -- I didn't see any data in between
2  there, no.
3      Q.    Okay.  And when I look at the range of this
4  effluent lead, 15.06 corresponds to 1.48, and 20.08
5  corresponds to 10.47, and a pass on NSF 53 is how many --
6  how many parts under the effluent lead, what's the number
7  there?
8           MS. EVERETT:  Objection, leading.
9           JUDGE MCNAMARA:  Well, it is and it isn't.  He is
10  directing his attention since this is a chart from which
11  there are numbers missing.
12      A.    So can you ask me the question again?  I'm still
13  a little bit confused.
14           JUDGE MCNAMARA:  Yeah, I am too actually, and
15  that is not good.
16           MR. TUCKER:  Okay.
17      Q.    So the measurements corresponding to 20.08, are
18  they in this chart?
19      A.    No, they are not.
20           JUDGE MCNAMARA:  Are you talking about filtered
21  liters?
22           MR. TUCKER:  Filtered gallons.  I'll ask it again
23  so it's clear.
24           JUDGE MCNAMARA:  Yeah.
25      Q.    So, Dr. Crittenden, are the measurements for

1   filtered gallons corresponding to 20.08 gallons in

2   Dr. Rockstraw's chart?

3        A.   No, it is not.

4        Q.   Okay.  And assuming that the effluent lead at

5   20.08 gallons is 10.47, is the NSF 53 requirement of

6   effluent lead at 10 closer to 20.08 or Dr. Rockstraw's

7   measurement of 15.06?

8        A.   So you're asking me which is closer?  Definitely

9   the 20 is closer to the -- having an effluent concentration

10  of 10.

11       Q.   So, in your opinion, Dr. Crittenden, do you think

12  that an effluent lead concentration of approximately 10

13  corresponding to the NSF is going to be much, much more

14  closer to the 20.08 that was left off this chart than 15.06?

15       A.   Yeah, absolutely.

16            MS. EVERETT:  Objection, Your Honor.  Again, that

17  is -- that is Mr. Tucker testifying.

18            JUDGE MCNAMARA:  That is.  That was going too

19  far.

20            Folks, there's a real problem here with the way

21  some of these charts have been put together.  It's

22  cherry-picking and it's not giving me a full picture.  And

23  that is to your detriment.

24            And I've been listening to this throughout, and I

25  have a pretty good idea what the Markman constructions were,

1    to say the least, and I am troubled by some of this.

2            The idea is not to obfuscate, it's to make clear,

3    and this chart that Dr. Rockstraw used did not specifically

4    calculate the manufacturer's usage, and I have a problem

5    with that.  And I have a problem now that there is backfill

6    on this.

7            So why don't you try your question again.  It's

8    not a hypothetical.  Presumably it's an accurate

9    measurement.

10           If, in fact, the number of filtered liters and

11   filtered gallons at the manufacturer's representation at the

12   time for the Aqua Crest filter had been actually portrayed

13   on this chart, isn't that what you're getting at,

14   Mr. Tucker?

15           MR. TUCKER:  I am, Your Honor.  Do you want me to

16   try again or --

17           JUDGE MCNAMARA:  I think you better try again,

18   because I think that Dr. Crittenden is confused.  I don't

19   think the question was clear.

20           And I am really concerned about the accuracy of

21   the way information is being brought into this.  These are

22   complicated formulae, and there are a lot of different

23   periods of time that are at play with these filters.

24           So, yeah, try again, Mr. Tucker.

25           MR. TUCKER:  Okay.

1      Q.   So, Dr. Crittenden, if the filtered gallons were,
2  say, between 19 and 20 gallons, in your opinion, do you
3  think the effluent lead would be 10 or under approximately?
4      A.   It's hard to say.  I don't think -- it's hard to
5  say.
6      Q.   Dr. Crittenden, the effluent lead, when it goes
7  from 15.06 to 20.8, it increases dramatically, like a
8  twofold increase; is that correct?
9      A.   Yeah, it did.
10     Q.   I'm sorry.  Fivefold increase?
11     A.   Fivefold, yeah, it increased dramatically, yes.
12     Q.   Okay.  It's a fivefold increase.  And that
13 fivefold increase, do you think that in your expert opinion
14 the effluent lead under 10 for the 7023 would be closer to
15 20 or 15?
16     A.   Closer to 20 for sure.
17          MR. TUCKER:  That's all I have, Your Honor.
18          JUDGE MCNAMARA:  Okay.  So the bottom line for
19 this, Dr. Crittenden, is that, if you had a chart that shows
20 that the number of filtered gallons was 20 gallons, then the
21 FRAP formula or the number of parts per billion of effluent
22 lead would exceed the allowable lead content based on the
23 NSF 53 standard of 2007, is that accurate?
24          THE WITNESS:  Yes, that's accurate.
25          JUDGE MCNAMARA:  Okay.  Folks, let's be really

1  clear what the bottom lines are that you're getting to here.

2          MR. TUCKER:  Could I have one more question,

3  Your Honor?

4          JUDGE MCNAMARA:  Yes.

5          MR. TUCKER:  Let's put that exhibit back up.

6  BY MR. TUCKER:

7      Q.   So, again, Dr. Crittenden, we don't -- we don't

8  have any data at 10.

9      A.   What do you mean?

10     Q.   Did Brita ever --

11         JUDGE MCNAMARA:  I think you need to be clear.

12  You need to be clear, Mr. Tucker.

13         MR. TUCKER:  I gotcha.

14     Q.   Dr. Crittenden, did Brita provide any testing

15  data showing how many gallons the 7023B was at when the

16  effluent lead reached 10?

17     A.   No, we can only -- we can only look at the

18  breakthrough curve and take an educated guess as to what

19  that would be, but they didn't provide that.  We know

20  that -- I'm pretty confident that 20, which is the

21  recommendation from Aqua Crest, that's what they say the

22  lifetime is --

23         JUDGE MCNAMARA:  Twenty gallons, Dr. Crittenden?

24         THE WITNESS:  Yeah, 20 gallons.  The whole

25  history is that ZeroWater claims 20, and the Aqua Crest is a

1  replacement filter, and that's 20.

2          So when you run -- so if it's 20, it's 20.  And

3  if you run the test, NSF 53, you can see that it exceeds the

4  10 micrograms per liter of lead, which is the NSF standard.

5          So it's failing that.  There's no doubt about

6  that.  And the FRAP is high, ranging from 450 to 470.  So

7  there's no infringement, the filter is not effective at 20,

8  and even though -- okay.

9          So if you look at the charts, there's a range, 15

10 to 20, 20 is right in the middle, that's good.  The

11 ZeroWater, they say 20, okay.  So we choose 20, according to

12 the Court's claim construction, 20 it is.

13         So now the next question is, what is the FRAP.

14 Well, it ranges between 450 and 470.  That's it.  No

15 infringement.

16 BY MR. TUCKER:

17     Q.   Dr. Crittenden, do you think it's likely that

18 filtered gallons between 19 gallons and 20 gallons would be

19 slightly under the effluent lead of 10?

20     A.   It could be.  I would have to see the plot in

21 front of me, but it could be.

22     Q.   Is it more -- is it more likely at 19 to 20?

23 It's right near 10 as opposed to at 15.06 gallons?

24     A.   Yeah, I think so.  It would be closer to just

25 under 10, but, again, I would have to do some -- I'd have to

1   look at it a little more carefully than this discussion as

2   we're having it.

3       Q.   Okay.  Thank you, Dr. Crittenden.  I appreciate

4   your time.

5       A.   Okay.

6            JUDGE MCNAMARA:  Ms. Everett?

7            MS. EVERETT:  I don't have anything further,

8   Your Honor.

9            JUDGE MCNAMARA:  I want to know, Dr. Crittenden,

10  are you saying that the ZeroWater filter and the Aqua Crest

11  filter, based upon paragraph 149 of your report, does or

12  does not -- I'm sorry.

13  BY JUDGE MCNAMARA:

14      Q.   Were you saying in paragraph 149 of your rebuttal

15  report that the lifetime usage has to include the NSF 53

16  standard?

17      A.   Right.  I mean, if you're -- let me put it this

18  way.  If you're designing a water treatment filter to remove

19  lead, then you certainly want to make sure that the filter

20  that you design will meet the NSF 53 standard.

21           And then you certainly, on top of that, as a

22  manufacturer, you don't want to design a filter that, you

23  know, supposedly is going to protect public health, and, you

24  know, you better stop using that filter right at 20 gallons

25  or whatever the number turns out to be for the NSF results.

1   You wouldn't want it to stop right there; you would want to

2   have some sort of safety factor.

3           And I think -- that's what we're talking about

4   here, that there is no -- well, there has to be a safety

5   factor.  You're asking whether or not we could use just NSF

6   53.  But, no, you would have to have a safety factor.  So

7   you could be pretty well assured that the lead concentration

8   is not above 10 according -- for the 2007 standard.

9           Do I make myself clear?  I can try again.

10          JUDGE MCNAMARA:  No, that's fine, Dr. Crittenden.

11          Thank you very much.

12          What I would like the parties to do is to submit

13  parts of Dr. Crittenden's report and mark it as an exhibit

14  that includes paragraph 149 and also surrounding paragraphs

15  wherever he has addressed the issue of claim construction

16  and his interpretation of the claim construction and

17  application.

18          I'd also like that to include, please, anything

19  dealing with his interpretation of Dr. Rockstraw's

20  application of a Markman construction and the application of

21  the NSF/ANSI 53 standard.  I would like to read those

22  paragraphs.

23          So you'll have an opportunity to put in what you

24  were looking at, Ms. Everett, and you will have an

25  opportunity, Mr. Tucker, to look at that, look at what Brita

1  is offering, and then, if there are other paragraphs that

2  are more explanatory, to provide those as well.  And I would

3  like that marked as an exhibit, please.

4          MR. TUCKER:  Okay.  Just so I'm clear,

5  Your Honor, Brita is going to start with 149.

6          JUDGE MCNAMARA:  And anywhere around it, and

7  anything around it, anything that explains exactly the point

8  he was getting to.  If it includes a potential claim

9  construction, his interpretation of an application, whether

10  or not he agreed with Dr. Rockstraw, and just -- I want this

11  as expansive as possible, because some of this was not at

12  all clear, and I think it needs to be clear.  So I may ask

13  for more depending on what you submit.

14          MR. TUCKER:  Should we submit the underlying

15  exhibit so you can see like the chart where they left off

16  the 20.0?

17          JUDGE MCNAMARA:  Yeah, absolutely.  I'm really

18  troubled by that.

19          MR. TUCKER:  Okay.  Thank you, Your Honor.

20          JUDGE MCNAMARA:  Okay.

21          MR. TUCKER:  Dr. Crittenden, you can turn off

22  your video and you're free to go.

23          THE WITNESS:  Okay.  Thank you.

24          JUDGE MCNAMARA:  Yes.  Thank you.  You may step

25  down.

1    MR. TUCKER:  I'm going to turn over the podium to
2  Mr. Swain, Your Honor, unless there's any more questions.
3    JUDGE MCNAMARA:  No, not at this point.  Thank
4  you.
5    MR. SWAIN:  Good afternoon, Your Honor.
6    JUDGE MCNAMARA:  Good afternoon, Mr. Swain.
7    MR. SWAIN:  I appear to be a lot closer on video
8  than I was on Friday.  I assure you nothing has changed
9  about my own physical appearance.  I think the camera might
10  need a little adjusting.
11    It is my pleasure as part of Respondents'
12  case-in-chief to introduce our next expert, Dr. Rob Herman.
13    JUDGE MCNAMARA:  Okay.  Very good.
14    Good afternoon, Mr. Herman.
15    THE WITNESS:  Good afternoon.
16        ROBERT V. HERMAN,
17    having been first duly sworn and/or affirmed
18  on his oath, was thereafter examined and testified as
19  follows:
20    JUDGE MCNAMARA:  Please state your full name.
21    THE WITNESS:  Robert Vernon Herman.
22    JUDGE MCNAMARA:  Thank you very much.
23    He is your witness, Mr. Swain.
24
25

```
 1                    DIRECT EXAMINATION
 2  BY MR. SWAIN:
 3       Q.   Mr. Herman, welcome.  Could you please provide
 4  your educational background?
 5       A.   I have a Bachelor of Science in chemistry from
 6  Lawrence Institute of Technology out of Southfield,
 7  Michigan, and I also have a Masters in Environmental Health
 8  Science from University of Michigan.
 9       Q.   Did you bring some demonstratives to help with
10  your testimony today, Mr. Herman?
11       A.   Yes, I did.
12       Q.   Let's look at one of those.
13            Could I have RDX-72?
14            Now, Mr. Herman, I believe you just gave your
15  educational background.  There's a bullet point I think that
16  might be missing here.
17            Do you have a doctorate, Mr. Herman?
18       A.   Yes, I do.  I have a Doctorate of Theology in
19  chaplaincy from Summit Bible College.
20       Q.   Thank you.  Is it okay if I address you as
21  Mr. Herman even though in some contexts you might be
22  Dr. Herman?
23       A.   I prefer Mr. Herman.  Thank you.
24       Q.   Mr. Herman, where do you work?
25       A.   Currently I work at Herman & Associates.
```

1    Q.   But before Herman & Associates where did you
2    work?
3    A.   For a very long time I was employed by NSF
4    International.
5    Q.   The same NSF International that you've been
6    hearing so much about over the last four days?
7    A.   Yes.
8    Q.   Could you summarize -- I realize it's 35 plus
9    years -- but could you summarize briefly your experience at
10   NSF International?
11   A.   Well, I really started working with the DWTU
12   Drinking Water Treatment Unit standards in 1987.  I was
13   developing test protocols and performing research studies
14   for the Joint Committee, which is the committee that's
15   responsible for the standards.
16        I also designed and built custom test equipment
17   for the laboratories.  I actually constructed several
18   laboratories over that time period -- not with my own hands,
19   but I oversaw the construction.
20        I was also on several standards committees and
21   was on the Joint Committee for many years, currently still
22   serving emeritus on the Joint Committee.  And I have tested
23   hundreds of filters, including gravity-fed filters.
24   Q.   Mr. Herman, with your experience at NSF of 35
25   years, what was your experience with respect specifically to

1    lead testing gravity-fed water filters?

2        A.    Well, beginning about in 2004 or so, I was

3    working with lead, specifically for NSF Standard 53, and

4    assigned by NSF to be the primary investigator on

5    determining why we were having some issues with the then

6    current standard.

7            I ended up chairing the task group that was

8    responsible for investigating and developing a new protocol

9    and validating that protocol for NSF Standard 53, and then,

10   of course, I've run that test ever since.

11       Q.    By "that test," do you mean NSF 53 2007 version?

12       A.    NSF Standard 53 lead 8.5 test 2007 and subsequent

13   versions.

14       Q.    Now, Mr. Herman, I want you to set aside your

15   modesty for just one moment.  Do you believe there is anyone

16   in the United States or perhaps globally that has tested

17   more gravity filters for lead reduction than you?

18       A.    I don't think so.  I'm not aware of anyone.

19       Q.    And have you been asked to provide an expert

20   opinion in this investigation?

21       A.    Yes, I have.

22       Q.    And did you provide an expert report in this

23   investigation?

24       A.    Yes, I did.

25       Q.    I'd like to show you a document briefly.

1     Can I have RX-979?

2     Mr. Herman, what is this document?

3     A.   That's my curriculum vitae.

4     Q.   Thank you.  And at what rate are you currently

5  compensated for your time?

6     A.   My base rate is $200 an hour.

7     MR. SWAIN:  Your Honor, at this time Respondents

8  proffer Mr. Robert Herman as an expert in the field of water

9  filtration, contaminant reduction testing, lead reduction

10  testing, under the NSF 53 2000 standard and otherwise.

11     JUDGE MCNAMARA:  Mr. Ainsworth, does Brita have

12  any objections to the proffer?

13     MR. AINSWORTH:  No objection, Your Honor.

14     JUDGE MCNAMARA:  Thank you very much.  Mr. Herman

15  is so accepted for the purposes upon which he has been

16  called to testify and the topics thereto.

17     MR. SWAIN:  Thank you, Your Honor.

18     Q.   Mr. Herman, let's talk about things you're not an

19  expert in.

20     Have you ever testified at a hearing and for

21  patent litigation before?

22     A.   No, I haven't.

23     Q.   And before this investigation have you ever been

24  deposed?

25     A.   No.

1      Q.   Have you ever rendered an expert report in any

2  sort of IP litigation context?

3      A.   No.

4      Q.   Neither have I.

5           Now, Mr. Herman, let's talk about your expert

6  opinions in this matter.  What were you asked to

7  investigate?

8      A.   So I was asked to investigate several filters

9  that are considered potential prior art to determine whether

10  or not they would meet any or all of the claims under the

11  '141 patent.

12     Q.   Just briefly, Mr. Herman, what are your

13  conclusions?

14          Can I have RDX-74?

15     A.   Essentially my conclusions are that the PUR

16  1-stage system does meet and anticipates the claims on 1

17  through 5 and 23, the Brita legacy filter anticipates the

18  claims 1 through 6 and 23, DuPont WF-PTC-100 anticipates

19  claims 1 through 5 and 23.

20          I also made some observations regarding the

21  ZeroWater ZF-201 filter system regarding calculating a FRAP.

22     Q.   Thank you, Mr. Herman.  Speaking strictly to A

23  through C here, the references here, these three references,

24  what methods did you use to evaluate whether these prior art

25  filters met the asserted claims of the '141 patent?

1       A.   Well, I inspected test units, specifically

2   identified features and functions of them.  I also performed

3   testing at two different laboratories to evaluate some of

4   the parameters that are needed in the FRAP equation.

5       Q.   Did you perform any chemical assays of the prior

6   art filters?

7       A.   Yes, one we weren't exactly sure what the lead

8   absorbent may be, so there was some additional testing done

9   to determine whether or not it was a lead absorber.

10      Q.   Through that testing did you determine the FRAP

11  factor for each of those filters?

12      A.   Yes, I did.

13      Q.   And when you determined the FRAP factor for each

14  of those filters, how many samples of each did you test?

15      A.   Between 2 and 7 samples.

16      Q.   Thank you.  Did you look at any lab notebooks and

17  contemporaneous testing as well?

18      A.   Yes, I did.

19      Q.   I want to talk about your testing, Mr. Herman,

20  but, first, I want to talk about NSF 53.

21           Mr. Herman, you are familiar with NSF 53, the

22  lead testing standard 2007, correct?

23      A.   I have breathed NSF Standard 53 for the last 20

24  years.

25      Q.   And speaking of more recent history, are you

1    familiar with claim 1 of the '141 patent?

2        A.   Yes, I am.

3        Q.   Okay.  Is claim 1 of the '141 patent coextensive

4    with the NSF 53 2007 standard?

5        A.   Understanding what that term means, no.

6        Q.   Now, Mr. Herman, how different is the scope of

7    the claims in the '141 patent from what is required by NSF

8    53 2007 for lead reduction?

9        A.   There's extensive differences between the two.  I

10   think it would be best if we narrowed it down a little bit.

11   I have some demonstratives that will cover that.

12       Q.   Certainly.

13            Can I have RDX-7.5, please.

14            Mr. Herman, what is shown on RDX-7.5?

15       A.   So this is just a summary slide of the '141

16   patent versus the NSF Standard 53 2007 version.  And there's

17   four areas that we would like -- I would like to discuss.

18            One, the total influent leads concentration

19   variances between them, the differences, fine particulate in

20   the influent, the lead effluent concentration requirements,

21   as well as allowances or deviations from specifications that

22   are allowed.

23       Q.   Okay.  For the record, we're speaking of JX-22,

24   the '141 patent, and RX-0084, the NSF 53 2007 standard on

25   the right.

1      Let's talk about total lead influent differences,

2   Mr. Herman.

3      Could I have RDX-76?

4      What is shown here, Mr. Herman?

5   A.   Okay.  This image here is giving a graphical

6   representation of the allowable total lead range between the

7   NSF standard and the '141 patent.

8      The '141 patent allows that throughout the test

9   you can have lead, total lead ranging between 120 and 180

10  parts per billion.  The NSF standard requires that the

11  overall test influent lead be between 135 and 165 parts per

12  billion lead.

13  Q.   Mr. Herman, when we say "influent," what do we

14  mean?  Do we mean the water going into the filter?

15  A.   Yeah, the water that you would prepare and

16  challenge the filter with and actually pour into the filter.

17  Q.   If someone were to tell this Court that the total

18  lead requirement of the '141 patent and NSF 53 2007 were the

19  same, what would you say?

20  A.   I would say they're not.

21  Q.   Let's go to RDX-78.

22      (Clarification by reporter.)

23  Q.   For the record, every time I've said 7 and

24  followed by a number, I intended to put a dash in between

25  them, and I will proceed accordingly.

1        Could I have RDX-7.7, Mr. Kotarski?

2        JUDGE MCNAMARA:  Keep it at dot so it's precise

3   with the demonstrative.

4        MR. SWAIN:  Absolutely.

5   Q.   Could I have RDX-7.7, Mr. Kotarski?  Thank you.

6        Mr. Herman, what is shown on RDX-7.7?

7   A.   This is showing the different forms of lead that

8   would be present in the influent test water and the

9   differences between the '141 patent, and NSF Standard 53

10  2007.

11  Q.   And this total lead line, is that the total lead

12  influent you discussed earlier?

13  A.   Yeah, this is just another representation of --

14  the '141 patent allows 120 to 180 parts per billion; NSF 53

15  for the test requires 135 to 165.

16  Q.   What is meant by the line here, quote/unquote,

17  colloidal particulate lead?

18  A.   Well, in the standard and basically in parlance

19  in the industry, particulate lead is referred to exactly

20  that.  However, we wanted to put both of those in there

21  because in the patent it's referred to as colloidal lead.

22  So we kind of use them interchangeably during this case.

23  Q.   So when you speak of particulate lead in your

24  opinion, are you speaking as to colloidal lead within the

25  context of the '141 patent?

1    A.   Yes, I am.  And within the NSF Standard 53 and

2    within the patent, they are both defined in a similar manner

3    where they are all particulate greater than .1 micron in

4    size.

5    Q.   There's a line here, Mr. Herman, that says fine

6    lead and there's some question marks and then a 20 percent.

7    Can you explain what is meant by that?

8    A.   Okay.  Fine lead is the whole crux of the matter

9    with regards to lead reduction in Standard 53.

10        Prior to the 2007 version, there was an

11   assumption of particulate lead within the test, but it

12   wasn't well-defined.

13        So when we began the investigation and the

14   development of the new lead test, one of the first things we

15   discovered is that what really made a difference in how

16   products perform was the presence of fine lead, which is

17   really defined as .1 micron to 1.2 micron.  So, essentially,

18   everything around 1 micron and down effects on water

19   filtration and the filter's ability to remove lead.

20        And it's critical that you have a specification

21   for that.  The '141 patent is silent on it.  It doesn't have

22   any specification.  And NSF 53, you would think, well, it's

23   kind of a loose specification, greater than 20.

24        But, in reality, if you have greater than 20

25   percent fine lead, you are in control of your test water and

1   you are challenging it with a particulate that will actually

2   result in, if it's a poor performer, a lot of lead in the

3   effluent.

4       Q.   Could I have RDX-7.8, please, Mr. Kotarski.

5            What is shown here, Mr. Herman?

6       A.   Just another graphic kind of showing what the

7   parameters are.  At the top is from the '141 patent.  You

8   basically have a range for soluble lead and you add that

9   with a range of colloidal lead, that gives you your total

10  lead.

11           The lower is you have your soluble lead, but

12  that's sort of -- it happens because you have a total lead

13  that's not all particulate.  It's not really measured

14  directly.

15           So in the standards where we're really concerned

16  about particulates, so we have a specification on how much

17  colloidal lead must be there, and then within that a

18  percentage of it that must be fine.

19      Q.   Thank you, Mr. Herman.

20           Can I have RDX-9?

21           What is shown here in your demonstrative?

22      A.   It's really just to give us a feeling for what

23  size --

24           JUDGE MCNAMARA:  Hold on just a second.  Sorry to

25  interrupt, Mr. Swain.  It's RDX-7C.9.

1          MR. SWAIN:  Yes, Your Honor, 7C.9.

2      A.   So this is just to give us an idea of what size

3  range we're talking about.

4          For example, many have talked about a human hair.

5  Seventy microns, 60 microns, that's about the size of a

6  human hair.  Beach sand, 80 microns.

7          But when you really start getting down small,

8  bacteria, 1 micron, that actually is a very small bacteria.

9  Silt, .5, like when you kick it up, you know, when you're in

10  the lake or something like that, it just makes a mess.  And

11  allergens as .1, which we can't even see.

12      Q.   Let's look at the actual particulates of lead

13  we're talking about in this case.

14          Could we have RDX-7C.10?

15      A.   So this is just a representation of different

16  kinds of particle lead you can have.  So fine particulate is

17  very fine, .1 to 1.2 micron, as defined by NSF Standard 53.

18          There's also another range that's very common in

19  the tests, and that runs from about 1.2 to 15 microns.

20          You typically don't have much larger than 15

21  microns, at least in a Standard 53 test, but there's no

22  limitation in the '141 patent.

23      Q.   Why are fine particulates so important and vital

24  to the NSF 53 standard?

25      A.   As I mentioned before, the fine particulate

1  really is the difficult lead to remove.

2      Q.   Can I have RDX-7C.11?

3           Could you explain to the Court what is shown by

4  your demonstrative?

5      A.   Well, what it's really showing here is that,

6  under the '141 patent, you can have a lot of large

7  particulate lead.  You don't necessarily have to have fine.

8  And so when you pass that through a filter, a filter may do

9  very well.  You may end up with very little in the effluent.

10          Where, under Standard 53, you're required to have

11 that fine, and with that requirement you're going to limit

12 the size of the particulate you're actually forming in your

13 test water.  You're not going to have the really large

14 stuff.

15          So that's a very stringent restriction or

16 challenge for that filter.  And so you're going to have a

17 lot of it pass through the filter.

18     Q.   To be clear, Mr. Herman, on 7C.11, is this the

19 same concentration of colloidal lead in both the '141 and

20 NSF 53 2007 examples you show here?

21     A.   It certainly could be.  There's -- the

22 concentration isn't as important as the size range in

23 reality.

24     Q.   Mr. Herman, a hypothetical.  If I had a pitcher

25 full of lead challenge water for NSF 53 2007, and you had a

1    glass, and I were -- and the only thing between my pitcher

2    and your glass was an NSF 53 2007 certified filter, would

3    you drink that water?

4        A.    Sure.

5        Q.    Now same hypothetical.  If I told you the only

6    thing between this water and your glass was a patent that

7    met the claims of the '141 patent, would you drink the water

8    that came out of that filter?

9        A.    No, and I wouldn't recommend anyone else do it

10   either.

11       Q.    Let's talk next about difference 3, the effluent

12   requirements.

13             Mr. Herman, what is meant by effluent lead?

14       A.    So effluent lead is essentially the level of lead

15   that's in the water that leaves the filter.

16       Q.    And I want to make sure for the Court that this

17   is RDX-7C.12.

18             Continue, Mr. Herman.

19       A.    So on the right you can see the NSF Standard 53.

20   This is part of Table 14.  It shows a maximum effluent

21   concentration in milligrams per liter, which is .010.  That

22   translates to 10 parts per billion or 10 micrograms per

23   liter.  That is a requirement in the standard for the

24   maximum lead.

25             Within the '141 patent, the patent is silent on

1  what the limit is, and, as demonstrated in Table 5, PT 3-6,

2  the FRAP factor was calculated as an acceptable FRAP factor,

3  and this was an embodiment of the patent, and the Ce value

4  is 13.3, which would be a failure under Standard 53.

5      Q.   If someone were to tell this Court that the

6  NSF 53 2007 standard allows the testing agency to ignore or

7  disregard effluents over 10 ppb when testing, what would you

8  say to that?

9      A.   I would say the way the standard is written, and,

10  I'm sorry, I wrote it, there's no allowance to say you can

11  just disregard an effluent because it's over 10.

12     Q.   Thank you, Mr. Herman.  Speaking of allowance,

13  I'd like to now talk about allowances with respect to

14  influent lead, the fourth difference.

15          Could I have RDX-7C.13?

16          Mr. Herman, what allowances does the '141 patent

17  allow with respect to deviating from its influent lead

18  concentration ranges?

19     A.   Well, the patent, I believe, teaches in the

20  embodiments that you can go over or under the specific

21  ranges that are stated in the claim without undue impact.

22          MR. AINSWORTH:  Objection, Your Honor.  This is

23  Paul Ainsworth.

24          JUDGE MCNAMARA:  Yes.  What's the nature of the

25  objection?

1       MR. AINSWORTH:  This is an opinion that was not
2   contained in his expert report.  He did not discuss this at
3   all in his expert report about the allowances of the '141
4   patent.  This is a brand-new opinion and we're hearing it
5   for the first time.
6       JUDGE MCNAMARA:  Okay.  Mr. Swain, do you have a
7   response to Mr. Ainsworth?
8       MR. SWAIN:  I do, Your Honor.
9       JUDGE MCNAMARA:  Where in the expert report --
10      MR. SWAIN:  Absolutely.
11      JUDGE MCNAMARA:  -- it is provided?
12      MR. SWAIN:  Yep.  Could I have RDX-985 -- thank
13  you.
14      This is Exhibit C to Mr. Herman's report, and he
15  discusses this very embodiment here.
16      Could I have it -- could I have the ELMO on
17  actually?  Thank you.
18      As you see right here, Mr. Herman is discussing
19  this very embodiment of the patent, and he talks about the
20  20.8 here, and he talks about the deviations and compares it
21  to deviations that may occur in other testing.
22      He also discusses, Your Honor, a whole host of
23  differences between the NSF test, generally, and the '141
24  patent throughout the body of his report.  He talks about
25  the background and he talks about the differences in the

1  2007 standard.

2      All Mr. Herman is trying to say is his

3  observations both on his report and what he has seen so far

4  in this investigation.  This also relates to what

5  Dr. Knipmeyer testified upon cross-examination about this

6  very embodiment of the patent.

7      JUDGE MCNAMARA:  Mr. Swain, I think I need to

8  have you provide more of the text and explanation of those

9  charts from Exhibit C that you could find in Mr. Herman's

10  report.

11      And so what I'm going to do, in the interest of

12  time, is provisionally allow the testimony, but I want you

13  to substantiate where this opinion actually in the form of

14  an opinion occurs.

15      And if you can't, then, Mr. Ainsworth, you

16  certainly will be able to file -- I'll either decide what

17  I'm allowing provisionally will not be allowed or you can

18  move to strike and I'll let you know.

19      MR. AINSWORTH:  Thank you, Your Honor.

20      MR. SWAIN:  Thank you, Your Honor.  Just so I am

21  clear on your procedure, you would like a submission from

22  Respondents on this?

23      JUDGE MCNAMARA:  Yeah, I would.  I'd like to know

24  exactly which paragraphs in Mr. Herman's report actually

25  discusses Table C and the comparisons between the NSF

1    standard and the '141 patent, as you've just described it.

2    I'd like to know if there's narrative and in which

3    paragraphs.

4         MR. SWAIN:  Sure.  Thank you, Your Honor.  I will

5    move along, because we're moving on to a different topic,

6    just briefly, but I do want to bring up RDX-7.14.

7         Q.   Mr. Herman, what is shown on RDX-7.14?

8         MR. AINSWORTH:  Pardon me, Your Honor.  I have

9    the same objection to this slide and this testimony.  I'll

10   accept your ruling as it applied last time.  This is new

11   testimony from an opinion from Dr. Herman related to Table 2

12   of the '141 patent.  He nowhere discussed it in the body of

13   his report.

14        MR. SWAIN:  Again, Your Honor, he gave extensive

15   discussion about how the table, including Table 2, deviated

16   from the '141 patent claims all over Exhibit C.  But I'm

17   happy to --

18        JUDGE MCNAMARA:  Yes, the numbers are there.  The

19   question is whether or not there's any narrative.

20        And the other question that I have, during

21   Dr. Knipmeyer's deposition, was she questioned about this?

22   Did you have available or -- well, did you have already --

23   this is something of a rhetorical question, just to put it

24   on the record given the time frames, but did you already

25   have Mr. Herman's opinion on the embodiments and the

1  comparison with the '141 and the NSF 53 2007 standard when

2  Dr. Knipmeyer was deposed?

3          MR. SWAIN:  Hopefully timing will be helpful for

4  Your Honor.  This testimony that's shown here on RDX-7C.14,

5  this is from the trial testimony this week.

6          JUDGE MCNAMARA:  I know.  I'm asking you a

7  different question.

8          MR. SWAIN:  Sure.

9          JUDGE MCNAMARA:  I'm asking you if you deposed,

10  if when Dr. Knipmeyer was deposed, she was asked about the

11  differences between the '141 patent embodiments and the

12  NSF 53 2007 standard.

13          Did your team ask her about that?  Let's start

14  there.

15          MR. SWAIN:  Yes, Your Honor, we did ask her about

16  that.

17          JUDGE MCNAMARA:  Okay.  So that might be the more

18  appropriate testimony.

19          The question also is, did Dr. Herman offer any

20  opinions in his written reports, either -- well, in either

21  of his reports -- or address what Dr. Knipmeyer said with

22  respect to any comparisons between the '141 patent and the

23  NSF 53 2007 standard?  Other than the Exhibit C that you

24  just showed me.

25          MR. SWAIN:  Your Honor, I was surprised to get an

1  objection on this.  So I think what I would -- my team is

2  working on finding that, and I think what I would like to do

3  is find that in his report where he discussed it.  I know it

4  was discussed at his deposition.  I would like to provide

5  you with the appropriate cites where he has done that.

6          JUDGE MCNAMARA:  I think that's right.  And in

7  the interest of time we'll follow the same procedure.  I'm

8  going to provisionally allow this testimony.  I would like

9  to have you provide that documentation.  We'll talk more at

10  the end of the day about this.  But, provisionally, I'll

11  allow it.  I'll tell you what I would like at the end of the

12  day.

13          And you will have an opportunity, Mr. Ainsworth,

14  once you see all of these references -- and I would like

15  them attached to whatever it is that you're -- to what you

16  submit, Mr. Swain -- you'll have an opportunity to address

17  this, Mr. Ainsworth.  And I'll either strike the testimony

18  if it's not substantiated, if the opinion is not

19  substantiated, or was previously provided, or is simply an

20  explanation of additional detail of what was already

21  provided, or I'll allow you to move to strike.

22          MR. AINSWORTH:  Thank you, Your Honor.

23          MR. SWAIN:  Thank you, Your Honor.

24     Q.   We can go ahead and move on.

25          Two final questions on NSF 53 versus the '141

1   patent, Mr. Herman.

2        How does the difference between -- we can take

3   this demonstrative down, Mr. Kotarski.

4        How do the differences in the influent lead

5   tolerance and the effluent lead tolerance and the type of

6   lead particulate in the '141 patent versus the NSF 53 2007

7   standard and the '141 patent inform and explain your

8   conclusions as to the anticipation of that patent?

9   A.   I may have lost my way in the question.

10  Q.   That's okay.  Mr. Herman, what is the consequence

11  of the '141 patent being much broader than the NSF 53 2007

12  standard when it comes to testing for the reduction of lead?

13  A.   Well, when you have a wider range of variability

14  and you don't have control of all the parameters, especially

15  fine particulate, you can end up having significant

16  variations in the performance of the product that's being

17  tested.

18       So you can run it according to '141 and you may

19  get one set of results that look great, and you can run it

20  again under '141, and you can have another set of results

21  that looks really poor.

22  Q.   Given how broad the '141 patent claims are, is it

23  even possible to have a gravity-fed filter that is NSF 53

24  2007 or later certified yet would not infringe the '141

25  patent?

1       A.   Well, in my -- in all my experience, I don't

2   think you could design -- well, I don't think that a

3   commercially viable product would be -- that would pass NSF

4   Standard 53, especially current versions, and not end up

5   FRAPPing, that meeting the FRAP equation.

6       Q.   Thank you, Mr. Herman.  I would like to now talk

7   about the prior art references that you evaluated.

8            Could I have RDX-7C.17?

9            Mr. Herman, if you could refresh the Court's

10  recollection, are these the four prior art references you

11  looked at?

12      A.   Yeah, these are the four prior art references.

13  The DuPont PTC-100 and the Brita legacy granular as well as

14  the PUR 1-stage, I actually performed testing on those

15  products.  The ZeroWater ZF-201 I used in information from

16  testing and documents from the 2006-2007 period.

17      Q.   Thank you, Mr. Herman.  I want to ask you about

18  the DuPont, Brita, and PUR products first that you tested.

19           Let's talk about the PUR 1-stage.

20           Could I have RDX-7C.18, please.

21           Could you give a general overview of what the PUR

22  1-stage filter is?

23      A.   The PUR 1-stage filter is a filter designed to go

24  into a gravity-fed pitcher system.  A lot of times it was

25  provided with a pitcher.  It contains an ion exchange resin,

1   which would be equivalent to a lead scavenger.  And it

2   contains two different types of granular activated carbon,

3   silverized and nonsilverized.  And this would be in a loose

4   mixed-media bed.

5       Q.   What was your understanding as to the variants of

6   the 1-stage filter in the 2005-2006 time frame?

7       A.   There are essentially two variants.  One, the

8   1450, as it's referred to, had a type of indicator on the

9   top of the cartridge that a user could actually see about

10  how much water they had put through it.  And the other was

11  the 1450Z or ZRDO, which it did not have that attachment to

12  the top.

13       Other than that, the ion exchange resins used,

14  the granular carbon used, the amounts of each in them, the

15  ratios between them were practically equivalent.

16       Q.   And when you're analyzing the product,

17  Mr. Herman, are you referring to RPX-113 and RPX-111 for the

18  packaging of the PUR 1-stage?

19       A.   Yes.

20       Q.   And when you're discussing the contents of the

21  PUR 1-stage, are you referring to RX-210C, RX-194C, RX-195C

22  and RX-214C?

23       A.   Yes.

24       Q.   Is there any particular difference between the

25  filter media of the PUR 1-stage variance?

1      A.   No, the formula cards that I had reviewed that

2   Mike and Frank from Helen of Troy had provided me indicated

3   that there was no difference in quantities or type or

4   sources.

5           (Whereupon, the hearing proceeded in confidential

6   session.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx23031-23033 redacted in their entirety

```
 1                O P E N   S E S S I O N

 2

 3          MR. SWAIN:  We can go back on the public record,

 4    Your Honor.

 5          JUDGE MCNAMARA:  Okay.  Thank you.  We've lost

 6    you, Mr. Swain.

 7          MR. SWAIN:  I don't know if we got a --

 8          JUDGE MCNAMARA:  You don't have to wait for them

 9    to come back in on the public record.  Go ahead.

10    BY MR. SWAIN:

11       Q.  All right.  Mr. Herman, does Brita dispute the

12    public availability or on-sale status of the PUR 1-stage

13    product as of May 2006?

14       A.  I'm not aware of a dispute.

15       Q.  Thank you.  I'd like to talk about the next prior

16    art filter you looked at, the Brita legacy granular product.

17          Could I have RDX-7C.19?

18          Mr. Herman, what is the Brita legacy granular

19    filter?

20       A.  It is a gravity-fed filter that fits typically

21    inside of a pitcher.  It contains a mixed media, which would

22    include activated carbon and an ion exchange media.

23       Q.  And as shown on RDX-7C.19, there's an RPX-106.

24    Do you see that?

25       A.  Yes.
```

1    Q.   What does the packaging tell you about the
2    contents of the Brita legacy filter?
3    A.   The packaging was copyrighted in 1999, and it
4    also shows that the product was certified for lead
5    reduction, it had a capacity of 40 gallons, and it was meant
6    for use in a pitcher filter.
7    Q.   And on the right is RX-331, Mr. Herman.  What
8    does that tell us about the contents of the Brita legacy
9    filter?
10   A.   Yes, that was an insert within the package, and
11   it indicates and confirms that there is an activated carbon
12   present and an ion exchange resin that functions as a lead
13   scavenger.
14   Q.   And so, Mr. Herman, does the Brita legacy filter
15   have activated carbon?
16   A.   Yes.
17   Q.   And does it have a lead scavenger in a component
18   that can remove or reduce lead in water?
19   A.   Yes.
20   Q.   Would that be the ion exchange resin?
21   A.   Yes, it would.
22   Q.   And is the Brita legacy filter a gravity-fed
23   water filter?
24   A.   Yes, it is.
25   Q.   And does Brita dispute any of this, Mr. Herman?

1      A.   I'm not aware.

2      Q.   Mr. Herman, was the Brita legacy granular filter

3 here in public use or on sale in the United States on or

4 before May of 2006?

5      A.   Definitely.  They, I believe, originally were

6 certified in 1996.  They had a revision to increase their

7 capacity to 40 gallons in 1998.  And I know I saw it on the

8 shelves in that time period.

9      Q.   Does Brita dispute the Brita legacy filter was on

10 sale or in public use as of May 2006?

11     A.   I'm not aware of a dispute.

12     Q.   Is the Brita legacy filter discussed in the '141

13 patent itself?

14     A.   Actually it is.  It's used as a prior art example

15 in Table 3.  And in Table 3 it also demonstrates a capacity

16 of 40 gallons.

17     Q.   Could I have JX-22 at Table 3, Mr. Kotarski.

18          Could you point out to the Court, Mr. Herman,

19 where Table 3 the Brita granular legacy filter is?

20     A.   Yes.  It's actually the top section of the table,

21 the very first one, marked as "Brita granular."  And the

22 data immediately below that all the way down until it says

23 "Maxtra 55.45" is data related to the Brita granular.

24          JUDGE MCNAMARA:  For the record, it's Table 3

25 from the '141 patent.

1        MR. SWAIN:  Yes, quite correct, Your Honor.

2    A.   Yes.

3    Q.   May I also have Table 5 of the '141 patent,

4  Mr. Kotarski?

5        Do you see the Brita granular discussed in the

6  '141 patent, Mr. Herman, in Table 5?

7    A.   Yes.  Near the bottom where it's highlighted,

8  mixed media, there's Brita granular, which takes data from

9  Table 3.  It shows lifetime of 40 gallons, a flow rate of

10  5.5, a volume of 128.

11    Q.   Thank you.  Do you believe the filters that you

12  examined in RPX-106 with a copyright of 1999 are materially

13  the same as what is discussed as the group Brita granular

14  legacy filter in the '141 patent?

15    A.   Yes.

16    Q.   Did you hear any facts or contentions from Brita,

17  the four Brita employees and two Brita experts that have

18  testified, about any difference in the Brita legacy filter

19  that you tested from 1999 and those sold between then and

20  the one mentioned in the patent?

21    A.   No.

22    Q.   And what else did you evaluate to reach that

23  conclusion?

24    A.   Well, I also looked at some of the logbooks that

25  Brita had from their testing to determine that and also some

1  testimony.

2      Q.   Thank you, Mr. Herman.  I'd like to talk next

3  about the DuPont PTC-100 filter.

4           Can I please have RDX-7C 20.

5           Mr. Herman, what is shown on RDX-7C.20?

6      A.   It's showing two of the packages.  The package on

7  the left that's green is the 2005 version of the PTC-100.

8  That is actually a three-pack.  So they called it a PTX-103,

9  but essentially it's three PTC-100's.  And on the right is

10 the same product but the 2007 variant.

11     Q.   Can you provide your understanding as to the

12 contents of the PTC-100 filters?

13     A.   Okay.  The PTC-100s were a gravity-fed water

14 pitcher filter that contained activated carbon.  It also

15 contained a specialized carbon-based --

16          MR. SWAIN:  I'm going to pause, and I would like

17 to go on the third-party confidential record.

18          (Whereupon, the hearing proceeded in confidential

19 session.)

20

21

22

23

24

25

Appx23039-23054 redacted in their entirety

```
 1                    O P E N   S E S S I O N
 2              MR. SWAIN:  Yes, please, let's go on the public
 3    record.
 4              JUDGE MCNAMARA:  Thank you, Ms. Kinkade.
 5    BY MR. SWAIN:
 6         Q.    Showing you RX-986, what is shown here at page
 7    15?
 8         A.    Okay.  This is the protocol that was the basis of
 9    the evaluation at Helen of Troy.
10         Q.    Could I have RX-684 at page 2, Mr. Kotarski.
11               What is shown here in RX-684 at page 2?
12         A.    This was the instructions for preparation in
13    operating the test for, excuse me, for the QFT testing.
14         Q.    Mr. Herman, did attorneys have any authorship or
15    involvement in the bounds of either of these protocols?
16         A.    I don't think so.  I'm not aware of any.
17         Q.    Did you oversee the testing of QFT and Helen of
18    Troy?
19         A.    Yes, I did.  And actually both of these methods
20    were generated based on a lot of my input into the protocol
21    and how they actually performed the test.
22         Q.    Was there any aspect of either test that you were
23    uncomfortable with?
24         A.    Oh, no.
25         Q.    And is this oversight of testing consistent with
```

1    your 30 plus years of experience at NSF?

2        A.    It's what I do.

3        Q.    Thank you, Mr. Herman.

4              Could I have RDX-7.26?

5              Mr. Herman, what's shown on RDX-7C.26?

6        A.    Okay.  It's showing, on this one, the products

7    that were tested at Helen of Troy; however, I'm not basing

8    my opinion on the IT1326.  I believe that was inadvertently

9    left into this table.  I apologize for that.

10             But IT1370, which is the DuPont PTC-100, 2005

11   version, the lot code 5264 was tested at Helen of Troy.

12             And IT1371, which is also -- which is a PUR

13   1-stage, the 1450Z variant, without the indicator, was also

14   tested, and it had a lot code of 6171.

15       Q.    Thank you, Mr. Herman.  There's red and blue

16   shown on this chart.  What is that meant to mean?

17       A.    That just makes it easier to differentiate

18   between the different examples of prior art.

19       Q.    So the red would mean -- would mean DuPont?

20       A.    Red would mean DuPont.  The dark blue is PUR.

21       Q.    Thank you, Mr. Herman.

22             Could I have 7C.28, RDX-7C.28?

23             What is shown here, Mr. Herman?  I should

24   actually make that RDX-7C.27.

25             What is shown here on RDX-7C.27?

1    A.    These were six of the filters that were evaluated

2  by QFT.  The identification in the far left column, 2-A, 2-B

3  were DuPont PTC-100 filters, the 2007 version.  The 2-A had

4  a lot code of 7039 and so did the 2-B.

5         The two blue in the middle are Brita's legacy

6  filters, the OBO3.  They are identified as 3-A and 3-B.  We

7  weren't confident that we could actually read the codes that

8  were on top and what they meant, so we don't really have

9  codes for those.

10        4-A and 4-B were the PTC-100 2005 versions.

11  Those both had a lot code of 6254.

12    Q.    Thank you.  Let's take a look at RDX-7C.28.

13    A.    These are QFT specimens that were tested for the

14  PUR 1-stage, which there was, as we mentioned earlier, there

15  was one test at Helen of Troy.  We had three that we tested

16  at QFT.  5-A was 1450Z variant with a lot code of

17  6171602002.

18        5-B was also a 1450Z 1-stage that had a lot code

19  of 6158602002.

20        And then 7-A is a 1450 version, which means it

21  had the indicator on the top of it, and that has a lot code

22  of 5288602001.

23    Q.    Thank you, Mr. Herman.  I'm going to interrupt

24  you for one moment.

25        What does the status column mean for all of the

1  products we discussed on RDX-7.2C, RDX-7C.27, and RDX-7C.28?

2      A.   The "sealed" indicates that prior to testing they

3  were within their sealed pouch and they were unopened, you

4  know, they were properly sealed.

5           You'll notice on 9-A and 10-A they were marked as

6  unsealed.  These had been allowed to be exposed to the

7  elements prior to the testing, so I actually do not rely on

8  those because who knows what kind of situation or what could

9  occur to those filters being unsealed.

10     Q.   Thank you, Mr. Herman.  Did you see any evidence

11  that any of the exhibits we've just discussed, these

12  specimens, were counterfeit --

13     A.   No.

14     Q.   -- tampered with --

15     A.   No.

16     Q.   -- left in a non-temperature controlled

17  environment at any time?

18     A.   I wouldn't be able to tell, but no.

19     Q.   Otherwise altered or tampered with?

20     A.   No.

21     Q.   Can I have RDX-7C.29?

22          I want to talk about your testing now.  What is

23  shown on RDX-7C.29?

24     A.   Well, there are a couple of photographs inside

25  the different laboratories.  Helen of Troy is on the left,

1   and it shows the bench where they had some of the filters

2   that they were performing testing on.  The smaller picture

3   shows Mr. Mitchell running his SEM to do an analysis.

4           And the right photo is the quality filter testing

5   lab.  That shows Jaime Young performing the testing on the

6   filters, and also the smaller image shows his ICP mass spec,

7   which did the lead analyses.

8       Q.  Mr. Herman, did you visit both sites as part of

9   the testing?

10      A.  Yes, I actually -- I did several things.  I

11  reviewed the protocol, made sure it was appropriate, made

12  some suggested modifications to those protocols.  I

13  interviewed the different people that were conducting the

14  tests, and I actually observed them perform the tests and

15  made sure they were performing them properly.

16          I visited each location and also inspected the

17  equipment and all the instruments they were using to make

18  sure they were properly calibrated and suitable for the

19  purpose.

20      Q.  Give a brief overview as to how both Helen of

21  Troy labs and Quality Filter Testing labs tested the prior

22  art filters for flow rate and effluent lead for the FRAP

23  equation.

24      A.  Without boring everybody to death, I think,

25  essentially, they would prepare the influent challenge in a

1   carbol large enough to be able to feed their tests that they

2   were going to do that day.  They were prepared according to

3   the procedures that we had outlined, performed tests on it

4   to make sure it was meeting specification.

5        They would pour that influent in 1-liter

6   allotments into the upper receiving trays of the filter

7   apparatus.  It would pass through the filter, and then they

8   would collect the effluents, measure, verify that they had

9   the correct amounts.

10        And then also at sample points they would be

11   sampling the effluent to determine whether or not -- or

12   actually measure the amount of lead in the effluent.

13        For the actual filter rate testing at each one of

14   those sample points, they would put 1 liter into the vessel

15   and start a stopwatch.  And then when the vessel had

16   emptied, they would stop the stopwatch, and that would be

17   their time for treatment for 1 liter.

18   Q.    Thank you, Mr. Herman.  I'd like to first discuss

19   the flow rate calculations that you did do.

20        Did you determine through the testing at Helen of

21   Troy labs and the Quality Filter Testing Laboratory testing,

22   did you determine the average time in minutes that it takes

23   each filter to filter one liter of water averaged over the

24   filter usage lifetime?

25   A.    Yes, I was able to calculate that from the data

1   that was provided by each laboratory.

2       Q.   And how many samples of that 1-liter flow rate

3   time did you take over the lifetime of each of the filters?

4       A.   It was between 5 and 6 samples that were taken

5   over the lifetime to be able to calculate that.

6       Q.   I'd like to show you RDX-7C.30.

7            What is shown here, Mr. Herman?

8       A.   Okay.  These are the different sample points that

9   are taken for the tests.  For example, the first liter, 37

10  liters in, 76, 114, 151, that's equivalent to the different

11  points where you'd say start up 25 percent, 50 percent, 75,

12  and 100 percent of life.

13      Q.   And you cite some documents here at the bottom,

14  RX-684C through RX-707C.  Do you see that?

15      A.   Yes, I do.

16      Q.   What documents are those, Mr. Herman?

17      A.   Those are the test results for these products.

18      Q.   Are those the test results for QFT?

19      A.   Yes.

20      Q.   Okay.  And what is RX-986C?  Is that the Helen of

21  Troy testing results?

22      A.   I believe it is.

23      Q.   If I could -- could you please give your

24  conclusions as to the average flow rate of the PUR 1-stage

25  you determined?

1    A.    Okay.  So the PUR 1-stage, which is in the lower

2  table there, there were four different samples that were

3  tested, 5-A, 5-B, 7-A, and 7-B -- I mean 7-A and the Helen

4  of Troy 1371.

5         So each one of those, we took those values that

6  were measured at each one of those sample points, averaged

7  them to develop the average flow rate that's reported in the

8  last column.

9         So for 5-A, it would be 6.51 minutes per liter;

10  5-B, 5.84 minutes per liter; 7-A would be 11.16 minutes per

11  liter; and the 1371 would be 6.21 minutes per liter.

12    Q.   And going back to the Brita filter, just briefly,

13  Mr. Herman.

14         Are the average flow rates that you determined at

15  5.42 and 5.79, are those consistent with what Brita

16  represents in its patent what the average flow rate of its

17  Brita legacy granular filter is?

18    A.   Yes, I believe in Table 2 of the patent and also

19  in Table 5 -- I'm sorry, that would be 3 and 5 -- of the

20  patent, it indicated that the Brita legacy filter, I believe

21  they put in a value of 5.5.

22    Q.   Thank you, Mr. Herman.  I'd like to now go to

23  RDX-7C.31.

24         What is shown here, Mr. Herman?

25    A.   This is the testing results from both Helen of

1    Troy and QFT for the Recura, Protect Plus, DuPont PTC-100s.

2         Q.   And could you please describe what your results

3    were for the average flow rate for the DuPont PTC filters?

4         A.   Certainly.  So for items 2-A and 2-B, they were

5    both the 2007 version of the specimen, and the average flow

6    rate for those, for 2-A was 11.87, and the average for 2-B

7    was 11.99.

8              For the 4-A and 4-B and the HOT 1370 of the 2005

9    versions, the 4-A was a average flow rate of 10.28; 4-B,

10   10.60; and 1370, 5.05.

11        Q.   Mr. Herman, why did you take five sample points

12   for the DuPont PTC and the preceding Brita and PUR products?

13   Why did you use five equally spaced sample points?

14        A.   Because that's really standard practice in the

15   industry, and it's definitely standard practice in NSF

16   Standard 53.

17             For example, in NSF standard 53, we use anywhere

18   from four to six samples to establish any performance

19   characteristics of a filter.  So when we're doing lead

20   testing, we actually, to determine its capacity and

21   determine its performance over its 200 percent, let's say,

22   we'll actually collect six sample points, and that will

23   attribute that performance metric to that product.

24             So doing flow rate, which would, according to my

25   reading of the patent, has equal importance in the equation

1   as it does to lead, sampling of that, similar sample points

2   would be considered appropriate.

3       Q.   Mr. Herman, what does the '141 patent examples

4   tell us about measuring average flow rate over the unit

5   lifetime L?

6       A.   Well, when you look at Table 3 --

7       Q.   Can I have Table 3 of JX- -- thank you.

8           Can I look at the first three examples for

9   Mr. Herman?  If possible, could we just have the flow rate

10  lines highlighted?

11          Please proceed.

12      A.   Okay.  So if you look at the far right, there's a

13  column and for Brita granular it shows 5 minutes 32 seconds.

14  So these are minute/seconds.  This isn't a decimal.  So 5

15  minutes 32 seconds.

16          If you actually take all the values to the left

17  that are represented in this table, they will equal 5

18  minutes and 32 seconds.

19          MR. AINSWORTH:  Objection, Your Honor.

20  Your Honor, objection.  I'm sorry.

21          JUDGE MCNAMARA:  What's the basis of the

22  objection, Mr. Ainsworth?

23          MR. AINSWORTH:  This is, again, outside the scope

24  of his report, Your Honor.  Once again, Mr. Herman is

25  providing opinions about the data in the '141 patent that he

1    didn't provide in his report trying to explain his flow rate

2    calculation, which, as you may recall, was the subject of a

3    motion in limine.

4         He is trying to backfill his opinion.

5    Your Honor, he didn't disclose his basis in his report and I

6    feel it should be precluded.

7         JUDGE MCNAMARA:  Mr. Swain, what's your response

8    to Mr. Ainsworth?  He has got a valid point here.

9         MR. SWAIN:  Your Honor, Mr. Herman talked about

10   the sampling practice of the '141 patent in his report and

11   my colleagues are bringing it up right now.  He also

12   discussed it in his deposition.

13        He is merely pointing out merely arithmetic

14   within the patent and how those were determined.

15        He used sampling points and he is explaining how

16   he justified his sampling points in his report.

17        JUDGE MCNAMARA:  Do you have those paragraphs

18   yet?  Or we can do the same thing, in the interest of time,

19   we can do the same thing we did with the previous two sets

20   of objections.

21        I'll provisionally allow this, and, Mr. Swain,

22   you're going to have to substantiate where in deposition

23   testimony, expert reports, et cetera this opinion was given,

24   and explain.

25        Mr. Ainsworth, either I will strike or you will

1   have an opportunity to file a motion to strike.

2           Are you satisfied with that so that we can

3   proceed?

4           MR. AINSWORTH:  I am, Your Honor.  Thank you.

5           JUDGE MCNAMARA:  Okay.  Thank you.

6           MR. SWAIN:  Thank you, Your Honor.  One of the

7   reasons, I'll represent, it's taken me aback a little bit,

8   because we served these demonstratives and discussed this

9   last night and didn't hear anything from them.

10          But we're happy to show you where in the report

11  he calculates and shows that the '141 patent uses sample

12  rates within the body of his report per your instructions.

13          JUDGE MCNAMARA:  I'll give you more instructions

14  on the three provisional allowances of testimony for today a

15  little later on.

16          MR. SWAIN:  Sure.  Thank you, Your Honor.  Just

17  one additional question.

18  BY MR. SWAIN:

19      Q.  Mr. Herman, how is the PUR 2-stage average flow

20  rate calculated in your eyes in the '141 patent?

21      A.  In this case it's actually calculating from three

22  datapoints.

23      Q.  Thank you.  Mr. Herman --

24      A.  Could I add, please, to this?

25      Q.  Please.

1    A.    The other issue is the patent doesn't explicitly

2    state anywhere in it that you have to sample at every liter.

3    And in the tables you can see discrete sample points with

4    measurements of flow rate, individual flow rates.

5            So as a person of ordinary skill in the art and

6    the fact that that's the way tests are all through the

7    standards, including 53, on how the tests are run, you would

8    assume that taking a sample point for a flow rate at each

9    one of these points would be perfectly reasonable.

10    Q.    Thank you, Mr. Herman.  Is the flow rate -- I

11    want to go back to the PTC-100 flow rate that you observed

12    in RDX-7C.31.

13            And I'm going to need to go onto the Brita

14    confidential record now, Your Honor.

15            (Whereupon, the hearing proceeded in confidential

16    session.)

17

18

19

20

21

22

23

24

25

Appx23068-23069 redacted in their entirety

1                O P E N   S E S S I O N

2

3    BY MR. SWAIN:

4        Q.    Mr. Herman, let's have RDX-7.35 -- 7C.35 up.

5              So, Mr. Herman, we've got almost everything we

6    need.  What is the last thing we need to determine to get

7    our FRAP calculation?

8        A.    We need lead.

9        Q.    Let's find our lead, Mr. Herman.  I want to first

10   provide you RX-709 and 710, if I could, Mr. Kotarski.

11             What are the documents here shown for -- on the

12   screen?

13       A.    Okay.  These are printouts of the data that was

14   generated under Mike Mitchell's instrument, the ICPOES, that

15   had performed the analysis for the lead in the influent and

16   the effluent of the data that he had provided.

17       Q.    This is the Helen of Troy testing?

18       A.    Yes, the Helen of Troy testing.

19       Q.    Thank you.  Could I have now RX-684, 685, 686,

20   687, 688, 689, 690, 691, 692, 693, 694, 695, 696, 697, 698,

21   699, 700, 701, 702, 703, 704, 705, 706, and 707.

22             It's a lot here, Mr. Herman, but hopefully you

23   recognize these.  If we could zoom up a couple on the upper

24   left.

25             What is shown here from RX-684 through RX-707?

1       A.   Could you zoom in on RX-684, please?

2            Okay.  These are the data sheets and the analysis

3   results from the QFT testing of the products.

4       Q.   Thank you, Mr. Herman.

5            Now do you have a demonstrative of the results

6   from the FRAP testing from both Helen of Troy and QFT that

7   you rely upon?

8       A.   Yes.  Yes, I do.

9       Q.   Can I have RDX-7C.32, please.

10           What is shown here, Mr. Herman?

11      A.   Okay.  On this one we're looking at the PUR

12  product.  This is the 1-stage product with samples from QFT

13  and Helen of Troy, IT1371.

14           The first three have the same volume of 177

15  milliliters.  Their lifetime for all four samples on this

16  table are 40.  However, the first one, 1371, had a flow rate

17  of 6.2 minutes per liter, effluent level of 12.1, and so the

18  calculation for the FRAP was 166.

19           The QFT 5-A sample, same volume, 177, and 40 is

20  the lifetime, but the flow rate was 6.51, effluent was 11.3,

21  and the FRAP value of 162.8.

22           The QFT 5-B, again, the same volume, 177, the

23  same lifetime of 40.  However, the flow rate was 5.842,

24  effluent was 11.4, and the FRAP calculated to 147.3.

25           QFT 7-A, which is the 1450 version on this table,

1   has a volume of 188, a lifetime of 40, flow rate of 11.16

2   minutes per liter, effluent of 5.7, and a FRAP of 149.5.

3       Q.   Thank you, Mr. Herman.  Let's talk about the

4   Brita legacy calculations that you obtained.

5           Can I have RDX-7C.33.

6       A.   Yes.  These are the two samples that we tested at

7   QFT of the Brita OBO3.  The 3-A sample, first I should

8   probably say that they both have the same volume of 138

9   milliliters, a lifetime of 40 gallons.

10          The 3-A sample had a flow rate of 5.422, effluent

11  of 15.3, which calculated to a FRAP of 143.1.

12          The 3-B sample, same volume, and lifetime as 3-A,

13  with a flow rate of 5.79, an effluent of 17.5, and a FRAP of

14  174.7.

15      Q.   Thank you, Mr. Herman.

16          And could I have RDX-7C.34.

17          What is shown on RDX-7C.34?

18      A.   This is testing results for the DuPont PTC-100

19  and a FRAP for the FRAP calculation.  So the first three are

20  the 2005 version.  The IT1370 was tested at Helen of Troy.

21  Volume for all the samples was 114 milliliters, lifetime 40

22  gallons.

23          The flow rate for the IT1370 was 4.75 minutes per

24  liter, effluent at 18.56 with a FRAP of 125.6.

25          The QFT 4-A 2005 version had a flow rate of

1   10.284, an effluent of 4.2, and a calculated FRAP of 61.5.

2          The QFT 4-B samples, also 2005 version, had a

3   flow rate of 10.596, effluent of 4.9, lifetime of 40 --

4   sorry -- I said that several times -- FRAP 74.

5          And the last two samples are QFT 2-A and 2-B,

6   which are both 2007 versions.  The 2-A had a flow rate of

7   11.868, effluent of 3.3, and a FRAP of 55.8.

8          The 2-B version, 2007, had a flow rate of 11.99,

9   effluent of 3.8, and a FRAP of 64.9.

10     Q.   Thank you, Mr. Herman.  Now does Brita agree with

11  the results of your testing?

12     A.   I don't think so.

13     Q.   Do you understand specifically Brita argues that

14  the influent water went out of spec early on in your

15  testing?  Do you understand that to be an argument?

16     A.   Yes.

17     Q.   Okay.  What is your response to that argument,

18  Mr. Herman?

19     A.   Well, essentially, that within the '141 patent

20  itself, it demonstrates that incursions from the

21  specifications are allowed when calculating a FRAP value.

22     Q.   Do you believe that going under early on in the

23  test -- let's frame it, Mr. Herman.

24          How -- when we talk about under specification,

25  how far under did the testing go for influent lead?

```
 1         A.    Well, in one of the embodiments the influent at
 2    the beginning of the test, the particulate actually, was
 3    about 30 percent as well.
 4         Q.    Actually, Mr. Herman, I'm asking you about your
 5    testing, the QFT testing.  How far below did we go?
 6         A.    Okay.  So we had a few samples that were below in
 7    the early part of the testing where we were between 2 and 7
 8    percent below our specification.
 9         Q.    2 or 7 percent below as far as which aspect of
10    the lead?
11         A.    That was soluble lead.
12         Q.    Now you were saying about the '141 patent and
13    what it allows?
14         A.    Yes.  The '141 patent demonstrates in several
15    locations where you can go outside of the stated limits and
16    still calculate valid FRAP values.
17         Q.    Is your going outside on a sample point or two,
18    is that consistent with NSF protocol?
19         A.    Well, it depends on what specification you're
20    specifically referring to.  But there are allowances within
21    NSF Standard 53 that will allow some variances at single
22    points, but there are very strict rules on how that's
23    applied and when it is considered acceptable.
24         Q.    Setting that aside, do you believe that the lead
25    amounts that deviated early on in the test, do you believe
```

1    that had any material impact on your FRAP calculations?

2         A.   No, I don't believe they do.  When you have --

3    when you pull a sample at 100 percent, there's two major

4    effects that are going on that's going to control how much

5    effluent lead is present.

6              One is what exactly you have in the test water

7    that's going into the filter at that time, how much lead you

8    have, how much particulate, and how much fine particulate

9    you have going in is going to effect it.

10             The second is how much loading, how much lead has

11   loaded onto that filter over its lifetime up to that point,

12   because that will have a direct effect on what capacity is

13   available to be able to remove the lead, you know, what are

14   the conditions within the filter.

15        Q.   Mr. Herman, did this impact all of the samples

16   you tested?

17        A.   Pardon?

18        Q.   The slight low on the soluble lead that you just

19   discussed, did that impact all of your samples?

20        A.   No, it didn't.  Actually the 7-A sample that was

21   a 1450 PUR 1-stage did not experience any of those effects.

22        Q.   Thank you, Mr. Herman.  Now did you do anything

23   to confirm the lead performance testing of those very same

24   filters that experienced a little bit of underage during the

25   initial testing?

1    A.    Yes.  I realized that having some low values

2    early on in the tests would be pretty contentious, so I

3    actually requested that we continue and basically restart

4    the sample after that point at 20 gallons and extend the

5    test another 40 gallons so that we would have data that

6    demonstrates the performance for 40 gallons without any low

7    levels.

8    Q.    Can I have RDX-7C.36, please.

9          Could you explain to the Court what is shown here

10   with respect to your testing?

11   A.    Okay.  So this is a line graph you could

12   basically say of how much water we're putting through a

13   filter.

14         Over on the far left you got a little blue bar

15   there that's called the COND.  It's actually conditioning

16   water.  So depending on manufacturer's instructions, you're

17   going to put some water through.  It's very common to put

18   two batches through to prepare the filter to be able to

19   perform.  And then you actually start your test.  So that's

20   the point where you say zero.

21         And then you're performing the test, we got up to

22   20 gallons, and we're like, okay, we have some challenges

23   here with our influent water.  So what I effectively did is

24   made that first 20 gallons all conditioning, in other words,

25   we're going to ignore this.  We're going to pretend that

1   this was conditioning water.  And then so we basically

2   restarted the test at 20 gallons and ran it all the way out

3   to 60.

4       So we reported the first 40, because actually I

5   don't have a real problem with that data, but we wanted to

6   confirm that we weren't doing, you know, making a major

7   effect on the FRAP value so we ran the additional 40

8   gallons.

9       Q.  And so you restarted testing or at least parallel

10  testing, do I understand, at the 20-gallon mark here on

11  RDX-7C.36?

12      A.  We essentially restarted the last 40 gallons at

13  that 76 liter mark.

14      Q.  Mr. Herman, did that 20-gallon mark when you

15  started the second test -- how were those filters feeling?

16      A.  They got a lot of lead in them.  They are feeling

17  a little tired, I guess you could say, but they still have

18  quite a bit of capacity.

19      I mean, these filters are designed to be able to

20  go to 80 gallons.  So I didn't feel they were going to reach

21  exhaustion by the end of the study.

22      Q.  Do you believe that running 20 gallons of lead

23  challenge water before you even began your measurement of

24  lifetime had -- materially impact the FRAP value of your

25  second 40 testing?

1    A.   Well, adding all that lead and everything into

2    the filter, I don't -- I don't think it would certainly make

3    the filter perform better.  So you would expect your FRAP

4    value could be impacted, but, if it did, it would be

5    negatively.

6    Q.   Can I have -- do you have a demonstrative showing

7    your results from the continued second 40 testing?

8    A.   Yes, I do.

9    Q.   Can I have RDX-7C.37, please?

10        What is shown here, Mr. Herman?

11    A.   Okay.  This is what we would consider all the

12    testing, including the first 40 and the last 40.  So,

13    essentially, it's the same table as we saw before, but it

14    has those last 40 gallons, the additional extended test, for

15    5-A and 5-B.

16    Q.   Why is there no, quote/unquote, last 40 for the

17    7-A filter?

18    A.   Because the 7-A actually started after that

19    point, so it was never exposed to the lower levels of lead.

20    Q.    In the interest of completeness, could I have you

21    read in the last 40 readings for the 5-A and 5-B samples,

22    Mr. Herman?

23    A.   Certainly the QFT sample 5-A for the last 40

24    gallons: volume 177; flow rate, 7.42; effluent, 6.9, at a

25    lifetime of 40 gallons, yields a FRAP of 113.3.

1    The QFT 5-B sample for the last 40 gallons of

2    testing: volume 177; flow rate, 6.983; effluent at 5.4;

3    lifetime of 40 gallons; a FRAP of 86.5.

4    Q.    Thank you, Mr. Herman.

5    Could I have RDX-7C.38?

6    Mr. Herman, could you please explain what's shown

7    here as far as the last 40 testing?

8    A.    The same thing we saw on the previous slide but

9    this time for the Brita.

10    We continued it out for that last 40 of the test

11    for products or samples 3-A and 3-B.  So the last 40 for

12    3-A: again, volume 138; flow rate, 5.76; our effluent value

13    was 3.5; lifetime still 40; FRAP 34.7.

14    The QFT 3-B for the last 40: again, 138 for the

15    volume; 6.11 is the flow rate; effluent at 4.8; lifetime of

16    40 gallons; gives you a FRAP of 51.6.

17    Q.    Thank you, Mr. Herman.

18    Can I have RDX-7C.39?

19    What is shown here, Mr. Herman, with respect to

20    your last 40 testing for the QFT samples?

21    A.    This is now the DuPont PTC-100's.  There was a

22    total of four samples being tested by QFT, so there are four

23    instances where we extended into the last 40 gallons.

24    Here we go.  So the volume is all 114

25    milliliters.  Lifetime is all 40 gallons.  So for QFT 4-A,

1   last 40 gallon sample, the flow rate is 13.07; the effluent

2   at 4.2, which gives you a FRAP of 78.2.

3           For the sample 4-B, for the last 40, that has a

4   flow rate of 13.41; effluent of 1.7; and a FRAP of 32.5.

5           QFT 2-A sample, which is the 2007 version, the

6   last 40 is 15.01 is the flow rate; 2.2 is the effluent; and

7   it calculates to 47.1 FRAP.

8           And the last sample of the 2-B last 40 is 14.82

9   flow rate, 2.6 in the effluent, which calculates to a 54.9

10  FRAP.

11      Q.   Mr. Herman, for both the first 40 and last 40

12  samples that you ran, are you confident that 40 gallons of

13  compliant challenge water under the '141 patent was run

14  through these filters?

15      A.   Yes.

16      Q.   Let's look at RDX-7C.40.

17           What is shown here, Mr. Herman?

18      A.   So these are all of the parameters that you would

19  need, including the FRAP for the PUR 1-stage, Brita, and the

20  DuPont PTC-100.

21           So we show that they each are a gravity-fed

22  system, they all contain activated carbon, they also

23  include -- they all include a lead scavenger.

24      Q.   Thank you, Mr. Herman.

25           So could I have RDX-7C.41.

1    How does that inform your opinion as to whether
2    these three filters meet the claims of claims 1 and 2 of the
3    '141 patent?
4    A.    So based on claim 1 that requires a FRAP of under
5    or about 350, the PUR 1-stage is certainly below that with a
6    maximum value of 166;
7        The Brita OBO3 is also below that value with
8    174.7;
9        And the DuPont PTC-100 is also below that value
10    with a 125.6.
11        So in that case all three of them meet the
12    requirements of claim 1.
13    Q.    Can I have RDX-7C --
14    A.    Excuse me.  I forgot to finish my statements
15    regarding claim 2.
16    Q.    Please continue, Mr. Herman.  I'm so sorry.
17    A.    All right.  So claim 2 requires a FRAP of
18    equivalent or less than 200, and in this case the PUR
19    1-stage is 166, which is below the 200 and it meets claim 2.
20        The Brita is 174.7, as its maximum FRAP, and that
21    also is below 200.
22        And the DuPont PTC-100 has a maximum FRAP of
23    125.6, which is also below 200.
24        So all three embodiments -- not embodiments --
25    but prior art meet claim 2.

1    Q.   Can I have RDX-7C.42, please, Mr. Kotarski.

2         Mr. Herman, what's shown here as far as your

3    opinions as to whether PUR 1-stage, the Brita legacy

4    granular, and the DuPont PTC 100 meet claims 3 and 4 of the

5    '141 patent?

6    A.   Well, claim 3 is a statement regarding less than

7    or approximately less than or equal to 300 milliliters for

8    the volume of the media, and the PUR 1-stage I had measured

9    177 and 188 milliliters volume, which is below the 300, so

10   that would meet claim 3.

11        The Brita legacy filter, OBO3, had 138

12   milliliters volume, and which is significantly also below

13   the 300 mls, so it would meet claim 3.

14        And the PTC-100 had 114 milliliters, which is

15   significantly below 300 to meet claim 3.

16        Also, claim 4 is met by the Brita legacy filter,

17   since it is below 150 milliliters at 138.

18        And the DuPont PTC-100 is also below and meets

19   claim 4 at 114 milliliters.

20   Q.   Thank you, Mr. Herman.  Let's talk about claims 5

21   and 6 briefly.

22        Could I have RDX-7C.43?

23        What is shown here, Mr. Herman?

24   A.   These are the flow rates that we observed for

25   these different products.  And in relation to claim 5, which

1    puts an upper limit of 12 minutes per liter, for claim 5 we

2    see that the PUR 1-stage has a maximum flow rate of 11.16,

3    which is below 12, so it meets claim 5.

4            For Brita, we see a maximum flow of 6.1, which is

5    below 12, which meets claim 5.

6            And the PTC-100 has a range of 5 to 12 --

7    actually it's 11.99 -- and that meets claim 5, as it being

8    approximately equal to or less than 12 minutes per liter.

9            I also note that the Brita had four samples,

10   three of them were below 6, so I'm willing to conclude that

11   the Brita also meets claim 6 of being 6 minutes per liter or

12   less.

13       Q.   Thank you, Mr. Herman.

14            Could you remind the Court what the '141 patent

15   tells us the flow rate of the Brita legacy granular filter

16   is?

17       A.   In their table they indicate that it was 5.5.

18       Q.   Thank you, Mr. Herman.

19            And let us not forget about claim 23.  Do you

20   have an opinion whether these filters when used in their

21   systems meet claim 23 of the '141 patent?

22       A.   Yes.  All three of these products, the PUR

23   1-stage, the Brita, and the DuPont PTC-100, are all

24   cartridges intended and solely meant to be used in

25   gravity-fed filter systems using pitchers or other such

1  similar devices to filter water with an upper reservoir, as

2  far as water reservoir, connected to a filter water

3  reservoir by the filter cartridge, and the cartridge

4  contains a filter, which includes the -- well, includes the

5  requirements of claim 1.

6      Q.   And other than the filter component of claim 23

7  being a FRAP of 350 or less, does Brita dispute any of the

8  other claim limitations of claim 23?

9      A.   No, I do not believe they do.

10     Q.   And did you inspect the pitchers that these

11  filters go into, some of these compatible pitchers?

12     A.   Yes.

13     Q.   Are those the ones RPX-105, RPX-153, and RPX-252

14  shown below?

15     A.   Mm-hmm.

16     Q.   Thank you, Mr. Herman.

17          Now, again, does Brita have some criticisms on

18  your testing?

19     A.   Yes, they do.

20     Q.   Okay.  Now, first of all, did Brita or any of its

21  experts come and inspect the laboratories where these were

22  tested?

23     A.   No.

24     Q.   Did they perform any full lifetime testing to

25  rebut your opinion?

```
 1        A.   No, they did not.

 2        Q.   And did they themselves hire -- strike that.

 3   Withdrawn.

 4             Let's talk about the criticisms Brita has about

 5   your testing.

 6             Could I have Brita's pre-hearing brief at 62?

 7             I can stay on the confidential record for that.

 8             (Clarification by reporter.)

 9             (Whereupon, the hearing proceeded in confidential

10   session.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx23086-23114 redacted in their entirety

1           O P E N   S E S S I O N

2

3           JUDGE MCNAMARA:  And I also wanted to give you

4    some dates for Dr. Hatch and Dr. Freeman's testimony.

5           I looked at my calendar.  I'm going to be gone

6    quite a bit in September and otherwise pretty well stacked

7    up.  So let me give you dates.

8           I can give you dates of October 5, 6, or 7 and

9    dates of 12, 13, or 14, both in October.

10          Now I gather you're going to need two days for

11   this, is that right, or are you going to need one day?

12          MR. AINSWORTH:  I think one day, Your Honor.

13          JUDGE MCNAMARA:  Go ahead.  Mr. Ainsworth?

14          MR. AINSWORTH:  I apologize.  I think we can do

15   it in one day.  Mr. Swain and I have tentatively talked

16   about that.

17          JUDGE MCNAMARA:  Okay.  Good.  So I've given you

18   six dates, so one of those dates should probably work.

19          MR. AINSWORTH:  Thank you, Your Honor.  We'll

20   confer with Mr. Swain and get back to you with a date.

21          JUDGE MCNAMARA:  That would be helpful.  Do you

22   think you could get back by close of business tomorrow?

23   That might be a problem.  I understand you have to contact

24   Dr. Hatch and Dr. Freeman.  Why don't you --

25          MR. AINSWORTH:  If we could have a couple days, I

1   think we can work it out.

2       JUDGE MCNAMARA:  Why don't you get back to me by

3   next Monday close of business.

4       MR. AINSWORTH:  Thank you, Your Honor.

5       MR. SWAIN:  Thank you, Your Honor.  We can do

6   that.  If we know earlier, we'll let you know earlier.

7       JUDGE MCNAMARA:  That would be great.  And the

8   way to do that is, again, just a quick filing, a

9   one-sentence, two-sentence paragraph on EDIS with a copy to

10  McNamara 337 so that we can formalize it again.

11      MR. AINSWORTH:  We will, Your Honor.  Thank you.

12      MR. SWAIN:  Thank you, Your Honor.

13      JUDGE MCNAMARA:  Is there any business that needs

14  to be dealt with before we close today, any other business?

15      MR. SWAIN:  There is just one issue that's been

16  brewing around.  I haven't had a chance to talk to

17  Mr. Ainsworth.  Because we have the extended hearing, the

18  satellite hearing, if you will, how we will handle

19  post-hearing briefing.  I don't know if we have an answer

20  today, but I wanted to get the Court and the parties

21  thinking about that.

22      JUDGE MCNAMARA:  Well, I'll have to -- I'll take

23  a look at the scheduling, and I will probably extend some

24  time.  I'm not sure how much.  It depends on how that eats

25  into time to write the ID.

1       MR. SWAIN:  Certainly.

2       JUDGE MCNAMARA:  We'll work that out, and I'll

3  take a look at the schedule again for post-hearing briefing,

4  and we'll talk about it, if not tomorrow, certainly we'll do

5  something before we take -- before we hear from Dr. Hatch

6  and Dr. Freeman so that this is resolved well in advance and

7  nobody is guessing.

8       MR. SWAIN:  That is much appreciated, Your Honor.

9  Thank you.

10      JUDGE MCNAMARA:  Yes.  We'll probably be dealing

11  with this tomorrow, which means I have to look at this

12  before tomorrow close of business.

13      The other issue that I have to resolve by

14  tomorrow is the issue of allowing the exhibits that were

15  cited to which there were objections, and that was this

16  morning.  We'll take a look at that, and I'll let you know

17  tomorrow.

18      I'm not inclined to step into the middle of a

19  stipulation that the parties themselves did not seem to

20  clearly understand on each side, but we'll get back to you

21  tomorrow about that.

22      MR. SWAIN:  Understood, Your Honor.  Thank you.

23      JUDGE MCNAMARA:  Okay.

24      MR. AINSWORTH:  Thank you, Your Honor.

25      JUDGE MCNAMARA:  All right.  So is there anything

1    else that should be addressed tonight?

2           MR. AINSWORTH:  Nothing from Brita, Your Honor.

3           MR. SWAIN:  Nothing further from Respondents,

4    Your Honor.  Thank you.

5           JUDGE MCNAMARA:  Okay.  Thank you very much.

6    Then I will see you tomorrow at 9:30.  Have a good evening,

7    everyone.

8

9           (Whereupon, at 5:35 p.m., the proceedings

10   adjourned, to reconvene the following day, August 23, 2022,

11   at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C O N T E N T S

2              INDEX OF WITNESSES

3
                                        RE-    RE-
     WITNESS                 DIRECT CROSS DIRECTCROSS

5    AIDEN ZHANG.................833    835

6    DOUG KELLAM.................842    898   914

7    ALISON HILL.................924    943

8    JOHN C. CRITTENDEN..........963    978   996

9    ROBERT V. HERMAN............1007

10

11

12

13   AFTERNOON SESSION                        962

14

15

16   CONFIDENTIAL SESSIONS     891-897      1031-1033

17                             911-915      1039-1054

18                             921-923      1068-1069

19                             947-968      1086-1114

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS

 2          LIST OF EXHIBITS SUBMITTED FOR ADMISSION:

 3          CDX-0008C

 4          CDX-0009C

 5          CDX-0009C

 6          CDX-0010C

 7          CDX-119

 8          CPX-0021C

 9          CPX-0022C

10          CPX-0022C

11          CPX-0024C

12          CPX-0024C

13          CPX-0059C

14          CPX-0059C

15          CPX-0060C

16          CPX-0060C

17          CPX-0061C

18          CPX-0061C

19          CPX-0063

20          CPX-0063C

21          CPX-0063C

22          CPX-0064C

23          CPX-0064C

24          CPX-0065C

25          CPX-0065C
```

| | |
|---|---|
| 1 | CPX-0068C |
| 2 | CPX-0068C |
| 3 | CPX-0074C |
| 4 | CPX-0115C |
| 5 | CPX-0126C |
| 6 | CX-0012C |
| 7 | CX-0024 |
| 8 | CX-0024 |
| 9 | CX-0060C |
| 10 | CX-0064C |
| 11 | CX-0074C |
| 12 | CX-0382C |
| 13 | CX-0471C |
| 14 | CX-0944C |
| 15 | CX-0957C |
| 16 | CX-192C |
| 17 | RDX-14C |
| 18 | RX-0848C |
| 19 | RX-1040C |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1    C E R T I F I C A T E

2    TITLE: IN THE MATTER OF CERTAIN HIGH-PERFORMANCE GRAVITY-FED

3    WATER FILTERS AND PRODUCTS CONTAINING THE SAME

4    INVESTIGATION NO.: 337-TA-1294

5    HEARING DATE: August 22, 2022

6    LOCATION: Washington, D.C. - REMOTE

7    NATURE OF HEARING: Evidentiary Hearing

8         I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9    above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:  August 22, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative

13

14        I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//     Raymond G. Brynteson

20

21        I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//     Linda Kenkade

25

Heritage Reporting Corporation
(202) 628-4888

Appx23122

1    UNITED STATES INTERNATIONAL TRADE COMMISSION

2    Washington, D.C.

3    Before the Honorable MaryJoan McNamara

4    Administrative Law Judge

5

6    ------------------------------x

7    In the Matter of              Investigation No.

8

9    CERTAIN HIGH-PERFORMANCE       337-TA-1294

10    GRAVITY-FED WATER FILTERS AND

11    PRODUCTS CONTAINING THE SAME

12    ------------------------------x

13

14

15    EVIDENTIARY HEARING

16    Tuesday, August 23, 2022

17    Volume V

18

19        The parties met via remote videoconferencing

20    pursuant to notice of the Administrative Law Judge at 9:30

21    a.m. Eastern.

22

23

24

25    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

1  A P P E A R A N C E S:

2  (all parties appeared remotely)

3

4  For Complainant Brita LP:

5          STERNE, KESSLER, GOLDSTEIN & FOX, PLLC

6          1100 New York Avenue, NW

7          Washington, DC 20005

8          (202) 371-2600

9          painsworth@sternekessler.com

10              Paul A. Ainsworth, Esq.

11              Josephine Kim, Esq.

12              Uma Everett, Esq.

13              Lauren Watt, Esq.

14              Robert E. Niemeier, Esq.

15

16

17

18

19

20

21

22

23

24

25  CONTINUED ON FOLLOWING PAGE

```
1    A P P E A R A N C E S (continued):

2

3    For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

4    Limited:

5            ALSTON & BIRD LLP

6            950 F Street, NW

7            Washington, DC 20004

8            (202) 239-3025

9            Pur-ITC@alston.com

10                Adam D. Swain, Esq.

11                Thomas W. Davison, Esq.

12

13

14

15            ALSTON & BIRD LLP

16            101 S. Tryon Street

17            Charlotte, North Carolina 28280

18            (704) 444-1000

19            Pur-ITC@alston.com

20                Karlee N. Wroblewski, Esq.

21

22

23

24

25    CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents PUR Group, Kaz USA, Inc., and Helen of Troy

 4   Limited:

 5           ALSTON & BIRD LLP

 6           1950 University Avenue

 7           East Palo Alto, California 94303

 8           (650) 838-2000

 9           Pur-ITC@alston.com

10               Katherine G. Rubschlager, Esq.

11

12

13   For Respondents EcoLife Technologies, Inc., and Qingdao

14   Ecopure Filter Co., Ltd.:

15           CALFEE, HALTER & GRISWOLD LLP

16           1405 East Sixth Street

17           Cleveland, Ohio 44114

18           (216) 622-8200

19           ecopure_brita@calfee.com

20               Todd R. Tucker, Esq.

21               Jack R. Smith, Esq.

22               Brad Liu, Esq.

23               Ashley J. Earle, Esq.

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5        BAKER & HOSTETLER LLP

 6        1801 California Street

 7        Denver, Colorado 80202

 8        (303) 764-4072

 9        zerowater-itc@bakerlaw.com

10            Jared A. Brandyberry, Esq.

11

12        BAKER & HOSTETLER LLP

13        1050 Connecticut Avenue, NW

14        Washington, DC 20036

15        (202) 861-1633

16        zerowater-itc@bakerlaw.com

17            Cassandra J. Simmons, Esq.

18

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5         BAKER & HOSTETLER LLP

 6         One North Wacker Drive

 7         Chicago, Illinois 60606

 8         (312) 416-6200

 9         zerowater-itc@bakerlaw.com

10             John S. Letchinger, Esq.

11

12         BAKER & HOSTETLER LLP

13         1735 Market Street

14         Philadelphia, Pennsylvania 19103

15         (215) 568-3100

16         zerowater-itc@bakerlaw.com

17             Jeffrey J. Lyons, Esq.

18             Phillip D. Wolfe, Esq.

19

20

21

22

23

24

25   CONTINUED ON FOLLOWING PAGE
```

```
 1   A P P E A R A N C E S (continued):

 2

 3   For Respondents Zero Technologies, LLC and Culligan

 4   International Co.:

 5           BAKER & HOSTETLER LLP

 6           312 Walnut Street

 7           Cincinnati, Ohio 45202

 8           (513) 929-3400

 9           zerowater-itc@bakerlaw.com

10               Derek M. Freitas, Esq.

11

12

13   For Respondent Vestergaard Frandsen Inc. d/b/a LifeStraw:

14           K&L GATES

15           70 W. Madison Street

16           Chicago, Illinois 60602

17           Vestergaard1294@klgates.com

18               Jeffrey R. Gargano, Esq.

19               Nelson M. Hua, Esq.

20               Devon C. Beane, Esq.

21               Ewa Wojciechowska, Esq.

22

23

24

25               ** Index appears at end of transcript **
```

```
 1              P R O C E E D I N G S
 2              (In session at 9:30 a.m.)
 3         JUDGE MCNAMARA:  One of the things I wanted to
 4    talk about today and I will actually, I think, bring it up
 5    after lunch, I took a look at the scheduling for
 6    post-hearing briefing and it's pretty clear that your briefs
 7    are due right now before we'll hold the hearing or the
 8    remainder of the hearing with Dr. Hatch and Dr. Freeman.
 9              So I'll adjust that later today so that there's
10    time for the briefing, and we'll adjust other dates as
11    necessary.
12         MR. SWAIN:  Thank you, Your Honor.
13         MR. AINSWORTH:  Thank you, Your Honor.
14         JUDGE MCNAMARA:  So I guess I'll hear from you
15    next week about which of the dates that I gave you that you
16    will have selected.
17         MR. SWAIN:  Well, Your Honor, Respondents, we
18    just confirmed our last person is available, we can do any
19    of the dates that you're available for so long as the
20    hearing is a remote one, and that includes Dr. Hatch.
21         JUDGE MCNAMARA:  It will be remote.  We have
22    already started down this path.  There's a lot of new
23    technology in at least one of the courtrooms, and I know
24    they are adding additional technology to some of the others.
25    It's going to be quite wonderful.  It's very different.  So,
```

1   yeah, I'm expecting that this will be remote.  I expect that

2   I won't start having in-person hearings until sometime in

3   November.

4           Okay.  So Mr. Ainsworth, have you had a chance to

5   look at any of the dates and talked to your client?

6           MR. AINSWORTH:  We have, Your Honor.  I don't yet

7   have Dr. Freeman's availability, but hopefully later today

8   or tomorrow I should have our date.

9           JUDGE MCNAMARA:  Just let me know.  I'm open, so

10  I gave you any of those dates, whatever works.

11          MR. AINSWORTH:  Thank you, Your Honor.

12          JUDGE MCNAMARA:  Okay.  The other thing I'll get

13  back to you on this morning, yesterday before lunch

14  Mr. Davison and Ms. Watt argued with respect to the disputed

15  exhibits that were listed on certain demonstratives.

16          When I went back, I realized that the only

17  demonstratives that were directly addressed were Mr. Green's

18  and not Dr. Rockstraw's or Mr. Ramirez's.

19          So maybe I missed something, but I did not see

20  the actual demonstratives that were at issue.  I just saw

21  the exhibit numbers.  So can you tie those to

22  demonstratives, first of all, the disputed exhibits?

23          MR. AINSWORTH:  Yes, Your Honor, we can

24  definitely tie those to the demonstratives and where those

25  demonstratives were discussed in the record as well if that

1    would be helpful.

2         JUDGE MCNAMARA:  Yeah, I think so.  I just want a

3    list of just the demonstrative numbers that were at issue so

4    that when I issue an order and give it to you orally as well

5    that it's quite precise so that we're clear.

6         MR. AINSWORTH:  Thank you, Your Honor.  There

7    wasn't any objection to the demonstratives coming in as

8    evidence.

9         JUDGE MCNAMARA:  No, no, I know, it was the

10   exhibits.

11        MR. AINSWORTH:  All right.  Just so that's clear.

12        JUDGE MCNAMARA:  Demonstratives aren't evidence,

13   but the problem is that the demonstratives contain summaries

14   that came from an extensive number of exhibits, and it would

15   not only be difficult for the other side to go back and

16   correlate the two, but it would be difficult for our team.

17   We would have to go through every single exhibit and find

18   out where the particular summary number came from that's at

19   issue.

20        So I'll talk about that later today.  We're

21   looking into that.  But I think, first of all, what I would

22   like from your teams is just to send an email to McNamara337

23   and tie the exhibits to the particular demonstratives that

24   were at issue where the exhibits were located.

25        MR. AINSWORTH:  Will do, Your Honor.

```
 1              JUDGE MCNAMARA:  Okay?
 2              MR. AINSWORTH:  Will do.  Thank you.
 3              JUDGE MCNAMARA:  All right.  So are we okay on
 4      time for today?
 5              MR. SWAIN:  I don't see any issues from
 6      Respondents' end, Your Honor.
 7              JUDGE MCNAMARA:  Mr. Ainsworth?
 8              MR. AINSWORTH:  I agree, Your Honor.
 9              JUDGE MCNAMARA:  Okay, good.  Do you have any
10      other business that you'd like me to address this morning?
11              MR. SWAIN:  Not from Respondents, Your Honor.
12              JUDGE MCNAMARA:  Okay.  Good.
13              Mr. Ainsworth, from Brita's side?
14              MR. AINSWORTH:  Nothing from Brita, Your Honor.
15      Thank you.
16              JUDGE MCNAMARA:  Good.
17              All right, Mr. Swain, are you ready to call your
18      next witness?
19              MR. SWAIN:  I am ready to continue the direct
20      examination of Mr. Robert Herman.
21              JUDGE MCNAMARA:  Very good.
22                        ROBERT HERMAN,
23              having been previously duly sworn and/or
24      affirmed on his oath, was thereafter examined and testified
25      further as follows:
```

1    JUDGE MCNAMARA:  Good morning, Mr. Herman.  Can
2  you hear me?

3    THE WITNESS:  Yes, I can.

4    JUDGE MCNAMARA:  Okay.  Very good.  You are still
5  under oath.

6    And so, Mr. Swain, you have the floor.

7    THE WITNESS:  Your Honor, I have a question, and
8  I think you're the only person I can ask this.  So I
9  apologize if I'm wasting time with the Court.  I'm kind of
10  new at this.

11    But last night I realized that part of my
12  testimony yesterday, one of my observations, my opinions, I
13  kind of forgot to cover.  There was an objection, and then I
14  just moved on, and I didn't actually cover the information
15  that I wanted to.  I was wondering if I was allowed to do
16  that to cover it now.

17    JUDGE MCNAMARA:  And you're under advice not to
18  talk to your counsel about testimony.

19    I think you can certainly cue him about what you
20  left out, and then, if he has questions about that, he can
21  certainly ask you about that.  Not about the content per se,
22  but you can alert him that there was something that you
23  unintentionally did not cover just by topic.

24    THE WITNESS:  It's basically the content of my
25  report at paragraph 126, I think it is -- no, 136 --

1   regarding variants.

2          JUDGE MCNAMARA:  Okay.  Mr. Swain, you now know,

3   roughly, what the topic area is, so I'm sure you can cover

4   that as you choose.

5          MR. SWAIN:  Thank you, Your Honor.  I'm hopeful

6   the remaining examination will cover this anyway, so thank

7   you for understanding Mr. Herman's questions.

8          JUDGE MCNAMARA:  No, that's -- that can be very

9   disconcerting, I'm sure.

10         DIRECT EXAMINATION (continued)

11  BY MR. SWAIN:

12     Q.   Mr. Herman, I want to talk to you about the

13  ZeroWater product, but, before we move on from the products

14  you tested, I want to ask you about your observations with

15  respect to the '141 patent and the embodiments of the '141

16  patent.

17         Could I have, Mr. Kotarski, Table 2 of the '141

18  patent up?  JX-22.

19         Let's do the whole thing, please.

20         Mr. Herman, what is shown here on Table 2 of the

21  '141 patent?

22     A.   These are the test results for the embodiments of

23  the patent.

24     Q.   What observations do you make with respect to the

25  embodiments and how -- whether they fall within the influent

1 lead range prescribed by the claim 1 of the '141 patent?

2      A.   Through these tests there's actually ten

3 different points where the influent lead, the total

4 particulate or soluble lead actually were outside of the

5 bounds of ranges listed in the patent.

6           PT 3-4 at the beginning showed that it actually

7 fell below the specification for particulate lead.  That

8 one, I believe, is like 20.6 or something like that, which

9 is actually significantly below 30.

10          PT 3-11 -- actually PT 3-4 also had another point

11 that was off -- but PT 3-11 also demonstrated several points

12 that were out, and PT 3-13.

13          So that's PT 3-11 and PT 3-13, there were several

14 points that total influent went out of specification and/or

15 particulate went out of specification.

16      Q.   Mr. Herman, if we could have PT 3-4 alternate

17 housing back up.

18          JUDGE MCNAMARA:  Before you leave that, I'm

19 sorry, Mr. Swain, are you going to -- can you highlight the

20 particular --

21          Or, Mr. Herman, can you highlight the particular

22 findings that were out of spec for each of those identified

23 samples that you discussed or products that you discussed?

24 And then, if that could be annotated and provided, that

25 would be helpful.

1      THE WITNESS:  Certainly.  At the 3 liter sample

2   point, the total influent lead was at 181.6, which is beyond

3   the specification of 180 for total.

4      And then if you go to the right at the 273, I'm

5   sorry, and the 303, both the soluble dropped below the 87.9,

6   and the 84.8 particulate, you got to actually do the

7   calculation, so pardon me for a second.

8      And I believe it actually went -- I have it all

9   listed in my paragraph in my report, so doing it by memory

10  is making it a little difficult.

11     JUDGE MCNAMARA:  Sure.  It's your first report or

12  your rebuttal report?

13     THE WITNESS:  My first report, paragraph 136.

14     JUDGE MCNAMARA:  All right.  And then, Mr. Swain,

15  if you could just keep those highlights in and just make

16  that a separate demonstrative.

17     MR. SWAIN:  Sure, Your Honor.  Thank you, Your

18  Honor.

19     Could I have -- what I'd like to do is finish

20  highlighting PT 3-11 and 3-13 here, we'll make that an RDX,

21  and then we'll move to the next example and make that an

22  RDX, and so on.

23     JUDGE MCNAMARA:  That's fine.

24  BY MR. SWAIN:

25     Q.   Okay.  Mr. Kotarski, could I have PT 3-13

1    highlighted at the 3 liter and 76 liter marks?

2         Mr. Herman, what's your observation with respect

3    to the ranges and whether the '141 patent embodiment of 3-13

4    met the claim 1 ranges for PT 3-13?

5         A.   So at the 3 liter mark, the total influent

6    concentration was exceeded, 185 versus 180 is the maximum,

7    and also it's not -- you can't really see it on here, but if

8    you subtract that from the soluble, you end up with 64.1, I

9    believe, for the particulate colloidal particular influent

10   and that exceeds the maximum 60.

11        If you go to the next one, that 170 isn't over

12   the influent total, but the difference between those two is

13   over the 60 allowed for particulate.

14        Q.   Could I also have -- thank you, Mr. Herman.

15        Could I also have the 303 liter mark highlighted

16   at the soluble point for PT 3-13, Mr. Kotarski.

17        And I do want to state for the record right now,

18   Mr. Kotarski is doing, and his team are doing, an excellent

19   job helping annotate.

20        JUDGE MCNAMARA:  They certainly are.  Both sides'

21   techs, the tech people are just wonderful.

22        MR. SWAIN:  I couldn't agree more, Your Honor,

23   and I'm glad it's made of record.

24        Q.   Mr. Herman, could you please comment on PT 3-13

25   and whether it was in spec, the '141 patent at the 303 liter

1     mark?

2      A.   You can see the 85.6 for the soluble lead is

3 below the lower limit of 90.

4      Q.   Thank you.

5        And if we could have, Mr. Kotarski, could you put

6 red boxes around all the highlighted points?

7        Thank you.  I would like to make this -- can we

8 take a screenshot and call this RDX-7C.61 -- or 65.  Thank

9 you.

10       Go ahead, Mr. Herman.

11     A.   I would just like to note that these tables don't

12 actually show the particulate lead values, so these do refer

13 to my report.

14     Q.   Mr. Herman, how do we determine -- we can't refer

15 to your report in the evidentiary record, so I'll ask you,

16 how do I determine the colloidal lead in claim 1 for each of

17 these datapoints?

18     A.   So the colloidal lead is calculated by taking the

19 influent total lead concentration and subtracting the

20 influent soluble lead concentration.

21     Q.   And, for example, in PT 3-13 at the 3 liter mark,

22 I would obtain that by subtracting 120.9 from 185; is that

23 correct?

24     A.   That is correct.

25     Q.   Okay.  Could I have PT 3-4 alternate housing up,

```
 1    Mr. Kotarski?

 2           Mr. Herman, could you please explain whether PT

 3    3-4 the alternate housing embodiment of the '141 patent

 4    meets -- or how its influent lead matches with the '141

 5    requirements on influent lead?

 6    A.   So the influent total is within and the soluble

 7    is in, but if you subtract the two apart, you end up with a

 8    value that's, I think, 20.8, which is significantly below

 9    30, which is what the requirement is shown in claim 1.

10    Q.   Again, so it's clean for the record, Mr. Herman,

11    what is the colloidal lead at the -- at one out of the three

12    datapoints for the PT 3-4 alternate housing?

13    A.   The colloidal lead is 20.8 at 3 liter, which you

14    could assume is actually the first half of the test.

15    Q.   Thank you, Mr. Herman.  And how far below

16    percentagewise is 20.9 from -- from 30?

17    A.   It's a little over 9, so that's almost exactly 30

18    percent.  It's a little bit greater than that.

19    Q.   And this is still an embodiment that the

20    inventors of the '141 patent say is within bounds of their

21    patent?

22    A.   Yes, it is, and it's the best calculated FRAP

23    that they have on their embodiments.

24    Q.   Thank you, Mr. Herman.

25           Can we take this -- Mr. Kotarski, could we make
```

1    this RDX-7C.66.

2           And if I could, Mr. Kotarski, could I have

3    Table 3 of the '141 patent up.

4           Mr. Herman, what is shown in Table 3 of the '141

5    patent?

6      A.   These are the prior art products that were tested

7    and shown in the patent.

8      Q.   Can I have the Brita granular prior art testing

9    from Brita brought up, please.  Thank you, Mr. Kotarski.

10          Mr. Herman, what's your observation as to whether

11   when Brita's inventors tested the prior art, whether they

12   met the influent lead specifications of the '141 patent?

13     A.   No, they did not.  At the 151 liter mark, which

14   is actually at the point where you calculate your FRAP from,

15   they exceeded total lead, they add 182.7 versus 180, and

16   their particulate lead also exceeded the 60, and doing the

17   math in my head, it's about 70 or so.

18     Q.   Mr. Herman, how do we calculate -- to calculate

19   the colloidal lead of the '141 patent at the 151 liter

20   sample point, do we subtract 107.60 from 182.70?

21     A.   Yes.

22     Q.   I'm subtracting my soluble lead from my total

23   lead?

24     A.   Correct, and that would give you your colloidal

25   lead, which actually believe is 75.1.

1     Q.   And what is the upper limit on colloidal lead in

2   the '141 patent?

3     A.   60.

4     Q.   How far above percentagewise is 75 colloidal

5   versus 60 colloidal?

6     A.   Well, the delta is 15, so that would be 25

7   percent above.

8     Q.   So at the point where you measure the FRAP value

9   of the effluent lead, Brita's inventors, did they exceed the

10   colloidal lead requirement of the '141 patent by 25 percent?

11    A.   Yes.

12    Q.   Thank you.

13        Let's make this RDX- -- can we have -- bring the

14   red box and highlighting down to cover 107.60, Mr. Kotarski.

15        And let's mark this -- let's take a screenshot

16   and mark this RDX-7C.67.  We can take this down.

17        And I'd like to now talk to you -- I want to move

18   from the filters you tested, Mr. Herman -- actually, before

19   that, Mr. Herman, in the QFT testing, how far below the lead

20   requirements in the early on did the QFT testing go

21   percentagewise?

22    A.   I think the worst case we had was 7 percent.

23    Q.   Anything higher than that?

24    A.   No.

25    Q.   Mr. Herman, I want to talk to you about -- moving

1  from the products you tested to products that were already

2  tested, I'd like to talk to you about the ZeroWater ZF-201

3  product.

4          Have you examined the ZeroWater ZF-201 product

5  for its FRAP value?

6      A.   Yes, I have.

7      Q.   Can I have RDX-7.46 -- 7C.46, please.

8          Mr. Herman, what did you evaluate when it came to

9  evaluating the ZeroWater ZF-201 product?

10     A.   There was an NSF test report for lead pH 8.5 that

11 I reviewed, NSF wetted parts list and also Pace Analytical

12 test reports from the years 2006 to 2007.

13     Q.   By NSF reports, are these the type of test

14 reports that you had dealt with while you were at NSF?

15     A.   Yes.  It actually has my name on it.

16     Q.   Let's take a look at RDX-7C.48.

17         MR. SWAIN:  Your Honor, I would like to go on the

18 confidential record, please.

19         Let's take that down.

20         JUDGE MCNAMARA:  Whose confidential?

21         MR. SWAIN:  This is ZeroWater and NSF

22 confidential information.

23         (Whereupon, the hearing proceeded in confidential

24 session.)

25

Appx23144-23154 redacted in their entirety

```
1                O P E N   S E S S I O N

2

3            JUDGE MCNAMARA:  Yes.

4                      CROSS-EXAMINATION

5   BY MR. AINSWORTH:

6        Q.   Good morning, Mr. Herman.

7        A.   Good morning, Mr. Ainsworth.

8        Q.   As you know, I am counsel for Brita.  It's nice

9   to see you again.

10            Mr. Herman, you would agree that the FRAP factor

11   that you've been talking about through your direct testimony

12   has four elements to it, correct?

13        A.   Correct.

14        Q.   And you would also agree that the Court has

15   provided claim constructions for each of those elements,

16   correct?

17        A.   Yes.

18        Q.   And you would also agree that in order to

19   accurately calculate the FRAP factor for prior art product,

20   you have to accurately measure each of those four variables,

21   true?

22        A.   You definitely need to measure them as accurately

23   as you can.

24        Q.   Fair enough.  Now I want to put yourself back in

25   2006, when you were on the task force at the NSF.  This is
```

1    after the draft guidance came out, right, on pH 8.5 lead

2    challenge?

3        A.   I'm not sure what you mean by draft guidance.

4        Q.   I'm sorry.  Didn't the draft NSF 53 standard come

5    out in November of 2005?

6        A.   There was a ballot that came out at that time.

7        Q.   And that ballot was based upon a draft standard

8    that had been circulated in November of 2005, correct?

9        A.   Okay.  So all through the balloting process

10   you're going to have different ballots that go out.  So

11   there are several documents that occurred at the end of

12   2005, and I'm trying to clarify exactly which one you're

13   referring to.  I'm not trying to be difficult.

14       Q.   What I'm trying to establish, by November 2005,

15   the challenge water as it was ultimately defined in the NSF

16   53 standard 2007 had already been described in a draft

17   document from NSF, correct?

18       A.   It had been described.  There were a few minor

19   changes that occurred prior to adoption.

20       Q.   Okay.  And in the summer of 2006 people in the

21   industry knew essentially what the new standard was going to

22   be once it was formally adopted in 2007, correct?

23       A.   I believe most people in the industry were aware

24   of that.

25       Q.   And you're aware that third-party labs like Pace

1    Analytical had done testing of existing commercial

2    gravity-fed water filters according to that -- the 2007 or

3    what would become the 2007 standard, right?

4         A.   I'm trying to remember whether I remember seeing

5    Pace Analytical results.  I believe I did see Pace

6    Analytical results, but I believe they were in relation to

7    the committee itself evaluating capability of being able to

8    run the test.  I do not know whether or not they actually

9    tested other commercial products.

10        Q.   Well, let's bring up RX-600, Mr. Rennick, please.

11             And this should be in your cross binder, but

12   we'll put it on the screen, Mr. Herman.

13             Do you recognize RX-600, Mr. Herman?

14        A.   I believe I've seen it as evidence, yes.

15        Q.   And this is dated September 25th, 2006, correct?

16        A.   Yes, it is.

17        Q.   And on your direct testimony you testified that

18   you trust the results from Pace Analytical, right?

19        A.   For flow rate, yes.

20        Q.   Just for flow rate, nothing else?

21        A.   Well, it depends what it is.

22        Q.   Okay.  So you see the client for Pace Analytical

23   was Culligan, right?

24        A.   Yes.

25        Q.   And the contact at Culligan was Mr. Frank

1  Brigano.  You know Mr. Brigano, right?

2       A.   Yes, I do.

3       Q.   And it says there in the first paragraph:

4            "Enclosed, please find our final laboratory

5  analysis report regarding the evaluation of eight gravity

6  filtration devices from various manufacturers for high pH

7  and alkalinity lead reduction testing."

8            Do you see that?

9       A.   Mm-hmm.

10      Q.   And it says, testing was performed referencing

11  protocol proposed in revision --

12           JUDGE MCNAMARA:  I'm sorry.  Mr. Ainsworth, I'm

13  going to ask you to back up and start again.

14           Mr. Herman, we need a yes or no.

15           THE WITNESS:  Oh, I'm sorry.  The last one was a

16  yes.

17           JUDGE MCNAMARA:  Thank you.

18           I'm sorry, Mr. Ainsworth.  Go ahead.

19           MR. AINSWORTH:  Thank you, Your Honor.

20      Q.   So the next sentence, Mr. Herman, says, "Testing

21  was performed referencing protocol proposed in revision to

22  NSF/ANSI 53 2006 issue 59 draft 5 (August 2006)."

23           Do you see that?

24      A.   Yes, I do.

25      Q.   Okay.  And you know what that is, right?

1    A.    I'm pretty certain I'm aware of the contents of

2    that, yes.

3    Q.    If we go down, next paragraph, it tells us in the

4    next sentence, each test system was preconditioned according

5    to instructions detailed in the use and care manual supplied

6    with each product, right?

7    A.    Mm-hmm.

8    Q.    So far so good?  Are you with me?

9    A.    Yes.

10    Q.    I'm just going to skip down to the third sentence

11    there.  It says, the lead concentration in six of the eight

12    systems exceeded the NSF Standard 53 maximum allowable level

13    of 10 parts per billion after sampling the initial 10 BV

14    datapoint.

15        Do you see that?

16    A.    Yes, I do.

17    Q.    And what that means is that six of the eight

18    gravity-fed filters they tested failed the very first pour

19    during the lead challenge at 8.5, right?

20    A.    No.  They stayed at -- reached the maximum

21    allowable level to 10 ppb after sampling the initial 10 BV

22    sample point.  If it was actually at that point, I would

23    think they would have said "at" instead of "after."  I mean,

24    that's detail, but that's what I would have -- that would

25    have been more accurate language.

1          So I would imagine it was at the next sample

2   point.

3          Q.   Why don't we look down at the date.

4          A.   Sure.

5          Q.   Let's go to the next page.

6          A.   Much preferred.

7          Q.   Let's pull up the data -- now a fail -- let's

8   orient the Court to what it is.

9          We have a sample number, a sample description, a

10  volume, and then in the middle column there is parts per

11  billion, right?

12         A.   Correct.

13         Q.   I'm sorry.  It's lead in milligrams per liter.  I

14  misspoke.  It's easy to convert milligrams per liter to

15  parts per billion, right, you just move the decimal point

16  over, is it three points; is that right?

17         A.   Yes, you move it over three points.

18         Q.   All right.  So it tells us the percent reduction

19  in the next column over.

20         Do you see that?

21         A.   Yes, I do.

22         Q.   So under the 53 standard, what percent reduction

23  would be a failure at the first time point?

24         A.   We actually don't use percent reduction for

25  failure because that would allow the failure point to vary.

1   We actually use a set value.

2         Q.   Right.  You use 10 parts per billion, right?

3         A.   Yes.

4         Q.   And if we look at the second row, the first

5   sample at the tested, right?

6         A.   Mm-hmm.

7         Q.   And that's the initial pour, the initial pour,

8   one down, where it says -- there we go -- do you see the

9   0.13?

10        A.   Yes, I do.

11        Q.   And that's the first sample they drew of

12  effluent, correct?

13        A.   Yes, that's the first sample 10 bed volume,

14  that's what the BV stands for.

15        Q.   And the 0.13 would be 13 parts per billion,

16  right?

17        A.   That is correct, from an influent of 190.

18        Q.   And if we went down to the next row, it would be

19  14 parts per billion, right?

20        A.   Yes, it would.

21        Q.   And the next row down would be 38 parts per

22  billion?

23        A.   Yes, 38.

24        Q.   And the next row down would be 35 parts per

25  billion, right?

1      A.   Mm-hmm, correct.

2      Q.   Now the next two, they pass at the first time

3    point.  We have a .047 and a -- I'm sorry.  We have a 4.7

4    parts per billion and then a 5.3 parts per billion, right?

5      A.   That would be correct.

6      Q.   So two pass at that time point.

7      A.   Mm-hmm.

8      Q.   And then at the next time point we're at 32 parts

9    per billion and 32 parts per billion for the next two,

10   correct?

11     A.   Correct.

12     Q.   Okay.  Now you mentioned that the influent was a

13   little high, it's 19 -- 190 parts per billion, right?

14     A.   Yes, 190 parts per billion.  This would be -- and

15   this would invalidate the entire test under NSF Standard 53.

16     Q.   But this is showing each one of these samples

17   was -- was above 10 parts per billion at the first time

18   point, right, except for two, six of the eight.

19     A.   True, but it's not a valid test so...

20     Q.   Let's go down to the next one, the next time

21   point, which is at the 20-gallon mark.

22          Do you see that?

23     A.   Yes.

24     Q.   And at the 20-gallon mark the influent is at 160

25   parts per billion, right?

1      A.    Correct.

2      Q.    Mr. Rennick, if we can go down and highlight for

3   the judge, D2.  Do you see where D2 is?

4            So that's the influent at the 20-gallon mark,

5   right?

6      A.    That's total influent at 20 gallons, looks like

7   160.

8      Q.    So the 20-gallon mark, the Pace Analytical report

9   was inspect for the NSF 53 pH 8.5 challenge water, right?

10     A.    Only for total.  I have not seen the particulate

11  or fines on this test yet or the water quality, so I can't

12  make that judgment.  In reality, this test is already

13  invalid so...

14     Q.    You're discounting the entire test because the

15  first time point was above -- was above the right amount of

16  influent or lead concentration influent, the whole test goes

17  out?

18     A.    NSF 53 is very clear about total lead.  It has to

19  be below -- at single points you could go up to 180, but

20  once you get outside that range, it invalidates the test.

21     Q.    So just --

22     A.    There's no recovery from it.

23     Q.    This wasn't a certification test.  They were just

24  doing an investigation into these filters, right?  They

25  weren't trying to certify.

1       A.    Sure, but you're inferring this met the

2  requirement of NSF Standard 53 2007, and it doesn't.  That's

3  why I was just trying to clarify.

4       Q.    Okay.  I didn't actually say that.  I'm just

5  going through the results with you, sir.

6       A.    My apologies.

7       Q.    And if we go down under the 20-gallon mark, so

8  we're now at the next set of samples -- are you with me?

9       A.    Yes, I am.

10      Q.    Just so we can run through these two, at 20

11 gallons, the first sample was -- tell us the influent there.

12 It was, again, 160 parts per billion.  Below that, the

13 effluent on the first sample, would you agree with me, was

14 10, I guess 10.9 parts per billion?

15      A.    No, that would be 19.  That would be 19.

16      Q.    I'm sorry.  My math is off.  I don't move

17 decimals.

18      A.    That's all right.  A lot of numbers.

19      Q.    We're not good with numbers.

20            So the next one down would be 21 parts per

21 billion, right?

22      A.    Correct.

23      Q.    And 35 parts per billion?

24      A.    Correct.

25      Q.    And 34 parts per billion?

1     A.   Correct.

2     Q.   The next one down, pretty close, that would be

3  still passing, if that was -- if it had been a proper

4  certification test all the way through, but that's at 9.6

5  parts per billion, right?

6     A.   Yeah, if we just look at the effluent values and

7  isolate them, you would say that would be a passing point.

8     Q.   And then the next three we have 11 parts per

9  billion, 25, and 24 parts per billion, right?

10    A.   Yes.

11    Q.   So Mr. Rennick, we can take this down.

12         JUDGE MCNAMARA:  Just a minute.  Sorry,

13  Mr. Ainsworth.  This is still Exhibit 600?  Let me see --

14  RX-600?

15         MR. AINSWORTH:  RX-600, Your Honor, on page 2.

16         JUDGE MCNAMARA:  Right.  And would you make sure

17  that you annotate, that you blow up or give us a screenshot

18  of this annotated document and mark it as an RDX at the end

19  of your slides?

20         MR. AINSWORTH:  We will mark it as a CDX.

21         JUDGE MCNAMARA:  CDX.  Sorry about that.

22         MR. AINSWORTH:  Mr. Rennick, can you capture that

23  for us?

24    Q.   Mr. Herman, you would agree that the gravity-fed

25  water industry in 2006 was concerned that existing

1   commercial filters would not be able to pass the NSF 53 2007

2   standard, right?

3       A.   Oh, yes, there was quite a bit of concern that,

4   with the requirements of fine particulate as well as a very

5   stringent specification for total particulate, that they

6   would have a difficult time meeting the requirements of NSF

7   53.

8       Q.   And even though you quibble with some of the

9   influent in that Pace report, that's consistent with that

10  view that existing gravity-fed filters would not satisfy the

11  requirements of NSF 53 2007, right?

12      A.   I wouldn't say I quibble with it.  That's a major

13  issue with that data.  You overload a filter, you can expect

14  you're going to get high effluents.  It's a common

15  occurrence.  So without even seeing the particulate or fine

16  particulate that was present in that test and the water

17  quality, I can't say it was run properly according to that

18  standard.  It was a new standard.  People were having

19  challenges performing the test, as was shown in our task

20  group.

21      Q.   So you'll accept results from Pace for some

22  things but not for others, is that your testimony?

23      A.   I will accept the data for what it demonstrates

24  to me.

25      Q.   Okay.  Now let's turn to your testing,

1    Mr. Herman.

2         So if we could pull up RX-684, and if we could

3    turn to page 2.

4         Your Honor, this is marked as a confidential

5    exhibit, although I think Respondents have already shown it

6    on the public record.

7         JUDGE MCNAMARA:  Yeah, I think they did too.

8         MR. AINSWORTH:  Okay.

9    Q.   So, Mr. Herman, this was the protocol that you

10   used for your testing that you've testified about in the

11   last couple days, correct?

12   A.   It's a protocol that was provided to QFT

13   Laboratories for the testing that we conducted at that

14   laboratory.

15   Q.   You didn't actually write the protocol, correct?

16   A.   No, I did not draft these.

17   Q.   And --

18   A.   I provided input to them, but I didn't draft

19   them.

20   Q.   The testing had already started at the Helen of

21   Troy Labs by the time you were engaged and working on this

22   investigation, correct?

23   A.   Yes, they were -- through the first run, they

24   were about halfway through the run when I arrived.  So I

25   ended up not using that as a basis for my invalidity claims

1  during the proceedings here.  And at that time that's when I

2  began to review their procedures, provide updates, and

3  evaluate their equipment and their processes.

4      Q.  Thank you, Mr. Herman.  I just had a real simple

5  question, but thank you for the narration.

6          Let's go down to the lower bottom of the page.

7  At the bottom of the page where it says, see where it says

8  total lead 120 to --

9          Mr. Rennick, if you could blow up that, the whole

10  next two points too, please.

11          Now this was the specification that someone at

12  Helen of Troy came up with for the total amount of lead to

13  use for this particular set of experiments, right?

14      A.  Yes.

15      Q.  You didn't select that amount; someone else did.

16      A.  I didn't select it, but I had no problem with it.

17      Q.  And you don't know why it was chosen, do you?

18      A.  Specifically what was the exact thought process,

19  no, I don't.

20      Q.  And you don't know who chose it, do you?

21      A.  No.

22      Q.  And if you had to guess, the reason they put --

23  they chose 120 to 140 was because, if you put less lead in,

24  you're going to get less lead out, right?

25      A.  That would be a reasonable assumption.  I mean,

1    there's several different things you could speculate on why

2    they did, but that's possible.

3        Q.   Okay.  Let's take this down.  And if we could

4    bring up CDX-17 at 3.

5        Mr. Herman, you talked yesterday about your

6    challenge water and the data -- you recognize the data here

7    on CDX-17 comes from your report, right?

8        A.   Correct.

9        Q.   We have highlighted some rows, but otherwise this

10    is your data, correct?

11        A.   Yeah, I also indicated what the red marks were,

12    so that's mine.

13        Q.   And we agree that on the days where the rows are

14    highlighted that the challenge water was either out of

15    specification at the start of the day or at the end of the

16    day, right?

17        A.   Yes.  The grab sample that was taken show that

18    the soluble lead was below the 90.

19        Q.   Now and you realize that the challenge water was

20    not in specification when you saw the data, right?

21        A.   Yes.

22        Q.   And the gentleman who actually did the testing

23    for you, Mr. Young, he also recognized the challenge water

24    was out of specification, right?

25        A.   Actually, I don't think he realized until he put

1    all the data together and provided it to us.  He was doing

2    that on a -- every few days, so I don't think he actually

3    realized that until that point.  I mean, I can provide a

4    little context, if you want it.

5         Q.   Mr. Herman --

6         A.   Oh, you don't.  Okay.

7         Q.   I have some questions for you.

8         A.   Okay.

9         Q.   If your counsel has follow-up, he will get there

10   with you.

11        A.   All right.

12        Q.   All right?  Now once you realized the challenge

13   water was out of specification, you decided to revise the

14   protocol, right?

15        A.   I wasn't so much revising the protocol.  I really

16   wanted to tighten it up so to ensure its integrity.  I

17   didn't want to have continuing situations where he was not

18   measuring or monitoring soluble lead.

19        Q.   Mr. Herman, yes or no, you modified the protocol

20   after you saw the data showing the challenge water was out

21   of spec.

22        A.   Yes.

23        Q.   Let's go back to RDX-684.  And go to page 3,

24   please.

25             Now, Mr. Herman, this is the memo that you issued

1   to your technician, Mr. Young, for modifications to the test

2   protocol, correct?

3       A.   Yes.

4       Q.   And you wrote this on April 27th, correct?

5       A.   I believe I did, yeah.

6       Q.   And it was, as you state at the top, this

7   document outlines the modifications to the test protocol

8   previously provided by Mike Mitchell, Rob Herman, and Adam

9   Swain, correct?

10      A.   Mm-hmm.

11           JUDGE MCNAMARA:  Yes or no?  I'm sorry.

12           THE WITNESS:  Oh, I'm sorry.  I did it again.

13  Yes.  I'm sorry.  I'll try to remember that.

14      Q.   Then we go down to your first change to your

15  protocol.  And if we're looking down at the table there,

16  this table provides the parameters for total lead, soluble

17  lead, and colloidal lead, correct?

18      A.   Yes.  It shows acceptable range in one column,

19  which is unchanged, and then a target range.

20      Q.   So, Mr. Herman, your target range for colloidal

21  lead, you modified it to be 30-40 parts per billion,

22  correct?  Yes or no.

23      A.   I narrowed it to be 30-40, yes.

24      Q.   And you narrowed the range for soluble lead to

25  90-100, yes or no?

1       A.   For the target I narrowed it to 90-100, although
2   the acceptable range did not change.
3       Q.   And the total lead you kept at 120-140 parts per
4   billion, yes or no?
5       A.   Yes.
6       Q.   Thank you.  The other change you made -- one of
7   the other changes you made is you stopped checking to see
8   whether the challenge water was within specification at the
9   end of the day, yes or no?
10      A.   Yes.  There's no need.
11      Q.   Okay.  So even though your tests beforehand were
12  showing the challenge water was out of specification at the
13  end of the day, you did not see a need to continue to
14  monitor the tank at the end of the day, yes or no?
15      A.   No, because earlier -- early in the test the end
16  of the day was out, but later, before we got to this point,
17  there were several days where it actually -- the tank went
18  into spec at the end of the day.  It was actually correcting
19  the influents.
20      Q.   Let's go back and look at that.
21           Let's go back to CDX-17, and I believe it is
22  slide 3.
23           So on days -- on the 20th, 21st, and 22nd you
24  were out of specification at the end of the day, right?
25      A.   Correct.

1    Q.    And what you're saying is, because you're in

2    specification at the end of the day on the 23rd, 24th, and

3    25th, you thought the tank was stabilized.  Is that your

4    testimony?

5    A.    My testimony is that the tank did stabilize and

6    we met an equilibrium condition within the tank that would

7    ensure the challenge would stay within specification

8    throughout the day.

9    Q.    But you didn't do any testing to confirm that,

10    correct?

11    A.    Nope, and I kind of wish I had.

12    Q.    We can take that down, Mr. Rennick.

13        Mr. Herman, you worked at NSF for over 30 years;

14    is that right?

15    A.    Yes.

16    Q.    And you've conducted, as Mr. Swain said, probably

17    more testing under NSF than any human alive.

18    A.    Probably.

19    Q.    All right.  I may have overstated Mr. Swain's

20    compliment to you, but I will give you that, sir, you've

21    done a lot of testing.

22        And one of the reasons why people come to NSF to

23    test under various standards is to confirm their rated

24    capacity for their filters, correct?

25    A.    Well, actually they come to NSF specifically to

1  get certified by NSF because they are an independent third

2  party to show that their product functions the way they

3  claim it functions and meets the requirements of the

4  standard.

5         So they don't really come to us to say establish

6  our lifetime, they tell us that.

7    Q.   Well, that wasn't quite my question, sir, so I'll

8  ask it again.

9         They come to confirm their rated capacity or

10  get -- may I step away -- to certify the rated capacity for

11  their particular filter against the contaminants they care

12  about, right?  That's one of the things NSF does.

13    A.   NSF will verify their claims against the

14  standard.

15    Q.   Thank you.  For someone to make a lifetime claim

16  for lead reduction, in 2007, with the 2007 standard, they

17  had to maintain below 10 parts per billion for 200 percent

18  of filter life, true?

19    A.   Under certain conditions.  Under NSF Standard 53,

20  I'll just narrow the discussion to the lead test, because

21  certification involves a lot more than just passing a test.

22         So for the lead test you actually have two tests

23  you have to pass.  You have to pass the lead 6.5 test, which

24  is primarily for soluble lead, and you also have to pass the

25  8.5 test.

1        For a product that does not have what we call a
2    performance indication device, which means it tells you when
3    it's exhausted, you have to test that product at 200 percent
4    of the claimed capacity on the product.
5        Q.    Okay.  And the benchmark is you need to stay
6    below 10 parts per billion in effluent across the entire
7    length of that test, correct?
8        A.    In 2007, that is the value that was the maximum
9    effluent allowed.
10       Q.    And prior to 2007 there was also a pH 8.5 lead
11   challenge test, correct?
12       A.    Yes.  It was established in 1999.
13       Q.    And it had a different challenge water, but it
14   had the same benchmark of 10 parts per billion, correct?
15       A.    Well, in '99 it actually had a benchmark of 15,
16   and the test water was a little broader.  It was the same
17   test water but the specifications were a little broader.  I
18   believe in 2002 that is when it changed to 10 as the
19   effluent allowance.
20       Q.    So we can agree that by at least 2002 the pH 8.5
21   NSF test for lead reduction, the benchmark was 10 parts per
22   billion was your maximum you could have in effluent and pass
23   the test, correct?
24       A.    For that specific parameter, yes, it was 10.
25       Q.    So if you have -- in 2006, if you had a

1   gravity-fed water filter and you wanted to have a 40 gallon

2   lifetime claim for lead reduction -- are you with me?

3       A.   Yep.

4       Q.   -- you would need to test to 80 gallons and stay

5   below 10 parts per billion for the whole 80 gallons, true?

6       A.   For an NSF certification test, yes.

7       Q.   In order to have NSF certify and validate a

8   lifetime of 40 gallons, you would test out to 80 gallons and

9   stay under 10 parts per billion lead in effluent, correct?

10      A.   Yes, that is what's the test protocol.

11      Q.   Okay.  And then the change in 2007 was the

12  challenge water changed and the requirements for making the

13  challenge water, but the basic requirement of staying below

14  10 parts per billion for 200 percent of filter life, if you

15  don't have an indication device, stayed the same, can we

16  agree upon that?

17      A.   Yes.  Yes.

18      Q.   Okay.

19      A.   We can.

20      Q.   So let's go to CDX-17 at slide 10.

21           Mr. Herman, I'll represent to you this is the

22  data from your report, RX-985, at pages 15 and 19, and I

23  just put up your table.  But do you recognize generally the

24  data that's on CDX-17 at slide 10?

25      A.   Yes, yes, I do.

1    Q.   Okay.  These are the lead concentrations that you

2  collected in effluent for the PUR 1-stage filters 5-A and

3  5-B for all of your tests of filters 5-A and 5-B, right?

4    A.   Yeah, these are the influent and effluent data

5  for filter 5-A and 5-B that were conducted at QFT

6  Laboratories.

7    Q.   Right.  Now, Mr. Rennick, let's actually stay

8  here.

9         So, Mr. Herman, I'm going to ask you a

10  hypothetical.  Okay?

11    A.   Okay.

12    Q.   So I want you to assume that for filter 5-A you

13  tested all the way out to 80 gallons.  That's the first

14  assumption.  Can you do that with me?

15    A.   I'll try.

16    Q.   And I want you to assume that out to 80 gallons

17  the lead concentration stayed right where it was at 60

18  gallons, so 6.9.  Okay?

19    A.   Okay.

20    Q.   If this challenge water was the basis for

21  determining the lifetime of this filter, would you agree

22  with me that you could not say this filter had a 40-gallon

23  lifetime claim for lead reduction?

24    A.   I would have -- I'm not sure what -- there's not

25  enough information for me to understand this scenario.

1    So you're stating that, if it went out to 80

2   gallons at 6.9, it wouldn't establish a capacity of 40

3   gallons?

4       Q.   Yes.  You could not make a claim for a 40-gallon

5   lifetime claim for lead reduction --

6       A.   It doesn't matter how far you go.  This test was

7   not a Standard 53 test.  It would not meet the requirements

8   of Standard 53, so you wouldn't -- you wouldn't use that

9   parameter or that method here.  This is a one-for-one

10  compliant test, not a Standard 53 test.

11      Q.   Mr. Herman, I need you to answer my question,

12  please.

13      I'm asking you to assume the 80 gallon -- testing

14  at 80 gallons.  Are you with me?

15      A.   Sure.

16      Q.   Okay.

17      A.   It went to 80 gallons.

18      Q.   And I want you to assume that you're using the

19  challenge water of the '141 patent to evaluate the lifetime

20  of this filter.  Okay?  Can you make that assumption for me?

21      A.   There's -- you're making a lot of assumptions

22  that I'm having trouble accepting to make a leap.  So that's

23  why I'm having trouble.

24      The '141 patent doesn't have the test to

25  establish lifetime.  There's nothing in the '141 patent that

1    says you establish lifetime by doing this, so I'm a little

2    confused.

3        Q.   Mr. Herman, I'm sorry, are you unable to accept

4    my assumption that you're using the challenge water for the

5    '141 patent to evaluate the lifetime of this filter?  You

6    cannot make that assumption; is that your testimony?

7        A.   Well, what I'm saying is the lifetime is -- my

8    understanding, and I could be completely wrong, that

9    lifetime has different ways of being determined.

10           If you do it under Standard 53, I believe this is

11   part of the construction -- Your Honor, forgive me if I get

12   this wrong because I'm not an expert at how to interpret

13   this stuff, I mean, your Markman -- but my understanding is

14   if you use Standard 53, then you can establish your lifetime

15   in accordance with 53.

16           And if I was running a 53 test and I ran it out

17   to 80 gallons and it met the requirements all the way

18   through, then, yes, it would provide it.  If I ran it out to

19   80 gallons and it didn't meet the effluent requirements,

20   then it wouldn't establish lifetime according to 53.

21           However, if you use the Markman, it also says you

22   can do it in other ways, where you can establish your

23   capacity in other methods.  So if I use the '141 patent to

24   establish it, there's no effluent requirements for lead.  So

25   then let --

1          MR. AINSWORTH:  Your Honor --

2      A.   Let me answer your question to give you a yes.

3  So under those conditions, if it went to 6.9 at 80, then I

4  would say, yes, you could establish the 40-gallon capacity

5  for this product using the '141 patent test.

6          MR. AINSWORTH:  Your Honor, you're on mute.  I'm

7  sorry.

8          JUDGE MCNAMARA:  All right.  Sorry about that.

9          You were talking over one another.

10         Ms. Kinkade, were you able to get the testimony

11  where Mr. Ainsworth and Mr. Herman were talking both at the

12  same time?

13         (Clarification by reporter.)

14         JUDGE MCNAMARA:  Mr. Ainsworth, I'm going to

15  allow the testimony.  Mr. Herman was answering your question

16  to the best of his ability, and he told you that he had some

17  difficulty with your hypothetical and explained why.  So I'm

18  going to allow that.

19     Q.   Mr. Herman, I'm going to try this again.  I'm

20  going to try this again.  I think you're trying to make this

21  more complicated than it is.

22         If we're using the challenge water that you used

23  in your test as the challenge water to determine the

24  lifetime of this filter, would this filter have a lifetime

25  of 40 gallons, yes or no?

1    A.    I'm having trouble answering that, as I explained

2  earlier, because it's an incomplete hypothetical.  There's

3  too many missing parts.

4    Q.    Okay.  So you're not able to use your data here

5  to evaluate whether this filter would have a capacity of 40

6  gallons using the challenge water that you apply to it,

7  correct?

8    A.    That was not the purpose of the test.

9    Q.    Okay.  Let's go to slide 10 -- sorry -- slide 6.

10         Mr. Herman, this takes the same data and puts it

11  on a graph.

12         Will you accept that representation?

13    A.    Yes.

14    Q.    And that red dash down there, do you recognize

15  that, that's at 10 parts per billion, that's the --

16    A.    The dash is at 10 parts per billion.

17    Q.    And every one of the filters you tested

18  significantly exceeded -- I'm sorry.  Every one of the PUR

19  1-stage filters that you tested significantly exceeded 10

20  parts per billion during the first 40 gallons, right?

21    A.    Yes.

22    Q.    Now if we go to slide 12, Mr. Herman, this is,

23  again, your data on slide 12 from your testing for the QFT

24  testing of the Brita 3-A and 3-B filters.

25         Do you see that?

```
 1       A.   Yes, I do.

 2       Q.   And you would agree that both of the Brita

 3  filters you tested significantly exceeded 10 parts per

 4  billion during the first 40 gallons of the test.

 5       A.   Yes, they did.

 6       Q.   And if we go to slide 13, this is your testing of

 7  the DuPont 2005 filters.

 8            Do you recognize that?

 9       A.   Yes, I do.

10       Q.   And, once again, you would agree with me that

11  each of these filters significantly exceeded 10 parts per

12  billion before the first 40 gallons of the test was

13  complete, correct?

14       A.   They did exceed 10 in the effluent, yes.

15       Q.   Significantly.

16       A.   Well, yeah, sure.  They were over 10.

17       Q.   Like, for example, the 4-A filter was at 41 parts

18  per billion.  That's a pretty big -- pretty far above the 10

19  parts per billion requirement.

20       A.   Mm-hmm, it's a great demonstration of what fines

21  do when you have them present in the test.

22       Q.   And, lastly, let's go to slide 14.

23            Mr. Herman, this is your data on the DuPont 2007

24  filter, right?

25       A.   Yes.
```

1       Q.    Filters 2-A and 2-B from your testing numbers?

2       A.    Yeah, from testing at QFT.

3       Q.    And each of these filters, again, exceeded the

4    2000 -- I'm sorry -- exceeded 10 parts per billion before

5    the first 40 gallons of the test was complete, correct?

6       A.    Correct.

7       Q.    Okay.

8       A.    This was the best performing set of filters.

9       Q.    So we can take that down, Mr. Rennick.

10          Let's turn to -- let's turn to the average

11   filtration unit time over lifetime.

12          Now, Mr. Herman, in your testing that you did at

13   QFT, I think we can agree you only sampled at about six

14   datapoints per filter, correct?

15      A.    Per filter, yeah, that's about right.

16      Q.    And for the first 40 gallons it was four times,

17   right?

18      A.    First 40 gallons?

19      Q.    Yeah, for --

20      A.    Or you're talking about the entire test.  It

21   actually was -- we started up 10, 20, 30, 40, so that would

22   be five.

23      Q.    I apologize.  You're right.  There was a startup.

24          So five measurements of flow rate over the first

25   40 gallons, correct?

```
 1        A.   Correct.

 2        Q.   And that's the methodology you used to calculate

 3   flow rate, because that's the methodology you've used in

 4   your labs for a while, fair?

 5        A.   That's the methodology we used in our labs since

 6   I've been there, since 1987.

 7        Q.   And when you determined how to calculate the

 8   average filtration unit time over lifetime, did you look how

 9   Brita had done it in its infringement testing of the accused

10   products?

11        A.   No.

12        Q.   No.

13        A.   Actually -- oh, go ahead.

14        Q.   No one gave you that data to look at to see what

15   Brita's protocol was?

16        A.   I think I saw that data after their testing had

17   been completed.

18        Q.   After the QFT testing was completed?

19        A.   I'm pretty sure, yeah.

20        Q.   Okay.  So your counsel didn't share Brita's

21   protocol for testing average filtration unit time over

22   lifetime with you.

23        A.   No, I actually think the whole point was for me

24   to review the '141 patent and use that as my guide.

25        Q.   Now you said yesterday, I believe, I believe you
```

1   testified that the patent doesn't explicitly state anywhere

2   in it that you have to sample every liter.

3           Does that sound like your testimony?

4       A.   Yep.

5       Q.   So, Mr. Rennick, let's go to JX-22, the '141

6   patent, and let's go to column 25, lines 41-43.  It's on

7   page 43.  Again, it's lines 41-43.  Keep going up, there you

8   go, a little more.  One more line.  There we go.

9           Do you see where it says, the average filtration

10  unit time is defined as the time it takes to filter one

11  liter of water averaged over all filtered liters in the

12  defined filter lifetime, Mr. Herman?

13      A.   Yes, I do.

14      Q.   Did you see that when you reviewed the '141

15  patent?

16      A.   Yes, I did.

17      Q.   Okay.  Now you can take that down, Mr. Rennick.

18          And you acknowledge that Dr. Knipmeyer appeared

19  to use average filter rates on a per liter basis for most,

20  if not all, of the prototypes in her Table 2, correct?

21      A.    In the data I reviewed from the notebooks, that

22  appears what they did for many of them.

23      Q.   And you heard her testify -- I'm sorry.  Did you

24  hear her testify on Wednesday?

25      A.    Yes, I did, mm-hmm.

1    Q.   And you heard her testify that was her standard
2    procedure for measuring flow rates for her prototypes.
3    A.   Yes, she said that was her standard procedure for
4    testing and the embodiments.
5    Q.   You don't dispute that that's how Dr. Knipmeyer
6    did it when she was testing her prototypes.
7    A.   When -- from what I can see, when she was testing
8    the items in Table 2, which is the embodiments, that she
9    tested and measured the volume at each liter.
10   Q.   And you also saw the spreadsheets she put up
11   during her direct examination that showed the underlying
12   data for her prototypes, right, showing the flow rate for
13   her filters, correct?
14   A.   Yeah, I saw that.
15   Q.   Okay.  Now your measurements of the flow rates
16   for the filters you tested amount to -- you essentially put
17   3.3 percent of the total filtered liters and just used the
18   flow rate from 3.3 percent of the liters, right?
19   A.   Well, it would have been a flow rate off of 5
20   liters out of 40 -- out of 151.  So that's about 3.3
21   percent, yep.
22   Q.   Okay.  If we go to slide 16 and CDX-17.
23        I'm sorry.  Let's go to the next slide, slide 17.
24        Now, Mr. Herman, I'll represent to you what I've
25   put on CDX-17 at slide 17 is the high and the low flow rate

1    for each of the filters listed here on slide 17.

2            Will you accept that representation?

3    A.   Sure.

4    Q.   And I'll represent the red dots on each of the

5    bars corresponds to the average you used either for the

6    first 40 or the last 40.

7            Will you accept that representation?

8    A.   Sure.

9    Q.   So if we look over at the DuPont filters, on the

10   right-hand side, filters 2-A and 2-B, would you agree with

11   me that the averages that you selected or the averages you

12   calculated were well below the median for between the high

13   and the low on the flow rates that you measured?

14   A.   Well, if you're calculating the arithmetic

15   average, when you have a rapid increase or, in this case,

16   rapid increase in time it takes to measure or, I'm sorry,

17   the time it takes to filter 1 liter of water, because in

18   these at the end they actually went up quite drastically

19   near the end, you would end up having your average, by

20   definition, will have a tendency to be at the lower end of

21   the range.  It didn't say use median in the '141 patent, it

22   said average.

23   Q.   You're absolutely right, Mr. Herman.  Because of

24   the way filters function, if you have -- many filters are

25   faster at the beginning than they are over the life of the

1    filter, true?

2        A.    You'll typically have some change in flow rate

3    over time as a filter progresses.

4        Q.    And the less samples that you take, you could

5    have more weighting towards the front of the lifetime of the

6    filter versus across the entire life of the filter, correct?

7        A.    Not if you evenly space out your sample points.

8    So if you take sample points at evenly spaced intervals, you

9    get a good representation of how the pattern of that filter

10   is changing over time.  Unless there's something wrong with

11   the filter where it's just bouncing all over the place,

12   you'll get -- you will actually see a nice trend in how that

13   flow rate will change over time.  So collecting samples at

14   intervals works perfectly well.

15       Q.    So if you have a 40-gallon filter, 40-gallon

16   lifetime filter, how many sample points do you need to

17   accurately determine with scientific certainty the average

18   filtration unit over time, over the lifetime of the entire

19   40 gallons, only five?

20       A.    Well, in my experience, and in the development of

21   NSF Standard 53, we vary measurements of critical parameters

22   anywhere from four times over the capacity to six times over

23   two times the capacity.

24            So in not just my opinion, but the opinion of the

25   Joint Committee and everybody else who put that standard

1  together, that's adequate to measure a critical parameter

2  for a water filter.

3      Q.   But the NSF 53 standard doesn't set a set

4  specification for determining the average filtration unit

5  over lifetime for filters.  That's not part of the NSF

6  standard, right?

7      A.   Yeah, the standard doesn't measure filtration

8  rate quite that way.  There's -- there are some tests that

9  we evaluate flow rate, because that determines when the

10  sample points are taken, for example, live cyst reduction

11  testing, which is a pathogen, when we're testing that, we

12  actually use change in flow rate to determine when a sample

13  point is, and that -- that test actually has the fewest

14  number of sample points.  It only has four.

15      Q.   Now at NSF you're not concerned with developing

16  and creating water filters, correct?

17      A.   We evaluate products.

18      Q.   You're there to evaluate products for standard

19  reasons and certification reasons, not in terms of how to

20  actually make a water filter, correct?

21      A.   No, we're not in the business of designing water

22  filters.  We're in the business of protecting public health.

23      Q.   And so you would understand why Dr. Knipmeyer,

24  who is interested in how to make a water filter, might take

25  more sample points for a filtration unit over time, over

1    lifetime, than if you're just doing a certification test?

2    You can understand that, right?

3         A.   Sure, I can understand that, you know, more

4    data -- if you're a scientist and you're collecting data,

5    you almost always want more data.

6         Q.   So you would understand that -- okay.  Strike

7    that.  Withdrawn.

8              Let's switch topics for a quick second,

9    Mr. Herman.  We have been talking about NSF for a little

10   while.

11             Are you aware -- I'm sorry.  When did you first

12   become aware that there was an ANSI patent policy ever?

13   When is the first time you heard of that?

14        A.   I actually heard of it early on in the case when

15   I came on.

16        Q.   In this investigation was the first time --

17        A.   In this investigation, yep, yep.

18        Q.   And during the course of your work on the NSF

19   task force, you don't recall ever hearing about a patent

20   policy, correct?

21        A.   I didn't.  And the way the standard department

22   works, they figured I had been around forever so I knew

23   everything.  So I don't know whether or not they had put a

24   training together for the people on the joint -- on the

25   joint committee or the other committees because they never

1    invite me to them.

2       Q.   And you never heard or, I'm sorry, you were never

3    aware of any unethical behaviors by Brita in connection with

4    any of their involvement with the NSF/ANSI 53 task force,

5    true?

6       A.   I wasn't aware of any unethical behavior.

7    Everyone on that task group had -- I mean, they had their

8    agendas for their businesses, they had other reasons for why

9    they may want changes to the protocol, but it was my job to

10   make sure that the process I considered -- everyone's

11   opinion got to be heard and addressed.

12      Q.   Thank you, Mr. Herman.

13           MR. AINSWORTH:  Your Honor, I'm not one to

14   suggest a break, but it's 11:00, and if Ms. Kinkade needs a

15   break, this is a good stopping point in my

16   cross-examination.

17           JUDGE MCNAMARA:  It's okay to ask for a break.

18   We do this organically, so that's just fine, Mr. Ainsworth,

19   we'll take a break for 15 minutes.  I'll see you back here

20   at 11:15.  Thank you.

21           MR. AINSWORTH:  Thank you, Your Honor.

22           (Whereupon, the proceedings recessed at 10:59

23   a.m.)

24           (In session at 11:15 a.m.)

25           JUDGE MCNAMARA:  Good morning again, everyone.

1    MR. AINSWORTH:  Good morning, Your Honor.

2    JUDGE MCNAMARA:  All right.  Mr. Ainsworth?

3    MR. AINSWORTH:  Thank you, Your Honor.  At this

4  time I would like to go on the confidential record, and this

5  would be ZeroWater confidential information.

6    (Whereupon, the hearing proceeded in confidential

7  session.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx23193-23199
redacted in their entirety

```
 1                O P E N   S E S S I O N

 2

 3            JUDGE MCNAMARA:  Okay.  Thank you.

 4   BY MR. AINSWORTH:

 5       Q.   So, Dr. Herman, I think you mentioned a few times

 6   in your testimony about fine particulate lead.

 7            Do you recall that?

 8       A.   Yes.

 9       Q.   And it's fair to say that fine particulate lead

10   was one of the factors that led to the 2007 revision to the

11   NSF standard, right?

12       A.   Yes, I would say particulate lead was the issue,

13   and particulate lead -- fine particulate lead was the most

14   critical aspect.

15       Q.   And in developing the 2007 revision to the NSF

16   standard, you're highly prescriptive in the preparation of

17   the challenge water to be sure that the challenge water that

18   was used by other labs would be consistent and reliable,

19   correct?

20       A.   There are many, many requirements in the NSF 53

21   2007, including how tanks are prepared, order of addition,

22   types of chemicals used, even experience of the laboratory

23   cleaning procedures, et cetera.

24       Q.   And a lot of that is directed towards ensuring

25   that the total lead, lead particulate and fine lead
```

1    particulate, are consistent within specification; is that

2    fair?

3        A.    Actually, I would adjust that just a little bit.

4    I would say the intent of that was to allow the

5    laboratories, that they could be successful, and allow them

6    to be able to create that test water as successfully as

7    possible.

8            For example, at the NSF Ann Arbor laboratory we

9    had a 95 percent success rate.  We were really proud of

10   that.  But 5 percent of our tanks we would have to throw

11   out.

12       Q.    Now with respect to fine particulate, the

13   standard is under NSF 2007 -- sorry -- NSF 53 2007, that you

14   want to have at least 20 percent of your particulate is

15   between .1 and 1.2 microns.

16           Do I have that right?

17       A.    Yes.  Yes, that is a minimum specification.

18       Q.    And in your view that's a critical part of the

19   NSF 53 2007 pH 8.5 challenge water specification, correct?

20       A.    Yes, because when you actually are obtaining at

21   least 20 percent, then you're controlling the particulate

22   formation and any agglomeration of particulates within the

23   test water.

24       Q.    And if you are not properly controlling for fine

25   particulate, you can have extreme variability in pH 8.5 lead

1  challenge water, do you agree with that?

2  A.  Sure.  If you just throw it together and don't

3  control fines, then, yes, you could have significant

4  variance.

5  Q.  Now in your test results you did not control for

6  fine particulates -- I'm sorry.

7  In your testing for this investigation, you did

8  not control for fine particulates in your challenge water,

9  correct?

10  A.  No, I did not.  I was patterning after the '141

11  patent and how that test is performed.

12  Q.  Okay.  Now does the protocol that you had -- I'm

13  sorry.

14  I say you followed, but you know when I say you

15  followed, I mean the people working under your direction.

16  That protocol had specifications for alkalinity,

17  right?

18  A.  Yes, it has specifications and ranges for

19  alkalinity.

20  Q.  And claim 1 of the '141 patent doesn't have any

21  specifications or requirements for alkalinity, correct?

22  A.  Nope.

23  Q.  And you also included specifications for

24  hardness, correct?

25  A.  Mm-hmm, yes, I did.

1    Q.   And you agree with me, claim 1 does not recite a

2    requirement for the hardness of the challenge water,

3    correct?

4    A.   No, it does not.

5    Q.   And --

6    A.   Although it would be really hard to get

7    particulate lead without it.

8    Q.   And you would agree that you set specifications

9    for the challenge water for its temperature, correct?

10   A.   Yes, I did.

11   Q.   And those -- there's no requirement in claim 1 as

12   to the temperature of the challenge water, right?

13   A.   No, there is not.

14   Q.   Okay.  You also provided for adding a certain

15   amount of calcium chloride to ensure you had the right

16   amount of chlorine in the testing water, correct?

17   A.   Actually, that wouldn't be calcium chloride.

18   That's for hardness.  For chlorine, we would actually had

19   sodium hypochlorite.

20   Q.   Thanks for the correction, doctor.  Again, I'm a

21   political scientist, not a chemist.

22   A.   Understood.

23   Q.   It was not an intentional misleading on my part.

24   My apologies.

25        But you can control for chlorine was my point,

1    correct?

2        A.    Yes.

3        Q.    And you did -- for each of those parameters that

4    we just talked through -- alkalinity, hardness, temperature,

5    chlorine -- none were in the '141 patent, but you knew to

6    include them because that's how you make challenge water

7    under the industry standard, right?

8        A.    That's -- if you want to make particulate, you're

9    going to have to have those constituents; otherwise, you

10   won't make particulate.

11       Q.    Okay.  And even though you knew that, by leaving

12   out specifications for fine particulate, it could lead to

13   extreme variability in the tests, you didn't include that in

14   your challenge water specifications for this investigation,

15   right?

16       A.    Right, because I was trying to reflect what was

17   in the '141 patent, and, from my point of view, that means

18   if it ends up having a wide variation because of fines,

19   that's inherent within the patent specification.

20       Q.    So you didn't -- when you read the '141 patent,

21   you didn't see it telling you to control for fine

22   particulates in the challenge water for claim 1; is that

23   your testimony?

24       A.    Yes, it doesn't indicate that you have to control

25   fines.

 1      Q.   So, Mr. Rennick, let's go to JX-22, column 25,

 2   lines 59, all the way down to 60.  Actually go up, it's a

 3   little higher than that.

 4           So this is a specification, column 25, of the

 5   '141 patent.

 6           Do you see it, Dr. Herman?

 7      A.   Yes, I do.

 8      Q.   And do you see where it says, "Preferably, the

 9   source water is prepared as defined in the NSF/ANSI 53

10   protocol 2007"?  I read that correctly, yes?

11      A.   Yep, that's correct.  It gives a preference to

12   NSF 53 protocol.

13      Q.   And it tells you the illustrative source water

14   specifications according to the NSF/ANSI 53 protocol 2007

15   are as follows.

16           Did I read that correctly?

17      A.   Mm-hmm, if you're running Standard 53 protocol

18   2007 for this, then this would be appropriate.

19      Q.   And then I want to jump down to the very bottom.

20   It tells you hardness, alkalinity, chlorine content, and pH

21   of the water is specified as follows.

22           Do you see that?

23      A.   Yep.  I would also note I also see the total lead

24   content range of 135-165.

25      Q.   Thank you for noting that, Mr. Herman.  Again, if

1   you would just answer the questions I'm trying to get

2   through here.  Your counsel can come back to other things

3   you would like to talk about.

4       A.   Sorry.

5       Q.   You agree with me it provides for specifications

6   for hardness, alkalinity, chlorine content, and pH of the

7   water, right?

8       A.   Yeah, it basically reflects what's in the NSF

9   standard 53 protocol as a preference.

10      Q.   And that's not in claim 1, but the specification

11  tells you, here's how you prepare the challenge water,

12  right?

13      A.   It tells me this is a way to prepare the

14  challenge water.

15      Q.   And then if we go right above where we

16  highlighted --

17           Do you see the line that says greater than 20

18  percent of the colloidal lead must be in the 0.1 micron to

19  1.2 micron size range?  Do you see that?

20      A.   Yes.  As I said before, the specifications here

21  reflect the requirements that are in NSF/ANSI Standard 53.

22      Q.   And that language right there that I just read,

23  greater than 20 percent of the colloidal lead must be in the

24  0 .1 micron to 1.2 micron size range, that is referring to

25  fine particulate lead, correct?

1      A.   Yes, that is the specification in Standard 53 for
2   fine particulate lead.
3      Q.   So, just to be clear, Mr. Herman, the '141 patent
4   inventors in their specification told people how to make the
5   challenge water, how to use hardness, alkalinity, chlorine
6   content, adjust the pH, and to use fine particulate lead,
7   just as is described in the NSF/ANSI 53 protocol.  That's
8   what they said in their specification, true?
9      A.   What they gave in the specification was an option
10  to use NSF/ANSI Standard 53, yes.
11     Q.   All right.  So let's go to slide 21 in CDX-17.
12          We have gone through these, I think, Mr. Herman,
13  but CDX-17, you followed the NSF specification when it came
14  to hardness, right?
15     A.   The hardness range actually at the specification
16  stated here, I don't think it's actually reflecting Standard
17  53.  One of them -- the hardness or alkalinity, one of them
18  is off.  I would have to look at Table 14 to verify.
19     Q.   Your specifications were consistent with the NSF
20  specification for NSF 53 2007, correct?
21     A.   I believe the ranges overlapped.
22     Q.   Okay.  And you followed the temperature range for
23  NSF 53 2007, right?
24     A.   Yeah.  That's normal.
25     Q.   And you followed the constituent components for

1 the challenge water, including calcium chloride dihydrate,

2 magnesium sulfate, sodium bicarbonate, sodium hydroxide, you

3 followed all those, correct?

4      A.   Yeah, the chemical constituents of the test water

5 were followed so that we could make particulate lead.

6      Q.   And the one thing you did not follow, the one

7 thing you said would lead to extreme variability in the

8 challenge water, was the guidelines on fine lead

9 particulates, correct?

10      A.   That fine particulates was not included in the

11 specification because we did not see it as a requirement to

12 perform FRAP testing under the '141 patent.

13      Q.   You didn't think it was important to have

14 challenge water that did not have extreme variability in it.

15      A.   I thought it was important to demonstrate the

16 inherent variability of the '141 patent by not having a

17 specific specification requirement for fine particulate

18 lead.

19      Q.   I thought you were trying to demonstrate the

20 prior art practiced the '141 patent, sir.

21      A.   Yes, and actually it did, even with fine

22 particulate coming and going in the challenge.

23      Q.   By using unstable challenge water, challenge

24 water that -- contrary to what the inventors directed in

25 their specification as illustrative challenge water, you

1  ignored that for your test, right?

2      A.    No, I conducted the test in the same manner that

3  the inventors conducted it, as indicated in the patent.

4      Q.    The patent told you that they recommended

5  controlling for fine particulate lead and told you exactly

6  what to do in line with the NSF 53 standard, sir, correct?

7  We went through that.

8            Do we need to go back to that again?

9      A.    They had a preferable method of forming the

10  water, and one of them was NSF Standard 53, but they were

11  not following Standard 53 when they were conducting their

12  prior art testing.

13      Q.    You chose not to follow the guidance in the

14  specification of the '141 patent on how to make the

15  challenge water; isn't that right?

16      A.    I did not follow the specification that required

17  testing in accordance with Standard 53.

18      Q.    And including the requirements for fine lead

19  particulate, correct?

20      A.    I didn't test according to the specifications

21  requiring Standard 53, which would include fine particulate.

22      Q.    Okay.  Now let's just go back -- if we can go to

23  slide 7 of CDX-17.

24            This is CDX-17 at slide 7, and, Mr. Herman, we

25  already looked at the data that you generated on the Brita

1    legacy filters.  I'll represent this is just a graph like we

2    looked at before showing your data from your tests.

3            Will you accept that representation that I

4    graphed it correctly?

5        A.   I think you did.

6        Q.   Okay.  What we see here is, in the orange line,

7    that shows one of your -- the 3-B sample that you tested,

8    correct?

9        A.   Yes.

10       Q.   And it shows that, up to the first 10 gallons,

11   the Brita legacy filter was below 10 parts per billion,

12   right?

13       A.   Yes, it does.

14       Q.   And then when it gets to 20 gallons, it goes

15   above 10 parts per billion, right?

16       A.   Yes, it does.

17       Q.   And at 30 gallons, it goes all the way above 60

18   parts per billion.

19       A.   Yes.

20       Q.   And then at 40 gallons it drops back down to

21   somewhere around -- somewhere between 10 and 20, we'll say

22   above 15 parts per billion.

23           Can we agree upon that?

24       A.   Yes.

25       Q.   And then it isn't until after 50 gallons it falls

1    below 10 parts per billion.

2        A.    Correct.

3        Q.    Would you consider that to be extreme variability

4    in a test result?

5        A.    I would consider that an interesting pattern of

6    an effluent for a product, and it is extreme variability,

7    and my opinion it is due to particulate lead, especially

8    fines.

9        Q.    Okay.  Let's go to slide 9.

10            Now slide 9, similar to the slide we showed you

11    before, this is your data from the DuPont 2007 filter, and

12    we just graphed it out here.

13            Will you accept that representation?

14        A.    Yes.

15        Q.    And for each of the DuPont filters, each of them

16    exceeded 10 parts per billion at some point in the first 40

17    gallons, right?

18        A.    Yes.

19        Q.    And if we look at the blue line, which was the IT

20    1326 sample, would you agree that that's some extreme

21    variability we're seeing the results for that particular

22    specimen?

23        A.    I wouldn't call it extreme.  Well, it's moderate

24    variability, yes.

25        Q.    It goes up and down, up and down, right,

1   Mr. Herman?

2        A.   Well, sure, but your scale is pretty expanded.

3   So it wouldn't look nearly as expanded if you had the scale

4   a little higher.

5        Q.   Let's go to slide 8, please, Mr. Rennick.

6             On slide 8 this is the data from your testing of

7   the DuPont 2005 filter, and we graphed it out here on slide

8   8.

9             And would you agree that the results of the

10  DuPont 2005 testing also showed extreme variability?

11       A.   No.  I would say the IT 1370 didn't show extreme

12  variability.  You did see quite a bit of variability in 4-A

13  and 4-B.

14       Q.   Comparing the three against each other, would you

15  consider -- so two look very similar, the third one, the

16  blue one, IT 1370, has a very different curve than the other

17  two, correct?

18       A.   I wouldn't describe it as a curve.  It can kind

19  of look like a curve, but they have different patterns, but,

20  of course, they were performed in two different laboratories

21  with two different types of waters being exposed.  So that

22  variation between units is not extreme.

23            MR. AINSWORTH:  Your Honor, could I have one

24  moment, please?

25            JUDGE MCNAMARA:  Yes, of course.

1   BY MR. AINSWORTH:

2       Q.   If we can go back, Mr. Rennick, to slide 6 from

3   CDX-17.

4            Now, Mr. Herman, we already looked at slide 6

5   from CDX-17 before.  This is your data for the PUR 1-stage

6   filter graphed out like the other ones we just looked at,

7   right?

8       A.   Correct.

9       Q.   And would you agree that the results on slide 6

10  show significant variability in the results?

11      A.   Well, some of the variability you're observing

12  here is actually not graphed correctly, because the 7-A,

13  actually, was not run concurrently with 5-A and 5-B.  It was

14  actually run at a different time period.  Shifted on here.

15           So the fact that it was high at the beginning is

16  actually -- it correlates really well with 5-A and 5-B.  The

17  differences, again, between the laboratories where 1371 was

18  run at Helen of Troy and the others were run at QFT, and we

19  had that spike in there that was due to the change in fine

20  particulate during the test resulting in significant

21  breakthrough of lead.

22           So actually, if you put the 7-A where it's

23  supposed to be, that spike is actually right at that

24  30-gallon mark.

25      Q.   I'm referring to the variability from 10 parts

1    per billion at one point to 80 parts per billion at a

2    different point in the test.

3              Don't you consider that to be highly variable?

4        A.    That's a significant change in performance of the

5    filter, which is a result of the particulate within the

6    test.

7        Q.    Okay.  Now, Mr. Herman, based on your experience,

8    with your data here for the PUR 1-stage, would you be able

9    to conclude that this data supports that these filters have

10   a lifetime of 40 gallons for lead reduction?

11       A.    These tests were not designed to establish

12   lifetime.  You're evaluating products against a lifetime.

13   There's a little difference there.

14       Q.    That wasn't quite my question.

15       A.    Okay.

16       Q.    My question was, from your data, would you be

17   able to conclude that the PUR 1-stage filters that you

18   tested had a lifetime of 40 gallons for lead reduction?

19       A.    Well, no, I would never use these -- this data

20   for that purpose.  Lifetime, to me, you have to have -- it

21   has to be established, to me, by the manufacturer, and they

22   determine what they consider a verification of lifetime.  So

23   this test is not designed to do that nor intended to do

24   that.

25       Q.    So the answer to my question is no, correct?

```
 1       A.   Answer no or yes.  This is not used for lifetime.
 2       Q.   So let's go to slide 7.
 3            I'm going to ask you the same question.  I
 4   understand your qualifications, but my question is, from
 5   your data and your testing of the Brita legacy filter, could
 6   you conclude that that filter has a lifetime of 40 gallons
 7   for lead reduction?
 8       A.   I would not make any conclusions regarding
 9   capacity or lifetime based on the testing that I performed.
10       Q.   Okay.  If we turn to slide 8, the DuPont 2005
11   filters, Mr. Herman, I'm going to ask you the same question.
12            From your testing, represented here on slide 8,
13   could you conclude that the DuPont 2005 filter had a
14   lifetime of 40 gallons for lead reduction?
15       A.   As I have said before, these tests were not
16   designed to evaluate for lifetime, so I would not use them
17   for such.  So, no, I would not use them for -- to
18   establishing lifetime.
19       Q.   You would not draw that conclusion from this
20   data.
21       A.   I would not use this data to try to draw that
22   conclusion.
23       Q.   Okay.  And then if we go to slide 9, the DuPont
24   2007 filter, I'm going to ask you the same question,
25   Mr. Herman, I know it's repetitive.
```

1       A.   Yes, it is.

2       Q.   That wasn't my question, Mr. Herman.  Thank you

3   for agreeing with me on one thing.

4            For the 2007 DuPont filter, you would not draw

5   the conclusion from your data that that filter had a

6   lifetime of 40 gallons for lead reduction, true?

7       A.   I would not use this data to determine whether or

8   not that filter had a lifetime of 40 gallons for lead

9   reduction.

10      Q.   And for the PUR 1-stage filter -- we can take

11  that down, Mr. Rennick -- to your knowledge the PUR 1-stage

12  filter was never certified for lead reduction under the

13  NSF 53 2007 standard, correct?

14      A.   Certified for lead reduction?  I do not believe

15  it was certified for lead reduction, no.

16      Q.   And the Brita legacy filter, to your knowledge

17  was the Brita legacy filter ever certified for lead

18  reduction under the NSF 53 2007 standard?

19      A.   Under the 2007 standard, no, I don't believe it

20  was.  I think it was under the '99 standard.

21      Q.   For the DuPont 2005 filter that you tested, was

22  that filter ever certified under NSF 53 2007 for lead

23  reduction?

24      A.   I don't believe that filter was available to be

25  certified under the 2007 standard for lead reduction.  I

1    know the 2007 was.  But the 2005 I don't believe was.

2        Q.   And the 2007 was certified sometime after 2008,

3    correct?

4        A.   I'm not sure of the date.  I'm sorry.

5        Q.   And do you know whether that -- do you know

6    whether the DuPont filter that was ultimately certified

7    under NSF 53 2007 was the same filter that you tested?

8        A.   I tested both variants of the Brita -- not the

9    Brita, I'm sorry -- I tested both variants of the DuPont

10   PTC-100, both the 2005 and 2007 version.

11       Q.   And my question was, the one that was ultimately

12   certified by NSF 53 lead reduction, you don't know whether

13   you actually tested the same DuPont filter, right, as part

14   of this test for this investigation?

15       A.   My understanding from Mr. Cueman's deposition was

16   that they had that one change that occurred for the 2007

17   version, and then there wasn't another change for a

18   significant period.  So I would assume or from that

19   information say that it was the same one that had been

20   certified.

21       Q.   Okay.

22       A.   The box we actually had with that filter in it

23   did have an NSF Standard 53 certification for lead, so that

24   filter I tested would have been that product.

25       Q.   It had an NSF 53 certification for lead for the

1    2007 standard on it?

2        A.   The date on it -- I'd have to go and look further

3    into it.  Off the top of my head I don't remember exactly

4    the wording on it, but it did have an NSF 53 certification

5    for lead reduction on the 2007 version, which, because of

6    the dating and everything, that would have been very

7    difficult to get someone to certify it to the old standard.

8    So I would have to conclude it was the 2007 version.

9        Q.   Do you know when -- do you know when the DuPont

10   2007 filter was actually certified under NSF 53 2007?

11       A.   I don't have specific information.  I don't

12   remember that.  I just remember the packaging that we had

13   used, the yellow packaging actually has right on it NSF

14   Standard 53 for lead, and that packaging was obviously for

15   the -- it was for the 2007 filter.  It was that -- that

16   claim was not on the packaging for the 2005 version.

17       Q.   Do you recall, Mr. Herman, whether the -- there

18   was ever a recall of the DuPont filter based upon inaccurate

19   information regarding their certification?

20       A.   I know that UL had an issue with the

21   certification and WQA also had a certification with them,

22   but I understand they got that cleared up.

23       Q.   Okay.

24           MR. AINSWORTH:  Your Honor, we have no further

25   questions.

1          JUDGE MCNAMARA:  Okay.  Thank you very much,

2    Mr. Ainsworth.

3          Mr. Swain, do you have any redirect?

4          MR. SWAIN:  I do, Your Honor.  I would ask the

5    witness, since he has been on the stand for quite some time

6    and Ms. Kinkade has been working for quite some time, if a

7    break is needed.  If not, I'm happy to proceed.

8          JUDGE MCNAMARA:  Sure.  Are you talking about an

9    early lunch break or are you talking about another 15-minute

10   break?

11         MR. SWAIN:  I would defer to Ms. Kinkade and the

12   witness on that, Your Honor.

13         THE WITNESS:  As far as I'm concerned I'd love to

14   push through.

15         JUDGE MCNAMARA:  Okay.  All right.  Ms. Kinkade,

16   let's just take a 15-minute break, and I will see you back

17   here at 12:15.

18         (Whereupon, the proceedings recessed at 11:56

19   a.m.)

20         (In session at 12:15 p.m.)

21         JUDGE MCNAMARA:  Good afternoon everyone.  I

22   think we are back.  Mr. Herman, are you ready?

23         THE WITNESS:  Yes, I am, Your Honor.

24         JUDGE MCNAMARA:  Mr. Swain?

25         MR. SWAIN:  Yes.  Thank you, Your Honor.

1    BY MR. SWAIN:

2        Q.    Could I have RDX-7C 25 up, Mr. Kotarski?

3              Mr. Herman, do you remember being asked questions

4    about how you determined the lifetime of the prior art

5    products?

6        A.    Yes.

7        Q.    Let's have RDX-7C.25 up, please.

8              Could you tell the Court how you determined the

9    lifetime as in the total number of gallons of water that a

10   manufacturer or seller of these three prior art filters has

11   validated can be filtered before these filters are replaced?

12       A.    I reviewed the packaging of the products and the

13   literature with the products, which all had claims of 40

14   gallons for each one of them.

15       Q.    And were these 40 gallons certified by NSF?

16       A.    In many cases they were.

17       Q.    Are there any cases where they weren't?

18       A.    Actually, you're correct, no, there is not a case

19   that they were not certified at that capacity by NSF.

20       Q.    And you -- what is the lifetime that you

21   determined for the Brita legacy granular filter?

22       A.    Forty gallons.

23       Q.    What does the -- could I have Table 5 of the '141

24   patent, please?

25              Mr. Herman, what does the '141 patent and the

1    patent inventors tell us and the world what the lifetime of

2    the Brita legacy granular filter is for the FRAP

3    calculation?

4        A.   Forty gallons.

5        Q.   Is that 40 gallons NSF 53 2007 certified?

6        A.   No.

7        Q.   Thank you.

8             Mr. Herman, you were asked some questions about

9    flow rate.  Have you reviewed the '141 patent in this

10   investigation, sir?

11       A.   Yes, I have.

12       Q.   Have you reviewed the prosecution history?

13       A.   Yes.

14       Q.   The parent application?

15       A.   Yes.

16       Q.   Does it say anywhere in any of those documents

17   that one must measure the average flow rate by measuring

18   every liter of the lifetime?

19       A.   No, it does not.

20       Q.   You were asked about Dr. Knipmeyer's underlying

21   testing in her notebooks.

22            Do you recall that?

23       A.   Yes.

24       Q.   Where she tested some of the prototypes every

25   liter?

1       A.   Yes.

2       Q.   Did any of that prototype information or

3  instructions or protocol that you have to test every liter,

4  did any of that make it into the '141 patent?

5       A.   No, I did not see any evidence of that.

6       Q.   When testing the prior art in the '141 patent,

7  how did Brita present to the world how to test average flow

8  rate over lifetime?

9       A.   They committed average of anywhere from three to

10  five datapoints.

11      Q.   Let's take a look at that, Mr. Herman.

12           Can I have Table 3 of the '141 patent, JX-22.

13           Could you explain to the Court what you mean by

14  three to six samples?

15      A.   Well, at the top, the Brita granular, and the

16  Maxtra 5545, the averages that are represented in the table

17  are equivalent to the averages of each datapoint across the

18  table.

19           So in this case, for those two, there were six

20  datapoints.

21      Q.   So, for example, is the 532 average reported for

22  the granular filter -- the granular filter the average of

23  the six datapoints you see for the 3 L, 76 L, 151 L, 227 L,

24  273 L, and 303 L?

25      A.   Yes.

1   Q.   And so the average flow rate is based on six

2   datapoints of 303 liters, correct?

3   A.   Correct.

4   Q.   Does that sound to be about 3 to 4 percent of

5   lifetime?

6   A.   Yeah.

7   Q.   Same question for the PUR 2-stage.  Do you see

8   the averages reported as 16 --

9        It's one more -- one lower, Mr. Kotarski.  I

10  skipped one.

11       The PUR 2-stage product, how was the average flow

12  rate represented to the world by the inventors of the '141

13  patent?

14  A.   It was presented as the average of those three

15  datapoints presented there.

16  Q.   And the result was three datapoints?

17  A.   The three datapoints was 16 minutes and 2

18  seconds.

19  Q.   So if someone were to tell this Court that

20  sampling three to five sample points is insufficient to

21  measure average flow rate of the '141 patent, what is your

22  response to that?

23  A.   That practice was not exercised consistently in

24  the patent.

25  Q.   Thank you, Mr. Herman.  We can set that aside.

1          Can I have RX- -- I'd like to talk to you a

2     little bit more about your lead testing.

3          Can I have RX-684 at 2?

4          And could I have, under Tank Specifications,

5     Mr. Kotarski, bring all of that up.  Thank you.

6          Mr. Herman, do you see sub-2 here where it talks

7     about total lead, soluble lead, and colloidal lead?

8     A.   Yes, I do.

9     Q.   Are these ranges within what is prescribed by

10    claim 1 of the '141 patent?

11    A.   Yes, they are.

12    Q.   Did you ever prescribe a range that was outside

13    the range of claim 1 of the '141 patent?

14    A.   No, I did not.

15    Q.   Thank you.

16         I'd like now RX-985 at 23, please.  We can stay

17    on the public record.

18         Do you recall Mr. Ainsworth asking you about this

19    document here, Mr. Herman?

20    A.   Yes.

21    Q.   Okay.  And I believe you mentioned you wanted to

22    provide some context as to why there was a switching from

23    two sample points to one.

24         Do you recall that?

25    A.   Yes, I do.

1    Q.   Could you please provide the Court what context

2    you wanted to provide?

3    A.   Well, the context, and I explained this in my

4    direct, the demonstration of the data all the way up to the

5    17.5 volume provides information showing that the system was

6    stabilized and was actually correcting low-level influents

7    at the beginning of the test, and there were three days,

8    which demonstrated that the tank was stable and was going to

9    maintain its stability over time.

10   Q.   Mr. Herman, is there any doubt in your mind that

11   from the 20 gal point on the influent water in your testing

12   met the specifications of the '141 patent?

13   A.   I am certain that it met the specifications of

14   the '141 patent.

15   Q.   Now I want the record to be clear so no one

16   misconstrues your words later on.

17        You mentioned that you kind of wish you had the

18   second point of data here, correct?

19   A.   Yes, I did say that.  Essentially it was so there

20   wouldn't be an argument about it.  Apparently the three days

21   of where it had corrected and maintained the levels weren't

22   adequate for Mr. Ainsworth to believe me that they are going

23   to hold the specification.

24   Q.   Mr. Herman, can you remind the Court how often

25   NSF tests its challenge lead tanks when it tests water?

1      A.   Once prior to the tank being used.

2      Q.   And is what you've done here in RX-985 at 23

3  consistent with that?

4      A.   Yes, it is.

5      Q.   Thank you.  One final set of redirect.

6           MR. SWAIN:  I do need to go on the ZeroWater

7  confidential information.

8           (Whereupon, the hearing proceeded in confidential

9  session.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx23227-23231 redacted in their entirety

1    O P E N   S E S S I O N

2

3        JUDGE MCNAMARA:  Okay.

4  BY MR. AINSWORTH:

5        Q.   So, Mr. Rennick, if we could pull up the '141

6  patent.  Let's go to Table 3 that Mr. Swain and Mr. Herman

7  were discussing on redirect.

8            Blow up Table 3 for us all the way, please.

9  There we go.

10           Now, Mr. Herman, you were asked on redirect about

11  Table 3, and you offered the opinion that the averages

12  reported in Table 3 are averages from just a handful of

13  datapoints, correct?

14       A.   From the datapoints presented.

15       Q.   You don't know for a fact how the inventors

16  calculated the average, right?  You're drawing an inference.

17       A.   I am drawing a conclusion based on taking the

18  data that's in the table and calculating an average, and it

19  aligns with the averages presented in the table.

20       Q.   So let's look at the one that Mr. Swain did not

21  show you.  Let's go to the PUR 2-stage at the second from

22  the bottom section of Table 3.  There you are.

23           You see these three datapoints:  One at 8 minutes

24  13 seconds; one at 12 minutes 15 seconds; and one at 12

25  minutes 30 seconds.  Can we agree upon that?

1      A.   Yes.

2      Q.   And you see the average reported is 18 minutes 52

3   seconds.  Can we agree on that?

4      A.   Yes, I do see that.

5      Q.   So can we agree that the average reported for the

6   PUR 2-stage filter, this one here, of 18 minutes and 52

7   seconds could not be the average of the 3 liter, 76 liter,

8   and 151 liter reported flow rate measurements?

9      A.   Yes, that value is incorrect, and if you actually

10  look at Table 5 you'll see the correct value, which is the

11  average of those three.

12     Q.   You don't -- do you agree -- well, how do you

13  know that's an incorrect average for the whole test?

14     A.   Because the reported average in calculating the

15  FRAP in Table 5 is the average of those three points, or at

16  least it correlates to the average of those three points.

17     Q.   So you're drawing another inference there, right?

18     A.   I'm drawing a conclusion based on the dataset in

19  front of me.

20     Q.   But Dr. Knipmeyer wasn't asked about that data

21  during her testimony, was she, at this hearing.

22     A.   I don't think so.  I mean, you're asking me and

23  I'm telling you what I'm observing.

24     Q.   And she testified under oath as to her practice

25  for calculating flow rate, correct?

1    A.   Well, standard practice and whether you follow it
2   for every single test you do are two different things.
3    Q.   Okay.  But you don't know one way or the other,
4   do you?
5    A.   I know from what the data shows that it would
6   appear that the data they used to calculate the FRAP in
7   Table 5 was actually an average of three datapoints as
8   presented in Table 3.
9    Q.   Mr. Herman, just answer my question.  You don't
10  know for a fact how the inventors calculated the average,
11  right?
12   A.   I have no idea how they got 18.52 for this table.
13   Q.   Okay.  Or for the other averages in the table,
14  you don't know for a fact; you're drawing an inference.
15   A.   I'm drawing a conclusion based on data.  I mean,
16  what do you want me to say?  I'm not going to say I don't
17  know.  I know what I did, and I just explained what I did.
18  So that's the fact.
19       MR. AINSWORTH:  No further questions, Your Honor.
20       JUDGE MCNAMARA:  All right.  Thank you.
21       Thank you, Mr. Herman.  I think we have concluded
22  with your testimony.
23       MR. SWAIN:  Your Honor, I wished that were true.
24  I just have --
25       JUDGE MCNAMARA:  Do you have recross, I mean

1    redirect?

2         MR. SWAIN:  Very briefly, Your Honor.  I do want

3    to put up Table 5 of the '141 patent.

4                   REDIRECT EXAMINATION

5    BY MR. SWAIN:

6         Q.   Could I have the two PUR 2-stage timer products

7    highlighted?

8         Mr. Herman, what do the inventors -- just the

9    bottom two, Mr. Kotarski.

10        What do the inventors of the '141 patent tell us

11   in the instrument that defines their invention, defines what

12   they're telling the world, what the average flow rate is for

13   the PUR 2-stage of these two embodiments?

14        A.   So for the upper one they're saying that the

15   average flow rate is 10.4, and for the lower item they're

16   showing that the average is 11.0.

17        Q.   And are those two numbers the average of the

18   three datapoints in Table 3 for those two embodiments?

19        A.   They are equivalent to the average of the three

20   datapoints shown in Table 3.

21        Q.   And one last question.  I believe it was RX-177C.

22        Let's go on the confidential record or stay on --

23        (Whereupon, the hearing proceeded in confidential

24   session.)

25

Appx23236-23237 redacted in their entirety

```
 1                O P E N   S E S S I O N
 2                   AFTERNOON SESSION
 3               (In session at 1:39 p.m.)
 4          JUDGE MCNAMARA:  Good afternoon everyone.
 5          So Respondents are going to call their next
 6  witness.
 7          MS. SIMMONS:  Great.  The ZeroWater Respondents
 8  call Dr. Thomas Vander Veen.
 9          JUDGE MCNAMARA:  Ms. Simmons, would you identify
10  yourself on the record, please?
11          MS. SIMMONS:  Of course, Your Honor.  My name is
12  Cassandra Simmons, and I'm with the ZeroWater Respondents.
13          JUDGE MCNAMARA:  Okay.  Thank you very much.  And
14  who will be crossing for Brita?
15          MS. KIM:  Good afternoon, Your Honor.  This is
16  Josephine Kim.
17          JUDGE MCNAMARA:  Yes, good afternoon, Ms. Kim.
18          All right.  Dr. Vander Veen, how are you?  It's
19  been a while since I've seen you.
20          THE WITNESS:  Good afternoon.  Good to see you
21  again.
22          JUDGE MCNAMARA:  Everything okay?  Did your
23  family make it through COVID okay?
24          THE WITNESS:  We did, yes.  Thank you.
25                    THOMAS D. VANDER VEEN,
```

```
1              having been first duly sworn and/or affirmed

2   on his oath, was thereafter examined and testified as

3   follows:

4              JUDGE MCNAMARA:  Please state your full name.

5              THE WITNESS:  Thomas D. Vander Veen.

6              JUDGE MCNAMARA:  All right.  Thank you very much.

7              Ms. Simmons, the floor is yours.

8                       DIRECT EXAMINATION

9   BY MS. SIMMONS:

10      Q.   Dr. Vander Veen, can you please introduce

11  yourself to the Court?

12      A.   Sure.  My name is Thomas Vander Veen.  I am a

13  managing director at Epsilon Economics.

14      Q.   What was your assignment in this case?

15      A.   In this case I was asked to analyze the economic

16  prong of the domestic industry and the opinions presented by

17  Mr. Green as well as to look at bond.

18      Q.   Mr. Kotarski, could we please pull up RDX-11C

19  slide 2.

20           Mr. Vander Veen, can you please describe your

21  qualifications and experience?

22      A.   Sure.  I have a bachelor's degree in economics

23  mathematics from Calvin College; I have a master's degree

24  and a Ph.D., both of those are in economics and both from

25  Brown University.
```

1     I've been working as an economist for about 20
2     years, currently as a consultant advising clients on
3     strategy issues related to the valuation of intellectual
4     property, but also assessing damages in federal court as
5     well as testifying here before the ITC.
6           Prior to my work as a consultant, I was employed
7     by the U.S. International Trade Commission, and I was a
8     member of the staff of one of the Commissioners.
9     Q.    About how many ITC cases have you opined on?
10    A.    I think more than 50.
11          MS. SIMMONS:  At this point I'd like to tender
12    Dr. Vander Veen as an expert in economics related to
13    domestic industry and bond.
14          JUDGE MCNAMARA:  Ms. Kim, does Brita have any
15    objections to Dr. Vander Veen testifying as an expert for
16    the purposes upon which he has been called to testify?
17          MS. KIM:  No, Brita has no objection.
18          JUDGE MCNAMARA:  All right.  Thank you.  Then
19    Dr. Vander Veen is accepted as an expert on the topics for
20    which he has been called to testify.
21    BY MS. SIMMONS:
22    Q.    Dr. Vander Veen, what opinions are you here to
23    offer today?
24    A.    At a high level, my opinion is that Complainants
25    have not established a domestic industry or the economic

1  prong of domestic industry, and also that no bond would be

2  economically reasonable for the ZeroWater Respondents.

3      Q.  Can we please move to slide RDX-11C 3?

4          On this slide, are these the products you

5  considered in this investigation?

6      A.  Yes.  This provides my understanding of the

7  domestic industry products.  They include what I've called

8  domestic industry filters, and those are the Longlast, the

9  Longlast+ filters, and then there's also domestic industry

10 containers, so those are pitchers that are compatible with

11 the DI filters.

12     Q.  And does this slide reflect the ZeroWater

13 products as well?

14     A.  It does.  It's my understanding that the

15 ZeroWater accused products include the ZeroWater 5-stage

16 replacement filters and then the containers that are

17 compatible with them.

18     Q.  Thank you.  Mr. Kotarski, can you please take

19 that slide down?

20         Let's start with Brita's manufacturing process in

21 a global context, because I think the Court could use some

22 clarity here.

23         Can you grab the Brita Elite filter in front of

24 you labeled CPX-2 and state the country of origin located on

25 the bottom?

 1      A.   So CPX-2, this is a Brita Elite filter, and --
 2   sorry -- it states that it is Made in Canada of Global
 3   Component Parts and that it is printed in Canada.
 4      MS. SIMMONS:  Your Honor, would you like to see
 5   Exhibit CPX-2 on the ELMO?
 6      JUDGE MCNAMARA:  Not necessary.
 7      If you could just hold it up again,
 8   Dr. Vander Veen, that might be helpful.
 9      THE WITNESS:  (Complying.)
10      JUDGE MCNAMARA:  Got it.  Okay.  Thank you.  It
11   will be nice when we get back to the building and can accept
12   exhibits again -- at least samples.  I don't think we're
13   going back to paper.
14      MS. SIMMONS:  We're happy to send you these
15   samples, if you would like, Your Honor.
16      JUDGE MCNAMARA:  I'll find out what Dockets is
17   doing.  I'm not sure they are yet.  So I'll find out and
18   we'll let you know.  We'll let both sides know.
19      MS. SIMMONS:  Thank you.
20      Q.   Dr. Vander Veen, can you please grab a Brita
21   pitcher with a Longlast+ filter that's in front of you
22   labeled CPX-3 and state the country of origin on the side?
23      A.   It indicates that the pitcher Made in Dominican
24   Republic of Global Components.
25      Q.   And can you be so kind to show the Court what

1   we're talking about when we talk about a pitcher?

2       A.   So this is obviously the pitcher.  The filter

3   fits within that.

4       Q.   Thank you.

5           At this point I think we are going to go on the

6   confidential record here -- at least the Brita confidential

7   record.

8           (Whereupon, the hearing proceeded in confidential

9   session.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx23244-23315 redacted in their entirety

1          O P E N   S E S S I O N

2

3          MR. AINSWORTH:  So yesterday, sorry, when was it,

4     yesterday we had some objections to the testimony of

5     Dr. Herman, and you held those provisionally, the four

6     objections.

7          We have conferred with the other side, and, in

8     view of the testimony today, we are withdrawing those

9     objections so Your Honor does not need to resolve those

10    issues.  I just want to state that for the record.

11         JUDGE MCNAMARA:  For all four of them?

12         MR. AINSWORTH:  Yes, Your Honor.

13         JUDGE MCNAMARA:  Okay.  That's good.

14         MR. AINSWORTH:  We try to make things more

15    efficient for you.

16         JUDGE MCNAMARA:  Well, that's very kind, but it

17    also made your lives a little easier for sure.  I don't

18    think you needed all that extra paper or digitization.

19         MR. AINSWORTH:  We'll be submitting the list you

20    requested, Your Honor, of matching up the demonstratives for

21    Mr. Green and Dr. Herman, and I believe Mr. Ramirez, with

22    their cite exhibits.

23         We'll also include exactly where in the

24    transcript those demonstratives were discussed so you have a

25    concordance as to where all the evidence is.

1    We sent a list to the other side, I think, a few

2    minutes ago -- or will in a few minutes -- and then we'll

3    send it to Your Honor this afternoon.

4        JUDGE MCNAMARA:  Okay.  And then I'm going to

5    give you my ruling on that before the day is done, probably

6    just before the exhibits come in, for the ruling on whether

7    or not the exhibits should be stricken.

8        MR. AINSWORTH:  Thank you, Your Honor.  And just

9    one point of clarification.  I apologize for not knowing

10   your preference on this.

11       For the list of admitted exhibits that you

12   already moved into evidence -- that we moved into evidence,

13   do you want that filed or just submitted via email?

14       JUDGE MCNAMARA:  It needs to be filed on EDIS.

15       MR. AINSWORTH:  Okay.  Will do.  Thank you, Your

16   Honor.

17       JUDGE MCNAMARA:  Okay.  And then I imagine there

18   will be another set of exhibits today.

19       MR. AINSWORTH:  I imagine there will be, yeah.

20       JUDGE MCNAMARA:  Yes.  Okay.  Mr. Swain, do you

21   have anything you would like to add here?

22       MR. SWAIN:  Nothing presently, Your Honor.  I

23   think Mr. Ainsworth covered it.

24       JUDGE MCNAMARA:  Okay.  And then also at the end

25   of the day I'll talk to you about the briefing schedule.

1 I'll give you both the ruling on the issue of the striking

2 of exhibits and on the schedule as I've talked about it with

3 my staff and what we think makes sense.  Okay.

4           MR. AINSWORTH:  So, Your Honor, so that you know,

5 in view of the evidence today, we do not have any further

6 witnesses to call today.

7           Our next witness will be Dr. Freeman in response

8 to Dr. Hatch.  Dr. Rockstraw testified earlier on

9 infringement.  We do not plan to call him in rebuttal on

10 invalidity.  And so I think we are finished with the

11 testimony today.

12           JUDGE MCNAMARA:  Okay.  I was not expecting to

13 get done this early.  I guess that's really good.

14           Mr. Swain, anything more?

15           MR. SWAIN:  I love a good Tuesday surprise,

16 Your Honor, but making things efficient for the Court and

17 its hearing, I'm all for it.

18           I would say, I would like, before we resume the

19 final proceedings here, maybe a 15-minute break to clean

20 things up on our end and be able to present.

21           JUDGE MCNAMARA:  Yes, that would be fine.  And

22 then I will also pull up what I need to pull up so I can

23 read from it.

24           So I'll see you back here in 15 minutes.  It's

25 3:32 now.

1          (Whereupon, the proceedings recessed at 3:32

2    p.m.)

3          (In session at 3:45 p.m.)

4          JUDGE MCNAMARA:  Okay.  I think we're back.  Have

5    you had enough time to do what you need to do,

6    Mr. Ainsworth?

7          MR. AINSWORTH:  I think it's Mr. Swain that asked

8    for the break.

9          JUDGE MCNAMARA:  Yeah.  I didn't know if you

10   needed to take care of some things as well.

11         Mr. Swain, did you have enough time or do you

12   need more time?

13         MR. SWAIN:  I think I have a list of to-do's so I

14   would like to discuss them with Your Honor.

15         JUDGE MCNAMARA:  Okay.  Go ahead.

16         MR. SWAIN:  The number one is the final exhibits

17   for the hearing are due this Friday.  Of course, that date

18   was set before we had poor Dr. Hatch got sick and we had our

19   satellite hearing to occur in October.

20         We were wondering if they are still desired by

21   this Friday, or can they wait until the October hearing is

22   concluded?

23         JUDGE MCNAMARA:  Okay.  So my preference is to

24   get all of the exhibits in for those people who have

25   testified, and then when Dr. Hatch and Dr. Freeman testify,

1   their exhibits will come in during that hearing day.  So

2   that's what I would like to do.

3          MR. SWAIN:  Thank you, Your Honor.  And for

4   today's exhibits, I have not spoken with Mr. Ainsworth or

5   anyone on his side yet, but the consensus from Respondents'

6   side is we would like a little bit more time to exchange

7   that and provide an accurate list to the Court.  We were

8   hoping by maybe close of business Thursday to get that in.

9          JUDGE MCNAMARA:  You know, my preference -- I

10  know we keep leaving the record open and I have a problem

11  with that.  I really would like you to take time now, since

12  we have additional time today, to agree on exhibits for

13  those people who have already testified, and then just

14  narrow it down if there are any disputed issues.  I would

15  prefer that that be taken care of today.

16         MR. SWAIN:  Okay.  And when would you like that

17  submitted by?

18         JUDGE MCNAMARA:  I'm going to come back on the

19  record.  I would like us to be able to have a list to admit

20  into evidence all of the exhibits from those folks who have

21  testified through today.  And that's what's typical.  And so

22  I'm hoping that your teams have been talking all along as

23  the witnesses have testified.

24         So my preference would be to have that joint list

25  submitted today.  And I can give you time.  Again, I had

1  planned to be here until close of business, so we can give

2  you time now.

3          MR. SWAIN:  Okay.  I think we can do that, and I

4  think, as soon as we take maybe another half-hour break and

5  confer with the other side, I think we can get back on at

6  4:30, if that works.

7          JUDGE MCNAMARA:  Sure does.

8          MR. SWAIN:  I'm seeing some nodding heads.

9          JUDGE MCNAMARA:  Yes or no?  Which nodding heads

10  are you seeing, yes or no?

11          MR. SWAIN:  Yes.  Yes, nodding.  I'm sorry.  I

12  was --

13          JUDGE MCNAMARA:  Well, nodding can also be a

14  different motion.

15          MR. SWAIN:  I agree, Your Honor.  Depends on what

16  the specification says, I suppose, but I always thought this

17  was shaking (demonstrating).

18          JUDGE MCNAMARA:  So this is why attorneys

19  disagree all the time; we have a different understanding of

20  words.

21          MR. SWAIN:  That's right, Your Honor.

22          And the third item, we have met and conferred

23  with Brita on this, and we just want to make sure we

24  understand the issue between Your Honor and Brita, but we

25  wanted to understand the timing of any affidavits that were

1    requested by Your Honor that Brita was to provide, namely,

2    the Ms. Kahn declaration on the flow rate issue with the

3    Longlast products, the domestic industry global value

4    metrics value added that were requested of Mr. Ramirez, as

5    well as the status, the yes or no affidavit, as far as

6    whether Brita had prior art products in its possession that

7    it could test from either Mr. Nishijima or whomever has the

8    knowledge.

9        JUDGE MCNAMARA:  Yeah, I think when I originally

10   talked about this, I think I said ten days from that date.

11   I may be incorrect.  I could probably go back and check the

12   transcripts.  But my contemplation was ten days.

13       MR. AINSWORTH:  Thank you, Your Honor.  I don't

14   think you said as to that affidavit, but we can absolutely

15   do that, and we're working to get that done very

16   expeditiously.

17       JUDGE MCNAMARA:  And if you can get it done

18   sooner obviously, just file it on EDIS, with a copy to

19   McNamara 337.

20       MR. AINSWORTH:  Yes, Your Honor.

21       JUDGE MCNAMARA:  Okay.  What's next, Mr. Swain?

22       MR. SWAIN:  The only thing I have, and it's up to

23   Your Honor about a briefing schedule, but I realize you'll

24   let us know.

25       JUDGE MCNAMARA:  Well, here's what I was thinking

1    about that.  So let me talk to you for just a moment about

2    that and get your thinking.

3            Originally when my team and I talked, we think

4    that the original briefing schedule, at least for what has

5    already been provided in testimony, and for those witnesses,

6    would remain in place.

7            In other words, the pre-hearing briefs are due

8    September 7, 2022.  The reply briefs are due September 16,

9    2022.

10            Now I recognize that there may be some issues

11    with that, because of the testimony that Dr. Hatch and

12    Dr. Freeman are giving that might affect other testimony.

13    May or may not.

14            So, Mr. Ainsworth first, what's your thinking on

15    that?

16            And then supplemental briefing, we were thinking

17    supplemental briefing for just Dr. Hatch and Dr. Freeman

18    where each side would have a week after the supplemental

19    hearing to get in their supplemental briefing and then

20    another -- and then another four days after that for any

21    reply briefs just on that testimony of Drs. Hatch and

22    Freeman.

23            MR. AINSWORTH:  Your Honor, that is fine with

24    Complainant.

25            JUDGE MCNAMARA:  Will that work for you,

1    Mr. Swain?

2         MR. SWAIN:  Yes, Your Honor.  I think actually,

3    because Dr. Hatch and Dr. Freeman are testifying about

4    discrete issues in this case, namely, 101, 112, and

5    priority, if I have that correct, and 112, I want to make

6    sure it's clear, we're talking written description and

7    enablement requirements, no indefiniteness.

8         So I think those issues, we would like to present

9    those later once those witnesses have testified in the

10   supplemental briefing, because that's where a lot of that

11   testimony comes from.

12        JUDGE MCNAMARA:  See, that's why I said I think

13   there might be some issues here where there is some

14   crossover, but I don't think there would be a problem with

15   your addressing 112 for those witnesses that have already

16   testified, would there be, seriously?

17        MR. SWAIN:  Well, no, Your Honor.  I just want to

18   make sure that we're not waiving anything if we have our

19   indefinite -- or written description and enablement

20   arguments presented and our opening briefs, but then we'll

21   have a more fulsome argument once we have all the expert

22   testimony put in.  As you well know, those are both

23   provinces of expert testimony.

24        JUDGE MCNAMARA:  Yeah.  And so my thinking about

25   that is, I recognize there's a caveat to this and that there

1  would be additional testimony.

2        I would think, Mr. Ainsworth, that would be your

3  understanding as well.

4        MR. AINSWORTH:  That would be my understanding as

5  well, Your Honor, absolutely.

6        JUDGE MCNAMARA:  And it would just be -- I'm

7  sorry.  Go ahead.  I didn't mean to interrupt you.  Go

8  ahead.

9        MR. AINSWORTH:  Are we keeping the page limits

10  the same, so we just got to keep a portion of our pages for

11  the supplemental briefing?  What's your preference?

12        JUDGE MCNAMARA:  I think on this, this is so

13  complicated, frankly, with all of the testing, I actually

14  thought, frankly, when I read the pre-hearing briefs, that

15  the testing might be a little less complicated than it's

16  turned out to be, but there you go.  And there are a lot of

17  tables involving testing.

18        So my thinking is that whatever the limitations

19  have been given to you for pre-hearing and post-hearing

20  briefs you use right now for what has already been -- for

21  that testimony that has already occurred.

22        And then I would be willing to add pages on for

23  Dr. Freeman and Dr. Hatch.  This is complicated stuff, which

24  is not to say that it's -- I mean, I've seen some

25  complicated things over the course of the years, but when

1  you get into the minutiae of the testing, that, to me, that

2  involves a fair amount of comparing and contrasting, more

3  so, I think, than I've seen in quite a while.

4          So I think I would add on pages for that.  I'm

5  not sure of the number.  I know this is sort of -- this is

6  off the cuff, and so I'm willing to entertain ideas here.

7  This is just discussion and it's not written in stone.  I

8  mean, I'm willing to entertain ideas.

9          MR. AINSWORTH:  Thank you, Your Honor.  I rarely

10  ask for more briefing and more pages.

11          JUDGE MCNAMARA:  Me too.

12          MR. AINSWORTH:  As I know will Mr. Swain.

13          I think, because there are only two more

14  witnesses that we'll be dealing with in the supplemental

15  briefing, I would think maybe an additional 20 pages for

16  that section of the hearing.  I don't know if that sounds

17  like a right number to you, Your Honor.

18          JUDGE MCNAMARA:  Wow.  You know the old rule, ask

19  for far more than you want and see what you get.

20          So if you're starting with 20, I was going to go

21  higher than that.  I'm giving away the store here.

22          MR. AINSWORTH:  Mr. Swain may raise me, though.

23  He has a lot more to cover because he has the burden.

24          JUDGE MCNAMARA:  Yeah, I know.

25          Mr. Swain, do you have any ideas on this now that

1  I've already told you that I'm willing to go higher?  I'm

2  bidding against our chambers here, I'm well aware of that

3  fact.

4          MR. SWAIN:  Your Honor, we do try and endeavor to

5  make our briefs as tight and concise as possible.  First of

6  all, I agree with the sentiment, let's keep the original

7  pre-hearing brief limits so that all the testing can be

8  addressed and other attendant issues there.

9          As far as the supplemental briefing schedule to

10  handle 112, 101, and priority, I think we're going to need

11  more than 20 pages, as tight as we can make it.  I think

12  we're looking somewhere closer to 35, 40.

13          JUDGE MCNAMARA:  Wow, even you're bidding against

14  yourself.  This is a great day.  You guys don't play poker,

15  do you.

16          MR. SWAIN:  Not very well, Your Honor, not very

17  well.

18          JUDGE MCNAMARA:  All right.  So since you have

19  suggested 40, why don't I go with 40 for the initial briefs,

20  and then for reply, for Dr. Freeman and Dr. Hatch, what if I

21  give you, let's say, another 25?  Will that do it?

22          MR. AINSWORTH:  I think so, Your Honor.

23          MR. SWAIN:  Yes, Your Honor, 25 sounds fine to

24  us.

25          JUDGE MCNAMARA:  If you need more, let me know.

1  I mean, again, it's just with these hearings, I've thought
2  so much about the amount of time that's allocated for
3  hearings, and sometimes -- I mean, I go back and forth on
4  this all the time in my head, and sometimes I think that the
5  numbers of days of hearings, given the complexity of some of
6  these things, is too limited, which is why I always suggest
7  to the parties and the scheduling order, if you need more
8  time, let me know.  I know you want a limit, but sometimes
9  it can become too conclusory, and that's always my concern.
10        So, in any event, if you're good with 40 and 25,
11  then that's what it will be, if that will accommodate your
12  needs.
13        MR. AINSWORTH:  Your Honor, if I may?
14        JUDGE MCNAMARA:  Sure.
15        MR. AINSWORTH:  For the normal briefing we're
16  allowed to allocate ourselves between --
17        JUDGE MCNAMARA:  Yes.
18        MR. AINSWORTH:  May we do the same thing in the
19  supplemental briefing?
20        JUDGE MCNAMARA:  Absolutely.
21        MR. AINSWORTH:  Okay.  Thank you.
22        JUDGE MCNAMARA:  However you want to do it.
23        So that's that issue.  And so it's going to be
24  ten days and four days after the hearing for the briefing
25  and reply.

1      So we're all in accord.  We all understand that,
2   then.  I mean, we're all on the same page, at least?  I
3   don't mean the pun there, but maybe I do.
4      So we have the same page limits for both sides, a
5   total of 65, to be allocated as you so choose, and ten days
6   for the initial Hatch/Freeman part of the briefs and four
7   days thereafter.
8      MR. AINSWORTH:  Thank you, Your Honor.
9      JUDGE MCNAMARA:  So the next thing I wanted to
10  talk about before I get to what I'm going to do with respect
11  to --
12     Well, first of all, do either of you have
13  anything more you'd like to raise before I raise a couple of
14  issues?
15     MR. SWAIN:  Nothing from Respondents at this
16  time.
17     JUDGE MCNAMARA:  That's fine, Mr. Swain, you
18  jumped into the breach first.
19     MR. SWAIN:  I'm a terrible poker player, as we've
20  all learned.  I have nothing further to raise at this time,
21  although we are going to work on exhibits and get you a
22  list.  I would suggest we get back on the record at 4:45.
23     JUDGE MCNAMARA:  I need to take a couple more
24  minutes.  There are a couple things I need to raise.
25     Mr. Ainsworth, do you have anything more before I

1   get off to let you confer?

2            MR. AINSWORTH:  No, Your Honor.

3            JUDGE MCNAMARA:  Okay.  So here's what I'm going

4   to do.

5            With respect to the exhibits that -- there was a

6   motion to strike the exhibits from certain of the

7   demonstratives, some of which -- I think the only ones,

8   again, that were raised by -- were those connected to

9   Mr. Green's demonstratives, and you're going to fill that in

10  for Dr. Rockstraw and I think Mr. Ramirez.

11           I'm not going to strike the exhibits.  Indeed,

12  the transcript, Mr. Davison did mention Ground Rule 8.7.9,

13  but I think that Mr. Davison was giving this ground rule a

14  stricter reading than is required for a sponsoring witness.

15           The ground rule does not necessarily stand for

16  the proposition he has represented.  We think it would be

17  consistent with past practices to accept exhibits into

18  evidence when cited in a demonstrative, specifically the

19  exhibits were summarized in Dr. Rockstraw's and Mr. Green's

20  demonstratives and were thus relied upon.

21           Moreover, we think Brita's practice is consistent

22  with the parties' stipulation that, quote, the hearing would

23  not be interrupted by individual proffers of physical or

24  documentary evidence.  Instead, the parties are supposed to

25  work together in order to determine what was introduced each

1    day.

2         There should -- and then there's a note that, if

3    referenced, the evidence would be considered introduced into

4    evidence, if not otherwise, and that was -- there is

5    transcript testimony on this to which we'll refer in the

6    order.

7         So we just don't think -- and it is often true in

8    these proceedings that the parties agree beforehand that it

9    is not necessary to read all of the string exhibits into

10   evidence.  It's not the preferred way of going.

11        It's helpful when you have summary tables to

12   specifically identify which of the numbers come from which

13   exhibits.  And that would be my preference going forward.

14   Nobody likes string exhibits, not 50 or 60 of them, but I

15   think the stipulation that you-all entered into was what you

16   agreed upon and you abided by that, and the objection was

17   outside or was stricter than we're reading the stipulation

18   that you-all entered into.  So that's what I'm doing on

19   that.

20        There are a couple of other issues I wanted to

21   raise.  I did not hear enough evidence for there to be a

22   claim of any kind of estoppel, or the inequitable conduct,

23   of course, was eliminated or removed.  But when I heard

24   Mr. Herman's testimony about the standard setting, I did not

25   hear enough evidence to suggest that there was any estoppel.

1    So I would expect that that defense would be dropped.

2          I also believe that you should go through -- and

3    I think that there are certain accused products that

4    probably should also be dropped from the case.  And when I

5    have time after the hearing, I will try and make a list of

6    those.

7          I made notes in my notes about those, but I think

8    there was insufficient evidence for some of the products to

9    remain in the case, and I think you need to look at that

10   very critically before you spend time and more of your

11   clients' money writing about accused products that probably

12   should not be in the case.

13         Similarly, any other defenses for which no

14   evidence was adduced should also be eliminated from the

15   case, and I put that burden on the Respondents, and there

16   were a few of those as well.

17         So if push comes to shove, before the next

18   hearing, I'll give you a list of both the accused products

19   and the affirmative defenses that I think should be gone

20   from the case because of lack of evidence.

21         MR. AINSWORTH:  Understood, Your Honor.  Thank

22   you.

23         MR. SWAIN:  Thank you, Your Honor.

24         JUDGE MCNAMARA:  Okay.  So I'm going to get off

25   now.  I'll see you back here at 4:45?

1    MR. AINSWORTH:  Very good.  Thank you, Your

2  Honor.

3    MR. SWAIN:  Thank you, Your Honor.

4    JUDGE MCNAMARA:  All right.  See you shortly.

5    (Whereupon, the proceedings recessed at 4:05

6  p.m.)

7    (In session at 4:48 p.m.)

8    JUDGE MCNAMARA:  Okay.  I see Mr. Swain and I'm

9  looking to see if Mr. Ainsworth is back yet.

10    Hello, Ms. Kinkade.  How are you doing?

11    All right.  There you are, Mr. Ainsworth.

12    How are we doing?

13    MR. SWAIN:  Your Honor, the parties have met and

14  conferred.  We have an agreed-upon list for Mr. Herman, and

15  I believe we are close -- I think we have an agreement on

16  Dr. Vander Veen as well, but Mr. Ainsworth can provide

17  confirmation there.

18    MR. AINSWORTH:  We're still going through the

19  list.  It's a rather long list for Dr. Vander Veen, and --

20    JUDGE MCNAMARA:  Do you need a little more time?

21    MR. AINSWORTH:  Please.

22    JUDGE MCNAMARA:  Sure.  How about if I come back

23  on, let's say, at 5:00?  It's ten of now.

24    MR. AINSWORTH:  That should be fine.

25    JUDGE MCNAMARA:  Okay.  Then I'll see you back

1   here at 5:00.

2          MR. AINSWORTH:  Thank you, Your Honor.

3          (Whereupon, the proceedings recessed at 4:49

4   p.m.)

5          (In session at 5:00 p.m.)

6          JUDGE MCNAMARA:  Hello everyone.

7          MR. SWAIN:  Your Honor, there are people on this

8   side that are still working to get Dr. Vander Veen affirmed.

9   I'm hoping Mr. Ainsworth can give us the latest on this.  I

10  don't think there's much objectionable left.

11         MR. AINSWORTH:  I think we're ready -- should be

12  an email going back to the other side here in about a minute

13  saying we're ready to go.

14         JUDGE MCNAMARA:  All right.  I'll give you five

15  more minutes.  We'll just keep coming back in.  We'll get

16  this done.

17         MR. AINSWORTH:  Thank you, Your Honor.

18         (Whereupon, the proceedings recessed at 5:01

19  p.m.)

20         (In session at 5:04 p.m.)

21         JUDGE MCNAMARA:  What I would like you to do,

22  please, is just say for the record that the list has been

23  submitted, that it will be filed on EDIS, and just broadly

24  what it covers.

25         MR. SWAIN:  Your Honor, I don't know if anyone

1   can hear me, but I can't hear.

2           JUDGE MCNAMARA:  Can you hear me?

3           MR. AINSWORTH:  I can hear you.

4           JUDGE MCNAMARA:  Mr. Swain, can you hear me?  I

5   don't think he can hear me.

6           MR. AINSWORTH:  I guess now is the time for me to

7   make my best arguments.

8           MR. SWAIN:  Your Honor, if I might interject, I

9   could not hear you just now.

10          JUDGE MCNAMARA:  I know.  I know you couldn't.

11  Just so that you know, when you see the record,

12  Mr. Ainsworth made a remark about making his best arguments

13  now that you can't hear him.

14          MR. SWAIN:  I'm so sorry I missed it.

15          JUDGE MCNAMARA:  We're back.  What I was asking

16  was that I just saw the email come across.  Please just --

17          I think, Mr. Ainsworth, since you represent

18  Complainant, why don't you put on the record that you agreed

19  upon a list of exhibits and for which witnesses, and

20  Mr. Swain can affirm, and we'll get that into the record,

21  and a list can be submitted to Ms. Kinkade and you can file

22  on EDIS.

23          Were there any objectionable exhibits?

24          Go ahead, Mr. Swain.  Can you hear me?

25          MR. SWAIN:  Your Honor, I would like to introduce

1   an individual, Mr. Phillip Wolfe, who has done a lot of work

2   on this case and has not had a chance to make an appearance.

3   I would like Mr. Phillip Wolfe to formally move the exhibits

4   into evidence.

5            JUDGE MCNAMARA:  That would be terrific.

6            Mr. Ainsworth, how about if we go that route?

7            MR. AINSWORTH:  Absolutely.  If Mr. Wolfe could

8   also move in both day four and day five, that would be

9   great.

10           JUDGE MCNAMARA:  That would be great.

11           Good afternoon, Mr. Wolfe.  Did you hear that?

12           MR. WOLFE:  Yes, I did.  Good morning, Your

13   Honor, or good afternoon.  Excuse me.

14           JUDGE MCNAMARA:  Good afternoon.  I'm glad you're

15   able to do this.  This is good.

16           So what I'm asking you to do is to move into

17   evidence the exhibit lists and the exhibits that the parties

18   have agreed upon.  So go ahead.  You've got the floor.

19           MR. WOLFE:  Thank you, Your Honor.  Respondents

20   would like to formally move in the agreed-upon exchanged

21   exhibits for Mr. Herman and Dr. Vander Veen.

22           JUDGE MCNAMARA:  All right.  And so you will

23   submit those into evidence on EDIS as well as those to

24   Ms. Kinkade, correct?

25           MR. WOLFE:  Yes, Your Honor.

1    JUDGE MCNAMARA:  Okay.  Mr. Ainsworth, is there

2  anything you would like to add, or do you agree with the

3  list that you've seen so far that Mr. Wolfe is moving

4  into -- any exhibits that Mr. Wolfe has moved into evidence?

5    MR. AINSWORTH:  Your Honor, I also believe we

6  need to move the exhibits from day four, which would be

7  Mr. Zhang, Ms. Hill, Mr. Kellam -- and, I'm sorry, it's been

8  a long week and I'm trying -- who else -- oh, we're also

9  moving in the Rockstraw and Green exhibits that you already

10  ruled upon.  That's on the list as well.

11    JUDGE MCNAMARA:  Yes.

12    MR. AINSWORTH:  And I believe that is it.  Thank

13  you, Your Honor.  Oh, and Dr. Crittenden was also on day

14  four as well.

15    JUDGE MCNAMARA:  Yes, he was.

16    So, Mr. Wolfe, Mr. Ainsworth has already moved

17  those additional exhibits into evidence for the individuals

18  who testified on day four.

19    So do you affirm or agree with the list of

20  exhibits and those witness exhibits that Mr. Ainsworth has

21  moved into evidence, do you affirm or agree on behalf of

22  Respondents?

23    MR. WOLFE:  Agreed.  No objection from

24  Respondents.

25    JUDGE MCNAMARA:  Very good.  Okay.  And so just

1   to confirm, my understanding is, Mr. Wolfe, that there is no

2   objection by Respondents to any of the exhibits that we've

3   mentioned, and there are no residual exhibits from at least

4   these five days of hearing that are objected to and outside

5   the lists that we've got now; is that correct?

6           MR. WOLFE:  That's correct, Your Honor.

7           JUDGE MCNAMARA:  Okay.  Very good.

8           And you agree, Mr. Ainsworth?

9           MR. AINSWORTH:  Brita agrees.  Thank you, Your

10  Honor.

11          JUDGE MCNAMARA:  Thank you.

12          So thank you, Mr. Wolfe.  It looks as though we

13  have our exhibits for these first five days admitted into

14  evidence.  And maybe, Mr. Wolfe, you'll be back for the next

15  day of hearing and can also do it again.

16          MR. WOLFE:  Absolutely, Your Honor.  Thank you.

17          (Whereupon, the exhibits, as recited and

18  reflected in the index, were received in evidence, without

19  objection.)

20          JUDGE MCNAMARA:  Very good.  Thank you.

21          Thank you everybody.  This was a very good

22  hearing, and I know how much work went into all of this.

23  And thank you to all the technical people, and, of course,

24  Ms. Kinkade, to you.  Thank you.  It makes our job so much

25  easier.

 1              THE REPORTER:  Thank you, Your Honor.

 2              MR. AINSWORTH:  Your Honor, Mr. Swain and I spoke

 3     on the break.  We have one more thing we wanted to raise

 4     with you.

 5              JUDGE MCNAMARA:  Sure.

 6              MR. AINSWORTH:  In terms of the briefing

 7     schedule, if Your Honor would agree, for our initial

 8     post-hearing briefing, because of the holiday, the Labor Day

 9     holiday, we were going to ask if we could push both those

10     dates back by two days.

11              JUDGE MCNAMARA:  Yes.  Yes, absolutely.

12              MR. AINSWORTH:  Thank you.

13              JUDGE MCNAMARA:  And the other thing is I'll be

14     out of the country anyway.

15              MR. AINSWORTH:  And then for the last brief, the

16     reply supplemental brief, if it would be okay to have seven

17     days.  You gave us four, but we agreed upon seven, if that

18     would be okay with Your Honor.

19              JUDGE MCNAMARA:  That's fine with me.

20              MR. AINSWORTH:  Thank you.

21              JUDGE MCNAMARA:  All right.  So we'll get an

22     order out on that.

23              So just to be clear, on the supplemental

24     briefing, the initial brief will be ten days from the

25     hearing, and you would like an additional seven days for the

1   reply briefs.

2        MR. AINSWORTH:  That's right, Your Honor.  Thank

3   you.

4        JUDGE MCNAMARA:  And then you would like an

5   additional two days added on to each of the pre-hearing --

6   I'm sorry -- the post-hearing brief for the five days we

7   just finished and an additional two days as well for the

8   reply briefs.

9        Is my understanding accurate?

10       MR. AINSWORTH:  That's correct, Your Honor.

11   Thank you.

12       MR. SWAIN:  Your Honor, and Mr. Ainsworth, I'm

13   sorry to interject, I just want to make sure, because I

14   think the two days does push us to a Sunday on the reply.

15   In sum, it's a joint motion to move the initial post-hearing

16   brief from September 7th to the 9th, and that, in turn,

17   moves the reply brief from September 16th to the 19th.

18       JUDGE MCNAMARA:  That works.  Okay.

19       So, again, to repeat, to make sure that I'm

20   granting the correct joint motion, the initial post-hearing

21   briefs from this five days will be due on September 9th, and

22   the reply briefs from these five days will be due on the

23   19th of September.

24       MR. AINSWORTH:  Thank you, Your Honor.

25       JUDGE MCNAMARA:  All right.  Well, thank you

1  everybody.  Again, I really appreciate it.  Have a good rest

2  of your day, and I will see you -- I'll be waiting to hear

3  which day you've chosen in October.  Please file something

4  on EDIS, or if you're down to two days, you know, let me

5  know and I'll pick one.  Whichever way you want to do it,

6  I've made those days available, so they're available.

7          MR. SWAIN:  Your Honor, I have one last thing I

8  would like to state for the record.

9          JUDGE MCNAMARA:  Sure.

10          MR. SWAIN:  I would like to thank you,

11  Ms. Muhammad, Ms. Lee, Ms. Alanko, especially new to your

12  bench, and especially Ms. Kinkade, who I want her to keep

13  typing down these words.  We all know she is the best in the

14  business and does a fantastic job with these hearings every

15  time.

16          And I would also like to thank on our team

17  Ms. Healy and Ms. Walltower as well as the On the Record

18  team for doing a superb job making us all look good.

19          So I just wanted to make sure that was on the

20  record.  And thank you, especially, Your Honor, for your

21  time.  We look forward to seeing you in October.

22          JUDGE MCNAMARA:  My pleasure.  And thank you

23  again.  And, again, both trial teams were terrific.  And

24  your technical people are wonderful, and you do an amazing

25  job, you really do.

1       So thank you, thank you both, and thank you all,

2   and we'll see you in October.

3           MR. AINSWORTH:  Thank you, Your Honor.

4           MR. SWAIN:  Thank you, Your Honor.

5           JUDGE MCNAMARA:  Ms. Kinkade, we'll see you soon.

6           THE REPORTER:  Thank you, Your Honor.

7   //

8

9           (Whereupon, the proceedings concluded at 5:13

10  p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C O N T E N T S

 2               INDEX OF WITNESSES

 3
                                    RE-    RE-
     WITNESS            DIRECT CROSS DIRECTCROSS

 5   ROBERT HERMAN...............1135   1155  1235  1228

 6   THOMAS D. VANDER VEEN.......1239   1267

 7

 8

 9   AFTERNOON SESSION                      1238

10

11

12   CONFIDENTIAL SESSIONS                  1144-1154

13                                          1193-1199

14                                          1227-1231

15                                          1236-1237

16                                          1244-1315

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXHIBITS

 2         EXHIBIT LISTS SUBMITTED FOR ADMISSION:

 3         RDX-0002

 4         RX-0659C

 5         RX-0192C

 6         RX-0210C

 7         RX-0194C

 8         RX-0195C

 9         RX-0214C

10         RX-0986C

11         RX-0709C

12         RX-0710C

13         RX-1043

14         RPX-0114

15         RPX-0116

16         RPX-0117

17         CX-0957C

18         CX-0944C

19         CX-0471C

20         CX-0176C

21         CX-0177C

22         CX-0187C

23         CX-0049C

24         CX-0047C

25         CX-0179C
```

| | |
|---|---|
| 1 | CX-0144C |
| 2 | CX-0181C |
| 3 | CPX-0067C |
| 4 | CX-0185C |
| 5 | CX-0180C |
| 6 | CX-0159 |
| 7 | CX-0165 |
| 8 | RX-2612C |
| 9 | RDX-0005 |
| 10 | RDX-0021 |
| 11 | RX-2530 |
| 12 | RX-0507C |
| 13 | RX-0735C |
| 14 | RX-0740C |
| 15 | RX-0742C |
| 16 | RX-0750C |
| 17 | RX-0760C |
| 18 | RX-0774C |
| 19 | RX-0779C |
| 20 | RX-0788C |
| 21 | RX-0798C |
| 22 | RX-0799C |
| 23 | RX-0800C |
| 24 | RX-0803C |
| 25 | RX-0810C |

```
 1          RX-1403C

 2          RX-1404C

 3          RX-1405C

 4          RX-1407C

 5          RX-1537C

 6          RX-2445C

 7          RX-2447C

 8          RX-2448C

 9          RX-2449C

10          RX-2450C

11          RPX-0121C

12          RPX-0122C

13          RPX-0123C

14          RPX-0124C

15          ------------------------------

16          CDX-0001C

17          CPX-0011C

18          CPX-0012C

19          CX-0108C

20          CX-0114C

21          CX-0118C

22          CX-0119C

23          CX-0139C

24          CX-0143C

25          CX-0186C
```

| | |
|---|---|
| 1 | CX-0922C |
| 2 | CX-0932C |
| 3 | JX-0022 |
| 4 | RDX-0001 |
| 5 | RDX-0015 |
| 6 | RDX-0018 |
| 7 | RDX-0019 |
| 8 | CDX-0004C |
| 9 | CPX-0070C |
| 10 | CPX-0073C |
| 11 | CPX-0152C |
| 12 | CX-0010 |
| 13 | CX-0011 |
| 14 | CX-0063C |
| 15 | CX-0075C |
| 16 | CX-0108C |
| 17 | CX-0121C |
| 18 | CX-0127C |
| 19 | CX-0133C |
| 20 | CX-0168 |
| 21 | CX-0170 |
| 22 | CX-0171 |
| 23 | CX-0173 |
| 24 | CX-0191C |
| 25 | CX-0194C |

| | |
|---|---|
| 1 | CX-0211C |
| 2 | CX-0212C |
| 3 | CX-0222C |
| 4 | CX-0223C |
| 5 | CX-0227C |
| 6 | CX-0237C |
| 7 | CX-0238C |
| 8 | CX-0240C |
| 9 | CX-0242C |
| 10 | CX-0245C |
| 11 | CX-0247C |
| 12 | CX-0249C |
| 13 | CX-0251C |
| 14 | CX-0252C |
| 15 | CX-0253C |
| 16 | CX-0269C |
| 17 | CX-0273C |
| 18 | CX-0319 |
| 19 | CX-0910C |
| 20 | CX-0911C |
| 21 | CX-0912C |
| 22 | JX-0022 |
| 23 | RDX-0013C |
| 24 | RDX-0020C |
| 25 | RPX-0043C |

| | |
|---|---|
| 1 | RPX-0054C |
| 2 | RPX-0060C |
| 3 | RPX-0102C |
| 4 | RPX-0159C |
| 5 | RX-0379C |
| 6 | RX-0416C |
| 7 | RX-0432C |
| 8 | RX-0511C |
| 9 | RX-0555C |
| 10 | RX-0599 |
| 11 | RX-1005C |
| 12 | RX-1010 |
| 13 | RX-1572 |
| 14 | RX-1573 |
| 15 | RX-1916 |
| 16 | RX-2066 |
| 17 | RX-2131 |
| 18 | RX-2579C |
| 19 | CX-0690C |
| 20 | CX-0691C |
| 21 | CX-0692C |
| 22 | CX-0693C |
| 23 | CX-0694C |
| 24 | CX-0695C |
| 25 | CX-0696C |

| 1  | CX-0698C |
|----|----------|
| 2  | CX-0699C |
| 3  | RX-2600C |
| 4  | RX-2607C |
| 5  | RX-2608C |
| 6  | RX-2609C |
| 7  | RX-2610C |
| 8  | RX-2611C |
| 9  | CX-0006C |
| 10 | CX-0165  |
| 11 | CX-0166  |
| 12 | CX-0228C |
| 13 | CX-0274C |
| 14 | CX-0275C |
| 15 | CX-0276C |
| 16 | CX-0277C |
| 17 | CX-0278C |
| 18 | CX-0279C |
| 19 | CX-0280C |
| 20 | CX-0281C |
| 21 | CX-0284C |
| 22 | CX-0291C |
| 23 | CX-0292C |
| 24 | CX-0294C |
| 25 | CX-0295C |

| | |
|---|---|
| 1 | CX-0301C |
| 2 | CX-0303C |
| 3 | CX-0306C |
| 4 | CX-0307C |
| 5 | CX-0308C |
| 6 | CX-0311C |
| 7 | CX-0312C |
| 8 | CX-0313C |
| 9 | CX-0314C |
| 10 | CX-0325C |
| 11 | CX-0326C |
| 12 | CX-0327C |
| 13 | CX-0328C |
| 14 | CX-0329C |
| 15 | CX-0330 |
| 16 | CX-0334 |
| 17 | CX-0455 |
| 18 | CX-0457C |
| 19 | CX-0458 |
| 20 | CX-0459C |
| 21 | CX-0463C |
| 22 | CX-0464C |
| 23 | CX-0466C |
| 24 | CX-0470C |
| 25 | CX-0471C |

| | |
|---|---|
| 1 | CX-0476C |
| 2 | CX-0481C |
| 3 | CX-0482C |
| 4 | CX-0484C |
| 5 | CX-0485C |
| 6 | CX-0486C |
| 7 | CX-0487C |
| 8 | CX-0488C |
| 9 | CX-0489C |
| 10 | CX-0490C |
| 11 | CX-0491C |
| 12 | CX-0492C |
| 13 | CX-0520C |
| 14 | CX-0545C |
| 15 | CX-0568C |
| 16 | CX-0569C |
| 17 | CX-0571C |
| 18 | CX-0587C |
| 19 | CX-0588C |
| 20 | CX-0590C |
| 21 | CX-0868C |
| 22 | CX-0870C |
| 23 | RPX-0039C |
| 24 | RPX-0040C |
| 25 | RPX-0041C |

| 1  | RPX-0042C |
|----|-----------|
| 2  | RPX-0043C |
| 3  | RPX-0061  |
| 4  | RPX-0062  |
| 5  | RPX-0066C |
| 6  | RPX-0102  |
| 7  | RX-0111C  |
| 8  | RX-0157C  |
| 9  | RX-0169C  |
| 10 | RX-0177C  |
| 11 | RX-0179C  |
| 12 | RX-0359   |
| 13 | RX-0362C  |
| 14 | RX-0379C  |
| 15 | RX-0380C  |
| 16 | RX-0381C  |
| 17 | RX-0382C  |
| 18 | RX-0383C  |
| 19 | RX-0384C  |
| 20 | RX-0385C  |
| 21 | RX-0386C  |
| 22 | RX-0387C  |
| 23 | RX-0388C  |
| 24 | RX-0389C  |
| 25 | RX-0390C  |

| | |
|---|---|
| 1 | RX-0392C |
| 2 | RX-0393C |
| 3 | RX-0394C |
| 4 | RX-0396C |
| 5 | RX-0402C |
| 6 | RX-0403C |
| 7 | RX-0405C |
| 8 | RX-0406C |
| 9 | RX-0413C |
| 10 | RX-0414C |
| 11 | RX-0415C |
| 12 | RX-0416C |
| 13 | RX-0417C |
| 14 | RX-0418C |
| 15 | RX-0425C |
| 16 | RX-0426C |
| 17 | RX-0427C |
| 18 | RX-0428C |
| 19 | RX-0432C |
| 20 | RX-0433C |
| 21 | RX-0434C |
| 22 | RX-0437C |
| 23 | RX-0438C |
| 24 | RX-0441C |
| 25 | RX-0444C |

| | |
|---|---|
| 1 | RX-0445C |
| 2 | RX-0446C |
| 3 | RX-0447C |
| 4 | RX-0452C |
| 5 | RX-0454C |
| 6 | RX-0460C |
| 7 | RX-0461C |
| 8 | RX-0462C |
| 9 | RX-0466C |
| 10 | RX-0467C |
| 11 | RX-0468C |
| 12 | RX-0473C |
| 13 | RX-0474C |
| 14 | RX-0476 |
| 15 | RX-0477 |
| 16 | RX-0500C |
| 17 | RX-0502C |
| 18 | RX-0511C |
| 19 | RX-0597 |
| 20 | RX-0598 |
| 21 | RX-0599 |
| 22 | RX-0600 |
| 23 | RX-0601 |
| 24 | RX-0602 |
| 25 | RX-0604 |

| | |
|---|---|
| 1 | RX-0605 |
| 2 | RX-0607 |
| 3 | RX-0609 |
| 4 | RX-0610 |
| 5 | RX-0614C |
| 6 | RX-0618C |
| 7 | RX-0620C |
| 8 | RX-0625C |
| 9 | RX-0631 |
| 10 | RX-0632 |
| 11 | RX-0633C |
| 12 | RX-0634C |
| 13 | RX-0635C |
| 14 | RX-0715C |
| 15 | RX-0716C |
| 16 | RX-0723C |
| 17 | RX-0852 |
| 18 | RX-0853 |
| 19 | RX-0854 |
| 20 | RX-0855 |
| 21 | RX-0856 |
| 22 | RX-0857 |
| 23 | RX-0858 |
| 24 | RX-0859 |
| 25 | RX-0860 |

| | |
|---|---|
| 1 | RX-0861 |
| 2 | RX-0989 |
| 3 | RX-0991 |
| 4 | RX-0995 |
| 5 | RX-0998 |
| 6 | RX-0999 |
| 7 | RX-1003 |
| 8 | RX-1005C |
| 9 | RX-1006 |
| 10 | RX-1007 |
| 11 | RX-1043 |
| 12 | RX-1059 |
| 13 | RX-1060 |
| 14 | RX-1066 |
| 15 | RX-1657 |
| 16 | CDX-0008C |
| 17 | CDX-0009C |
| 18 | CDX-0009C |
| 19 | CDX-0010C |
| 20 | CPX-0021C |
| 21 | CPX-0022C |
| 22 | CPX-0022C |
| 23 | CPX-0024C |
| 24 | CPX-0024C |
| 25 | CPX-0059C |

| | |
|---|---|
| 1 | CPX-0059C |
| 2 | CPX-0060C |
| 3 | CPX-0060C |
| 4 | CPX-0061C |
| 5 | CPX-0061C |
| 6 | CPX-0063 |
| 7 | CPX-0063C |
| 8 | CPX-0063C |
| 9 | CPX-0064C |
| 10 | CPX-0064C |
| 11 | CPX-0065C |
| 12 | CPX-0065C |
| 13 | CPX-0068C |
| 14 | CPX-0068C |
| 15 | CPX-0074C |
| 16 | CPX-0115C |
| 17 | CPX-0126C |
| 18 | CX-0012C |
| 19 | CX-0024 |
| 20 | CX-0024 |
| 21 | CX-0060C |
| 22 | CX-0064C |
| 23 | CX-0074C |
| 24 | CX-0382C |
| 25 | CX-0471C |

| | |
|---|---|
| 1 | CX-0944C |
| 2 | CX-0957C |
| 3 | CX-0192C |
| 4 | RDX-14C |
| 5 | RX-0848C |
| 6 | RX-1040C |
| 7 | JX-0022 |
| 8 | JX-0023 |
| 9 | CX-0040 |
| 10 | CX-0041 |
| 11 | CX-0042 |
| 12 | CX-0043 |
| 13 | CX-0915 |
| 14 | CX-0916 |
| 15 | CX-0917 |
| 16 | CX-0918 |
| 17 | CX-0919 |
| 18 | CX-0920 |
| 19 | CX-0921 |
| 20 | JX-0001 |
| 21 | JX-0012 |
| 22 | JX-0015 |
| 23 | JX-0018 |
| 24 | JX-0019 |
| 25 | JX-0020 |

```
 1          JX-0021

 2          CX-0351C

 3          CX-0352

 4          CX-0353

 5          CX-0354

 6          CX-0355

 7          CX-0356

 8          CX-0357

 9          CX-0358

10          CX-0359

11          CX-0360

12          CX-0361

13          CX-0362

14          CX-0363

15          CX-0364

16          CX-0365

17          CX-0351

18          CX-0718

19          CX-0719C

20          CX-0720C

21          CX-0721C

22          CX-0722C

23          CX-0723C

24          CX-0724C

25          CX-0725C
```

| | |
|---|---|
| 1 | CX-0726 |
| 2 | CX-0727C |
| 3 | CX-0728C |
| 4 | CX-0729C |
| 5 | CX-0730C |
| 6 | CX-0731C |
| 7 | CX-0732C |
| 8 | CX-0733 |
| 9 | CX-0734 |
| 10 | CX-0735C |
| 11 | CX-0736C |
| 12 | CX-0737C |
| 13 | CX-0738C |
| 14 | CX-0739C |
| 15 | CX-0740C |
| 16 | CX-0741C |
| 17 | CX-0742 |
| 18 | CX-0743 |
| 19 | CX-0744 |
| 20 | CX-0745C |
| 21 | CX-0746C |
| 22 | CX-0747C |
| 23 | CX-0748C |
| 24 | CX-0749C |
| 25 | CX-0750 |

| | |
|---|---|
| 1 | CX-0751 |
| 2 | CX-0752 |
| 3 | CX-0753C |
| 4 | CX-0754 |
| 5 | CX-0755C |
| 6 | CX-0756C |
| 7 | CX-0757C |
| 8 | CX-0758C |
| 9 | CX-0759C |
| 10 | CX-0760C |
| 11 | CX-0761C |
| 12 | CX-0762C |
| 13 | CX-0763C |
| 14 | CX-0764C |
| 15 | CX-0765C |
| 16 | CX-0766 |
| 17 | CX-0767C |
| 18 | CX-0768C |
| 19 | CX-0769C |
| 20 | CX-0770C |
| 21 | CX-0771C |
| 22 | CX-0772C |
| 23 | CX-0773 |
| 24 | CX-0774C |
| 25 | CX-0775 |

| 1  | CX-0776C |
| 2  | CX-0777C |
| 3  | CX-0778C |
| 4  | CX-0779  |
| 5  | CX-0780C |
| 6  | CX-0781C |
| 7  | CX-0782C |
| 8  | CX-0783C |
| 9  | CX-0784C |
| 10 | CX-0785C |
| 11 | CX-0786C |
| 12 | CX-0787C |
| 13 | CX-0788C |
| 14 | CX-0789C |
| 15 | CX-0790C |
| 16 | CX-0791C |
| 17 | CX-0792C |
| 18 | CX-0793C |
| 19 | CX-0794  |
| 20 | CX-0795C |
| 21 | CX-0796C |
| 22 | CX-0797C |
| 23 | CX-0798C |
| 24 | CX-0799  |
| 25 | CX-0800  |

| | |
|---|---|
| 1 | CX-0801C |
| 2 | CX-0802C |
| 3 | CX-0803C |
| 4 | CX-0804C |
| 5 | CX-0805C |
| 6 | CX-0806C |
| 7 | CX-0807 |
| 8 | CX-0808 |
| 9 | CX-0809 |
| 10 | CX-0810 |
| 11 | CX-0811C |
| 12 | CX-0812 |
| 13 | CX-0813 |
| 14 | CX-0814C |
| 15 | CX-0815C |
| 16 | CX-0816 |
| 17 | CX-0817 |
| 18 | CX-0818 |
| 19 | CX-0819 |
| 20 | CX-0820C |
| 21 | CX-0821C |
| 22 | CX-0822 |
| 23 | CX-0823 |
| 24 | CX-0824 |
| 25 | CX-0825 |

| | |
|---|---|
| 1 | CX-0826C |
| 2 | CX-0827 |
| 3 | CX-0828 |
| 4 | CX-0829 |
| 5 | CX-0830 |
| 6 | RX-1078C |
| 7 | RX-1079C |
| 8 | RX-1080C |
| 9 | RX-1082C |
| 10 | RX-1083C |
| 11 | RX-1084C |
| 12 | RX-1085C |
| 13 | RX-1086C |
| 14 | RX-1087C |
| 15 | RX-1088C |
| 16 | RX-1089C |
| 17 | RX-1090C |
| 18 | RX-1091C |
| 19 | RX-1092C |
| 20 | RX-1093C |
| 21 | RX-1094C |
| 22 | RX-1095C |
| 23 | RX-1096C |
| 24 | RX-1097C |
| 25 | RX-1098C |

| | |
|---|---|
| 1 | RX-1099C |
| 2 | RX-1100C |
| 3 | RX-1101C |
| 4 | RX-1102C |
| 5 | RX-1103C |
| 6 | RX-1104C |
| 7 | RX-1105C |
| 8 | RX-1106C |
| 9 | RX-1107 |
| 10 | RX-1108C |
| 11 | RX-1109C |
| 12 | RX-1110C |
| 13 | RX-1111C |
| 14 | RX-1112C |
| 15 | RX-1113C |
| 16 | RX-1114C |
| 17 | RX-1115C |
| 18 | RX-1116C |
| 19 | RX-1633C |
| 20 | RX-2252C |
| 21 | RX-2253C |
| 22 | RX-2254C |
| 23 | RX-2555C |
| 24 | RX-2556C |
| 25 | RX-2557C |

| | |
|---|---|
| 1 | RX-2558C |
| 2 | RX-2559C |
| 3 | RX-2560C |
| 4 | RX-2561C |
| 5 | RX-2562C |
| 6 | RX-2563C |
| 7 | RX-2564C |
| 8 | RX-2565C |
| 9 | RX-1646 |
| 10 | RX-1647 |
| 11 | RX-1648 |
| 12 | RX-1649C |
| 13 | RX-1650 |
| 14 | RX-1651 |
| 15 | RX-1652 |
| 16 | RX-1653 |
| 17 | RX-1654 |
| 18 | RX-1655 |
| 19 | RX-1656 |
| 20 | RX-1657 |
| 21 | RX-1658 |
| 22 | RX-1659 |
| 23 | RX-1660 |
| 24 | RX-1661 |
| 25 | RX-1662 |

1368

| | |
|---|---|
| 1 | RX-1663 |
| 2 | RX-1664 |
| 3 | RX-1665 |
| 4 | RX-1666 |
| 5 | RX-1667 |
| 6 | RX-1668 |
| 7 | RX-1669 |
| 8 | RX-1670 |
| 9 | RX-1671 |
| 10 | RX-1672 |
| 11 | RX-1673 |
| 12 | RX-1674C |
| 13 | RX-1675 |
| 14 | RX-2601 |
| 15 | RX-2602 |
| 16 | RX-2603 |
| 17 | CX-0688C |
| 18 | RX-2604C |
| 19 | RX-2606C |
| 20 | RX-2598C |
| 21 | RX-2550C |
| 22 | RX-2551C |
| 23 | RX-2597C |
| 24 | RPX-0149C |
| 25 | RPX-0150C |

```
1          RPX-0151C

2          RX-0246C

3          --------------------------

4          David Rockstraw:

5          CPX-0104C

6          CX-0001C

7          CX-0013C

8          CX-0016

9          CX-0018

10         CX-0020

11         CX-0021

12         CX-0022

13         CX-0023

14         CX-0032

15         CX-0035

16         CX-0036

17         CX-0038

18         CX-0080C

19         CX-0147C

20         CX-0150C

21         CX-0151C

22         CX-0152C

23         CX-0154C

24         CX-0155C

25         CX-0157
```

```
 1          CX-0159

 2          CX-0160

 3          CX-0161

 4          CX-0162

 5          CX-0163

 6          CX-0164

 7          CX-0174

 8          CX-0175C

 9          CX-0204C

10          CX-0282C

11          CX-0283C

12          CX-0456C

13          CX-0519C

14          CX-0565

15          CX-0566

16          CX-0570C

17          CX-0581C

18          CX-0701

19          CX-0943

20          Phil Green:

21          CPX-0014C

22          CPX-0017C

23          CPX-0019C

24          CPX-0020C

25          CPX-0023C
```

| | |
|---|---|
| 1 | CPX-0025C |
| 2 | CPX-0026C |
| 3 | CPX-0067C |
| 4 | CPX-0082C |
| 5 | CPX-0085C |
| 6 | CPX-0086C |
| 7 | CPX-0097C |
| 8 | CPX-0104C |
| 9 | CPX-0105C |
| 10 | CPX-0107C |
| 11 | CPX-0112C |
| 12 | CPX-0113C |
| 13 | CPX-0114C |
| 14 | CPX-0116C |
| 15 | CPX-0117C |
| 16 | CPX-0118C |
| 17 | CPX-0119C |
| 18 | CPX-0120C |
| 19 | CPX-0121C |
| 20 | CPX-0122C |
| 21 | CPX-0123C |
| 22 | CPX-0124C |
| 23 | CPX-0125C |
| 24 | CPX-0127C |
| 25 | CPX-0128C |

| | |
|---|---|
| 1 | CPX-0129C |
| 2 | CPX-0130C |
| 3 | CPX-0131C |
| 4 | CPX-0132C |
| 5 | CPX-0133C |
| 6 | CPX-0134C |
| 7 | CPX-0135C |
| 8 | CX-0003C |
| 9 | CX-0007C |
| 10 | CX-0022 |
| 11 | CX-0023 |
| 12 | CX-0044C |
| 13 | CX-0045C |
| 14 | CX-0046C |
| 15 | CX-0047C |
| 16 | CX-0048C |
| 17 | CX-0049C |
| 18 | CX-0050C |
| 19 | CX-0051C |
| 20 | CX-0065C |
| 21 | CX-0124C |
| 22 | CX-0134C |
| 23 | CX-0144C |
| 24 | CX-0145C |
| 25 | CX-0163 |

| | |
|---|---|
| 1 | CX-0176C |
| 2 | CX-0177C |
| 3 | CX-0179C |
| 4 | CX-0180C |
| 5 | CX-0181C |
| 6 | CX-0185C |
| 7 | CX-0187C |
| 8 | CX-0268C |
| 9 | CX-0317C |
| 10 | CX-0318C |
| 11 | CX-0321C |
| 12 | CX-0366 |
| 13 | CX-0367C |
| 14 | CX-0368C |
| 15 | CX-0369C |
| 16 | CX-0370C |
| 17 | CX-0371C |
| 18 | CX-0372C |
| 19 | CX-0373C |
| 20 | CX-0374C |
| 21 | CX-0375C |
| 22 | CX-0376C |
| 23 | CX-0377C |
| 24 | CX-0378C |
| 25 | CX-0381C |

| | |
|---|---|
| 1 | CX-0383C |
| 2 | CX-0384C |
| 3 | CX-0385C |
| 4 | CX-0386C |
| 5 | CX-0387C |
| 6 | CX-0388C |
| 7 | CX-0389C |
| 8 | CX-0390C |
| 9 | CX-0391C |
| 10 | CX-0392C |
| 11 | CX-0393C |
| 12 | CX-0394C |
| 13 | CX-0395C |
| 14 | CX-0396C |
| 15 | CX-0397C |
| 16 | CX-0398C |
| 17 | CX-0399C |
| 18 | CX-0400C |
| 19 | CX-0402C |
| 20 | CX-0403C |
| 21 | CX-0404C |
| 22 | CX-0405C |
| 23 | CX-0406C |
| 24 | CX-0407C |
| 25 | CX-0408C |

| 1  | CX-0409C |
| 2  | CX-0410C |
| 3  | CX-0411C |
| 4  | CX-0412C |
| 5  | CX-0413C |
| 6  | CX-0414C |
| 7  | CX-0415C |
| 8  | CX-0416C |
| 9  | CX-0417C |
| 10 | CX-0418C |
| 11 | CX-0419C |
| 12 | CX-0420C |
| 13 | CX-0421C |
| 14 | CX-0422C |
| 15 | CX-0423C |
| 16 | CX-0424C |
| 17 | CX-0425C |
| 18 | CX-0426C |
| 19 | CX-0427C |
| 20 | CX-0428C |
| 21 | CX-0429C |
| 22 | CX-0430C |
| 23 | CX-0461C |
| 24 | CX-0493C |
| 25 | CX-0494C |

| 1  | CX-0521C |
|----|----------|
| 2  | CX-0522C |
| 3  | CX-0523C |
| 4  | CX-0524C |
| 5  | CX-0525C |
| 6  | CX-0526C |
| 7  | CX-0527C |
| 8  | CX-0528C |
| 9  | CX-0529C |
| 10 | CX-0530C |
| 11 | CX-0531C |
| 12 | CX-0532C |
| 13 | CX-0533C |
| 14 | CX-0534C |
| 15 | CX-0535C |
| 16 | CX-0536C |
| 17 | CX-0537C |
| 18 | CX-0538C |
| 19 | CX-0539C |
| 20 | CX-0540C |
| 21 | CX-0541C |
| 22 | CX-0542C |
| 23 | CX-0543C |
| 24 | CX-0544C |
| 25 | CX-0852  |

```
1        CX-0855

2        CX-0902C

3        CX-0961

4        Herman:

5        RX-0084

6        RDX-0007C

7        RPX-0108

8        RPX-0113

9        RPX-0111

10       RX-0210C

11       RX-0194C

12       RX-0195C

13       RX-0214C

14       RPX-0150C

15       RPX-0106

16       RX-0331

17       RX-0108

18       RPX-0103

19       RX-0635C

20       RX-0986C

21       RX-0111C

22       RX-0473C

23       RPX-0110C

24       RPX-0113C

25       RX-0684C to RX-0707C
```

| | |
|---|---|
| 1 | RPX-0106 |
| 2 | RX-0684 |
| 3 | RPX-105 |
| 4 | RX-0709 |
| 5 | RX-0710 |
| 6 | RX-0985C |
| 7 | RPX-0105 |
| 8 | RPX-0153 |
| 9 | RX-0252 |
| 10 | RX-0474C |
| 11 | RX-0760C |
| 12 | RX-1649C |
| 13 | RX-0774C |
| 14 | RX-0803C |
| 15 | RX-0760C |
| 16 | RPX-0103-RPX-0109 |
| 17 | RX-0600 |
| 18 | RX-0177C |
| 19 | CDX-0017C |
| 20 | Vander Veen Direct: |
| 21 | CPX-0002 |
| 22 | CPX-0003 |
| 23 | CPX-0011C |
| 24 | CPX-0022C |
| 25 | CX-0047C |

| | |
|---|---|
| 1 | CPX-0026C |
| 2 | CX-0051C |
| 3 | CX-0252C |
| 4 | CPX-0060C |
| 5 | CX-0176C |
| 6 | CPX-0064C |
| 7 | CX-0180C |
| 8 | CPX-0067C |
| 9 | CX-0185C |
| 10 | CPX-0074C |
| 11 | CX-0251C |
| 12 | CPX-0062C |
| 13 | CX-0078C |
| 14 | CX-0178C |
| 15 | RDX-0011C |
| 16 | RDX-0011C |
| 17 | RPX-0101C |
| 18 | CPX-0019C |
| 19 | CX-0044C |
| 20 | RX-0892C |
| 21 | RX-0909C |
| 22 | RX-1304C |
| 23 | RX-1307C |
| 24 | RX-1309C |
| 25 | RX-1311C |

```
1          CPX-0111C

2          CX-0520C

3          CPX-0064C

4          CX-0180C

5          RX-1471C

6          RX-2483C

7          RX-2484C

8          Vander Veen Cross:

9          CX-0269C

10         CDX-0016C

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        C E R T I F I C A T E

2    TITLE: IN THE MATTER OF CERTAIN HIGH-PERFORMANCE GRAVITY-FED

3    WATER FILTERS AND PRODUCTS CONTAINING THE SAME

4    INVESTIGATION NO.:  337-TA-1294

5    HEARING DATE:  August 23, 2022

6    LOCATION:  Washington, D.C. - Remote

7    NATURE OF HEARING:  Evidentiary Hearing

8         I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9    above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:  August 23, 2022
     Signed:
11   ss//    _____

12   Signature of the Contractor or the Authorized Contractor's
     Representative

13

14        I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//    Raymond G. Brynteson

20

21        I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//    Linda Kerkade

25